IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CATHY CLEILAND;                         )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        Civil Action No.:
                                        )        2:07-CV-00486-MEF-SRW
LIFE INSURANCE COMPANY OF               )
NORTH AMERICA;                          )
TEMPLE-INLAND DISABILITY                )
HEALTH AND WELFARE PLAN; and            )
TEMPLE INLAND FOREST PRODUCTS           )
CORPORATION;                            )
                                        )
        Defendants.                     )

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Plaintiff, Cathy Cleiland, and files this Brief in Support

of Plaintiff's Motion for Partial Summary Judgment.  Plaintiff has such a severely

disabling back condition that she has had three laminectomies and has been under

constant medical management for debilitating pain for almost four years.  Life

Insurance Company of North America ("LINA") was not only aware of Plaintiff's

painful and disabling condition but it profited from it to the tune of over $25,000

by representing to the Social Security Administration that she was prevented from

working in any occupation due to her disabilities.  After LINA convinced the

1

Social Security Administration that Plaintiff was disabled and received its $25,000 resulting therefrom, LINA arbitrarily changed its position, stating that Plaintiff was not disabled so that it would not be required to pay her any further disability benefits. Defendants continued to add insult to injury, even after LINA's arbitrary denial of Plaintiff's benefits, by refusing to provide her with copies of all "relevant" records within the statutorily prescribed time.

Plaintiff therefore seeks an order from this Court finding 1) Life Insurance Company of North America's ("LINA") wrongful denial of Plaintiff's claims for Long Term Disability ("LTD") benefits arbitrary and capricious and 2) imposing a penalty against all Defendants of $110 per day for their failure to provide plan documents within thirty days pursuant to 29 U.S.C. § 1132(c).

This motion is supported by the Temple-Inland Disability Health and Welfare Plan, correspondence between the parties, documents submitted by Plaintiff to Defendants during their review of her claim, documents produced by Advantage 2000 Consultants and documents from the claim file produced by LINA, attached hereto as Exhibits A through V.

## Narrative Summary of Undisputed Facts

**A.     LINA's Denial of Plaintiff's Claim for LTD Benefits.**

1.    At all times relevant hereto, Plaintiff was insured by the Temple-Inland Disability Health and Welfare Plan (hereinafter "Plan"), which is issued by LINA. *See* Exhibit A, Copy of Plan and Doc. # 11 at ¶ 8, LINA's Answer.

2.   The Plan provides the following Definition of Disability:

An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, the Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn 80% or more of his or her Indexed Covered Earnings.

Exhibit A at LINA/Cleiland 0494.

3.   From 2002 through 2003, Plaintiff suffered painful back problems that required a laminectomy,[1] which was performed by Dr. Hackman, Plaintiff's neurosurgeon, on May 21, 2003.  *See* Exhibit B at LINA-Cleiland 1055.

---

[1] A laminectomy is a surgical procedure in which the surgeon cuts into the patient's back and removes parts of the patient's vertebrae.  http://www.webmd.com/back-pain/decompressive-laminectomy-for-spinal-stenosis.  Possible complications of laminectomies include nerve injury and an instable spine.  *Id.*  These complications are increased in patients such as Plaintiff, who suffer from diabetes and undergo multiple laminectomies.  *Id.*

4.  Plaintiff thereafter submitted a Short Term Disability ("STD") Claim to LINA based on her back surgery.  Exhibit B at LINA/Cleiland 1054.

5.  Prior to Plaintiff's disability in May 2003, she worked as a Human Resource Manager at Temple-Inland.  *See* Exhibit B at LINA/Cleiland 1054-1055.

6.  LINA approved Plaintiff's claim for STD benefits through June 18, 2003.  *See* Exhibit C at LINA/Cleiland 1042.

7.  Dr. Hackman thereafter submitted an Extension of Disability Request Form identifying Plaintiff's diagnoses as Lumbar radiculitis and estimating her return to work date as August 13, 2003.  *See* Exhibit D at LINA/Cleiland 1035.

8.  Unfortunately before Plaintiff was able to return to work in August 2003, she had to undergo a second laminectomy.  *See* Exhibit E at LINA/Cleiland 1019.

9.  LINA therefore extended Plaintiff's STD benefits through October 7, 2003.  *See* Exhibit F at LINA/Cleiland 1015.

10.  On October 1, 2003, before Plaintiff's STD benefits expired, LINA converted Plaintiff's claim for Short Term Disability ("STD") benefits into a claim for Long Term Disability ("LTD") benefits.  *See* Exhibit G at LINA/Cleiland 1014.

11.  LINA's internal documents reflect its knowledge that Plaintiff's primary disabling condition is her back, that she suffers extreme pain and that she has had multiple back surgeries.  Exhibit G at LINA/Cleiland 1012 & 1014.

4

12.   In or around February 2004, LINA hired Advantage 2000 Consultants, Inc. ("Advantage") to "represent [Plaintiff] in her Social Security disability claim." Exhibit H at ADVANTAGE004.

13.   LINA hired Advantage to reduce the amount of LTD benefits it paid Plaintiff and to obtain a refund for amounts already paid.   Exhibit H at LINA/Cleiland 0789.

14.   Advantage investigated Plaintiff's disability on LINA's behalf by obtaining Plaintiff's medical records, speaking to Plaintiff and her Attending Physicians, and thereafter made the determination and representation that Plaintiff is "disabled and unable to engage in any substantial, gainful activity."  Exhibit I at ADVANTAGE165.

15.   Based on Advantage's determination, it represented to the Social Security Administration Judge that Plaintiff "has not been able to return to [her] work, *or any work* since her onset date of 5/14/03" and that "the limitations posed by her continued impairments would limit her ability to perform even a full range of sedentary work."  Exhibit H at ADVANTAGE236-237.

16.   Advantage kept LINA fully apprised of its investigation and findings related to Plaintiff's claim for Social Security disability benefits.  *See* Exhibit H at ADVANTAGE033-44, 060, 070-072.

5

17.   On May 26, 2005, and as a result of Advantage's representations regarding Plaintiff's disability, the Social Security Administration issued a "fully favorable" decision, finding Plaintiff disabled.  *See* Exhibit I, LINA/Cleland 0806-0814.

18.  Advantage forwarded the SSA's favorable decision to LINA on May 31, 2005, stating that they "will forward the payment information once received."  *See* Exhibit I at LINA/Cleland 0804.

19.   On July 5, 2005, Advantage sent LINA a Confirmation of Plaintiff's Social Security Benefit Entitlement, which included a dollar amount of the Social Security award for past due benefits.  *See* Exhibit I at LINA/Cleland 0800-0801.

20.   Advantage also requested LINA complete an "LTD Overpayment Calculation Sheet", to give Advantage sufficient information to "contact the [Plaintiff] to coordinate the repayment of [LINA's] LTD Overpayment."  *Id.* at LINA/Cleland 0800.

21.   Upon LINA's completion of the form, Advantage demanded payment "in the amount of $25,240.66"[2] from Plaintiff based on LINA's alleged overpayment of LTD benefits.  *See* Exhibit I at LINA/Cleland at 0789.

---

[2] The total amount awarded by Social Security was $24,600.00 for past benefits.  *See* Exhibit H at ADVANTAGE 016.  Social Security also awarded $1,325.00 per month for future benefits.  *Id.*

22.   Advantage clearly states that "this money will be sent to CIGNA [LINA] and applied toward your Long Term Disability benefits overpayment." *Id.*

23.   Plaintiff thereafter was forced to send Advantage a check in the amount of $25,240.66, which was forwarded to LINA.   LINA paid Advantage at least $2,150 for its efforts on LINA's behalf.   *See* Exhibit H at ADVANTAGE074&081.

24.   LINA thereafter notified Plaintiff by correspondence dated December 7, 2005 that it would no longer pay Plaintiff disability benefits because it had allegedly "determined that [Plaintiff] do[es] not meet the … policy's Definition of Disability[.]"   Exhibit J at LINA/Cleiland 0258.

25.   In support of its decision, LINA relied heavily on an alleged telephone conversation in which "Kitty" from the Center for Pain of Montgomery, one of Plaintiff's treating medical facilities, "stated they are not disabling" Plaintiff. Exhibit J at LINA/Cleiland 0259.

26.   LINA further stated that the information failed to support that Plaintiff was "incapable of performing [her] occupation" and that she therefore does "not meet the definition of total disability from any occupation as of November 21, 2005." Exhibit J at LINA/Cleiland 0260.

27.   LINA further asserted that the medical documentation "evidenced … no current complaints of any radiating pain, numbness or tingling, no current

7

diagnostic testing [and Plaintiff's] medication usage has been stable for several months."  Exhibit J at LINA/Cleiland 0260.

28.   Plaintiff appealed LINA's denial of further LTD benefits.

29.   LINA's internal documents dated March 2, 2006 contain a notation that Plaintiff's "chronic pain appears to be stable & *no changes in treatment have occurred*."  Exhibit K at LINA/Cleiland 0065.  (Emphasis added).

30.   LINA notified Plaintiff by letter dated March 10, 2006 that it was "reaffirming [its] previous denial of benefits dated December 07, 2005."  Exhibit L.

31.   The letter reflects the basis for LINA's denial of benefits that Plaintiff's "chronic pain appears to be stable and no changes in treatment have occurred."  *Id.*

32.   Moreover, LINA states that "the documentation does not support deficits which require limitations and restrictions precluding [Plaintiff] from performing any sedentary occupation from November 21, 2005 through present." *Id.*

33.   Plaintiff notified LINA of her appeal of their March 10, 2006 denial by letter dated September 5, 2006.  *See* Exhibit M, LINA/Cleiland 0520-0521.

34.  From October 19, 2006 through January 18, 2007, Plaintiff submitted 229 pages of documents to LINA documenting her disability and resulting inability to perform in any occupation.  *See* Exhibit N (CLE00001-00229).

35.  Included in this document production were 1) Medical Opinion of Plaintiff's Attending Physician Steven D. Wise, M.D.[3]; 2) Medical Opinion of Plaintiff's Attending Physician Bret M. Johnson, M.D.[4]; 3) CV of Plaintiff's Attending Physician David P. Herrick, M.D.[5]; 4) Updated medical records from Montgomery Pain Center[6]; 5) Sworn statement of David Herrick, M.D.[7]; and 6) Vocational Analysis Report of Mark Boatner, M.Ed.[8]

36.  The medical opinion form completed by Dr. Wise, one of Plaintiff's attending physicians, addressed *just* Plaintiff's diabetes, which was *not* her primary disabling condition.  *See* Exhibit N at CLE00135-137.

37.  Dr. Wise's medical opinion is that Plaintiff cannot "be reasonably expected to be reliable in attending an eight hour a day, 40 hour work week in view of the degree of pain, fatigue or other limitations [she] experiences."  Exhibit N at CLE00136.

---

[3] Submitted October 19, 2006.
[4] Submitted November 3, 2006.
[5] Submitted November 27, 2006.
[6] Submitted November 27, 2006.
[7] Submitted November 27, 2006.
[8] Submitted January 18, 2007.

9

38.    Dr. Wise also indicated that daily, and for several hours a day, Plaintiff's medication "would cause lapses in concentration or memory on a regular basis to the extent that [Plaintiff] [can]not attend to a task or be reliable in following work instructions." *Id.*

39.    Dr. Wise also states that Plaintiff has a medical need to be absent from work on a chronic basis, approximately 5-6 times per month, as a result of her diabetes alone. *Id.*

40.    A medical opinion form completed by Dr. Johnson, one of Plaintiff's attending physicians, was submitted to LINA on November 3, 2006.

41.    Dr. Johnson addresses some of Plaintiff's primary disabling conditions involving her back: her three cervical spine surgeries, herniated disc and resulting chronic pain. *See* Exhibit N at CLE00138-140.

42.    Dr. Johnson indicates that Plaintiff is only physically capable of sitting for a period of less than one hour at a time. *Id.*

43. Dr. Johnson also states that Plaintiff is only physically capable of standing or walking for a period of less than one hour at a time. *Id.*

44.    Dr. Johnson further indicates that Plaintiff is never capable of lifting more than 20 pounds, only infrequently capable of lifting 11-20 pounds and only occasionally capable of lifting or carrying 1-10 pounds. *Id.*

10

45. Dr. Johnson further indicates that Plaintiff requires approximately six to seven hours of bedrest during a normal workday and that she would require thirty minutes of rest for every one hour of work.  Exhibit N at CLE00138-139.

46. Finally, Dr. Johnson indicates that Plaintiff could not be "reasonably expected to be reliable in attending an eight hour a day, 40 hour work week[,]" that she suffers "moderately severe" pain even with her pain medications.  *Id.*

47. Moreover, Dr. Johnson states that Plaintiff suffers lapses in concentration or memory daily for several hours a day, which cause her to be unable to attend to tasks or be reliable in following work instructions.  Exhibit N at CLE00139.

48. Dr. Johnson concludes by indicating that Plaintiff has a reasonable medical need to be absent from a full-time work schedule on a chronic basis, approximately two to four times per week.  Exhibit N at CLE00140.

49. The medical records from the Pain Center of Montgomery span September 2006 to October of 2006 and consistently reflect Plaintiff's pain as a 9 to 10 out of a scale of 10, with 10 being the "worst pain you can imagine."  Exhibit N at CLE00143-145.

50. Moreover, the records consistently reflect that each visit Plaintiff's condition is "worse" than her prior visit.  *See* Exhibit M at CLE00143 and 145.

51.  These updated medical records, sent to LINA on November 27, 2006 also reflect that the Pain Center of Montgomery referred Plaintiff, as a result of shoulder pain, to Dr. Waters at Montgomery Imaging Center who performed an MRI and diagnosed Plaintiff with acromioclavicular joint osteoarthritis, supraspinatus tendinosis and bursitis.  Exhibit N at CLE00148-149.

52.  Dr. David Herrick, one of Plaintiff's attending physicians at Pain Center of Montgomery, provided testimony under oath on November 13, 2006, which testimony was submitted to LINA on November 27, 2006.

53.  Dr. Herrick's testimony outlines Plaintiff's disability and refutes LINA's assertion that his office has not disabled Plaintiff.  *See* Exhibit N at CLE00161-195.

54.  Dr. Herrick testified that Plaintiff's diagnoses include "severe degenerative dis[c] disease in both the cervical and lumbar spine …and both cervical and lumbar Failed Surgery Syndrome."  Exhibit N at CLE00167.

55.  Dr. Herrick also testified that Plaintiff has "had multiple surgeries of both the cervical [and] lumbar spine, including fusions of both the cervical and lumbar spine."  *Id.*

56. Dr. Herrick further testified that there is ***no cure*** for Plaintiff and her "problems are not going to go away" but rather the purpose of treatment is "to just try[] to make her life as comfortable as possible." Exhibit N at CLE00168-170.

57. In response to a question posed regarding LINA's finding that Plaintiff's condition appears to be stable, Dr. Herrick testified as follows:

> That's a curious way to put it. I think that she is managed as well as she can be managed. I think that she is as functional as she can be functional. And I was thinking about some way to try to describe this. And I can use an analogy if you like.
>
> …
>
> Okay. To me, it's kind of like a demolition derby. You know, the cars they use in demolition derby are not – you know, they're pretty much – they're damaged to begin with. And she's, you know, still driving around in the demolition derby, but she's looking pretty rough right now. So she's stable, if you want to put it that way, from the point of view that she's still moving. She still functions to some degree. She certainly does not function in a normal fashion, and she doesn't function as well as somebody else her age who didn't have all these problems would be functioning.

Exhibit N at CLE00171-172.

58. Dr. Herrick refuted LINA's assertion that "Kitty" from his office stated that the Pain Center of Montgomery was not disabling Plaintiff. Dr. Herrick stated that Kitty is a nurse, that "[i]t's not in the nurse's job description to be doing that … [and] I don't think Kitty did in this case either." Exhibit N at CLE00180-181.

59.    Moreover, Dr. Herrick testified he hadn't seen evidence of *any* physician stating they were not disabling Plaintiff, that she currently still has complaints of radiating pain, numbness and tingling and that she had suffered such symptoms even at the time of LINA's denial in December 2005.  Exhibit N at CLE0188.

60.    In response to whether he agrees with LINA's determination that Plaintiff's medical documents don't establish that Plaintiff has a severe condition that warrants limitations and restrictions, Dr. Herrick stated:  "that's really kind of an absurd statement.  No, I don't agree with that."  Exhibit N at CLE0189.

61.    The Vocational Analysis Report of Mark Boatner, M.Ed., CRC, submitted to LINA on January 18, 2007, summarizes medical records submitted by eight of Plaintiff's treating physicians and spanning a time period of 1997 through November 2006.  *See* Exhibit N at CLE00196-00214.

62.    Mr. Boatner's extensive review of Plaintiff's medical history and restrictions and limitations resulted in his conclusion that Plaintiff "is unable to remain in any gainfully employed capacity due to her chronic pains in her neck and upper extremities as well as by her back pain and the radiating pain in her lower extremities."  Exhibit N at CLE00213.

63.  Mr. Boatner further concluded that Plaintiff "does not possess the sustainable functional capacity required for sedentary work or any other rating of work." *Id.*

64.  After LINA had received the documents summarized above, it notified Plaintiff by letter dated March 15, 2007, that it was reaffirming its denial of her claim for LTD benefits. *See* Exhibit O, LINA/Cleiland 0233-235.

65.  LINA again restated its purported reason that "[t]he available medical records on file do not provide documentation of significant measured physical limitations time-concurrent with the denial date to support continuation of work restrictions recommended by treating physicians."  Exhibit O at LINA/Cleiland 0234.

66.  LINA further stated that their "review of the records on file, the physical and psychological limitations and restrictions provided by [Plaintiff's] physicians are not supported as of November of 2005 and forward[.]" *Id.* at LINA/Cleiland 0235.

67.  Having exhausted her administrative remedies, Plaintiff filed this action on June 4, 2007, asserting wrongful denial of benefits pursuant to 29 U.S.C. § 1132.

**II.  Defendants' Failure to Produce Plan Documents.**

15

68.  29 U.S.C. § 1132(c) provides:

Any administrator … who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary … by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

69.  29 C.F.R. § 2575.502c-1 increases this amount "from $100 a day to $110 a day" for violations occurring after July 29, 1997.

70.  Plaintiff first requested all "relevant" documents as defined by 29 C.F.R. § 2560.503-1 from the Temple-Inland Defendants by certified mail dated August 4, 2006.  *See* Exhibit P.

71.  The Temple-Inland Defendants received Plaintiff's request on August 7, 2006.  *Id.*

72.  Plaintiff thereafter requested all "relevant" documents as defined by 29 C.F.R. § 2560.503-1 from ***all*** Defendants, including LINA and again including Temple-Inland, Inc., on September 5, 2006.  *See* Exhibit Q.

73.  LINA and Temple-Inland received Plaintiff's request on September 11, 2006.  *Id.*

16

74.  On August 15, 2006, the Temple-Inland Defendants produced only the Summary Plan Description ("SPD") for the Temple-Inland Salaried Retirement Plan.  *See* Exhibit R, Correspondence from Temple-Inland Defendants.

75.  On September 12, 2006, the Temple-Inland Defendants supplemented their response by producing SPDs for the Temple-Inland Disability Health and Welfare Plan, Temple-Inland Group Medical Plan and Temple-Inland Group Benefits Plan, as well as the Long Term Disability Insurance Certificate.  *See* Exhibit S, Correspondence from Temple-Inland Defendants.

76.  The Temple-Inland Defendants, however, have still not produced the plan documents for all of the plans to which Plaintiff is entitled benefits.

77.  On October 23,2006, LINA produced the disability policy, claim file and Acclaim printout.  *See* Exhibit T.

### III.  Relevant Procedural History.

78.  Plaintiff filed this action on June 4, 2007, asserting a claim for benefits under 29 U.S.C. § 1132(a)(1)(B) (COUNT I), failure to produce plan documents under 29 U.S.C. § 1132(c) (COUNT II), and Equitable Estoppel (COUNT III) against LINA, Cigna Corporation, Cigna Holdings, Temple-Inland Disability Health and Welfare Plan and Temple Inland Forest Products Corporation.

17

79.   Defendants Cigna Corporation and Cigna Holdings were voluntarily dismissed without prejudice pursuant to defense counsel's representations that their absence would not be used as a basis to withhold documents and that they had no involvement in the claims process.  *See* Exhibit U, Correspondence dated July 11, 2007 and July 17, 2007.

Plaintiff now moves for summary judgment and requests this Court find LINA's wrongful denial of Plaintiff's claim for disability benefits arbitrary and capricious and also enter an order awarding $110 per day for Defendants' tardy production of plan documents in violation of 29 U.S.C. § 1132(c).

## ARGUMENT

**I.  LINA's Wrongful Denial of Plaintiff's Claim for Disability Benefits Was Arbitrary and Capricious.**

LINA denied Plaintiff's claim for disability benefits *after* it had profited in an amount exceeding $25,000 by representing to the Social Security Administration that Plaintiff was disabled from any occupation, *after* it had received notice that its alleged information contradicting Plaintiff's disability was not only erroneous but that the very physician from which the information allegedly came strongly feels that Plaintiff is incapable of performing in any full-time occupation due to her disabilities and *after* it had received notice from a vocational capacities expert that Plaintiff is not capable of working in any full-time occupation.  It is clearly arbitrary and capricious as a matter of law for an insurer to deny an individual disability benefits when they so clearly have knowledge of her disability *and have profited from claiming such.*

The decision to deny benefits under an ERISA plan is evaluated under varying standards of review, depending upon the factual circumstances of the case. In *Firestone Tire & Rubber Company v. Bruch*, 109 S.Ct. 948 (1989), the United States Supreme Court ruled that a decision to deny benefits should be reviewed under *de novo* standard unless the benefit plan grants the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms

of the plan, in which case the denial of benefits should be reviewed under an

arbitrary and capricious standard. *Id.*, at 956. Defendants, however, have not met

their burden in showing that they are entitled to the arbitrary and capricious

standard of review. Even assuming *arguendo* that Defendants are entitled to this

heightened standard of review, Defendants' wrongful decision is both arbitrary and

capricious and summary judgment should therefore be granted as to Plaintiff's

claim for benefits pursuant to 29 U.S.C. § 1132(a).

**A.    LINA Had Knowledge of Plaintiff's Disability from Its Agent, Advantage 2000 Consultants, at the Time of Its Denial.**

Knowledge that an agent acquires within the scope of his employment is

imputed to his principal. *See Harris v. Gulf Refining Co.*, 240 F.2d 249, 252 (5th

Cir. 1957) ("[S]ince he undoubtedly was the agent of one of the defendants the

knowledge he acquired within the scope of his employment is chargeable to his

master."). "[N]otice to agent while engaged in the business of the principal, acting

within the scope of the agent's authority in respect to a transaction depending, is

imputed to the principal, and when the principal adopts the acts of the agent, he

does so in the light of such imputed notice." *Life & Cas. Ins. Co. of Tennessee v.

Crow*, 164 So. 83, 85 (Ala. 1935). Moreover, "the principle cannot take the benefit

20

of the agent's act without taking also the burdens resulting from the agent's knowledge and intentions." *Connecticut Fire Ins. Co. v. Commercial Nat. Bank of San Antonio*, 87 F.2d 968, 969 (5th Cir. 1937).

LINA employed Advantage as its agent to represent Plaintiff in obtaining Social Security disability benefits so as to offset the amount of LTD benefits that it was then paying Plaintiff. *See* Exhibit H at ADVANTAGE004) ("*[T]here is no cost to you for our services. This service is being provided by CIGNA Group Insurance[.]*"). *See also* Exhibit H at ADVANTAGE003 & 024 (listing "Client Company" as CIGNA Group Insurance). LINA essentially represented to the federal government that plaintiff was disabled and unable to perform any gainful occupation in order to obtain a refund of amounts it had already paid to Plaintiff. LINA's efforts were successful, and they were rewarded approximately $25,000 for their efforts, in the amount to which Social Security found Plaintiff was entitled due to her debilitating conditions.

Advantage investigated Plaintiff's disability by obtaining Plaintiff's medical records, speaking to Plaintiff and her Attending Physicians, and making the determination, on LINA's behalf, that Plaintiff is "disabled and unable to engage in any substantial, gainful activity." Exhibit H at ADVANTAGE165. Advantage therefore represented to the Social Security Administration Judge, on LINA's

behalf, that Plaintiff "has not been able to return to [her] work, *or any work* since her onset date of 5/14/03" and that "the limitations posed by her continued impairments would limit her ability to perform even a full range of sedentary work." Exhibit H at ADVANTAGE236-237. Advantage consistently kept LINA apprised of the information it obtained in its representation of Plaintiff and the progress of their claim for her Social Security Disability Benefits. *See* Exhibit H at ADVANTAGE033-044, 051, 060, 070-072.

On June 27, 2005 and as a result of Advantage's representations, the Social Security Administration found Plaintiff disabled as of May 14, 2003 and awarded her Social Security disability benefits from her date of disability forward. Exhibit H at ADVANTAGE016-019. Upon LINA's notification that it was successful in Plaintiff's claim for Social Security disability benefits, it readily adopted Advantage's actions and representations by demanding payment in the amount of $25,240.66 from Plaintiff as a result of her Social Security award. *See* Exhibit H at ADVANTAGE074&081.

LINA was directly involved in Plaintiff's claim for Social Security benefits and profited over $25,000 for its efforts. Pursuant to *Harris*, *Crowe* and *Connecticut Fire Ins. Co.*, LINA cannot now avoid the burden resulting from its knowledge and profit from Plaintiff's disability by denying her disability benefits.

LINA's denial of Plaintiff's claim for LTD benefits is therefore arbitrary and capricious as a matter of law.

**B.    LINA    Had    Additional    Evidence    of    Plaintiff's    Disability Contemporaneous With the Time of Its Denial.**

Not only did LINA received notice of, and profit from, Plaintiff's disability by virtue of its role in her claim for Social Security benefits but it received notice from Plaintiff herself contemporaneously with its denial of her claim for LTD benefits.    This notice consisted of over two hundred and twenty-nine pages of documents, including testimony from one of Plaintiff's treating physicians in support of her disability, the report of a Vocational Capacities expert and Plaintiff's current medical records, all of which clearly contradicted LINA's alleged reason for denying Plaintiff's claim for benefits.    *See* Exhibit N (CLE0001-0229).

In support of its decision to deny benefits, LINA relied heavily on an alleged telephone conversation in which "Kitty" from the Center for Pain of Montgomery, one of Plaintiff's treating facilities, allegedly "stated they are not disabling" Plaintiff.    Exhibit J at LINA/Cleiland 0259.    LINA further stated that the information did not support that Plaintiff was "incapable of performing [her] occupation and that she therefore does "not meet the definition of total disability

from any occupation as of November 21, 2005." Exhibit J at LINA/Cleiland 0260. LINA again notified Plaintiff by letter dated March 16, 2007 that they were reaffirming their previous denial of Plaintiff's LTD benefits because "the medical evidence on file [as of November 21, 2005] no longer supported [Plaintiff's] inability to function at a sedentary capacity for the period of time in question" and that "the physical and psychological limitations and restriction provided by [Plaintiff's] physicians are not supported as of November of 2005 and forward[.]" Exhibit V at LINA/Cleiland0225-0226.

The 229 documents submitted to LINA by Plaintiff from October 19, 2006 through January 18, 2007, completely refute LINA's reasons for denial and clearly document Plaintiff's disability and resulting inability to perform in any occupation. *See* Exhibit N (CLE00001-00229). Included in this document production were 1) Medical Opinion of Steven D. Wise, M.D.[9]; 2) Medical Opinion of Bret M. Johnson, M.D.[10]; 3) CV of David P. Herrick, M.D.[11]; 4) Updated medical records from Montgomery Pain Center[12]; 5) Sworn statement of David Herrick, M.D.[13]; and 6) Vocational Analysis Report of Mark Boatner, M.Ed.[14]

---

[9] Submitted October 19, 2006.
[10] Submitted November 3, 2006.
[11] Submitted November 27, 2006.
[12] Submitted November 27, 2006.
[13] Submitted November 27, 2006.
[14] Submitted January 18, 2007.

Dr. Wise's medical opinion clearly reflects that, due to Plaintiff's diabetes alone, which is not even her primary disabling condition, she would suffer such numerous absences from work and lapses in concentration and memory from her prescribed medications that she could not reliably perform a full-time occupation. *See* Exhibit N at CLE00136.  Dr. Johnson's medical opinion, which addresses Plaintiff's limitations resulting from her three cervical spine surgeries, herniated disc and resulting chronic pain, also indicates that Plaintiff's physical limitations, excessive daily requirements of bedrest and resulting unreliability to attend a normal workweek render her incapable of working in any full-time occupation. *See* Exhibit N at CLE00138-140.  Moreover, Dr. Johnson also notes that Plaintiff suffers "moderately severe" pain ***even with her pain medications***, which not inconsequentially renders her unable to attend to tasks or be reliable in following work instructions.  *See* Exhibit N at 00139.

The updated medical records from the Pain Center of Montgomery reflect that with each visit, Plaintiff's condition deteriorates and reveals that she has been diagnosed with ***even more disabling conditions***[15] since was deemed disabled by the Social Security Administration.  *See* Exhibit N at CLE00143-149.  Moreover, Dr. David Herrick's sworn testimony clearly refutes LINA's assertion that his

---

[15] Including acromioclavicular joint osteoarthritis, supraspinatus tendinosis, and bursitis.  *See* Exhibit E at CLE00148-149.

office is not disabling Plaintiff.  *See* Exhibit M at CLE00161-195.  Rather, Dr.

Herrick's testimony provides a clear overview of Plaintiff's numerous painful and

disabling conditions and that her best prognosis is not that her problems will ever

go away, but rather that her life be made "as comfortable as possible."  Exhibit N

at CLE00168-170.

Plaintiff even supported her claim by submitting the report of a Vocational

Expert, Mr. Mark Boatner, to LINA.  *See* Exhibit N at CLE00196-00214.  Mr.

Boatner's report provides an overview of Plaintiff's medical history and declining

condition and unequivocally concludes that Plaintiff "does not possess the

sustainable functional capacity required for sedentary work or any other rating of

work." Exhibit N at CLE00213.

Despite Plaintiff's clear and compelling evidence documenting her

disability, LINA notified Plaintiff by letter dated March 15, 2007, that they were

reaffirming their denial of her claim for LTD benefits because "[t]he available

medical records on file do not provide documentation of significant measured

physical limitations time-concurrent with the denial date to support continuation of

work restrictions recommended by treating physicians."  Exhibit O at

LINA/Cleiland 0234.  LINA further stated that their "review of the records on file,

the physical and psychological limitations and restrictions provided by [Plaintiff's]

physicians are not supported as of November of 2005 and forward[.]"  *Id.* at

LINA/Cleiland 0235.

**C.    LINA's Denial of Plaintiff's Claim for LTD Benefits Was Arbitrary and Capricious.**

LINA completely failed to meet its requirement of acting in good faith in its denial of Plaintiff's claim for LTD benefits.

> Good faith requires an honest effort to ascertain the facts upon which its exercise must rest and an honest determination from such ascertained facts . . . If the fiduciary knew of matters concerning which honesty would require investigation, and failed to act, or if it knew of matters which would honestly compel a given determination and it announced to the contrary, in cannot, in law, be regarded as having exercised good faith, and its action would be arbitrary. Thus, an improper motive sufficient to set aside a fiduciary's decision, may be inferred from the fiduciary's failure to investigate or to interpret honestly evidence that greatly preponderates in one direction.

*Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1566 at 1566 n. 11 (citing Colket v. St. Louis Union Trust Co., 52 F.2d 390, 395-96 (8th Cir. 1931)).

As is discussed *supra*, LINA was in possession of a mountain of evidence of Plaintiff's disability and resulting inability to perform in *any* occupation contemporaneously with its denial of her claim for LTD benefits. Despite the mountain of evidence which would "honestly compel" a determination that Plaintiff is disabled pursuant to the terms of the policy and LINA's profiting from its representations that Plaintiff was indeed disabled, LINA inexplicably continued to deny Plaintiff's claim for LTD benefits. LINA clearly did not exercise good

faith in its denial of Plaintiff's claim for benefits and its decision to deny benefits is therefore arbitrary as a matter of law.

Plaintiff therefore requests this Honorable Court enter Partial Summary Judgment finding LINA's denial of her claim for LTD benefits arbitrary and capricious pursuant to 11 U.S.C. § 1132(a).

## II. Defendants are Liable for Failure to Produce Plan Documents Pursuant to 11 U.S.C. § 1132(c).

Pursuant to 11 U.S.C. § 1132(c), the Temple-Inland Defendants were required to produce to Plaintiff all "relevant" plan documents within thirty days of Plaintiff's request, or by September 7, 2006. The Temple-Inland Defendants did not produce anything until September 15, 2006 and then it was not all "relevant" documents as they were required to produce. The Temple-Inland Defendants supplemented their production by sending additional documents on October 12, 2006. The Temple-Inland Defendants still have not produced copies of all "relevant" plan documents, including copies of all plans to which plaintiff is entitled benefits. The Temple-Inland Defendants are therefore liable for a minimum of $3850, or thirty-five (35) days of noncompliance with 11 U.S.C. § 1132(c). However, because the Temple-Inland Defendants still have not satisfied their duties pursuant to 11 U.S.C. § 1132(c), the clock is still running and they are

liable for $110 per day for every day since September 7, 2006, or $57,200 as of the date of the filing of this motion.

Pursuant to 11 U.S.C. § 1132(c), LINA was required to produce to Plaintiff all "relevant" plan documents within thirty days of Plaintiff's request, or by October 12, 2006. LINA did not produce any documents until October 23, 2006. LINA is therefore liable for a fine of $110 per day, or $1210, for the eleven days that it was noncompliant with 11 U.S.C. § 1132(c).

## CONCLUSION

Plaintiff therefore respectfully requests this Honorable Court grant partial summary judgment finding Defendant LINA's wrongful denial of plaintiff's claim for LTD benefits arbitrary and capricious. Plaintiff also respectfully requests this Honorable Court enter an order imposing a fine of $110 per day for every day each Defendant has been noncompliant with 11 U.S.C. § 1132(c), and provide plaintiff 30 days from such a ruling in which to file a Motion for Interest, Costs and Attorney Fees.

/s/ Jenifer Champ Wallis
One of the Attorneys for Plaintiff

**OF COUNSEL:**
Thomas O. Sinclair
Jenifer Champ Wallis
CAMPBELL, GIDIERE, LEE, SINCLAIR & WILLIAMS
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
T: (205) 803-0051
F: (205) 803-0053

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 8th day of February, 2008, a copy of the foregoing was filed electronically using this Court's electronic filing system. Notice of this filing is due to be served by operation of the Court's electronic filing system to the following parties indicated on the electronic filing receipt as participants in the Courts CM/ECF system:

**Attorneys for Defendants**
William B. Wahlheim, Jr.
John David Collins
Grace Robinson Murphy
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL  35203-2602

/s/Jenifer Champ Wallis
Of Counsel

**Plaintiff's Index of Exhibits in Support of
Brief in Support of Motion for Partial Summary Judgment**

| | |
|---|---|
| Exhibit A | Plan<br>(LINA/Cleiland 0480-0515) |
| Exhibit B | **Acknowledgement of Claim**<br>(LINA/Cleiland 1052-1055) |
| Exhibit C | **LINA Correspondence (June 4, 2003)**<br>(LINA/Cleiland 1042) |
| Exhibit D | **Dr. Hackman Extension of Disability Request Form**<br>(LINA/Cleiland 1035) |
| Exhibit E | **Dr. Hackman Follow-Up Medical Request Form**<br>(LINA/Cleiland 1019) |
| Exhibit F | **LINA Correspondence (August 12, 2003)**<br>(LINA/Cleiland 1015) |
| Exhibit G | **LINA Internal Documents**<br>(LINA/Cleiland 1012&1014) |
| Exhibit H | **Advantage 2000 Consultants' Documents**<br>(ADVANTAGE 001–299) |
| Exhibit I | **LINA Internal Documents Related to Advantage 2000 Consultants**<br>(LINA/Cleiland 0789-0814) |
| Exhibit J | **LINA Correspondence (December 7, 2005)**<br>(LINA/Cleiland 0258-0260) |
| Exhibit K | **LINA Internal Documents**<br>(LINA/Cleiland 0065) |
| Exhibit L | **LINA Correspondence (March 10, 2006)**<br>(LINA/Cleiland 0677-0679) |
| Exhibit M | **Plaintiff Correspondence to LINA (September 5, 2006)**<br>(LINA/Cleiland 0520-0521) |
| Exhibit N | **Documents submitted to LINA by Plaintiff (October 19, 2006-January 18, 2007)** |

| | |
|---|---|
| | (CLE 00001-00229) |
| Exhibit O | **LINA Correspondence to Plaintiff (March 15, 2007)** (LINA/Cleiland 0233-0235) |
| Exhibit P | **Plaintiff 29 U.S.C. § 1132(c) Requests to Defendants and Certified Mail Receipts** |
| Exhibit Q | **Plaintiff's 29 U.S.C. § 1132(c) Request to LINA (September 5, 2006)** (LINA/Cleiland 0522-0523) |
| Exhibit R | **Temple-Inland Response to Plaintiff's 29 U.S.C. § 1132(c) Request (August 15, 2006)** |
| Exhibit S | **Temple-Inland Response to Plaintiff's 29 U.S.C. § 1132(c) Request (September 12, 2006)** |
| Exhibit T | **LINA Response to Plaintiff's 29 U.S.C. § 1132(c) Request (October 23, 2006)** |
| Exhibit U | **Correspondence Between Counsel Regarding CIGNA Dismissal (July 11 & 17, 2007)** |
| Exhibit V | **LINA Internal Documents** (LINA/Cleiland 0225-0226) |

# EXHIBIT

## "A"

LIFE INSURANCE COMPANY OF NORTH AMERICA
(herein called the Company)

Amendment to be attached to and made a part of the Group Policy
A Contract between the Company and

Temple-Inland Forest Products Corporation
(herein called the Policyholder)

Effective Date: January 1, 1999

Group Policy No.: FLK-020104

This Amendment will be in effect only for eligible employees in Active Service on the Effective Date shown above. If an Employee is not in Active Service on the date he would otherwise become eligible, he will become eligible on the date he returns to Active Service provided any required Waiting Period has been satisfied.

As of the Effective Date shown above, the Company and the Policyholder hereby agree that the Policy is amended as follows:

1.    The Eligibility Waiting Period on the page entitled SCHEDULE OF BENEFITS FOR CLASS 1 is hereby replaced by the following:

Eligibility Waiting Period

The Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage. It will be extended by the number of days the Employee is not in Active Service.

Initial Group:  No Waiting Period.

New Hires:

Each Full-time salaried exempt Employee, commission II Employee, commission III Employee, and commission IV Employee shall be eligible to participate in the Plan on the first day he becomes an Employee provided he is in Active Service that day, or if not, on the first day thereafter when he is in Active Service.

Each Full-time salaried nonexempt Employee who is not a Financial Services Employee shall be eligible to participate in the Plan on the first day he becomes an Employee, provided he is in Active Service that day, or if not, on the first day thereafter when he is in Active Service.

Each Full-time salaried non-exempt Employee who is a Financial Services Employee, and each hourly Employee, part-time hourly Employee, part-time salaried Employee, or commission I Employee shall be eligible to participate in the Plan on the first day of the month following completion of the Waiting Period, provided he is in Active Service that day, or if not, on the first day thereafter when he is in Active Service. For this group, Waiting Period is defined as follows:

For a Financial Services Employee, Waiting Period means three continuous months of Active Service from an Employee's most recent date of hire as an Employee. For all other Employees, Waiting Period means 31 days of Active Service from an Employee's most recent date of hire as an Employee.

LINA/Cleiland 0480

2.      The page entitled **EFFECTIVE DATE OF INSURANCE** is hereby replaced by the following:

## EFFECTIVE DATE OF INSURANCE

An Employee, his or her eligible Spouse or Dependent Child will be insured for an amount not to exceed the Guaranteed Issue Amount on the date he or she becomes eligible, if the Employee is not required to contribute to the cost of this insurance.

An Employee, his or her eligible Spouse or Dependent Child will be insured for an amount that exceeds the Guaranteed Issue Amount on the date the Insurance Company agrees in writing to insure that eligible person. The Insurance Company will require the eligible person to satisfy the Insurability Requirement before it agrees to insure him or her.

An Employee who is required to contribute to the cost of this insurance may elect insurance for himself or herself and an eligible Spouse or Dependent Child only by authorizing payroll deduction in a form approved by the Employer and the Insurance Company. The effective date of this insurance depends on the date and amount of insurance elected.

If the coverage is elected within 31 days after the individual becomes eligible, during an Annual Enrollment Period or within 31 days after a Life Status Change, the Guaranteed Issue Amount will be effective on the latest of the following dates.

1.      The Policy Effective Date.
2.      The date payroll deduction is authorized for this insurance.
3.      The date the Employer or Insurance Company receives the completed enrollment form.
4.      The effective date determined by the Employer's benefit plan.

If coverage is elected in an amount that exceeds the Guaranteed Issue Amount or an enrollment form is received more than 60 days after an individual is eligible to elect coverage, the amount over the Guaranteed Issue Amount will be effective on the date the Insurance Company agrees in writing to insure that eligible person. The Insurance Company will require the eligible person to satisfy the Insurability Requirement before it agrees to insure him or her.

If coverage for a Dependent Child is in force and another Dependent Child is acquired, coverage for that child is effective on the date the child qualifies as a Dependent Child.

If an eligible person is not in Active Service on the date insurance would otherwise be effective, it will be effective on the date he or she returns to Active Service.

LINA/Cleiland 0481

## LIFE INSURANCE COMPANY OF NORTH AMERICA
### (herein called the Company)

Amendment to be attached to and made a part of the Group Policy
A Contract between the Company and

Temple-Inland Forest Products Corporation
(herein called the Policyholder)

Effective Date: September 1, 1998

Group Policy No.:  FLK-020104

This Amendment will be in effect only for eligible employees in Active Service on the Effective Date shown above.  If an Employee is not in Active Service on the date he would otherwise become eligible, he will become eligible on the date he returns to Active Service provided any required Waiting Period has been satisfied.

As of the Effective Date shown above, the Company and the Policyholder hereby agree that the Policy is amended as follows:

1.  The section entitled TERMINATION OF INSURANCE is hereby replaced by the following:

### TERMINATION OF INSURANCE

An Insured's coverage will end on the earliest of the following dates.
1.  The date the Employee is eligible for coverage under a plan intended to replace this coverage.
2.  The date the Policy is terminated by the Insurance Company.
3.  The end of the month following the date the Insured is no longer eligible.
4.  The day after the end of the period for which premiums are paid.
5.  The date an Employee is no longer in Active Service.

2.  The definition of Covered Earnings on the page entitled SCHEDULE OF BENEFITS FOR CLASS I is hereby replaced by the following:

Covered Earnings is defined as:
a.  For All Purposes: For all purposes under the Temple-Inland Benefit Solutions Plan, "Covered Earnings" includes only compensation paid to an Employee by an Employer for services performed by the Employee for the Employer as reflected on the Employer's payroll system which meets all of the definitions set forth in this paragraph a. and the applicable paragraphs b. or c. below.  "Covered Earnings" does not include any amounts that are not paid through the Employer's payroll system (including, but not limited to, benefits such as insured disability pay).

LINA/Cleland 0482

"Covered Earnings" includes the Employee's base pay prior to any reduction for elective deferrals (within the meaning of Section 402(g)(3) of the Code) or any salary reduction contributions under the Temple-Inland Benefit Solutions Plan. "Covered Earnings" includes commissions actually paid, but excludes commissions that have not yet been paid (whether or not they have been earned, have accrued, or are otherwise payable at the time of the calculation).

"Covered Earnings" excludes all other compensation including, but not limited to, insured disability pay, imputed income, overtime, bonuses, excess credits under a cafeteria plan, incentive or restricted stock, compensation in lieu of dividends, stock options, performance units, shift differentials, premium pay, severance pay, non-cash compensation, allowances, fringe benefits (cash and noncash), moving expenses, welfare benefits, deferred compensation, amounts paid by an Employer to an Employee on behalf of an entity that is not a member of the Employer's controlled group of corporations for services rendered by the Employee on behalf of such entity, and any other compensation.

For Costs and Credits: For purposes of determining Costs and Credits, an Employee's "Covered Earnings" is the Employee's "Covered Earnings" in effect at the time the Solutions enrollment data is produced as determined below:

i.      For a salaried Employee, "Covered Earnings" is the annual base salary.

ii.     For an hourly Employee, "Covered Earnings" is the Employee's base hourly rate multiplied by 2,080 hours for a Full-time Employee or 1,040 hours for a part-time Employee, regardless of the number of hours regularly worked.

iii.    For newly hired commission I Employees, commission II Employees, commission III Employees and commission IV Employees, "Covered Earnings" is the greater of:

    (1)     base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever applicable), or

    (2)     $20,000

iv.     For all other commission I Employees, commission II Employees, commission III Employees, and for any other hourly Employees or salaried Employees with commission pay, "Covered Earnings" is determined by:

    (1)     adding the Employee's base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever is applicable, but using only amounts actually paid), and commissions paid from January 1 through the time the Solutions enrollment data is produced, and then

    (2)     annualizing that amount based on a full 12-month year.

v.      For all other commission IV Employees, "Covered Earnings" is determined by:

(1)    adding the Employee's base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever is applicable, but using only amounts actually paid), and commissions paid from January 1 through the time the Solutions enrollment data is produced, and then

(2)    annualizing that amount based on a full 12-month year; provided, however, that "Covered Earnings" shall not exceed the maximum salary in the range for salary grade 19-1 for commission IV Employees.

ii.    For Employees hired after the Solutions enrollment data is produced or Employees who have a change in pay or change in status after the Solutions enrollment data is produced, "Covered Earnings" will be determined as of the date of hire or the date of change in pay or change in status, respectively; provided, however, that the Plan Administrator may elect in his sole discretion to use the "Frozen pay" determined at the time the Solutions enrollment data is produced to determine Costs and Credits for any group or classification of Employees with commission pay.

For Benefit Payments: For the purpose of determining the amount of a benefit to be paid, an Employee's "Covered Earnings" in effect on the date of the event for which the claim is paid will be used, as determined below:

I.    For a salaried Employee, "Covered Earnings" is the annual base salary.

ii.    For an hourly Employee, "Covered Earnings" is the Employee's base hourly rate multiplied by the number of hours the Employee is regularly scheduled to work, up to a maximum of 2,080 hours.

iii.    For commission I Employees, commission II Employees, and commission III Employees, and for any other hourly Employees or salaried Employees with commission pay, "Covered Earnings" is the greater of:

(1)    the Employee's base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever is applicable) and commissions actually paid during the twelve months prior to the date of the event for which the claim is paid (or, if the Employee has been employed for less than twelve months, an annualized amount based on commissions actually paid during such shorter period), or

(2)    $20,000.

LINA/Cleiland 0484

iv.    For commission IV Employees, "Covered Earnings" is the greater of:

(1)    the Employee's base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever is applicable) and commissions actually paid during the twelve months prior to the date of the event for which the claim is paid (or, if the Employee has been employed for less than twelve months, an annualized amount based on commissions actually paid during such shorter period); provided, however, that "Covered Earnings" shall not exceed the maximum salary in the range for salary grade 19-1 for commission IV Employees, or

(2)    $20,000.

Except for the above, this amendment does not change the Policy in any way.

<u>FOR THE COMPANY</u>

By:

John K. Leonard, President

Date: June 17, 1999

Amendment No. 1

TL-004780

LINA/Cleiland 0485

Except for the above, this amendment does not change the Policy in any way.

FOR THE COMPANY

By:

John K. Leonard, President

Date: April 28, 1999

Amendment No. 2

TL-004780

LINA/Cleiland 0486

LIFE INSURANCE COMPANY OF NORTH AMERICA
1601 CHESTNUT STREET, PHILADELPHIA, PA  19192-2235
215-761-1000
A STOCK INSURANCE COMPANY

**GROUP POLICY**

POLICYHOLDER: Temple-Inland Forest Products Corporation

POLICY NUMBER: FLK-020104

POLICY EFFECTIVE DATE: January 1, 1998

POLICY ANNIVERSARY DATE: January 1

This Policy describes the terms and conditions of coverage. The Policy is issued in Texas and shall be governed by its laws. The Policy goes into effect on the Policy Effective Date, 12:01 AM at the Policyholder's address.

The Insurance Company and the Policyholder have agreed to all the terms of this Policy.

*George D. Mulligan*

George D. Mulligan, Secretary

*John K. Leonard*

John K. Leonard, President

TL-004700

LINA/Cleiland 0487

IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the Life Insurance Company of North America, Group Insurance's toll-free telephone number for information or to make a complaint at:

1-800-441-1832

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the
Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
X # (512) 475-1771

PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim you should contact the agent or company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.

TL-004426

AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis del Life Insurance Company of North America, Group Insurance Division para informacion o para someter una queja al:

1-800-441-1832

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

1-800-252-3439

Puede escribir al Departamento de
Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero.
Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

UNA ESTE AVISO A SU POLIZA:
Este aviso es solo para proposito de informacion y se convierte en parte o condicion del documento adjunto.

# IMPORTANT INFORMATION ABOUT COVERAGE UNDER THE TEXAS LIFE, ACCIDENT, HEALTH AND HOSPITAL SERVICE INSURANCE GUARANTY ASSOCIATION

Texas law establishes a system, administered by the Texas Life, Accident, Health and Hospital Service Insurance Guaranty Association (the "Association"), to protect policyholders if their life or health insurance company fails to or cannot meet its contractual obligations. Only the policyholders of insurance companies which are members of the Association are eligible for this protection. However, even if a company is a member of the Association, protection is limited and policyholders must meet certain guidelines to qualify. (The law is found in the Texas Insurance Code, Article 21.28-D.)

**BECAUSE OF STATUTORY LIMITATIONS ON POLICYHOLDER PROTECTION, IT IS POSSIBLE THAT THE ASSOCIATION MAY NOT COVER YOUR POLICY OR MAY NOT COVER YOUR POLICY IN FULL.**

### ELIGIBILITY FOR PROTECTION BY THE ASSOCIATION

When an insurance company which is a member of the Association is designated as impaired by the Texas Commissioner of Insurance, the Association provides coverage to policyholders who are:

- residents of Texas at the time that their insurance company is impaired;
- residents of other states, ONLY if the following conditions are met:
  1) The policyholder has a policy with a company based in Texas;
  2) The company has never held a license in the policyholder's state of residence;
  3) The policyholder's state of residence has a similar guaranty association of the policyholder's state of
  4) The policyholder is **not eligible** for coverage by the guaranty association of the policyholder's state of residence.

### LIMITS OF PROTECTION BY THE ASSOCIATION

Accident, Accident and Health, or Health Insurance:
- up to a total of $200,000 for one or more policies for each individual covered.

Life Insurance
- net cash surrender value up to a total of $100,000 under one or more policies on any one life; or
- death benefits up to a total of $300,000 under one or more policies on any one life.

Individual Annuities:
- net cash surrender amount up to a total of $100,000 under one or more policies owned by one contract holder.

Group Annuities:
- net cash surrender amount up to $100,000 in allocated benefits under one or more policies owned by one contract holder; or
- net cash surrender amount up to $5,000,000 in unallocated benefits under one contract holder regardless of the number of contracts.

**THE INSURANCE COMPANY AND ITS AGENTS ARE PROHIBITED BY LAW FROM USING THE EXISTENCE OF THE ASSOCIATION FOR THE PURPOSE OF SALES, SOLICITATION, OR INDUCEMENT TO PURCHASE ANY FORM OF INSURANCE.**

When you are selecting an insurance company, you should not rely on coverage by the Association.

Texas Life, Accident, Health and Hospital
Service Insurance Guaranty Association
301 Congress, Suite 500
Austin, Texas 78701
800-982-6362

Texas Department of Insurance
P.O. Box 149104
Austin, Texas 78714-9104
800-252-3439

LINA/Cleiland 0489

## TABLE OF CONTENTS

ELIGIBILITY FOR INSURANCE .................................................................. 1

EFFECTIVE DATE OF INSURANCE ............................................................ 1

TERMINATION OF INSURANCE ................................................................. 2

CONTINUATION OF INSURANCE ............................................................... 3

SCHEDULE OF BENEFITS ......................................................................... 4

SCHEDULE OF BENEFITS FOR CLASS 1 .................................................. 10

DESCRIPTION OF BENEFITS .................................................................... 16

EXCLUSIONS .......................................................................................... 16

CLAIM PROVISIONS ................................................................................ 18

ADMINISTRATIVE PROVISIONS .............................................................. 19

GENERAL PROVISIONS ........................................................................... 20

DEFINITIONS .......................................................................................... 23

SCHEDULE OF AFFILIATES ....................................................................

LINA/Cleiland 0490

## ELIGIBILITY FOR INSURANCE

An Employee in one of the Classes of Eligible Employees shown in the Schedule of Benefits is eligible to be insured on the Policy Effective Date, or the day after he or she completes the Eligibility Waiting Period, if later. The Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage. It will be extended by the number of days the Employee is not in Active Service.

Except as noted in the Reinstatement Provision, if an Employee terminates coverage and later wishes to reapply, or if a former Employee is rehired, a new Eligibility Waiting Period must be satisfied. An Employee is not required to satisfy a new Eligibility Waiting Period if insurance ends because he or she is no longer in a Class of Eligible Employees, but continues to be employed by the Employer, and becomes a member of an eligible class.

TL-004710

## EFFECTIVE DATE OF INSURANCE

An Employee will be insured on the date he or she becomes eligible, if the Employee is not required to contribute to the cost of this insurance.

An Employee who is required to contribute to the cost of this insurance may elect to be insured only by authorizing payroll deduction in a form approved by the Employer and the Insurance Company. The effective date of this insurance depends on the date coverage is elected.

Insurance for an Employee who applies for coverage within 30 days after he or she becomes eligible, during an Annual Enrollment Period or within 30 days after a Life Status Change, is effective on the latest of the following dates.
1.    The Policy Effective Date.
2.    The date payroll deduction is authorized.
3.    The date the Employer or Insurance Company receives the completed enrollment form.
4.    The effective date determined by the Employer's benefit plan.

If an Employee's enrollment form is received more than 60 days after he or she is eligible for this insurance, the Insurability Requirement must be satisfied before this insurance is effective. If approved, this insurance is effective on the date the Insurance Company agrees in writing to insure the Employee.

If an Employee is not in Active Service on the date insurance would otherwise be effective, it will be effective on the date he or she returns to any occupation for the Employer on a Full-time basis.

TL-004712

## TERMINATION OF INSURANCE

The insurance on an Employee will end on the earliest date below.
1.    The date the Employee is eligible for coverage under a plan intended to replace this coverage.
2.    The date the Policy is terminated.
3.    The date the Employee is no longer in an eligible class.
4.    The day after the period for which premiums are paid.
5.    The date the Employee is no longer in Active Service.

TL-004714

LINA/Cleiland 0491

## CONTINUATION OF INSURANCE

Insurance continues if an Employee's Active Service ends due to a Disability for which benefits under the Policy are may become payable. Premiums for the Employee will be waived while Disability Benefits are payable. If the Employee does not return to Active Service, this insurance ends when the Disability ends or when benefits are no longer payable, if earlier.

If an Employee's Active Service ends due to an Employer approved unpaid family medical leave of absence, insuranc for that Employee will continue for up to 12 weeks if the required premium is paid. If an Employee's Active Service ends due to an Employer approved unpaid leave of absence or layoff, excluding family medical leave, insurance for that Employee will continue for the period specified by the Employer, if any, not to exceed 6 months if the required premium is paid.

If an Employee's insurance is continued and he or she becomes Disabled during the leave of absence, Disability Benefits will not begin until the later of the following dates.
1.      the date the Benefit Waiting Period is satisfied
2.      the date the Employee was scheduled to return to Active Service

TL-004716

LINA/Cleiland 0492

## SCHEDULE OF BENEFITS

**Premium Due Date**

Premiums are due monthly in advance on the date coinciding with the day of the Policy Anniversary Date or the last day of the month, if earlier. Premiums will be based upon the amount of coverage in effect for an insured during the prior month one single annual settlement will be made.

**Participation Requirements**

For Contributory Plans

The greater of 75% of Eligible Employees or a minimum of 10 Employee

For Non-Contributory Plans

100% of Eligible Employees, but not less than 25 Employees.

**Classes of Eligible Employees**

Class 1  All active, Full-time and part-time salaried, commissioned I, II, III and IV Employees and designated non-union hourly Employees (Streetsboro, Crawfordsville, Lexington Box, Harrington, Maysville and Ontario Mill locations) of the Employer who are a participant in the Temple-Inland Benefit Solutions Plan and who are regularly scheduled to work a minimum of 20 hours or more per week.

LINA/Cleiland 0493

## SCHEDULE OF BENEFITS FOR CLASS 1

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:    None.

For Employees hired after the Policy Effective Date:

- Each Full-time Salaried Exempt Employee, Commission II Employee, Commission III Employee and Commission IV Employee shall be eligible to participate in the Plan on the first day he becomes an Employee, provided he is in Active Service that day, or if not, on the first day thereafter when he is in Active Service.

- Each Full-time Salaried Nonexempt Employee who is not a Financial Services Employee shall be eligible to participate in the Plan on the first day he becomes an Employee, provided he is in Active Service that day, or if not, on the first day thereafter when he is in Active Service.

- Each Salaried Nonexempt Employee who is a Financial Services Employee, and each Hourly Employee, Part-time Hourly Employee, Part-time Salaried Employee, or Commission I Employee shall be eligible to participate in the plan upon the first day of the month following completion of the Waiting Period, provided he is in Active Service that day, or if not, on the first day thereafter when he is in Active Service. For this group the waiting period is defined as follows:

    For a Financial Services Employee, Waiting Period means three continuous months of Active Service from an Employee's most recent date of hire as an Employee. For all other Employees, Waiting Period means one month of Active Service from an Employee's most recent date of hire as an Employee.

**Definition of Disability**

An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, an Employee is Disabled if, because of Injury or Sickness he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

LINA/Cleiland 0494

**Definition of Covered Earnings**

a.  <u>For All Purposes:</u> For all purposes under the Temple-Inland Benefit Solutions Plan, "Covered Earnings" includes only compensation paid to an Employee by an Employer for services performed by the Employee for the Employer as reflected on the Employer's payroll system which meets all of the definitions set forth in this paragraph a. and the applicable paragraphs b. or c. below. Covered Earnings does not include any amounts that are not paid through the Employer's payroll system (including, but not limited to, benefits such as insured disability pay).

"Covered Earnings" includes the Employee's base pay prior to any reduction for elective deferrals (within the meaning of Section 402(g)(3) of the Code) or any salary reduction contributions under the Temple-Inland Benefit Solutions Plan. "Covered Earnings" includes commissions actually paid, but excludes commissions that have not yet been paid (whether or not they have been earned, have accrued, or are otherwise payable at the time of the calculation).

"Covered Earnings" excludes all other compensation including, not limited to, insured disability pay, imputed income, overtime, bonuses, excess credits under a cafeteria plan, incentive or restricted stock, compensation in lieu of dividends, stock options, performance units, shift differentials, premium pay, severance pay, non-cash compensation, allowances, fringe benefits (cash and noncash), moving expenses, welfare benefits, deferred compensation, amounts paid by an Employer to an Employee on behalf of an entity that is not a member of the Employer's controlled group of corporations for services rendered by the Employee on behalf of such entity, and any other compensation.

b.  <u>For Costs and Credits:</u> For purposes of determining Costs and Credits, an Employee's "Covered Earnings" is the Employee's Covered Earnings in effect at the time the Solutions enrollment data is produced as determined below:

    I.    For a salaried Employee, "Covered Earnings" is the annual base salary.

    ii.    For an hourly Employee, "Covered Earnings" is the Employee's base hourly rate multiplied by 2,080 hours for a Full-time Employee or 1,040 hours for a part-time Employee, regardless of the number of hours regularly worked.

    iii.    For newly hired commission I Employees, commission II Employees, commission III Employees and commission IV Employees, "Covered Earnings" is the greater of:

        (1)    base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever applicable), or

        (2)    $20,000

    iv.    For all other commission I Employees, commission II Employees, commission III Employees, and fc any other hourly Employees or salaried Employees with commission pay, "Covered Earnings" is determined by:

        (1)    adding the Employee's base pay, if any (as determined above for a salaried Employee or an hourly Employee, whichever is applicable, but using only amounts actually paid), and commissions paid from January 1 through the time the Solutions enrollment data is produced, and then

        (2)    annualizing that amount based on a full 12-month year.

LINA/Cleiland 0495

**Benefit Waiting Period**            180 days

A period of Disability is continuous even if the Employee can return to Active Service for up to 30 days during the Benefit Waiting Period. The length of the Benefit Waiting Period will not be extended by the number of days the Employee can return to Active Service.

**Disability Benefits**

Option 1 (tax free premiums)        The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearer dollar or $2,500, reduced by any Other Income Benefits.

Option 2 (after tax premiums)       The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearer dollar or $2,500, reduced by any Other Income Benefits.

Option 3 (tax free premiums)        The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearer dollar or $7,500, reduced by any Other Income Benefits.

Option 4 (after tax premiums)       The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearer dollar or $7,500, reduced by any Other Income Benefits.

**Minimum Disability Benefit**        $50

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for dependents, or which the Employee's dependents receive because of the Employee's entitlement to Other Income Benefits.

*Work Incentive Benefits*
For the first 12 months the Employee returns to work, the Disability Benefit is as figured above. If for any month during this period, the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 100% of his or her Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount.

After the first 12 months the Employee returns to work, the Disability Benefit is as figured above, reduced by 50% of his or her current earnings received during any month he or she returns to work. If the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 80% of his or her monthly Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount.

No Disability Benefits will be paid if the Insurance Company determines the Employee is able to work under a Transitional Work Arrangement or other modified work arrangement and he or she refuses to do so.

Current earnings include any wage or salary for work performed while Disability Benefits are payable. If an Employee is working for another employer on a regular basis when Disability begins, current earnings will include an increase in the amount he or she earned from this work during the period for which Disability Benefits are payable.

*Decreases in Coverage Amount*

An Employee may elect a decrease in his or her benefit amount at future annual enrollments or within 30 days after a Life Status Change by signing a change form. The lesser benefit amount will be effective on the date the completed change form is received by the Employer or Insurance Company.

LINA/Cleiland 0496

### Increases in Coverage Amount

During an Annual Enrollment Period an Employee may elect an increased benefit amount up to the Maximum Benefit Amount. If an Employee requests an increased benefit amount after the Annual Enrollment Period, this request will not be considered for eligibility until the following Annual Enrollment Period.

However, an Employee who has initially declined coverage for the higher benefits of Options 3 or 4 must satisfy the Insurability requirement for that amount.

If an Employee is not actively at work on the date an increased benefit amount would otherwise be effective, the Employee will become insured on the date he or she returns to work at his or her regular occupation for the Employer on a Full-time basis.

### Limit on Increases or Decreases

The Insurance Company reserves the right to limit or deny the amounts of insurance available to individuals who do not meet our underwriting requirements or where limited by law.

### Additional Benefits

*Rehabilitation During Disability*        Please refer to the Description of Benefits for an explanation of this benefit.

*Reasonable Accommodation Benefit*        Please refer to the Description of Benefits for an explanation of this benefit.

*Specified Loss Benefits*
Time Period for Accident        90 days

Table for Accidental Loss



| Loss | Benefit Period |
|------|----------------|
| Both hands or feet, the entire sight in both eyes, hearing in both ears, speech, one hand and one foot, one hand or foot and the entire sight of one eye | 46 Months |
| One arm or leg | 35 Months |
| One hand or foot | 23 Months |
| The entire sight in one eye or hearing in one ear | 15 Months |
| Thumb and index finger of either hand | 12 Months |

The loss of a hand or foot means the complete severance through or above the wrist or ankle joint. The loss of an arm or leg means complete severance through or above the elbow or knee joint. The loss of a thumb and index finger means complete severance through or above the metacarpophalangeal joints (the joints between the fingers and the hand). "Severance" means complete separation and dismemberment of the limb from the body. The loss of sight, speech or hearing means total and irrecoverable loss of the function.

LINA/Cleiland 0497

If more than one loss results from an Accident, the Insurance Company will pay for the longest benefit period of the losses incurred.

*Survivor Benefit*

| | |
|---|---|
| Benefit Waiting Period | After 6 Disability Benefits are payable. |
| Amount of Benefit | 100% of the sum of the last full Disability Benefit plus any current earnings by which the Disability Benefit was reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

**Maximum Benefit Period**

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 62 or under | The Employee's 65th birthday or the date the 42nd Monthly Benefit is payable, if later. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 24th Monthly Benefit is payable. |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 or older | The date the 12th Monthly Benefit is payable. |

**Initial Premium Rates**

| | |
|---|---|
| Options 1 and 2 | $.60 per $100 of Covered Payroll |
| Options 3 and 4 | An additional $.60 per $100 of Covered Payroll in excess of Options 1 and 2. |

Covered Payroll for an Employee will mean his or her covered earnings for the insurance month prior to the date the determination is made. For the Options 1 and 2, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $4,167. For Options 3 and 4, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $12,500.

TL-004774

LINA/Cleiland 0498

## DESCRIPTION OF BENEFITS

The following provisions explain the benefits available under the Policy. Please see the Schedule of Benefits for the applicability of these benefits on a class level.

**Disability Benefits**

The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician. Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue.

**Benefit Waiting Period**

The Benefit Waiting Period is the period of time an Employee must be continuously Disabled before Disability Benefits may be payable. The Benefit Waiting Period is shown in the Schedule of Benefits.

The Insurance Company will waive the Benefit Waiting Period for an Employee if benefits under a Prior Plan were payable on the Policy Effective Date and the Employee returns to Active Service within 6 months after that date. The return to Active Service must be for more than 14 consecutive days but less than 6 months. The later Disability must be caused by the same or related causes.

**Termination of Disability Benefits**

Disability Benefits will end on the earliest of the following dates.
1. The date an Employee earns more than 80% of his or her Indexed Covered Earnings
2. The date the Insurance Company determines an Employee is not Disabled
3. The end of the Maximum Benefit Period
4. The date an Employee dies
5. The date the Employee refuses to participate in rehabilitation efforts as required by the Insurance Company
6. The date the Employee is no longer receiving Appropriate Care

**Successive Periods of Disability**

Once an Employee is eligible to receive Disability Benefits under the Policy, separate periods of Disability resulting from the same or related causes are a continuous period of Disability unless the Employee can return to Active Service for 6 or more consecutive months.

A period of Disability is not continuous if separate periods of Disability result from unrelated causes or the later Disability occurs after coverage under the Policy ends.

The Successive Periods of Disability provision will not apply if an Employee is eligible for coverage under a plan that replaces this Policy.

## Mental Illness, Alcoholism and Drug Abuse Limitation

The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 months of Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.

1. Alcoholism
2. Anxiety Disorders
3. Delusional (paranoid) disorders
4. Depressive disorders
5. Drug addiction or abuse
6. Eating disorders
7. Mental Illness
8. Somatoform disorders (psychosomatic illness)

If, before reaching the lifetime maximum benefit, an Employee is confined in a hospital for more than 14 consecutive days, that period of confinement will not count against the lifetime limit. The confinement must be for the Appropriate Care of any of the conditions listed above.

## Pre-Existing Condition Limitation

The Insurance Company will not pay Disability Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre-Existing Condition. A "pre-existing condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance.

The Pre-Existing Condition Limitation will apply to any added benefits or increases in benefits. It will not apply to a period of Disability that begins after an Employee is in Active Service for at least 12 months after his or her most recent effective date of insurance or the effective date of any added or increased benefits.

The Pre-Existing Condition Limitation will not apply to an Employee covered under a Prior Plan who satisfied the pre-existing condition limitation, if any, under that plan. If an Employee, covered under a Prior Plan, did not fully satisfy the pre-existing condition limitation of that plan, credit will be given for any time that was satisfied.

Time will not be credited for any day an Employee is not actively at work due to his or her Injury or Sickness. The Pre-Existing Condition Limitation will be extended by the number of days the Employee is not actively at work due to his or her Injury or Sickness.

## Disability Benefit Calculation

The Disability Benefit for any month Disability Benefits are payable is shown in the Schedule of Benefits.  Disability Benefits are based on a 30 day period.  They will be prorated if payable for any period less than a month.

## Work Incentive Benefit

If an Employee is covered for Work Incentive Benefits, he or she may return to work while Disabled and Disability Benefits will continue.  The conditions under which an Employee may return to work and the amount of this benefit is shown in the Schedule of Benefits.



The Insurance Company will review the Employee's status and will require satisfactory proof of earnings and continued Disability.

## Other Income Benefits

While an Employee is Disabled, he or she may be eligible for benefits from other income sources. If so, the Insurance Company may reduce the Disability Benefits payable by the amount of such Other Income Benefits. The extent to which Other Income Benefits will reduce any Disability Benefits payable under the policy is shown in the Schedule of Benefits.

Other Income Benefits include:
1. any amounts which the Employee or any dependents, if applicable, receive (or are assumed to receive*) under:
   a.   the Canada and Quebec Pension Plans;
   b.   the Railroad Retirement Act;
   c.   any local, state, provincial or federal government disability or retirement plan or law;
   d.   any sick leave or salary continuation plan of the Employer;
   e.   any work loss provision in "No-Fault" auto insurance;
   f.   any Disability Benefits received from the Veterans' Administration;
   g.   any Workers' Compensation, occupational disease, unemployment compensation law or similar state or federal law, including all permanent as well as temporary disability benefits. This includes any damages, compromises or settlement paid in place of such benefits, whether or not liability is admitted.

2. any Social Security disability or retirement benefits the Employee or any third party receives (or is assumed to receive*) on the Employee's behalf or for his or her dependents; or, if applicable, which his or her dependents receive (or are assumed to receive*) because of the Employee's entitlement to such benefits.

3. any retirement plan benefits funded by the Employer. "Retirement plan" means any defined benefit or defined contribution plan sponsored or funded by an employer. It does not include an individual deferred compensation agreement; a profit sharing or any other retirement or savings plan maintained in addition to a defined benefit or other defined contribution pension plan, or any Employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or any Employee contributions under a 401(k) plan or any Employer match thereon.

4. any proceeds payable under any group insurance or similar plan. If there is other insurance that applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay for its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies.

5. any wage or salary for work performed. If an Employee is covered for Work Incentive Benefits, the Insurance Company will only reduce Disability Benefits to the extent provided under the Work Incentive Benefit in the Schedule of Benefits.

Dependents include any person who receives (or is assumed to receive)* benefits under any applicable law on account of an Employee's entitlement to benefits.

   * See the Assumed Receipt of Benefits provision.

12

LINA/Cleiland 0501

*Increases in Other Income Benefits*

After the first deduction for any Other Income Benefit (except wage or salary) is made, benefits will not be further reduced during that period of Disability due to any cost of living increase in that Other Income Benefit.

*Lump Sum Payments*

Other Income Benefits or earnings that are paid in a lump sum will be prorated over the period for which the sum is given. If no time is stated the lump sum will be prorated monthly over a five year period.

If no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit.

*Assumed Receipt of Benefits*

The Insurance Company will assume the Employee (or his or her dependents, if applicable) are receiving Other Income Benefits if they may be eligible for them. These assumed benefits will be the amount the Insurance Company estimates the Employee (or his or her dependents, if applicable) may be eligible to receive. Disability Benefits will be reduced by the amount of any assumed benefits as if they were actually received.

Except for any wage or salary for work performed while Disability Benefits are payable, this assumption will not be made if the Employee gives the Insurance Company proof of the following events.
1. Application was made for these benefits
2. A Reimbursement Agreement is signed
3. Any and all appeals were made for these benefits or the Insurance Company determines further appeals will not be successful
4. Payments were denied

The Insurance Company will not assume receipt of, nor reduce benefits by, any elective, actuarially reduced, or early retirement benefits under such laws until the Employee actually receives them.

*Social Security Assistance*

The Insurance Company will, at its discretion, assist the Employee in applying for Social Security Disability Income (SSDI) benefits. Disability Benefits will not be reduced by the assumed receipt of SSDI benefits while the Employee participates in the Social Security Assistance Program.

The Insurance Company may require the Employee to file an appeal if it believes a reversal of a prior decision is possible. If the Employee refuses to participate in, or cooperate with, the Social Security Assistance Program, the Insurance Company will assume receipt of SSDI benefits until the Employee gives us proof that all administrative remedies are exhausted.

**Minimum Benefit**

The Insurance Company will pay the Minimum Benefit regardless of any reductions made for Other Income Benefits However, if there is an overpayment due, this benefit may be reduced to recover the overpayment.

## Recovery of Overpayment

If benefits are overpaid, the Insurance Company has the right to recover the amount overpaid by either of the following methods.

1.    A request for lump sum payment of the overpaid amount
2.    A reduction of any amounts payable under the Policy

If there is an overpayment due when an Employee dies, any benefits payable under the Policy will be reduced to recover the overpayment.

TL-004771

# ADDITIONAL BENEFITS

## Rehabilitation During A Period of Disability

If, while an Employee is Disabled, the Insurance Company determines that he or she is a suitable candidate for rehabilitation he or she may participate in a Rehabilitation Plan. The terms and conditions of the Rehabilitation Plan must be mutually agreed upon by the Employee and the Insurance Company.

The Insurance Company may require an Employee to participate in a rehabilitation assessment or a Rehabilitation Plan at our expense. The Insurance Company will work with the Employee, the Employer and the Employee's Physician and others, as appropriate, to develop a Rehabilitation Plan. If the Employee refuses to participate in the rehabilitation efforts, Disability Benefits will not be payable.

The Rehabilitation Plan may, at the Insurance Company's discretion, allow for payment of the Employee's medical expense, education expense, moving expense, accommodation expense or family care expense while he or she participates in the program.

A "Rehabilitation Plan" is a written agreement between the Employee and the Insurance Company in which the Insurance Company agrees to provide, arrange or authorize vocational or physical rehabilitation services.

## Reasonable Accommodation Benefit

The Insurance Company may reimburse the Employer for expenses incurred in making a Reasonable Accommodation. For the Employer to be eligible for this benefit, the Reasonable Accommodation must meet the following conditions.

1.    It must be made on behalf of a Disabled Employee and result in his or her ability to return to any occupation for the Employer.
2.    It must be approved by the Insurance Company in writing before it is implemented or any expense is incurred.
3.    It must meet federal standards of a Reasonable Accommodation as detailed in the Americans with Disabilities Act of 1990 and any later amendments.

"Reasonable Accommodation" means any modification or adjustment to a job, an employment practice, or the work environment that makes it possible for a person with a disability to perform the material duties of any occupation without causing undue hardship to the Employer.

LINA/Cleiland 0503

## Spouse Rehabilitation Benefit

While an Employee is Disabled, his or her Spouse may, at the option of the Insurance Company, be eligible to participate in a Rehabilitation Plan. To be eligible, the following conditions must be met.

1.  The Employee must be continuously Disabled for 12 months
2.  The Spouse's earnings must be 60% or less than the Employee's Covered Earnings
3.  The Spouse must be determined by the Insurance Company to be a suitable candidate for re-employment.

The Spouse's Rehabilitation Plan may include, at the Insurance Company's discretion, payment of the Spouse's education expenses, reasonable job placement expenses and moving expenses. It may also include family care expenses if necessary for the Spouse to be retrained under the Rehabilitation Plan.

Disability Benefits will be reduced by 50% of a Spouse's earnings from Rehabilitative Work. If the Spouse was working before the Rehabilitation Plan begins, Disability Benefits will be reduced by 50% of the increase in income that results from a Spouse's participation in the program.

"Spouse" means the Employee's lawful spouse living with the Employee on the date his or her Disability begins. The Rehabilitation Plan will end if the Spouse is not living with the Employee during the term of the agreement.

TL-005105

## Specified Loss Benefit

If an Employee suffers a loss from an Accident, the Insurance Company will pay Disability Benefits as shown in the Table for Accidental Loss. For an Employee to be eligible for benefits, the following conditions must be met.

1.  The loss must occur within the Time Period for Accident and must be shown in the Table for Accidental Loss.
2.  The Accident must be the sole cause of the loss.
3.  The Accident and the resulting loss must occur while coverage is effective.
4.  The Benefit Waiting Period has been satisfied.

If an Employee dies within the Time Period for Accident, the Insurance Company will pay benefits for the period between the date Monthly Benefits are payable and the date the Employee dies. If the Employee dies after this time, but before the end of the Guaranteed Benefit Period, the Insurance Company will pay the rest in a lump sum.

"Accident" means a sudden, unforeseeable external event that causes bodily injury to an Employee.

TL-005108

## Survivor Benefit

The Insurance Company will pay a Survivor Benefit if an Employee dies while Monthly Benefits are payable. The Employee must have been continuously Disabled for the Survivor Benefit Waiting Period before the first benefit is payable. These benefits will be payable for the Maximum Benefit Period for Survivor Benefits.

Benefits will be paid to the Employee's Spouse. If there is no Spouse, benefits will be paid in equal shares to the Employee's surviving Children. If there are no Spouse and no Children, benefits will be paid to the Employee's estate

"Spouse" means an Employee's lawful spouse. "Children" means an Employee's unmarried children under age 21 who are chiefly dependent upon the Employee for support and maintenance.

TL-005107

## EXCLUSIONS

The Insurance Company will not pay Disability Benefits for a Disability that results, directly or indirectly, from any of the following events.

1. attempted suicide, or whenever an Employee injures himself or herself on purpose.
2. war or any act of war, whether or not declared.
3. serving on full-time active duty in any armed forces. If the Employee sends proof of military service, the Insurance Company will refund the portion of the premium paid to cover the Employee during a period of such service.
4. terrorism or active participation in a riot.
5. commission of a felony.
6. the revocation, restriction or non-renewal of an Employee's license, permit or certification necessary to perform the duties of his or her occupation unless due solely to Injury or Sickness otherwise covered by the Policy.
7. incarceration in a penal or corrections institution.

The Insurance Company will not pay Disability Benefits for any period of Disability during which the Employee does any of the following.

1. refuses to participate in rehabilitation efforts as required by the Insurance Company.
2. is not receiving Appropriate Care.
3. refuses to participate in a Transitional Work Arrangement or other modified work arrangement. These work arrangements mean any work offered to the Employee by the Employer or an affiliated company while the Employee is Disabled and which may be his or her own or any occupation. The work arrangements include, but are not limited to reassigned duties, work site modification, flexible work arrangements, job adaption or special equipment.
4. fails to cooperate with the Insurance Company in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

TL-004772

## CLAIM PROVISIONS

**Notice of Claim**
Written notice, or notice by any other electronic or telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 31 days after a covered loss occurs or begins or as soon as reasonably possible. If this notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written notice, or notice by any other electronic or telephonic means authorized by the Insurance Company, was given as soon as was reasonably possible. Notice can be given at our home office in Philadelphia, Pennsylvania or to our agent. Notice should include the Policyholder's name and Policy Number and the claimant's name and address.



**Claim Forms**
When the Insurance Company receives written notice of a claim, or notice by any other electronic or telephonic means authorized by the Insurance Company, it will send claim forms for filing proof of loss. If claim forms are not sent within 15 days after notice is received by the Insurance Company, the proof requirements will be met by submitting, within the time required under "Proof of Loss" section, written proof of the nature and extent of the loss.

**Claimant Cooperation Provision**
Failure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**Insurance Data**
The Employer is required to cooperate with the Insurance Company in the review of claims and applications for insurance. Any information the Insurance Company provides in these areas is confidential and may not be used or released by the Employer if not permitted by applicable privacy laws.

**Proof of Loss**
Written proof of loss must be given to the Insurance Company within 90 days after the date of the loss for which a claim is made. If written proof of loss is not given in that time, the claim will not be invalidated nor reduced if it is shown that written proof of loss was given as soon as was reasonably possible. In any case, written proof must be given not more than a year after the time otherwise required unless proof is not given solely due to the lack of legal capacity.

Within 30 days of a request, written proof of continued Disability and of regular attendance by a Physician must be given to the Insurance Company.

**Time of Payment**
Disability Benefits will be paid at regular intervals of not less frequently than once a month. Any balance, unpaid at the end of any period for which the Insurance Company is liable, will be paid at that time.

**To Whom Payable**
Disability Benefits will be paid to the Employee. If any person to whom benefits are payable is a minor or, in the opinion of the Insurance Company, is not able to give a valid receipt, such payment will be made to his or her legal guardian. However, if no request for payment has been made by the legal guardian, the Insurance Company, may at its option, make payment to the person or institution appearing to have assumed custody and support.

If an Employee dies while any Disability Benefits remain unpaid, the Insurance Company may, at its option, make direct payment to any of the following living relatives of the Employee: spouse, mother and father, natural or adopted children, brothers and sisters; or to the executors or administrators of the Employee's estate. The Insurance Company may reduce the amount payable by any indebtedness due.

Payment in the manner described above will release the Insurance Company from all liability for any payment made.

**Physical Examination and Autopsy**
The Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require. The Insurance Company may, at its expense, require an autopsy unless prohibited by law.

**Legal Actions**
No action at law or in equity may be brought to recover benefits under the Policy less than 60 days after written proof of loss has been furnished as required by the Policy. No such action shall be brought more than 3 years after the time written proof of loss must be furnished.

**Time Limitations**
If any time limit stated in the Policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity, is less than that permitted by the law of the state in which the Employee lives when the Policy is issued, then the time limit provided in the Policy is extended to agree with the minimum permitted by the law of that state.

**Physician/Patient Relationship**
The Employee will have the right to choose any Physician who is practicing legally. The Insurance Company will in no way disturb the Physician/patient relationship.

TL-004724

## ADMINISTRATIVE PROVISIONS

**Premiums**
The premiums for this Policy will be based on the rates currently in force, the plan and the amount of insurance in effect.

**Changes in Premium Rates**
The premium rates may be changed by the Insurance Company from time to time with at least 120 days advance written notice. No change in rates will be made until 24 months after the Policy Effective Date. An increase in rates will not be made more often than once in a 12 month period and will take effect on the Policy Anniversary Date. However, the Insurance Company reserves the right to change the rates at any time if any of the following events take place.
1.  The terms of the Policy change.
2.  A division, subsidiary, affiliated company or eligible class is added or deleted from the Policy, causing a change in the group demographic composition by 10% or more.
3.  There is a change in the factors bearing on the risk assumed because of a change in the group demographic composition by 10% or more.
4.  Any federal or state law or regulation is amended to the extent it affects the Insurance Company's benefit obligation.
5.  The Insurance Company determines that the Employer has failed to promptly furnish any necessary information requested by the Insurance Company, or has failed to perform any other obligations in relation to the Policy.

If an increase or decrease in rates takes place on a date that is not a Premium Due Date, a pro rata adjustment will apply from the date of the change to the next Premium Due Date.

As of any premium due date after the Policy has been in force for 24 months, the Insurance Company may grant a premium holiday in such amount as it may determine based on experience.

**Reporting Requirements**
The Employer must, upon request, give the Insurance Company any information required to determine who is insured, the amount of insurance in force and any other information needed to administer the plan of insurance.

**Payment of Premium**
The first premium is due on the Policy Effective Date. After that, premiums will be due monthly unless the Policyholder and the Insurance Company agree on some other method of premium payment.

If any premium is not paid when due, the Policy will be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

LINA/Cleiland 0507



**Notice of Cancellation**
The Policyholder or the Insurance Company may cancel the Policy as of any Premium Due Date by giving 31 days advance written notice. If a premium is not paid when due, the Policy will automatically be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

**Policy Grace Period**
A Policy Grace Period of 31 days will be granted for the payment of the required premiums under the Policy. The Policy will be in force during the Policy Grace Period. If the required premiums are not paid during the Policy Grace Period, insurance will end on the last Premium Due Date. The Policyholder will be liable to the Insurance Company for any unpaid premium for the time the Policy was in force.

**Grace Period for the Employee**
If the required premium is not paid on the Premium Due Date there is a 31 day grace period after each premium due date after the first. If the required premium is not paid during the grace period, insurance will end on the last day for which premium was paid.

**Reinstatement of Insurance**
An Employee's insurance may be reinstated if it ends because the Employee is on an unpaid leave of absence or an Employee is rehired within three months of the date of termination of employment and he or she applies for Reinstatement within 31 days of his return to Active Service.

An Employee's insurance may be reinstated only if reinstatement occurs within 6 months from the date insurance ends due to an Employer approved unpaid leave of absence or on any date in which he or she returns from active duty in the armed forces as defined by the Uniformed Services Employment and Reemployment Act of 1994 (USERRA) if the following conditions are met:
1.  An Employee must be in a Class of Eligible Employees.
2.  The required premium must be paid.
3.  A written request for reinstatement must be received by the Insurance Company within 31 days from the date an Employee returns to Active Service.

Reinstated insurance will be effective on the date the Employee returns to Active Service. If an Employee did not fully satisfy the Eligibility Waiting Period or the Pre-Existing Condition Limitation before insurance ended due to an unpaid leave of absence, credit will be given for any time that was satisfied.

TL-004720

## GENERAL PROVISIONS

**Entire Contract**
The entire contract will be made up of the Policy, the application of the Policyholder, a copy of which is attached to the Policy, and the applications, if any, of the Employees.

**Incontestability**
All statements made by the Policyholder or by an Employee are representations not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a copy of the instrument containing the statement is signed by the Employee and has been furnished to the claimant. In the event of death or incapacity, the beneficiary or representative must receive the copy.

After two years from an Employee's effective date of insurance, or from the effective date of any added or increased benefits, the validity of an Employee's insurance under the Policy may not be contested using such statements.

LINA/Cleiland 0508



**Misstatement of Age**
If an Employee's age has been misstated, the Insurance Company will adjust all benefits to the amounts that would have been purchased for the correct age.

**Policy Changes**
No change in the Policy will be valid until approved by an executive officer of the Insurance Company. This approval must be endorsed on, or attached to, the Policy. No agent may change the Policy or waive any of its provisions.

**Workers' Compensation Insurance**
The Policy is not in lieu of and does not affect any requirements for coverage under any Workers' Compensation Insurance.

**Certificates**
An individual certificate of insurance will be delivered to the Policyholder for delivery to Employees. Each certificate will list the benefits, conditions and limits of the Policy. It will state to whom benefits will be paid.

**Assignment of Benefits**
The Insurance Company will not be affected by the assignment of an Employee's certificate until the original assignment or a certified copy of the assignment is filed with us. The Insurance Company will not be responsible for the validity or sufficiency of an assignment. An assignment of benefits will operate so long as the assignment remains in force provided coverage under the Policy is in effect. This insurance may not be levied on, attached, garnished, or otherwise taken for a person's debts. This prohibition does not apply where contrary to law.

**Conformity with State Statutes**
Any provision of the Policy in conflict on the Policy Effective Date with the laws of the state where the Policy is delivered is amended to conform to the minimum requirements of such laws.

**Clerical Error**
A person's insurance will not be affected by error or delay in keeping records of insurance under the Policy. If such an error is found, the premium will be adjusted fairly.

**Agency**
The Employer and plan administrator are agents of the Employee for transactions relating to insurance under the Policy. The Insurance Company is not liable for any of their acts or omissions.

TL-004726

## DEFINITIONS

Please note, certain words used in this document have specific meanings. These terms will be capitalized throughout this document. The definition of any word, if not defined in the text where it is used, may be found either in this Definitions section or in the Schedule of Benefits.

**Active Service**
An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if either of the following conditions are met.

1.  He or she is actively at work. This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel.

2.  The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

20

LINA/Cleiland 0509



An Employee is considered in Active Service on a day which is not one of the Employer's scheduled work days only if he or she was in Active Service on the preceding scheduled work day.

**Annual Enrollment Period**
The period in each calendar year agreed upon by the Employer and the Insurance Company when an eligible Employee may enroll for or change benefit elections under the Policy.

**Appropriate Care**
Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability, or ongoing medical treatment and care of the Employee's Disability by a Physician that conforms to generally-accepted medical standards, including frequency of treatment and care.

**Consumer Price Index (CPI-W)**
The Consumer Price Index for Urban Wage Earners and Clerical Workers published by the U.S. Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

**Employee**
For eligibility purposes, an Employee is an employee of the Employer in one of the "Classes of Eligible Employees." Otherwise, Employee means an employee of the Employer who is covered under the Policy.

**Employer**
The Policyholder and any affiliates or subsidiaries covered under the Policy. The Employer is the agent of the Employee for transactions relating to this insurance. The actions of the Employer shall not be considered actions of the Insurance Company.

**Flexible Benefits Plan**
The Flexible Benefits Plan is the Employee Benefits Plan arrangement sponsored by the Employer for eligible Employees.

**Full-time**
Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class.

**Indexed Covered Earnings**
For the first 12 months Monthly Benefits are payable, Indexed Covered Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable, Indexed Covered Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of:
1.  10% of the Employee's Indexed Covered Earnings during the preceding year of Disability; or
2.  the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

**Injury**
The term Injury means an accidental loss or bodily harm.

**Insurability Requirement**
An Employee will satisfy the Insurability Requirement on the day the Insurance Company agrees in writing to accept the Employee as covered under the Policy. To determine an Employee's acceptability for coverage, the Insurance Company will require evidence of good health and may require it be provided at the Employee's expense.

**Insurance Company**
The Insurance Company underwriting the Policy is named on the Policy cover page.

21

LINA/Cleiland 0510

**Conformity with State Statutes**
Any provision of the Policy in conflict on the Policy Effective Date with the laws of the state where the Policy is delivered is amended to conform to the minimum requirements of such laws.

**Clerical Error**
A person's insurance will not be affected by error or delay in keeping records of insurance under the Policy. If such an error is found, the premium will be adjusted fairly.

**Agency**
The Employer and plan administrator are agents of the Employee for transactions relating to insurance under the Policy. The Insurance Company is not liable for any of their acts or omissions.

TL-004726

# DEFINITIONS

Please note, certain words used in this document have specific meanings. These terms will be capitalized throughout this document. The definition of any word, if not defined in the text where it is used, may be found either in this Definitions section or in the Schedule of Benefits.

**Active Service**
An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if either of the following conditions are met.

1. He or she is actively at work. This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel.
2. The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

An Employee is considered in Active Service on a day which is not one of the Employer's scheduled work days only if he or she was in Active Service on the preceding scheduled work day.

**Annual Enrollment Period**
The period in each calendar year agreed upon by the Employer and the Insurance Company when an eligible Employee may enroll for or change benefit elections under the Policy.

**Appropriate Care**
Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability, or ongoing medical treatment and care of the Employee's Disability by a Physician that conforms to generally-accepted medical standards, including frequency of treatment and care.

**Consumer Price Index (CPI-W)**
The Consumer Price Index for Urban Wage Earners and Clerical Workers published by the U.S. Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

**Employee**
For eligibility purposes, an Employee is an employee of the Employer in one of the "Classes of Eligible Employees." Otherwise, Employee means an employee of the Employer who is covered under the Policy.

22

LINA/Cleiland 0511

**Employer**
The Policyholder and any affiliates or subsidiaries covered under the Policy. The Employer is the agent of the Employee for transactions relating to this insurance. The actions of the Employer shall not be considered actions of the Insurance Company.

**Flexible Benefits Plan**
The Flexible Benefits Plan is the Employee Benefits Plan arrangement sponsored by the Employer for eligible Employees.

**Full-time**
Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class.

**Indexed Covered Earnings**
For the first 12 months Monthly Benefits are payable, Indexed Covered Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable, Indexed Covered Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of:
1.    10% of the Employee's Indexed Covered Earnings during the preceding year of Disability; or
2.    the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

**Injury**
The term Injury means an accidental loss or bodily harm.

**Insurability Requirement**
An Employee will satisfy the Insurability Requirement on the day the Insurance Company agrees in writing to accept the Employee as covered under the Policy. To determine an Employee's acceptability for coverage, the Insurance Company will require evidence of good health and may require it be provided at the Employee's expense.

**Insurance Company**
The Insurance Company underwriting the Policy is named on the Policy cover page.

**Life Status Change**
A Life Status Change is an event recognized by the Employer's Flexible Benefits Plan as qualifying an Employee to make changes in benefit selections at a time other than an Annual Enrollment Period.

If there is no Employer sponsored Flexible Benefits Plan, or if it is no longer in effect, the following events are Life Status Changes.
1.    Marriage
2.    Divorce, annulment or legal separation
3.    Birth or adoption of a child
4.    Death of a spouse
5.    Termination of a spouse's employment
6.    A change in the benefit plan available to the Employee's spouse
7.    A change in the Employee's or spouse's employment status that affects either's eligibility for benefits

23

LINA/Cleiland 0512

**Physician**
Physician means a licensed doctor practicing within the scope of his or her license and rendering care and treatment to an Employee that is appropriate for the condition and locality. The term does not include an Employee, an Employee's spouse, the immediate family (including parents, children, siblings or spouses of any of the foregoing, whether the relationship derives from blood or marriage), of an Employee or spouse, or a person living in an Employee's household.

**Prior Plan**
The Prior Plan refers to the plan of insurance providing similar benefits to an Employee sponsored by the Employer and in effect directly prior to the Policy Effective Date.

**Sickness**
The term Sickness means a physical or mental illness.

TL-004708

LINA/Cleiland 0513



## IMPORTANT INFORMATION ABOUT COVERAGE UNDER
## THE TEXAS LIFE, ACCIDENT, HEALTH AND HOSPITAL SERVICE
## INSURANCE GUARANTY ASSOCIATION

Texas law establishes a system, administered by the Texas Life, Accident, Health and Hospital Service Insurance Guaranty Association (the "Association"), to protect policyholders if their life or health insurance company fails to or cannot meet its contractual obligations. Only the policyholders of insurance companies which are members of the Association are eligible for this protection. However, even if a company is a member of the Association, protection is limited and policyholders must meet certain guidelines to qualify. (The law is found in the Texas Insurance Code, Article 21.28-D.)

BECAUSE OF STATUTORY LIMITATIONS ON POLICYHOLDER PROTECTION, IT IS POSSIBLE THAT THE ASSOCIATION MAY NOT COVER YOUR POLICY OR MAY NOT COVER YOUR POLICY IN FULL.

ELIGIBILITY FOR PROTECTION BY THE ASSOCIATION
When an insurance company which is a member of the Association is designated as impaired by the Texas Commissioner of Insurance, the Association provides coverage to policyholders who are:
- residents of Texas at the time that their insurance company is impaired;
- residents of other states, ONLY if the following conditions are met:
    1) The policyholder has a policy with a company based in Texas;
    2) The company has never held a license in the policyholder's state of residence;
    3) The policyholder's state of residence has a similar guaranty association; and
    4) The policyholder is not eligible for coverage by the guaranty association of the policyholder's state of residence.

LIMITS OF PROTECTION BY THE ASSOCIATION
Accident, Accident and Health, or Health Insurance:
- up to a total of $200,000 for one or more policies for each individual covered.
Life Insurance:
- net cash surrender value up to a total of $100,000 under one or more policies on any one life; or
- death benefits up to a total of $300,000 under one or more policies on any one life.
Individual Annuities:
- net cash surrender amount up to a total of $100,000 under one or more policies owned by one contract holder.
Group Annuities:
- net cash surrender amount up to $100,000 in allocated benefits under one or more policies owned by one contract holder; or
- net cash surrender amount up to $5,000,000 in unallocated benefits under one contract holder regardless of the number of contracts.

THE INSURANCE COMPANY AND ITS AGENTS ARE PROHIBITED BY LAW FROM USING THE EXISTENCE OF THE ASSOCIATION FOR THE PURPOSE OF SALES, SOLICITATION, OR INDUCEMENT TO PURCHASE ANY FORM OF INSURANCE.

When you are selecting an insurance company, you should not rely on coverage by the Association.

Texas Life, Accident, Health and Hospital                Texas Department of Insurance
Service Insurance Guaranty Association                   P.O. Box 149104
301 Congress, Suite 500                                  Austin, Texas 78714-9104
Austin, Texas 78701                                      800-252-3439
800-982-6362

LINA/Cleiland 0514

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the Life Insurance Company of North America, Group Insurance's toll-free telephone number for information or to make a complaint at:

1-800-441-1832

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the
Texas Department of Insurance
P.O. Box 149104
Austin, TX  78714-9104
FAX # (512) 475-1771

PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim you should contact the agent or company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

ATTACH THIS NOTICE TO YOUR POLICY:  This notice is for information only and does not become a part or condition of the attached document.

TL-004426

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis del Life Insurance Company of North America, Group Insurance Division para informacion o para someter
una queja al:

1-800-441-1832

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

1-800-252-3439

Puede escribir al Departamento de
Seguros de Texas
P.O. Box 149104
Austin, TX  78714-9104
FAX # (512) 475-1771

DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a
su prima o a un reclamo, debe comunicarse con
agente o la compania primero.
Si no se resuelve la disputa, puede
entonces comunicarse con el
departamento (TDI).

UNA ESTE AVISO A SU POLIZA:
Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

LINA/Cleiland 0515

# EXHIBIT

## "B"




**CIGNA** Group Insurance
Life • Accident • Disability

May 27, 2003

P.O. Box 2052
Tarrytown, NY 10591-9052
1.800.376.0725

TO:  CLEILAND, CATHY K
     8 CHEROKEE DRIVE #27
     MONROEVILLE, AL 36460

RE: CLEILAND, CATHY K
DATE OF BIRTH:
POLICY/PLAN HOLDER: TEMPLE INLAND
POLICY/PLAN #: UNKNOWN
COMPANY NAME: Life Insurance Company of North America

Dear Ms. Cleiland:

We acknowledge receipt of your claim for Short Term Disability (STD) benefits. We will do everything we can to
ensure your satisfaction and to make this process as simple as possible during this difficult time.

We are unable to make a determination on your claim based upon the information submitted. Therefore, we are requesting
additional medical information from John Hackman.

We must obtain medical information in order to verify your diagnosis and current functional abilities, and your current
treatment plan. We also ask that you review and sign the enclosed claim form (if any information is missing or
incorrect, please change it on the form) and Disclosure Authorization form, and return them to us at the address
listed above.

We expect to receive this information from either you or your physician within two weeks from the date that we received
your claim. We hope to be able to make a decision on your claim at that time. If we are unable to make the decision within
30 days of the day we received your claim, we will contact you and explain the reason for the delay.

As we mentioned above, we ask that you sign and return the enclosed Disclosure Authorization form to us as soon as
possible. To expedite processing of your claim, please feel free to fax the authorization to 800-377-4286   .
(If you cannot fax the authorization to our office, please return it to the address listed above.) We may be unable to obtain
medical information relevant to your claim without a signed authorization to release form. If we cannot get this
information, we cannot make a determination on your claim and any potential benefit payments may be delayed.

Please note that we are pursuing the information needed to make a decision on your claim. However, in the event that we
are unable to obtain this information, it is your responsibility to provide us with the required information. Please contact
your physicians and ask that they cooperate with us and respond to our requests as soon as possible. If we do not receive
the information needed by 07/10/2003, we will make a decision based on the information in our file.

We expect that you will return to work as soon as you are safely able to do so. In order to facilitate your return to work,
you may be contacted by one of our Nurse Case Managers or Vocational Rehabilitation Counselors. Please cooperate with
these individuals if you are contacted. Please keep us up-to-date on your condition by calling us after each of your doctor's
visits. Also, notify us immediately if you are released to return to work or if you actually do return to work.

LINA/Cleiland 1052

 

If you have other types of coverage that may pay benefits for this condition, you may submit a claim. For example, if yo life insurance plan includes a waiver of premium for disability, you may be eligible to submit a waiver claim. Please review the provisions of your booklet or certificate. Please review your Summary Plan Description or benefit booklet for more information on your benefits and to determine if you are eligible for additional benefits.

Please notify us if you begin to receive any other sources of income. This may include, but is not limited to: Social Security Disability or Retirement, Worker's Compensation, No-Fault disability insurance, pension, Veteran's benefits or any other disability payments from another group insurance policy.

Should you have any questions regarding this correspondence, please feel free to contact us.

Sincerely,
CIGNA Group Insurance

---

[1] Your employee benefit plan's Plan Administrator has selected the insurance company as the fiduciary for the review and determination of claims for benefits under federal law. The insurance company shall have the authority, in its discretion, to interpret plan documents, to decide questions of eligibility for coverage or benefits, to make findings of fact and to decide appeals of denied claims. Such decisions shall be final and binding on plan participants and beneficiaries to the full extent permitted by law.

*Policy / Coverage Nos.* UNKNOWN
*Disability Proof of Loss*





CIGNA Group Insurance
Life • Accident • Disability

Life Insurance Company of North America
Connecticut General Life Insurance Company
CIGNA Life Insurance Company of New York

**CIGNA**

---

**FRAUD WARNING:** Any person who, knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or (2) conceals for the purpose of misleading, information concerning any material fact thereto, commits a fraudulent insurance act. *For residents of the following states, please see the reverse side of this form: Colorado, District of Columbia, Florida, Maryland, New Jersey, New York, Pennsylvania, Oregon, or Virginia.*

---

### INSTRUCTIONS FOR FILING A CLAIM

This form is a single application for Short Term and Long Term Disability Benefits and contains the information reported to our service center.

To The Employee:  A. Please review this information carefully.
         B. Make any changes you feel are necessary.
         C. Sign the section marked Employee Certification and the Disclosure Authorization.
         D. Return the signed forms to our office.

If these instructions are not followed, your claim may be subject to a delay or return.

---

### EMPLOYEE INFORMATION

Name of Employee (Last, First, Middle):
CLEILAND, CATHY  K

Date of Birth: ▮▮▮▮▮ | Social Security Number: ▮▮▮▮▮ | Sex: ○Male ●Female ○Unknown

Address (Street, Apt.):
8 CHEROKEE DRIVE #27

| City: | State: | Zip Code: | Telephone No.: |
|---|---|---|---|
| MONROEVILLE | AL | 36460 | |

Please describe your condition:
Lower Back Surgery (Name Of Surgery Unsure)Pinched Nerve

---

### PLEASE COMPLETE SECTIONS A, B OR C - AND THE REMAINDER OF THE APPLICATION

**A** | Is this an Injury? ●Yes ○No ○Unknown | Date of Injury: 04/24/2002 | Time of Injury: 07:00 AM | Is this work related? ○Yes ●No ○Unknown

Describe the cause of injury:
Car Accident

**B** | Is this an Illness? ○Yes ●No ○Unknown | Date of Illness: | | Is this work related? ○Yes ○No ○Unknown

Describe the cause of Illness:

**C** | Is this an Pregnancy? ○Yes ●No ○Unknown | Delivery/Due Date: | Delivery Method: | Were there complications? ○Yes ○No ○Unknown

Describe the Complications:

---

Are you currently losing time from work? ●Yes ○No ○Unknown | If yes, what specifically prevents you from working?

| Last Day Worked: 05/13/2003   # hours worked: 18.00 | Date first unable to work: 05/14/2003 | Date You Plan to Return to Work 07/07/2003 |
|---|---|---|

Have you had the same or similar condition in the past? ○Yes ●No ○Unknown | If yes, when did it occur (dates)? | Please describe:

Please list any states in which you may be liable for filing tax returns:
AL

Are you receiving any other income or benefits? If so, please complete the following.

| Benefit Type | Gross Weekly Amount | Date Began | Paid thru Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

---

LINA/Cleiland 1054

Please list any hospitals, clinics or physicians that treated you for your condition:

| Name & Address | Telephone No. | Specialty | First Treatment Date | Last Treatment Date |
|---|---|---|---|---|
| John Hackman<br>Unknown<br>MONTGOMERY, AL 36106 | (334) 834-1663 | Surgery,<br>Neurological | | 05/22/2003 |
| | | | | |
| | | | | |
| | | | | |

## EMPLOYMENT INFORMATION

| Occupation:<br>Human Resource Manager | Date Hired:<br>08/24/1998 | Basic Earnings:<br>$2,000.00 | Frequency:<br>BI-WEEKLY | Date of last change in earnings:<br>08/01/1998 |
|---|---|---|---|---|

Please provide a brief description of daily job duties:

Management Employee Relations

Please check the appropriate items regarding this employee:

- [ ] Exempt
- [x] Non-Exempt
- [ ] Management
- [x] Non-Management
- [ ] Supervisory
- [x] Non-Supervisory
- [x] Salaried
- [ ] Hourly
- [x] Full Time
- [ ] Part Time
- Hours/Week  40.00
- [ ] Union - Local #
- [x] Non-Union

| Has Employee been laid off?<br>◯Yes ●No ◯Unknown | Or terminated?<br>◯Yes ●No ◯Unknown | If yes, please indicate the date and reason: |
|---|---|---|

| STD Policy / Covg. Number:<br>UNKNOWN | Effective date of employee's STD coverage: | Was STD insurance issued on the basis of a statement of physical condition?<br>◯Yes ◯No ●Unknown |
|---|---|---|

| Percent of Employee's STD contribution:<br>0.00 % | Employee's contributions were made on:<br>◯ Pre-Tax Basis  ◯ Post-Tax Basis | Premium Paid Thru Date: |
|---|---|---|

| LTD Policy / Covg. Number: | Effective date of employee's LTD coverage: | Was LTD insurance issued on the basis of a statement or physical condition?<br>◯Yes ◯No ◯Unknown |
|---|---|---|

| Percent of Employee's LTD contribution:<br>% | Employee's contributions were made on:<br>◯ Pre-Tax Basis  ◯ Post-Tax Basis | Premium Paid Thru Date: |
|---|---|---|

## EMPLOYEE WORK LOCATION

| Employer Name:<br>TEMPLE INLAND<br>Address (include Street, City, State & Zip):<br>P.O. BOX 966  MONROEVILLE AL  36461 | Contact Person:<br><br>Telephone No.: |
|---|---|

## ADDITIONAL EMPLOYERS (if applicable)

| Employer Name:<br><br>Address (include Street, City, State & Zip): | Title | Contact Person:<br><br>Telephone No.: |
|---|---|---|

| Name of Employee (Last, First, Middle):<br>CLEILAND, CATHY K | Social Security Number: |
|---|---|

## CERTIFICATION

This is to certify the facts as indicated above are true to the best of my knowledge and belief.

Signature of Employee:

Date of signature:

The issuance of this form is not an admission of the existence, nor does it recognize the validity, of any claim and is without prejudice to the company's legal rights in the premises.

612286 (03/2003)    STD

Page 4 of 9

LINA/Cleiland 1055

# EXHIBIT

## "C"

Jennifer L. Leahy
Case Manager III
Disability Management Solutions



**CIGNA** Group Insura
Life · Accident · Disability

FILE COPY

June 4, 2003

Routing  1115
P.O. Box 2052
Tarrytown, NY 10591
Telephone  1-800-376-0725 ext
1230
Facsimile  1-860-298-6555

CATHY CLEILAND
8 CHEROKEE DRIVE #27
MONROEVILLE, AL 36460

| | |
|---|---|
| **Name of Insured:** | **Cathy Cleiland** |
| **Policy Number:** | **SHD 020035** |
| **Policyholder:** | **Temple Inland** |
| **Administered By:** | **Life Insurance Company of North America** |

Dear Ms. Cleiland:

We have evaluated the circumstances that are preventing you from working.  We have been unable to reach you or your physician to confirm the type of procedure you had on May 21, 2003.  Therefore, with the current information of file we would assume you would be able to return to work after 4 weeks of recovery as of **June 18, 2003**.  Please call our office to clarify your diagnosis and type of surgery.

If you are able to return to work prior to **June 18, 20033** please contact our office immediately.

If you are unable to return to work on **June 18, 2003** for medical reasons, please have your physician complete the attached Disability Extension Form.

Please be certain to keep your employer informed of your return to work status.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy.  This determination has been made in good faith without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein. We will be pleased to review any information you have that would prove contrary to our findings.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

# EXHIBIT

## "D"

10/2003 11:44 FAX  1 334 834 1936    DR JOHN HACKMAN                    ☒007/007
3/09/2003 15:32 FAX                   Cigna                             ☒002



**CIGNA** Group Insurance
Life · Accident · Disability
Please return to Jennifer Leahy at fax #(860) 298-6555

## EXTENSION OF DISABILITY REQUEST FORM

| Claimant Name: | Cathy Cleiland | Claimant DOB: | |
|---|---|---|---|

If you feel your patient will be unable to return to work on **July 16, 2003**, we require additional information to substantiate a continuing disability. **Please provide a copy of office visit notes and diagnostic testing results from the date you began treating this patient for this condition through the present.** In addition, we would appreciate a response to the following questions.

1. What is the primary diagnosis?

    Lumbar radiculitis, L4-5, left

2. Are there any other diagnoses?

    _____

    _____

3. What are the specific limitations you have placed on your patient, if any?

    See post-operative instructions

    _____

4. What are the complicating factors preventing recovery, if any?

    _____

    _____

5. What is your patient's expected return to work date?    approx 8/13/03
6. What is your current treatment plan for this patient?    rest and recovery for lumbar laminectomy

    done on 5/21/03

7. When is your patient's next office visit?    07/08/03
8. When was your patient's last office visit?    4/23/03
Completion of this form without accompanying medical records will not be sufficient to consider extension of disability.

Written Name _____    Signature and date _____
                                  John E. Hackman, M.D.
Neurosurgeon _____     1722 Pine Street, Suite 1001, Montgomer
Specialty, if applicable          Telephone Number 36109
                                  (334) 834-892
*Confidential, unpublished property of CIGNA. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel. © Copyright 2003 CIGNA*

# EXHIBIT

## "E"

07/18/2003 11:38 FAX  1 334 834 1936      DR JOHN HACKMAN                    ☒ 002/008
07/17/2003 10:25 FAX            Cigna                    ☒ 002

*Disability Management Solutions* ℠
*Follow-Up Medical Request Form*

CIGNA Group Insurance
Life • Accident • Disability
Life Insurance Company of North America
Connecticut General Life Insurance Company
CIGNA Life Insurance Company of New York

We are continuing to evaluate your patient's disability claim. Please respond to the following questions.
Attached is a Department of Labor description of your patient's occupation for your reference.
**Please document your medical findings by providing copies of supporting reports, such as office notes/consultations/testing.**
*(Failure to provide the requested reports may result in delay in the claim determination.)*

| Claimant Name: | Date of Birth: |
|---|---|
| **Cathy Cleiland, Please fax response to JLeahy (860) 298-6555** | |

How has the patient's condition changed since the last update?   ☐ No change   ☐ Improved   ☐ Worse

Patient had additional back surgery on 7/16/03

| Date of your patient's last office visit: | When is your patient's next office visit? |
|---|---|
| 7/17/03 – discharged from hospital | 8/28/03 |

Please list any change in the treatment plan since the last update:

Patient had a recurrence of pain in her left hip and leg, MRI scan showed   a large
recurrent disc herniation at L4-5 on the left with extruded fragments

Please list all current medications that are related to this impairment or impact return to work:



What are the specific restrictions that you have placed on your patient at this time?   See post-op discharge instructions

At Work: Patient is recovering from back surgeries done on 5/21/03 and 7/16/03



At Home  *(Activities of Daily Living)*:



Do you expect functional deficits to prevent your patient from performing essential job functions?   ☒ Yes   ☐ No
Please specify:



Could your patient return to work at this time if accommodations were made for the listed restrictions?   ☐ Yes   ☒ No
If no, why not?   She is recovering from back surgery done on 7/16/03

If no, based on your experience, what is your best estimate of when your patient can return to work?   approx 10/8/03
With Restrictions: _____   Without Restrictions: _____

| Physician Name: *(Please Print)* | Degree & Specialty: |
|---|---|
| John E. Hackman, M.D. | Neurosurgeon |
| Address: *(Street, City, State, Zip Code)* | |
| 1722 Pine Street, Suite 1001, Montgomery, AL  36106 | |
| Telephone Number: | Federal Tax ID #: |
| (334 )  834-1663 | |
| Physician Signature: | Date: |
|  | 7/18/03 |

818283  5-03                              *Thank you for your time.*

LINA/Cleiland 1019

# EXHIBIT

## "F"

Jennifer L. Leahy
Case Manager III
Disability Management Solutions



**CIGNA** Group Insurai
Life · Accident · Disability

FILE COPY

August 12, 2003

Routing 1115
P.O. Box 2052
Tarrytown, NY 10591
Telephone 1-800-376-0725 ext
1230
Facsimile 1-860-298-6555

CATHY CLEILAND
8 CHEROKEE DRIVE #27
MONROEVILLE, AL 36460

| | |
|---|---|
| **Name of Insured:** | **Cathy Cleiland** |
| **Policy Number:** | **SHD 020035** |
| **Policyholder:** | **Temple Inland** |
| **Administered By:** | **Life Insurance Company of North America** |

Dear Ms. Cleiland:

We have completed a thorough review of a claim submitted on your behalf from your employer, Temple Inland

We have informed your employer that your claim has been approved through **October 7, 2003.**

If you are able to return to work prior to **October 8, 2003** please contact our office immediately.

If you are unable to return to work on **October 8, 2003** for medical reasons, please have your physician complete the attached Disability Extension Form.

Please be certain to keep your employer informed of your return to work status.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein. We will be pleased to review any information you have that would prove contrary to our findings.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

LINA/Cleiland 1015

# EXHIBIT

# "G"

# TEAM STAFFING
## QUICK FILE REVIEW FORM

Date of Staffing: 9/29

(251) 342 5545

| CM NAME: | O Leahy |
|---|---|
| CX's NAME: | Cathy Cleiland |
| AGE: | 45 |
| SSN: | ████████ |
| OCCUPATION: | HR Manager |
| DX: | L4-S5 radiculitis |
| DOI: | 5/14/03 |
| SURGERY DATE: | ~~#5~~ 5/21/03 laminectomy & re-exploration laminectomy 7/10/03 |
| LTD? | yes | STD MAX DATE: | 11/11/03 |

| SUGGESTED STRATEGY | prepare for LTD referral |
|---|---|
| | Cx s/p 2 disc surgers. Cx continue c̅ L4-L5 radiculite. |
| | Cx has a RTW of 10/8/03. CM concern this this way not occur because of extreme pain |
| RECOMMENDED DURATION OF DISABILITY | If no RTW - please get mobility standing. See how symptomatic Cx is c̅ sitting. this could be |
| | Check here if this needs to be Assigned to NCM for Medical Management |

a problem

| NCM: | Dele Ofton | | |
|---|---|---|---|
| TL/SCM: | | CM: | |

## STD TO LTD REFERRAL FORM

| PH NAME: | Temple | STD POL #: | SHD 020035 | LTD POL #: | FLK 020104 |
|---|---|---|---|---|---|
| STD CM NAME: | Jennifer Leahy | | LTD CM NAME: | | Karen Kirby |
| CLAIMANT: | Cathy Cleiland | SSN: | | AGE: | 46 |
| DOI: | 05/14/03 | BEN PD THRU: | 10/07/03 | STD MAX: | 11/11/03 |
| OCC: | HR Manager | | DIAGNOSIS: | | L4-5 radiculitis |
| ICD-9: | | | MVA OR WC: (CIRCLE ONE) | | |
| MED REVIEW IN FILE: | Yes | | IF YES, DATE REVIEWED: | | 09/29/03 |

| CLAIM SUMMARY: |
|---|
| Scheduled RTW 100803, but is possible tht CX will not RTW at that time based on past hx of pain. I will let you know when I hear back from CX.  052103 L4-5 Laminectomy & 071603 re-exploration laminectomy. |

| JD IN FILE? | No | EST RTW DATE: | 100803 |
|---|---|---|---|

**********************************************************************

| PLEASE SET DIARY FOR LTD SCM AND CHECK HERE WHEN COMPLETED! | done |
|---|---|

*STD TO LTD REFERRAL INFO:*

TO: LTD SA: _Louise_     FROM: SCM/TL _JKirby_     DATE _10/1/03_

✓ LTD SA – Copy/Create LTD File, refer to LTD SCM. Return original to: _Jen Leahy_

___ LTD SA – Shared Policyholder. Do NOT copy file. Create LTD file and refer to LTD SCM

LTD SA: _Donna Zacchio_     Dated Completed: _10/1/03_

LINA/Cleiland 1014

# EXHIBIT

# "H"

# PART 1



ADVANTAGE 2000
CONSULTANTS INC.
"Your Gateway to Social Security"

*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

Friday, May 20, 2005

Ms. Cathy A Cleiland
P.O. Box 148
Clio, AL 36017

RE: 

Dear Ms. Cleiland:

I am writing to you about your claim for Social Security Disability benefits.

I wanted to let you know the status of your claim. We are still waiting for a hearing date. Do you have a current phone number? I called your mother's house but there was no answer. Please call me with a current phone number.

You can reach me toll free at the 800 number shown above.

Sincerely,

Trudy Wagner
Case Manager Assistant

ADVANTAGE001



ADVANTAGE 2000
CONSULTANTS INC.
"Your Gateway to Social Security"

Visit Us Online at: www.advantage2k.com

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

Friday, January 07, 2005

Ms. Cathy A Key
P.O. Box 148
Clio, AL 36017

RE: ▆▆▆▆▆▆

Dear Ms. Key:

I am writing to you about your claim for Social Security Disability benefits.

I was trying to reach you to give you the current status of your case.  I called the OHA (Office of Hearings and Appeals) today.  At the current time, the OHA said your case is in  unworked mode.  This means that the court has not worked up your file and  it will be a while before we get a court date.  We will notify you as soon as the status changes on your case.

Please call me if you have any questions about this matter. You can reach me toll free at the 800 number shown above.

Sincerely,

Dan Schulte
Case Manager

ADVANTAGE002



*Visit Us Online at www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Tuesday, March 09, 2004

Ms. Cathy Cleiland
8 Cherokee Dr., Num.27
Monroeville, AL 36460

RE: ▰▰▰▰▰▰

Dear Ms. Cleiland:

I am writing to advise you that I submitted the appropriate forms and authorizations to the Social Security Administration (SSA) today to appeal the recent denial of your claim for disability benefits.  Please take notice of the following:

**1)**  If you are contacted directly by SSA, please let me know.  SSA should send copies of all correspondence to me as well, but this does not always happen.  I am responsible for providing the information needed to process your claim.  In turn, I need a copy of any documents that you have received from SSA.

**2)**  If you seek any medical attention, related or unrelated to your current disabling condition, please inform me.  Additional medical evidence or additional medical problems can result in receiving a favorable decision from SSA.

**3)**  While your claim is awaiting a decision, CIGNA Group Insurance - Dallas TX FCO generally continues to pay long term disability (LTD) at a level that is not adjusted for the anticipated Social Security Disability (SSDI) benefit.  When SSDI claims are awarded, an offset and overpayment often exist with the LTD company.  If your SSDI claim is ultimately approved, keep in mind that your LTD company representative will be contacting you to coordinate the integration of your SSDI benefits with your LTD payment.

Advantage 2000 Consultants is known within the industry as a company that provides excellent representation services.  At the conclusion of your SSDI claim, I hope you will feel that I have represented you in a professional and efficient manner.  I am here to provide you with an explanation of the SSDI decision making process, and timely answers to any questions that you may have.  If you have questions and I am unavailable, another member of our staff will attempt to assist you.  I look forward to working with you.  Please feel free to call me at any time on our toll free number, **1-800-580-5299.**

Sincerely,

Dan Schulte
Case Manager

ADVANTAGE003



ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299 - Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Monday, February 23, 2004

Ms. Cathy Cleiland
8 Cherokee Dr., Num.27
Monroeville, AL 36460

RE: ▮▮▮▮▮▮▮

Dear Ms. Cleiland:

We are pleased that we are representing you in your Social Security disability claim.  *As you were previously advised, there is no cost to you for our services.  This service is being provided by CIGNA Group Insurance - Dallas TX FCO.*

Since your claim has recently been denied, we will now proceed to the Hearing level of appeal. I have enclosed the appropriate forms to request a hearing.  **Please sign the forms where indicated and return them to me within five (5) days.   It is important that we get these forms submitted timely.**

If you have any questions please feel free to give me a call.

I look forward to serving you.

Sincerely,

Dan Schulte
Case Manager

ADVANTAGE004



*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

Wednesday, November 26, 2003

Ms. Cathy Cleiland
8 Cherokee Dr., Num.27
Monroeville, AL 36460

RE:

Dear Ms. Cleiland:

I have included in this mailing your voided check and W-2. There is also a letter from SSA
requesting your birth certificate with a envelope addressed to the SSA office.

Please call me if you have any questions about this matter. You can reach me toll free at the
800 number shown above.

Sincerely,

Mary Lynn Kniker
Claims Analyst

ADVANTAGE005



*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Monday, October 13, 2003

Ms. Cathy Cleiland
8 Cherokee Dr., Num.27
Monroeville, AL 36460

RE: █████████

Dear Ms. Cleiland:

Thank you for allowing Advantage 2000 Consultants to assist you with your Social Security disability claim.

Enclosed is the information that we completed for your Social Security application.  Please review the documents to ensure that the information entered is correct and sign the forms where highlighted.  **After signing, please return all of the forms, an original or certified copy of your birth certificate (PLEASE DO NOT SEND A PHOTOCOPY), a copy of your 2002 W-2, and a voided check (for direct deposit of your Social Security benefits) in the envelope provided.  It is important that I receive these forms back from you as soon as possible.**

When I receive the forms, I will forward all of the documentation, including any supportive medical evidence we have, to Social Security.  I will follow up with Social Security to ensure all of the paperwork has been received and they are processing your claim.  Throughout the claims process, I will also do periodic calls to Social Security to check the status of your claim.  I will keep you informed of the progress as well.

Once a decision has been made, I will notify you immediately.  Social Security should send me copies of all notices including favorable and unfavorable decisions.  Unfortunately, this does not always happen.  ***Should you receive any calls or notices from Social Security please call me.***  My toll-free number is shown above.

Again, thank you for your assistance and cooperation.

Sincerely,


Mary Lynn Kniker
Claims Analyst

ADVANTAGE006

Social Security Administration
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

DATE: FEB 1 2 2004

CATHY K CLEILAND
8 CHEROKEE DRIVE
NUMBER 27
MONROEVILLE AL 36460

Claim Number: ▮▮▮▮▮▮▮▮
WE's Number:

Telephone:    (251) 246-6018

We are writing about your claim for Social Security disability benefits
Based on a review of your health problems you do not qualify for bene-
fits on this claim.  This is because you are not disabled under our
rules.

We have enclosed information about the disability rules and more details
about the decision on your claim.

ABOUT THE DECISION

The trained staff who decided this case work for the state but used    -
our rules.

Please remember that there are many types of disability programs, both
government and private, which use different rules.  A person may be
receiving benefits under another program and still not be entitled under
our rules.  This may be true in your case.

IF YOU DISAGREE WITH THE DECISION

If you disagree with this decision, you have the right to request a
hearing.  A person who has not seen your case before will look at it.

*  You have 60 days to ask for a hearing.

*  The 60 days start the day after you get this letter.  We assume
   you got this letter 5 days after the date on it unless you show us
   that you did not get it within the 5-day period.

*  You must have a good reason for waiting more than 60 days to ask
   for a hearing.

*  You have to ask for a hearing in writing.  We will ask you to sign
   a form HA-501-U5, called "Request for Hearing."  Contact one of
   our offices if you want help.

ADVANTAGE007

HOW THE HEARING PROCESS WORKS

After we send your case for a hearing, the ALJ will mail you a letter
at least 20 days before the hearing to tell you its date, time and
place.  The letter will explain the law in your case and tell you
what has to be decided.  Since the ALJ will review all the facts in
your case, it is important that you give us any new facts as soon as
you can.

Form SSA-L443-U3 (7-93)
Destroy Prior Editions

I18

Social Security Administration
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

The hearing is your chance to tell the ALJ why you disagree with the decisions in your case. You can give the ALJ new evidence and bring people to testify for you. The ALJ also can require people to bring important papers to your hearing and give facts about your case. You can question these people at your hearing.

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your Social Security Claim." It has more information about the Adjudication Officer and the hearing.

IT IS IMPORTANT TO GO TO THE HEARING

It is very important that you go to the hearing. If for any reason you cannot go, contact the ALJ as soon as possible before the hearing and explain why. The ALJ will reschedule the hearing if you have a good reason. If you do not go to the hearing and do not have a good reason for not going, the ALJ may dismiss your request for a hearing.

NEW APPLICATION

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. If you disagree with this decision and you file a new application instead of appealing:

*  You might lose some benefits, or not qualify for any benefits, and

*  We could deny the new application using this decision, if the facts and issues are the same.

So, if you disagree with this decision, you should ask for an appeal within 60 days.

IF YOU WANT HELP WITH YOUR APPEAL

You can have a friend, lawyer, or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee.

ADVANTAGE008

Form SSA-L443-U3 (7-93)
Destroy Prior Editions

Social Security Administration
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

OTHER BENEFITS

Based on the application you filed, you are not entitled to any
other benefits, besides those you may already be getting.  In the
future, if you think you may be entitled to other benefits you will
need to apply again.  (THIS SECTION DOES NOT APPLY TO YOU IF YOU
HAVE ANOTHER SOCIAL SECURITY CLAIM PENDING.)

FAMILY BENEFITS

If you have a spouse or child we cannot pay them benefits unless you
are entitled to Social Security benefits.

IF YOU HAVE ANY QUESTIONS

If you have any questions, you may call us toll-free at 1-800-772-1213
or call your local Social Security office at the number shown on page
1.  We can answer most questions over the phone.  You can also write
or visit any Social Security office.  The office that serves your area
is located at:

            4249 NORTH COLLEGE AVENUE
            JACKSON AL 36545


If you do call or visit an office, please have this letter with you.
It will help us answer your questions.  Also, if you plan to visit an
office, you may call ahead to make an appointment.  This will help us
serve you more quickly.

                        Regional Commissioner


ADVANTAGE 2000
ONE CORPORATE DRIVE
ATTN LYNN KIKER
SWANSEA IL 62226
Enclosures:
Your Right to Question the Decision Made on your Claim
Explanation of Decision
Disability Rules Factsheet


                                        ADVANTAGE009


APH
                                        D68
                                        Form SSA-L443-U3 (7-93)
I18                                     Destroy Prior Editions

Social Security Administration
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

## RULES FOR SOCIAL SECURITY DISABILITY

You must meet certain rules to qualify for Social Security disability benefits:

FOR DISABLED WORKER'S BENEFITS:

You must have the required work credits and your health problems must:
   * keep you from doing any kind of substantial work (described below), and
   * last, or be expected to last, for at least 12 months in a row, or result in death.

FOR DISABLED CHILD'S BENEFITS:

You must be age 18 or older and your health problems must:

   * begin before age 22 or you must become disabled again within 7 years after the month that your earlier period of disability ended, and
   * keep you from doing any kind of substantial work (described below), and
   * last, or be expected to last, for at least 12 months in a row, or result in death.

FOR DISABLED WIDOW'S, WIDOWER'S OR SURVIVING DIVORCED SPOUSE'S BENEFITS:

You must be at least age 50, and your health problems must:

   * keep you from doing any kind of substantial work (described below), and
   * last, or be expected to last, for at least 12 months in a row, or result in death, and
   * have started before the end of a special period.

   The special period starts with the latest of:

   ***the month your spouse died, or
   ***the month your Social Security benefits as a parent ended, or
   ***the month your earlier period of widow(er)'s disability ended.

   The special period ends at the close of the 84th month (7 years) after the month it started.

ADVANTAGE010

Form SSA-L443-U3 (7-93)
Destroy Prior Editions

Social Security Administration
RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE
Notice of Disapproved Claim

INFORMATION ABOUT SUBSTANTIAL WORK

Generally, substantial work is physical or mental work you are paid
to do. Work can be substantial even if it is part-time. To decide
if your work is substantial, we consider the nature of the job
duties, the skills and experience you need to do the job, and how
much you actually earn.

Usually, we find that your work is substantial if your gross
earnings average over $800 per month after we deduct allowable
amounts. This monthly amount is higher for Social Security
disability benefits due to blindness.

Your work may be different than before your health problems began.
It may not be as hard to do and your pay may be less. However,
we may still find that your work is substantial under our rules.

If you are self-employed, we consider the kind and value of your
work, including your part in the management of the business, as
well as your income, to decide if your work is substantial.

NON-ENGLISH SPEAKING INFORMATION

If you do not speak English, or do not speak English well, we
will provide you with an interpreter at no cost to you. Or,
you may wish to bring your own interpreter with you such as
a friend or family member. If you want us to provide an
interpreter, please tell us ahead of time.

---

ADVANTAGE011

Form SSA-L443-U3 (7-93)
Destroy Prior Editions

I18

**DISABILITY DETERMINATION SERVICE**
**POST OFFICE BOX 2371**
**MOBILE, ALABAMA 36652-2371**

FEB 1 7 2004

Toll-Free Number 1-800-292-6743

Local Number 433-2820                                    Local Fax Number 436-0599

FEB 1 2 2004

ADVANTAGE 2000                          RE: CATHY K CLEILAND
ONE CORPORATE DRIVE                          8 CHEROKEE DRIVE
ATTN LYNN KIKER                              NUMBER 27
SWANSEA IL 62226                             MONROEVILLE AL 36460
                                        A/N: ███████████

Dear ADVANTAGE 2000

The above-named individual has applied for disability benefits under the
Social Security Act.  Enclosed is a copy of a letter we recently mailed
to this individual.

Enclosures

ADVANTAGE012

APH

N1

Social Security Administration

EXPLANATION OF DETERMINATION

| Name of Claimant | W/E's Name (If CDB or DWB) | SSN | Type of Claim |
|---|---|---|---|
| CATHY K CLEILAND | | ▆▆▆▆▆▆▆ | INDIB |

The evidence listed was used in evaluating your claim.

Charles M Eddins MD Report Received 11/20/03
JOHN E HACKMAN MDPA Report Received 11/17/03
JACKSON HOSPITAL & CLINIC Report Received 11/18/03
JILL HALL PHD Consultative Exam 01/28/04

We have determined that your condition is not expected to remain severe enough for 12 months in a row to keep you from working.  In deciding this we considered the medical evidence, your statements and how your condition affected your ability to work.

You state you became disabled on 5-14-03 because of multiple back surgeries.  The evidence indicates your condition(s) is severe and keeps you from working at this time.  In order to be eligible for disability benefits, a condition must keep you from doing any work for twelve (12) consecutive months.  Although you are unable to work at this time, within twelve (12) months from the date of your last surgery, you should be able to return to your past job as a/an human resources manager as you describe this work.

If your condition does not improve as expected, write, call or visit any Social Security office.

ADVANTAGE013

Hearing Decision Checksheet - **IMMEDIATE ACTION NECESSARY**

**Hearing Assistant** - Complete or check the appropriate response

CLAIMANT: Cathy A Cleiland    CLIENT CO: CIGNA Group Insurance - Dallas TX FCO
HEARING REP: Dan Schulte
     Date of Decision: 5/26/2005        Date A2K Rec'd: 5/31/2005

Phone #: ████████              SSN: ███████

Decision Type -
    ✔  Fully Favorable (Original Dates)    ___  Fully Favorable (Negotiated)
    ___ Partially Favorable....
                    ___  Adjusted Onset Date
                    ___  Closed Period of Disability    ___/___/___ - ___/___/___

✔ On The Record Decision      ____ Oral Hearing Held -

Date of Application              _10 / 10 /2003_
Date of Onset Established:       _05/ 14/2003_
Date Of Entitlement-Cash:       _11/2003_

Copy of Decision e-mailed to CC: Tues    _Tuesday_

*** CHECK FOR ANY OUTSTAN[...]    [...]NCELLED ✔ NONE

Date routed to Hearing Rep:    Tu[...]    [...]st. Initials _____

**HEARING REPRESENT[...]**

Need to give the claimant a call and discuss the favorable deci[...] [...]em know about......
    ✔  Date of Onset Approved
    ✔  Date of Entitlement (after five *FULL* months), no > than 12 months retro from app date!!!
    ✔  Potential for "Own Motion Review"
    ✔  Approximate time to payment 35-60 days
    ✔  Check may arrive before award letter & need to call us if payment/letter received
    ✔  LTD Overpayment Obligation/C.O.B., if applicable

ARE DEPENDENTS INVOLVED:    ✔ NO         YES(#-of-dep._____)
IF "YES", HAVE APPS BEEN FILED WITH SSA?  ____Yes  ____No (inform clmt to contact SSA)

    ____Dep. living in household  ____Dep. not living in household
*Dep.name/ssn/dob:* _____

**HAS BANKING INFORMATION CHANGED SINCE THE APPLICATION?**
Yes _____  If yes, the claimant will need to give SSA the new information.    No ✔
    DATE:  _6 / 4 / 05_    REP. SIGNATURE: _Daniel Schulte_

JUL 0 5 2005

# Social Security Administration
# Retirement, Survivors and Disability Insurance
Important Information

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date:  June 27, 2005
Claim Number: ███████████

0623 MCS,PC7,I,BA,T110,                    000017250 01 MB    0.309
DAN SCHULTE
ATTY FOR C KEY
ONE CORPORATE DR
SWANSEA, IL 62226-2066

||lll|u||l|l|l|l|l|l||lu||ll|u||ll||l|l|l|u|u|lll|u|ll

Enclosed is a copy of a letter we sent to CATHY K CLEILAND.

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to
find general information about Social Security.  If you have any specific
questions, call us toll-free at 1-800-772-1213.  We can answer most questions
over the phone.  If you prefer to visit one of our offices, please check the local
telephone directory for the office nearest you.  Or call us and we can give you the
office address.  Please have this letter with you if you call or visit an office.  It
will help us answer your questions.



Jo Anne B. Barnhart
Commissioner
of Social Security

C

ADVANTAGE015

Social Security Administration
**Retirement, Survivors and Disability Insurance**
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: June 27, 2005
Claim Number: ███████████

CATHY K CLEILAND
PO BOX 148
CLIO, AL 36017

You are entitled to monthly disability benefits beginning November 2003.

**The Date You Became Disabled**

We found that you became disabled under our rules on May 14, 2003.

However, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits. For these reasons, your first month of entitlement to benefits is November 2003.

**What We Will Pay And When**



- You will receive $24,600.00 around July 3, 2005.

- This is the money you are due for November 2003 through May 2005.

- Your next payment of $1,325.00, which is for June 2005, will be received on or about the third Wednesday of July 2005.

- After that you will receive $1,325.00 on or about the third Wednesday of each month.

- These and any future payments will go to the financial institution you selected. Please let us know if you change your mailing address, so we can send you letters directly.

The day we make payments on this record is based on your date of birth.

ADVANTAGE016

See Next Page



Page 3 of 4

**Other Information**

We are sending a copy of this notice to DAN SCHULTE.

**Do You Disagree With The Decision?**

You have already been notified of your appeal rights regarding the decision made by the Administrative Law Judge and what you must do to have that decision reexamined. If you believe that any other determination made by us in carrying out the Administrative Law Judge decision is incorrect, you may also request that part of your case be reexamined.

If you want this reconsideration, you may request it through any Social Security office. If additional evidence is available, you should submit it with your request. We will review your case and consider any new facts you have. A person who did not make the first decision will decide your case. We will correct any mistakes. We will review those parts of the decision which you believe are wrong and will look at any new facts you have. We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you get this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason for waiting more than 60 days to ask for an appeal.

- You have to ask for an appeal in writing. We will ask you to sign a Form SSA-561-U2, called "Request for Reconsideration". Contact one of our offices if you want help.

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your Social Security Claim". It contains more information about the appeal.

**Things To Remember For The Future**

Doctors and other trained staff decided that you are disabled under our rules. But, this decision must be reviewed at least once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

Please tell us if there is a change in the mailing address and/or direct deposit information. We need this information to make sure payments are deposited timely and important notices regarding your payments reach you.

ADVANTAGE017



## Your Benefits

The following chart shows your benefit amount(s) before any deductions or rounding. The amount you actually receive(s) may differ from your full benefit amount. When we figure how much to pay you, we must deduct certain amounts, such as Medicare premiums. We must also round down to the nearest dollar.

| Beginning Date | Benefit Amount | Reason |
|---|---|---|
| November 2003 | $1,217.70 | Entitlement began |
| December 2003 | $1,243.20 | Cost-of-living adjustment |
| January 2004 | $1,290.30 | Credit for additional earnings |
| December 2004 | $1,325.10 | Cost-of-living adjustment |

## Information About Representative's Fees

Your representative told us that a fee will not be charged. If a fee is charged, your representative must receive approval from the Social Security Administration.

## Other Social Security Benefits

The benefit described in this letter is the only one you can receive from Social Security. If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

## Your Responsibilities

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "What You Need To Know When You Get Disability Benefits". It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A provider of employment or vocational rehabilitation services may contact you about getting help to go to work. The provider may be a State vocational rehabilitation agency or a provider under contract with the Social Security Administration.

If you go to work, special rules allow us to continue your cash payments and health care coverage. For more information about how work and earnings affect disability benefits, call or visit any Social Security office and ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).



Page 4 of 4

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-800-962-8726. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
1778 WHATLEY DRIVE
DOTHAN, AL 36303

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Jo Anne B. Barnhart
Commissioner
of Social Security

ADVANTAGE019

Social Security Administration
  Please read the back of the last copy before you complete this form.

OMB No. 0960-0527

| Name (Claimant)(Print or Type) Cathy Cleiland   CLEILAND | Social Security Number |
| Wage Earner (If Different) | Social Security Number |

## Part I                    APPOINTMENT OF REPRESENTATIVE

I appoint this person,  Dan Schulte                                    of Advantage 2000

(Name and Address)                                One Corporate Drive

to act as my representative in connection with my claims(s) or asserted right(s) under:    Swansea, IL 62226

| [X] Title II (RSDI) | [ ] Title XVI (SSI) | [ ] Title IV FMSHA (Black Lungs) | [ ] Title XVIII (Medicare Coverage) |

This person may, entirely in my place, make any request or give any notice; give or draw out evidence or information; get information; and receive any notice in connection with my pending claim(s) or asserted right(s).

[ ]  I am appointing, or I now have, more than one representative.  My main representative
is _____
(Name of Principal Representative)

| Signature (Claimant)  Cathy K. Cleiland | Address | 8 Cherokee Dr., Num.27 Monroeville, AL 36460 |
| Telephone Number (with Area Code) ( ) | Date  3-1-2004 |

## Part II                    ACCEPTANCE OF APPOINTMENT

I,  Dan Schulte                        , hereby accept the above appointment. I certify that I have not been suspended or prohibited from practice before the Social Security Administration; that I am not disqualified from representing the claimant as a current or former officer or employee of the United States; and that I will not charge or collect any fee for representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form.  If I decide not to charge or collect a fee for the representation, I will notify the Social Security Administration. (Completion of Part III satisfies requirement.)

| [ ] I am an attorney. | [X] I am not an attorney. | (Check one.) |

| Signature (Representative)  Dan Schulte | Address | One Corporate Drive Swansea, IL 62226 |
| Telephone Number (with Area Code) (618) 212-1123 | Date  3-9-04 |

## Part III (Optional)          WAIVER OF FEE          *Any fee charged will be charged to a Third party and not to the claimant*
....from the claimant

I waive my right to charge and collect a fee under sections 206 and 1631(d)(2) of the Social Security Act.  I release my client (the claimant) from any obligations, contractual or otherwise, which may be owed to me for services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative)  Dan Schulte | Date  3-9-04 |

ADVANTAGE020

## Part II (Optional)          ATTORNEY'S WAIVER OF DIRECT PAYMENT

I waive only my right to direct payment of a fee from the withheld past-due retirement, survivors, disability insurance or black lung benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Attorney Representative) | Date |

FILE COPY

Social Security Administration
Please read the back of the last copy before you complete this form.

Form Approved
OMB No. 0960-0527

| Name (Claimant)(Print or Type) Cathy Clelland *CLEILAND* | Social Security Number |
|---|---|
| Wage Earner (If Different) | Social Security Number |

## Part I    APPOINTMENT OF REPRESENTATIVE

I appoint this person, _Dan Schulte_

of Advantage 2000
One Corporate Drive
Swansea, IL 62226

(Name and Address)

to act as my representative in connection with my claims(s) or asserted right(s) under:

| [X] Title II (RSDI) | [ ] Title XVI (SSI) | [ ] Title IV FMSHA (Black Lungs) | [ ] Title XVIII (Medicare Coverage) |
|---|---|---|---|

This person may, entirely in my place, make any request or give any notice; give or draw out evidence or information; get information; and receive any notice in connection with my pending claim(s) or asserted right(s).

[ ]    I am appointing, or I now have, more than one representative. My main representative is _____

(Name of Principal Representative)

| Signature (Claimant) _Cathy S. Clelland_ | Address | 8 Cherokee Dr., Num.27 Monroeville, AL 36460 |
|---|---|---|
| Telephone Number (with Area Code) ( ) | Date    3-1-2004 | |

## Part II    ACCEPTANCE OF APPOINTMENT

I, _Dan Schulte_ , hereby accept the above appointment. I certify that I have not been suspended or prohibited from practice before the Social Security Administration; that I am not disqualified from representing the claimant as a current or former officer or employee of the United States; and that I will not charge or collect any fee for representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form. If I decide not to charge or collect a fee for the representation, I will notify the Social Security Administration. (Completion of Part III satisfies requirement.)

| [ ] I am an attorney. | [X] I am not an attorney. | (Check one.) |
|---|---|---|

| Signature (Representative) _Dan Schulte_ | Address | One Corporate Drive Swansea, IL 62226 |
|---|---|---|
| Telephone Number (with Area Code) (618) 212-1123 | Date    3-9-04 | |

## Part III (Optional)    WAIVER OF FEE

....from the claimant

*Any fee charged will be charged to a Third party and not to the claimant*

I waive my right to charge and collect a fee under sections 206 and 1631(d)(2) of the Social Security Act. I release my client (the claimant) from any obligations, contractual or otherwise, which may be owed to me for services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative) _Dan Schulte_ | Date    3-9-04 |
|---|---|

ADVANTAGE021

## Part II (Optional)    ATTORNEY'S WAIVER OF DIRECT PAYMENT

I waive only my right to direct payment of a fee from the withheld past-due retirement, survivors, disability insurance or black lung benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Attorney Representative) | Date |
|---|---|

**ADVANTAGE 2000 CONSULTANTS TALK SHEET**
· Annotate with date and initials

Claimant: _____    SSN: _____

Date: | Notes:

6/22    Called PC - 410-966-2992 - Robin -
in CA process as q today (A)

ADVANTAGE022

```
          ***  REC 2005171  131331 HA711CE0 1A70  CIPQYA4   PQA4   (F-1A7 )  ***


FACT     DTE:06/20/05  SSN:███████████  BIC:A   DOC:D59 UNIT:ADVAN2 PG: 001
STATUS   MBR YES LOU-06/20 DATA FILES NO  LOU-06/20 SSACCS NO  LOU-06/17
         CPS NO
ACCOUNT  PCOC-7 NOP-01 SP-F TAC-D LUM-06 LMM-03/04 FLI-M  SEC-D CDY-0
         DRAMS READ  INACTIVE ACCT
INSURED  CLAIM TYPE-DISABILITY DATE OF FILING-10/15/2003 FIRST MET-04/1998
         LAST MET-12/2007  DIB QC EARNED-00  FULL QC REQUIRE-24
         FULL QC EARNED-40  CURR QC EARNED-00  HLTHBEN QC EARN-00  CONVERTED
PMT CYC  CYI-3 PCEFD-02/17/2004 PCCOM-02/04 PCCR-I
PRIMARY  C A KEY DOB-07/11/1957 LSPA-$0.00
PAYMENT  PIC-A  MPA-$0.00 DOC-D68 SCC-01490  RD-02/18/04 LAP-T F/LLOA-2/3
         ZDPC-082 EDA-02/17/04 EDL-02/17/04
TELE NO  BTN-251-342-5545 BTC1-O CPND-02/04
PAYEE    CATHY A KEY
ADDRESS  8 CHEROKEE DR NUMBER27 MONROEVILLE AL 36460-8508
BENEFIT  BIC-A  CATHY A KEY SB-F DOB-07/11/1957 B  ABN-DXBQ LAF-ND MBP-$0.00
         DRD-02/17/04 LANG-E TOC-5
BEN DENY DATE OF FILING-10/15/2003 APP RECEIPT-00/00/0000 ID CODE-A
         CUR ENT CODE-DISABLED  DIB ONSET-05/14/2003  DISALOW/DEN RSN-0E3
         LEVEL OF DENIAL-INITIAL   CONVERTED
DIB      DDO-05/14/03 LOD-1 BDC-E3 DSD-02/04
CITIZEN  START-07/11/1957 COUNTRY-UNITED STATES PROVEN
```

ADVANTAGE023

Call Sheet                                                                 Page 1 of 2

 

 Visit Us Online at: www.advantage2k.com
*"Your Gateway to Social Security"*    One Corporate Drive, Swansea, IL 62226
Telephone: (800) 899-3433 · Fax: (314) 845-6141
Email: advantage2000@advantage2k.com

# **Call Sheet**

*Bernice*
*mathus home address &*
*Phone: 1134 Brundige St.*
*Clio, AL, 36017*

~~~~~Claimant~~~~~
SSN: ████████
Claimant: Cathy Cleiland
Address: P.O. Box 148 Clio, AL 36017

Phone: ████████
*Ozelle - #not working) &* ████████

~~~~~Client Company Representative~~~~~
Yvonne Smith
CIGNA Group Insurance - Dallas TX FCO
Address: 12225 Greenville Avenue Dallas, TX 75243
Phone: (800)352-0611 x / Fax: (860)731-3378
Email: yvonne.smith@cigna.com

~~~~~SSA~~~~~

DO - 0628
Address: 1778 Whatley Dr. Dothan, AL 36303
Phone: (800)962-8726 / Fax: (334)794-9043

DDS - 0S01
Address: P.O.Box 830300 Birmingham, AL 35283
Phone: (800)292-8106 / Fax: (205)989-2295

---

OHA - 0X78
Address: 550 Government Street Suite 200 Mobile, AL 36602
Phone: (251)441-5441 / Fax: (251)441-5993

*Recused*
*ALJ Ryan*
*asst. Donna*

~~~~~Provider~~~~~
Doctors Office
Practice: Center for Pain
Physican: David HerrickMD
Address: 2055 East South Blvd. Suite 812 Montgomery, AL 36116
Phone: (334)288-7808 x
Doctors Office

ADVANTAGE024

Call Sheet  Page 2 of 2

Practice: Charles Eddins, MD
Physican: Charles EddinsMD
Address: 1772 Alabama Avenue Monroville, AL 36461
Phone: (251)575-4825 x
Doctors Office
Practice: Eye Center South
Physican: William BennettM.D.
Address: 2800 Ross Clark Circle, S.W. Dalthan , AL 36301
Phone: (334)793-2211 x
Doctors Office
Practice: University of Alabama, Division of Neuro Surgery
Physican: Mark HadleyMD
Address: FOT 1030 510 20th Street South Birmingham, AL 35294
Phone: (205)934-1439 x

ADVANTAGE025

Call Sheet                                                                Page 1 of 2

 *Visit Us Online at: www.advantage2k.com*
One Corporate Drive, Swansea, IL 62226
Telephone: (800) 899-3433 - Fax: (314) 845-6141
Email: advantage2000@advantage2k.com

# Call Sheet

*new address:*

~~~~Claimant~~~~

*Mathis home add.*
*1134 Brundige St.*
*Clio, AL, 36017*

SSN: █████████

Claimant: Cathy Key
Address: P.O. Box 148 Clio, AL 36017

*Mathis*
Phone: ███████                   *Cell:* ███████████

~~~~~Client Company Representative~~~~~

Drusilla Gamez
CIGNA Group Insurance - Dallas TX FCO
Address: 12225 Greenville Avenue Dallas, TX 75243
Phone: (800)352-0611 x 6505 / Fax: (860)731-3378
Email: drusilla.gamez@cigna.com

~~~~~SSA~~~~~

DO - 0628
Address: 1778 Whatley Dr. Dothan, AL 36303
Phone: (800)962-8726 / Fax: (334)794-9043

DDS - 0S01
Address: P.O.Box 830300 Birmingham, AL 35283
Phone: (800)292-8106 / Fax: (205)989-2295

OHA - 0X78
Address: 550 Government Street Suite 200 Mobile, AL 36602
Phone: (251)441-5441 / Fax: (251)441-5993

*ALJ Ryan*
*Asst - Donna*

~~~~~Provider~~~~~

Doctors Office
Practice: Center for Pain
Physican: David HerrickMD
Address: 2055 East South Blvd. Suite 812 Montgomery, AL 36116
Phone: (334)288-7808 x

Doctors Office

ADVANTAGE026

Call Sheet  Page 2 of 2

Practice: Charles Eddins, MD
Physican: Charles EddinsMD
Address: 1772 Alabama Avenue Monroville, AL 36461
Phone: (251)575-4825 x
Doctors Office
Practice: Eye Center South
Physican: William BennettM.D.
Address: 2800 Ross Clark Circle, S.W. Dalthan , AL 36301
Phone: (334)793-2211 x
Doctors Office
Practice: University of Alabama, Division of Neuro Surgery
Physican: Mark HadleyMD
Address: FOT 1030 510 20th Street South Birmingham, AL 35294
Phone: (205)934-1439 x

ADVANTAGE027

Call Sheet                                                    Page 1 of 2

                              



Visit Us Online at: www.advantage2k.com
One Corporate Drive, Swanton, IL 62226
Telephone: (800) 199-3433 · Fax: (314) 845-6141
Email: advantage2000@advantage2k.com

# **Call Sheet**

~~~~~Claimant~~~~~                    *Mothers home address*
                                     *1134 Brundige St.*
SSN: ████████                        *Clio, AL, 36017*
Claimant: Cathy Key
Address: P.O. Box 148 Clio, AL 36017

Phone: ████████

~~~~~Client Company Representative~~~~~

Drusilla Gamez
CIGNA Group Insurance - Dallas TX FCO
Address: 12225 Greenville Avenue Dallas, TX 75243
Phone: (800)352-0611 x 6505 / Fax: (860)731-3378
Email: drusilla.gamez@cigna.com

~~~~~SSA~~~~~

DO - 0628
Address: 1778 Whatley Dr. Dothan, AL 36303
Phone: (800)962-8726 / Fax: (334)794-9043

DDS - 0S01
Address: P.O.Box 830300 Birmingham, AL 35283
Phone: (800)292-8106 / Fax: (205)989-2295

                                                    *Asst:*
                                                    *Donna*

OHA - 0X42
Address: 3381 Atlanta Highway Montgomery, AL 36109
Phone: (334)223-7503 / Fax: (334)223-7069

     *X78*                                *Case in*
                                          *mobil, AL*
~~~~~Provider~~~~~                        *Ph 251-441-5441*
Doctors Office                           *Fax 251-441-5993*
Practice: Center for Pain
Physican: David HerrickMD
Address: 2055 East South Blvd. Suite 812 Montgomery, AL 36116
Phone: (334)288-7808 x

Doctors Office

ADVANTAGE028

Call Sheet

Practice: Charles Eddins, MD
Physican: Charles EddinsMD
Address: 1772 Alabama Avenue Monroville, AL 36461
Phone: (251)575-4825 x
Doctors Office
Practice: University of Alabama, Division of Neuro Surgery
Physican: Mark HadleyMD
Address: FOT 1030 510 20th Street South Birmingham, AL 35294
Phone: (205)934-1439 x

ADVANTAGE029

Call Sheet



*Visit Us Online at: www.advantage2k.com*
One Corporate Drive, Swansea, IL 62226
Telephone :(800) 899-3433 · Fax :(314) 345-6141
Email: advantage2000@advantage2k.com

# Call Sheet

~~~~~Claimant~~~~~

SSN: ████████

Claimant: Cathy Key

Address: 5777 Chester Ct. Mobile, AL 36609

Phone: ████████

~~~~~Client Company Representative~~~~~

Drusilla Gamez

CIGNA Group Insurance - Dallas TX FCO

Address: 12225 Greenville Avenue Dallas, TX 75243

Phone: (800)352-0611 x 6505 / Fax: (860)731-3378

Email: drusilla.gamez@cigna.com

~~~~~SSA~~~~~

DO - 0624

Address: 550 Government St. Suite 100 Mobile, AL 36602

Phone: (251)432-2002 / Fax: (251)441-5977

DDS - 0V19

Address: P.O. Box 2371 Mobile, AL 36652

Phone: (800)292-6743 / Fax: (251)434-1222

OHA - 0X78

Address: 550 Government Street Suite 200 Mobile, AL 36602

Phone: (251)441-5441 / Fax: (251)441-5993

~~~~~Provider~~~~~

Doctors Office

Practice: Center for Pain

Physican: David HerrickMD

Address: 2055 East South Blvd. Suite 812 Montgomery, AL 36116

Phone: (334)288-7808 x

Doctors Office

ADVANTAGE030

Practice: Charles Eddins, MD
Physican: Charles EddinsMD
Address: 1772 Alabama Avenue Monroville, AL 36461
Phone: (251)575-4825 x
Doctors Office
Practice: University of Alabama, Division of Neuro Surgery
Physican: Mark HadleyMD
Address: FOT 1030 510 20th Street South Birmingham, AL 35294
Phone: (205)934-1439 x

ADVANTAGE031



Visit Us Online at: www.advantage2k.com
One Corporate Drive, Swansea, IL 62226
Telephone: (800) 199-3433 · Fax: (314) 845-6141
Email: advantage2000@advantage2k.com

# Call Sheet

~~~~~Claimant~~~~~

**NAME CHANGE**
**CATHY A. KEY**

SSN: ▮▮▮▮▮
Claimant: Cathy Cleiland
Address: 8 Cherokee Dr. Num. Monroeville, AL 36460   *Prototype*

friend's ph#
new phone #

Phone: ▮▮▮▮▮   cell #
home-

~~~~~Client Company Representative~~~~~

~~Karen Kirby~~  Drusilla Gamez  Dallas
CIGNA Group Insurance - ~~Tarrytown~~ NY FCO
Address: 120 White Plains Road Suite 208 Tarrytown, NY 10591
Phone: (800)376-0725 x 1518 / Fax: (800)377-4286
Email: karen.kirby@cigna.com

~~~~~SSA~~~~~

CR - Miss Singleton

DO - 0D68   4249 N. College Ave.
Address: SOCIAL SECURITY JACKSON, AL 36545
Phone: (334)246-6018 / Fax: (334)246-9310
B   251-246-6018

DDS - 0V19
Address: P.O. Box 2371 Mobile, AL 36652
Phone: (800)292-6743 / Fax: (251)434-1222
B+A   334-433-2820

OHA - 0X78
Address: 3605 Springhill Business Park Mobile, AL 36608   ALT Ryan
B Phone: (251)441-5441 / Fax: (251)441-5993
2   334-441-5441

ADVANTAGE032



**Trudy Wagner**

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Tuesday, May 31, 2005 2:18 PM |
| **To:** | Yvonne Smith (yvonne.smith@cigna.com) |
| **Subject:** | Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 - DOB: ■■■■■■ |

05/31/2005 2:16:02 PM
DOB: ■■■■■
Policy ID #: FLK 20104
Claimant: Cathy Cleiland - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Yvonne Smith (800) 352-0611 - yvonne.smith@cigna.com

### Hello Yvonne,

Attached is the Notice of Decision – Fully Favorable OTR for Ms. Key. We will forward the payment information once received. Dan Schulte is the Case Manager handling this claim. If you have any questions, you may reach Mr. Schulte at (800)580-5299 ext. 123.

FF OTR Dec
-26-05.pdf (355 KB.

Thank you,

*Trudy Wagner*

Case Manager Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144 (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

**ADVANTAGE033**

**Trudy Wagner**

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Friday, April 15, 2005 3:34 PM |
| **To:** | Yvonne Smith (yvonne.smith@cigna.com) |
| **Subject:** | Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 - DOB: ███████ |

04/15/2005 3:33:08 PM
DOB: ███████
Policy ID #: FLK 20104
Claimant: Cathy Cleiland - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Yvonne Smith (800) 352-0611 - yvonne.smith@cigna.com

## Hello Yvonne,

**We are still waiting for a Hearing date for Ms. Cleiland and will inform you when we do have a date. Dan Schulte is the case Manager handling this claim. If you have any questions, you may reach Mr. Schulte at (800) 580-5299 ext. 123.**

**Thank you,**

*Trudy Wagner*
Case Manager Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE034

1



## Trudy Wagner

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Wednesday, March 09, 2005 8:09 AM |
| **To:** | Yvonne Smith (yvonne.smith@cigna.com) |
| **Subject:** | Claimant: Cathy Key - Administrative Law Judge Hearing - Policy ID #: FLK 20104 - DOB: ████████ |

03/09/2005 8:02:56 AM
DOB: ████████
Policy ID #: FLK 20104
Claimant: Cathy Key - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Yvonne Smith (800) 352-0611 - yvonne.smith@cigna.com

Hello Yvonne,

I spoke to the claimant yesterday and she has changed her name back to Cleiland and has already done so at SSA. We will be referring to her as Cathy Cleiland in the future.

Thank you,

*Trudy Wagner*
Case Manager Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE035

1




**Trudy Wagner**

**From:**       Trudy Wagner
**Sent:**       Friday, August 27, 2004 10:02 AM
**To:**         Drusilla Gamez (drusilla.gamez@cigna.com)
**Subject:**    Claimant:  Cathy Key - Administrative Law Judge Hearing - Policy ID #:  FLK 20104


08/27/2004 9:58:34 AM
SSN: ███████████
Policy ID #: FLK 20104
Claimant:  Cathy Key - Administrative Law Judge Hearing
Client:  CIGNA Group Insurance - Dallas TX FCO / Drusilla Gamez (800) 352-0611 - drusilla.gamez@cigna.com

Drusilla,

We have another address change for Ms. Key. P.O. Box 148, Clio, AL, 36017. Her new phone number is ███████████

Have a nice day,

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL  62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE036

1

**Trudy Wagner**

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Tuesday, August 17, 2004 10:37 AM |
| **To:** | Drusilla Gamez (drusilla.gamez@cigna.com) |
| **Subject:** | Claimant:  Cathy Key - Administrative Law Judge Hearing - Policy ID #:  FLK 20104 |

08/17/2004 10:34:20 AM
SSN: ▮▮▮▮▮▮
Policy ID #:  FLK 20104
Claimant:  Cathy Key - Administrative Law Judge Hearing
Client:  CIGNA Group Insurance - Dallas TX FCO / Drusilla Gamez (800) 352-0611 - drusilla.gamez@cigna.com

Drusilla,

Just wanted to update you on Ms. Key. She has a new phone number: ▮▮▮▮▮▮▮ her address is now 5777 Chester
Ct., Mobile, AL. 36609.

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL  62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE037

1



## Trudy Wagner

| | |
|---|---|
| **From:** | Ben Galey |
| **Sent:** | Wednesday, April 14, 2004 4:14 PM |
| **To:** | Trudy Wagner |
| **Subject:** | RE: Claimant:  Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #:  FLK 20104 |

This has been completed

-----Original Message-----
**From:** Trudy Wagner
**Sent:** Monday, April 12, 2004 10:53 AM
**To:** Ben Galey
**Subject:** Claimant:  Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #:  FLK 20104

04/12/2004 10:49:59 AM
SSN: ▮▮▮▮▮▮
Policy ID #:  FLK 20104
Claimant:  Cathy Cleiland - Administrative Law Judge Hearing
Client:  CIGNA Group Insurance - Dallas TX FCO / Drusilla Gamez (800) 352-0611 - drusilla.gamez@cigna.com

Ben,

This claimant has changed her name it is now Cathy A. Key. SSA already has Cathy A. Key in their system.

Thanks,

*Trudy Wagner*

Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL  62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

**ADVANTAGE038**

1

**Trudy Wagner**

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Monday, April 12, 2004 11:04 AM |
| **To:** | Drusilla Gamez (drusilla.gamez@cigna.com) |
| **Subject:** | Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 |

04/12/2004 11:00:14 AM
SSN: ██████████
Policy ID #: FLK 20104
Claimant: Cathy Cleiland - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Drusilla Gamez (800) 352-0611 - drusilla.gamez@cigna.com

Drusilla,

Cathy Cleiland has changed her name with Social Security and is now Cathy A. Key. I spoke to her this morning and verified this information.

Thank you,

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE039

1

**Trudy Wagner**

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Monday, April 12, 2004 10:53 AM |
| **To:** | Ben Galey |
| **Subject:** | Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 |

04/12/2004 10:49:59 AM
SSN: ███████
Policy ID #: FLK 20104
Claimant: Cathy Cleiland - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Drusilla Gamez (800) 352-0611 - drusilla.gamez@cigna.com

Ben,

This claimant has changed her name it is now Cathy A. Key. SSA already has Cathy A. Key in their system.

Thanks,

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE040

1

**Trudy Wagner**

| | |
|---|---|
| **From:** | Trudy Wagner |
| **Sent:** | Tuesday, March 09, 2004 2:12 PM |
| **To:** | Drusilla Gamez (drusilla.gamez@cigna.com) |
| **Subject:** | Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 |

03/09/2004 1:59:52 PM
SSN: ███████████
Policy ID #: FLK 20104
Claimant: Cathy Cleiland - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Drusilla Gamez (800) 352-0611 - drusilla.gamez@cigna.com

## Drusilla,

We received the signed Hearing Request forms back from Ms. Cleiland and are forwarding them to Social Security. Dan Schulte is the Case Manager handling this claim. If you have any questions, you may reach Mr. Schulte at (800)580-5299 ext. 123.

Also, please send us any medical information you have for Ms. Cleiland.

Thank you,

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE041

1

**Mary Lynn Kniker**

| | |
|---|---|
| **From:** | Mary Lynn Kniker |
| **Sent:** | Wednesday, November 26, 2003 9:59 AM |
| **To:** | Karen Kirby (karen.kirby@cigna.com) |
| **Subject:** | Claimant:  Cathy Cleiland - Initial Claim - PolicyID:  FLK 20104 |

11/26/2003 9:57:43 AM
SSN: <span style="background:black">▉▉▉▉</span>
Policy Holder:  Temple Inland / Employer Group:  Temple Inland / PolicyID:  FLK 20104
Claimant:  Cathy Cleiland - Initial Claim
Client:  CIGNA  / Karen Kirby (800) 376-0725 - karen.kirby@cigna.com

Karen,
    I received the initial claim proof of application for Cathy Cleiland. The date of filing is 10/27/2003.

Thanks,

*Lynn Kniker*

Claims Analyst
Advantage 2000 Consultants, Inc.
One Corporate Drive
Swansea, IL  62226
800-580-5299
618-212-1100
marylynn.kniker@advantage2k.com

ADVANTAGE042

**Jamie Fonger**

**To:** karen.kirby@cigna.com
**Subject:** Claimant: Cathy Cleiland - Initial Claim - PolicyID: FLK 20104

10/22/2003 11:10:11 AM
SSN: ▮▮▮▮▮▮
Policy Holder: Temple Inland / Employer Group: Temple Inland / PolicyID: FLK 20104
Claimant: Cathy Cleiland - Initial Claim
Client: CIGNA / Karen Kirby (800) 376-0725 - karen.kirby@cigna.com

Dear Karen:

We submitted the initial claim for this individual to the Social Security Administration today. Included in the mailing was a cover letter to be forwarded to the state Disability Determination Service (DDS.) Once we receive the proof application we will let you know.

We will ensure that DDS has received the claim for medical evaluation. Should you have any questions about this case in the interim, please contact Lynn Kniker the representative for this individual.

Thank you for the opportunity to serve CIGNA Group Insurance - Tarrytown NY FCO.

Sincerely,

Jamie Fonger
Claims Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(618) 212-1135
(800)580-5299
jamie.fonger@advantage2k.com

ADVANTAGE043

1

**Mary Lynn Kniker**

| | |
|---|---|
| **From:** | Mary Lynn Kniker |
| **Sent:** | Monday, October 13, 2003 10:36 AM |
| **To:** | Karen Kirby (karen.kirby@cigna.com) |
| **Subject:** | Claimant: Cathy Cleiland - Initial Claim - PolicyID: FLK 20104 |

10/13/2003 10:34:25 AM
SSN: ▮▮▮▮▮
Policy Holder: Temple Inland / Employer Group: Temple Inland / PolicyID: FLK 20104
Claimant: Cathy Cleiland - Initial Claim
Client: CIGNA / Karen Kirby (800) 376-0725 - karen.kirby@cigna.com

Karen,
    I completed the initial claim interview with Cathy Cleiland. The forms will be forwarded to the claimant for her signature.

*Lynn Kniker*

Claims Analyst
Advantage 2000 Consultants, Inc.
One Corporate Drive
Swansea, IL 62226
800-580-5299
618-212-1100
marylynn.kniker@advantage2k.com

ADVANTAGE044



*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

# FEE AGREEMENT
## FOR
## SOCIAL SECURITY REPRESENTATION

Claimant:  Cathy Cleiland                    SSN: ████████

I, Cathy Cleiland, (hereafter to be referred to as claimant), have appointed a representative
from Advantage 2000* to represent me in administrative proceedings in connection with my
claim for benefits under the provisions of the Social Security Act.

My representative and I understand that for a fee to be payable, the Social Security
Administration (SSA) must approve any fee my representative charges to or collects from me
for services my representative provides in proceedings before SSA in connection with my
claim(s) for benefits.

We agree that if  SSA favorably decides my claim(s) for benefits,  my representative shall be
entitled to receive a fee not to exceed the lesser of  twenty-five percent (25%) of past-due
benefits resulting from my claim(s) or $5300.  **Any fee payable shall be paid by my
long term disability benefit plan and I shall have no direct or indirect
liability for payment of that fee.**

**We have both received signed copies of this agreement.**

_Cathy J. Cleiland_                         _3-1-2004_
Claimant Signature                               Date

_Dan Schmitt_                               _3-9-04_
Representative  Signature                        Date

* Not associated with any governmental agency

ADVANTAGE045

Social Security Administration                                              Form Approved
Please read the back of the last copy before you complete this form.        OMB No. 0960-0527

| Name (Claimant)(Print or Type)<br>Cathy Cleiland | Social Security Number |
|---|---|
| Wage Earner (If Different) | Social Security Number |

## Part I          APPOINTMENT OF REPRESENTATIVE

I appoint this person, _Dan Schulte_                             of Advantage 2000 ,
                              (Name and Address)          **One Corporate Drive**
to act as my representative in connection with my claims(s) or asserted right(s) under:   **Swansea, IL 62226**

| [X] Title II (RSDI) | [ ] Title XVI (SSI) | [ ] Title IV FMSHA (Black Lungs) | [ ] Title XVIII (Medicare Coverage) |
|---|---|---|---|

This person may, entirely in my place, make any request or give any notice; give or draw out evidence or information; get information; and receive any notice in connection with my pending claim(s) or asserted right(s).

[ ] I am appointing, or I now have, more than one representative. My main representative is _____
(Name of Principal Representative)

| Signature (Claimant)<br>_Cathy K. Cleiland_ | Address | 8 Cherokee Dr., Num.27<br>Monroeville, AL 36460 |
|---|---|---|
| Telephone Number (with Area Code)<br>( ) | Date | 3-1-2004 |

## Part II          ACCEPTANCE OF APPOINTMENT

I, _Dan Schulte_                             , hereby accept the above appointment. I certify that I have not been suspended or prohibited from practice before the Social Security Administration; that I am not disqualified from representing the claimant as a current or former officer or employee of the United States; and that I will not charge or collect any fee for representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form. If I decide not to charge or collect a fee for the representation, I will notify the Social Security Administration. (Completion of Part III satisfies requirement.)

| [ ] I am an attorney. | [X] I am not an attorney.    (Check one.) |
|---|---|

| Signature (Representative)<br>_Dan Schulte_ | Address | **One Corporate Drive**<br>**Swansea, IL 62226** |
|---|---|---|
| Telephone Number (with Area Code)<br>(618) 212-1123 | Date | 3-9-04 |

## Part III (Optional)          WAIVER OF FEE          *Any fee charged will be charged to a*
                         ....from the claimant          *Third party and not to the claimant*

I waive my right to charge and collect a fee under sections 206 and 1631(d)(2) of the Social Security Act. I release my client (the claimant) from any obligations, contractual or otherwise, which may be owed to me for services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative)<br>_Dan Schulte_ | Date | 3-9-04 |
|---|---|---|

ADVANTAGE046

## Part II (Optional)          ATTORNEY'S WAIVER OF DIRECT PAYMENT

I waive only my right to direct payment of a fee from the withheld past-due retirement, survivors, disability insurance or black lung benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Attorney Representative) | Date |
|---|---|

Form SSA-1696-U4 (4-95)          (See Important Information on Reverse)          FILE COPY
Use Until Stock Is Exhausted

Social Security Administration
Please read the back of the last copy before you complete this form.

Form Approved
OMB No. 0960-0527

| Name (Claimant)(Print or Type)<br>Cathy Cleiland | Social Security Number |
|---|---|
| Wage Earner (If Different) | Social Security Number |

## Part I — APPOINTMENT OF REPRESENTATIVE

I appoint this person, _____ **of Advantage 2000**

(Name and Address)   **One Corporate Drive**

to act as my representative in connection with my claims(s) or asserted right(s) under:   **Swansea, IL 62226**

[X] Title II (RSDI)   [ ] Title XVI (SSI)   [ ] Title IV FMSHA (Black Lungs)   [ ] Title XVIII (Medicare Coverage)

This person may, entirely in my place, make any request or give any notice; give or draw out evidence or information; get information; and receive any notice in connection with my pending claim(s) or asserted right(s).

[ ] I am appointing, or I now have, more than one representative. My main representative is _____

(Name of Principal Representative)

| Signature (Claimant)   *Cathy W. Cleiland* | Address   8 Cherokee Dr., Num.27<br>Monroeville, AL 36460 |
|---|---|
| Telephone Number (with Area Code)<br>( ) (251) 769-3061 | Date   3-1-2004 |

## Part II — ACCEPTANCE OF APPOINTMENT

I, _____ , hereby accept the above appointment. I certify that I have not been suspended or prohibited from practice before the Social Security Administration; that I am not disqualified from representing the claimant as a current or former officer or employee of the United States; and that I will not charge or collect any fee for representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form. If I decide not to charge or collect a fee for the representation, I will notify the Social Security Administration. (Completion of Part III satisfies requirement.)

[ ] I am an attorney.   [X] I am not an attorney.   (Check one.)

| Signature (Representative) | Address   One Corporate Drive<br>Swansea, IL 62226 |
|---|---|
| Telephone Number (with Area Code)<br>( ) | Date |

## Part III (Optional) — WAIVER OF FEE

....from the claimant   *Any fee charged will be charged to a Third party and not to the claimant*

I waive my right to charge and collect a fee under sections 206 and 1631(d)(2) of the Social Security Act. I release my client (the claimant) from any obligations, contractual or otherwise, which may be owed to me for services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative) | Date |
|---|---|

**ADVANTAGE047**

## Part II (Optional) — ATTORNEY'S WAIVER OF DIRECT PAYMENT

I waive only my right to direct payment of a fee from the withheld past-due retirement, survivors, disability insurance or black lung benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Attorney Representative) | Date |
|---|---|

Form SSA-1696-U4 (4-95)
Use Until Stock Is Exhausted
(See Important Information on Reverse)
FILE COPY

# COMPLETING THIS FORM TO APPOINT A REPRESENTATIVE

## Choosing To Be Represented

You can choose to have a representative help you when you do business with Social Security. We will work with your representative, just as we would with you. It is important that you select a qualified person because, once appointed, your representative may act for you in most Social Security matters. We give more information, and examples of what a representative may do, on the back of the "Claimant's Copy" of this form.

## Paperwork and Privacy Act Notice

The Social Security Administration will recognize someone else as your representative if you sign a written notice appointing that person and, if he or she is not an attorney, that person signs the notice agreeing to be your representative. (You can read more about this in our regulations: 20 CFR g 404.1707, 410.684, and 416.1507.) Giving the information this form requests is voluntary. Without it though, we may not work with the person you choose to represent you.

## How To Complete This Form

Please print or type. At the top, show your full name and your Social Security number. If your claim is based on another person's work and earnings, also show the "wage earner's" name and Social Security number If you appoint more than one person, you may v ant to complete a form for each of them.

## Part I Appointment of Representative

Give the name and address of the person(s) you are appointing. You may appoint an attorney or any other qualified person to represent you. You also may appoint more than one person, hut see "What Your Representative(s) May Charge" on the hack of the "Claimant's Copy" of this form. You can appoint one or more persons in a firm corporation, or other organization as your representative(s), but you may not appoint a law firm legal aid group, corporation, or organization itself.

Check the block(s) showing the program(s) under which you have a claim. You may check more than one block. Check:

o    Title II (RSDI), if your claim concerns retirement, survivors, or disability insurance benefits.

o    Title XVI (SSI), if your claim concerns supplemental security income.

o    Title IV FMSHA (Black Lung), if your claim concerns black lung benefits under the Federal Mine Safety and Health Act.

o    Title XVIII (Medicare Coverage), if your claim concerns entitlement to Medicare or enrollment in the Supplementary Medical Insurance (SMI) plan.

If you will have more than one representative, check the block and give the name of the person you want to be the main representative.

## How To Complete This Form, continued

Sign your name, but print or type your address, your area code and telephone number and the date.

## Part II Acceptance of Appointment

Each person you appoint (named in part I) completes this part, preferably in all cases. If the person is not an attorney, he or she must give his or her name, state that he or she accepts the appointment. and sign the form.

## Part III (Optional)   Waiver of Fee

Your representative may complete this part if he or she will not charge any fee for the services provided in this claim. If you appoint a second representative or co-counsel who also will not charge a fee, he or she also should sign this part or give us a separate, written waiver statement.

## Part IV (Optional)   Attorney's Waiver of Direct Payment

Your representative may complete this part if he or she is an attorney who does not want direct payment of all or part of the approved fee from past-due retirement, survivors, disability insurance, or black lung benefits withheld.

The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance v with the clearance requirements of section 3507 of the Paperwork Reduction Act of 1995. We may not conduct or sponsor. and you are not required to respond to, a collectinn of information unless it displays a valid OMB control number

## Time It Takes to Complete This Form

We estimate that it ii ill take you about 10 minutes to complete this form. This includes the time it will take to read the instructions gather the necessary facts and fill out the form. If you have comments or suggestions on this estimate, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Building, Baltimore MD 21235. Send only comments relating to our "time it takes" estimate to the office listed above All requests for Social Security cards and other claims-related information should be sent to your local Social Security office, whose address is listed under Social Security Administration in the U.S. Government section of your telephone directory.

## References

o    18 U.S.C §§ 203. 205, and 207; 30 U.S.C. § 923(b); and 42 U.S.C. §§ 406(a), 1320a-6, and 1383(d)(2)

o    20 CFR §§ 404. 1700 et. seq., 410.684 et. seq., and 416.1500 et. seq.

o    Social Security Rulings 88-10c (C.E. 1988), 85-3 (C.E. 1985), 83-27 (C.E. 1983), and 82-39 (C.E.1982)

ADVANTAGE048



*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

# FEE AGREEMENT
## FOR
## SOCIAL SECURITY REPRESENTATION

Claimant:  Cathy Cleiland                    SSN: ████████

I,  Cathy Cleiland,  (hereafter to be referred to as claimant), have appointed a representative from Advantage 2000* to represent me in administrative proceedings in connection with my claim for benefits under the provisions of the Social Security Act.

My representative and I understand that for a fee to be payable, the Social Security Administration (SSA) must approve any fee my representative charges to or collects from me for services my representative provides in proceedings before SSA in connection with my claim(s) for benefits.

We agree that if  SSA favorably decides my claim(s) for benefits,  my representative shall be entitled to receive a fee not to exceed the lesser of  twenty-five percent (25%) of past-due benefits resulting from my claim(s) or $5300.  **Any fee payable shall be paid by my long term disability benefit plan and I shall have no direct or indirect liability for payment of that fee.**

**We have both received signed copies of this agreement.**

_Cathy X. Cleiland_                          _3-1-2004_
Claimant Signature                                   Date

_____                   _____
Representative   Signature                            Date

\* Not associated with any governmental agency

**ADVANTAGE049**



*Visit Us Online at: www.advantage2k.com*

ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

# AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>        SSN#: ▇▇▇▇▇        Date of Birth: ▇▇▇▇▇

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:

   Address: _____

3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: _____
   - ☐ Opinions and statements from my treating physicians about my condition
   - ☐ Office notes/consultations/ follow up visits
   - ☐ Diagnostic testing reports
   - ☑ X-ray and imaging reports
   - ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   - ☐ Mental Health Visit notes
   - ☐ Discharge summary/Operative reports
   - ☐ Laboratory results
   - ☐ Outpatient records
   - ☐ Pathology reports
   - ☐ Other _____

4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:

   <div align="center"><strong>Advantage 2000 Consultants</strong></div>

   Address: _____<strong>One Corporate Drive</strong>_____
   _____<strong>Swansea, IL 62226</strong>_____
   For the purpose of: ____<strong>Pursuit of Social Security Disability Benefits</strong>____

6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: __<strong>Fully Favorable Social Security Decision</strong>__ . If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

_Cathy K. Cleiland_ _____        _____
Signature of Patient or Legal Representative         Date

_____        _____
If Signed by Legal Representative, Relationship to Patient     Signature of Witness

ADVANTAGE050

# EXHIBIT

# "H"

# PART 2

ADVANTAGE 2000
CONSULTANTS INC.
"Your Gateway to Social Security"

Visit Us Online at: www.advantage2k.com

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

## Authorization for Advantage 2000 to Release Information

I have appointed Advantage 2000 Consultants Inc. to represent me before the Social Security Administration. Since their services are being made available to me by my long term disability (LTD) insurer or administrator, I authorize Advantage 2000 Consultants to release information about my Social Security claim and benefits to my LTD plan.

I understand that this information from Advantage 2000 will be used by my long term disability insurer/administrator to monitor and determine the correct coordination between Social Security payments and my long term disability plan payments. I also understand that my entitlement to Social Security disability may cause my long term disability payments to be reduced and that retroactive Social Security benefits may create a long term disability benefit overpayment.

This authorization terminates 120 days after Social Security renders a final determination of my eligibility and releases any retroactive payments to which I or my dependents are entitled.

Signature: _Cathy X. Cleiland_
Cathy Cleiland

Social Security Number: ██████████

Date: ___3-1-2004___

ADVANTAGE051

Social Security Administration

Form Approved
OMB No. 0960-0527

Please read the back of the last copy before you complete this form.

| Name (Claimant)(Print or Type) Cathy Cleiland | Social Security Number |
| Wage Earner (If Different) | Social Security Number |

## Part I    APPOINTMENT OF REPRESENTATIVE

I appoint this person, _Lynn Kniker_

of Advantage 2000

(Name and Address)

One Corporate Drive
Swansea, IL 62226

to act as my representative in connection with my claims(s) or asserted right(s) under:

[X] Title II
(RSDI)

[ ] Title XVI
(SSI)

[ ] Title IV FMSHA
(Black Lungs)

[ ] Title XVIII
(Medicare Coverage)

This person may, entirely in my place, make any request or give any notice; give or draw out evidence or information; get information; and receive any notice in connection with my pending claim(s) or asserted right(s).

[ ] I am appointing, or I now have, more than one representative. My main representative is _____

(Name of Principal Representative)

| Signature (Claimant) _Cathy L. Cleiland_ | Address  8 Cherokee Dr. Num.27 Monroeville, AL 36460 |
| Telephone Number (with Area Code) (251) 769-3061  or  251-342-5545 | Date  10-17-2003 |

## Part II    ACCEPTANCE OF APPOINTMENT

I, _Lynn Kniker_ , hereby accept the above appointment. I certify that I have not been suspended or prohibited from practice before the Social Security Administration; that I am not disqualified from representing the claimant as a current or former officer or employee of the United States; and that I will not charge or collect any fee for the representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form. If I decide not to charge or collect a fee for the representation, I will notify the Social Security Administration. (Completion of Part III satisfies requirement.)

[ ] I am an attorney.

[X] I am not an attorney.        (Check one.)

| Signature (Representative) _Lynn Kniker_ | Address  One Corporate Drive Swansea, IL 62226 |
| Telephone Number (with Area Code) (800) 580-5299 | Date  10-13-03 |

## Part III (Optional)    WAIVER OF FEE

....from the claimant

*Any fee charged will be charged to a Third party and not to the claimant*

I waive my right to charge and collect a fee under sections 206 and 1631(d)(2) of the Social Security Act. I release my client (the claimant) from any obligations, contractual or otherwise, which may be owed to me for services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative) _Lynn Kniker_ | Date  10-13-03 |

ADVANTAGE052

## Part II (Optional)    ATTORNEY'S WAIVER OF DIRECT PAYMENT

I waive only my right to direct payment of a fee from the withheld past-due retirement, survivors, disability insurance or black lung benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Attorney Representative) | Date |

Form SSA-1696-U4 (4-95)        (See Important Information on Reverse)        FILE COPY



*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

# FEE AGREEMENT
## FOR
## SOCIAL SECURITY REPRESENTATION

Claimant: Cathy Cleiland                    SSN: ███████

I, Cathy Cleiland, (hereafter to be referred to as claimant), have appointed a representative from Advantage 2000* to represent me in administrative proceedings in connection with my claim for benefits under the provisions of the Social Security Act.

My representative and I understand that for a fee to be payable, the Social Security Administration (SSA) must approve any fee my representative charges to or collects from me for services my representative provides in proceedings before SSA in connection with my claim(s) for benefits.

We agree that if SSA favorably decides my claim(s) for benefits, my representative shall be entitled to receive a fee not to exceed the lesser of twenty-five percent (25%) of past-due benefits resulting from my claim(s) or $5300. __Any fee payable shall be paid by my long term disability benefit plan and I shall have no direct or indirect liability for payment of that fee.__

We have both received signed copies of this agreement.

_Cathy J. Cleiland_                     _10-17-2003_
Claimant Signature                              Date

_Lynn Kruhe_                          _10-13-03_
Representative(s) Signature(s)                   Date

* Not associated with any governmental agency

**ADVANTAGE053**

Social Security Administration

Please read the back of the last copy before you complete this form.

Form Approved
OMB No. 0960-0527

| Name (Claimant) (Print or Type) Cathy Cleiland | Social Security Number |
| Wage Earner (If Different) | Social Security Number |

## Part I — APPOINTMENT OF REPRESENTATIVE

I appoint this person, _____ of Advantage 2000

(Name and Address)    One Corporate Drive

to act as my representative in connection with my claims(s) or asserted right(s) under:    Swansea, IL 62226

[X] Title II (RSDI)    [ ] Title XVI (SSI)    [ ] Title IV FMSHA (Black Lungs)    [ ] Title XVIII (Medicare Coverage)

This person may, entirely in my place, make any request or give any notice; give or draw out evidence or information; get information; and receive any notice in connection with my pending claim(s) or asserted right(s).

[ ] I am appointing, or I now have, more than one representative. My main representative is _____

(Name of Principal Representative)

| Signature (Claimant) _Cathy F. Cleiland_ | Address    8 Cherokee Dr. Num.27 Monroeville, AL 36460 |
| Telephone Number (with Area Code) (251) 769-3061 | Date    10-17-2003 |

## Part II — ACCEPTANCE OF APPOINTMENT

I, _____, hereby accept the above appointment. I certify that I have not been suspended or prohibited from practice before the Social Security Administration; that I am not disqualified from representing the claimant as a current or former officer or employee of the United States; and that I will not charge or collect any fee for representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form. If I decide not to charge or collect a fee for the representation, I will notify the Social Security Administration. (Completion of Part III satisfies requirement.)

[ ] I am an attorney.    [X] I am not an attorney.    (Check one.)

| Signature (Representative) | Address    One Corporate Drive Swansea, IL 62226 |
| Telephone Number (with Area Code) (    ) | Date |

## Part III (Optional) — WAIVER OF FEE

....from the claimant

*Any fee charged will be charged to a Third party and not to the claimant*

I waive my right to charge and collect a fee under sections 206 and 1631(d)(2) of the Social Security Act. I release my client (the claimant) from any obligations, contractual or otherwise, which may be owed to me for services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative) | Date |

ADVANTAGE054

## Part II (Optional) — ATTORNEY'S WAIVER OF DIRECT PAYMENT

I waive only my right to direct payment of a fee from the withheld past-due retirement, survivors, disability insurance or black lung benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Attorney Representative) | Date |

Form SSA-1696-U4 (4-95)    (See Important Information on Reverse)    FILE COPY

# COMPLETING THIS FORM TO APPOINT A REPRESENTATIVE

## Choosing To Be Represented

You can choose to have a representative help you when you do business with Social Security. We will work with your representative, just as we would with you. It is important that you select a qualified person because, once appointed, your representative may act for you in most Social Security matters. We give more information, and examples of what a representative may do, on the back of the "Claimant's Copy" of this form.

## Paperwork and Privacy Act Notice

The Social Security Administration will recognize someone else as your representative if you sign a written notice appointing that person and, if he or she is not an attorney, that person signs the notice agreeing to be your representative. (You can read more about this in our regulations: 20 CFR § 404.1707, 410.684, and 416.1507.) Giving the information this form requests is voluntary. Without it though, we may not work with the person you choose to represent you.

## How To Complete This Form

Please print or type. At the top, show your full name and your Social Security number. If your claim is based on another person's work and earnings, also show the "wage earner's" name and Social Security number If you appoint more than one person, you may v ant to complete a form for each of them.

## Part I Appointment of Representative

Give the name and address of the person(s) you are appointing. You may appoint an attorney or any other qualified person to represent you. You also may appoint more than one person, hut see "What Your Representative(s) May Charge" on the hack of the "Claimant's Copy" of this form. You can appoint one or more persons in a firm corporation, or other organization as your representative(s), but you may not appoint a law firm legal aid group, corporation, or organization itself,

Check the block(s) showing the program(s) under which you have a claim. You may check more than one block. Check:

o   Title II (RSDI), if your claim concerns retirement, survivors, or disability insurance benefits.

o   Title XVI (SSI), if your claim concerns supplemental security income.

o   Title IV FMSHA (Black Lung). if your claim concerns black lung benefits under the Federal Mine Safety and Health Act.

o   Title XVIII (Medicare Coverage), if your claim concerns entitlement to Medicare or enrollment in the Supplementary Medical Insurance (SMI) plan.

If you will have more than one representative, check the block and give the name of the person you want to be the main representative.

Form SSA-1696-114 (4-95)

## How To Complete This Form, continued

Sign your name, but print or type your address, your area code and telephone number and the date.

## Part II Acceptance of Appointment

Each person you appoint (named in part I) completes this part, preferably in all cases. If the person is not an attorney, he or she must give his or her name, state that he or she accepts the appointment, and sign the form.

## Part III (Optional)   Waiver of Fee

Your representative may complete this part if he or she will not charge any fee for the services provided in this claim. If you appoint a second representative or co-counsel who also will not charge a fee, he or she also should sign this part or give us a separate, written waiver statement.

## Part IV (Optional)   Attorney's Waiver of Direct Payment

Your representative may complete this part if he or she is an attorney who does not want direct payment of all or part of the approved fee from past-due retirement, survivors, disability insurance, or black lung benefits withheld.

The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Paperwork Reduction Act of 1995. We may not conduct or sponsor. and you are not required to respond to, a collection of information unless it displays a valid OMB control number

## Time It Takes to Complete This Form

We estimate that it ii ill take you about 10 minutes to complete this form. This includes the time it will take to read the instructions gather the necessary facts and fill out the form. If you have comments or suggestions on this estimate, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Building, Baltimore MD 21235. **Send only comments relating to our "time it takes" estimate to the office listed above All requests for Social Security cards and other claims-related information should be sent to your local Social Security office, whose address is listed under Social Security Administration in the U.S. Government section of your telephone directory.**

## References

o   18 U.S.C §§ 203. 205, and 207; 30 U.S.C. § 923(b); and 42 U.S.C. § 406(a), 1320a-6, and 1383(d)(2)

o   20 CFR §§ 404. 1700 et. seq., 410.684 et. seq., and 416.1500 et. seq.

o   Social Security Rulings 88-10c (C.E. 1988), 85-3 (C.E. 1985), 83-27 (C.E. 1983), and 82-39 (C.E.1982)

ADVANTAGE055



*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

### FEE AGREEMENT
### FOR
### SOCIAL SECURITY REPRESENTATION

Claimant:  Cathy Cleiland                    SSN: ▓▓▓▓▓

I,  Cathy Cleiland,  (hereafter to be referred to as claimant), have appointed a representative from Advantage 2000* to represent me in administrative proceedings in connection with my claim for benefits under the provisions of the Social Security Act.

My representative and I understand that for a fee to be payable, the Social Security Administration (SSA) must approve any fee my representative charges to or collects from me for services my representative provides in proceedings before SSA in connection with my claim(s) for benefits.

We agree that if SSA favorably decides my claim(s) for benefits, my representative shall be entitled to receive a fee not to exceed the lesser of twenty-five percent (25%) of past-due benefits resulting from my claim(s) or $5300.  **Any fee payable shall be paid by my long term disability benefit plan and I shall have no direct or indirect liability for payment of that fee.**

**We have both received signed copies of this agreement.**

_Cathy X. Cleiland_                    ✓ _10 - 17 - 2003_
Claimant Signature                              Date

_____          _____
Representative(s) Signature(s)                    Date

* Not associated with any governmental agency

ADVANTAGE056



**ADVANTAGE 2000**
**CONSULTANTS INC.**
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone: (800) 580-5299 - Fax: (314) 894-4891*
*Email: advantage2000@advantage2k.com*

## Authorization for Advantage 2000 to Release Information

I have appointed Advantage 2000 Consultants Inc. to represent me before the Social Security Administration. Since their services are being made available to me by my long-term disability (LTD) insurer or administrator, I authorize Advantage 2000 Consultants to release information about my Social Security claim and benefits to my LTD plan.

I understand that this information from Advantage 2000 will be used by my long-term disability insurer/administrator to monitor and determine the correct coordination between Social Security payments and my long-term disability plan payments. I also understand that my entitlement to Social Security disability may cause my long-term disability payments to be reduced and that retroactive Social Security benefits may create a long-term disability benefit overpayment.

This authorization terminates 120 days after Social Security renders a final determination of my eligibility and releases any retroactive payments to which I or my dependents are entitled.

Signature: *Cathy L. Cleiland*
Cathy Cleiland

Social Security Number: ▮▮▮▮▮▮

Date: 10/17/2003

ADVANTAGE057



*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone: (800) 580-5299- Fax: (314) 894-4891*
*Email: advantage2000@advantage2k.com*

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>        SSN#: ▓▓▓▓        Date of Birth: ▓▓▓▓

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:

   _____

   Address: _____

3. The type and amount of information to be used or disclosed is as follows for treatment received on dates:_____
   - ☐ Opinions and statements from my treating physicians about my condition
   - ☐ Office notes/consultations/ follow up visits
   - ☐ Diagnostic testing reports
   - ☐ X-ray and imaging reports
   - ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   - ☐ Mental Health Visit notes
   - ☐ Discharge summary/Operative reports
   - ☐ Laboratory results
   - ☐ Outpatient records
   - ☐ Pathology reports
   - ☐ Other _____

4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:

   <u>**Advantage 2000 Consultants**</u>

   Address: <u>**One Coporate Drive**</u>

   <u>**Swansea, IL 62226**</u>

   For the purpose of: <u>**Pursuit of Social Security Disability Benefits**</u>
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: <u>**Fully Favorable Social Security Decision**</u>. If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

✓ *Cathy L. Cleiland*                    ✓ 10 - 17 - 2003
_____        _____
Signature of Patient or Legal Representative        Date

_____        _____
If Signed by Legal Representative, Relationship to Patient    Signature of Witness

ADVANTAGE058



*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

**To our Customers:**

Enclosed in this letter is a revised release of information disclosure form which reflects the change in federal law to comply with HIPAA rule (Section 164.508). As of April 14, 2003, all requests for information must include all the information on this form to be fulfilled by the hospital's HIM Release of Information desk.

As background, the federal government published the standards for privacy of individually identified health information on December 28, 2000.  These standards are also known as the HIPAA privacy rule.  The rule establishes standards for information disclosure-including what constitutes a valid authorization. Below is an overview of this information for future reference. Each hospital will need to comply with the new HIPAA rules mandated to be in effect by April 14, 2003.

**The central HIPAA rule (Section 164.508) pertaining to the release of health information states that a valid authorization for the release of patient information must be in plain language and contain the following elements:**

- A specific and meaningful description of this information to be disclosed
- The name of the covered entity (hospital) or individual authorized to make the disclosure
- The name of the covered entity or person to whom the hospital or individual can make the disclosure
- An expiration date or event that relates to the individual or the purpose of the use or disclosure
- A statement of the individual's right to revoke the authorization in writing
- A statement about the exceptions to the right to revoke
- A description of how the individual may revoke the authorization
- A statement that information used or disclosed pursuant to the authorization may be subject to re-disclosure by the recipient and no longer be protected by the rule
- Signature of the individual
- The date
- If the authorization is signed by a personal representative of the individual, a description of such representative's authority to act for the individual

**The authorization for release of information is not valid, according to the privacy rule, if the   authorization has any of the following defects:**
- The expiration date or event has passed
- The authorization has not been filled out completely with the respect to the required content listed above
- The authorization is known by the covered entity to have been revoked
- The authorization is a prohibited type of compound authorization (must not be combined with any other document request)
- Any material information in the authorization is known by the covered entity to be false

**ADVANTAGE059**

**Marilyn Brown**

| | |
|---|---|
| **From:** | Marilyn Brown |
| **Sent:** | Thursday, October 02, 2003 9:53 AM |
| **To:** | 'karen.kirby@cigna.com' |
| **Subject:** | Claimant: Cathy Cleiland - SSA-1696 Pending - Policy ID #: FLK |

10/02/2003 9:52:04 AM
SSN: ▮▮▮▮▮▮
Policy ID #:  FLK 20104
Claimant:  Cathy Cleiland - SSA-1696 Pending
Client:  CIGNA Group Insurance - Tarrytown NY FCO / Karen Kirby (800) 376-0725 - karen.kirby@cigna.com

Dear Karen:

We are pleased to acknowledge that we have received your referral on **Cathy Cleiland**.

I will contact and review with the CIGNA Group Insurance insured:
- The financial advantages to applying for SSDI
- The Social Security Disability application/appeals process

I just wanted to let you know that this referral is greatly appreciated!

I will keep you informed of significant events in the process and will let you know if there are any unusual factors that would assist you in managing the LTD claim.  We will also add the claimant to all regularly scheduled status and event reports.

Should your office receive any additional medical evidence while we are pursuing Social Security benefits, it would be most helpful if you could please send a copy to me.

As always, your business is appreciated.  I look forward to working with you and your insured!

Sincerely,

Janelle Caponi
Customer Service Specialist

ADVANTAGE060

10/02/2003



One Corporate Drive · Swansea, IL 62226
P.O. Box 24157 · Belleville, IL 62223
Telephone: 1-800-580-5299 · Fax: 1-314-845-6141
E-mail: ccms.customer.service@advantage2k.com

Date of Referral: 10/2/03

## SOCIAL SECURITY ASSISTANCE PROGRAM - REFERRAL GUIDE

### CIGNA Group Insurance

**Company Name:**
**FCO:** TARRYtown
**Company Address:**
**City, State and Zip:** Karen Kirby
**Case Manager:**
**CM Phone Number:** 800 376 0725
**CM Fax Number:**
**CM Email:** Karen.Kirby @cigna.com

Disabled Person's Name: Cathy Cleiland

Policyholder: Temple Inland          1 5-21-03    2 low back surgeries
                                      7-16-03
Policy Number: FLK 20104             6-2002  1 cervical surgery

Claim Number: _____

Social Security Number: ████████████

Date of Birth: ████████████

Telephone Number: 251-769-3061    Sex: Male ☐  Female ☒

Address: 8 Cherokee Drive #27

Monroeville  AL  36460    MVA 4-25-2003

Nature of Disability [Diagnosis]: Mult back surg

Date the Disability Began: 5/14/2003.

What is their marital status?    Married ☐    Widowed ☐    unknown
                                 Divorced ☐   Single ☐
Does the disabled person have any minor or disabled children?  YES ☐  NO ☐
Does Family Benefit Offset Apply?                              YES ☐  NO ☐

Has the Disabled Person applied for Social Security before?    unknown
☐ Unknown
☐ Current application or appeal pending    Date of Last Denial (If Available) ___/___/___
☐ Previous SS application denied.

Level of Latest Denial:    Initial App ☐  Recon ☐  Hearing ☐  Appeals Council ☐

ADVANTAGE061

Cathy

## ADVANTAGE 2000 CONSULTANTS TALK SHEET
Annotate with date and initials

| Date: | Notes: |
|-------|--------|
| 4/15/05 | Called OHA - pre hng date. ALJ Ricardo Ryan Jw |
| 5/19/05 | Called OHA - pre hng reverue ALJ Ryan Jw |
| 5/19/05 | Called Clnt phone disc. Called mother |
| | no answer sent letter to clnt Jw |
| 5/31/05 | FF OTR Dec rec/cc status/actions done/file to CM Jw |
| 6/2/05 | # not working - Mothers # Busy - ds |
| 4/4/05 | # not working (still) - Mother reported 0396 - |
| | now updated in sys. ds - Spoke to claimant |
| | discussed decision + supplemental |
| | info. ds |

Change Call Sheet - Calling Key

## ADVANTAGE 2000 CONSULTANTS TALK SHEET
Annotate with date and initials

Date:                   Notes:

1-7-05    Called Donna at OHA for OTR status    DB

_____    Ph 251-441-5441 ex 3076     OTR less

_____    sent 5-24-04    left v/m

1-7-05    Call OHA files is in mobile office unassigned

_____    Ph 251-441-5441 Mobile Office    DB

1-7-05    Called Clnt. rang many times - no    DB

_____    answer. all requests to your long

_____    distant provider are busy L-2

1-7-05    Sent status letter to clnt

1-7-05    Called _____ assigned to ALT Judge Ryan

_____    reworked ___ Mobile OHA

1/20/05   Called OHA left v/m for Donna RE OTR status J.

1/21/05   Donna Sizemore from OHA left v/m OTR has been denied J.

3/8/05    Called Clmt - no answer - mother answ -    Jw

_____    Cathy moved - cellphone # is: 334-807-0396 Jw

_____    Spoke to clmt will call if she goes to get

_____    any new treatment. Cleiland is now

_____    her last name has been changed at SSA    Jw

3/18/05   Called OHA prehring development    Jw

_____    OHA said they can't change her name w/o proof Jw

3/22/05   called clmt she will send copy of her SS card Jw

4/8/05    DDS CE letter nec    Jw

**ADVANTAGE063**

**ADVANTAGE 2000 CONSULTANTS TALK SHEET**
Annotate with date and initials

| Date: | Notes: |

11-11-04  Called client States left message with        DB
          client's mother.

11-12     Called OHA Montgomery unassigned work-up
11-12     Called OHA - Mobile - reworked assigned     DB
          to ALJ Ricardo Ryan
          left V/M concerning OTR letter
          Jeannie Hober. She is to call
          me back with States.

12-10     Called OHA unworked                          DB
12-10     Called Mobile OHA for OTR States             DB
          Pending for long Judge Ryan
          Jeannie Hober left V/M with
          Jeannie Hober concerning OTR States   DB
          Donna x 3076 working

12-10     Recd call back from Jeannie at     DB
          Mobile OHA. They do have OTR in
          file. She suggest I talk to
          Donna at ex 3076 (Donna is the
          one working up the file. However,
          Donna is on leave + not here today)
          Ph 251-441-5441 x 3082    OTR States

1-4-05    Called OHA - U massigned work-up     DB

*Cathy Key*

## ADVANTAGE 2000 CONSULTANTS TALK SHEET
Annotate with date and initials

| Date: | Notes: |
|---|---|
| 8/27 | Dr. Bennett told her she has; left 6th cranial nerve paulsey - not Bells paulsey, cataracts in both eyes, cornea distrophy in both eyes and her optic nerve look like she may have glocoma - but her eye pressure is okay. She has another apt in 3 whs. (She is also on 3200mg of neurton daily JW |
| 8/31/04 | Mailed Med reg to Dr Bennett (CK) |
| 8/31/04 | Called OHA - told of address change JW |
| 9-30 | Called OHA left v/m to call back DB on status. |
| 9-30 | Called OHA unassigned, unworked case is in Mobil, AL Ph 251-441-5441 Fax 251-441-5993 |
| 9-30 Mobile | Called Mobile, AL OHA unworked Judge ▓▓ Ryan DB They did get over OTR it is on front of folder. She will ask Judge tomorrow if he has looked at it |
| 9-30 | Called Dr Bennett. Clnt is listed DB as new patient. They have never seen patient. Clnt has no up comeing appointments |

## ADVANTAGE 2000 CONSULTANTS TALK SHEET
Annotate with date and initials

| Date: | Notes: | |
|---|---|---|
| 5/12 | med follow up Herrick | LW |
| 5/20 | Dr. Herrick refuses to do Q's | LW |
| 5/24/04 | OTR request mailed - bs | |
| 6/8/04 | Called OHA - unworked left V/m for ~~Doris~~ Donna - | |
| | she won't be in off. till Thurs | LW |
| 6/8/04 | Called claimant left V/m | LW |
| 7/13/04 | Claimant called - left msg she moved in with | |
| | her parents ph# is 334-397-4704 - ~~(crossed out)~~ | |
| | Called her back & left msg for address | LW |
| 7/13/04 | unworkd assigned to ALJ Ryan | LW |
| | left msg for Jeanie Hobbs for OTR Status | LW |
| 8/17/04 | Called claimant talked with mother | |
| | she gave new phone # 251-342-5545 | |
| | 5777 Chester Ct, Mobile AL 36609 | |
| | was married two weeks ago has | |
| | not changed name yet. CC Status | LW |
| 8/17/04 | Called OHA told them of address change | LW |
| 8/27/04 | Claimant called - she moved back with | |
| | her mother - is getting divorced & will | |
| | change her name to Cleveland & let us know | |
| | when this is done. She has been having problems | |
| | with double vision & went to an eye Dr. | |

William L. Bennett, MD
Eye Center South
2800 Ross Clark Cir.
Dothan, AL 36301
334-???-????

ADVANTAGE066

## ADVANTAGE 2000 CONSULTANTS TALK SHEET
Annotate with date and initials

Date:              Notes:

| | | |
|---|---|---|
| 3/10/04 | Med req to Hadley & Eddins | fw |
| 3/15/04 | SSA- Reqst recieved | fw |
| 3/26/04 | medsrec from Hadley ck req to acct. | fw |
| 4/1/04 | Med req follow up to Eddins | fw |
| 4-6-04 | claimant called w/new source - Center for Pain - request prepared - ds | |
| 4-6-04 | Mailed Med req to Center for Pain (X) | |
| 4/7/04 | Called OHA - Jeannie transfered to Donna cut off called back - left msg for Donna | fw |
| 4/8/04 | OHA called (Donna Sizemore) left msg | fw |
| 4/8/04 | Called OHA & asked about name difference was told    Jan of 04    Named changed to Key | |
| 4/9/04 | Called Claimant left msg - what name goes with SS # | fw |
| 4/9/04 | meds rec from Charles Eddins | sw |
| 4/12/04 | Claimant called and left msg | fw |
| 4/12/04 | Called claimant She Changed her name to Key - after her divorce | fd |
| 4/12/04 | E-mailed Ben to update system, CC Status | fw |
| 4/14/04 | Ben E-mailed system updated | fw |
| 4/20/04 | Notes rec. from Pain Mng Center | fw |
| 4/24/04 | Ck req sent to acct. | fw |

ADVANTAGE067

**ADVANTAGE 2000 CONSULTANTS TALK SHEET**
Annotate with date and initials

| Date: | Notes: |
|---|---|
| 11/20 | Received ADL for clmt to complete & SSI denial letter. |
| 11/26 | Sent status to CC about POA. Called clmt & left a message on ans. mach. X. Sent proofs back to clmt. JC |
| 12/3 | Clmt called & left a message about her B/C |
| 12/4 | Called clmt back & left a message on ans. mach. X |
| 12/10 | Received general info letter that was sent to clmt. X |
| 12-13 | Rec'd letter re: CE on 12-30-03. JBH |
| 12-17 | Left VM re: CE on 12-31-03. JBH 12-17-03 |
| 1/8/04 | Received letter from DDS stating that the clmt did NOT attend the CE on 12-31-03. |
| 1/9/04 | Received notice of rescheduled CE for 1-28-04 |
| 1/12/04 | Called clmt. & left a mess. on ans. mach. X |
| 2/9 | Received T/C denial letter. Called clmt. transferred to hearing. Gave file to Kevin M. X |
| 2-20-04 | Assigned to Dan S. KM |
| 2/23/04 | Hrng forms to claimant                    Lw |
| 2-25-04 | Called, LM on VM. ds |
| 2/27/04 | Called, LM on VM. ds |
| 3/9/04 | Hrng forms to SSA, CC Status, Claimant letter. included signed forms copied  Lw |
| 3/9/04 | Hrng forms rec. from claimant              Lw |
| 4-17-04 ✗D |  |

ADVANTAGE068

ADVANTAGE 2000 CONSULTANTS TALK SHEET
Annotate with date and initials

Claimant: _Cathy Cleiland_     SSN: ████████████

Contact made clmt. Clmt indicates:

Date: 10/2/03     Claim Status: _Neds IC_

CSS: _JMc_

| Date: | Notes: |
|---|---|
| 10/2/03 | Called clmt - n/a, l/m on a/m for clmt returned my call - She needs IC Set apt w/ Lynn Mon 10/6 @ 9:30 am |
| 10/6 | Clmt. called & left a message with Janelle that she is trying to get into the doctor & cannot do the claim. Called her cell phone - no couldn't leave a message. & Called home phone # & left a message. JC |
| 10/10 | Called clmt & completed IC forms. |
| 10/13 | Sent status to cc. Gave file to assist. JC |
| 10/13/03 | IC forms to clmt w/ 11696 packet JC |
| 10/20/03 | IC forms rcvd from clmt (v/c N-2) JC |
| 10/22/03 | IC to SSA certified - St to Cl JC |
| 10/30 | Clmt called about POA. Called SSA they have the claim. The CR sent out the POA info yesterday. Called clmt back & left a message for with POA status. |
| 11/5 | Received POA. Faxed copy to clmts HR person. Called clmt & let her know. JC |

**Tammy Isaak**

| | |
|---|---|
| **From:** | Tammy Isaak |
| **Sent:** | Tuesday, July 05, 2005 1:17 PM |
| **To:** | 'kelli.archacki@cigna.com' |
| **Cc:** | 'chris.brady@cigna.com'; 'CGIOverpaymentRecoveryUnit@CIGNA.com' |
| **Subject:** | Cleland, Cathy  Policy: FLK 20104  Policy Holder: Temple Inland  DOB: |

   

Cleland  Cathy.rtf    Cleland  Cathy    OP Calc Sheet.xls    Referral
(15 KB)         FACT Query.pd...    (484 KB)       erpayment Form.doc

Please complete the attached LTD Overpayment Calculation Sheet and return it to Advantage 2000 Benefit Coordination Team (RecoveryTeam@advantage2k.com) within 72 hours of receipt.  In addition, the attached CGI Recovery Team Referral Guide is to be completed and forwarded to the CGI Recovery Team along with a copy of the completed calculation sheet.  Once received, our Benefit Coordination Team will contact the claimant to coordinate the repayment of their LTD Overpayment.

**PLEASE NOTIFY ADVANTAGE 2000 IMMEDIATELY IF YOU HAVE REASON TO BELIEVE THE LTD CLAIM WILL CLOSE WITHIN THE NEXT TWO MONTHS**

Thank you for allowing us to be of service.

**Tammy Isaak**
Awards Processing Specialist
tammy.isaak@advantage2k.com
**Advantage 2000 Consultants, Inc.**
One Corporate Drive
Swansea, IL  62226

Toll Free:  1-800-580-5299

ADVANTAGE070

1

# ADVANTAGE 2000 CONSULTANTS, Inc.

Telephone 1-800-899-3433
Fax 1-314-845-6141

Date:   7/5/2005

To: Kelli Archacki
CIGNA Group Insurance - Dallas TX FCO

From: Tammy Isaak for Dan Schulte of ADVANTAGE 2000 Consultants Inc·

## SOCIAL SECURITY DISABILITY ENTITLEMENT
## CONFIRMATION

RE: **Cathy Cleiland**     SSN: ▓▓▓▓▓     FLK 20104
Phone: (334) 807-0396     Level of Decision = ALJ Hearing

| PLEASE NOTIFY ADVANTAGE 2000 IMMEDIATELY IF YOU HAVE REASON TO BELIEVE THE LTD CLAIM WILL CLOSE WITHIN THE NEXT TWO MONTHS |
| --- |

**Entitlement Data Based On:** 07/01/2005 - Fact Query
**AWARD PROCESSED DATE:** 06/24/2005

| | |
| --- | --- |
| Date of Disability Established by SS: | 05/14/2003 |
| Date of Entitlement to SS Disability: | 11/01/2003 |
| Retroactive Benefits paid: | $24,600.00 |
| This represents payment through: | 05/01/2005 |

*Handwritten notes:*
11/03 – 1217×1 =1217
12/03 1243×1 1243
11/04-11/04 1290×11 14190
12/00-5/05 1325×6 7950
24600

**Diagnosis Code:** 7240 - Disorders of Back (discogenic and de
**Secondary Diagnosis Code:** 2500 - Diabetes Mellitus

**PRIMARY BENEFIT HISTORY:**

| Date | PIA | Benefit Paid | Basis |
| --- | --- | --- | --- |
| 11/2003-11/2003 | $1,217.70 | $1,217.00 | Origina |
| 12/2003-12/2003 | $1,243.02 | $1,243.00 | Cost of |
| 01/2004-11/2004 | $1,290.30 | $1,290.00 | Additio |
| 12/2004-Cont'g | $1,325.10 | $1,325.00 | Cost of Living Adjustment |

**Amounts for Offset Consideration:** *[Your Jurisdiction per Plan Provisions]*
**Primary -**

| | | | |
| --- | --- | --- | --- |
| 11/2003 – 12/2003 | @ | $1,217.00 | |
| 01/2004 – Cont'g | @ | $1,217.00 + $47.00 Additional Earnings Increase | |

ADVANTAGE071

**No Dependents are Noted!**

---

***IF CHECKED***, THE  FOLLOWING  SPECIAL COMMENT APPLIES TO THIS CASE

_____ Benefits for dependents are payable on this claim, but have not yet been processed by SSA.

_____ The monthly benefits payable from SSA have been reduced to the amounts shown above because the worker receives workers compensation payments  or some other public disability benefit based on employment that was not covered by F.I.C.A. tax provisions.

__X__ **The SSA disability benefit shown above was increased to include additional earnings in the primary insurance amount calculation.**

_____ SSI Windfall Offset Provisions Involved.  Retroactive Benefits Not Released

THANK YOU FOR THIS REFERRAL !

ADVANTAGE072

```
    ***  REC 2005182  085854 HA711CE0 1A70  CIPQYA4   PQA4   (F-1A7 )   ***

FACT     DTE:07/01/05  SSN:██████████  BIC:A ████████████ UNIT:ADVAN2 PG: 001
STATUS   MBR YES LOU-07/01 DATA FILES YES LOU-07/01 SSACCS NO  LOU-06/30
         CPS NO
ACCOUNT  PCOC-7 NOP-01 SP-F CIS-N TAC-D LUM-07 LMM-07/05 RCC-5 ERC-03 FLI-M
         SEC-D CDY-0 DRAMS READ
INSURED  CLAIM TYPE-DISABILITY DATE OF FILING-10/10/2003 FIRST MET-04/1998
         LAST MET-12/2008  WAIT PER START-06/2003  NONX NO GMS USED-04/1998
         EXC NO GMS USED-04/1998  20/40 EXCLUSION-TEST MET
         20/40 NON EXCL-TEST MET  DIB QC REQUIRE-20  DIB QC EARNED-40
         FULL INS EXCL-TEST MET  FULL INS NONEXCL-TEST MET
         FULL QC REQUIRE-24  FULL QC EARNED-40  CURR QC EARNED-00
         HLTHBEN QC EARN-00
PMT CYC  CYI-3 PCEFD-02/17/2004 PCCOM-02/04 PCCR-I
PRIMARY  CATHY K CLEILAND DOB-07/11/1957 LSPA-$0.00
PIA HIS  11/03 $1217.70 L2   FMAX-$1826.50D ELY-03 IME-$2707 YOC-00
         12/03 $1243.20 L2K  FMAX-$1864.80D ELY-03 IME-$2707 YOC-00
         01/04 $1290.30 L22  FMAX-$1935.50D ELY-03 IME-$2851 YOC-00
         12/04 $1325.10 L2K  FMAX-$1987.70D ELY-03 IME-$2851 YOC-00
PAYMENT  PIC-A  MPA-$1325.00 DOC-628 SCC-01020  RD-06/24/05 LAP-T PSC-C
         F/LLOA-2/3  ZDPC-082 EDA-06/24/05 EDL-06/23/05
TELE NO  BTN-251-342-5545 BTC1-O CPND-06/05
PAYEE    CATHY K CLEILAND
ADDRESS  8 CHEROKEE DR NUMBER27 MONROEVILLE AL 36017-8508
BANK     ███████████████████61 BDCD-06/23/05
SCH PAY  PAID-06/24/2005 PMA-$0.00 THRU 05/05 CMA-$1325.00 FOR 06/05 SPI-P
         PPI-M
HLD CHK  $1325.00 FOR 06/05 TOH-1 SPM-TAPE
BENEFIT  BIC-A  CATHY K CLEILAND SB-F DOB-07/11/1957 B  DOEI-11/03 DOEC-11/03
         ABN-3TFX LAF-C  MBP-$1325.00 DRD-06/24/05 LANG-E TOC-5
HBAD01   HAP-01 HEDA-06/23/05
BENE ENT START-11/2003 DATE OF FILING-10/10/2003 APP RECEIPT-00/00/0000
         ID CODE-A  CUR ENT CODE-DISABLED  FULL RETIRE AGE-01/2024
BEN DENY DATE OF FILING-10/15/2003 APP RECEIPT-00/00/0000 ID CODE-A
         CUR ENT CODE-DISABLED  DIB ONSET-05/14/2003  DISALOW/DEN RSN-0E3
         LEVEL OF DENIAL-INITIAL  CONVERTED
DIB      DDO-05/14/03 LOD-1 BDC-E3 DSD-02/04
─────────────────────────────────────────────────────────────────────────
         DDO-05/14/03 DIG-7240 SDIG-2500 DOED-11/03 DSD-06/05

CITIZEN  START-████████ COUNTRY-UNITED STATES PROVEN
HISTORY  11/03  $1217.70  $  0.00 700  01        R    $1217.00
         12/03  $1243.20  $  0.00 200  01        R    $1243.00
         01/04  $1290.30  $  0.00 300  01        R    $1290.00
         12/04  $1325.10  $  0.00 100  01        R    $1325.00

+++ TRANS UPDATED THRU 07/01 +++

TRANS    RD-6/23/05 LAP-X   MCS PIC-A
         RD-6/24/05 LAP-TB  TITLE II PROCESS PIC-A
```

ADVANTAGE073

Explanation Of Benefits

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS            TX 75243
972-907-6500
LIFE INSURANCE CO OF NORTH AMERICA

Page        1

CIGNA

Please direct any questions to the above office.

ADVANTAGE 2000 CONSULTANTS               D063
ACCOUNTING DEPT.
4121 UNION RD., SUITE 216
INV. #:  20051345
ST. LOUIS            MO 63129

| Certholder / Claimant Name | Service | Service Dates | Patient No. | Policy No. | Amount Paid |
|---|---|---|---|---|---|
| C K CLEILAND<br>CATHY          K CLEILAND | EXPENSES | 07/05/05-07/05/05 | | FLK0020104 | 2150.00 |

DATE ISSUED :  **07/12/2005**          TOTAL PAYMENT $      **2,150.00**

Detach on Perforation Below - Please Cash Promptly

G2018A (SRO Check Overlay) 6-13-2003

ADVANTAGE074

# ADVANTAGE 2000 CONSULTANTS, Inc.

Telephone 1-800-899-3433
Fax 1-314-845-6141

Date:    7/5/2005

To:  Kelli Archacki
     CIGNA Group Insurance - Dallas TX FCO

From:  Tammy Isaak for Dan Schulte  of  ADVANTAGE  2000  Consultants  Inc

## SOCIAL SECURITY DISABILITY ENTITLEMENT
## CONFIRMATION

*10 -02-03*

RE:  **Cathy Cleiland**     SSN: ███████     FLK 20104
Phone: (334) 807-0396     Level of Decision = ALJ Hearing

---

| PLEASE NOTIFY ADVANTAGE 2000 IMMEDIATELY IF YOU HAVE REASON TO BELIEVE THE LTD CLAIM WILL CLOSE WITHIN THE NEXT TWO MONTHS |
|---|

**Entitlement Data Based On:** 07/01/2005 - Fact Query
**AWARD PROCESSED DATE:** 06/24/2005

Date of Disability Established by SS:      05/14/2003
Date of Entitlement to SS Disability:      11/01/2003
Retroactive Benefits paid:                $24,600.00
This represents payment through:          05/01/2003

**Diagnosis Code:** 7240 - Disorders of Back (discogenic and degenerative)
**Secondary Diagnosis Code:** 2500 - Diabetes Mellitus

**PRIMARY BENEFIT HISTORY:**

| Date | PIA | Benefit Paid | Basis |
|---|---|---|---|
| 11/2003-11/2003 | $1,217.70 | $1,217.00 | Original Award |
| 12/2003-12/2003 | $1,243.02 | $1,243.00 | Cost of Living Adjustment |
| 01/2004-11/2004 | $1,290.30 | $1,290.00 | Additional Earnings Increase |
| 12/2004-Cont'g | $1,325.10 | $1,325.00 | Cost of Living Adjustment |

| Amounts for Offset Consideration: *[Your Jurisdiction per Plan Provisions]* |
|---|
| **Primary -** |
| 11/2003 – 12/2003 @ $1,217.00 |
| 01/2004 – Cont'g @ $1,217.00 + $47.00 Additional Earnings Increase |

**No Dependents are Noted!**

ADVANTAGE075

_**IF CHECKED**_, THE  FOLLOWING  SPECIAL COMMENT APPLIES TO THIS CASE

____    Benefits for dependents are payable on this claim, but have not yet been processed by SSA.

____    The monthly benefits payable from SSA have been reduced to the amounts shown above because the worker receives workers compensation payments  or some other public disability benefit based on employment that was not covered by F.I.C.A. tax provisions.

__X__    **The SSA disability benefit shown above was increased to include additional earnings in the primary insurance amount calculation.**

____    SSI Windfall Offset Provisions Involved.  Retroactive Benefits Not Released

THANK YOU FOR THIS REFERRAL !

ADVANTAGE076

# ADVANTAGE 2000 CONSULTANTS, Inc.

Telephone 1-800-899-3433
Fax 1-314-845-6141

Date:    7/5/2005

To:  Kelli Archacki
     CIGNA Group Insurance - Dallas TX FCO

From:  Tammy Isaak for Dan Schulte  of  ADVANTAGE  2000  Consultants  Inc

## SOCIAL SECURITY DISABILITY ENTITLEMENT
## CONFIRMATION

RE:  **Cathy Cleiland**        SSN: ⬛⬛⬛⬛⬛       FLK 20104
Phone: (334) 807-0396      Level of Decision = ALJ Hearing

---

PLEASE NOTIFY ADVANTAGE 2000 IMMEDIATELY IF YOU HAVE REASON TO
BELIEVE THE LTD CLAIM WILL CLOSE WITHIN THE NEXT TWO MONTHS

---

**Entitlement Data Based On:** 07/01/2005 - Fact Query
**AWARD PROCESSED DATE:** 06/24/2005

Date of Disability Established by SS:        05/14/2003
Date of Entitlement to SS Disability:       11/01/2003
Retroactive Benefits paid:                  $24,600.00
This represents payment through:            05/01/2005

**Diagnosis Code:** 7240 - Disorders of Back (discogenic and degenerative)
**Secondary Diagnosis Code:** 2500 - Diabetes Mellitus

### PRIMARY BENEFIT HISTORY:

| Date | PIA | Benefit Paid | Basis |
|------|-----|--------------|-------|
| 11/2003-11/2003 | $1,217.70 | $1,217.00 | Original Award |
| 12/2003-12/2003 | $1,243.02 | $1,243.00 | Cost of Living Adjustment |
| 01/2004-11/2004 | $1,290.30 | $1,290.00 | Additional Earnings Increase |
| 12/2004-Cont'g | $1,325.10 | $1,325.00 | Cost of Living Adjustment |

**Amounts for Offset Consideration:** *[Your Jurisdiction per Plan Provisions]*
**Primary -**
| | | |
|---|---|---|
| 11/2003 – 12/2003 | @ | $1,217.00 |
| 01/2004 – Cont'g | @ | $1,217.00 + $47.00 Additional Earnings Increase |

**No Dependents are Noted!**

ADVANTAGE077

---

***IF CHECKED***, THE FOLLOWING SPECIAL COMMENT APPLIES TO THIS CASE

_____  Benefits for dependents are payable on this claim, but have not yet been processed by SSA.

_____  The monthly benefits payable from SSA have been reduced to the amounts shown above because the worker receives workers compensation payments or some other public disability benefit based on employment that was not covered by F.I.C.A. tax provisions.

__X__  **The SSA disability benefit shown above was increased to include additional earnings in the primary insurance amount calculation.**

_____  SSI Windfall Offset Provisions Involved.  Retroactive Benefits Not Released

THANK YOU FOR THIS REFERRAL !

ADVANTAGE078

```
      ***  REC 2005182  085854 HA711CE0 1A70  CIPQYA4   PQA4   {F-1A7 }  ***
```

```
FACT     DTE:07/01/05  SSN:              BIC:A            UNIT:ADVAN2 PG: 001
STATUS   MBR YES LOU-07/01 DATA FILES YES LOU-07/01 SSACCS NO  LOU-06/30
         CPS NO
ACCOUNT  PCOC-7 NOP-01 SP-F CIS-N TAC-D LUM-07 LMM-07/05 RCC-5 ERC-03 FLI-M
         SEC-D CDY-0 DRAMS READ
INSURED  CLAIM TYPE-DISABILITY DATE OF FILING-10/10/2003 FIRST MET-04/1998
         LAST MET-12/2008 WAIT PER START-06/2003 NONX NO GMS USED-04/1998
         EXC NO GMS USED-04/1998  20/40 EXCLUSION-TEST MET
         20/40 NON EXCL-TEST MET  DIB QC REQUIRE-20  DIB QC EARNED-40
         FULL INS EXCL-TEST MET  FULL INS NONEXCL-TEST MET
         FULL QC REQUIRE-24  FULL QC EARNED-40  CURR QC EARNED-00
         HLTHBEN QC EARN-00
PMT CYC  CYI-3 PCEFD-02/17/2004 PCCOM-02/04 PCCR-I
PRIMARY  CATHY K CLELLAND DOB-07/11/1957 LSPA-$0.00
PIA HIS  11/03 $1217.70 L2  FMAX-$1826.50D ELY-03 IME-$2707 YOC-00
         12/03 $1243.20 L2K FMAX-$1864.80D ELY-03 IME-$2707 YOC-00
         01/04 $1290.30 L22 FMAX-$1935.50D ELY-03 IME-$2851 YOC-00
         12/04 $1325.10 L2K FMAX-$1987.70D ELY-03 IME-$2851 YOC-00
PAYMENT  PIC-A  MPA-$1325.00 DOC-628 SCC-01020  RD-06/24/05 LAP-T PSC-C
         F/LLOA-2/3  ZDPC-082 EDA-06/24/05 EDL-06/23/05
TELE NO  BTN-251-342-5545 BTC1-O CPND-06/05
PAYEE    CATHY K CLELLAND
ADDRESS  8 CHEROKEE DR NUMBER27 MONROEVILLE AL 36017-8508
BANK                            61 BDCD-06/23/05
SCH PAY  PAID-06/24/2005 PMA-$0.00 THRU 05/05 CMA-$1325.00 FOR 06/05 SPI-P
         PPI-M
HLD CHK  $1325.00 FOR 06/05 TOH-1 SPM-TAPE
BENEFIT  BIC-A  CATHY K CLELLAND SB-F DOB-07/11/1957 B  DOEI-11/03 DOEC-11/03
         ABN-3TFX LAF-C  MBP-$1325.00 DRD-06/24/05 LANG-E TOC-5
HBAD01   HAP-01 HEDA-06/23/05
BENE ENT START-11/2003 DATE OF FILING-10/10/2003 APP RECEIPT-00/00/0000
         ID CODE-A  CUR ENT CODE-DISABLED  FULL RETIRE AGE-01/2024
BEN DENY DATE OF FILING-10/15/2003 APP RECEIPT-00/00/0000 ID CODE-A
         CUR ENT CODE-DISABLED  DIB ONSET-05/14/2003  DISALOW/DEN RSN-0E3
         LEVEL OF DENIAL-INITIAL  CONVERTED
DIB      DDO-05/14/03 LOD-1 BDC-E3 DSD-02/04

         DDO-05/14/03 DIG-7240 SDIG-2500 DOED-11/03 DSD-06/05
```

```
CITIZEN   START-         COUNTRY-UNITED STATES PROVEN
HISTORY   11/03  $1217.70 $  0.00 700  01          R   $1217.00
          12/03  $1243.20 $  0.00 200  01          R   $1243.00
          01/04  $1290.30 $  0.00 300  01          R   $1290.00
          12/04  $1325.10 $  0.00 100  01          R   $1325.00
```

```
+++ TRANS UPDATED THRU 07/01 +++
```

```
TRANS    RD-6/23/05 LAP-X   MCS PIC-A
         RD-6/24/05 LAP-TB  TITLE II PROCESS PIC-A
```

ADVANTAGE079

Social Security Administration
# Retirement, Survivors and Disability Insurance
Important Information

SOCIAL SECURITY
4249 N COLLEGE AVE
JACKSON, AL 36545
Claim Number: 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
October 30, 2003
2CS

CATHY K CLEILAND
8 CHEROKEE DR NUMBER27
MONROEVILLE AL 36460-0000

Dear CATHY K CLEILAND

We're writing to ask you to send us the following information:

YOUR BIRTH CERTIFICATE

You must send us the original records. If you don't have the original, you must send a copy certified by the person who is the custodian of the original record. Do not send copies certified by a notary public.

To help us give you better service, please send us this information as soon as you can. You may use the enclosed envelope to send us the information we need. We will return the documents to you right away.

**If You Have Any Questions**

For general information about Social Security we invite you to visit our website at www.socialsecurity.gov on the Internet. For general questions and specific questions about your case, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 251-246-6018 and ask for Ms. Singleton. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY/TDD number 251-246-9378. If you do call or visit an office, please have this letter with you. It will help us answer your questions.

*Deborah M. Hood*

Deborah M. Hood
Field Office Manager

ADVANTAGE080

# Invoice

| DATE |
|------|
| 07/05/2005 |

OTR

**ADVANTAGE 2000 CONSULTANTS**

*4121 Union Road*
*Suite 216*
*St. Louis, MO 63129*

*1-800-899-3433*

BILL TO

Sam Mariskanish
CIGNA Group Insurance
P.O. Box 22325
Pittsburgh, PA  15222

| INVOICE # |
|-----------|
| 20051345 |

| CGI Case Manager | Kelli Archacki |
|------------------|----------------|

| INSURED |
|---------|
| Cathy Cleiland |
| SSN |
| 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 |

| Policy Holder and Number |
|--------------------------|
| Temple Inland FLK20104 |

| SERVICE DATE | DESCRIPTION | RATE | AMOUNT |
|--------------|-------------|------|--------|
| 06/24/2005 | Representation Fee Social Security Disability Hearing (ALJ) Award  Referral Date - 10/2/2003 Retroactive Benefits Paid - $24,600.00 | 2,150.00 | 2,150.00 |

| A2K REPRESENTATIVE | DRS | **Total** | **$2,150.00** |
|--------------------|-----|-----------|---------------|

| WE APPRECIATE YOUR BUSINESS! |
|------------------------------|

# SOCIAL SECURITY DISABILITY ENTITLEMENT REPRESENTATION SERVICE
## TAX ID 43-1705035

ADVANTAGE081

UNIT:  9    DEC 1 3 2003    *DISABILITY DETERMINATION SERVICE*
*POST OFFICE BOX 2371*
*MOBILE, ALABAMA 36652-2371*

*Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*                    *Local Fax Number 436-0599*

December 10, 2003

CLAIM: 120334

ADVANTAGE 2000
ONE CORPORATE DRIVE                RE: CATHY K CLEILAND
ATTN LYNN KIKER                        8 CHEROKEE DRIVE
SWANSEA IL 62226                       NUMBER 27
                                       MONROEVILLE AL 36460
                                   A/N: ███████████  INT/SSA

Dear ADVANTAGE 2000

The above-named individual has applied for disability benefits under the
Social Security Act.  Attached is a copy of a letter we recently mailed
to this individual.

Sincerely,

April P Harris
Disability Specialist, Telephone Ext.  616

BLH
Enclosures
C12

ADVANTAGE082

DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

Toll-Free Number 1-800-292-6743

*Local Number 433-2820*                December 10, 2003                *Local Fax Number 436-0599*

TDN: 1734094316                                          CLAIM: 120334
                                                         VERY IMPORTANT
        CATHY K CLEILAND                                 KEEP APPOINTMENT
        8 CHEROKEE DRIVE
        NUMBER 27                              A/N: ▓▓▓▓▓▓ INT/SSA
        MONROEVILLE AL 36460

Dear CATHY K CLEILAND

The Social Security Administration sent your disability claim to the Disability Determination
Service (DDS) to make a decision. After reviewing this claim, it has been determined that more
medical evidence about your condition is needed. Therefore, a special medical examination or
test(s) has been scheduled. This examination is for Social Security evaluation purposes only.
The DDS will pay for this examination. If the date for the scheduled appointment is on a
Saturday, this is correct. We do have provider offices that conduct examinations or tests on
Saturdays. Please report to the following medical source:

PLEASE GO TO:  JILL HALL PHD
               JILL HALL PHD
               PARKER BUILDING SUITE B              Call the doctor's
               102 SOUTH SECOND AVENUE              office if directions
               ATMORE AL 36502-2646                 are needed.

               (251) 446-9894   Ext:

DATE:  December 31, 2003                             AT:  8:30 AM


At the time of the examination or test(s), it may be determined that other tests are also
needed, or that a scheduled test(s) is not needed or should not be done. Please read the
enclosed leaflet. It explains more about the examination or test(s) and your responsibility
for keeping the appointment. No treatment will be given or medications prescribed.  IF YOU
CANNOT KEEP THE APPOINTMENT, OR IF YOU DO NOT IMMEDIATELY LET THE DDS KNOW WHY YOU CANNOT
KEEP THE APPOINTMENT, A DECISION ON THIS CLAIM WILL BE MADE BASED ON INFORMATION IN THE FILE.
If you have a question or have a problem in getting to the examination or test(s), immediate-
ly call the DDS.  Please complete the top portion of the enclosed response form and return
it to the DDS.  This is to let the DDS know if the scheduled appointment can be kept.


After the examination or test(s) is completed, the DDS will be glad to send a copy of the
report to your doctor if you give your permission. If you want a copy of the report sent to
your doctor sign and return the authorization portion of the enclosed response form.

If you are entitled to reimbursement for travel cost, complete the enclosed travel form and
return it.

If you do not speak English, or do not speak English well, we will provide you with an inter-
preter at no cost to you. Or, you may wish to bring your own interpreter with you such as a
friend or family member. If you want us to provide an interpreter, please tell us ahead of
time.

                        Sincerely,

                                                    ADVANTAGE083

BLH
Enclosures
C02                        April P Harris
                           Disability Specialist, Telephone Ext.  616

UNIT: 9

**DISABILITY DETERMINATION SERVICE**
*POST OFFICE BOX 2371*
*MOBILE, ALABAMA 36652-2371*



1734101063

*Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*                    *Local Fax Number 436-0599*

December 3, 2003

CLAIM: 120334

CATHY K CLEILAND
8 CHEROKEE DRIVE              TDN: 1734101063
NUMBER 27
MONROEVILLE AL 36460         A/N: ███████ INT/SSA

Recently, we contacted you about this Social Security disability claim
and the following items were discussed.

* The role of the Disability Specialist
* General claim information such as name, address, phone number, and
  contact sources
* Your illness, injuries or condition(s) and how they affect you
* Your treatment sources
* The date you first stopped work because of your illness, injuries
  or condition(s)
* Any work performed since filing this claim or any work since the
  date you stated you became disabled
* The Social Security Administration's definition of disability and
  general Social Security program requirements
* The possibility of an examination(s) to document your case
* Your appeal rights
* The need for your cooperation during the disability claim process

If you have any changes to report, or if I may be of further
assistance in processing your disability claim, please contact me
at the the number listed above.

Sincerely,

April P Harris
Disability Specialist, Telephone Ext.  616

ADVANTAGE084

APH
PRUF (Mar 2001)

UNIT:  9                    *DISABILITY DETERMINATION SERVICE*
                              *POST OFFICE BOX 2371*
                           *MOBILE, ALABAMA 36652-2371*
                                                                        DEC 06 2003

                          *Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*                          *Local Fax Number 436-0599*

                          December 3, 2003

                                        CLAIM: 120334

                                 TDN: 1734101063

ADVANTAGE 2000
ONE CORPORATE DRIVE                  RE:   CATHY K CLEILAND
ATTN LYNN KIKER                      AKA:
SWANSEA IL 62226
                                           8 CHEROKEE DRIVE
                                           NUMBER 27
                                           MONROEVILLE AL 36460
                                     A/N:  ▮▮▮▮▮▮▮▮INT/SSA
                                     DOB:  ▮▮▮▮▮▮▮▮

ADVANTAGE 2000

The Disability Determination Service (DDS) is responsible for determining
if an individual is disabled or blind under the Social Security Act.  En-
closed is a copy of a letter the DDS recently mailed to this individual.

Sincerely,


April P Harris
Disability Specialist, Telephone Ext.   616


Enclosures
APH
MS04                                              ADVANTAGE085

UNIT:  9

**DISABILITY DETERMINATION SERVICE**
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

JAN 0 9 20

*Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*                                    *Local Fax Number 436-0599*

January  6, 2004

CLAIM:  120334

ADVANTAGE 2000
ONE CORPORATE DRIVE
ATTN LYNN KIKER
SWANSEA IL 62226

RE:  CATHY K CLEILAND
     8 CHEROKEE DRIVE
     NUMBER 27
     MONROEVILLE AL 36460
A/N:  ███████████  INT/SSA

Dear ADVANTAGE 2000

The above-named individual has applied for disability benefits under the
Social Security Act.  Attached is a copy of a letter we recently mailed
to this individual.

Sincerely,

April P Harris
Disability Specialist, Telephone Ext.   616

BLH
Enclosures
C12

ADVANTAGE086

DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

Toll-Free Number 1-800-292-6743

Local Number 433-2820                 January 6, 2004                 Local Fax Number 436-0599

TDN: 1734948055                                              CLAIM: 120334
                                                            VERY IMPORTANT
      CATHY K CLEILAND                                      KEEP APPOINTMENT
      8 CHEROKEE DRIVE
      NUMBER 27                          A/N: ███████████ INT/SSA
      MONROEVILLE AL 36460


Dear CATHY K CLEILAND

The Social Security Administration sent your disability claim to the Disability Determination
Service (DDS) to make a decision. After reviewing this claim, it has been determined that more
medical evidence about your condition is needed. Therefore, a special medical examination or
test(s) has been scheduled. This examination is for Social Security evaluation purposes only.
The DDS will pay for this examination. If the date for the scheduled appointment is on a
Saturday, this is correct. We do have provider offices that conduct examinations or tests on
Saturdays. Please report to the following medical source:

PLEASE GO TO:   JILL HALL PHD
                JILL HALL PHD
                PARKER BUILDING SUITE B              Call the doctor's
                102 SOUTH SECOND AVENUE              office if directions
                ATMORE AL 36502-2646                 are needed.

                (251) 446-9894  Ext:

DATE:  January 28, 2004                              AT:  9:00 AM


At the time of the examination or test(s), it may be determined that other tests are also
needed, or that a scheduled test(s) is not needed or should not be done. Please read the
enclosed leaflet. It explains more about the examination or test(s) and your responsibility
for keeping the appointment. No treatment will be given or medications prescribed.  IF YOU
CANNOT KEEP THE APPOINTMENT, OR IF YOU DO NOT IMMEDIATELY LET THE DDS KNOW WHY YOU CANNOT
KEEP THE APPOINTMENT, A DECISION ON THIS CLAIM WILL BE MADE BASED ON INFORMATION IN THE FILE.
If you have a question or have a problem in getting to the examination or test(s), immediate-
ly call the DDS.  Please complete the top portion of the enclosed response form and return
it to the DDS.  This is to let the DDS know if the scheduled appointment can be kept.


After the examination or test(s) is completed, the DDS will be glad to send a copy of the
report to your doctor if you give your permission. If you want a copy of the report sent to
your doctor sign and return the authorization portion of the enclosed response form.

If you are entitled to reimbursement for travel cost, complete the enclosed travel form and
return it.

If you do not speak English, or do not speak English well, we will provide you with an inter-
preter at no cost to you. Or, you may wish to bring your own interpreter with you such as a
friend or family member. If you want us to provide an interpreter, please tell us ahead of
time.

                        Sincerely,

                                                            ADVANTAGE087
BLH
Enclosures
C02                     April P Harris
                        Disability Specialist, Telephone Ext.  616

UNIT: 9    DISABILITY DETERMINATION SERVICE

JAN 0 8 2004

POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

Toll-Free Number 1-800-292-6743

*Local Number 433-2820*                                        *Local Fax Number 436-0599*

January 5, 2004

CLAIM: 120334

TDN: 1734933428

ADVANTAGE 2000
ONE CORPORATE DRIVE                    RE:  CATHY K CLEILAND
ATTN LYNN KIKER                        AKA:
SWANSEA IL 62226
                                            8 CHEROKEE DRIVE
                                            NUMBER 27
                                            MONROEVILLE AL 36460
                                       A/N:  ██████████ INT/SSA
                                       DOB:  ████████████

ADVANTAGE 2000

The Disability Determination Service (DDS) is responsible for determining
if an individual is disabled or blind under the Social Security Act.  En-
closed is a copy of a letter the DDS recently mailed to this individual.

Sincerely,


April P Harris
Disability Specialist, Telephone Ext.   616


Enclosures
APH
MS04

ADVANTAGE088

UNIT: 9     DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

Local Number 433-2820     Toll-Free Number 1-800-292-6743     Local Fax Number 436-0599

January 5, 2004     CLAIM: 120334

TDN: 1734933428

CATHY K CLEILAND
8 CHEROKEE DRIVE     A/N: ███████ INT/SSA
NUMBER 27
MONROEVILLE AL 36460

Dear  CATHY K CLEILAND

The Disability Determination Service (DDS) has been notified by
dr hall that you failed to keep
your appointment for an examination on 12-31-03.  This
appointment was necessary to help determine if you meet disability
requirements.  This examination is for Social Security evaluation
purposes only.

The law requires that your claim be documented medically and vocationally
to show how your impairment interferes with your ability to work.  The
law further requires that you cooperate fully in attempts to obtain the
needed information to complete the processing of your claim.

Please call the DDS at the number listed above so that your failure to
keep the scheduled appointment can be discussed with you.  Please call
between the hours of 8:30 a.m. to 12:00 noon and from 1:00 p.m. to
4:00 p.m., Monday through Friday.

If you do not speak English, or do not speak English well, we will provide
you with an interpreter at no cost to you.  Or, you may wish to bring your
own interpreter with you such as a friend or family member.  If you want
us to provide an interpreter, please tell us ahead of time.

If you do not contact this office within ten (10) days from the date of
this letter, a decision may be made based on the current information
available in your file.  IF you are currently receiving benefits, the
benefits may be stopped if you do not contact this office regarding this
matter within ten (10) days from the date of this letter.

Sincerely,

April P Harris
Disability Specialist, Telephone Ext.  616

ADVANTAGE089

CL11 -  APH

NOV 0 3 2003



**ADVANTAGE 2000 CONSULTANTS INC.**
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*
One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299· Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

## TO:  SOCIAL SECURITY CLAIMS REPRESENTATIVE

Social Security Administration
Jackson, AL 36545

RE:  Cathy Cleiland

SSN:  ██████████

I have been appointed the Representative for Ms. Cleiland. PLEASE SEND ME
AN ACKNOWLEDGEMENT OF YOUR RECEIPT OF MY SSA-1696, AND
PROVIDE THE REQUESTED INFORMATION BELOW. THANK YOU!

Claims Representative:  *C. Singleton*
CR Telephone No.:  *251-246-6018*

Claims filed or pending:
____ ✓ Title II          Alleged Onset Date *05/14/03*
____ Title XVI           Date Last Insured *12/31/07*
____ Concurrent

*10/10/03* Protected Filing Date
*10/27/03* SSA-1696 Receipt Date

History of Current Claim:
*10/27/03* Date Initial Claim Filed
*N/A* Date Reconsideration Filed
*N/A* Date Hearing Request Filed
*N/A* Date Appeals Council Request Filed

Current Claim sent to: ✓ DDS _____ Screening Unit _____ OHA

Any Prior Applications: Yes_____ No ✓
Date of Filing for Prior Application  *N/A*
Level of Last Decision  *N/A*

Thanks for your assistance.
Mary Lynn Kniker
Claims Analyst
Advantage 2000 Consultants, One Corporate Drive, Swansea, IL 62226

ADVANTAGE090

TRANSFER TO:                      CHECK/NOTICE 2                                NOT2
NH  ██████████    CATHY CLEILAND          CL  ██████      CATHY CLEILAND

MAILING METHOD INDICATOR (BLIND NOTICE INFORMATION) TYPE: _ 1.CERTIFIED MAIL
                                                          2.TELEPHONE CONTACT
AUTHORIZED REPRESENTATIVE                                 3.REGULAR MAIL
   TYPE: 2  1. ATTORNEY    2. NON-ATTORNEY    3. QUESTIONABLE
   FEE WAIVED (Y/N): Y
IF ATTORNEY,
   DIRECT PAYMENT WAIVED (Y/N): _     LAST WITHHOLDING DATE (MMYY): ____
   ATTORNEY/REP NAME: MARY          LYNN              KNIKER            ____
        ADDRESS: REP FOR C CLEILAND         ONE CORPORATE DR
                 _____     _____
        CITY: SWANSEA                STATE: IL     ZIP: 62226
        COUNTRY: _____      CONSUL CODE: ___
        POSTAL ZONE: _____
        PHONE: 800 580 5299                 FOREIGN PHONE: _____
   PENDING FEE AGREEMENT AMOUNT: _____
   FEE AGREEMENT TYPE: _   1. APPROVED   2. DISAPPROVED   3. UNDECIDED
   IF FEE PETITION APPROVED, ENTER FEE: _____

ADVANTAGE091

```
MCS                        EARNINGS COMP DETERMINATION              MCR1
NH SSN: ███████        NH NAME: CATHY      K CLEILAND           10/28/03
                                                                COM: 11/03

CASE DISPLAY    | 1. ALL          4. CIVIL SERVICE  7.          |
 1 _ _ _ _ _    | 2. REMARKS      5. PIA CALCS       8. PRINT   |
                | 3. EARNGS, I/S  6. WC/PDB                     |
----------------------------------------------------------------------------
PIA:   1217.70    FAMILY MAX:  1826.50      COMPUTATION TYPE:   NS 78 DIS EX
PIA REDUCED FOR AGE:                        LOW TWO YEARS: 1977  12382.18 IND
DATE LAST INSURED:            12/07                         1979  12861.81 IND
----------------------------------------------------------------------------
CLAIM                          CLAIM   ENTITLED          NEXT PAYMENT    ONGOING
DISPLAY BIC   CL NAME          TYPE      DATE  LAF       AMT - DATE      PAYMENT
  1 _   HA  CATHY  CLEILAND    DIB     Y  11/03  C       1217.00 11/03   1217.00




----------------------------------------------------------------------------
  CLAIM DISPLAY     1. ALL          3. ENTITLEMENT/ELIGIBILITY
      OPTIONS       2. REMARKS      4. PAYMENT CALCULATIONS    MORE (Y/N): N
ALERT CASE - SEE REMARKS
```

ADVANTAGE092

UNITED STATES

# DISABILITY DETERMINATION SERVICE
## POST OFFICE BOX 2371
## MOBILE, ALABAMA 36652-2371

NOV 0 8 2002

*Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*

*Local Fax Number 436-0599*

November 5, 2003

CLAIM: 120334

TDN: 1733318114

ADVANTAGE 2000
ONE CORPORATE DRIVE
ATTN LYNN KIKER
SWANSEA IL 62226

RE: CATHY K CLEILAND
AKA:

    8 CHEROKEE DRIVE
    NUMBER 27
    MONROEVILLE AL 36460
A/N: ▮▮▮▮▮INT/SSA
DOB:

ADVANTAGE 2000

The Disability Determination Service (DDS) is responsible for determining
if an individual is disabled or blind under the Social Security Act.  En-
closed is a copy of a letter the DDS recently mailed to this individual.

Sincerely,

Jack  Miller
Disability Specialist, Telephone Ext.

Enclosures
TRD
MS04

ADVANTAGE093

**DISABILITY DETERMINATION SERVICE**
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

1733318114

Toll-Free Number 1-800-292-6743

*Local Number 433-2820*                              *Local Fax Number 436-0599*

November 5, 2003

CLAIM: 120334

CATHY K CLEILAND
8 CHEROKEE DRIVE                        TDN: 1733318114
NUMBER 27
MONROEVILLE AL 36460                    A/N: ███████████INT/SSA

Dear CATHY K CLEILAND

IMPORTANT INFORMATION ABOUT YOUR DISABILITY CLAIM

Your claim for Social Security Disability or Supplemental Security Income
(SSI) Disability Benefits is being reviewed.  Before your claim can be
processed, some additional information is needed.

Please complete the attached Pain Report and return it to me within 10
days from the date of this letter in the attached self-addressed, stamped
envelope.  If you have difficulty completing the form, please ask a friend,
neighbor or relative to help you.  Do the best you can in completing the
form.

IT IS VERY IMPORTANT THAT YOU RETURN THIS PAIN REPORT.  YOUR CLAIM CANNOT
BE PROCESSED UNTIL THIS COMPLETED REPORT IS RECEIVED.  PLEASE RETURN THIS
LETTER WITH THE REQUESTED INFORMATION.  A PROMPT RESPONSE TO THIS WILL
HELP US PROCESS YOUR CLAIM FASTER.

Sincerely,

Jack  Miller
Disability Specialist, Telephone Ext.

Enclosure(s): Adult PAIN Questionnaire

---

ADVANTAGE094

CLAP - TRD


1733318114

DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371

Toll-Free Number 1-800-292-6743

*Local Number 433-2820*                                     *Local Fax Number 436-0599*

DISABILITY SPECIALIST: Jack Miller

TDN: 1733318114                          CATHY K CLEILAND
                                         A/N: ▓▓▓▓▓▓▓ INT/SSA

PAIN QUESTIONNAIRE

1. Please describe the pain:

   A. When did it begin? _____

   B. Where is it located? _____
   _____

   C. Has it changed in nature or location since it began? _____
   If so, how has it changed? _____
   _____

   D. Does it spread to other places? _____ If so, where? _____
   _____
   _____

   E. If not constant, how often does it occur? _____
   _____

   What brings it on? _____
   _____
   _____

   How long does it last? _____
   _____
   _____

2. If pain medicine is taken, please answer the following:

   A. What is the name of the medicine and the prescription number?
   _____

   B. Where is the medicine filled?_____

   C. What doctor prescribed this medicine?_____

   D. How much medicine is taken? _____

   E. How often is the medicine taken?_____

   F. How long has the medicine been taken?_____

   G. Does the medicine relieve the pain? No_____ Yes_____
   If yes, how long is the pain relieved? _____

Form FCL02

ADVANTAGE095

Disability Determination Service
Pain Questionnaire
Form FCL02
Page 2


CATHY K CLEILAND                          TDN: 1733318114

    H.  Does the medicine cause any side effects? No_____ Yes_____
        If yes, what are the side effects?_____
        _____
        _____

3.  Please describe any devices worn or used to relieve the pain. _____
    _____
    _____

4.  Please describe any other things done to relieve pain. _____
    _____
    _____

5.  When did the pain first begin to affect activities? _____
    _____
    _____

6.  Please describe any changes in activities since the pain began. _____
    _____
    _____

7.  Please describe current daily activities (walking, shopping, household
    chores, driving, socializing, etc.) _____
    _____
    _____

8.  Are there any other statements you wish to make about the pain the
    applicant has? _____
    _____
    _____
    _____
    _____


_____      _____
    Signature of Claimant                       Date of Statement

# EXHIBIT

# "H"

# PART 4

## LIST OF EXHIBITS

**Claimant:**     **CATHY A. KEY**                                    SSN: ████████

| Exh. No. | Part No. | Description | No. of Pages |
|----------|----------|-------------|--------------|

### PAYMENT DOCUMENTS/DECISIONS

| | | | |
|---|---|---|---|
| 1 | A | Initial Disability Determination by State Agency, Title II, dated 2/10/04 | 2 |

### JURISDICTIONAL DOCUMENTS/NOTICES

| | | | |
|---|---|---|---|
| 1 | B | Social Security Notice dated 2/12/04 | 5 |
| 2 | B | Request for Hearing filed 3/12/04 | 2 |
| 3 | B | Letter of Acknowledgement of Request for Hearing dated 4/1/04 | 7 |

### NON-DISABILITY DEVELOPMENT

| | | | |
|---|---|---|---|
| 1 | D | Application for Disability Insurance Benefits filed 10/10/03 | 5 |
| 2 | D | Detailed Earnings Query, dated 2/25/05 | 16 |

### DISABILITY RELATED DEVELOPMENT AND DOCUMENTATION

| | | | |
|---|---|---|---|
| 1 | E | Disability Report - Adult dated 10/13/03 | 10 |
| 2 | E | Work History Report dated 10/13/03 | 8 |

ADVANTAGE156

## LIST OF EXHIBITS

**Claimant:**    CATHY A. KEY                                                **SSN:** ███████████

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| 3 | E | Statement of Claimant dated 10/17/03 | 2 |
| 4 | E | Disability Report - Field Office dated 10/31/03 | 2 |
| 5 | E | Initial Claimant Contact Form dated 11/5/03 | 2 |
| 6 | E | Daily Activities Questionnaire dated 11/10/03 | 5 |
| 7 | E | Pain Questionnaire dated 11/10/03 | 2 |
| 8 | E | Vocational Rationale Form dated 2/04 | 3 |
| 9 | E | Disability Report - Appeal dated 3/3/04 | 7 |
| 10 | E | Letter dated 5/24/04 from claimant's representative | 2 |

## MEDICAL RECORDS

| | | | |
|---|---|---|---|
| 1 | F | MRI dated 9/5/97 from Southwest Alabama MRI Services | 1 |
| 2 | F | Radiological Consultations dated from 1/23/98 to 12/3/98 from William B. Faircloth, M.D. | 2 |
| 3 | F | Progress notes covering the period from 12/1/99 to 12/13/99 by John L. Hinton, M.D. | 3 |
| 4 | F | MRI dated 2/16/00 from Mobile Infirmary | 1 |
| 5 | F | Radiological Consultation dated 3/7/01 from Springhill Memorial Hospital | 1 |
| 6 | F | Hospital Records for admission on 5/2/01 through discharge on 5/3/01 from Jackson Hospital | 1 |
| 7 | F | Emergency Room Records dated 3/30/02 from Jackson Hospital | 1 |
| 8 | F | Emergency/Outpatient Record dated 4/10/02 from Jackson Hospital | 6 |
| 9 | F | Emergency/Outpatient Record dated 4/29/02 from Jackson Hospital | 15 |

### LIST OF EXHIBITS

Claimant:    **CATHY A. KEY**                                    SSN: ████████

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| 10 | F | Hospital Records for admission on 6/24/02 through discharge on 6/25/02 from Jackson Hospital | 6 |
| 11 | F | Emergency/Outpatient Record dated 10/1/02 from Jackson Hospital | 5 |
| 12 | F | Psychological Consultative Examination dated 1/30/03 by Jill Hall, Ph.D. | 6 |
| 13 | F | Hospital Records for admission on 5/21/03 through discharge on 5/22/03 from Jackson Hospital | 7 |
| 14 | F | Emergency Room Records dated 6/5/03 from Jackson Hospital | 1 |
| 15 | F | Medical Records dated 6/26/03 from Benjamin S. Citrin, M.D. | 2 |
| 16 | F | Emergency Room Records dated 7/13/03 from Jackson Hospital | 1 |
| 17 | F | Hospital Records for admission on 7/14/03 through discharge on 7/17/03 from Jackson Hospital | 8 |
| 18 | F | Hospital Records for admission on 8/10/03 through discharge on 8/12/03 from Jackson Hospital | 5 |
| 19 | F | Medical Records covering the period from 4/19/01 to 9/18/03 from John E. Hackman, M.D. | 23 |
| 20 | F | Medical Records covering the period from 11/9/99 to 10/31/03 from IMC-Doctors Clinic | 49 |
| 21 | F | Medical Report dated 11/17/03 from Mark N. Hadley, M.D. | 2 |
| 22 | F | Hospital Records for admission on 12/16/03 through discharge on 12/18/03 from UAB | 5 |
| 23 | F | RFC - Residual Functional Capacity Assessment - Physical (completed by DDS physician) dated 2/10/04 | 8 |
| 24 | F | Psychiatric Review Technique Form (completed by DDS physician) dated 2/10/04 | 14 |
| 25 | F | Medical Records covering the period from 12/29/03 to 2/11/04 from Mark N. Hadley, M.D. | 3 |
| 26 | F | Medical Records dated 3/29/04 from The Center for Pain | 2 |

ADVANTAGE158

## LIST OF EXHIBITS

**Claimant:  CATHY A. KEY**                                          **SSN:** ████████

| Exh. No. | Part No. | Description | No. of Pages |
|----------|----------|-------------|--------------|
| 27 | F | Professional Qualifications, Benjamin S. Citrin, M.D.; William B. Faircloth, M.D.; John E. Hackman, M.D.; Mark N. Hadley, M.D.; John L. Hinton, M.D. | 5 |

ADVANTAGE159

SOCIAL SECURITY ADMINISTRATION

Refer To:

CATHY A. KEY

Office of Hearings and Appeals
550 Government Street
Suite 200
Mobile, AL 36602-2010
Tel: (251) 441-5441 / Fax: (251) 441-5993

April 1, 2004

DAN SCHULTE
ONE CORPORATE DRIVE
SWANSEA, IL 62226

Dear DAN SCHULTE:

## NOTICE TO REPRESENTATIVE OF CLAIMANT BEFORE THE SOCIAL SECURITY ADMINISTRATION

We have received written notice that the claimant has appointed you to act as the representative in connection with this claim(s) under the Social Security Act (the Act). We will, therefore, be dealing directly with you on matters pertaining to this claim(s).

Generally, to charge a fee for services, you must use one of two, mutually exclusive fee approval processes. You must file either a fee petition or a fee agreement with us. In either case, you cannot charge more than the fee amount we approve.

### Fee Petition Process

You may ask for approval of a fee by giving us a fee petition when you have completed your services to the claimant. This written request must describe in detail the amount of time you spent on each service provided and the amount of fee you are requesting.

### Fee Agreement Process

If you and the claimant have a written fee agreement, that you have not already submitted, either of you must give it to us before we decide the claim(s). We will usually approve the agreement if you both sign it; the fee you agreed on is no more than 25 percent of the past-due benefits, or $5,300 (or a higher amount we set and announce in the Federal Register), whichever is less; we approve the claim(s); and the claim results in past-due benefits.

ADVANTAGE160

See Next Page

CATHY A. KEY  Page 2 of 2

If you do not file a fee agreement, you must use form **SSA-1560-U4 (PETITION TO OBTAIN APPROVAL OF A FEE FOR REPRESENTING A CLAIMANT BEFORE THE SOCIAL SECURITY ADMINISTRATION)** to petition for approval of the fee you wish to charge. File the SSA-1560-U4 when the proceedings are complete and your services have ended. If you are an attorney-at-law and seek direct payment from the claimant's title II past-due benefits, you must file the SSA-1560-U4, or a notice of intent to petition for a fee within 60 days of the notice of the favorable determination. Further information and instructions for completion are given on the form itself.

After we approve a fee, you must look to the claimant for payment, except when you are an attorney-at-law and there are past-due benefits payable under title II of the Act as a result of a favorable determination on the claim. In such cases, we will pay up to 25 percent of such past-due benefits directly to you toward payment of the approved fee and charge you the assessment required by section 206(d) of the Social Security Act. You cannot charge or collect this expense from the claimant.

The law does not provide for such direct payment for services provided in connection with a claim for Supplemental Security Income payments.

If you wish to waive either a fee or direct payment of a fee and you have not already done so, you should sign and date the appropriate box below or send us a letter with an appropriate statement. Early filing of the waiver will enable us to prevent the automatic withholding of past-due benefits for a possible attorney's fee.

---

**WAIVER OF FEE** - I waive my right to charge and collect a fee under sections 206(a) and 1631(d)(2)(A) of the Social Security Act. I release my client (the claimant) from any obligation, contractual or otherwise, which may be owed to me for the services I have provided in connection with my client's claim(s) or asserted right(s).

| Signature (Representative) | Date |
|---|---|
|  |  |

---

**ATTORNEY'S WAIVER OF DIRECT PAYMENT** -- I waive only my right to direct payment of a fee from the withheld Social Security past-due benefits of my client (the claimant). I do not waive my right to request fee approval and to collect a fee directly from my client or a third party.

| Signature (Representative) | Date |
|---|---|
|  |  |

---

Social Security Administration                    Form **SSA-L1697-U3**          (04-02)

ADVANTAGE161

# Social Security



www.ssa.gov.

# Your Right To Representation

You can choose to have a representative help you when you do business with Social Security. We will work with your representative, just as we would with you.

*Your representative cannot charge or collect a fee from you without first getting written approval from us, even if your claim is denied.* However, your representative may accept money in advance as long as he or she holds it in a trust or escrow account.

Both you and your representative are responsible for providing us with accurate information. It is wrong to knowingly and willingly furnish false information. If you do, you may be prosecuted criminally.

## What A Representative Can Do

Once appointed, your representative can act for you in most Social Security matters. For example, he or she can:

- Get information from your Social Security file.
- Help you get medical records or information to support your claim.
- Come with you, or for you, to any interview, conference or hearing you have with us.
- Request a reconsideration, hearing or Appeals Council review.
- Help you and your witnesses prepare for a hearing and question any witnesses.

Your representative also will receive a copy of the decision(s) we make on your claim(s).

## Choosing A Representative

You can choose an attorney or other qualified person to represent you. You also can have more than one representative.

Some organizations can help you find an attorney or give you free legal services if you qualify. Some attorneys don't charge unless you receive benefits. Your Social Security office has a list of organizations that can help you find a representative.

You can appoint one or more *persons* in a firm, corporation or other organization as your representative(s), but you *may not* appoint the firm, corporation or organization itself. You also may not appoint a person who has been suspended or disqualified from representing others before the Social Security Administration or who may not, by law, act as a representative.

Once you choose a representative, you must tell us *in writing* as soon as possible. To do this, you can get a Form SSA-1696-U4, *Appointment of Representative*, from any Social Security office.

You must give the name of the person you are appointing and sign your name. If the person is *not* an attorney, he or she must, in writing, give his or her name; state that he or she accepts the appointment; and sign the form.

## What Your Representative May Charge

To charge you a fee for his or her services, your representative first must file either a fee agreement or a fee petition with us. Your representative *cannot* charge you more than the fee amount we approve. If either you or your representative disagree with the fee we approve, you or your representative can ask us to look at it again.

A representative who charges or collects a fee without our approval, or charges or collects too much, may be suspended or disqualified from representing anyone before the Social Security Administration. He or she also may face criminal prosecution.

### Filing A Fee Agreement

If you and your representative have a written fee agreement, your representative may ask us to approve it any time before we decide your

**ADVANTAGE162**




claim. Usually, we'll approve the agreement and tell you in writing how much your representative may charge as long as:

- You both signed the agreement.
- The fee you agreed on is no more than 25 percent of past-due benefits or $5,300, whichever is less.
- Your claim was approved and resulted in past-due benefits.

If we don't approve the fee agreement, we will tell you and your representative in writing that your representative must file a fee petition.

## Filing A Fee Petition

Your representative may give us a fee petition when he or she has finished working on your claim(s). This written request, accounting for the fee, describes in detail the amount of time spent on each service provided. Your representative must give you a copy of the fee petition and each attachment. If you disagree with the information shown, contact us within 20 days. We will consider the reasonable value of the services provided and tell you in writing the amount of the fee we approve.

## How Much You Pay

The amount of the fee we decide your representative may charge is the most you owe him or her, except for out-of-pocket expenses. It might be different from the amount you agreed to pay.

If an attorney represents you, we usually withhold 25 percent of your past-due benefits to pay toward the fee for you. Later, we pay the attorney's fee from this money and send you any money left over.

You must pay your representative directly:

- The rest you owe:
  - If the amount of the fee is more than the amount of money we withheld and paid your attorney for you.
- All of the fee you owe:
  - If we did not withhold past-due benefits; for example, when your representative is not an attorney or the benefits are Supplemental Security Income (SSI); or
  - If we withheld, but later paid you the money because your attorney did not either ask for approval until after 60 days

of the date of your notice of award or tell us on time that he or she planned to ask for a fee.

- For out of pocket expenses your representative incurs or expects to incur:
  - For example, the cost of getting your doctor's or hospital records. Our approval is not needed for such expenses.

## If Someone Else Pays Your Representative

Even when someone else will pay the fee for you (for example, an insurance company), we must approve the fee unless:

- It's a nonprofit organization or federal, state, county, or city agency that will pay the fee and any expenses from government funds.
- Your representative gives us a written statement that you will not have to pay any fee or expenses.

## If You Go Before A Federal Court

The court can allow a reasonable fee for your attorney. The fee usually will not exceed 25 percent of all past-due benefits that result from the court's decision. Your attorney cannot charge any additional fee for services before the court.

## For More Information

If you have questions about your right to representation, visit our website at **www.ssa.gov** or call our toll-free number, **1–800–772–1213**.

People who are deaf or hard of hearing may call our toll-free TTY number, 1–800–325–0778, between 7 a.m. and 7 p.m. on business days.

We treat all calls confidentially—whether they're made to our toll-free number or to one of our local offices. We also want to make sure you receive accurate and courteous service. That is why we have a second Social Security representative listen to some incoming and outgoing telephone calls.

*Social Security Administration*
SSA Publication No. 05-10075
February 2002 (*Recycle prior editions*)
ICN 468000
Unit of Issue—HD (one hundred)

**ADVANTAGE163**

 Printed on recycled paper

ENCLOSURE -- REIMBURSEMENT OF TRAVEL EXPENSES

<u>IMPORTANT INFORMATION ABOUT PAYMENT OF TRAVEL EXPENSES</u>

An Administrative Law Judge (ALJ) may authorize reimbursement of reasonable travel expenses to a claimant, representative or unsubpoenaed lay or medical witness whose appearance the ALJ determines is reasonably necessary for a fair hearing, when such person must travel more than 75 miles one way to attend the hearing.

Sections 201(j), 1631(h), and 1817(i) of the Social Security Act, as amended, provide that the amount available for payment under these sections for travel by a representative to attend a proceeding before an ALJ or other adjudicator shall not exceed the maximum amount allowable under these sections for travel originating within the geographic area of the office having jurisdiction over such proceeding.

If you must travel more than 75 miles one-way from your home or office to attend the hearing, and wish to request payment for travel expenses, please submit your request with an itemized list of what you spent and supporting receipts, to the ALJ at the hearing.  If you require unusual travel arrangements (such as meals, lodging, taxicabs or ambulance services) or would like to request advance payment of travel expenses, please contact the hearing office immediately.  The ALJ must authorize unusual travel arrangements in advance, unless they are unexpected and unavoidable, and must decide whether the request for advance payment is reasonable and necessary.

"Reasonable" means that the amount of advance payment you requested is not more than we would pay for reimbursable travel expenses under the regulations.  "Necessary" means that without the advance payment you would not have enough money to pay for your transportation to and from the hearing, and consequently would be unable to attend the hearing.

If we pay your travel expenses in advance, you must, within 20 days after the hearing, provide the ALJ an itemized list of what you spent and supporting receipts.  If the advance payment exceeds the amount you are due, we will notify you of the amount of the overpayment, and give you 20 days from the date of the notice to repay that amount.

If you request a change in the hearing location the ALJ selected to a location further from your residence or office, we will not reimburse you any additional travel expenses.

**ADVANTAGE164**

Form Approved
OMB No. 0960-0269

# REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE
(Take or mail original and all copies to you local Social Security office,
the Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post)

See Privacy Act
Notice on Reverse

| 1. CLAIMANT | 2. WAGE EARNER, IF DIFFERENT | 3. SOC. SEC. CLAIM NUMBER | 3. SPOUSE'S CLAIM NUMBER |
|---|---|---|---|
| Cathy Cleiland | | | |

5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE. I disagree with the determination made on my claim because:

I remain disabled and unable to engage in any substantial, gainful activity.

An administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in you case.
You will receive notice of the time and place of a hearing at least 20 days before the date set for a hearing.

6. I have additional evidence to submit. ☐ Yes ☐ No

Name and address of source of additional evidence:

_____

7. Check one of the blocks:

☒ I wish to appear at a hearing.

☐ I do not wish to appear at a hearing and I request that a decision be made based on the evidence in my case.
(Complete Waiver Form HA-4608).

(Please submit it to the Social Security office, The Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post within 10 days. Attach an additional sheet if you need more space.)

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security office will give you a list of legal referral and service organizations. (If you are represented and have not done so previously, complete and submit form SSA-1696 (Appointment of Representative).)
[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

| 8. (CLAIMANT'S SIGNATURE) | (DATE) | 9. (REPRESENTATIVE'S SIGNATURE/NAME) | (DATE) |
|---|---|---|---|
| *Cathy L. Cleiland* | 3-1-2004 | *Dan Sevill* | 3-9-04 |

ADDRESS
8 Cherokee Dr.. Num.27

(ADDRESS) ☐ ATTORNEY; ☒ NON ATTORNEY;
1 Corporate Drive

| CITY | STATE | ZIPCODE |
|---|---|---|
| Monroeville, AL | | 36460 |

| CITY | STATE | ZIPCODE |
|---|---|---|
| Swansea | Il | 62226 |

| TELEPHONE NUMBER | FAX NUMBER |
|---|---|
| (251) 769-3061 | |

| TELEPHONE NUMBER | FAX NUMBER |
|---|---|
| 618-212-1100 | 314-894-4981 |

TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION-ACKNOWLEDGEMENT OF REQUEST FOR HEARING

FORM HA-501-U5 (09-2001) EF(01-2003)
Destroy Prior Editions

CLAIMS FOLDER

ADVANTAGE165

**ADVANTAGE 2000**
**CONSULTANTS INC.**
*"Your Gateway to Social Security"*

*Visit Us Online at www.advantage2k.com*

One Corporate Drive Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

Tuesday, March 09, 2004

Social Security Administration
4249 N. College Ave.
Jackson, AL 36545

RE: Cathy Cleiland
SSN: ███████

Dear Claims Representative:

I have been informed that the disability claim for Ms. Cleiland has been denied. Ms. Cleiland does not agree with that determination and wishes to file a Request for Hearing.

Enclosed are the Request for Hearing, the SSA-3441, a copy of the SSA-1696 appointing me as representative in this matter, and our fee agreement.

Since the claimant resides in your service area, please ensure I receive copies of all award and/or denial notices, in addition to other pertinent letters and notices.

If you need any additional information or assistance, please contact me.

Sincerely,

Dan Schulte
Case Manager

91 7108 2133 3930 9354 2179

ADVANTAGE166

ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

*Visit Us Online at www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Tuesday, March 09, 2004

Office of Hearings and Appeals
550 Government Street
Suite 200
Mobile, AL 36602

RE: Cathy Cleiland
SSN: ███████

Dear Judge:

The above-named claimant has requested that I assist with their Social Security Disability claim.  Form SSA-1696 and our fee agreement are already on file.

Due to the distance from your office,  we are requesting a copy of **Sections 'D',  'E', and 'F'** from worked up **Exhibit File** be sent to us or if you prefer,  forward it to the  **Social Security Administration, Lake Christine Center, 1652 Lebanon Ave., Belleville, IL 62221,** and we will be happy to copy it there.

Thank you for your assistance.  If you have any questions, please call me.

Sincerely,

Dan Schulte
Case Manager

ADVANTAGE167

## REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE
*(Take or mail original and all copies to you local Social Security office,*
*the Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post)*

See Privacy Act
Notice on Reverse

| 1. CLAIMANT | 2. WAGE EARNER, IF DIFFERENT | 3. SOC. SEC. CLAIM NUMBER | 3. SPOUSE's CLAIM NUMBER |
|---|---|---|---|
| Cathy Cleiland | | | |

**5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE.** I disagree with the determination made on my claim because:

I remain disabled and unable to engage in any substantial, gainful activity.

An administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in you case. You will receive notice of the time and place of a hearing at least 20 days before the date set for a hearing.

6. I have additional evidence to submit.  ☐ Yes  ☐ No

Name and address of source of additional evidence:

_____

_____

*(Please submit it to the Social Security office, The Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post within 10 days. Attach an additional sheet if you need more space.)*

7. Check one of the blocks:

☒ I wish to appear at a hearing.

☐ I do not wish to appear at a hearing and I request that a decision be made based on the evidence in my case.
(Complete Waiver Form HA-4608).

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security office will give you a list of legal referral and service organizations. (If you are represented and have not done so previously, complete and submit form SSA-1696 (Appointment of Representative).)
[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

| 8. (CLAIMANT'S SIGNATURE) | (DATE) | 9. (REPRESENTATIVE'S SIGNATURE/NAME) | (DATE) |
|---|---|---|---|
| *Cathy X. Cleiland* | 3-1-2004 | *Tim Surville* | 3-9-04 |

ADDRESS
8 Cherokee Dr. Num.27

(ADDRESS)  ☐ ATTORNEY;  ☒ NON ATTORNEY;
1 Corporate Drive

| CITY | STATE | ZIPCODE | CITY | STATE | ZIPCODE |
|---|---|---|---|---|---|
| Monroeville, AL 36460 | | | Swansea | IL | 62226 |

| TELEPHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
|---|---|---|---|
| (251) 769-3061 | | 618-212-1100 | 314-894-4981 |

**TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION-ACKNOWLEDGEMENT OF REQUEST FOR HEARING**

10. Request received for the Social Security Administration on _____ (Date) _____ by _____ (Print Name)

_____ (Title) _____ (Address) _____ (Servicing FO Code) _____ (PC Code)

11. Was the request for hearing received within 65 days of the reconsidered determination? ☐ YES ☐ NO
(If no is checked, attach claimant's explanation for delay, and attach copy of appointment notice, letter, or other pertinent material or information in the Social Security office.)

12. Claimant is represented ☐ Yes ☐ No
☐ List of legal referral and service organizations provided

13. Interpreter Needed ☐ Yes ☐ No
Language (including sign language)

14. Check one: ☐ Initial Entitlement Case
☐ Disability Cessation Case
☐ Other Postentitlement Case

15. Check all claim types that apply:
☐ RSI only (RSI)
☐ Title II Disability-worker or child only (DIWC)
☐ Title II Disability-Widow(er) only (DIWW)
☐ SSI Aged only (SSIA)
☐ SSI Blind only (SSIB)
☐ SSI Disability only (SSID)
☐ SSI Aged/Title II (SSAC)
☐ SSI Blind/Title II (SSBC)
☐ SSI Disability/Title II (SSDC)
☐ HI Entitlement (HIE)
☐ Title VII Only (SVB)
☐ Title VII/Title XVI (SVB/SSI)
☐ Other, specify _____

16. HO COPY SENT TO _____ HO on _____
☐ CF Attached ☐ Title II ☐ Title XVI ☐ Title VIII or
☐ Title II held in FO to establish CAPS ORBIT or
☐ CF requested ☐ Title II ☐ Title XVI ☐ Title VIII
(Copy of teletype or phone report attached)

17. CF COPY SENT TO _____ HO on _____
☐ CF Attached ☐ Title II ☐ Title XVI
☐ Other Attached

FORM HA-501-U5 (09-2001) EF(01-2003)
Destroy Prior Editions

CLAIMS FOLDER

ADVANTAGE168

Form Approved
OMB No. 0960-0144

SOCIAL SECURITY ADMINISTRATION

# DISABILITY REPORT- APPEAL

For SSA Use Only
Do not write in the shaded area.
Related SSN _____
Number Holder _____

Date of Last Disability Report

Claimant is filing: ☐ Reconsideration   ☐ Reconsideration for Disability Cessation   ☐ Request for ALJ Hearing

## SECTION 1- INFORMATION ABOUT THE DISABLED PERSON

A. NAME *(First, Middle Initial, Last)*   *Cathy Cleveland*

B. SOCIAL SECURITY NUMBER   ▆▆▆▆▆▆▆▆▆

C. DAYTIME TELEPHONE NUMBER *(If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)*

251   342-5545   ☒ Your Number   ☐ Message Number   ☐ None

Area Code   Number

D. Give the name of a friend or relative that we can contact (other than your doctors) **who knows about your illnesses, injuries or conditions** and can help you with your claim.

NAME   *Bernice Key*   RELATIONSHIP   *Mother*

ADDRESS   *PO Box 68*
*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

*Clio*   *AL*   *36017*   DAYTIME PHONE   *334*   *397-4707*
City   State   ZIP   Area Code   Number

## SECTION 2- INFORMATION ABOUT YOUR ILLNESSES, INJURIES, OR CONDITIONS

A. Has there been any change (for better or worse) in your illnesses, injuries, or conditions **since you last completed a disability report?** ☒ Yes   ☐ No

If "Yes," please describe in detail:

*additional back surgery, increased pain*

| Approximate date the changes | | |
|---|---|---|
| Month | Day | Year |
| 12 | | 03 |

B. Do you have any new physical or mental limitations as a result of your illnesses, injuries, or conditions **since you last completed a disability report?** ☒ Yes   ☐ No

If "Yes," please describe in detail:

*Is increasing limited by pain*

| Approximate date the changes | | |
|---|---|---|
| Month | Day | Year |
| | | |

C. Do you have any new illnesses, injuries or conditions **since you last completed a disability report?** ☐ Yes   ☒ No

If "Yes," please describe in detail:

| Approximate date the changes | | |
|---|---|---|
| Month | Day | Year |
| | | |

**If you need more space, use Remarks, Section 10.**

ADVANTAGE169

## SECTION 3 - INFORMATION ABOUT YOUR MEDICAL RECORDS

A. Since you last completed a disability report, have you been seen or will you see a doctor/hospital/clinic or anyone else for the illnesses, injuries or conditions that limit your ability to work?   ☒ YES   ☐ NO

B. Since you last completed a disability report, have you seen or will you see a doctor/hospital/clinic or anyone else for emotional or mental problems that limit your ability to work?   ☐ YES   ☐ NO

C. List other names you have used on your medical records.

_____

_____

---

## If you answered "NO" to both A and B, go to Section 4.

Tell us who may have medical records or other information about your illnesses, injuries or conditions **since you last completed a disability report.**

D. List each DOCTOR/HMO/THERAPIST/OTHER. Include your next appointment.

**1.**

| NAME  MARK HADLEY, MD | DATES |
|---|---|
| STREET ADDRESS  University of Alabama Birmingham  Div. of neurosurgery  FOT 1030 510 20th St. S. | FIRST VISIT  11/03 |
| CITY  Birmingham  STATE AL  ZIP 35294 | LAST SEEN 2/04 |
| PHONE 205  934-1439  PATIENT ID # (If known) | NEXT APPOINTMENT |

REASONS FOR VISITS _____

BACK pain

WHAT TREATMENT WAS RECEIVED?   Surgery / pain meds.

**2.**

| NAME  Charles EDDINS, MD | DATES |
|---|---|
| STREET ADDRESS  172  ALABAMA  Ave. | FIRST VISIT  1996 |
| CITY Monroville  STATE AL  ZIP 36461 | LAST SEEN 1/04 |
| PHONE 251  575-4825  PATIENT ID # (If known) | NEXT APPOINTMENT |

REASONS FOR VISITS _____

all conditions

WHAT TREATMENT WAS RECEIVED?   Medications / exam

**If you need more space, use Remarks, Section 10.**

**E. List each HOSPITAL/CLINIC. Include your next appointment.**

| HOSPITAL/CLINIC | TYPE OF VISIT | DATES | |
|---|---|---|---|
| NAME | ☐ INPATIENT STAYS *(Stayed at least overnight)* | DATE IN | DATE OUT |
| STREET ADDRESS | ☐ OUTPATIENT VISITS *(Sent home same day)* | DATE FIRST VISIT | DATE LAST VISIT |
| CITY   STATE   ZIP | ☐ EMERGENCY ROOM VISITS | DATE OF VISITS | |
| PHONE _____  Area Code   Phone Number | | | |

Next **appointment** _____   Your hospital/clinic **number** _____

**Reasons** for visits _____

_____

What **treatment** did you receive? _____

_____

What **doctors** do you see at this hospital/clinic on a regular basis? _____

_____

**If you need more space, use Remarks, Section 10.**

**F. Since you last completed a disability report**, does **anyone else have medical records or information** about your illnesses, injuries, or conditions (Workers' Compensation, insurance companies, prisons, attorneys, or welfare agency), or are you scheduled to see anyone else?   ☐ YES   ☒ NO   If "**YES,**" complete information below:

| NAME | DATES |
|---|---|
| STREET ADDRESS | FIRST VISIT |
| CITY   STATE   ZIP | LAST SEEN |
| PHONE _____  Area Code   Phone Number | NEXT APPOINTMENT |
| CLAIM NUMBER (If any) | |
| REASONS FOR VISITS | |

**If you need more space, use Remarks, Section 10.**

## SECTION 4 - MEDICATIONS

Are you currently taking any **medications** for your illnesses, injuries or conditions? ☒ YES
If "YES," please tell us the following: *(Look at your medicine bottles, if necessary.)*  ☐ NO

| NAME OF MEDICINE | IF PRESCRIBED, GIVE NAME OF DOCTOR | REASON FOR MEDICINE | SIDE EFFECTS YOU HAVE |
|---|---|---|---|
| neurotin | HADLEY | Pain | fatigue |
| Darvocet | HADLEY | Pain | |
| Robaxin | HADLEY | Muscle relaxer | NA |
| effexor | EDDINS | Depression | |
| insulin | EDDINS | Diabetes | |

If you need more space, use Remarks, Section 10.

## SECTION 5 - TESTS

**Since you last completed a disability report,** have you had any **medical tests** for illnesses, injuries or conditions or do you have any such tests scheduled?    ☐ YES  ☒ NO

If "YES," please tell us the following: *(Give approximate dates, if necessary.)*

| KIND OF TEST | WHEN DONE, OR WHEN WILL IT BE DONE? (Month, day, year) | WHERE DONE? (Name of Facility) | WHO SENT YOU FOR THIS TEST? |
|---|---|---|---|
| EKG (HEART TEST) | | | |
| TREADMILL (EXERCISE TEST) | | | |
| CARDIAC CATHETERIZATION | | | |
| BIOPSY--Name of body part | | | |
| HEARING TEST | | | |
| SPEECH/LANGUAGE TEST | | | |
| VISION TEST | | | |
| IQ TESTING | | | |
| EEG (BRAIN WAVE TEST) | | | |
| HIV TEST | | | |
| BLOOD TEST (NOT HIV) | | | |
| BREATHING TEST | | | |
| X-RAY--Name of body part | | | |
| MRI/CT SCAN Name of body part | | | |

If you need more space, use Remarks, Section 10.

FORM SSA-3441-BK (2-2004) EF (02-2004)

ADVANTAGE172

## SECTION 6 - UPDATED WORK INFORMATION

Have you worked since you last completed a disability report?

☐ YES ☒ NO

If "YES," you will be asked to give details on a separate form.

## SECTION 7 - INFORMATION ABOUT YOUR ACTIVITIES

A. How do your illnesses, injuries or conditions affect your ability to care for your personal needs?

On bad days - aproximately 4 days a week has trouble even getting out of bed.

B. What changes have occurred in your daily activities **since you last completed a disability report?**

If none, show "NONE."

Has a few good days a week, other days can't get out of bed. Has pain & frustration due to pain.

**If you need more space, use Remarks, Section 10.**

## SECTION 8 - EDUCATION/TRAINING INFORMATION

Have you completed any type of **special job training, trade or vocational school since you last completed a disability report?** ☐ YES ☒ NO

If "YES," describe what type: _____

_____

_____

Approximate date completed: _____

**ADVANTAGE173**

FORM SSA-3441-BK (2-2004) EF (02-2004)

PAGE 5

## SECTION 9 - VOCATIONAL REHABILITATION, EMPLOYMENT, or OTHER SUPPORT SERVICES INFORMATION

Since you last completed a disability report, have you participated in the Ticket Program or another program of vocational rehabilitation services, employment services or other support services to help you go to work?

☐ YES   ☒ NO

If "YES," complete the following information:

NAME OF ORGANIZATION _____

NAME OF COUNSELOR _____

ADDRESS _____

*(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*

_____

*City*                    *State*        *Zip*

DAYTIME PHONE NUMBER _____

*Area Code*                    *Number*

DATES SEEN _____ TO _____

TYPE OF SERVICES OR TESTS PERFORMED

*(IQ, vision, physicals, hearing, workshops, etc.)*

## SECTION 10 - REMARKS

Use this section for any added information you did not show in earlier parts of the form. When you are done with this section (or if you don't have anything to add), be sure to go to the next page and complete the blocks there.

ADVANTAGE174

FORM SSA-3441-BK (2-2004) EF (02-2004)

| SECTION 10 - REMARKS |
| --- |

ADVANTAGE175

| Name of person completing this form *(Please Print)* | Date Form Completed *(Month, day, year)* |
| --- | --- |
| Dan Schutte for Cathy Cleiland | 3-3-04 |
| Address *(Number and street)* | e-mail address *(optional)* |
| City | State | Zip Code |

FORM SSA-3441-BK (2-2004) EF (02-2004)                                         PAGE 7



## SOCIAL SECURITY ADMINISTRATION

Refer To:

CATHY A. KEY

Office of Hearings and Appeals
550 Government Street
Suite 200
Mobile, AL 36602-2010
Tel: (251) 441-5441 / Fax: (251) 441-5993

April 1, 2004

DAN SCHULTE
ONE CORPORATE DRIVE
SWANSEA, IL 62226

Dear DAN SCHULTE:

We have received your client's request for a hearing before an Administrative Law Judge (ALJ). This letter tells you about the hearing process and things that you should do now to prepare for the hearing. We will mail a Notice of Hearing to you and your client at least 20 days before the date of the hearing to tell you its time and place.

### The Hearing

At the hearing, you and your client may present her case to the ALJ who will hear and decide it. The ALJ will consider the issue(s) you or your client has raised and the evidence now in her file and any additional evidence you provide. The ALJ may consider other issues as well and, if necessary, change parts of the previous decision that were favorable to your client. The Notice of Hearing will state the issues the ALJ plans to consider at the hearing.

Because the hearing is the time to show the ALJ that the issues should be decided in your client's favor, we need to make sure that her file has everything you want the ALJ to consider. You and your client are responsible for submitting needed evidence. After the ALJ reviews the evidence in the file, he or she may request more evidence to consider at the hearing.

### Providing Additional Evidence

If there is more evidence you want the ALJ to see, get it to us as soon as possible. If you need help, you should contact us immediately. You may ask the ALJ to issue a subpoena that requires a person to submit documents or testify at your hearing.

### You May See The Evidence In Your File

If you wish to see the evidence in your client's file, you may do so on the date of the hearing or before that date. If you wish to review the file before the date of the hearing, please call us.

ADVANTAGE176

See Next Page

CATHY A. KEY                                     Page 2 of 2

**If You Have Any Questions Or Your Client's Address Changes**

If you have any questions please call or write us. You must notify us if there is a change in your client's address. Our telephone number and address are shown on the first page of this letter

Sincerely yours,

Stuart A. Wein
Hearing Office
Chief Administrative Law Judge

Enclosures

Form SSA-L1697-U3

cc: CATHY A. KEY
    8 CHEROKEE DRIVE #27
    MONROEVILLE, AL  36460

ADVANTAGE177



ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

Visit Us Online at: www.advantage2k.com

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299 - Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

Tuesday, April 06, 2004

Center for Pain
2055 East South Blvd.
Suite 812
Montgomery, AL 36116

RE: Cathy Cleiland
DOB: █████
SSN: █████

Dear Doctor:

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.**  The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.

**Thank you in advance for your assistance.**  If you have any questions, please  feel free to call me or my assistant at 800-580-5299.

Sincerely,

Dan Schulte
Case Manager

ADVANTAGE178

**To:  Center for Pain**
**Re:  Cathy Cleiland**                 SSN: ████████

Please answer the following questions regarding your patient.

1. Provide dates of treatment, date of **first exam_____ and last exam_____.**

2. **Diagnosis:**

3. Please list pertinent findings at most recent examination, such as, **spasms, reflex changes, muscle weakness, swelling, inflammation, gait disturbance, muscle atrophy,** etc.

4. Identify all of your patient's **symptoms.**

5. Is there reduced range of motion?  If yes, describe **affected joint, nature, and degree of limitation.**

6. List any medications prescribed for patient.

7. What **other treatment modalities** (physical therapy, surgery, braces, etc.) have you prescribed for your patient?

8. How often is your patient's experience of pain sufficiently severe to interfere with **attention and concentration?**

9. Does your patient need a job that permits **shifting positions at will** from sitting, standing or walking?

   If yes, **how often** will he or she need to shift?

10. Will your patient need to take **unscheduled breaks** during a work shift?  If yes, how often will this happen?

    **How long** (on average) will your patient have to rest before returning to work?

11. Please estimate, on average, how often your patient is likely to be **absent from work** due to complications from his or her impairments or to receive necessary medical treatment?  _
    Never                                    _ less than once per month
    _ about once per month                   _ about twice per month
    _ about three times per month            _ more than three times per month

ADVANTAGE179

12. List any **work-related restrictions** you have placed on your patient and your basis for making these restrictions.


13. Does your patient have significant and persistent **disorganization of motor function** in two extremities resulting in sustained disturbance or gross and dexterous movement or gait and station? __ Yes __ No

14. Does your patient require the use of hand held assistive devices for ambulation?

Yes _____          No_____

Cane_____          Crutches_____          Walker_____
If yes, how far can the patient safely walk without an assistive device? _____
Why is the assistive device needed?
_ Balance problem          _ Lower extremity weakness
Other: _____



_____          _____
**Physician Signature**                              **Date**


**ADVANTAGE180**



Medical Requests                Date: 3.9.04

Claimant: Cathy Cleiland          SSN: ▓▓▓▓▓▓▓

| Doctor: | Meds: |
|---|---|
| MARK HADLEY, MD | Office Notes: 11/03 to present |
| University OP ALABAMA Birmingham | |
| DIV of neuro surgery | Interrog's: neuro + ORTHO Pce |
| FOT 1030 | |
| 510 20th ST. SOUTH | Hospital Rec: _____ |
| Birmingham, AL  3529Y | |
| 209-934-1439 | |

| Doctor: | Meds: |
|---|---|
| Charles EDDINS, MD | Office Notes: 12/03 to present |
| 1772 ALABAMA Ave | Interrog's: Regular |
| Monrouille, AL  36461 | Hospital Rec: _____ |
| 251-575-4825 | |

| Doctor: | Meds: |
|---|---|
| _____ | Office Notes: _____ |
| _____ | Interrog's: _____ |
| _____ | Hospital Rec: _____ |

| Doctor: | Meds: |
|---|---|
| _____ | Office Notes: _____ |
| _____ | Interrog's: _____ |
| _____ | Hospital Rec: _____ |

| Doctor: | Meds: |
|---|---|
| _____ | Office Notes: _____ |
| _____ | Interrog's: _____ |
| _____ | Hospital Rec: _____ |

Thank You!

ADVANTAGE181



Visit Us Online at www.advantage2k.com
One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299 - Fax (814) 894-4891
Email: advantage2000@advantage2k.com

MAR 1 5 2004

## TO:  SOCIAL SECURITY CLAIMS REPRESENTATIVE

Social Security Administration
Jackson, AL 36545
RE:   Cathy Cleiland
SSN: ▉▉▉▉▉▉▉

I have been appointed as the Representative for Ms. Cleiland. PLEASE SEND
ME AN ACKNOWLEDGEMENT OF YOUR RECEIPT OF MY SSA-1696,
AND PROVIDE THE REQUESTED INFORMATION BELOW. THANK
YOU!

Claims Representative:  *Ms. Singleton*
CR Telephone No.:   *251-246-6018*

Claims filed or pending:
___✓___ Title II          Alleged Onset Date  *12/02*
_____ Title XVI         Date Last Insured   *5/14/03*
_____ Concurrent

_____ Protected Filing Date
*3/12/04* SSA-1696 Receipt Date

History of Current Claim:
*10/03* Date Initial Claim Filed
*N/A* Date Reconsideration Filed
*3/12/04* Date Hearing Request Filed
*N/A* Date Appeals Council Request Filed

Current Claim sent to: _____ DDS _____ Screening Unit  ✓ OHA

Any Prior Applications: Yes_____ No ✓
Date of Filing for Prior Application _____
Level of Last Decision  *Initial Claim*

Thanks for your assistance.
Dan Schulte
Case Manager
Advantage 2000 Consultants, One Corporate Drive, Swansea, IL 62226

ADVANTAGE182



ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

Visit Us Online at: www.advantage2k.com

One Corporate Drive  Swansea, IL 62226
Telephone: (800) 580-5299 · Fax: (314) 894-4891
Email: advantage2000@advantage2k.com

Tuesday, April 06, 2004

Center for Pain
2055 East South Blvd.
Suite 812
Montgomery, AL 36116

RE: Cathy Cleiland
DOB:
SSN: 4

Dear Doctor:

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.** The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.

**Thank you in advance for your assistance.** If you have any questions, please feel free to call me or my assistant at 800-580-5299.

**Sincerely,**

*Dan Schulte /dy*

Dan Schulte
Case Manager

4-6-04

2

**ADVANTAGE183**



ADVANTAGE 2000
CONSULTANTS INC.
"Your Gateway to Social Security"

*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

MAR 2 4 2004

Wednesday, March 10, 2004
received  03-17-04

Mark   Hadley, MD
University of Alabama, Division of Neuro Surgery
FOT 1030
510 20th Street South
Birmingham, AL 35294

RE: Cathy Cleiland
DOB:
SSN:

Dear Dr. Hadley,

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.** The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.

**Thank you in advance for your assistance.** If you have any questions, please  feel free to call me or my assistant at 800-580-5299.

Sincerely,

Dan Schulte/tw

Dan Schulte
Case Manager

Enc. DS/tw

ADVANTAGE184



ADVANTAGE 2000
CONSULTANTS INC.
"Your Gateway to Social Security"

*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299 - Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>    SSN#: █████    Date of Birth: █████

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure: <u>Mark Hadley; Univ of Alabama Birmingham, Div of NeuroSurg</u>
   Address: <u>FOT 1030; 510 20th Street South</u>
   <u>Birmingham, AL, 35294</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: <u>11/08/03 to present</u>
   - ☐ Opinions and statements from my treating physicians about my condition
   - ☑ Office notes/consultations/ follow up visits
   - ☑ Diagnostic testing reports
   - ☑ X-ray and imaging reports
   - ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   - ☐ Mental Health Visit notes
   - ☐ Discharge summary/Operative reports
   - ☑ Laboratory results
   - ☐ Outpatient records
   - ☐ Pathology reports
   - ☑ Other <u>2 questionaires</u>
4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:
   <u>Advantage 2000 Consultants</u>
   Address: <u>One Corporate Drive</u>
   <u>Swansea, IL 62226</u>
   For the purpose of: <u>Pursuit of Social Security Disability Benefits</u>
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: <u>Fully Favorable Social Security Decision</u>. If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cathy S. Cleiland</u>    <u>3/5/04</u>
Signature of Patient or Legal Representative    Date

_____    _____
If Signed by Legal Representative, Relationship to Patient    Signature of Witness

ADVANTAGE185

To: Mark  Hadley , MD
Re: Cathy Cleiland                    SSN: ███████████

Please answer the following questions regarding your patient referenced above.

1. Please provide the dates of treatment:  **First exam 11/01/2003 to the Last exam**.

2. **Diagnosis:**

3. Please describe the **findings** at the most recent examination.

    *Dr Hadley does not do PCE'D or FCE'D*

4. Identify all of your patient's **symptoms:**

   Fatigue ___                              pain ___
   Balance problems ___                     difficulty remembering ___
   Poor coordination ___                    depression ___
   Weakness ___                             emotional lability ___
   Paralysis ___                            difficulty solving problems ___
   Unstable walking ___                     problems with judgement ___
   Numbness/tingling/sensory disturbance ___
   Vision impairment ___                    increased muscle tension ___
   Rapid eye movement ___                   tremor ___
   Bladder problems ___                     bowel problems ___
   Speech/communication difficulties ___
   Heat sensitivity ___
   Other:

5. Does your patient have significant and persistent **disorganization of motor function** in two extremities resulting in sustained disturbance or gross and dexterous movement or gait and station?  ___ Yes  ___ No

6. Is an **assistive device** required for ambulation?  ___ Yes  ___ No
   If yes, how far can the patient safely walk without an assistive device? _____
   Why is the assistive device needed?
   ___ Balance problem              ___ Lower extremity weakness
   Other: _____

7. Please list the **medications** you have prescribed for your patient and any side effects.

**ADVANTAGE186**

8. Please include a copy of **CT or MRI** interpretation that was used to aid in diagnosis of cerebral vascular accident or other organic mental dysfunction.

9. Please include copies of any **neuropsychological testing** (WAIS, WMS-III, Trails A & B, etc.) that have been performed on your patient within the past six months.

10. Please describe any **other treatment modalities** (physical therapy, speech therapy, occupational therapy, braces, relaxation techniques, etc.) that you have recommended for your patient and how successful these have been.

11. Please **estimate**, on average, how often your patient is likely to be absent from work due to complications from his or her impairment or to receive necessary medical treatment.
    _ Never                            _ Less than once per month
    _ About once per month             _ About twice per month
    _ About three times per month      _ More than three times per month

12. How often is your patient's experience of fatigue, weakness, or pain sufficiently severe to interfere with **attention and concentration**?
    _ Never                            _ Seldom
    _ Often                            _ Frequently
    _ Constantly

13. Will your patient sometimes need to take **unscheduled breaks** during an 8 hour workday? __ Yes __ No
    If yes, how often do you think this will happen? _____
    How long, on average, will your patient have to rest before returning to work?
    _____

14. Please describe any **work-related restrictions** you have placed on your patient and your basis for doing so.

_____    _____
**Physician Signature**                **Date**

To: Mark Hadley, MD
Re: Cathy Cleiland          SSN: ███████

Please answer the following questions regarding your patient.

1. Provide dates of treatment, date of **first exam 11/01/2003 to the last exam.**
   *See Attached Clinical*

2. **Diagnosis:** *Lumbar instability*

3. Please list pertinent findings at most recent examination, such as, **spasms, reflex changes, muscle weakness, swelling, inflammation, gait disturbance, muscle atrophy,** etc.
   *See attached Clinical*

4. Identify all of your patient's **symptoms.**

5. **Is there reduced range of motion?  If yes, describe affected joint, nature, and degree of limitation.**

6. List any medications prescribed for patient.   *Clinical Attached*

7. What **other treatment modalities** (physical therapy, surgery, braces, etc.) have you prescribed for your patient?   *See Attached Clinical*

8. How often is your patient's experience of pain sufficiently severe to interfere with **attention and concentration?**

9. Does your patient need a job that permits **shifting positions at will** from sitting, standing or walking?

   If yes, **how often** will he or she need to shift?

10. Will your patient need to take **unscheduled breaks** during a work shift?  If yes, how often will this happen?

    **How long** (on average) will your patient have to rest before returning to work?

11. Please estimate, on average, how often your patient is likely to be **absent from work** due to complications from his or her impairments or to receive necessary medical treatment? _
    Never _        _ less than once per month
    _ about once per month        _ about twice per month
    _ about three times per month _ more than three times per month

                                        **ADVANTAGE188**

                                        O16  Page 1

12. List any **work-related restrictions** you have placed on your patient and your basis for making these restrictions.

13. Does your patient have significant and persistent **disorganization of motor function** in two extremities resulting in sustained disturbance or gross and dexterous movement or gait and station? __ Yes __ No

14. Does your patient require the use of hand held assistive devices for ambulation?

Yes _____          No_____

Cane_____          Crutches_____          Walker_____
If yes, how far can the patient safely walk without an assistive device? _____
Why is the assistive device needed?
_ Balance problem          _ Lower extremity weakness
Other: _____

_____          _____
**Physician Signature**                        **Date**

**ADVANTAGE189**

```
UNIVERSITY OF ALABAMA HOSPITAL LABORATORIES        PATIENT NAME:    CLEILAND, CATHY K
THE KIRKLIN CLINIC                                 MEDICAL RECORD:  (00000)00000-0698678
2000 5TH AVENUE SOUTH                              AGE:  46 YRS    SEX: F     RACE: W
BIRMINGHAM, AL 35233          (205) 801-8723       LOCATION:  PAC
                                                   ADMIT DATE: 11/17/03   DISCH DATE: 11/22/03
                                                   PHYSICIAN:  HADLEY, MARK N.
                                                   CONSULTING PHYSICIANS:  HADLEY, MARK N.
```

****************************************************************************************
GENERAL CHEMISTRY
****************************************************************************************

| PROCEDURE | SODIUM | POTASSIUM | CHLORIDE | BICARBONATE | ANION GAP | GLUCOSE RANDOM |
|-----------|--------|-----------|----------|-------------|-----------|----------------|
| UNITS | MEQ/L | MEQ/L | MEQ/L | MEQ/L | MEQ/L | MG/DL |
| REF RANGE | [133-145] | [3.3-5.1] | [96-108] | [23-29] | [8.0-16.0] | [70-105] |
| 11/17/03  1552 | 141 | 4.6 | 102 | 30 H | 9.0 | 367 H |

| PROCEDURE | BUN | CREATININE | CALCIUM | C-REACTIVE PROT |
|-----------|-----|------------|---------|------------------|
| UNITS | MG/DL | MG/DL | MG/DL | |
| REF RANGE | [6-19] | [0.4-1.2] | [8.4-10.2] | |
| 11/17/03  1552 | 6 | 0.7 | 9.6 | IN LAB |

****************************************************************************************
URINALYSIS
****************************************************************************************

- MACROSCOPIC AND CHEMICAL SCREENING -

| PROCEDURE | COLLECT TIME | RECEIPT TIME | ANALYSIS TIME | COLOR | CLARITY | SPEC GRAVITY | pH |
|-----------|--------------|--------------|---------------|-------|---------|--------------|-----|
| UNITS | HOURS | HOURS | HOURS | | | | |
| REF RANGE | | | | [YELLOW] | [CLEAR] | [1.003-1.035] | [4.5-8.0] |
| 11/17/03  1552 | 1620 | 1625 | 1630 | STRAW | HAZY * | 1.018 | 5.0 |

| PROCEDURE | PROTEIN | GLUCOSE | KETONES | BILIRUBIN | BLOOD | NITRITE | LEUKOCYTE ESTER |
|-----------|---------|---------|---------|-----------|-------|---------|------------------|
| REF RANGE | [NEGATIVE] | [NEGATIVE] | [NEGATIVE] | [NEGATIVE] | [NEGATIVE] | [NEGATIVE] | |
| 11/17/03  1552 | NEGATIVE | 3+ * | NEGATIVE | NEGATIVE | NEGATIVE | NEGATIVE | NEGATIVE |

- CELLULAR COMPONENTS -

| PROCEDURE | WBC | SQUAMOUS |
|-----------|-----|----------|
| UNITS | /HPF | /LPF |
| 11/17/03  1552 | 0-5 * | FEW * |

LEGEND:
H = HIGH, * = ABNORMAL

```
PATIENT NAME: CLEILAND, CATHY K                                    PAGE:   1
                    ***************************************
                    *    OUTPATIENT LABORATORY REPORT     *
                    ***************************************
                                                            PRINTED: 11/17/03 1836
        CHEMISTRY        URINALYSIS
```

ADVANTAGE190

```
UNIVERSITY OF ALABAMA HOSPITAL LABORATORIES        PATIENT NAME:    CLEILAND, CATHY K
THE KIRKLIN CLINIC                                 MEDICAL RECORD:  (00000)00000-0698678
2000 5TH AVENUE SOUTH                              AGE:  46 YRS    SEX: F      RACE: W
BIRMINGHAM, AL 35233          (205) 801-8723       LOCATION:  PAC
                                                   ADMIT DATE: 11/17/03   DISCH DATE: 11/22/03
                                                   PHYSICIAN: HADLEY, MARK N.
                                                   CONSULTING PHYSICIANS:  HADLEY, MARK N.
```

*****************************************************************************************
                                    URINALYSIS
*****************************************************************************************

- MISCELLANEOUS -

```
       PROCEDURE    BACTERIA
       REF RANGE    [NEGATIVE]
11/17/03  1552      MANY *
```

*****************************************************************************************
                                 BLOOD CELL PROFILE
*****************************************************************************************

- BLOOD CELL PROFILE -

| PROCEDURE | HEMATOCRIT | HEMOGLOBIN | RBC | MCV | MCH | MCHC | RDW | PLATELET COUNT |
|---|---|---|---|---|---|---|---|---|
| UNITS | % | GM/DL | MI/CMM | FL | PG | G/DL | % | 10 X3 |
| REF RANGE | [33-45] | [11.3-15.2] | [3.80-5.20] | [80-96] | [27-33] | [32-36] | [11.0-16.0] | [150.0-400.0] |
| 11/17/03  1552 | 39 | 12.9 | 4.38 | 88 | 29 | 33 | 11.9 | 455.9 H |

```
       PROCEDURE    MPV
11/17/03  1552      7
```

---WBC INSTRUMENT (AUTOMATED) DIFFERENTIAL---

```
       PROCEDURE    WBC
           UNITS    10 X3
       REF RANGE    [4.00-11.00]
11/17/03  1552      9.15
```

*****************************************************************************************
                              MISCELLANEOUS HEMATOLOGY
*****************************************************************************************

```
       PROCEDURE    SED RATE
11/17/03  1552      IN LAB
```

LEGEND:
H = HIGH, * = ABNORMAL

```
PATIENT NAME: CLEILAND, CATHY K                                    PAGE:   2
                    ******************************************
                    *    OUTPATIENT LABORATORY REPORT    *
                    ******************************************
                                                           PRINTED: 11/17/03 1836
           URINALYSIS    HEMATOLOGY    MISC HEMATOLOGY
```

ADVANTAGE191

UNIVERSITY OF ALABAMA HOSPITAL LABORATORIES
THE KIRKLIN CLINIC
2000 5TH AVENUE SOUTH
BIRMINGHAM, AL 35233        (205) 801-8723

PATIENT NAME:    CLEILAND, CATHY K
MEDICAL RECORD:  (00000)00000-0698678
AGE: 46 YRS        SEX: F      RACE: W
LOCATION:  PAC
ADMIT DATE: 11/17/03    DISCH DATE: 11/22/03
PHYSICIAN: HADLEY, MARK N.
CONSULTING PHYSICIANS: HADLEY, MARK N.

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
COAGULATION
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

- PROTHROMBIN TIME AND PARTIAL THROMBOPLASTIN TIME -

| | PROCEDURE UNITS | PT PATIENT SEC | I N R | PTT PATIENT SEC |
|---|---|---|---|---|
| REF RANGE | | [12.6-14.6] | | [24-35] |
| 11/17/03 | 1552 | 13.1 | 1.00 | 25 |

PTT PATIENT (10/31/02 -- Current)
    LTV: GREATER THAN 100 SECONDS.
    THERAPEUTIC GOALS FOR HEPARIN THERAPY:
    52-75 SECONDS FOR PREVENTION OF DVT
    68-100 SECONDS FOR TREATMENT OF DVT

---

\*\* LAST PAGE OF  PATIENT REPORT \*\*

---

PATIENT NAME: CLEILAND, CATHY K                                          PAGE:   3
                    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                    \*     OUTPATIENT LABORATORY REPORT     \*
                    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                                        PRINTED: 11/17/03 1836
                                            COAGULATION

ADVANTAGE192



*"Your Gateway to Social Security"*

Visit Us Online at: *www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Wednesday, March 10, 2004

Mark   Hadley, MD
University of Alabama, Division of Neuro Surgery
FOT 1030
510 20th Street South
Birmingham, AL 35294

RE: Cathy Cleiland
DOB:
SSN:

Dear Dr. Hadley,

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.**  The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.

**Thank you in advance for your assistance.**  If you have any questions, please  feel free to call me or my assistant at 800-580-5299.

Sincerely,

Dan Schulte
Case Manager

Enc. DS/tw

ADVANTAGE194



*Visit Us Online at www.advantage2k.com*
One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>     SSN#: ▮▮▮▮     Date of Birth: ▮▮▮▮

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure: <u>Mark Hadley; Univ of Alabama Birmingham, Div of NeuroSurg</u>
   Address: <u>FCT 1030; 5016 20 th Street South</u>
   <u>Birmingham, AL, 35294</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: <u>11/0 ?03 to present</u>
   ☐ Opinions and statements from my treating physicians about my condition
   ☑ Office notes/consultations/ follow up visits
   ☑ Diagnostic testing reports
   ☑ X-ray and imaging reports
   ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   ☐ Mental Health Visit notes
   ☐ Discharge summary/Operative reports
   ☑ Laboratory results
   ☐ Outpatient records
   ☐ Pathology reports
   ☑ Other  <u>2 questionaires</u>

4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:
   <u>Advantage 2000 Consultants</u>
   Address:  <u>One Corporate Drive</u>
   <u>Swansea, IL 62226</u>
   For the purpose of: <u>Pursuit of Social Security Disability Benefits</u>
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: <u>Fully Favorable Social Security Decision</u>. If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cathy K. Cleiland</u>     <u>3/5/04</u>
Signature of Patient or Legal Representative     Date

_____     _____
If Signed by Legal Representative, Relationship to Patient     Signature of Witness

**ADVANTAGE195**

**To:** Mark   Hadley , MD
**Re:** Cathy Cleiland                    SSS: 

Please answer the following questions regarding your patient referenced above.

1. Please provide the dates of treatment: **First exam 11/01/2003 to the Last exam**.

2. **Diagnosis:**

3. Please describe the **findings** at the most recent examination.

4. Identify all of your patient's **symptoms:**

Fatigue __                                   pain __
Balance problems __                          difficulty remembering __
Poor coordination __                         depression __
Weakness __                                  emotional lability __
Paralysis __                                 difficulty solving problems __
Unstable walking __                          problems with judgement __
Numbness/tingling/sensory disturbance __
Vision impairment __                         increased muscle tension __
Rapid eye movement __                        tremor __
Bladder problems __                          bowel problems __
Speech/communication difficulties __
Heat sensitivity __
Other:

5. Does your patient have significant and persistent **disorganization of motor function** in two extremities resulting in sustained disturbance or gross and dexterous movement or gait and station?   __ Yes __ No

6. Is an **assistive device** required for ambulation? __ Yes __ No
   If yes, how far can the patient safely walk without an assistive device? _____
   Why is the assistive device needed?
   _ Balance problem            _ Lower extremity weakness
   Other: _____

7. Please list the **medications** you have prescribed for your patient and any side effects.

ADVANTAGE196

N2    Page 1

 

8. Please include a copy of **CT or MRI** interpretation that was used to aid in diagnosis of cerebral vascular accident or other organic mental dysfunction.

9. Please include copies of any **neuropsychological testing** (WAIS, WMS-III, Trails A & B, etc.) that have been performed on your patient within the past six months.

10. Please describe any **other treatment modalities** (physical therapy, speech therapy, occupational therapy, braces, relaxation techniques, etc.) that you have recommended for your patient and how successful these have been.

11. Please **estimate**, on average, how often your patient is likely to be absent from work due to complications from his or her impairment or to receive necessary medical treatment.
    _ Never                              _ Less than once per month
    _ About once per month               _ About twice per month
    _ About three times per month        _ More than three times per month

12. How often is your patient's experience of fatigue, weakness, or pain sufficiently severe to interfere with **attention and concentration**?
    _ Never                              _ Seldom
    _ Often                              _ Frequently
    _ Constantly

13. Will your patient sometimes need to take **unscheduled breaks** during an 8 hour workday? __ Yes __ No
    If yes, how often do you think this will happen? _____
    How long, on average, will your patient have to rest before returning to work?

14. Please describe any **work-related restrictions** you have placed on your patient and your basis for doing so.

_____      _____
**Physician Signature**                      **Date**

**ADVANTAGE197**

 

**To:** Mark   Hadley , MD
**Re:** Cathy Cleiland          SSN: 

Please answer the following questions regarding your patient.

1. Provide dates of treatment, date of **first exam 11/01/2003 to the last exam.**

2. **Diagnosis:**

3. Please list pertinent findings at most recent examination, such as, **spasms, reflex changes, muscle weakness, swelling, inflammation, gait disturbance, muscle atrophy**, etc.

4. Identify all of your patient's **symptoms.**

5. Is there reduced range of motion?  If yes, describe **affected joint, nature, and degree of limitation.**

6. List any medications prescribed for patient.

7. What **other treatment modalities** (physical therapy, surgery, braces, etc.) have you prescribed for your patient?

8. How often is your patient's experience of pain sufficiently severe to interfere with **attention and concentration?**

9. Does your patient need a job that permits **shifting positions at will** from sitting, standing or walking?

   If yes, **how often** will he or she need to shift?

10. Will your patient need to take **unscheduled breaks** during a work shift?  If yes, how often will this happen?

    **How long** (on average) will your patient have to rest before returning to work?

11. Please estimate, on average, how often your patient is likely to be **absent from work** due to complications from his or her impairments or to receive necessary medical treatment?  _
    Never                          _ less than once per month
    _ about once per month        _ about twice per month
    _ about three times per month _ more than three times per month

<div align="right">

ADVANTAGE198

</div>



12. List any **work-related restrictions** you have placed on your patient and your basis for making these restrictions.

13. Does your patient have significant and persistent **disorganization of motor function** in two extremities resulting in sustained disturbance or gross and dexterous movement or gait and station? __ Yes __ No

14. Does your patient require the use of hand held assistive devices for ambulation?

Yes _____          No_____

Cane_____          Crutches_____          Walker_____
If yes, how far can the patient safely walk without an assistive device? _____
Why is the assistive device needed?
_ Balance problem          _ Lower extremity weakness
Other: _____

_____          _____
**Physician Signature**                                    **Date**

ADVANTAGE199

O16  Page 2



*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Wednesday, March 10, 2004

Charles Eddins, MD
1772 Alabama Avenue
Monroville, AL 36461

RE: Cathy Cleiland
DOB: 
SSN:

Dear Dr. Eddins,

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.**  The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

<u>Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.</u>

**Thank you in advance for your assistance.**  If you have any questions, please  feel free to call me or my assistant at 800-580-5299.

Sincerely,

Dan Schulte
Case Manager

Enc. DS/tw

**ADVANTAGE200**



*Visit Us Online at www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299 - Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>      SSN#: ██████      Date of Birth: ██████

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:
   <u>Charles Eddins, MD</u>
   Address: <u>1772 Alabama Ave</u>
   <u>Monroeville, AL, 36446</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on dates: <u>12/01/03 to the present</u>
   - [ ] Opinions and statements from my treating physicians about my condition
   - [✓] Office notes/consultations/ follow up visits
   - [✓] Diagnostic testing reports
   - [✓] X-ray and imaging reports
   - [ ] Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   - [ ] Mental Health Visit notes
   - [ ] Discharge summary/Operative reports
   - [✓] Laboratory results
   - [ ] Outpatient records
   - [ ] Pathology reports
   - [✓] Other <u>1 Questionnaire</u>
4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:
   Advantage 2000 Consultants
   Address:      One Corporate Drive
                 Swansea, IL 62226
   For the purpose of:   Pursuit of Social Security Disability Benefits
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition:   Fully Favorable Social Security Decision   . If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cathy K. Cleiland</u>                    <u>3/5/04</u>
Signature of Patient or Legal Representative        Date

_____          _____
If Signed by Legal Representative, Relationship to Patient    Signature of Witness



**To: Charles   Eddins , MDd**
**Re: Cathy Cleiland**          SSN: ▓▓▓▓▓▓▓

Please complete the following items based on your clinical evaluation, other testing results, client discussions, and/or medical treatments.  Any item that you do not believe you can answer should be marked *N/A* (not applicable).

1.  Please provide dates of treatment:  **First exam** 12/01/2003 to the **Last exam**.

2.  **Diagnosis:**



3.  Please list your patient's reported **symptoms**.



4.  Please describe the **physical findings** at the most recent examination.



5.  In an 8-hour workday, your patient can (circle full capacity for each activity):
    **Sit**      (number of hours):      less than 1   2   3   4   5   6 or more
    **Stand/walk** (hours):      less than 1   1   2   3   4   5   6 or more

6.  Patient can use hands for repetitive action, such as:
    | **Simple grasping** | **Pushing/pulling** | **Fine manipulation** |
    |---|---|---|
    | R: _ Yes _ No | _ Yes _ No | _ Yes _ No |
    | L: _ Yes _ No | _ Yes _ No | _ Yes _ No |

7.  Patient can use feet for repetitive movements as in operating foot controls:
    | **Right foot** | **Left foot** |
    |---|---|
    | _ Yes _ No | _ Yes _ No |

8.  Patient can lift/carry:

    | | Never | Occasionally | Frequently |
    |---|---|---|---|
    | 0-4 lbs. | _____ | _____ | _____ |
    | 5-9 lbs. | _____ | _____ | _____ |
    | 10-19 lbs. | _____ | _____ | _____ |
    | 20-49 lbs. | _____ | _____ | _____ |
    | 50-100 lbs. | _____ | _____ | _____ |

**ADVANTAGE202**

R20  Page 1

9. Patient is able to:

| | Never | Occasionally | Frequently |
|---|---|---|---|
| Bend | ＿＿＿ | ＿＿＿ | ＿＿＿ |
| Squat | ＿＿＿ | ＿＿＿ | ＿＿＿ |
| Crawl | ＿＿＿ | ＿＿＿ | ＿＿＿ |
| Climb | ＿＿＿ | ＿＿＿ | ＿＿＿ |
| Reach above Shoulder level | ＿＿＿ | ＿＿＿ | ＿＿＿ |

10. Restriction of activities involving:
   a.  Unprotected heights
   _ Total     _ Severe     _ Moderate     _ Mild
   b.  Being around moving machinery
   _ Total     _ Severe     _ Moderate     _ Mild
   c.  Exposure to marked changes in temperature and humidity
   _ Total     _ Severe     _ Moderate     _ Mild
   d.  Driving automotive equipment
   _ Total     _ Severe     _ Moderate     _ Mild
   e.  Exposure to dust, fumes and gases
   _ Total     _ Severe     _ Moderate     _ Mild

11. Please describe any other **work-related restrictions** you have placed on your patient and your basis for doing so.

12. Please estimate, on average, how often your patient is likely to be absent from work **due to complications from his or her impairment or to receive necessary medical treatment.**
   _ Never                          _ Less than once per month
   _ About once per month           _ About twice per month
   _ About three times per month    _ More than three times per month

13. How often is your patient's experience of **fatigue, weakness, or pain** sufficiently severe to interfere with attention and concentration?
   _ Never                _ Seldom
   _ Often                _ Frequently
   _ Constantly

14. Will your patient sometimes need to take **unscheduled breaks** during an 8-hour workday?
   _ Yes    _ No
   If yes, how often do you think this will happen? ＿＿＿＿＿＿＿＿＿＿＿
   How long, on average, will your patient have to rest before returning to work?
   ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿          ＿＿＿＿＿＿＿
**Physician Signature**                              **Date**



*MAY I PLEASE HAVE A CHECK!*

Disabled Claimant          Cathy Cleiland

SSN ████████████

Client Company          CIGNA Group Insurance - Dallas TX FCO
          LOCAL CASE_____

Location          Dallas, TX 75243

Policy or Claim #          ████████████

Dr. Mark N. Hadley

Name: Dr. Mark N. Hadley
Address: University of Alabama at Birmingham
          UAB Station
          Birmingham, AL 35294

AMOUNT REQUESTED  $18.37 Prepayment_____

Records Already Received____yes_____

Requested By: Trudy Wagner For Dan Schulte  Date____Friday, March 26, 2004

Check_____ Date Issued_____

ADVANTAGE204

Advantage 2000 

**Dr. Mark N. Hadley**
DIVISION OF NEUROSURGERY
UNIVERSITY OF ALABAMA AT BIRMINGHAM
UAB STATION
BIRMINGHAM, ALABAMA 35294
Tax ID# 630649108

Patient Name: *Cathy Cleiland*

| | | |
|---|---|---|
| Retrieval Fee | $5.00 | |
| Pages 1-25   $1.00 each | 13.00 | 13 pgs. |
| Pages 26-   $0.50 each | | |
| Postage | $0.37 | |
| Total Amount Due: | $18.37 | |

PS-8786

03.17.04

**ADVANTAGE205**



*MAY I PLEASE HAVE A CHECK!*

Disabled Claimant          Cathy Cleiland

SSN          ████████

Client Company          CIGNA Group Insurance - Dallas TX FCO
     LOCAL CASE_____

Location          Dallas, TX 75243

Policy or Claim #          ████████

Medical Provider: Charles Eddins MD

Name: Smart Document Solutions, LLC
Address: P.O. Box 409740
Atlanta, GA 30384-9740

_____

AMOUNT REQUESTED $43.21 Prepayment_____

Records Already Received_____yes_____

Requested By: Trudy Wagner For Dan Schulte  Date____Friday, April 09, 2004

Check_____ Date Issued_____

ADVANTAGE206

# INVOICE

Smart Document Solutions, LLC
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

Invoice #: 0020623109
Date:      04/06/2004

| Ship to: | Bill to: | Records from: |
|---|---|---|
| DAN SCHULTE<br>ADVANTAGE 2000 CONSULTANTS<br>1 CORPORATE DR<br>SWANSEA, IL 62226 | DAN SCHULTE<br>ADVANTAGE 2000 CONSULTANTS<br>1 CORPORATE DR<br>SWANSEA, IL 62226 | IMC DOCTORS CLINIC<br>1772 SOUTH ALABAMA AVENUE<br>MONROEVILLE, AL 36460 |

Requested By: DAN SCHULTE
Patient Name: CLEILAND CATHY

SSN: 
DOB:

| Description | Quantity | Unit Price | Amount |
|---|---|---|---|
| Basic Fee | | | 0.00 |
| Retrieval Fee | | | 5.00 |
| Per Page Copy (Paper) 1 | 22 | 0.50 | 11.00 |
| Per Page Copy (Paper) 2 | 25 | 1.00 | 25.00 |
| Shipping/Handling | | | 2.21 |
| Subtotal | | | 43.21 |
| Sales Tax | | | 0.00 |
| Invoice Total | | | 43.21 |
| Balance Due | | | 43.21 |

Please remit this amount : $ 43.21

---

Smart Document Solutions, LLC
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

| Invoice #:  0020623109 |
|---|
| Check # _____ |
| Payment Amount $_____ |

# Please return stub with payment.
Please include invoice number on check.
To pay by credit card, please call (770) 754-6000.

ADVANTAGE207



*MAY I PLEASE HAVE A CHECK!*

Disabled Claimant          Cathy A (Cleiland) Key

SSN          █████████

Client Company          CIGNA Group Insurance - Dallas TX FCO
          LOCAL CASE_____

Location          Dallas, TX 75243

Policy or Claim #          █████████

Medical Provider: Center for Pain

Name___Action Corporation (Center for Pain)
Address__P.O. Box 380213
          Birmingham, AL 35238-0213

_____

AMOUNT REQUESTED  $7.37 Prepayment____no_____

Records Already Received___yes_____

Requested By: Trudy Wagner For Dan Schulte  Date____Monday, April 26, 2004

Check_____ Date Issued_____

ADVANTAGE208

Invoice for medical records regarding patient  Cathy Cleiland  *KEY*

# Acton Corporation

APR 2 6 2004

**Invoice Number**
127108

"The Release of Information Specialists"

**Release of Information Charges**

Advantage 2000
One Corporate Drive
Swansea IL 62226

DAN
Atn Dan Schulte

| **Date** | 4/21/2004 |
|---|---|

**Patient's Name**
Cathy Cleiland (KEY)

**Records Requested From:**
Pain Ctr. Montg.

| **Release of Information Charges** | **Price** |
|---|---|
| 2  Alabama Page Cost | $2.00 |
| Alabama Processing Fee | $5.00 |
| $0.37 Postage | $0.37 |
| | $0.00 |
| | $0.00 |
| | $0.00 |

| **Subtotal** |
|---|
| $7.37 |

| **Amount Paid** |
|---|
| $0.00 |

| **AMOUNT DUE** |
|---|
| **$7.37** |

**Comments**

Your balance is due by: **5/21/2004**

All charges are regulated by state law where applicable. A late fee
service charge of 1.5% per month (18% annual rate) will be made
against all total fees not paid on or before the invoice due date.

You may pay your balance of
by calling us with your credit card
information. Please call:

**1-205-678-7227**

**Tax ID Number**
72-1355541

   

---

| **Invoice Number** | **Amount Due** |
|---|---|
| 127108 | $7.37 |

| **Invoice Due Date** |
|---|
| 4/21/2004 |

| **Requestor of Medical Records** |
|---|
| Advantage 2000 |

To ensure that proper payment is applied,
remove this portion and send it with your
payment to:

**Acton Corporation
P.O. Box 380213
Birmingham, AL 35238-0213
1-205-678-7227**

ADVANTAGE209

SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS

Form Approved
OMB No. 0960-0269

## REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE
(Take or mail original and all copies to your local Social Security office,
the Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post)

See Privacy Act
Notice on Reverse

| 1. CLAIMANT Cathy Cleiland | 2. WAGE EARNER, IF DIFFERENT | 3. SOC. SEC. CLAIM NUMBER | 3. SPOUSE's CLAIM NUMBER |
|---|---|---|---|

**5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE.** I disagree with the determination made on my claim because:

I remain disabled and unable to engage in any substantial, gainful activity.

An administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in you case.
You will receive notice of the time and place of a hearing at least 20 days before the date set for a hearing.

| 6. I have additional evidence to submit.  ☐ Yes  ☐ No | 7. Check one of the blocks. |
|---|---|
| Name and address of source of additional evidence: | ☒ I wish to appear at a hearing. |
| | ☐ I do not wish to appear at a hearing and I request that a decision be made based on the evidence in my case. |
| (Please submit it to the Social Security office, The Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post within 10 days. Attach an additional sheet if you need more space.) | (Complete Waiver Form HA-4608). |

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security office will give you a list of legal referral and service organizations. (If you are represented and have not done so previously, complete and submit form SSA-1696 (Appointment of Representative).)
[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

| 8. (CLAIMANT'S SIGNATURE)          (DATE) | 9. (REPRESENTATIVE'S SIGNATURE/NAME)          (DATE) |
|---|---|
| ADDRESS 8 Cherokee Dr.. Núm.27 | (ADDRESS) ☐ ATTORNEY;  ☒ NON ATTORNEY; 1 Corporate Drive |
| CITY          STATE          ZIPCODE Monroeville, AL 36460 | CITY          STATE          ZIPCODE Swansea          Il          62226 |
| TELEPHONE NUMBER (251) 769-3061 | FAX NUMBER | TELEPHONE NUMBER 618-212-1100 | FAX NUMBER 314-894-4981 |

TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION-ACKNOWLEDGEMENT OF REQUEST FOR HEARING

10. Request received for the Social Security Administration on _____ (Date) _____ by _____ (Print Name) _____

_____ (Title) _____ (Address) _____ Servicing FO Code _____ (FO Code) _____

11. Was the request for hearing received within 65 days of the reconsidered determination? ☐ YES  ☐ NO
If not, is checked, attach claimant's explanation for delay, and attach copy of appointment notice, letter, or other pertinent material or information in the Social Security office.

12. Claimant is represented  ☐ Yes  ☐ No
☐ List of legal referral and service organizations provided

13. Interpreter Needed  ☐ YES  ☐ No
Language (including sign language)

14. Check one  ☐ Initial Entitlement Case
☐ Disability Cessation Case
☐ Other Postentitlement Case

16. FO COPY SENT TO _____ HO on _____
☐ CF Attached  ☐ Title II  ☐ Title XVI  ☐ the VIII or
☐ The Title II in FO to establish CAPS ORBIT or
☐ CF requested  ☐ Title II  ☐ Title XVI  ☐ Title VIII
(Copy of teletype or phone report attached)

17. CF COPY SENT TO _____ HO on _____
☐ CF Attached  ☐ Title II  ☐ Title XVI
☐ Other Attached

15. Check all claim types that apply
☐ RSI only          (RSI)
☐ Title II Disability-worker or child only  (DIWC)
☐ Title II Disability-Widow(er) only  (DIWW)
☐ SSI Aged only          (SSIA)
☐ SSI Blind only          (SSIB)
☐ SSI Disability only          (SSID)
☐ SSI Aged/Title II          (SSAC)
☐ SSI Blind/Title II          (SSBC)
☐ SSI Disability/Title II          (SSDC)
☐ HI Entitlement          (HE)
☐ Title VIII Only          (SV8)
☐ Title VIII/Title XVI          (SV8/SSI)
☐ Other - specify

ADVANTAGE210

## PAPERWORK/PRIVACY ACT NOTICE

The Social Security Act (sections 205(a), 702,1631(e)(1)(a) and (b), and 1869(b)(1) and (c), and Public Law 106-169 (Section 809(a)(1) of Sections 251(a) ) as appropriate) authorizes the collection of information on this form. We need the information to continue processing your claim.  You do not have to give it, but if you do not you may not receive benefits under the Social Security Act.  We may give out the information on this form without your written consent if we need to get more information to decide if you are eligible for benefits or if a Federal law requires us to do so.  Specifically, we may provide information to another Federal, State, or local government agency which is deciding your eligibility for a government benefit or program; to the President or a Congressman inquiring on your behalf; to an independent party who need statistical information for a research paper or audit report on a Social Security program; or to the Department of Justice to represent the Federal government in a court suit related to a program administered by the Social Security Administration.  We explain, in the Federal Register, these and other reasons why we may use or give out information about you.  If you would like more information, get int touch with any Social Security office, the Veterans Affairs Regional Office in Manila, or any U.S. Foreign Service post.

We may also use the information you give us when we match records by computer.  Matching programs compare our records with those of other Federal, State, or local government agencies.  Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government.  The law slows us to this even if you do not agree to it.

Explanations about these and other reasons why information about you may be used or given out are available in Social Security offices.  If you want to learn more about this, contact any Social Security office, the Veterans Affairs Regional Office in Manila, or any U.S. Foreign Service post.

**Paperwork Reduction Act Statement** – This information collection meets the requirements of 44 U.S.C. § 3507, as Amended by Section 2 of the *Paperwork Reduction Act of 1995*.  You do not need to answer these questions unless we display a valid Office of Management and Budget control number.  We estimate that it will take about 10 minutes to read the instruction, gather the facts, and answer the questions. **SEND THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE.  The office is listed under the U.S. Government agencies in your telephone directory or you may call Social Security at 1-800-772-1213.**  You may send comments on our time estimate above:  SSA, 1338 Annex Building, Baltimore, MD 21235-0001. *Send only comments relating to our time estimate to this address, not the completed form.*

ADVANTAGE211

INITIAL INTERVIEW

Date _3-3-04_                                    System Updated: _3-3-04_

Claimant _Cathy Cleland_

AOD _5-14-03_    DOB _▆▆▆▆▆_    EDU _16_    C's _0_

_____ DLI _____ _5'4"_ HGT _155_ WGT _0_ DomHd L R

UWA, W/C, Unemployment, WIB, DWIB, Prior Apps:

_____

_____

Employment History: _____

_HR manager    1988 - 2003_

_____

_____

_____    **ADVANTAGE212**

Dx and Symptoms: _____

_clf misses pain meds can't even walk._

| | 11/03 |
|---|---|
| MARK HADLEY, MD | 2/04 |
| University of AL - Birmg | |
| DV of neurosurgery | |
| 205-934-1439 | |

_mobilization_
_titan rods_
_screws + bone_
_graft_

                                          _1996_
Dr. Charles EDDins           _1/04_
1772 ALABAMA Ave
Monrouille, AL 32461
251-575-4825

_maybe_
_have_
_3 good_
_days a_
_week_

_permanent nerve damage in back -_

Mental Impairment: N/A _____

_____

_____

### **Treating Sources**

**Doctor:** _____  Specialty: _____

Frequency: _____ Last Visit: _____  Treated For: _____

**Doctor:** _____  Specialty: _____

Frequency: _____ Last Visit: _____  Treated For: _____

**Doctor:** _____  Specialty: _____

Frequency: _____ Last Visit: _____  Treated For: _____

**Doctor:** _____  Specialty: _____

Frequency: _____ Last Visit: _____  Treated For: _____

**Doctor:** _____  Specialty: _____

Frequency: _____ Last Visit: _____  Treated For: _____

**Hospital:** _____  In Pt  Out Pt

Dates of Visit: _____  Treatment: _____

**Hospital:** _____  In Pt  Out Pt

Dates of Visit: _____  Treatment: _____

**Hospital:** _____  In Pt  Out Pt

Dates of Visit: _____  Treatment: _____

**Hospital:** _____  In Pt  Out Pt

Dates of Visit: _____  Treatment: _____

Other Treatment:  P/T, Braces, Walking Aides, Elastic Stockings: _____

ADVANTAGE213

LEVEL 3 ROUTING SHEET

Claimant _CATHY Cleiland_    SSN ████████████

CASE MANAGER ___Dan S.___

DATE OF DENIAL ___2-12-04___

LEVEL OF DENIAL:    (1)        2

4486 COMPLETED BY (Claims Analyst's Name) _____
4486 NOT COMPLETED ✓

**********************************************************

ASSISTANTS:

Send to claimant for signature:
     SSA-501
     SSA-1696 x 2
     Fee Agreement x 3
     A2K Medical Release Authorization
     Postage paid return envelope

Enter actions:
     Hearing Interview held with Claimant-diary for 7 days
     HA-501 Received from Claimant-diary for 14 days

Route file to appropriate Case Manager (see above)

# *Advantage 2000 Consultants - Medical Development Summary*

| Claimant | SSN | LTD Claim # | DOB | Sex | Alleged Onset | Diagnosis |
|---|---|---|---|---|---|---|
| Cathy Key | ▮ | ▮ | ▮ | F | 5/14/2003 | multi back surgery |

| Type | Practice Name |
|---|---|
| Doctors Office | University of Alabama, Division of Neuro Surgery |

| Provider | Phone | First Seen | Last Seen |
|---|---|---|---|
| Mark Hadley MD | (205) 934-1439 | | |

| Reason For Visit | Type of Treatment |
|---|---|
| exam | exam |

| Record Type | Requested | Received | To SSA |
|---|---|---|---|
| Office, Narrative, FCE | 3/10/2004 | 3/26/2004 | |

**Remark:**
off. notes, neuro and ortho 11/03 to present: 3-26 rec off. notes Dr. won't do Q's sent ck req. to acct.tw

| Type | Practice Name |
|---|---|
| Doctors Office | Charles Eddins, MD |

| Provider | Phone | First Seen | Last Seen |
|---|---|---|---|
| Charles Eddins MD | (251) 575-4825 | | |

| Reason For Visit | Type of Treatment |
|---|---|
| exam | exam |

| Record Type | Requested | Received | To SSA |
|---|---|---|---|
| Office, Narrative, FCE | 3/10/2004 | 4/9/2004 | |

**Remark:**
off. notes and regular 12/03 to present: 4-1 called and spoke to Mary she said notes will go out 4-2 or next wk thay are waiting on some info. tw

| Type | Practice Name |
|---|---|
| Doctors Office | Center for Pain |

| Provider | Phone | First Seen | Last Seen |
|---|---|---|---|
| David Herrick MD | (334) 288-7808 | | |

| Reason For Visit | Type of Treatment |
|---|---|
| exam | exam |

| Record Type | Requested | Received | To SSA |
|---|---|---|---|
| Other | 4/6/2004 | 5/17/2004 | |

**Remark:**
office notes 02/01/04 to present date, ortho pce 4-26 notes rec. no Q's ck req. sent to acct.tw 4-27 called for Q's tw 5-12 called for Q's and want to know which Dr saw claimant tw office called back Dr is out of town and will do Q's when he gets back tw

| Type | Practice Name |
|---|---|
| Doctors Office | Eye Center South |

| Provider | Phone | First Seen | Last Seen |
|---|---|---|---|
| William Bennett M.D. | (334) 793-2211 | | |

Medical Development Summary

**Reason For Visit**
exam

**Type of Treatment**
exam

☐ **Record Type**
Other

Requested
8/31/2004

Received

To SSA

9-30-04 manual

**Remark:**
office notes 06/01/04 to present date, vision pce

9-30-04 They have never seen that. She is listed as a new patient, but has never came in for an appointment. She does not have any future appointments scheduled.

ADVANTAGE216

Medical Requests                    Date: *8-27-04*

Claimant: *Cathy Key (cleiland)*           SSN: ███████████

Doctor:                                     Meds:
*William Bennett, MD*                       Office Notes: *6/04 to present*
*Eye Center South*
*2800 Ross Clark Cir. S.W.*                 Interrog's: *Vision*

*Dothan, AL, 36301*                         Hospital Rec: _____

*334-793-2211*

Doctor:                                     Meds:
_____                             Office Notes: _____

_____                             Interrog's: _____

_____                             Hospital Rec: _____

Doctor:                                     Meds:
_____                             Office Notes: _____

_____                             Interrog's: _____

_____                             Hospital Rec: _____

Doctor:                                     Meds:
_____                             Office Notes: _____

_____                             Interrog's: _____

_____                             Hospital Rec: _____

Doctor:                                     Meds:
_____                             Office Notes: _____

_____                             Interrog's: _____

_____                             Hospital Rec: _____

Thank You!

ADVANTAGE217

_____

_____

Medications/ Side Effects:

Hadley

Neurotin        3200 mg/day

Darvocet      100-650 TAB — 1-2 every 8 hours

Robaxin        750 mg 3x day  Muscle relaxer

effexor    —        Eddins

insulin      **Doctor's Addresses and Phone Numbers**

ADVANTAGE218



*Visit Us Online at www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

"Your Gateway to Social Security"

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>        SSN#: ▓▓▓▓▓        Date of Birth: ▓▓▓▓▓

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:
   <u>William Bennett, M.D.  Eye Center South</u>
   Address: <u>2860 Ross Clart Circle, S.W.</u>
   <u>Dalthan, AL  36301</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: <u>06/01/04  to present date</u>

   ☐ Opinions and statements from my treating physicians about my condition
   ☒ Office notes/consultations/ follow up visits
   ☒ Diagnostic testing reports
   ☒ X-ray and imaging reports
   ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   ☐ Mental Health Visit notes
   ☐ Discharge summary/Operative reports
   ☒ Laboratory results
   ☐ Outpatient records
   ☒ Pathology reports
   ☒ Other <u>Forms</u>

4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:
   **Advantage 2000 Consultants**
   Address:        **One Corporate Drive**
   **Swansea, IL 62226**
   For the purpose of: **Pursuit of Social Security Disability Benefits**
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: **Fully Favorable Social Security Decision** . If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cathy K. Cleiland</u>                <u>08/04/04</u>
Signature of Patient or Legal Representative        Date

_____        _____
If Signed by Legal Representative, Relationship to Patient    Signature of Witness

ADVANTAGE219



*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Tuesday, August 31, 2004

William Bennett, M.D.
Eye Center South
2800 Ross Clark  Circle, S.W.
Dalthan , AL 36301

RE: Cathy A Key
DOB: ███████
SSN: ███████

Dear Dr. Bennett:

Cathy A Key  has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Key received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.**  The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

<u>Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.</u>

**Thank you in advance for your assistance.**  If you have any questions, please  feel free to call me or my assistant at 800-580-5299.

Sincerely,

Dan Schulte
Case Manager

**ADVANTAGE220**

To: William  Bennett , M.D.
Re: Cathy A Key                    SSN: ███████

Please answer the following questions regarding your patient referenced above.

1. Please provide the dates of treatment: **First exam** _____ **Last exam** _____.

2. **Diagnosis:**

3. What is the patient's **best-corrected** visual acuity?
   Right eye _____         Left eye _____

4. Please check those below that apply to your patient:
   a. __ Contraction of visual fields in the better eye to 10 degrees or less from the point of fixation
   b. __ Contraction of visual fields in the better eye so the widest diameter subtends an angle no greater than 20 degrees
   c. __ Contraction of visual fields in the better eye to 20 percent or less visual field efficiency
   d. __ The presence of total bilateral ophthalmoplegia

5. Describe any **work-related restrictions** you have placed on your patient and your basis for making those restrictions.

_____          _____
**Physician Signature**                            **Date**

ADVANTAGE221

# *Advantage 2000 Consultants - Medical Development Summary*

| Claimant | SSN | LTD Claim # | DOB | Sex | Alleged Onset | Diagnosis |
|---|---|---|---|---|---|---|
| Cathy Cleiland | ▓▓▓ | ▓▓▓ | ▓▓▓ | F | 5/14/2003 | multi back surgery |

**Type**
Doctors Office

**Practice Name**
University of Alabama, Division of Neuro Surgery

**Provider**
Mark Hadley MD

**Phone**
(205) 934-1439

**First Seen**      **Last Seen**

**Reason For Visit**
exam

**Type of Treatment**
exam

☐ **Record Type**    **Requested**    **Received**    **To SSA**
Office, Narrative, FCE    3/10/2004    3/26/2004

**Remark:**
off. notes, neuro and ortho 11/03 to present: 3-26 rec off. notes Dr. won't do Q's sent ck req. to acct.tw

---

**Type**
Doctors Office

**Practice Name**
Charles Eddins, MD

**Provider**
Charles Eddins MD

**Phone**
(251) 575-4825

**First Seen**      **Last Seen**

**Reason For Visit**
exam

**Type of Treatment**
exam

☐ **Record Type**    **Requested**    **Received**    **To SSA**
Office, Narrative, FCE    3/10/2004    4/9/04

*5-12- Called Dr. won't do Q's to*
*5-12- called for Q's busy Jw*
*4-9-04 ch req to acct Jw*

**Remark:**
off. notes and regular 12/03 to present: 4-1 called and spoke to Mary she said notes will go out 4-2 or next wk thay are waiting on some info. tw

*4-9-04 notes no Q's Jw*

---

**Type**
Doctors Office

**Practice Name**
Center for Pain

**Provider**
▓▓▓▓▓ Herrick or Knife ▓

**Phone**
(334) 288-7808

**First Seen**      **Last Seen**

**Reason For Visit**
exam

**Type of Treatment**
exam

☐ **Record Type**    **Requested**    **Received**    **To SSA**
Other    4/6/2004    5/20/04

*5-11 Dr. won't do Q's Jw*
*5-12 will send Q's when he gets back in town*
*4-26 notes rec. no Q's Jw*

**Remark:**
office notes 02/01/04 to present date, ortho pce

*5-12 called left msg for Q's not sure which Dr. sent notes Jw*

ADVANTAGE222

*Advantage 2000 Consultants - Medical Development Summary*

| Claimant | SSN | LTD Claim # | DOB | Sex | Alleged Onset | Diagnosis |
|---|---|---|---|---|---|---|
| Cathy Cleiland | | | | F | 5/14/2003 | multi back surgery |

| Type | Practice Name |
|---|---|
| Doctors Office | University of Alabama, Division of Neuro Surgery |

| **Provider** | | **Phone** | **First Seen** | **Last Seen** |
|---|---|---|---|---|
| Mark Hadley MD | | (205) 934-1439 | | |

**Reason For Visit**      **Type of Treatment**
exam      exam

| ☐ Record Type | Requested | Received | To SSA |
|---|---|---|---|
| Office, Narrative, FCE | 3/10/2004 | 3/24/04 | |

**Remark:**
off. notes, neuro and ortho 11/03 to present

*3-26 Ck req send to acd.*
*3-26 notes no Q's Dr. wont do Q's*

| Type | Practice Name |
|---|---|
| Doctors Office | Charles Eddins, MD |

| **Provider** | | **Phone** | **First Seen** | **Last Seen** |
|---|---|---|---|---|
| Charles Eddins MDd | | (251) 575-4825 | | |

*FAX*

**Reason For Visit**      **Type of Treatment**
exam      exam

| ☐ Record Type | Requested | Received | To SSA |
|---|---|---|---|
| Office, Narrative, FCE | 3/10/2004 | 4/2/04 | *notes not Q's* |

**Remark:**
off. notes and regular 12/03 to present

*4-1-04 Called Dr Eddins may said they
are waiting for some info
& will send neg out
tomorrow or early next wk. JW*

*4-27 Called & left msg for Q's JW*

ADVANTAGE223

Medical Requests                    Date: 4-6-04

Claimant: Cathy Cleveland    SSN: ████████████

| Doctor: | Meds: |
| Center for Pain | Office Notes: 2/04 to present |
| 20 55 East South Blvd | Interrog's: Ortho — |
| Suite 812 | Hospital Rec: |
| Montgomery, AL 36116 | 334 - 288 - 7808 |

| Doctor: | Meds: |
| | Office Notes: |
| | Interrog's: |
| | Hospital Rec: |

| Doctor: | Meds: |
| | Office Notes: |
| | Interrog's: |
| | Hospital Rec: |

| Doctor: | Meds: |
| | Office Notes: |
| | Interrog's: |
| | Hospital Rec: |

| Doctor: | Meds: |
| | Office Notes: |
| | Interrog's: |
| | Hospital Rec: |

Thank You!

ADVANTAGE224



*Visit Us Online at www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>      SSN#: ████████      Date of Birth: ████████ .

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:

   <u>Center For Pain</u>
   Address: <u>2055 East South Blvd. , Suite 812</u>
   <u>Montgomery, AL 36116</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: <u>02/07/04 to present date</u>

   ☐ Opinions and statements from my treating physicians about my condition
   ☒ Office notes/consultations/ follow up visits
   ☒ Diagnostic testing reports
   ☒ X-ray and imaging reports
   ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   ☐ Mental Health Visit notes
   ☐ Discharge summary/Operative reports
   ☒ Laboratory results
   ☐ Outpatient records
   ☐ Pathology reports
   ☒ Other <u>Forms</u>

4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:

   <u>Advantage 2000 Consultants</u>
   Address: <u>One Corporate Drive</u>
   <u>Swansea, IL 62226</u>
   For the purpose of: <u>Pursuit of Social Security Disability Benefits</u>
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: <u>Fully Favorable Social Security Decision</u> . If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cathy J. Cleiland</u>                    <u>03/25/04</u>
Signature of Patient or Legal Representative        Date

_____    _____
If Signed by Legal Representative, Relationship to Patient    Signature of Witness

ADVANTAGE225

# THE CENTER FOR PAIN OF MONTGOMERY. P.C.

David Herrick, M.D. _ Brad Katz, M. D.
2055 East South Blvd., Ste. 812
Montgomery, AL 36116

(334) 288-7808 Office
(334) 288-8089 Fax

Date: 5/19/04

To: *Attn Dan Schulte*

Of:

From: *Dr David Herrick*

Fax #:

Pages, including cover sheet:

Comments:

**CELEBREX**
(CELECOXIB CAPSULES)

*I CAN'T RESPOND TO THIS*

The information contained in th... individual or entity named abov... dissemination, distribution, or ... CPR part two). ...se of the ...notified that any ...al regulations (42

**✦BEXTRA**
valdecoxib tablets

ADVANTAGE226

May.19. 2004  3:08PM   CENTER FOR PAIN OF MONT SOUTH                No.8864  P. 2/5



**ADVANTAGE 2000**
**CONSULTANTS INC.**
*"Your Gateway to Social Security"*

Visit Us Online at: www.advantage2k.com

One Corporate Drive  Swansea, IL 62226
Telephone: (800) 580-5299- Fax: (314) 894-4891
Email: advantage2000@advantage2k.com

Tuesday, April 06, 2004

Center for Pain
2055 East South Blvd.
Suite 812
Montgomery, AL 36116

RE: Cathy Cleiland
DOB: ███████
SSN: ███████

Dear Doctor:

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits*.

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.** The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.

**Thank you in advance for your assistance.** If you have any questions, please  feel free to call me or my assistant at 800-580-5299.

Sincerely,

*Dan Schulte / dy*

Dan Schulte
Case Manager

ADVANTAGE227

Acton
4-16-04

May.19. 2004  3:09PM    CENTER FOR PAIN OF MONT SOUTH                    No.8864   P. 3/5


"Your Gateway to Social Security"

Visit Us Online a~ ~.advantage2k.com
One Corporate Drive  Swansea, IL 62226
Telephone: (800) 580-5299- Fax: (314) 894-4891
Email: advantage2000@advantage2k.com

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>          SSN#: ███          Date of Birth: ███

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:
   <u>Center For Pain</u>
   Address: <u>2055 East South Blvd, Suite 812</u>
   <u>Montgomery, AL 36116</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: <u>02/67/04 to present date</u>
   ☐ Opinions and statements from my treating physicians about my condition
   ☒ Office notes/ consultations/ follow up visits
   ☒ Diagnostic testing reports
   ☒ X-ray and imaging reports
   ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   ☐ Mental Health Visit notes
   ☐ Discharge summary/Operative reports
   ☒ Laboratory results
   ☐ Outpatient records
   ☐ Pathology reports
   ☒ Other <u>Forms</u>

4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:
   Advantage 2000 Consultants
   Address: _____One Corporate Drive_____
   _____Swansea, IL 62226_____
   For the purpose of: ___Pursuit of Social Security Disability Benefits___
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition: __Fully Favorable Social Security Decision__. If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cath. R. Cleiland</u>                    <u>03/25/04</u>
Signature of Patient or Legal Representative          Date

_____      _____
If Signed by Legal Representative, Relationship to Patient   Signature of Witness

**ADVANTAGE228**

To:  Center for Pain
Re:  Cathy Cleiland                    SSN: ████████

Please answer the following questions regarding your patient.

1.  Provide dates of treatment, date of first exam_____ and last exam_____.

2.  **Diagnosis:**

3.  Please list pertinent findings at most recent examination, such as, **spasms, reflex changes, muscle weakness, swelling, inflammation, gait disturbance, muscle atrophy,** etc.

4.  Identify all of your patient's **symptoms.**

5.  Is there reduced range of motion?  If yes, describe **affected joint, nature, and degree of limitation.**

6.  List any medications prescribed for patient.

7.  What **other treatment modalities** (physical therapy, surgery, braces, etc.) have you prescribed for your patient?

8.  How often is your patient's experience of pain sufficiently severe to interfere with **attention and concentration?**

9.  Does your patient need a job that permits **shifting positions** at will from sitting, standing or walking?

    If yes, **how often** will he or she need to shift?

10. Will your patient need to take **unscheduled breaks** during a work shift?  If yes, how often will this happen?

    **How long** (on average) will your patient have to rest before returning to work?

11. Please estimate, on average, how often your patient is likely to be **absent from work** due to complications from his or her impairments or to receive necessary medical treatment?  _ Never                          _ less than once per month
    _ about once per month         _ about twice per month
    _ about three times per month  _ more than three times per month

O16  Page 1

ADVANTAGE229

12. List any **work-related restrictions** you have placed on your patient and your basis for making these restrictions.

13. Does your patient have significant and persistent **disorganization of motor function** in two extremities resulting in sustained disturbance or gross and dexterous movement or gait and station? __ Yes __ No

14. Does your patient require the use of hand held assistive devices for ambulation?

Yes _____          No_____

Cane_____        Crutches_____        Walker_____
If yes, how far can the patient safely walk without an assistive device? _____
Why is the assistive device needed?
_ Balance problem          _ Lower extremity weakness
Other: _____

_____          _____
**Physician Signature**                    **Date**

O16  Page 2

ADVANTAGE230

ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Wednesday, March 10, 2004

Charles Eddins, MD
1772 Alabama Avenue
Monroville, AL 36461

RE: Cathy Cleiland
DOB:
SSN:

Dear Dr. Eddins,

Cathy Cleiland has requested that I serve as Representative in a claim/appeal for *Social Security Disability Benefits.*

In order to order to qualify for these benefits, this individual *must* furnish the Social Security Administration with medical records establishing the severity and duration of their impairment. Ms. Cleiland received treatment at your facility and we are updating our file.

**Please provide a copy of the requested information noted on the enclosed HIPPA compliant medical records release authorization.**  The patient has granted Advantage 2000 Consultants access to this evidence in support of the pending claim/appeal.

Time is of the essence in the Social Security claim and your earliest possible response would be most appreciated.

**Thank you in advance for your assistance.**  If you have any questions, please feel free to call me or my assistant at 800-580-5299.

Sincerely,

Dan Schulte
Case Manager

Enc. DS/tw

ADVANTAGE231



*Visit Us Online at:* ~~~advantage2k.com~~
*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299 - Fax:(314) 894-4801*
*Email: advantage2000@advantage2k.com*

*"Your Gateway to Social Security"*

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Patient Name: <u>Cathy Cleiland</u>          SSN: ▓▓▓          Date of Birth: ▓▓▓

1. I authorize the use or disclosure of the above named individual's health information as described below:
2. The following individual or organization is authorized to make the disclosure:
   Address: <u>Charles Eddins, MD</u>
   <u>1772 Alabama Ave</u>
   <u>Monroeville, AL, 36461</u>
3. The type and amount of information to be used or disclosed is as follows for treatment received on
   dates: <u>12/01/03  to the present</u>
   - ☐ Opinions and statements from my treating physicians about my condition
   - ☑ Office notes/consultations/ follow up visits
   - ☑ Diagnostic testing reports
   - ☑ X-ray and imaging reports
   - ☐ Clinic visit notes (including records related to HIV, alcohol and or drug treatment)
   - ☐ Mental Health Visit notes
   - ☐ Discharge summary/Operative reports
   - ☑ Laboratory results
   - ☐ Outpatient records
   - ☐ Pathology reports
   - ☑ Other <u>1 questionaire</u>
4. I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services and treatments for alcohol and drug abuse.
5. This information may be disclosed to and used by the following individual or organization:
   Advantage 2000 Consultants
   Address:          One Corporate Drive
   Swansea, IL 62226
   For the purpose of:    Pursuit of Social Security Disability Benefits
6. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to the information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire on the following date, event or condition:    Fully Favorable Social Security Decision  . If I fail to specify an expiration date, event or condition, this authorization will expire in six months.
7. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assume treatment. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules. If I have any questions about disclosure of my health information, I can contact (HIM director, privacy officer, other officer, other individual's name or contact information).
8. I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above.

<u>Cathy K. Cleiland</u>                    <u>3/5/04</u>
Signature of Patient or Legal Representative          Date

_____          _____
If Signed by Legal Representative, Relationship to Patient    Signature of Witness

ADVANTAGE232

**To: Charles  Eddins , MDd**
**Re: Cathy Cleiland**               SSN: 

Please complete the following items based on your clinical evaluation, other testing results, client discussions, and/or medical treatments.  Any item that you do not believe you can answer should be marked *N/A* (not applicable).

1.  Please provide dates of treatment:  **First exam** 12/01/2003 to the **Last exam**.

2.  **Diagnosis:**

3.  Please list your patient's reported **symptoms**.

4.  Please describe the **physical findings** at the most recent examination.

5.  In an 8-hour workday, your patient can (circle full capacity for each activity):
    **Sit**       (number of hours):     less than 1  1  2  3  4  5  6 or more
    **Stand/walk** (hours):     less than 1  1  2  3  4  5  6 or more

6.  Patient can use hands for repetitive action, such as:

| **Simple grasping** | **Pushing/pulling** | **Fine manipulation** |
|---|---|---|
| R: _ Yes _ No | _ Yes _ No | _ Yes _ No |
| L: _ Yes _ No | _ Yes _ No | _ Yes _ No |

7.  Patient can use feet for repetitive movements as in operating foot controls:

| **Right foot** | **Left foot** |
|---|---|
| _ Yes _ No | _ Yes _ No |

8.  Patient can lift/carry:

| | Never | Occasionally | Frequently |
|---|---|---|---|
| 0-4 lbs. | ____ | ____ | ____ |
| 5-9 lbs. | ____ | ____ | ____ |
| 10-19 lbs. | ____ | ____ | ____ |
| 20-49 lbs. | ____ | ____ | ____ |
| 50-100 lbs. | ____ | ____ | ____ |

ADVANTAGE233

9. Patient is able to:      **Never**        **Occasionally**   **Frequently**
   Bend           _____      _____       _____
   Squat          _____      _____       _____
   Crawl          _____      _____       _____
   Climb          _____      _____       _____
   Reach above    _____      _____       _____
   Shoulder level

10. Restriction of activities involving:
   a.  Unprotected heights
      _ Total    _ Severe    _ Moderate    _ Mild
   b.  Being around moving machinery
      _ Total    _ Severe    _ Moderate    _ Mild
   c.  Exposure to marked changes in temperature and humidity
      _ Total    _ Severe    _ Moderate    _ Mild
   d.  Driving automotive equipment
      _ Total    _ Severe    _ Moderate    _ Mild
   e.  Exposure to dust, fumes and gases
      _ Total    _ Severe    _ Moderate    _ Mild

11. Please describe any other **work-related restrictions** you have placed on your patient and your basis for doing so.



12. Please estimate, on average, how often your patient is likely to be absent from work **due to complications from his or her impairment or to receive necessary medical treatment.**
   _ Never                    _ Less than once per month
   _ About once per month     _ About twice per month
   _ About three times per month    _ More than three times per month

13. How often is your patient's experience of **fatigue, weakness, or pain** sufficiently severe to interfere with attention and concentration?
   _ Never                    _ Seldom
   _ Often                    _ Frequently
   _ Constantly

14. Will your patient sometimes need to take **unscheduled breaks** during an 8-hour workday?
   _ Yes  _ No
   If yes, how often do you think this will happen? _____
   How long, on average, will your patient have to rest before returning to work?
   _____

_____          _____
**Physician Signature**                   **Date**

ADVANTAGE234

# EXHIBIT

# "H"

# PART 3

UNIT:   3

*DISABILITY DETERMINATION SERVICE*
*POST OFFICE BOX 2371*
*MOBILE, ALABAMA 36652-2371*

*Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*                                    *Local Fax Number 436-0599*

November  5, 2003

CLAIM:  120334

TDN:  1733318120

ADVANTAGE 2000
ONE CORPORATE DRIVE                         RE:   CATHY K CLEILAND
ATTN LYNN KIKER                             AKA:
SWANSEA IL 62226
                                                  8 CHEROKEE DRIVE
                                                  NUMBER 27
                                                  MONROEVILLE AL 36460
                                            A/N: ███████████ INT/SSA
                                            DOB: ███████████


ADVANTAGE 2000

The Disability Determination Service (DDS) is responsible for determining
if an individual is disabled or blind under the Social Security Act.  En-
closed is a copy of a letter the DDS recently mailed to this individual.

Sincerely,


Jack  Miller
Disability Specialist, Telephone Ext.


Enclosures
TRD
MS04

ADVANTAGE097

UNIT: 3

**DISABILITY DETERMINATION SERVICE**
POST OFFICE BOX 2371
*MOBILE, ALABAMA 36652-2371*

1733318120

*Toll-Free Number 1-800-292-6743*

*Local Number 433-2820*                    *Local Fax Number 436-0599*

November 5, 2003

CLAIM: 120334

CATHY K CLEILAND
8 CHEROKEE DRIVE                 TDN: 1733318120
NUMBER 27
MONROEVILLE AL 36460             A/N: ██████████ INT/SSA

Dear CATHY K CLEILAND

IMPORTANT INFORMATION ABOUT YOUR DISABILITY CLAIM

Your claim for Social Security Disability or Supplemental Security Income
(SSI) Disability Benefits is being reviewed.  Before your claim can be
processed, some additional information is needed.

Please complete the attached Function Report and return it to me within 10
days from the date of this letter in the attached self-addressed, stamped
envelope.  If you have difficulty completing the form, please ask a friend,
neighbor or relative to help you.  Do the best you can in completing the
form.

IT IS VERY IMPORTANT THAT YOU RETURN THIS FUNCTION REPORT.  YOUR CLAIM
CANNOT BE PROCESSED UNTIL THIS COMPLETED REPORT IS RECEIVED.  PLEASE RETURN
THIS LETTER WITH THE REQUESTED INFORMATION.  A PROMPT RESPONSE TO THIS WILL
HELP US PROCESS YOUR CLAIM FASTER.

Sincerely,

Jack  Miller
Disability Specialist, Telephone Ext.

Enclosure(s): Adult Daily Activities Questionnaire

ADVANTAGE098

CLAF - TRD

DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 2371
MOBILE, ALABAMA 36652-2371



1733318120

Toll-Free Number 1-800-292-6743

*Local Number 433-2820*                                    *Local Fax Number 436-0599*

DISABILITY SPECIALIST: Jack Miller

TDN: 1733318120                                   CATHY K CLELAND
                                                 A/N: ████████INT/SSA

DAILY ACTIVITIES QUESTIONNAIRE

The answers to these questions will help us determine whether your condition is disabling
(or continues to be be disabling) within the meaning of the law.  Please explain your
answers wherever possible by giving descriptions and examples.  If you need more room for
your answers, you may use additional sheets.  Your cooperation is appreciated.

GENERAL INFORMATION

1.  Where do you currently live?

    _____House    _____Apartment    _____Boarding House    _____Nursing Home    _____Other

    If other, please explain.

2.  With whom do you live?

    _____Alone    _____With Family    _____With Friends    _____Board and Care    _____Other

    If other, please explain.

ACTIVITIES OF DAILY LIVING

1.  Please describe what is done on an average day.

2.  A.  Has your illness caused any changes in sleeping habits? _____
        If yes, please explain.

    B.  Do you take medication to sleep? _____  If yes, what type of medication is
        taken, how often is it taken and what doctor prescribed it?

3.  A.  Are you able to care for your personal needs (i.e., bathing, grooming, dressing)
        on a regular basis? _____YES _____NO

    B.  Do you require any assistance with your personal needs?  _____YES _____NO
        If yes, please describe the help received.

                                                        ADVANTAGE099

Form FCL01 (Mar 2001)              Page 1

Disability Determination Service
Daily Activities Questionnaire

CATHY K CLEILAND                                         TDN: 1733318120

4.  Do you prepare and cook meals?  _____YES _____NO
    If no, please explain why not and who prepares your meals.



5.  A.  Do you shop for personal needs? _____  How often? _____

    B.  Does anyone help you with shopping? _____ If so, what type of help
        is needed?


6.  A.  List the household chores you perform (i.e., cleaning, laundry, maintenance,
        ironing, etc.).

    B.  Do you need help in completing these chores? _____ If so, please describe the
        the help needed.



7.  What is done in your spare time?


8.  A.  Are you able to pay attention to the radio or TV programs? _____

    B.  What type of programs do you listen to or watch?


    C.  How long are programs listened to or watched at one time? _____
        Can you remember what is heard or seen? _____

    D.  Do you read? _____  How often? _____

    E.  What kinds of things do you read (i.e., books, magazines, newspapers)?


    F.  What is the length of time you spend reading? _____
        Can you remember what is read? _____


ADVANTAGE100

Form FCL01 (Mar 2001)                   Page 2

Disability Determination Service
Daily Activities Questionnaire

CATHY K CLEILAND                                    TDN: 1733318120


SOCIAL FUNCTIONING

1.  A.  How often do you go out of the home? _____

    B.  When you go out, is it by: _____ Walking _____ Riding the Bus _____ Driving a Car

        _____ Riding with someone else   _____ Other

        Please explain:


    C.  Where do you generally go? _____

    D.  Does anyone go with you to help you? _____   If yes, describe any help received?


2.  Please describe any problems in getting along with other people.  This includes
    family members, friends, neighbors, grocery clerks, landlords, bus drivers, etc.



3.  A.  How often do you visit with family or friends? _____
        What is done during the visits?


    B.  How often do you talk to friends or relatives on the telephone? _____

4.  Do you take care of children, pets, a spouse or parents? _____   If yes, describe
    what is done for them.



5.  A.  List your social activities and describe how you participate in each.


    B.  If you do not socialize, please explain why and describe any difficulties.



6.  Have your social activities changed since your condition began?




                                                        **ADVANTAGE101**

Form FCL01 (Mar 2001)              Page 3

Disability Determination Service
Daily Activities Questionnaire

CATHY K CLEILAND                                    TDN: 1733318120


PERSONAL INFORMATION

1.  Please describe any problems you have concentrating.  How does this affect your
    ability to work or complete tasks?


2.  A.  How long can you perform a task or chore before needing a break? _____

    B.  Do you finish most tasks? _____ If no, please give some examples.


3.  Please describe any problems you have in any of these areas: cooking meals, cleaning,
    shopping, taking public transportation, paying bills, taking care of the house,
    using the telephone.


4.  A.  List the medication(s) you take for your condition(s) and how often you take these.


    B.  Do you usually remember to take your medication or does someone else have to give
        it to you?


5.  Please explain how your condition keeps you from working.


6.  Have you tried to work since becoming ill? _____ If so, what happened?


7.  Have you lost a job as a result of your condition? _____ Please explain.


ADVANTAGE102

Form FCL01 (Mar 2001)                    Page 4

Disability Determination Service
Daily Activities Questionnaire

CATHY K CLEILAND                                          TDN: 1733318120

Is there any additional information about your condition that we should know?_____
Please explain:

Did you require help in completing this form? _____YES _____NO

If YES, who assisted?_____

_____
      NAME                                                      RELATIONSHIP

_____
ADDRESS     NUMBER      STREET      CITY      STATE      ZIP CODE      TELEPHONE NUMBER

_____

_____
YOUR SIGNATURE        (Please sign and return this form within 10 days in      DATE
                       the self-addressed, stamped envelope provided.)

_____
DISABILITY ANALYST'S SIGNATURE (If the information was taken over the phone.)      DATE

_____

Printed by: TRD
Form FCL01 (Mar 2001)              Page 5                    ADVANTAGE103



SOCIAL SECURITY ADMINISTRATION

# STATEMENT OF CLAIMANT OR OTHER PERSON

| NAME OF WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT | SOCIAL SECURITY NUMBER |
|---|---|
| NAME OF PERSON MAKING STATEMENT (if other than above wage earner, self-employed person, or SSI claimant) | RELATIONSHIP TO WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT |

Understanding that this statement is for the use of the Social Security Administration, I hereby certify that: _____

1. Are you or your spouse receiving a Railroad Retirement pension or annuity?    Yes_____    No___✓___

2. Is your spouse covered under the Social Security system of another country?    Yes_____    No___✓___

3. Were you or your spouse a civilian employee of the federal government on 01/01/83 or later?    Yes_____    No___✓___

4. Were you a Japanese Internee?    Yes_____    No_____

5. If you are enrolling in the Medicare Supplementary Medical Insurance Plan, are you eligible for Medicaid insurance?
   Yes_____    No_____

6. What was your rank in the Military service?    _____    N/A

7. If a government pension questionnaire is obtained and you are receiving a pension, please give us your civil service ID:_____
   or, other agency ID:_____

8. If filing for the Lump Sum Death payment, what is the claimant's place of birth? _____

9. Are you an officer of a corporation, or are you related to an officer of a corporation?    Yes_____    No___✓___

ADVANTAGE104



# Advantage 2000 Consultants, Inc. Interoffice Routing Sheet

## CIGNA TEAM

Date: _10/2/03_

NAME _Cathy Cleiland_     SSN ████████████

**ADMINISTRATION**

☐ Richard C. "Pete" Smith
President - Accounting, Systems,
Training, Business Operations

**ACCOUNTING/HR**

☐ Joann Conaway
Award Processing Specialist

☐ Linda Rogers
Accounting/HR, Home Office

☐ Peter Smith
Accounting/HR, Home Office

**CASE MANAGERS**

☐ Toby Lopez

☐ Robert Luetkenhaus

☐ Paul Madison

☐ Ron Morovitz

☐ Rick Salmi

☐ Dan Schulte

**CLAIMS ANALYSTS**

☐ Linda Jurging

☒ Mary Lynn Kniker

☐ Rebecca McColley

☐

☐ Marsha Miller

☐ Lisa Noerper

☐ Katie Shanks

☐ Melissa Smith

☐ Jill Snow

☐ Burt Wikgren

**CLAIMS OPERATIONS**

☐ James Reeves
Director of Claims Operations

☐ Kim Shay
Unit Supervisor

☐ Kevin Miles
Unit Supervisor

**CLAIMS ASSISTANTS**

☐ Mary Adams

☐ Jamie Fonger

☐ Diana Hanson

☐ Judy Herigodt

☐ Peggy Hetley

☐ Elizabeth Williams

☐ Linda Yates

**CUSTOMER SERVICE**

☐ Candace Batton
Customer Service Team Leader

☐ Janelle Caponi
Senior Customer Service Specialist

☐ Tammy Isaak
Senior Customer Service Specialist

☐ Tina Lennens
Customer Service Specialist

☐ Angela Skrabacz
Customer Service Specialist

☐ Tia Mink
Case Coordinator, CIGNA Team

**CASE STATUS**

☒ I/C Needed

☐ I/C Pending

☐ Recon Needed

☐ Recon Pending

☐ Hearing Needed

☐ Hearing Pending

☐ Denial Date _____

ADVANTAGE105

_10-10-03_

SCHEDULED ~~NM~~ ~~Due~~ @ 9:30   LEVEL _1_

Cathy Cleveland
5 med rel.

2002  50,000

STD - May — Nov   100% of pay.

Vac — $1500


juvenile diabetes type I
insulin dependent

Eric Barron      12-5-1975    Clio, AL
Divorce         10 - 1988    Ozark, AL
                4-23-1965
                    unknown
                        none

2003    4½ mo wages — 17,666
        6 mo 180% pay — 26,450
                        44,116

ADVANTAGE106

IRIB Form Confirmation Number for(V)    Page 1 of 1



**Social Security Benefit Application**

## Confirmation Number for CATHY K CLEILAND

**Your Confirmation Number is 42322326.**

In the event that you are unable to complete your online application for any reason, we will save your information for you. After waiting at least five minutes, you will be able to start this application again by selecting "Restart Your Incomplete Application" from the Social Security Claims menu. You will need to enter your Social Security number and Confirmation Number to finish your application. You will also need these numbers to establish a password so that you can continue doing business with us over the Internet in the future. If you lose your Confirmation Number and have not completed your application, you can start a new application and we will give you a new Confirmation Number. Your previous Confirmation Number will be deleted.

**Please print this page** because you will need it to complete your online application or to check the status of your claim.

**Remember to guard your Confirmation Number carefully.** Your Confirmation Number is the key to your application information!

- Don't put it where others can see it.
- Don't store it with other personal information, like your Social Security number.
- Don't give it to anyone else.
- Social Security employees will **NEVER** ask for your Confirmation Number.

**NOTE:** If you are acting as an authorized representative for a client, you must complete and submit Form SSA-1696-U4 before using any information on this page.

After you have completed your claim and sent your information to us over the Internet, an application will be produced which **you** must print, sign and mail or take to the Social Security Administration. We cannot begin processing your claim until we have received the signed paper application.

**If we do not receive your signed application by 04/12/2004, you may lose benefits.**

**If you choose not to finish your Social Security application on the Internet, you should call 1-800-772-1213 toll-free to avoid any loss of benefits.**



Claims Menu | SSA Home Page | Feedback | Office Locator | Navigation

ADVANTAGE107

SOCIAL SECURITY ADMINISTRATION  ☐ TEL   TOE 120/145

Form Approved
OMB No. 0960-0060

(Do not write in this space)

## APPLICATION FOR DISABILITY INSURANCE BENEFITS

I apply for a period of disability and/or all insurance benefits for which I am eligible under title II and part A of title XVIII of the Social Security Act, as presently amended.

### PART I - INFORMATION ABOUT THE DISABLED WORKER

| | | |
|---|---|---|
| 1. | (a) PRINT your name — FIRST NAME, MIDDLE INITIAL, LAST NAME | *Cathy K. Cleiland* |
| | (b) Enter your name at birth if different from item (a) → | *Cathy Anne Key* |
| | (c) Check (X) whether you are → | ☐ Male   ☒ Female |

2. Enter your Social Security Number ▓▓▓▓▓▓▓▓▓▓

3. (a) Enter your date of birth — MONTH, DAY, YEAR ▓▓▓▓▓▓

   (b) Enter name of State or foreign country where you were born. → *Ozark, AL*

If you have already presented, or if you are now presenting, a public or religious record of your birth established before you were age 5, go on to item 4.

(c) Was a public record of your birth made before you were age 5?  ☒ Yes  ☐ No  ☐ Unknown

(d) Was a religious record of your birth made before you were age 5?  ☐ Yes  ☐ No  ☒ Unknown

4. (a) What are the illnesses, injuries, or conditions that limit your ability to work? (Give a brief description.)

*Multiple back surgeries*

(b) Are your illnesses, injuries, or conditions related to your work in any way? →  ☐ Yes  ☒ No

5. (a) When did you become unable to work because of your illnesses, injuries or conditions? — MONTH, DAY, YEAR  *5-14-03*

   (b) Are you still unable to work? —  ☒ Yes  ☐ No

   (c) If you are no longer unable to work because of your illnesses, injuries or conditions, enter the date you became able to work. — MONTH, DAY, YEAR

6. (a) Have you (or has someone on your behalf) ever filed an application for Social Security benefits, a period of disability under Social Security, supplemental security income, or hospital or medical insurance under Medicare? →  ☐ Yes  ☒ No  ☐ Unknown
   (If "Yes," answer (b) and (c).)   (If "No," or "Unknown," go on to item 7.)

   (b) Enter name of person on whose Social Security record you filed other application.

   **ADVANTAGE108**

   (c) Enter Social Security Number of person named in (b).
   If unknown, check this block. ☐   ___ ___ ___ / ___ ___ / ___ ___ ___ ___

7. (a) Were you in the active military or naval service (including Reserve or National Guard active duty or active duty for training) after September 7, 1939 and before 1968? →  ☐ Yes  ☒ No
   (If "Yes," answer (b) and (c).)   (If "No," go on to item 8.)

   (b) Enter dates of service — FROM: (Month, year)   TO: (Month, year)

   (c) Have you *ever* been (or will you be) eligible for a monthly benefit from a military or civilian Federal agency? (include Veterans Administration benefits *only* if you waived military retirement pay) →  ☐ Yes  ☐ No

8. (a) Have you filed (or do you intend to file) for any other public disability benefits? (Include workers' compensation and Black Lung benefits) □ Yes (If "Yes," answer (b).)   ☒ No (If "No," go on to item 9.)

(b) The other public disability benefit(s) you have filed (or intend to file) for is (Check as many as apply):

☐ Veterans Administration Benefits   ☐ Welfare

☐ Supplemental Security Income   ☐ Other (If "Other," complete a Workers' Compensation/Public Disability Benefit Questionnaire)

9. (a) Do you have social security credits (for example, based on work or residence) under another country's Social Security System? (If "Yes," answer (b).) (If "No," go on to item 10.)   □ Yes   ☒ No

(b) List the country(ies): _____

10. (a) Are you entitled to, or do you expect to become entitled to, a pension or annuity based on your work after 1956 not covered by Social Security?   □ Yes (If "Yes," answer (b) and (c).)   ☒ No (If "No," go on to item 11.)

(b) ☐ I became entitled, or expect to become entitled, beginning   MONTH _____ YEAR _____

(c) ☐ I became eligible, or expect to become eligible, beginning   MONTH _____ YEAR _____

I agree to notify the Social Security Administration if I become entitled to a pension or annuity based on my employment after 1956 not covered by Social Security, or if such pension of annuity stops.

11. (a) Did you have wages or self-employment income covered under Social Security in all years from 1978 through last year?   ☒ Yes (If "Yes," skip to item 12.)   □ No (If "No," answer (b).)

(b) List the years from 1978 through last year in which you did not have wages or self-employment income covered under Social Security.

12. Enter below the names and addresses of all the persons, companies, or Government agencies for whom you have worked this year and last year. IF NONE, WRITE "NONE" BELOW AND GO ON TO ITEM 14.

| NAME AND ADDRESS OF EMPLOYER (If you had more than one employer, please list them in order beginning with your last (most recent) employer) | Work Began | | Work Ended (If still working show "Not Ended") | |
|---|---|---|---|---|
| | MONTH | YEAR | MONTH | YEAR |
| Temple Inland 36461 P.O. Box 966, Monroeville, AL | 8 | 1998 | 6 | 2003 |
| | | | | |
| | | | | |

13. May the Social Security Administration or the State agency reviewing your case ask your employers for information needed to process your claim?   ☒ Yes   □ No

14. THIS ITEM MUST BE COMPLETED, EVEN IF YOU WERE AN EMPLOYEE.

(a) Were you self-employed this year and last year? (If "Yes," answer (b).) (If "No," go on to item 15.)   □ Yes   ☒ No

| (b) ☐ Check the year or years in which you were self-employed | In what kind of trade or business were you self-employed? (For example, storekeeper, farmer, physician) | Were your net earnings from your trade or business $400 or more? (Check "Yes" or "No") | |
|---|---|---|---|
| ☐ This year | | | |
| ☐ Last year | | □ Yes | □ No |
| ☐ Year before last | | □ Yes | □ No |

15. (a) How much were your total earnings last year? (Count both wages and self-employment income. If none, write "None.")   Amount $ _____

(b) How much have you earned so far this year? (If none, write "None.")   Amount $ _____

**ADVANTAGE109**

Form SSA-16-F6 (5-2002)   EF (5-2002)   Page 2

(c) Did you receive any money from an employer(s) on or after the date in item 5(a) when you became unable to work because of your illnesses, injuries, or conditions? (If "Yes", give the amounts and explain in "Remarks" on page 4.) ⟶

☐ Yes  ☐ No

Amount $ _____

(d) Do you expect to receive any additional money from an employer such as sick pay, vacation pay, other special pay? (If "Yes," please give amounts and explain in "Remarks" on page 4.) ⟶

☐ Yes  ☐ No

Amount $ _____

## PART II — INFORMATION ABOUT THE DISABLED WORKER AND SPOUSE

16. Have you ever been married? (If "Yes," answer item 17.) (If "No," go on to item 18.) ⟶

☒ Yes  ☐ No

17. (a) Give the following information about your current marriage. If not currently married, show your last marriage below.

**Your current or last marriage**

| To whom married | When (Month, day, year) | Where (Name of City and State) |
|---|---|---|
| Samuel Cleiland | 7-19-1996 | Jackson, AL |

| How marriage ended (If still in effect, write "Not Ended.") | When (Month, day, year) | Where (Name of City and State) |
|---|---|---|
| Divorce | 10-10-2003 | Clark Co, AL |

Marriage performed by:
☒ Clergyman or public official
☐ Other (Explain in Remarks)

Spouse's date of birth (or age): [redacted]

If spouse deceased, give date of death: N/A

Spouse's Social Security Number (If none or unknown, so indicate): [redacted]

(b) Give the following information about each of your previous marriages. (If none, write "NONE.")

**Your previous marriage**

| To whom married | When (Month, day, year) | Where (Name of City and State) |
|---|---|---|
| Terry Floyd | 5-21-1991 | Elba AL |

| How marriage ended | When (Month, day, year) | Where (Name of City and State) |
|---|---|---|
| Divorce | 2- 1992 | Dothan, AL |

Marriage performed by:
☒ Clergyman or public official
☐ Other (Explain in Remarks)

Spouse's date of birth (or age): [redacted]

If spouse deceased, give date of death: N/A

Spouse's Social Security Number (If none or unknown, so indicate): unknown see remarks

*(Use a separate statement for information about any other marriages.)*

18. Have you or your spouse worked in the railroad industry for 5 years or more? ⟶

☐ Yes  ☒ No

## PART III — INFORMATION ABOUT THE DEPENDENTS OF THE DISABLED WORKER

19. If your claim for disability benefits is approved, your children (including natural children, adopted children, and stepchildren) or dependent grandchildren (including stepgrandchildren) may be eligible for benefits based on your earnings record.

List below: FULL NAME OF ALL such children who are now or were in the past 12 months UNMARRIED and:
- UNDER AGE 18
- AGE 18 TO 19 AND ATTENDING SECONDARY SCHOOL
- DISABLED OR HANDICAPPED (age 18 or over and disability began before age 22)

(IF THERE ARE NO SUCH CHILDREN, WRITE "NONE" BELOW AND GO ON TO ITEM 20.)

NO

ADVANTAGE110

20. Do you have a dependent parent who was receiving at least one-half support from you when you became unable to work because of your disability? (If

☐ Yes  ☒ No

## IMPORTANT INFORMATION ABOUT DISABILITY INSURANCE BENEFITS — PLEASE READ CAREFULLY

I. **SUBMITTING MEDICAL EVIDENCE:** I understand that as a claimant for disability benefits, I am responsible for providing medical evidence showing the nature and extent of my disability. I may be asked either to submit the evidence myself or to assist the Social Security Administration in obtaining the evidence. If such evidence is not sufficient to arrive at a determination, I may be requested by the State Disability Determination Service to have an independent examination at the expense of the Social Security Administration.

II. **RELEASE OF INFORMATION:** I authorize any physician, hospital, agency or other organization to disclose to the Social Security Administration, or to the State Agency that may review my claim or continuing disability, any medical record or other information about my disability. I also authorize the Social Security Administration to release medical information from my records, only as necessary to process my claim, as follows:

- Copies of medical information may be provided to a physician or medical institution prior to my appearance for an independent medical examination if an examination is necessary.
- Results of any such independent examination may be provided to my personal physician.
- Information may be furnished to any contractor for transcription, typing, record copying, or other related clerical or administrative service performed for the State Disability Determination Service.
- If I live in a state that has not been phased-in to the Ticket to Work Program, the State Vocational Rehabilitation Agency may review evidence necessary for determining my eligibility for rehabilitative services.

**THIS MUST BE ANSWERED** ➤ 21. DO YOU UNDERSTAND AND AGREE WITH THE AUTHORIZATIONS GIVEN ABOVE?
☒ Yes    ☐ No    (If "No," explain why in "Remarks.")

22. Check if applicable:
☐ I am not submitting evidence of ☐ my ☐ the deceased's earnings that are not yet on ☐ my ☐ his/her earnings record. I understand that these earnings will be included automatically within 24 months, and any increase in benefits will be paid with full retroactivity.

REMARKS (You may use this space for any explanation. If you need more space, attach a separate sheet.)

III. **REPORTING RESPONSIBILITIES:** I agree to promptly notify Social Security if:
- My MEDICAL CONDITION IMPROVES so that I would be able to work, even though I have not yet returned to work.
- I GO TO WORK whether as an employee or a self-employed person.
- I apply for or begin to receive a workers' compensation (including black lung benefits) or another public disability benefit, or the amount that I am receiving changes or stops, or I receive a lump-sum settlement.
- I am confined to jail, prison, a penal institution or correctional facility for conviction of a crime or I am confined to a public institution by court order in connection with a crime.

The above events may affect my eligibility or disability benefits as provided in the Social Security Act, as amended.

I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law by fine, imprisonment or both. I affirm that all information I have given in this document is true.

| SIGNATURE OF APPLICANT | Date (Month, day, year) |
|---|---|
| Signature (First name, middle initial, last name) (Write in ink) | |
| **SIGN HERE** ➤ | Telephone Number(s) at which you may be contacted during the day. (Include the area code) |

| FOR OFFICIAL USE ONLY | Direct Deposit Payment Address (Financial Institution) | | | |
|---|---|---|---|---|
| | Routing Transit Number | C/S | Depositor Account Number | ☐ No Account<br>☐ Direct Deposit Refused |

Applicant's Mailing Address (Number and street, Apt No., P.O. Box, or Rural Route) (Enter Residence Address in "Remarks," if different.)

| City and State | ZIP Code | County (if any) in which you now live |
|---|---|---|
| | | Monroe |

Witnesses are required ONLY if this application has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the applicant must sign below, giving their full addresses. Also, print the applicant's name in Signature block.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street, City, State and ZIP Code) | Address (Number and street, City, State and ZIP Code) |

**ADVANTAGE111**

Form SSA-16-F6 (5-2002)      EF (5-2002)      Page 4

## RECEIPT FOR YOUR CLAIM FOR SOCIAL SECURITY DISABILITY INSURANCE BENEFITS

| PERSON TO CONTACT ABOUT YOUR CLAIM | SSA OFFICE | DATE CLAIM RECEIVED |
|---|---|---|
| | | |

**TELEPHONE NUMBER (INCLUDE AREA CODE)**

Your application for Social Security disability benefits has been received and will be processed as quickly as possible.

You should hear from us within _____ days after you have given us all the information we requested. Some claims may take longer if additional information is needed.

In the meantime, if you change your address, or if there is some other change that may affect your claim, you — or someone for you — should report the change. The changes to be reported are listed below.

Always give us your claim number when writing or telephoning about your claim.

If you have any questions about your claim, we will be glad to help you.

| CLAIMANT | SOCIAL SECURITY CLAIM NUMBER |
|---|---|
| | |

## CHANGES TO BE REPORTED AND HOW TO REPORT
## FAILURE TO REPORT MAY RESULT IN OVERPAYMENTS THAT MUST BE REPAID

► You change your mailing address for checks or residence. To avoid delay in receipt of checks you should ALSO file a regular change of address notice with your post office.

► You go outside the U.S.A. for 30 consecutive days or longer.

► Any beneficiary dies or becomes unable to handle benefits.

► Custody Change—Report if a person for whom you are filing or who is in your care dies, leaves your care or custody, or changes address.

► You are confined to jail, prison, penal institution or correctional facility for conviction of a crime or you are confined to a public institution by court order in connection with a crime.

► You become entitled to a pension or annuity based on your employment after 1956 not covered by Social Security, or if such pension or annuity stops.

► Your stepchild is entitled to benefits on your record and you and the stepchild's parent divorce. Stepchild benefits are not payable beginning with the month after the month the divorce becomes final.

► Change of Marital Status—Marriage, divorce, annulment of marriage.

► You return to work (as an employee or self-employed) regardless of amount of earnings.

► Your condition improves.

► If you apply for or begin to receive workers' compensation (including black lung benefits) or another public disability benefit, or the amount of your present workers' compensation or public disability benefit changes or stops, or you receive a lump-sum settlement.

**HOW TO REPORT**
You can make your reports by telephone, mail, or in person, whichever you prefer.

If you are awarded benefits, and one or more of the above changes occur, the change(s) should be reported by calling:

_____

(Telephone Number—Include Area Code)

ADVANTAGE112

## FOR YOUR INFORMATION

An agency in your State that works with us in administering the Social Security disability program is responsible for making the disability decision on your claim. In some cases, it is necessary for them to get additional information about your condition or to arrange for you to have a medical examination at Government expense.

### Collection and Use of Information From Your Application — Privacy Act Notice/Paperwork Act Notice

The Social Security Administration is authorized to collect the information on this form under sections 202(b), 202(c), 205(a), and 1872 of the Social Security Act, as amended (42 U.S.C. 402(b), 402(c), 405(a), and 1395(ii). While it is VOLUNTARY, except in the circumstances explained below, for you to furnish the information on this form to Social Security, no benefits may be paid unless an application has been received by a Social Security office. Your response is mandatory where the refusal to disclose certain information affecting your right to payment would reflect a fraudulent intent to secure benefits not authorized by the Social Security Act. The information on this form is needed to enable Social Security to determine if you and your dependents are entitled to insurance coverage and/or monthly benefits. Failure to provide all or part of this information could prevent an accurate and timely decision on your claim or your dependent's claim, and could result in the loss of some benefits or insurance coverage.

Although the information you furnish on this form is almost never used for any other purpose than stated in the foregoing, there is a possibility that for the administration of the Social Security programs or for the administration of programs requiring coordination with the Social Security Administration, information may be disclosed to another person or to another governmental agency as follows: 1. to enable a third party or an agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; 2. to comply with Federal laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Veterans Administration); and 3. to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security).

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

Explanations about these and other reasons why information you provide us may be used or given out are available in Social Security offices. If you want to learn more about this, contact any Social Security office.

### PAPERWORK REDUCTION ACT NOTICE AND TIME IT TAKES STATEMENT:

This information collection meets the clearance requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You are not required to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take you about 20 minutes to read the instructions, gather the necessary facts, and answer the questions.

ADVANTAGE113

10. Was a child, either your own or your spouses, living with you while the child was under age 3 in any year after 1950?

Yes ✓    No _____

If yes, did you work in all of those years?    Yes ✓    No _____

11. Do you wish to file for Supplemental Security Income?

Yes _____    No ✓

If no, which of the following reasons apply:

* I (or my spouse) have monthly income of about $ _____.
I understand this is too high for SSI payments in my state.

* I (or my spouse) own resources worth about $ _____
this is more than the SSI limit of $ _____.

* The reason I am not filing for SSI is: _____

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

Explanations about these and other reasons why information you provide us may be used or given out are available in Social Security Offices. If you want to learn more about this, contact any Social Security Office.

The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Paperwork Reduction Act of 1995. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a valid OMB control number.

TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 15 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on this estimate, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235-0001. Send only comments relating to our "time it takes" estimate to the office listed above. All requests for Social Security cards and other claims-related information should be sent to your local Social Security office, whose address is listed under Social Security Administration in the U.S. Government section of your telephone directory.

I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law and/or State law. I affirm that all information I have given in this document is true.

### SIGNATURE OF PERSON MAKING STATEMENT

| Signature (First name, middle initial, last name) (Write in ink) | Date (Month, day, year) |
|---|---|
| SIGN HERE ☞ | Telephone Number (Include Area Code) |

Mailing Address (Number and street, Apt. No., P.O. Box, Rural Route)

| City and State | ZIP Code |
|---|---|

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the individual must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street, City, State, and ZIP Code) | Address (Number and street, City, State, and ZIP Code) |

ADVANTAGE114

*U.S. Government Printing Office: 1998 — 433-335/80302

Form Approved
OMB No. 0960-0045

## SOCIAL SECURITY ADMINISTRATION

## STATEMENT OF CLAIMANT OR OTHER PERSON

| NAME OF WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT | SOCIAL SECURITY NUMBER |
|---|---|
| CATHY CLELLAND | |
| NAME OF PERSON MAKING STATEMENT (if other than above wage earner, self-employed person, or SSI claimant) | RELATIONSHIP TO WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT |

Understanding that this statement is for the use of the Social Security Administration, I hereby certify that— Explanation of 3368, Sect. 2- Supplement

Even though my condition first bothered me on May of 2002, it wasn't until May, 14, 2003 that I could no longer work.

I had earnings from employment, above the SGA amount, until 5-14-2003, the date I became disabled.

ADVANTAGE115

Form SSA-795 (2-76)    (OVER)    Printed on recycled paper

SOCIAL SECURITY ADMINISTRATION

Form Approved
OMB No. 0960-0579

# DISABILITY REPORT
# ADULT

**For SSA Use Only**
Do not write in this box.

Related SSN _____

Number Holder _____

## SECTION 1- INFORMATION ABOUT THE DISABLED PERSON

A. **NAME** *(First, Middle Initial, Last)*

CATHY Cleiland

B. **SOCIAL SECURITY NUMBER**

████████████

C. **DAYTIME TELEPHONE NUMBER** *(If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)*

251 342-5545

Area Code    Number    ☑ Your Number    ☐ Message Number    ☐ None

D. Give the name of a **friend or relative** that we can contact (other than your doctors) **who knows about your illnesses, injuries or conditions** and can help you with your claim.

NAME  Bernice Key    RELATIONSHIP  Mother

ADDRESS  P. O. Box 68
*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

Clio,  AL  36017
City    State    ZIP

DAYTIME PHONE  334 397-4707
Area Code    Number

E. What is your **height** without shoes?  5 feet 4 inches

F. What is your **weight** without shoes?  158 pounds

G. Do you have a **medical assistance card**? (For Example, Medicaid or Medi-Cal)  If "YES," show the **number** here: ☐ YES  ☑ NO

H. Can you **speak English**? ☑ YES ☐ NO    If "NO," what languages can you speak? _____

If you **cannot speak English**, is there someone we may contact who speaks English and will give you messages? *(If this is the same person as in "D" above show "SAME" here.)*

NAME _____    RELATIONSHIP _____

**ADVANTAGE116**

ADDRESS _____
*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

City    State    ZIP    DAYTIME PHONE  Area Code ___  Number ___

I. Can you **read English**? ☑ YES ☐ NO    J. Can you **write more than your name in English**? ☑ YES ☐ NO

Disability Report-Adult-Form SSA-3368-BK



## SECTION 2
## YOUR ILLNESSES, INJURIES OR CONDITIONS AND HOW THEY AFFECT YOU

A. What are the **illnesses, injuries or conditions** that limit your ability to work? _____

_Multiple back surgeries_

B. How do your illnesses, injuries or conditions limit your ability to work? _Constant_
_low back pain. Cannot walk for longer than 30 minutes. Can only stay in_
_one position for 30 minutes without pain. Pain radiates down left leg._
_I drag my left leg. My lower half of my body is very weak._

C. Do your illnesses, injuries or conditions cause you **pain** or other symptoms? ☒ YES ☐ NO

D. When did your illnesses, injuries or conditions **first bother you?**

| Month | Day | Year |
|-------|-----|------|
| 5 | | 2002 |

E. When did you become **unable to work** because of your illnesses, injuries or conditions?

| Month | Day | Year |
|-------|-----|------|
| 5 | 14 | 2003 |

F. Have you **ever worked?** ☒ YES ☐ NO  *(If "NO," go to Section 4.)*

G. Did you **work at any time** after the date your illnesses, injuries or conditions first bothered you? ☒ YES ☐ NO

H. If "YES," did your illnesses, injuries or conditions cause you to: *(check all that apply)*

☐ work fewer hours? *(Explain below)*

☐ change your job duties? *(Explain below)*

☐ make any job-related changes such as your attendance, help needed, or employers? *(Explain below)*

_Even though my disabilities bothered me_
_in May of 2002, it wasn't until May 14, 2003._
_that I could no longer work._

I. Are you **working now?** ☐ YES ☒ NO

If "NO," when did **you stop working?**

| Month | Day | Year |
|-------|-----|------|
| 5 | 14 | 2003 |

J. Why did you **stop working?** _____
_See A + B above_

ADVANTAGE117

## SECTION 4 - INFORMATION ABOUT YOUR MEDICAL RECORDS

A. Have you been seen by a **doctor/hospital/clinic** or anyone else for the illnesses, injuries or conditions that limit your ability to work? ☒ YES   ☐ NO

B. Have you been seen by a **doctor/hospital/clinic** or anyone else for emotional or mental problems that limit your ability to work? ☒ YES   ☐ NO

### If you answered "NO" to both of these questions, go to Section 5.

C. List **other names** you have used on your medical records. _____ no _____

### Tell us who may have medical records or other information about your illnesses, injuries or conditions.

D. List each DOCTOR/HMO/THERAPIST/OTHER. Include your **next appointment**.

1.

PCP

| NAME Dr. Charles Eddins - G.P. | DATES |
|---|---|
| STREET ADDRESS 1772 Alabama Ave | FIRST VISIT 1998 |
| CITY Monroeville  STATE AL  ZIP 36461 | LAST SEEN 8-03 |
| PHONE 251-575-4825   Area Code  Phone Number   CHART/HMO # (If known) | NEXT **APPOINTMENT** |

REASONS FOR VISITS

Monitors condition, Depression

WHAT **TREATMENT** WAS RECEIVED?

Medication

2.

| NAME Dr. John Hackman   Neurosurgery | DATES |
|---|---|
| STREET ADDRESS 1722 Pine | FIRST VISIT 2000 |
| CITY Montgomery  STATE AL  ZIP 36106 | LAST SEEN 9-03 |
| PHONE 334-834-1663   Area Code  Phone Number   CHART/HMO # (If known) | NEXT APPOINTMENT 10-03 |

REASONS FOR VISITS

back injury

ADVANTAGE118

WHAT **TREATMENT** WAS RECEIVED?

performed all back surgeries, medication

## SECTION 4-INFORMATION ABOUT YOUR MEDICAL RECORDS

## DOCTOR/HMO/THERAPIST/OTHER

3.

| NAME | DATES |
|---|---|
| STREET ADDRESS | FIRST VISIT |
| CITY          STATE     ZIP | LAST SEEN |
| PHONE           CHART/HMO # (If known) | NEXT APPOINTMENT |
| *Area Code      Phone Number* | |

REASONS FOR VISITS _____

WHAT TREATMENT WAS RECEIVED? _____

**If you need more space, use Remarks, Section 9.**

E. List each HOSPITAL/CLINIC. Include your next appointment.

1.

| HOSPITAL/CLINIC | TYPE OF VISIT | DATES | |
|---|---|---|---|
| | | DATE IN | DATE OUT |
| NAME Jackson Hosp. | ☒ INPATIENT STAYS (Stayed at least overnight) | 6-2002 | overnight |
| | | 5-21-03 | overnight |
| STREET ADDRESS 1235 Forrest Ave | | 7-16-03 | 7-17-03 |
| | ☒ OUTPATIENT VISITS (Sent home same day) | DATE FIRST VISIT | DATE LAST VISIT |
| CITY Montgomery   STATE AL   ZIP 36106 | | 4-02 | 5-03 |
| PHONE 334 293-8000 | ☒ EMERGENCY ROOM VISITS | DATE OF VISITS | |
| *Area Code     Phone Number* | | 6-03 | |
| | | 8-03 | |

Next appointment _____ Your hospital/clinic number _____

Reasons for visits _____ back pain _____

What treatment did you receive? _____ Surgeries, testing _____

What doctors do you see at this hospital/clinic on a regular basis? _____

Dr. Hackman

ADVANTAGE119

| SECTION 4-INFORMATION ABOUT YOUR MEDICAL RECORDS |
|---|

## HOSPITAL/CLINIC

2.

| HOSPITAL/CLINIC | TYPE OF VISIT | | DATES | |
|---|---|---|---|---|
| NAME | ☐ INPATIENT STAYS *(Stayed at least overnight)* | | DATE IN | DATE OUT |
| STREET ADDRESS | ☐ OUTPATIENT VISITS *(Sent home same day)* | | DATE FIRST VISIT | DATE LAST VISIT |
| CITY STATE ZIP | | | | |
| PHONE _____ _____ Area Code   Phone Number | ☐ EMERGENCY ROOM VISITS | | DATE OF VISITS | |

Next **appointment** _____   Your hospital/clinic **number** _____

**Reasons** for visits _____

_____

What **treatment** did you receive? _____

_____

What **doctors** do you see at this hospital/clinic on a regular basis? _____

_____

**If you need more space, use Remarks, Section 9.**

| F. Does **anyone else have medical records or information** about your illnesses, injuries or conditions (Workers' Compensation, insurance companies, prisons, attorneys, welfare), or are you scheduled to see anyone else? |
|---|

☐ YES *(If "YES," complete information below.)*      ☒ NO

| NAME | DATES |
|---|---|
| STREET ADDRESS | FIRST VISIT |
| CITY STATE ZIP | LAST SEEN |
| PHONE _____ _____ Area Code   Phone Number | NEXT APPOINTMENT |
| CLAIM NUMBER (If any) | |
| REASONS FOR VISITS | |

ADVANTAGE120

**If you need more space, use Remarks, Section 9.**

## SECTION 5 - MEDICATIONS

Do you currently take any **medications** for your illnesses, injuries or conditions? ☒ YES
If "YES," please tell us the following: *(Look at your medicine bottles, if necessary.)* ☐ NO

| NAME OF MEDICINE | IF PRESCRIBED, GIVE NAME OF DOCTOR | REASON FOR MEDICINE | SIDE EFFECTS YOU HAVE |
|---|---|---|---|
| Darvaset 100-650 QID | Dr. Herkman | pain | nervous |
| Neurotin 300mg QID | Dr. Herkman | pain | |
| Flexeril 10mg QID | Dr. Herkman | muscle relaxer | sleepy |
| Effexor XR 75mg 1 a day | Dr. Eddins | depression | |

**If you need more space, use Remarks, Section 9.**

## SECTION 6 - TESTS

Have you had, or will you have, any **medical tests** for illnesses, injuries or conditions?
☒ YES ☐ NO  If "YES," please tell us the following: *(Give approximate dates, if necessary.)*

| KIND OF TEST | WHEN DONE, OR WHEN WILL IT BE DONE? (Month, day, year) | WHERE DONE? (Name of Facility) | WHO SENT YOU FOR THIS TEST? |
|---|---|---|---|
| EKG (HEART TEST) | | | |
| TREADMILL (EXERCISE TEST) | | | |
| CARDIAC CATHETERIZATION | | | |
| BIOPSY--Name of body part | | | |
| HEARING TEST | | | |
| VISION TEST | | | |
| IQ TESTING | | | |
| EEG (BRAIN WAVE TEST) | | | |
| HIV TEST | | | |
| BLOOD TEST (NOT HIV) | | | |
| BREATHING TEST | | | |
| X-RAY--Name of body part | | | ADVANTAGE121 |
| MRI/CT SCAN Name of body part  Back | 4-02  9-03 | Jackson Hosp. | Dr. Herkman |

**If you have had other tests, list them in Remarks, Section 9.**

## SECTION 7-EDUCATION/TRAINING INFORMATION

A. Check the highest grade of **school** completed.

Grade school:                                                                College:

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | GED | | 1 | 2 | 3 | 4 or more |
|---|---|---|---|---|---|---|---|---|---|----|----|----|-----|---|---|---|---|-----------|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☒ |

Approximate **date** completed: ___1988___

B. Did you attend **special education** classes?  ☐ YES  ☒ NO  *(If "NO," go to part C)*

NAME OF SCHOOL _____

ADDRESS _____
        *(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*

_____
*City*              *State*        *Zip*

DATES ATTENDED _____ TO _____

TYPE OF PROGRAM _____

C. Have you completed any type of **special job training, trade or vocational school?**

☐ YES ☒ NO  If "YES," what type?_____

Approximate date completed: _____

## SECTION 8 - VOCATIONAL REHABILITATION, EMPLOYMENT, or OTHER SUPPORT SERVICES INFORMATION

Are you participating in the Ticket Program or another program of vocational rehabilitation services, employment services or other support services to help you go to work?

☐ YES (Complete the information below)  ☒ NO

NAME OF ORGANIZATION _____

NAME OF COUNSELOR _____

ADDRESS _____
        *(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*

_____
*City*              *State*        *Zip*

DAYTIME PHONE NUMBER _____ _____
                     *Area Code*      *Number*

                                                ADVANTAGE122

DATES SEEN _____ TO _____

TYPE OF SERVICES OR
TESTS PERFORMED _____
               *(IQ, vision, physicals, hearing, workshops, etc.)*

| SECTION 9 - REMARKS |
|---|

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**ANYONE MAKING A FALSE STATEMENT OR REPRESENTATION OF A MATERIAL FACT FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW.**

| Signature of claimant or person filing on claimant's behalf *(parent, guardian)* | Date *(Month, day, year)* |
|---|---|
| *Tyrun Kruler for Cathy Cleiland* | 10-13-03 |

Witnesses are required **ONLY** if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| **Address** *(Number and street, city, state, and ZIP code)* | **Address** *(Number and street, city, state, and ZIP code)* |

**ADVANTAGE123**



SOCIAL SECURITY ADMINISTRATION

Form Approved
OMB No. 0960-0578

# WORK HISTORY REPORT

| SECTION 1 - INFORMATION ABOUT THE DISABLED PERSON |
|---|

**A. Name** *(First, Middle Initial, Last)*

*Cathy Cleiland*

**B. SOCIAL SECURITY NUMBER**

**C. DAYTIME TELEPHONE NUMBER** *(If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)*

251-342-5545  ☑ Your Number   ☐ Message Number   ☐ None
<u>Area Code   Phone Number</u>

| SECTION 2 - INFORMATION ABOUT YOUR WORK |
|---|

List the kinds of jobs that you have had in the **last 15 years that you worked.**

| Job Title (Example: Cook) | Type of Business (Example: Restaurant) | Dates Worked (Month & Year) From | To |
|---|---|---|---|
| 1. H R mgr. | general companies | 1988 | 2003 |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | ADVANTAGE124 | |
| 10. | | | |

*Work History Report - Form SSA-3369-BK*

Give us more information about Job No. 1 listed on Page 1. Estimate hours and pay, if you need to.

| JOB TITLE NO. 1 | *HR Mgr.* |
|---|---|

| Rate of Pay | Per *(Check One)* | | | | | Hours per day | Days per week |
|---|---|---|---|---|---|---|---|
| $ *53,000* | ☐ Hour | ☐ Day | ☐ Week | ☐ Month | ☑ Year | *8* | *5* |

Describe this job. What did you do all day? *(If you need more space, write in the "Remarks" section.)*

*Employee relations, Counseling employees, Handle benefits, interpreted union contract. Coordinate charity + community projects. Use a computer, Complete employee evaluations*

In this job, did you:

| | | |
|---|---|---|
| Use machines, tools or equipment? | ☑ YES | ☐ NO |
| Use technical knowledge or skills? | ☑ YES | ☐ NO |
| Do any writing, complete reports, or perform duties like this? | ☑ YES | ☐ NO |

In **this job**, how many total hours each day did you:

| | | | | |
|---|---|---|---|---|
| Walk? | *4* | Kneel? *(Bend legs to rest on knees.)* | *(* |
| Stand? | *4* | Crouch? *(Bend legs & back down & forward.)* | *\\* |
| Sit? | *1* | Crawl? *(Move on hands & knees.)* | *(* |
| Climb? | *1* | Handle, grab or grasp big objects? | *1* |
| Stoop? *(Bend down and forward at waist.)* | *1* | Reach? *1* | |
| | | Write, type or handle small objects? | *(* |

Lifting and Carrying *(Explain what you lifted, how far you carried it, and how often you did this.)*

*no*

Check the **heaviest** weight lifted:

☑ Less than 10 lbs   ☐ 10 lbs   ☐ 20 lbs   ☐ 50 lbs   ☐ 100 lbs. or more   ☐ Other _____

Check weight you **frequently** lifted: *(By frequently, we mean from 1/3 to 2/3 of the workday.)*

☑ Less than 10 lbs   ☐ 10 lbs   ☐ 25 lbs   ☐ 50 lbs. or more   ☐ Other _____

Did you supervise other people in this job?   ☑ YES *(Complete items below.)*   ☐ NO *(Skip to next page.)*

How many people did you supervise? _*2*_

What part of your time was spent supervising people? *25%*                    **ADVANTAGE125**

Did you hire and fire employees?   ☑ YES                    ☐ NO

| SECTION 3 - REMARKS |
|---|

ANYONE MAKING A FALSE STATEMENT OR REPRESENTATION OF A MATERIAL FACT FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW.

| Signature of claimant or person filing on claimant's behalf *(parent, guardian)* | Date *(Month, day, year)* |
|---|---|
| *Lynna Knith for Cathy Clieland* | 10 - 13-03 |

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| | |
| **Address** *(Number and street, city, state, and ZIP code)* | **Address** *(Number and street, city, state, and ZIP code)* |

**ADVANTAGE126**

 **Social Security Benefit Application**

## Summary Information For CATHY K CLEILAND

## Summary of Information Provided

Please review the information below. If you need to make changes, select the **"Fix"** button at the end of the section where you need to make the change. Changes may require additional information to be entered or changed on subsequent pages.

Once you're satisfied that all your information is correct, select the **"Send Now"** button at the bottom of the page to send your information to the Social Security Administration. We will use your information to create an application and then display it on your screen. Finally, we'll tell you what documents we need to see. You can send documents to us with your printed application or bring them to a local office.

### Identification Information

Your Name: **CATHY K CLEILAND** .

Your address:

**8 CHEROKEE DR NUMBER27**

**MONROEVILLE, AL 36460**

Your home phone number is: **(251) 342-5545.**

Your daytime phone number is: **(251) 342-5545.**

The best time to reach you is: **9 AM - 12 Noon.**

Your email address: **MARYLYNN.KNIKER@ADVANTAGE2K.COM.**

Your Social Security number:

Your Date of Birth:

During the past 14 months, you have been unable to work due to illnesses, injuries, or conditions that lasted or are expected to last at least 12 months or could be expected to result in death.

You stopped working due to an illness, injury or condition beginning **05/14/2003.**

| Fix Identification Information |

### Disability Information

The illnesses, injuries or conditions that limit your ability to work are **BACK PAIN MULTIPLE BACK SURGERIES.**

You **are not** blind.                                            ADVANTAGE127

Your disability **is not** related to your work.

You did **not** receive money from an employer on or after the date you became unable to work.

You expect to receive $**1500.00** from an employer in the future representing **vacation pay.**

You do **not** have any parents who received support from you when you became unable to work.

You authorize the release of your medical information.

You have **not** filed for workers' compensation or any similar type benefits.

You do **not** intend to file for workers' compensation or any similar type benefits in the future.

You **do not** intend to file for Supplemental Security Income payments.

You did **not** have a child of yours (or your spouse's) under age 3 living with you during any year with no earnings.

Fix Disability Information

## Other Names Information

Other name(s) you have used:

**CATHY ANNE KEY**

**CATHY K BARRON**

**CATHY K FLOYD**

Fix Name Information

## Personal Information

You are: **Female**

You were born in: **OZARK, AL USA.**

You **have public** records of your birth prior to age 5.

You **do not** know if **religious** records of your birth were made prior to age 5.

Your bank or other financial institution's Routing Transit Number: **000000000.**

Your **Checking** account number is **00000000000000000.**

You prefer to speak **English.**

You prefer to read **English.**

You **do not want** to register a password.

Fix Personal Information

## Additional Information

You are not currently married but have **3** previous marriage(s).

You have no eligible children.

You did not serve in the United States military.

You **have** been or **will** be employed in 2002, 2003, and/or 2004.

You **have not** been or **will not** be self employed in 2002, 2003, and/or 2004.

You **have not** worked for the railroad for 5 years or more.

Your spouse or prior spouse **has not** worked for the railroad for 5 years or more.

You **are not** receiving nor expect to receive a railroad pension or annuity.

Your spouse or prior spouse **is not** receiving **and does not expect** to receive a railroad pension or annuity.

ADVANTAGE128

You **did not work** for the Federal Government in January 1983.

Your spouse or prior spouse **did not work** for the Federal Government in January 1983.

You are not sure about your earnings history as shown on your Social Security Statement or you do not have a Social Security Statement

You **are not** included in another country's social security system.

You **have not** and **will not** file for benefits under another country's social security system.

Your spouse **is not** included in another country's social security system.

You **have not** taken a vow of poverty.

You **have not** previously filed for Social Security benefits.

You **have not** previously filed for Supplemental Security Income benefits.

You **have not** previously filed for Medicare.

Fix Additional Information

## Marriage Information

# Prior Marriage Information

You were previously married on **07/19/1996**.

You were previously married to **SAMUEL CLEILAND**.

Your prior spouse's Social Security number is ▮

**SAMUEL CLEILAND** was born on ▮

You were previously married by **a Clergy or Public Official**.

You were previously married in **JACKSON AL**.

Your marriage ended in **CLARK CO AL**.

Your marriage ended on **10/10/2003**.

Your marriage ended by **Divorce**.

You were previously married on **05/21/1991**.

You were previously married to **TERRY FLOYD**.

Your prior spouse's Social Security number is **Unknown**.

**TERRY FLOYD** was born on ▮

You were previously married by **a Clergy or Public Official**.

You were previously married in **ELBA AL**.

Your marriage ended in **DOTHAR AL**.

Your marriage ended on **02/02/1992**.

Your marriage ended by **Divorce**.

You were previously married on **12/05/1975**.

You were previously married to **ERIC BARRON**.

Your prior spouse's Social Security number is **Unknown**.

**ERIC BARRON** was born on ▮

You were previously married by **a Clergy or Public Official**.

You were previously married in **CLIO AL**.

ADVANTAGE129

Your marriage ended in **OZARK AL**.

Your marriage ended on **10/02/1988**.

Your marriage ended by **Divorce**.

<div align="center">

▓ Fix Marriage Information ▓

</div>

## Work History Information

You **have** given Social Security your permission to contact your employer(s) if necessary.

You **are not** a corporate officer with your employer.

You **are not** related to a corporate officer of your employer.

You **are not** a member of a family corporation or other closely held corporation from which you receive earnings.

You are employed by **TEMPLE INLAND, PO BOX 966, MONROEVILLE, AL 36461**.

Your employment began **08/1998** and continues.

<div align="center">

▓ Fix Work History Information ▓

</div>

## Earnings Information

Your total earnings from work or self-employment in **2002** were **$50000.00**.

Your total earnings from work or self-employment in **2003** are or will be **$44116.00**.

You expect your total earnings from work or self-employment in **2004** to be **$000000.00**.

You **do** want us to include your recent earnings when we compute your Social Security benefits.

Your total earnings **do not** include special payments.

<div align="center">

▓ Fix Earnings Information ▓

</div>

**If you need to discuss a particular question and the response you provided, please enter some information about it in the box below. A Social Security employee will call you to review this when we receive your signed application. Also use this area to provide us with the name of a person who can take a message for you.**

```
I will include a voided check for direct deposit information.
my representative is lynn kniker from advantage 2000 consultants, p.o. box
24157, belleville, il 62223. phone number 800-580-5299 x 128. e-mail
address marylynn.kniker@advantage2k.com. please send her any
correspondence related to my claim.
in the 6 months following my date of onset all monies posted will be short
term disability.
i am not appling for ssi because i receive short term disability over the
limit.
```

ADVANTAGE130

Case 2:07-cv-00486-MEF-SRW     Document 24-7     Filed 02/08/2008     Page 36 of 60

When you select "Send Now," you will send your data electronically to the Social Security
Administration. You will no longer be able to change your data. Please review your
information before selecting "Send Now."

Send Now          Quit

SSA Home Page | Help | Feedback | Home Page

ADVANTAGE131

# *ADVANTAGE 2000 CONSULTANTS, Inc.*

# 1 Corporate Drive
Swansea, Illinois 62226

Telephone 1-800-580-5299
Fax 1-314-845-5250

## FAX COVER

| | |
|---|---|
| **To: Kathy Dover** | **Fax #: 936-829-1537** |
| **From: Lynn Kniker** of Advantage 2000 Consultants | |
| **RE: Cathy Cleiland**    SS#: | |
| **Date: 11-05-2003** | |

Please call if you have any questions or did not receive the number of pages indicated.

Number of Pages (including cover sheet): 4

**Please find included the proof of filing for the Social Security disability claim for Cathy Cleiland.**

**Thanks,**
**Lynn Kniker**
**Claims Analyst**
**Advantage 2000 Consultants, Inc.**

FAX PDA
to
KathyDover
FX# 936-829-1537

ADVANTAGE132





*Visit Us Online at: www.advantage2k.com*

*One Corporate Drive  Swansea, IL 62226*
*Telephone:(800) 580-5299- Fax:(314) 894-4891*
*Email: advantage2000@advantage2k.com*

Wednesday, October 22, 2003

Social Security Administration
4249 N. College Ave.
Jackson, AL 36545

RE:  Cathy Cleiland
SSN ████████

Dear Claims Representative:

Enclosed is an application for disability benefits and related forms on behalf of Cathy Cleiland.
A form SSA-1696 is also enclosed.  I have been appointed as representative for this individual.
Please enter my name and contact information as representative on the appropriate computer
records for this claim.  Note that I am a *non-attorney* representative.

**Please provide a copy of the completed NOT2 screen from your MCS, which annotates
my appointment as representative.**

I hope that you will find the enclosed claim package substantially complete.  As the appointed
representative, it is my goal to make the claim as quick and easy for you to process as possible.
If I omitted or overlooked any evidence, forms, or questions please let me know and I will
complete the additional development as quickly as possible.

I would appreciate receiving originals or copies of any correspondence with regard to this
claim.  If you would please return the claims receipt to me, I will forward it to the applicant.

Thank you for your assistance in this matter.  If you have any questions, please call me at 1-
618-212-1100.

Sincerely,

Mary Lynn Kniker          *Delivered*
Claims Analyst            *10-27-03*
                          *1:37 pm*

91 7108 2133 3930 6516 2596

ADVANTAGE133




*ADVANTAGE 2000 CONSULTANTS INC.*
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*
*One Corporate Drive  Swansea, IL 62226*
*Telephone: (800) 580-5299- Fax: (314) 894-4891*
*Email: advantage2000@advantage2k.com*

Wednesday, October 22, 2003

 Disability Determination Services
P.O. Box 2371
Mobile, AL 36652

RE:  Cathy Cleiland
SSN: ███████

Dear DDS Examiner:

I am the appointed representative for Cathy Cleiland in this disability claim.  I am available to assist you in developing any medical evidence of record or identifying any treating sources for the claimant.  In turn, I would appreciate receiving copies of any correspondence sent to the claimant, including decision notices.  In addition, I would also appreciate receiving consultative examination reports received by DDS.

If you have any questions or incur any problems during your development, please contact me.

Sincerely,

Mary Lynn Kniker
Claims Analyst

ADVANTAGE134



| W-2 Wage and Tax Statement | 2002 (Rev. February 2002) | 7 Social security tips | 1 Wages, tips, other comp. 47940.59 | 2 Federal income tax withheld 3650.79 |
|---|---|---|---|---|
| Employer's name, address, and ZIP code | | 8 Allocated tips | 3 Social security wages 50892.88 | 4 Social security tax withheld 3155.36 |
| MPLE-INLAND FOREST PRODUCTS C | | 9 Advance EIC payment | 5 Medicare wages and tips 50892.88 | 6 Medicare tax withheld 737.95 |
| NROEVILLE 3 SOUTH TEMPLE DRIVE BOLL TX 75941 10206 | | 10 Dependent care benefits | 11 Nonqualified plans | 12a See instructions for box 12 C  456.75 |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

| Employee's name, address, and ZIP code | 13 Statutory employee / Retirement Plan X / Third-party Sick pay | 14 Other | 12b D  2952.29 |
|---|---|---|---|
| 115125300 THY K CLEILAND | | | 12c |
| CHEROKEE DRIVE #27 NROEVILLE AL 36460 | b Employer identification number 75-1462427 | | 12d |
| | d Employee's social ~~security~~ | | |

| ate | Employer's state I.D. no. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | 118215-3 | 47940.59 | 1700.34 | | | |

C For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)     OMB No. 1545-0008     Dept. of the Treasury - IRS
Visit the IRS Web Site at www.irs.gov.

---

**CATHY K CLEILAND**
8 CHEROKEE DR #27
MONROEVILLE, AL 36461

894

61-359/621

Date _____

Pay to the
Order of _____ | $ _____

_____ Dollars

**First United Security** Bank
Executive Office in Thomasville, Alabama          www.firstusbank.com
Thomasville, Alabama 36784

*void*

For _____

⑆062103592⑆ 48 092 61⑈ 0894

ADVANTAGE135

IRIB Form (X)

# Internet Social Security Benefit Application

**You must print this page now, sign the paper application, and bring or mail it to Social Security.** You should also print and keep a second copy for your records. Information about where to bring or mail this application will be provided on the next page. **After you have printed this page, go to the end and select the NextPage button to continue.**

10/10/2003
CATHY K CLEILAND
▮▮▮▮▮▮▮

I apply for all insurance benefits for which I am eligible under Title II [Federal Old Age, Survivors, and Disability Insurance] and Part A of Title XVIII [Health Insurance for the Aged and Disabled] of the Social Security Act as presently amended.

I have used the following name(s).

CATHY ANN KEY              CATHY K BARRON
~~CATHY K FLOYD~~ *Cathy Key Floyd*

My date of birth is ▮▮▮▮▮▮▮
I am a citizen of the United States.

I became unable to work because of my disabling condition on 05/14/2003.

I am still disabled.

No previous application has been filed with the Social Security Administration by or for me.

I have not filed, nor do I intend to file for workers' compensation, public disability or black lung benefits.

I am not currently married.

I was previously married to SAMUEL CLEILAND.
We were married on 07/20/1996 in JACKSON AL by a clergyman or public official.
My prior spouse's birthdate is ▮▮▮▮▮▮ and Social Security number is ▮▮▮▮▮▮
My marriage ended on 10/10/2003 in CLARK CO AL. *unknown*
The reason my marriage ended was Divorce.

I was previously married to TERRY FLOYD.                    ADVANTAGE136
We were married on 05/21/1991 in ELBA AL by a clergyman or public official.
My prior spouse's birthdate is ▮▮▮▮▮▮ and Social Security number is Unknown.

10/10/2003

My marriage ended on 02/02/1992 in DOTHAR AL.

The reason my marriage ended was Divorce.

I was previously married to ERIC BARRON.

We were married on 12/05/1975 in CLIO AL by a clergyman or public official.

My prior spouse's birthdate is ████████ and Social Security number is Unknown.

My marriage ended on 10/02/1988 in OZARK AL.

The reason my marriage ended was Divorce.

I do not have any children under age 18; age 18-19 attending elementary or secondary school full time; or age 18 or over and disabled before age 22 who may be eligible for Social Security benefits. This includes children who may or may not be living with me. Daughter is on SSI Laurie N. Barron DOB ████████

I am not sure if my earnings as shown on my Social Security Statement are correct or I do not have a Social Security Statement.

The Social Security Administration and the State agency reviewing my claim have my permission to contact my employers.

I understand that I must provide medical evidence about my disability, or assist the Social Security Administration in obtaining the evidence.

I understand that I may be requested by the State Disability Determination Service to have a consultative examination at the expense of the Social Security Administration and that if I do not go, my claim may be denied.

I authorize any physician, hospital, agency or other organization to disclose any medical record or information about my disability to the Social Security Administration or to the State Disability Determination Services that may review my claim.

I authorize the Social Security Administration to release any information about me to a physician or medical facility prior to an examination or test. Results of such examination or test may be released to my physician or other treating source.

I authorize that information about my disability may be furnished to any contractor for clerical services by the State Determination Services.

I am not entitled to nor do I expect to become entitled to a pension or annuity based in whole or in part on work after 1956 not covered by Social Security.

## Changes to be Reported and How to Report

If you are awarded benefits, you must tell us if:

- You change your address;
- You go outside the United States for 30 consecutive days or longer;
- Any beneficiary dies or becomes unable to handle benefits;
- The amount you expect to earn this year or next year changes;
- You are confined to a jail, prison, penal institution, or correctional facility for conviction of a crime **or** you are confined to a public institution by court order in connection with a crime;
- You become entitled to a pension or annuity based on your employment that was not covered by Social Security **or** if such a pension or annuity stops;
- A stepchild becomes entitled to benefits on your record and you and the stepchild's parent divorce; and
- You change your marital status.

ADVANTAGE137



If you are awarded spouse's benefits, you must tell us if:

- You begin to receive a U.S. Federal, State or local government pension based on your own employment or your present pension amount changes.

You must also agree to promptly notify the Social Security Administration and to promptly return any benefit check received if the check is for a month in or after the month in which:

- The worker dies (you may be entitled to survivor's benefits);
- You are divorced or your marriage is anulled;
- You marry; and/or
- You no longer have in your care the worker's child or grandchild under age 16 or disabled who is entitled to benefits.

If you filed for disability benefits, you must also tell us if:

- Your medical condition improves so that you would be able to work, even though you have not yet returned to work;
- You go to work, whether as an employee or a self-employed person;
- You apply for or receive a decision on benefits under any workers' compensation or similar type plan (including Black Lung benefits from the Department of Labor).
- I agree to report entitlement to and/or changes in the amount of workers' compensation or other public disability benefits. I understand that such benefits may affect my Social Security payments or result in an overpayment which I may have to pay back.

The above events may affect my eligibility to disability benefits as provided in the Social Security Act, as amended.

## How to Report

You can report by telephone, mail, or in person. If you wish to report by telephone, you may do so by calling 1-800-772-1213.

If you do not report any of these changes and the change causes an overpayment, you may have to pay a penalty in addition to repaying the overpayment.

I have read my reporting responsibilities.

I intend to submit evidence of recent earnings that are not yet on my earnings record so they may be considered when computing my monthly benefit amount. I understand that if I fail to submit this evidence within the next 10 days, it may be up to 24 months before my benefits are automatically recalculated to consider these earnings. However, any increase that may be due will be paid with full retroactivity.

I understand that SSA will use the earnings reported to SSA by my employer(s) and my self-employment tax return [if applicable] as the report of earnings required by law, to adjust benefits under the earnings test. I also understand that it is my responsibility to ensure that the information I give SSA concerning my earnings is correct. I also understand that I must furnish additional information as needed when my benefit adjustment is not correct based on the earnings on my record.

I agree to notify the Social Security Administration if I become entitled to a pension or annuity based on employment after 1956 not covered by Social Security, or if such pension or annuity stops.

I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act

ADVANTAGE138

IRIB Form (X)    Page 4 of 5

OCT 2 0 2003

commits a crime punishable under Federal law by fine, imprisonment or both. I affirm that all information I have given in connection with this claim is true.

My mailing address is     8 CHEROKEE DR NUMBER27
MONROEVILLE, AL 36460

My telephone number is     Home: (251) 342-5545

My Social Security Number is 

Signature:     *Cathy K. Cleiland*

Date:     10-19-2003

Witnesses are required only if this application has been signed by mark (X) above. If signed by (X), two witnesses to the signing who know the applicant must sign below, giving their full addresses.

_____
Signature of Witness

_____
Signature of Witness

_____
Number and Street Address

_____
Number and Street Address

_____
City, State and Zip Code

_____
City, State and Zip Code

I have the following questions about my application and I would like a Social Security employee to phone me to discuss my application once it has been received by Social Security.

ADVANTAGE139

I WILL INCLUDE A VOIDED CHECK FOR DIRECT DEPOSIT INFORMATION. MY REPRESENTATIVE IS LYNN KNIKER FROM ADVANTAGE 2000 CONSULTANTS, P.O. BOX 24157, BELLEVILLE, IL 62223. PHONE NUMBER 800-580-5299 X 128. E-MAIL ADDRESS MARYLYNN.KNIKER@ADVANTAGE2K.COM. PLEASE SEND HER ANY CORRESPONDENCE RELATED TO MY CLAIM. IN THE 6 MONTHS FOLLOWING MY DATE OF ONSET ALL MONIES POSTED WILL BE SHORT

TERM DISABILITY. I AM NOT APPLING FOR SSI BECAUSE I RECEIVE
SHORT TERM DISABILITY OVER THE LIMIT

NextPage

ADVANTAGE140

Social Security Administration
**Supplemental Security Income**
Important Information

NOV 13 2003

SOCIAL SECURITY
4249 N COLLEGE AVE
JACKSON, AL 36545

Date: October 29, 2003
Social Security Number: 

LYNN KNIKER
ADVANTAGE 2000 CONSULT
C/O LYNN KNIKER
P O BOX 24157
BELLEVILLE, IL 62223-9157

IdIuudddddddluudbldbuudbldudddddudIlI

Office Hours: 08:30 AM - 03:30 PM
Telephone Number: (251) 246-6018

On October 29, 2003, we talked with you about CATHY K CLEILAND's
eligibility for Supplemental Security Income (SSI). Based on that talk, we have
made an informal decision that she is not eligible for SSI.

**Why She Is Not Eligible**

We believe she is not eligible for SSI for the reason shown below:

- She has (or she and her spouse have) monthly income of about $2,000.00.
  This is too high for SSI payments in her State. (See the enclosure for
  important information.)

**Why You May Want To File A Claim**

You may want to file a claim for SSI if:

- You want a formal decision about her eligibility, or

- You disagree with our decision, or

- You want to give us more facts about her case.

If you decide to file, you should do so right away. The sooner you file, the sooner
we will make a formal decision about her eligibility. If we decide she is eligible,
she could lose benefits if you file after January 12, 2004.

Enclosure:

ADVANTAGE141

See Next Page

Form SSA-L991(7/94)



Page 2 of 2

## Things to Remember

This informal decision is only about her eligibility for SSI. This decision is not about her eligibility for Social Security benefits or Medicare.

## If You Have Any Questions

If you have any questions, you may call, write or visit any Social Security office. If you call or visit our office, please have this letter with you and ask for any SSI Claims Representative. The telephone number is shown at the top of this letter.

Also, if you plan to visit, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Linda S. McMahon
Deputy Commissioner
for Operations

Form SSA-L991(7/94)

ADVANTAGE142

# Information That May Help You Get SSI

You may be eligible for SSI if one or more of the following apply to you. If you think they might, contact your local Social Security office as soon as possible to file an application for SSI.

## A Plan For Achieving Self-Support (PASS)

A PASS can help you reach a work goal. It lets you set aside money and/or things you own to pay for things you need to reach the goal. For example, you could set aside money to start a business, go to school or get training for a job.

Any person who receives SSI because of a disability or blindness may have a PASS. In addition, a person who has a disability or is blind and does not receive SSI because his or her income or resources are too high may use an approved plan to become eligible for SSI.

Money that is saved under a PASS will not count against your resource limit of $2,000 ($3,000 for a couple) while the plan is in effect--usually up to 36 months. (In certain situations, it can be extended to 48 months.)

We can write a plan for you or you can get someone to help you write one. But we must approve the plan before you can use it.

## Burial Fund

You (and your spouse) can set aside up to $1,500 each to pay for burial expenses. In most cases this money will not count as a resource for SSI.

If you (and your spouse) own life insurance policies or have other burial arrangements in addition to your $1,500 burial funds, some of the money in the burial fund may count toward the resource limit of $2,000 for an individual or $3,000 for a couple.

Interest earned on your burial fund that is left in the fund does not count as a resource for SSI.

## Getting SSI While You Are Trying To Sell Excess Resources

You may be able to receive SSI for some months if you:

- Sign an agreement which allows you to receive SSI while you are trying to sell the property that causes your resources to be over the limit, and

- You agree to repay any SSI you receive while trying to sell the property.

## What If Your Income or Resources Change?

You may become eligible for SSI if your income or resources change. Contact us again if this happens.

Form SSA-L991(7/94)

ADVANTAGE143

**SOCIAL SECURITY ADMINISTRATION**

Refer To:

Cathy A. Key

Office of Hearings and Appeals
550 Government Street
Suite 200
Mobile, AL 36602-2010
Tel: 251-441-5441 / Fax: 251-441-5993

March 16, 2005

Dan Schulte
One Corporate Drive
Swansea, IL 62226

Dear Dan Schulte:

I have requested the Disability Determination Services to schedule a consultative examination for your client. They will advise you later of the time and place of the examination. It will be done at government expense.

Since this examination is necessary for the proper evaluation of your client's claim, it is urged that your client give full cooperation to the arrangements made. If you have any questions, please contact Jeanne N Hobbs at the phone number listed above.

Sincerely yours,

Ricardo M Ryan
Administrative Law Judge

cc: Cathy A. Key
P.O. Box 148
Clio, AL 36017

ADVANTAGE144

UNIT:  1

**DISABILITY DETERMINATION SERVICE**
**POST OFFICE BOX 830300**
**BIRMINGHAM, ALABAMA 35283-0300**

*Birmingham Number 205-989-2100*
*Toll-Free Number 1-800-292-8106*                          *Toll-Free Fax Number 1-800-524-6489*

April 1, 2005

CLAIM: 280228

DAN SCHULTE
ONE CORPORATE DRIVE                     RE: CATHY A KEY
SWANSEA IL 62226                            POST OFFICE BOX 148
                                            CLIO AL 36017

                                        A/N: ▮▮▮▮▮▮▮▮OHA/SSA

Dear DAN SCHULTE

The above-named individual has applied for disability benefits under the
Social Security Act.  Attached is a copy of a letter we recently mailed
to this individual.

Sincerely,


Gerry  Saunders
Disability Specialist, Telephone Ext.  485


SRB
Enclosures
C12                                          ADVANTAGE145

DISABILITY DETERMINATION SERVICE
POST OFFICE BOX 830300
BIRMINGHAM, ALABAMA 35283-0300

Birmingham Number 205-989-2100
Toll-Free Number 1-800-292-8106  April 1, 2005    Toll-Free Fax Number 1-800-524-6489

TDN: 1748295194

CATHY A KEY
POST OFFICE BOX 148
CLIO AL 36017

CLAIM: 280228
VERY IMPORTANT
KEEP APPOINTMENT

A/N: ███████  OHA/SSA

Dear CATHY A KEY

The Social Security Administration sent your disability claim to the Disability Determination
Service (DDS) to make a decision. After reviewing this claim, it has been determined that more
medical evidence about your condition is needed. Therefore, a special medical examination or
test(s) has been scheduled. This examination is for Social Security evaluation purposes only.
The DDS will pay for this examination. If the date for the scheduled appointment is on a
Saturday, this is correct. We do have provider offices that conduct examinations or tests on
Saturdays. Please report to the following medical source:

PLEASE GO TO:
        KEITH G VANDERZYL JR MDPA
        218D HOSPITAL AVENUE          Call the doctor's
        OZARK AL 36360-2072           office if directions
                                      are needed.

        (334) 774-5501  Ext:

DATE: April 12, 2005                              AT:  8:30 AM

At the time of the examination or test(s), it may be determined that other tests are also
needed, or that a scheduled test(s) is not needed or should not be done. Please read the
enclosed leaflet. It explains more about the examination or test(s) and your responsibility
for keeping the appointment. No treatment will be given or medications prescribed.  IF YOU
CANNOT KEEP THE APPOINTMENT, OR IF YOU DO NOT IMMEDIATELY LET THE DDS KNOW WHY YOU CANNOT
KEEP THE APPOINTMENT, A DECISION ON THIS CLAIM WILL BE MADE BASED ON INFORMATION IN THE FILE.
If you have a question or have a problem in getting to the examination or test(s), immediate-
ly call the DDS.  Please complete the top portion of the enclosed response form and return
it to the DDS.  This is to let the DDS know if the scheduled appointment can be kept.

After the examination or test(s) is completed, the DDS will be glad to send a copy of the
report to your doctor if you give your permission. If you want a copy of the report sent to
your doctor sign and return the authorization portion of the enclosed response form.

If you are entitled to reimbursement for travel cost, complete the enclosed travel form and
return it.

If you do not speak English, or do not speak English well, we will provide you with an inter-
preter at no cost to you. Or, you may wish to bring your own interpreter with you such as a
friend or family member. If you want us to provide an interpreter, please tell us ahead of
time.

                    Sincerely,

                                                  ADVANTAGE146
SRB
Enclosures
C02                 Gerry  Saunders
                    Disability Specialist, Telephone Ext.  485



**SOCIAL SECURITY ADMINISTRATION**

Refer To: ████████

Office of Hearings and Appeals
SSA/OHA Hearing Office
550 Government Street
Suite 200
Mobile, AL 36602-2010

Date: MAY 2 6 2005

Cathy A. Key
P.O. Box 148
Clio, AL 36017

<div align="center">

**NOTICE OF DECISION – FULLY FAVORABLE**

</div>

I have made the enclosed decision in your case.  Please read this notice and the decision carefully.

**This Decision is Fully Favorable To You**

Another office will process the decision and send you a letter about your benefits.  Your local Social Security office or another may first ask you for more information.  If you do not hear anything for 60 days, contact your local office.

**The Appeals Council May Review The Decision On Its Own**

The Appeals Council may decide to review my decision even though you do not ask it to do so.  To do that, the Council must mail you a notice about its review within 60 days from the date shown above.  Review at the Council's own motion could make the decision less favorable or unfavorable to you.

**If You Disagree With The Decision**

If you believe my decision is not fully favorable to you, or if you disagree with it for any reason, you may file an appeal with the Appeals Council.

**How to File an Appeal**

To file an appeal you or your representative must request that the Appeals Council review the decision.  You must make the request in writing.  You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office.  You may also mail your request right to the **Appeals Council, Office of Hearings and Appeals, 5107 Leesburg Pike, Falls Church, VA 22041-3255**.  Please put the Social Security number shown above on any appeal you file.

ADVANTAGE147

See Next Page

Cathy A. Key                                        Page 2 of 3

**Time to File an Appeal**

To file an appeal, you must file your request for review **within 60 days** from the date you get this notice.

The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period. The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**Time to Submit New Evidence**

You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review.

**How an Appeal Works**

Our regulations state the rules the Appeals Council applies to decide when and how to review a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J).

If you file an appeal, the Council will consider all of my decision, even the parts with which you agree. The Council may review your case for any reason. It **will** review your case if one of the reasons for review listed in our regulation exists. Section 404.970 of the regulation lists these reasons.

Requesting review places the entire record of your case before the Council. Review can make any part of my decision more or less favorable or unfavorable to you.

On review, the Council may itself consider the issues and decide your case. The Council may also send it back to an Administrative Law Judge for a new decision.

**The Appeals Council May Review The Decision On Its Own**

The Appeals Council may decide to review my decision even though you do not ask it to do so. To do that, the Council must mail you a notice about its review within 60 days from the date shown above. Review at the Council's own motion could make the decision less favorable or unfavorable to you.

**If No Appeal and No Appeals Council Review**

If you do not appeal and the Council does not review my decision on its own motion, you will not have a right to court review. My decision will be a final decision that can be changed only under special rules.

ADVANTAGE148

See Next Page



Cathy A. Key (███████)                                   Page 3 of 3



## Your Right To Representation In An Appeal

You may have a lawyer or other person help you in any appeal you file with the Appeals Council. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with an appeal.

If you get someone to help you with an appeal, you or that person should let the Appeals Council know. If you hire someone, we must approve the fee before he can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past-due insurance benefits to pay towards the fee.

## If You Have Any Questions

If you have any questions, you may call, write or visit any Social Security office. If you visit an office, please bring this notice and decision with you. The telephone number of the local office that serves your area is (251)246-6018. Its address is Social Security, 4249 N College Ave, Jackson, AL 36545.


                                   Ricardo M Ryan
                                   Administrative Law Judge

cc: Dan Schulte
    One Corporate Drive
    Swansea, IL 62226



**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings and Appeals**

### DECISION

<u>**IN THE CASE OF**</u>                                    <u>**CLAIM FOR**</u>

Cathy A. Key                                         Period of Disability and
_____                              Disability Insurance Benefits
(Claimant)                                           _____

_____                              ████████████
(Wage Earner)                                        _____
                                                     (Social Security Number)


## PROCEDURAL HISTORY

On October 10, 2003, the claimant protectively filed an application for a period of disability and Disability Insurance Benefits. This case is before the Administrative Law Judge on a request for a hearing filed by the claimant, who is dissatisfied with the previous determination at the state agency level which found that she was not disabled. Dan Shulte, a non-attorney, represents the claimant in this matter. Prior to the scheduling of a hearing in this matter, the undersigned arranged for a disability evaluation to further ascertain the claimant's capacity to perform work-related activities (Exhibit 28F). Based on same, the undersigned is convinced that a full hearing is not necessary in this matter. Instead, a "wholly favorable" decision may be issued in this matter with respect to all disability issues in dispute based on information already available for review (20 C.F.R. § 404.948(a)). The following discussion will highlight the evidentiary support contained in the record for reaching such a conclusion.


## ISSUES

The issues in this case are whether the claimant is under a disability as defined by the Social Security Act and if so, when the disability commenced, the duration of the disability, and whether the insured requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.


## HOLDING

After a thorough evaluation of the record, the Administrative Law Judge concludes that the claimant has been disabled since her alleged onset date of disability, i.e., May 14, 2003. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

ADVANTAGE150



## LAWS AND REGULATIONS

Section 216(i) of the Social Security Act provides for the establishment of a period of disability, and Section 223 provides for the payment of disability insurance benefits where the requirements specified therein are met.

## EVALUATION OF THE EVIDENCE

The claimant was born on ████████ making her forty-seven (47) years of age. She has a high school education and four years of college education. In her application for benefits, the claimant alleged that she is disabled due to "multiple back surgeries" and "low back pain." The claimant expressed that these conditions limited her ability to work because she can't walk for more than thirty minutes and can only stay in one position for twenty minutes. In addition, the claimant stated that pain radiated down her left leg and the lower half of her body is very weak. The claimant expressed that she stopped working due to her conditions on May 14, 2003.

A claimant is considered disabled under the Social Security Act when she is unable to engage in any substantial gainful activity because of a physical or mental impairment, or combination thereof, which is expected to last for a continuous twelve month period or result in death. The Commissioner has established a five-step sequential evaluation process by which to evaluate the extent of a claimant's impairment(s) in determining whether the statutory definition of "disability" is met.

Briefly, the sequential evaluation process requires consideration of :(1) whether the claimant is engaging in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly affects her ability to work; (3) whether her impairment meets a listing; (4) whether the claimant can return to her past relevant work; and (5) whether, if the claimant cannot perform her past relevant work, she can perform other work (20 CFR section 404.1520).

The first inquiry in the disability evaluation process involves a determination as to whether the claimant has engaged in substantial gainful activity. The undersigned finds that the claimant has not engaged in work activity since her alleged disability onset date of May 14, 2003. Therefore, a determination in the present case cannot be based on work activity alone.

The evidence establishes that the claimant is suffering from a combination of impairments which is more than a slight abnormality and which has more than a minimal effect on her ability to work, irrespective of age, education and work experience. The undersigned finds at step two of the evaluation process that the claimant has the following impairments which are considered to be "severe" under Social Security Regulations: status post C4-5, C5-6, C6-7 anterior cervical fusions, status post L4-5 diskectomy and L4-5 internal fixation, lumbar radiculitis, insulin dependent diabetes, status post right carpel tunnel release and right shoulder bursitis.

 

Cathy A. Key <span style="background:black">█████████</span>                                                   Page 3 of 6

Although the claimant has impairments which are considered to be "severe," as set forth above, they are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments (Appendix 1 to Subpart P, 20 C.F. R. Part 404).

The medical evidence reflects that the claimant has a history of treatment for lumbar spinal instability with radiculopathy (Exhibit 20F)(Exhibit 22F). On November 17, 2003, Mark N. Hadley, M.D., a neurosurgeon, examined the claimant based on a referral from the claimant's treating physician, Dr. John Hackman (Exhibit 21F). Dr. Hadley noted that the claimant had previously had a "good bit of spinal surgery performed" to include three separate anterior cervical procedures, a lumbar spinal surgery in 2002 and a second spinal procedure on July 16, 2003. He noted that the claimant continued to experience intractable pain despite the previous surgeries and moved with precision so as to avoid injury. Dr. Hadley reviewed the claimant's MR studies and opined that she had developed lumbar spinal instability with recurrent nerve root compression. He opined that she should undergo an operative procedure to provide decompression, internal fixation and fusion. Dr. Hadley opined that this procedure would not totally eliminate the claimant's symptoms; rather she would have "an opportunity to benefit" from same. On December 18, 2003, Dr. Hadley performed a L4-5 laminectomy and diskectomy with L4-5 internal fixation and fusion and L4-5 posterior lumbar interbody fusion (Exhibit 22F). Two months post surgery; Dr. Hadley examined the claimant and noted that she continued to experience pain despite surgery and pain medications. He additionally noted that she continued to experience burning sensations and residual left side weakness. He noted his discussion with the claimant that her symptoms were not "positive signs for complete recovery." The record reflects that the claimant participated in pain management therapy at the Center for Pain of Montgomery (Exhibit 26F). On March 29, 2004, treatment records reflected that the claimant presented with complaints of back and leg pain judged to be an eight on a scale of one to ten. Treatment notes reflected that the claimant had been prescribed Robaxin, Lortab and Neurontin medications to alleviate her symptom of pain.

The undersigned finds that a determination in this case cannot be based on medical considerations alone. Therefore, it is necessary to proceed to steps four and five of the sequential evaluation. Steps four and five require a determination of whether the claimant has, during the time at issue, retained the residual functional capacity to perform her past relevant work, and if not, to perform other work existing in significant numbers in the national economy consistent with her age, education and past work experience. In order to make these determinations, it is necessary to assess the claimant's mental and physical residual functional capacity. Residual functional capacity is the most that a claimant can still do despite limitations caused by her impairments.

On April 12, 2005, Keith G. Vanderzyl, M.D., examined the claimant and completed a report to the record (Exhibit 28F). Dr. Vanderzyl noted that the claimant had in the past had numerous

ADVANTAGE152

Cathy A. Key (                                     Page 4 of 6

surgeries to include C5-6 disk fusion, a C6-7 anterior cervical fusion, a C4-5 cervical fusion, a diskectomy at L4-5, and a PLIF surgery. He noted that she had participated in pain management therapy. In addition, he noted that she continued to experience recurrent discomfort, to include, burning dysesthesias, posterior occipital headaches and symptoms of leg and back pain. Dr. Vandrzyl noted that her current medications included Methadone, Robaxin, Neurontin, Klonopin and Effexor. He diagnosed the claimant as follows: status post C4-5, C5-6, C6-7 and anterior cervical fusions with anterior curve leading to now significant degenerative changes at the atlantal axis joint with marked restriction of motion and constant pain and numbness in both arms from probably anterior cord syndrome and known spinal stenosis and status post L4-5 diskectomy times two followed by L4-5 PLIF operation with internal fixation. Dr. Vanderzyl indicated that the claimant's symptoms were not alleviated with "chronic medication." He opined that she was "totally disabled from both her lumbar and cervical problems which will not resolve and will probably worsen with time with significant posterior column deficits leading to a loss of walking stability and bowel and bladder incontinence." Dr. Vanderzyl completed a medical source opinion (physical) and opined that the claimant could stand, walk or sit for a total of thirty minutes at one time. He opined that the claimant could not lift any weight at all. He opined that the claimant could never climb, balance, stoop, kneel, crawl, drive automobile equipment or be exposed to extreme weather conditions.

The Administrative Law Judge finds the claimant's statements regarding her functional limitations and pain credible and consistent with the record when considered in its entirety. The claimant's credibility is bolstered by her excellent work history. Although the issue as to whether a claimant is disabled is one reserved to the Commissioner, the undersigned finds persuasive Vanderzyl's findings regarding the extent to which the claimant's physical impairments and symptoms significantly interfere with her daily activities and her performance of work activity. His opinion regarding the extent to which the claimant's physical impairments preclude her performance of work activity to any appreciable degree is well supported by the record as a whole.

In accordance with Social Security Ruling 96-6p, the Administrative Law Judge considered the administrative findings of fact made by the State agency medical physicians and other consultants. These opinions were weighed as statements from non-examining experts. The undersigned notes that medical records received after their review revealed a worsening of the claimant's condition (Exhibit 28F).

Based on the foregoing and evidence of record, the undersigned finds that the claimant does not retain the residual functional capacity to perform even the minimal exertional or non-exertional demands of any level of work on a regular and sustained basis. The undersigned finds that the combination of the claimant's physical impairments and symptoms precludes her sustained performance of work activity at any exertional level (SSR 83-14)(SSR 96-9).

ADVANTAGE153

Cathy A. Key                                           Page 5 of 6

With the above-stated residual functional capacity, the undersigned finds at step four of the disability evaluation process, that the claimant is incapable of performing her past relevant work as a human resource manager. Since the claimant cannot perform her past relevant work, the burden of proof shifts to the Commissioner to show, at step five of the disability evaluation process, that the claimant can perform other jobs which exist in significant numbers in the national economy given her impairments, residual functional capacity and vocational profile.

The claimant is a younger individual with a high school education and four years of college education. She has past relevant work as a human resource manager; however is no longer able to perform this work. The claimant has a residual functional capacity which has rendered her unable to perform even the minimal exertional and non-exertional demands of work on a regular and sustained basis. The Medical-Vocational Guidelines of the Regulations recognize that an individual's occupational base may become so eroded by exertional and non-exertional limitations that she becomes functionally unable to perform most of the jobs existing in the national economy at the sedentary level of exertion (20 CFR, Part 404, Subpart P, Appendix 2, Section 201.00(h)(3)). Therefore, because the claimant can perform significantly less than a full range of sedentary-type work, and giving great weight to the opinion of Dr. Vanderzyl; the Administrative Law Judge concludes, at step five of the disability evaluation process, that other jobs which the claimant is capable of performing do not exist in significant numbers in the national economy.

Accordingly, the Administrative Law Judge finds that the claimant has been disabled since her alleged disability onset date of May 14, 2003.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1.      The claimant has not engaged in any substantial gainful activity since her alleged disability onset date of May 14, 2003.

2.      The claimant's impairments which are considered to be "severe" under the Social Security Act are as follows: status post C4-5, C5-6, C6-7 anterior cervical fusions, status post L4-5 diskectomy and L4-5 internal fixation, lumbar radiculitis, insulin dependent diabetes, status post right carpel tunnel release and right shoulder bursitis.

3.      The claimant's impairments do not, singly or in combination, meet or equal in severity the appropriate medical findings contained in 20 CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).

ADVANTAGE154

Cathy A. Key ██████████                                          Page 6 of 6

4.   The claimant's allegations of functional limitations and pain are considered credible.

5.   The claimant retains the residual functional capacity to perform no work on a regular and continuing basis.

6.   The claimant is unable to perform her past relevant work as a human resource manager.

7.   The claimant was forty-five(45) years old (a younger individual) on the date her disability began.  The claimant is currently forty-seven (47) (a younger individual age 18-49). The claimant has a high school education and four years of college education.

8.   Based upon the claimant's residual functional capacity, and vocational factors, there are no jobs existing in significant numbers which she can perform. The combination and severity of the claimant's physical impairments, as well as symptom of pain, has reduced her functional capacity to a point where no work exists in significant numbers in the national economy which she can perform on a regular and sustained basis at acceptable levels of performance. (Social Security Rulings 83-14 and 96-9p).

9.   The claimant met the disability insured status requirements of the Social Security Act on the date her disability began, and through December of 2008.

10.  The claimant has been under a disability as defined by the Social Security Act and Regulations since her alleged disability onset date of May 14, 2003.

## DECISION

Based on the Title II application filed on October 10, 2003, the claimant is entitled to a period of disability commencing May 14, 2003 and to disability insurance benefits pursuant to Sections 216(i) and 223 of the Social Security Act, as amended.  The claimant's disability has continued at least through the date of this decision.

Ricardo M Ryan
Administrative Law Judge
MAY 2 6 2005
Date

ADVANTAGE155

# EXHIBIT

## "H"

# PART 5

# *ADVANTAGE 2000 CONSULTANTS, Inc.*

P.O. Box 24157
Belleville, IL 62223

Fax: 314-894-4891
Phone: 800-580-5299

## F A X   C O V E R

| To: Judge Ryan | FAX: 251-441-5993 |
|---|---|
| From: Trudy Wagner of Advantage 2000 Consultants | |
| RE: OTR Request | Re: Cathy A. Key |
| Date: ███████ | SS# ███████ |

## Attn. Master Docket Clerk,

Here is a copy of the OTR Brief that was sent on May 24, 2004.

Thank you,

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

Please call if you have any questions or did not receive the number of pages indicated.

**Number of Pages (15)**

ADVANTAGE235



Visit Us Online at: www.advantage2k.com

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299 - Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

Monday, May 24, 2004

Master Docket Clerk
 Office of Hearings and Appeals
550 Government Street
Suite 200
Mobile, AL 36602

RE: Cathy A Key
SSN: 

Dear Master Docket Clerk:

I represent Cathy A Key, SSN: █████████, of Monroeville, AL 36460, in appeal of a
Reconsideration denial of entitlement to Title II Disability Benefits. My Appointment of
Representative, Form SSA-1696, was forwarded to you with the Request for Hearing on
3/9/2004.

Subsequently, I have received medical evidence with respect to Ms. Key which I believe
supports a finding of disabled for this claimant. I am enclosing that medical evidence for your
consideration.

Enclosed, please find records from Mark Hadley, MD dated 11/03-12/04, and records from
The Center for Pain dated 3/29/04.

Ms. Key is a younger individual. She has a college education. She was employed from 1988 to
5/2003 as a Human Resource Manager. She has not been able to return to this work, or any
work since her onset date of 5/14/03.

Ms. Key has significant back problems. She has had three separate anterior cervical procedures
over time. She was involved in a motor vehicle accident in 4/02 and ultimately had lumbar
spinal surgery at L4-5 in 5/03. She had a second procedure in 7/03 for a recurrent disc. She had
reported to her doctor that she is doing no better. She had important back pain that is different
form her pre-surgery pain. She has ongoing left lower extremity pain and she has developed a
severe burning dysesthesia in the bottom of her foot that radiates up to her knee. She walks
with a limp, and the more she walks, the more she limps. She has problems with her range of
motion; this is felt to be mechanical. It is believed that she has developed failure of the facet
complex on the left and then subluxation and collapse, which is causing further canal
compromise.

The chronic and debilitating nature of Ms. Key's continued back pain is consistent with the
severity of the criteria in Listing 1.04A, and disability under this listing should be considered.

ADVANTAGE236



ADVANTAGE 2000
CONSULTANTS INC.
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*

One Corporate Drive  Swansea, IL 62226
Telephone:(800) 580-5299- Fax:(314) 894-4891
Email: advantage2000@advantage2k.com

In the alternative, the limitations posed by her continued impairments would limit her ability to perform even a full range of sedentary work. These limits are consistent with the medical evidence and other evidence in file.

Therefore, based on the preceding, a finding of disabled is warranted in accordance with Social Security Ruling 96-9P and using vocational rule 201.00(h) as a guideline.

If I can be of additional assistance in development of this case for Hearing, please feel free to contact me or a member of our staff. I appreciate the time spent in your consideration of the enclosed documentation.

Sincerely,

Dan Schulte
Case Manager

ADVANTAGE237

# the
# CENTER for PAIN
### of Montgomery
### DAVID HERRICK, MD     ■     BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: **334-288-7808**

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: **334-387-7246**

Patient Name: _Cathy K. Cleiland_          Date: _3-29-04_

1.  Are you: ☐ Better?     ☐ Worse?     ☑ Same?

2.  Since your last visit, have you been to the Emergency Room?     ☑ YES     ☐ NO
    (If Yes, please explain) _UAB_

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?     ☑ YES     ☐ NO
    (If Yes, please explain) _Dr Mark Hadley ; UAB ; 12/16/03 ; C-4, C5 Lumbar laminectomy for decompression; C4-C5 diskectomy bilateral ; with C4-C5 posterior lumbar fusion; internal fixation, C4-C5 bilateral, Bone dorsolateral fusion C4, C5 bilateral_

4.  Since your last visit, have you had any X-rays?     ☐ YES     ☐ NO
    (If Yes, what kind and where were they done)_____

5.  Since your last visit, have you had any medication changes? ☑ YES     ☐ NO
    (Please list all medications) _Insulin N 35 R 15 x2 ; Effexor 75 mg; Neurontin 800 x4 ; Lortab 7.5 x 6  Daily  Robaxin 750 mg x3_

6.  Do you have any allergies? ☐ YES     ☑ NO
    (If Yes, Please list all your allergies) _Not that I am aware of_

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _____

ADVANTAGE238

---

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW



0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0  1  2  3  4  5  6  7  ⑧  9  10
No                Moderate          Worst
Pain               Pain              Pain

RIGHT          LEFT       LEFT          RIGHT

④

**The**
# Center for Pain
*of* M O N T G O M E R Y, P.C.
DAVID HERRICK, MD • BRAD KATZ, MD

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient _Cathy Cleiland_    Age _46_    Date _3/29/04_
Superbill# _____    Allergies _Ø_

Chief Complaint _(lst) seen 8/27/03_

History of Present Illness _had surgery 12-16-03 (Hadley)_
_All notes faxed_

**MEDS**
_Neurontin_
_Zeloxa_
_Lortab_
_Ambien_

Location _back + leg pain (Left)_
Timing
Other
PSH
PMH
FH/SOC Hx
ROS  #

**Exam**
GEN  #  _A&O x 3_  #3
HEENT
PUL
CARDIAC
ABD  _NT/ND_
EXT  _No CCE_
Spine
Neuro  _normal_
Extremities/Spine
X-ray/Labs

Diagnosis: _FBSS_

Plan:  _cont R/B/R of drugs opioids_
_Dur oxycon 30 po qd_

 **SCHOOL OF MEDICINE**

Department of Surgery
Division of Neurosurgery

November 17, 2003

Dr. John Hackman
1722 Pine Street, Suite 1001
Montgomery, Alabama 36106

Re: CATHY CLEILAND
    UAB #: 000000698678

Dear John:

I saw your patient, Cathy Cleiland, in the Neurosurgery Clinic today. She is a pleasant woman of 46 years and has had a good bit of spinal surgery performed. She has had three separate anterior cervical procedures accomplished over time. She was in a motor vehicle accident in April 2002 and ultimately had lumbar spinal surgery, left-sided L4-5 discectomy, in May 2003. She says she did not have much improvement from this, or at least any lasting improvement. It has become increasingly troublesome to her. She ultimately sought re-evaluation and a second procedure in July 16, 2003 for recurrent disc. She unfortunately states that she is no better. She has developed important back pain, which is different than what she has experienced previously. The left lower extremity pain and dysfunction remains but she now has severe burning dysesthesia in the bottom of the foot, which radiates up to the knee. She also is developing right lower extremity complaints. You have discussed with her the options of additional therapy and she would like my thoughts regarding her circumstance.

Of importance with this woman is that she is a bit overweight for her frame. She is 171 pounds on a 5 foot 4 inch frame. She has juvenile diabetes and has been treated for same for 25 years. She is utilizing Neurontin, Darvocet, Lortab and Flexeril in treatment of her pain syndrome but is really not much better. She has not had much in the way of physical therapy of late. She tried this after her first operation.

She describes mechanical type pain, sharp, stabbing, lancinating pain with motion. She cannot always anticipate which motion is going to give her the trouble. Rolling over in bed, for example, sometimes causes a sharp, stabbing pain that then radiates down her left leg. At other times she can stand and walk and get around reasonably well with just an underlying, severe low backache but will have superimposed sharp, stabbing pains that literally take her breath away. Her pain tends to follow the L5 distribution and also S1 on this left side. She is developing some right-sided complaints as well. She walks with a

The University of Alabama at Birmingham
1030 Faculty Office Tower ● 510 20th Street South
Birmingham, Alabama 35294-3410
(205) 934-7170● FAX (205) 934-6507

ADVANTAGE240

limp and the more she walks, the more she limps. She walks in a flexed position too, very careful with the positioning of her spine and her step. She really tries to avoid any jarring. She cannot keep shoes on her feet more than two to three hours because of the burning dysesthesias, particularly on the left but the right as well.

As we examine her, she does have pain that appears mechanical. She has a real tough time with flexion, extension, laterally bending or rotation of the lumbar spine. This tends to cause focal back pain, sometimes sharp with laincination down the left leg. She appears to be weak in the extensor hallucis longis and anterior tibialis on that left side compared to the right. She indeed has burning dysesthesias in the L5 and S1 distribution on the left. She has reduced ankle response on the left.

I reviewed films on Cathy from prior to her original surgery to her most recent three sets of MR studies with two different sets of plain spine films. She has what appears to be collapse and degeneration despite attempted discectomy times two. I think she has developed failure of the facet complex on this left side and then subluxation and collapse, which is causing further canal compromise. There is a good bit of scar in around the previous operative site. I do not see specific disc material, which has re-herniated, but significant collapse with narrowing and angulation with a grade I spondylosis.

I think Cathy Cleiland has developed lumbar spinal instability with recurrent nerve root compression. I think some of her components, particularly the burning dysesthesias in the left lower extremity, are probably the result of nerve root injury from her pathology and its attempted treatment. I do think her mechanical instability and ongoing neuro compression can be improved with an operative procedure to provide decompression, internal fixation and fusion with the hope to restore her normal lumbar lordosis and interspace height. While I do not think she will have alleviation of her severe burning dysesthesias in her left lower extremity, she does have a very good opportunity to benefit from the above-mentioned procedure. Cathy would like to proceed. We have tentatively selected the date of December 9 as an operative date. We will complete the history, physical and preoperative counseling today. I will keep you posted on our progress. Thank you for asking me to provide an opinion on this pleasant woman.

Sincerely,

Mark N. Hadley, M.D.
Professor of Neurosurgery

MNH/hr

DSCjob#1117-507

ADVANTAGE241

Page 1

 The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

## Operation Note

*NAME:* CLEILAND, CATHY    *MED. REC. NO.:* 000000698678    *ROOM:*

*SURG:* Mark N. Hadley, M.D.                *ASSIST:* Ajay K. Ananda, M.D.

*SURG#:* 2823

*SURG.SIGN:* Electronically Signed by Mark N. Hadley, M.D. on 12/19/2003

*DATE OPER.:* 12/16/2003    *ADMITTED:*    *DISCHARGED:*

*SERVICE:* Mark N. Hadley, M.D.    *DICTATED:* 12/16/03    *TRANSCRIBED:* 12/16/03

*DOCTOR/SERV. SIGN:* _____


PREOPERATIVE DIAGNOSIS:  Lumbar spinal instability, with L5 radiculopathy, left greater than right.

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURES PERFORMED:    1.  L4-L5 laminectomy for decompression.
    2.  L4-5 diskectomy, bilateral, with L4-5 posterior lumbar interbody fusion, bilateral.
    3.  Internal fixation L4-L5, bilateral.
    4.  Autologous bone dorsolateral fusion L4-L5, bilateral.

ANESTHESIA:  General with endotracheal intubation.

INDICATIONS:  This is a 46-year-old female who has had previous L4-5 surgery.  She has developed collapse and instability at L4-5, with marked L5 root compression and foot drop.  She has horrific pain, both mechanical in nature and radicular in nature, bilateral, again left more than right.  She is a candidate for operative decompression at the L4-5 level, followed by L4-5 posterior lumbar interbody fusion and internal fixation and dorsolateral fusion.  She understands the indications for as well

ADVANTAGE242





The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

as the risks of the procedure.  She wishes to proceed.  Consent has been obtained.

OPERATIVE TECHNIQUE:  After smooth induction of anesthesia and intubation, the patient was carefully moved from the hospital bed to the operating table and placed in the prone position on the Wilson frame.  The patient's lumbosacral spine was shaved, prepped, and draped in the usual sterile fashion.  I used the previous skin incision but essentially extended the incision from the inferior portion of L3 down to the superior portion of S1.  There was a great deal of scar on this left side, particularly at L4-5.  I dissected down bilaterally, exposing the spinous process and lamina of L4 and the spinous process and lamina of L5.  There was marked facet mobility, in fact fractured facet at the L4-5 level on the left with collapse.  I dissected out laterally bilaterally and exposed the facet complex at L4-5 and then the transverse process of L5.  I worked up in a careful manner in a cephalad direction and exposed the transverse processes of L4 bilaterally, using great care to avoid any compromise or exposure of the L3-4 facet complex.  I irrigated the wound with antibiotic solution.  I then used a double-action rongeur to remove the spinous processes and lamina which remained at L4 and L5.  I had dissected around the L4-5 scar on the left side, of course, but was able to do so and then fully decompress the thecal sac from superior L4 through L5.  Working from the patient's left side toward the right, I undercut the medial facet complex and decompressed the lateral recess stenosis here.  I took the L4-5 facet down as well.  I went around to the patient's right, worked back toward the left, worked around and through scar, and decompressed the exiting L5 root which was markedly compromised, as well as the exiting L4 root.  There was tremendous scar here from this collapsed, fractured, and failed facet.  I then worked underneath the L5 root on the left, worked in a cephalad direction, and found recurrent disc herniation.  I was able to dissect through this using both blunt and sharp dissection techniques, avoiding injury to the L5 and the L4 root, and then retract the nerve root medially.  The markedly collapsed interspace here was identified.  Posterior lumbar interbody fusion instruments were then sequentially used, beginning with an 8 mm blade up to an 11 mm blade, decorticating the inferior left





**The University of Alabama at Birmingham**
**The Medical Center/University of Alabama Hospitals**

endplate of L4 as well as the superior endplate of L5. Disc
material was removed with interspace rongeurs. I then dissected
on the patient's right side, careful to avoid any compromise of
the L4-5 root on the right. Again, posterior lumbar interbody
blades were used to remove disc material and decorticate the
endplates sequentially from 8 mm to 11. I then used a box cutter
to decorticate the endplates even better at the inferior L4 and
superior L5 bilaterally. I then placed a distraction device in
the interspace 12 mm. I used a 13 mm allograft posterior lumbar
interbody fusion substrate and tapped these as interposition
grafts, first on the patient's left and then the right. These
appeared to be in good position, and we had markedly increased,
although not quite to normal, the interspace height from her
preoperative collapsed circumstance. There was immediate firmness
and stability to this previously very unstable joint. I then
passed bone screws via the pedicles into the bodies with the use
of intraoperative fluoroscopy into L4 and L5 bilaterally. I
decorticated the exposed dorsolateral surfaces of L4 and L5. I
morselized all the patient's bone which I had removed during the
laminectomy and facetectomy completely of L4 and L5, admixed this
with bone morphogenic protein putty and paste, and then packed it
over the exposed dorsolateral surfaces of L4 and L5. Contoured
rods were then secured to the bone screws at L4 and L5 bilaterally
and locked into position, completing the procedure. I irrigated
the wound with antibiotic solution. There was no evidence of
nerve root compromise, thecal sac compression, or CSF leak.
Bleeding was well controlled. I placed a drain. We closed the
wound in multiple layers. The skin edges were approximated with a
running nylon suture.

I personally supervised the entirety of the procedure and
performed the essential elements outlined above.

Mark N. Hadley, M.D. / 07120 / TL030

ADVANTAGE244



The University of Alabama at Birmingham                                    PAGE 1
The Medical Center/University of Alabama Hospitals

## DISCHARGE SUMMARY

NAME: CLEILAND, CATHY                MED.REC.NO.: 00698678    ROOM:

SERVICE: Mark N. Hadley, M.D./2823    ADMITTED: 12/16/03    DISCHARGED: 12/18/03

                                      DICTATED: 12/18/03    TRANSCRIBED: 12/18/03


ADMISSION DIAGNOSIS:    Lumbar instability.

DISCHARGE DIAGNOSIS:    Same.

PROCEDURE:              L4-5 laminectomy and diskectomy with
                        L4-5 internal fixation and fusion and
                        L4-5 posterior lumbar interbody fusion
                        by Dr. Hadley on 12/16.

HISTORY OF PRESENT ILLNESS:  The patient is a 46-year-old white
female with a one and a half year history of low back pain and
left leg pain with numbness in the lateral left leg and plantar
surface of the left foot.  She has a history of prior lumbar
surgery.  Exam and imaging is consistent with L4-5 instability.
She presents now for elective decompression with L4-5 posterior
lumbar interbody fusion.

Please see history and physical for further details.

HOSPITAL COURSE:  The patient underwent the aforementioned
procedure which she tolerated without difficulty.  She was
followed on the floor postoperatively where she had an
uncomplicated hospital course and mobilized in a timely fashion
and she remained neurologically stable in comparison to her
preoperative exam.  She had a slight foot drop on the left
preoperatively and this was felt to have improved actually
somewhat on postoperative day one with almost normal strength on
the left side with dorsiflexion.  She was fitted with an LSO brace
and approved for discharge the morning of 12/18.

DISCHARGE CONDITION:  Good.

DISPOSITION:  Home.

DISCHARGE MEDICATIONS:  Neurontin 300 mg t.i.d.; Robaxin, Lortab,
and Advil as needed for pain.


**ADVANTAGE245**

 The University of Alabama at Birmingham                    PAGE 2
The Medical Center/University of Alabama Hospitals

<u>DISCHARGE SUMMARY</u>

NAME: CLEILAND, CATHY                    MED.REC.NO.: 00698678    ROOM:


Followup is on 12/29 for a wound check with Dr. Hadley.


Kevin N. Ammar, M.D./07734/TL032

_____
                                        Mark N. Hadley, M.D.

ADVANTAGE246

# THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 02/11/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

Cathy Cleiland is seen back in the Neurosurgery Clinic today. She is two months out from L4-5 decompression, stabilization and fusion. She is doing okay. She is using Darvocet N-100 for pain, which is substantially a lower dose of narcotic than she has used in the past. She is using Neurontin 800 mg TID same as her preop. She is still having important and bitter burning dysesthesias in that left lower extremity. She has been plagued with that. She states she does not feel any better in that left leg after her operation than she did six months ago. Her only change she notes is that she is not having the same kind of back pain she has had previously.

On exam, I bring out residual weakness in the tibialis anterior and extensor hallucis longis on the left side. I bring out no other abnormalities. Radiographic studies today look pretty good. Internal fixation and fusion, PLIF construct looks fine as it has previously.

I have given my support and encouragement to Cathy. We are going to refill her Robaxin and her Darvocet medications today. She needs to give this more time. As we told her preoperatively, the burning dysesthesias and longstanding nature of her problems in her left lower extremity including weakness, sensory loss and the dysesthesias are not terribly positive signs for a complete recovery. Hopefully, she will continue to improve over time. We will assist her as we can and see her back in four months at her six-month followup.

MNH/hr/2823
D: 2004-02-11
T: 2/12/04 9:18 PM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

cc:

job#:0211-043

ADVANTAGE247

## THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 01/14/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

Cathy Cleiland is seen back in the Neurosurgery Clinic today. She is four weeks out after re-operative lumbar spine surgery at L4-5 with posterior lumbar interbody fusion and internal fixation. While she is standing better and has better function in her left lower extremity, she still has severe, burning dysesthetic pain in her legs, worse in the left leg than the right. This is very similar to her preoperative circumstance. She is using Neurontin 300 mg to 600 mg three times per day. She is still using a fair bit of pain medication. Her wound was giving her trouble but she has no tenderness or soreness there.

On examination, her wound looks good. She has a scab on the bottom but it is not erythematous, not leaking. The skin edges are simply healing. There is no fullness or fluid here. She can bend and move her spine and certainly her posture is much better than it was prior to surgery. She cannot yet walk on her heels but can on her toes. Independent testing reveals improved strength in the extensor hallucis longis and anterior tibialis on the left compared to preoperatively.

Imaging studies were not performed today. We will obtain these in four weeks. I am going to put her on an elevated dose of Neurontin 800 mg qid. We will continue to offer supportive care. We will get her involved in physical therapy as an outpatient. I will see her back in four weeks.

MNH/hr/2823
D: 2004-01-14
T: 1/15/04 12:12 PM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

cc:

job#:0114-176

**ADVANTAGE248**

THE KIRKLIN CLINIC
Birmingham, Alabama

**Progress Notes**

Patient Name: Cleveland Calley
Date of Birth: _____
MR Number: 698678
Date of Service: 12/29/03
Physician: Kadley/Pritchard

12/16/03 - s/p L4-5 decompression and fusion, PLIF

Barb feeling better. Still has some burning in left leg. No fevers. Using brace.

Exam - wound intact & dry
Motor 5/5 & L TA & EHL 4+/5
Sensory - ↓ lateral left foot

A/P) stable post op. Start PT in 2 weeks. Fitted for bone stimulator by Dr Spurlock. RTC in 10 weeks c̄ films. Refilled Lortab

J Pritchard

Form # KF001TKC (Rev. 10/03)

3/31/04 c/o sorethroat, fever, Ø period since May

WT 166         138/84              98.0

(R) { • Neurontin level  • HgbA1C  } Next week
    { • Chem 12         • TSH }

46 y.o. WF.

→ missed labwork

• ⊕ s.th.  low grade fever
• Rash (R) ribs → ⊗ breast
• LMP = 5/03

Alexander
3 rehs

ADVANTAGE250

CONTINUATION

1/28/04 C/o depression

WT 170.5            144/80                    96.7

LAB ✓ Liver profile
Neurontin level          Monday
Ch-7                        tomorrow

RX  Effexor / 75 x 2 / samples only
                37.5 x 2 /     "      "

CLELAND, CATHY

A — The patient is in the office today for recheck status post her gastric bypass surgery in December. Glucoses have been somewhat variable. She states that she ran out of the Effexor a couple of weeks ago. She has been taking the Neurontin, but states that she continues to have some pain in her legs. She is otherwise feeling well.

O — On examination, chest clear. Heart regular without murmurs, gallops, or rubs. Extremities no edema.

A — 1.  Status of DEPENDENT DIABETES MELLITUS.
     2.  DEPRESSION.
on Effexor.
     3.  CHRONIC BACK PAIN.
on Neurontin now.

P — Samples were given of Effexor, enough for one month. The patient will recheck in the office as scheduled in one month. She is requesting something for sleep, but will hold off on prescription this until she gets back on the Effexor. Will check a Neurontin level as well as other lab studies, as noted in the chart. This will be done early next week. She will return sooner for any problems, changes. MN

CHARLES EDDINS, M.D.              CE/tn

ADVANTAGE251

2/6/04 Humulin R, Humulin N u.A.D #2 vials each
D.R.f. sent 50th syringes, I Microfine short
needles #50 E D.R.'s Eugene J Walmart in
Jackson, M. per Eddins/D. Keller RN

9/26/03 Pt. called 9. to tell us that she is not working and is due to see another MD. specialist to do #3 surgery @ UAB, and just wanted us to know that she hasn't been able to return for lab + appt. P. Keller LPN

10-22-03

Wt. 165          BP. 128/80          P. 88          Temp. 99.9

CLEILAND, CATHY                    10-22-03

S – The patient is in today with a four day history of back pain, dysuria, urinary frequency and urgency, malodorous urine. She also requests samples of Effexor.

O – Vital signs – noted. General – well developed white female; in no acute distress. Neck – supple; no masses; no lymphadenopathy or thyromegaly. Heart – regular rate and rhythm; no murmurs, gallops or rubs. Lungs – bilateral breath sounds; clear to auscultation. Abdomen – positive bowel sounds; soft, nontender, nondistended. Extremities – no clubbing, cyanosis or edema. Back – mild tenderness.

DATA BASE: UA – noted.

A/P – 1.    UTI.

Will treat with Bactrim Double Strength bid. for ten days. She has a low grade temp. Will follow-up on C&S.

2.    ANXIETY/DEPRESSION.

Given samples of Effexor XR 75 mg.

A.R. BOROUGHS, IV, M.D.          ARB/rm

10/3/03 Macrdrd 100mg (#10) – 1 BID x 5days called to Walmart Pharmacy in Mobile (666-6988) per Dr. Boroughs ———— Adams, LPN

ADVANTAGE252

CONTINUATION

NAME

10/10/02 C/o

10/21/02 Effexor XR 75 mg q d for depress. #30 + 7 Rf
(Lynn) @ Village per Eddins order ——        P. Keller

11/8/02 Humulin R U. AD. II Vials + 5 Rf (Lynn) @
Village per Eddins order ——        P. Keller

1/2/03 Klonopin 2mg q hS #30 + 7 Rf (Lynn) @ Village
Effexor XR 75 mg q d # 30 + 7 Rf per Eddins orders
Pt advised to make appt. back next month —— P. Keller

3-28-03    Effexor XR 75mg # 7; iad - 0 Rf, called to Walmart - Dr Jones

7-15-03 No show (Dr J) af

8/15/03 C/o depression;
Wt 156              104/60                    97.4

     6 wks (Effexor) 75 q day sample given
              XR

     ← (HgbA1c / Chem 7 / CBC ) → Wed.

CLELAND, CATHY                    08-15-03

S – The patient is in the office today for a check-up. She has been off from work,
status post motor vehicle accident. She had back surgery in May and July of this year.
She has weaned herself off of Klonopin and Effexor earlier this year; she thinks that she
may need to go back on this. She denies any suicidal or homicidal ideations. The
patient is supposed to see a pain management physician in the next few weeks, but this
has not been scheduled as yet.

O – On examination, chest – clear. Heart – regular without murmurs, gallops or rubs.
TM's – clear. Pharynx – clear. Neck – supple. Extremities – no edema.

A –  1.    DEPRESSION.
      2.    INSULIN DEPENDENT DIABETES MELLITUS.        ADVANTAGE253
      3.    OTHERS.

P – Will restart the Effexor XR 75 mg. daily; samples given for six weeks. The patient
will see the pain management physician, and he will adjust her medications as indicated.
Will check some lab work. She states that her blood glucoses have been running on the
lower side recently. She will recheck in my office as scheduled, sooner for any
problems, changes, etc.

CHARLES EDDINS, M.D.            CE/rm

CLEBLAND, CATHY                    00-26-02

S - This is a 45 year old female, followed by Dr. Eddins. She has diabetes mellitus, type 1. She has had recurrent UTI's. Dr. Terry saw her in the past and put her on Macrodantin for about six months; she did much better on this. On 08/28/02, she went to the Emergency Room with UTI; she was put on Bactrim DS bid. for ten days. During that time, she felt quite good. Since she has been off of this, her symptoms have recurred with some lower abdominal pain, difficulty getting her stream started at times and some dysuria. She has had no fever or chills. The patient states that she has been going through a divorce for about fourteen months; she has been under a lot of stress. During this time, her blood sugars have been somewhat higher than usual. She states that her menstrual periods have stopped abruptly. She states that she has not had any sexual relations, so she knows that she is not pregnant. The patient also has a HISTORY of cervical disc surgery times three, hypercholesterolemia, depression, mitral valve prolapse and restless leg syndrome. She is followed by a gynecologist in Birmingham.

O - On exam, lungs – clear. Heart – RR. Back – no cva tenderness. Abdomen – soft with mild suprapubic tenderness. Extremities – no edema.

LAB: Serum HCG - negative. Urinalysis shows 3+ bacteria.

A -    1.    RECURRENT UTI'S.
       2.    DM, TYPE 1.
       3.    OTHERS.

P - Will put her on Macrobid bid. for one week. Will see Dr. Eddins at that time with a repeat urinalysis. May need some additional chronic suppressive therapy. She will talk with her gynecologist about the menstrual periods stopping. Urine culture has been set up.

J. TIMOTHY JONES, M.D.            JTJ/rm

10/3/02 No Show for Cancel OMS

ADVANTAGE254

CONTINUATION

6/19/02 c/o    NO SNOW (DR) QMS

9/18/02 called in to Village Klonipin 1 mg q HS #30 + q
(Lynn) per Eddins — J. Keller RN

9-17-02 Klonipin 1 mg (#30, refill) —
PO q hs for restless leg called to
Village pharm per Dr Eddins — J. Kuyk Cu

9-18-02 Klonipin changed from 1 mg to
2 mg (#30, refills) — PO q hs for restless
leg. Called to Lynn @ Village pharm
per Dr. Eddins                J. Kuyk RN

9-18-02 Humulin N 1-2 vials. Use as
directed c 10 refills called to Lynn
@ Village pharm per Dr. Eddins — J. Kuyk RN

9-26-02 work in - Regular pt of Dr Eddins
BP 158/80         T- 98.8
                                    Hcts neg↑

ADVANTAGE255

4/4/02 C/o N/S (Dr) al

6/11/02 C/o Congest, cough, & fever
Wt 166.5
BP 122/82          T 98.5

(R) Klonopin 2 mg q day (q hs) (# 30, 2 RF)
Effexor XR 75 q day (# 30, 2 RF)
Biaxin 500 BID X 10 days

CLEILAND, CATHY                  06-11-02
S - The patient is in the office today with complaints of a productive cough. She took some Keflex which she had on hand at home. Symptoms have been present since Saturday. She complains of laryngitis, pharyngitis, low grade fever. The cough is rarely productive.
The patient states that her glucoses have been doing well, with maximum of 160; they generally are in the 140 range.
O - On examination, TM's – clear. Pharynx – posterior sinus drainage; mild erythema. Neck – supple. Chest – clear bilaterally. Heart – regular rate and rhythm without murmurs, gallops or rubs.
Chest x-ray was negative for infiltrate.
A - 1.    BRONCHITIS.
P - The patient will recheck in the office as scheduled in one week. Will begin on Biaxin 500 mg. bid. for ten days. She was instructed to follow her blood sugars closely. She has not seen her endocrinologist, and I stressed the need for her to make an appointment for this, because her diabetic control has been lacking frequently in the past. Will otherwise continue her current care. She will return to my office as needed for any other problems, changes, etc.
CHARLES EDDINS, M.D.      CE/rm

ADVANTAGE256

CONTINUATION

NAME

3/22/02 C/o BS↑, + BP↑, Not Sleeping
161 wt                    BP 136/76              T 99.1

[Hgb A1C/TSH/Chem 12/H+H] Monday

Rx Effexor XR 75 q day (#30, 2 RF)
Klonipin 2 mg q day (#30, 2 RF)

CLEILAND, CATHY                    03-22-02

S  - The patient is in the office today for a check-up. She states that she continues to have trouble with sleeping. She is still under a good deal of stress from her divorce. She does have a hearing in May.
The patient saw the ENT last week for her ears and sinuses. She is currently on antibiotics for this.
O - On examination, chest – clear. Heart – regular without murmurs, gallops or rubs. Extremities – no edema.
The patient did not have the lab tests done as instructed on her last visit.
A -  1.     INSULIN DEPENDENT DIABETES MELLITUS.
        2.     HYPERCHOLESTEROLEMIA.
        3.     RESTLESS LEG SYNDROME.
        4.     DEPRESSION.
P  - The patient was given a refill prescription for the Effexor and Klonopin. Will increase the Klonopin to 2 mg. daily. She states that she had been somewhat better a couple of times when she tried the 2 mg. dosage. She will recheck in the office as scheduled in two weeks. Will check lab studies as indicated in the chart on Monday. Will continue to follow her blood glucoses. I did recommend that she see an endocrinologist again; she will consider this and will discuss this further on recheck. The patient will return sooner for any problems, changes, etc.
CHARLES EDDINS, M.D.                    CE/rm

ADVANTAGE257

1/30/02 Effexor 75 XR qd #30 + 1 RA ⟩ (Jennifer)
Humulin R + N → 2 vials + 10RA Walmart
Insulin Syringes → #100 + 10 RA ⟩ P Keller LPN
1/30/02 Advised pt to make appt to discuss
Dr Keller LPN

2/4/02 C/o Resched.
2/5/02 C/o
tot Ap

2/27/02 C/o rash, fatigueness
wt 165                    BP 142/92        T

✓ [H+H/CBC/Chem 12/TSH]   Periods now WNL
            HgA1C
[X on Keflex from dentist]

CLEILAND, CATHY                02-27-02

S - The patient is in the office today with complaints of not sleeping well. She is still going through the divorce.
She comes in today with a chief complaint of a rash on her left arm; this has been present for only one day.
The patient states that her glucoses are very much variable, sometimes as low as 46 and sometimes high. She states that the Effexor is helping with the depression somewhat. She is seeing Dr. Mulkerne, a counselor.
The patient states that in addition to her divorce, she has had stress with the fact that her daughter has been ill. Also, she had an aunt, to whom she was very close, pass away recently.
She is already on Keflex for an unrelated dental problem.
O - On examination, there is an excoriated rash on the right arm. There are no vesicles. This is on the forearm anteriorly, slightly raised.
A - 1.    RASH.
    2.    DIABETES MELLITUS.
P - I strongly stressed the need for her to have close follow-up, keeping a log of her diabetes mellitus. The patient will recheck in the office as scheduled in one week; she will bring in her log of the glucoses at that time for review. I had ordered some lab studies, but she told our lab staff member that she did not have time to have the lab studies done and she left. I had instructed her that should the rash worsen, she should let us know.        CHARLES EDDINS, M.D.        CE/rm

ADVANTAGE258

CONTINUATION

NAME

ADDRESS

12/17/01 C/O may have pos. HCG test

Wt 167                BP 142/74              T 98.2

LMP ——> 10/26/01
                    (1st day)              UCG neg -10n

CLELAND, CATHY                    12-17-01
S    The patient is in the office today stating that she is approximately three weeks late
with her period. She has had some nausea, but there have been no other symptoms.
O – On examination, chest – clear. Heart – regular without murmurs, gallops or rubs.
Abdomen – soft, nontender, nondistended; no organomegaly. Extremities – no edema.
A – 1.    AMENORRHEA FOR NEARLY TWO MONTHS.
LAB: Urine pregnancy test – negative.
P – Will check a serum pregnancy test; will check other lab studies as indicated in the
chart.   The patient will recheck in the office in one to two weeks, sooner for any
problems, changes, etc.
CE/rm

1/3/01    Klonipin 1mg qhs #30, 2 RA
                  for problem sleep
    to Juddson (Wal-Mart)

1/17/02  Pt. called in C/O pressure in chest & was
advised to go to ER @ MCH for evaluation — P. Kellett pw

ADVANTAGE259

7-26-01 %

**"NO SHOW"**
APPT. NOT KEPT

8-30-01 % stress
Wt 171                    BP 138/68              T 98.4

Rx     Klonpn 1mg qhs (#30, 2Rf)
       Effexor 75 × R q day (#30, 2Rf)

CLELAND, CATHY                    08-30-01
S - The patient is in the office today for recheck. She is still going through her divorce. She does seem happier today; she states that she is in the process of working on the divorce.
Glucoses have been better controlled.
O - On examination, chest – clear. Heart – regular without murmurs, gallops or rubs.
A - 1.    INSULIN DEPENDENT DIABETES MELLITUS.
    2.    DEPRESSION.
P -    The patient has not had the test done as recommended by Dr. Jackson; I recommended that she have those done.    Refill prescriptions were given for her medication. Will otherwise continue her current care. She will recheck in the office as scheduled, sooner for any problems, changes, etc.
CE/m

ADVANTAGE260

CONTINUATION

NAME

7-12-01 C/O Check up

Wt 175
BP 144/90
T 98.6

44 y.o. W.F.

(R) Effexor 75XR q day (#30, 2 RF) + (Sample)
Klonipin ½ mg q hs (#30, 5 RF)

CLEILAND, CATHY                    07-12-01

S - The patient is in the office today for recheck. She states that her husband recently asked her for a divorce. She has been out of her Effexor for a few days; she asked for a refill of this. She also discontinued her Klonopin several months ago; she is having trouble with sleep at times.

O - On examination, chest – clear. Heart – regular without murmurs, gallops or rubs. Extremities – no edema. TM's – clear. Pharynx – clear. Neck – supple.

OF NOTE is the fact that the patient has had another neck surgery since her last visit with me. She has not been checking her blood sugars recently, and I stressed the need for her to do so.

A - 1.    INSULIN DEPENDENT DIABETES MELLITUS.
    2.    DEPRESSION.
    3.    HYPERCHOLESTEROLEMIA.

P - The patient had some results of lab studies done at Health Fair. The main abnormality was the glucose. She was instructed to watch her diet. She will bring in a list of her blood sugars in two weeks; will re-evaluate at that time. She was given refill prescriptions for her medications. She was also restarted on the Klonopin. The patient will recheck sooner for any problems, changes, etc.

CE/rm

ADVANTAGE261

2-13-01  Phone  Pt. C/o sugar reading too high & was referred ER for evaluation + have someone bring pt. ⟶ ___ Putomacher

3-15-01  C/o "bladder infection possibly" "burning when urinating" flank pain + urinary retention" pt. 23 td bed

WT 179
BP 146/102
T 99.2

U/A & C+S

℞ ① Effexor XR 75mg  q day  (#30, 2 RF)
   ② Bactrim DS  BID × 7 days  (#14, Ø RF)

CLEILAND, CATHY                           03-15-01
S - The patient is in the office today stating that she believes she has a urinary tract infection. There has been no temperature. Since her last visit with me, she has seen her gynecologist; she also had opening of a sebaceous cyst. She had been on Keflex, but completed this approximately four days ago.
O - On examination, there is no cva tenderness, no abdominal tenderness.
LAB: Urinalysis – few white cells.
A - 1.    URINARY TRACT INFECTION.
P - Bactrim Double Strength bid. for ten days; the patient was instructed to avoid excessive sun exposure while on this medication. She will recheck in the office as scheduled in one week, and will follow-up on her blood pressure at that time as well. She will return sooner for any worsening of her symptoms, changes or other problems.
CE/rm

5/31/01  Patient requested referral to Gastro in Montgomery. Appt made 6-13-01 @ 1:30pm ē Dr. Alto Jackson Jr. Patient notified /o George  ×o Dr. Eddie

ADVANTAGE262

CONTINUATION

NAME

ADDRESS                                                                    DATE

11/27/00 c/o Big Toe on (RT) foot Swollen

wt 177                    (CBC) (Chem 7)

BP 120/80

T 98.4 (Glucose 160 / 130 over Weekend)

CLEILAND, CATHY                          11-27-00

S - The patient is in the office today with complaints of her right great toe being inflamed. She went to Springhill Hospital yesterday and was placed on Augmentin, but states that she has not yet gotten that filled.

O - On examination, there is some mild erythema at the base of the toenail. There is no generalized involvement of the toe. The patient states that this is much better now. There is no fluctuance or purulence noted.

A - 1.     CELLULITUS OF THE TOE.

P - Will get the prescription for Augmentin filled and take as prescribed. The patient will recheck in the office as scheduled on Thursday. She will recheck sooner for any worsening of her symptoms, changes or any other problems, especially redness, drainage, swelling, etc. I explained the serious nature of infections in diabetics.

NOTE:  Blood sugar was noted to be elevated; the patient will recheck this when she gets home. She will take her insulin as soon as she gets home and will let us know if she has continued elevation.

CE/rm

11/30/00 c/o RTC

wt N/A          "NO SHOW"
BP              APPT. NOT KEPT
T

1-22-01 Effexor 75 mg ī q d #30 + Ī RA

Humulin N, 2 vials, u.a.d

Humulin R, 2 vials, u.a.d ── Walmart (Jackson)

(Pam)

ADVANTAGE263

10/26/00   Ativan 0.5 mg BID prn anxiety
Phone     (# 20, ØRF)  [to Jackson Wal-Mart - Holly]
          No driving, etc ? taking

                              CE

11/15/00   C/o Insulin adjustment

WB 177    RBS 390   JW
BP 120/80
T 98.9

CLEILAND, CATHY                    11-15-00
S - The patient is in the office today for blood sugar review. She has been placed on
steroids by her ENT physician, as she has had a herpetic infection of the ear. She states
that this is helping. She is on what sounds like half strength of a dose pack.
LAB: Random blood sugar – 390.
A - 1.     INSULIN DEPENDENT DIABETES MELLITUS WITH ELEVATIONS.
           PROBABLY SECONDARY TO STEROID USE.
P - The patient was given a sliding scale to use. She will let us know if there are any
levels over 400 or less than 80. She will recheck in the office as scheduled in two
weeks.
CE/rm

ADVANTAGE264

CONTINUATION

FORM #1

NAME

ADDRESS

10/2/00  C/o

DATE

Wt
BP

"NO SHOW"
APPT. NOT KEPT

10/24/00  C/o  Wants to Δ meds.

Wt 174.5
BP 122/80          • Normal Heart Cath → May '99
T 99.
                         P = 96 (Regular)

                    (↑ SH / thyroid prof / H+H / K+ / Mg)

CLEILAND, CATHY                    10-24-00
S - The patient is in the office today for a check-up.  She wants to talk about her medications.  She states that she has been under a lot of stress, as her husband just had heart surgery.  She states that her glucose has been doing well on home monitoring.  She complains that she feels anxious at times; there are no other specific complaints.
O - On examination, chest – clear.  Heart – regular without murmurs, gallops or rubs.  Extremities – no edema.  The patient did have borderline tachycardia today; she states that she has been under a lot of stress.
A - 1.    BORDERLINE TACHYCARDIA.
P - Will check lab studies as indicated in the chart.  EKG showed no acute changes.  Will discuss this with Dr. Citrin.  Will likely proceed with a holter monitor.  Will most likely need to add Benzodiazepine during the day; will discuss this further with Dr. Citrin.  The patient will recheck in the office as needed for any problems.
CE/rm

ADVANTAGE265

9/25/00  C/o  RTC (from Friday)

Wt 181
Bp 140/80
T 99.1

- Sed Rate
- CBC          } WNL
- Chem 6
- ANA  → Pending

(CT brain → WNL  (@ MCH)

---

CLELAND, CATHY                    09-25-00

S - The patient is in the office today for recheck. She states that her headache is better; the rash is improved. She states that the Darvocet helped.

O - On examination, the patient is alert and oriented. Pupils – reactive to light. Chest – clear. Heart – regular without murmurs, gallops or rubs. Extremities – no edema.

LAB: Glucose on Saturday was 160.

A - 1.    HEADACHE, IMPROVED.

P - The patient will recheck in the office as scheduled in one week. I stressed that should she have any severe headache, weakness, dizziness, etc., she should seek immediate medical attention. She will continue on the Darvocet as previously prescribed. She will otherwise recheck as needed for any problems, changes, etc.

NOTE: The patient has been followed by her gynecologist in Birmingham. She states that she has not had a pap smear and mammogram in about five years. I stressed the need for her to have this done as soon as possible. I explained that we would be glad to have that done here or make a referral to a gynecologist. The patient will consider this and let me know what she decides.

CE/rm

ADVANTAGE266

CONTINUATION

NAME

ADDRESS   9/22/00   ♀   *Headaches + rash*

wt 180
BP 120/70                    ✓ (glucose) plus
T 98.9                        ✓ [Chem 6 / ANA / SedRate / CBC ]

RBS. 336 ————— 1 trip con

DN100 (#15)              CT @ MCH today

Elocon Cream 0.1%

**CLEILAND, CATHY**                          09-22-00

S - The patient is in the office today with complaints of a rash extending down the side of her neck; this has been present for several days. This is pruritic. She states that on Wednesday she had the onset of headache; this was worse until this morning, but is actually somewhat improved at this time. She states that this begins in her neck and extends up to her face. There has been no known head trauma, etc. The patient states that she has been followed by a neurologist, who did not believe that there was an organic neurological problem, but probably secondary to an injury that she had sustained. There have been no respiratory symptoms, sore throat, etc. There has been no sinus pain or congestion. The patient states that she has used no new detergents, soaps, foods, etc.

O - On examination, the patient is alert and oriented. Skin - there is a pinkish rash behind the left ear, extending onto the neck and anterior chest; there are no other areas of involvement; this is not raised. There is some involvement into the hairline on the back of the neck. Optic discs - sharp. Cranial nerves 2-12 are intact. TM's - clear. Pharynx - clear. Neck - supple. Chest - clear. Heart - regular without murmurs, gallops or rubs. Reflexes are normal. Gait is normal.

A - 1.     HEADACHE.

P - Will check a head CT scan at Monroe County Hospital. Darvocet N100 as needed for pain. The possible sedative side effects of this medication were discussed and the patient was instructed not to drive, work, etc. after taking this should they occur. To use one every four hours as needed for pain. Will check lab studies as indicated in the chart. She will recheck in the office as scheduled on Monday. I stressed that should she have any increased headache, nausea, vomiting, temperature, worsening of the rash, etc., she should seek immediate medical attention.

NOTE: We will also treat the rash with Elocon cream, once daily to the affected area, 0.1%.

CE/rm

ADVANTAGE267

8/10/00  C/o (Consult for Rx)

Wt 177.5
BP 138/80
T 98.5

✓ (Chem 7/Liver prof/Hgb A₁c) next week

Rec. q year eye exam

Rx { Klonopin 1mg (1/2 T I D q hs) (#75 5RF)

{ Effexor 75XR q day (#30, 3RF)

---

**CLEILAND, CATHY K.**                    08-10-00

S - The patient is in the office today for a check-up. We reviewed her medications. Her glucose has been in the low 200's. She states that she has been very concerned about her daughter.

O - On examination, chest – clear. Heart – regular without murmurs, gallops or rubs. Extremities – no edema

A - 1.     DIABETES MELLITUS; INSULIN DEPENDENT.
    2.     DEPRESSION.

P - I discussed with her the need to get much improved control of her diabetes mellitus. The patient will recheck in the office in one to two weeks, sooner for any worsening of symptoms, changes or other problems.

NOTE: I warned her regarding the possible sedative side effects of the Klonopin and Effexor, which she asked to be refilled; she was instructed not to drive, work, etc. should these occur.

CE/tc/rm

"NO SHOW"
AUG 1 5 2000    APPT. NOT KEPT

ADVANTAGE268

FORM 81 | CONTINUATION

NAME Cathy Cleiland

ADDRESS

5-31-00 CW C/o pain on urination                    42 y.o. WF
LOT 170
BP 142/80          Shingles Cleared
Tq9.1

---

CLEILAND, CATHY                    05 31 00

S - The patient is in the office today with complaints of some dysuria last evening; there has been no fever, urinary frequency or back pain. She had some nausea, but no vomiting.

O - On examination, abdomen - soft, nontender, nondistended. There is no cva tenderness.

A - 1.    URINARY TRACT INFECTION.

NOTE: Urine specimen was obtained while she was on her menses.

P - Ceclor 250 mg. tid. for seven days. Will check a culture/sensitivity of the urine. The patient will recheck in the office if her symptoms have not improved by later in the week and if they have not completely resolved by the end of the course of antibiotics. She will recheck sooner for any worsening of her symptoms, changes or any other problems.

CE/rm

---

6-5-00        C/o saw Dr Eddins Wednesday for Kidney infection
Wt- 174½       and thinks he made her sick as infection is not
BP 126/84      better. Was been on Ceclor, and
               had nausea, and yesterday vomited
               Exam - tender over bladder area,
               and over sigmoid area

Rx DC Ceclor,
2 Cyrased qid
3/ Macrobid 100

ADVANTAGE269

1-25-00 c/o Shingles.
LcT 180
BD 100/80
T 97.3

(1ST Noticed Blister ~ 1 week ago)

CLEILAND, CATHY K.                    04-25-00
S - The patient is in the office today with complaints of possible shingles on her left arm. She noticed it about a week ago; she states that she took some Valtrex which she had on hand at home, that she was taking for a different problem.
O - On examination, there is about a 2 cm. irregularly annular shaped area of vesicles noted on the right upper arm. No other areas are noted.
A - 1.        APPARENT HERPETIC INFECTION.

P - Valtrex 1 gram tid. for one week; I explained that it is later in starting the medication than would be hoped. The patient will recheck in the office as scheduled on Friday, sooner for any worsening of symptoms, changes or other problems. I told her that she should see her specialist about this. Should she have any worsening of this, she will let us know.
CE/tc/rm

4-28-00
LWT
BP
T

**"NO SHOW"**
APPT. NOT KEPT

ADVANTAGE270

CONTINUATION

NAME

ADDRESS

| | DATE |
|---|---|

11-9-99 pt informed by tlt insulin also di ddn
wanted to put a Head of 2t coortin, but
Head of Op pt a little weak, had stopped
oxhanalgeut                                    Schorider

11-11-99 Serzone 100mg Bid #60, ORF called into Line Was
in Jackson (334)847-9550 per DrDott Bledding / KEM

11-29-99 c/o Dizzeness; fell 3 times this weekend
wt 181
BP 120/70          LMP = 3 wks & WNL   ( Husband Vasectomy
T 97

---

CLELLAND, CATHY                    11-29-98

S – The patient is in the office today with complaints of dizziness; she states that she
fell three time this weekend. There was no loss of consciousness. She had not wanted
to see the neurologist earlier, because she thought that it had been associated to her
vision. She is now willing for make this appointment.

O – On examination, optic discs – sharp. Cranial nerves 2-12 are intact. Gait is
normal. Chest – clear. Heart – regular without murmurs, gallops or rubs. Extremities
– no edema.

A – 1.    FREQUENT FALLS.
    2.    INSULIN DEPENDENT DIABETES MELLITUS.
    3.    DEPRESSION.

P – The patient will see Dr. Elmore's group this afternoon; someone will be taking her.
She will recheck in my office as needed for any problems.

ADDENDUM:  The patient also complains of some left ankle pain, just off of the fibula.
On examination, there is a calcification; it is not clear if this is new vs. old. There is
full range of motion, but there is some tenderness in the above noted area.   Good
pulses are felt.

The patient was placed in a velcro splint.    She will see Dr. Luscher's group on
Wednesday.  She will recheck for any increased pain, swelling, etc.
CE/rm

---

4/3/00 Cancel

CLEILAND, CATHY                    11-03-99

S - The patient is in the office today for recheck, wanting to discuss her medications. She has been followed by Dr. Mulkern; she will see him tonight. Glucoses have been better. She states that she has been under a lot of stress. She discontinued the Paxil as this made her mouth dry. I explained that this may be a symptom of all of these medications, but she states that the Prozac did not; she would like to try another medication.

O - On examination, chest - clear. Heart - regular without murmurs, gallops or rubs. extremities - no edema.
The patient denies any suicidal or homicidal ideations.

P - Will go ahead and give a trial of Serzone 100 mg. bid. Will check a chem 7, CBC, thyroid profile. The patient will otherwise continue her care.
NOTE: She states that she has had some dizziness, which occurs from time to time. The patient states that there has been no spinning of the room; it is mild.
On examination, optic discs - sharp. Cranial nerves 2-12 are intact. Reflexes are normal. Gait is normal.
We will proceed with the above studies, to help evaluate this. The patient will recheck in the office as scheduled next week. I explained that she should not drive if she has dizziness.
There has been no associated headache.

CE/rm

ADVANTAGE272

9-24-99
WT
BP 130/78
T 099    C/o discuss Medication

CLEILAND, CATHY                    09-24-89

S – The patient is in the office today to discuss her medications. I had gotten a call from her psychologist after she had called me; I had asked her psychologist to call me. She continues to have some problems with her marriage. She does tell me, however, that since I called, her husband has agreed to go back for further counseling with Dr. Mulkerne. The patient is interested in making a change in medication. She specifically denies any suicidal or homicidal ideations. She discontinued the Prozac one week ago.

P – We will change her to Paxil 10 mg. daily for one week and then increasing to 20 mg. daily. The patient will let us know how she is feeling. I stressed that should she have any problems, she should let me or Dr. Mulkerne know immediately; she is agreeable to this.

ADDENDUM: Glucose is elevated. Will increase Humulin N to 30 units in the morning and 13 units of R in the morning. Will take 30 units of N in the evening and 13 units of R in the evening. The patient will let us know how her blood sugars are doing on this regimen. I explained that she will need to recheck in one month for follow-up. The patient also states that her toe is still causing some pain. If this has not resolved in the next one to two weeks, she will return for re-evaluation.    CE/rm

10-25-99
WT
BD    "NO SHOW"    Dr apt
T    APPT. NOT KEPT

11-3-99  C/o discuss medication
BP 120/74        Dr. Mulkern tonight
T 99.5            (Chem 7 / CBC / TFT's)
WT 184

– Cont –

ADVANTAGE273

CONTINUATION

Cathy Cleland

1-11-99  Prozac 20mg Tod #30 ē 1 RF called to CVS
Magna 1-39-246-0034) per Dr Jones orders — Pam deusinca

2-16-99  pt has above refill, need appt — Lethrougll

9-13-99  C/O ran into sewing machial, Rt foot, little toe
BP 118/60
T 99           POI = 9/4/99

              Chem 7 / Hgb A1C / liver prof.

CLEILAND, CATHY                    09-13-99
S - The patient is in the office today stating that she ran into a sewing machine on
09/04/99; it went between her little toe and second toe; she states that she has had
pain since that time.
O - On examination, there is mild swelling of the toe.  There is no ecchymosis noted.
Sensation and motor strength are intact.  There is no tenderness past the MTP joint.
X-ray was done; no acute fracture was noted.
A - 1.   CONTUSION TO THE FOOT.
P - The toe was buddy taped.  The patient will recheck in the office if her symptoms
have not cleared in two weeks.  She will recheck sooner for any worsening of her
symptoms, changes or any other problems.

ADDEND 1.  Will check a chem 7, hemoglobin A1c and liver profile for follow-up on her
diabetes mellitus and the use of Prozac.  The patient will call the office tomorrow for
the results of this.  Will refill her Prozac.  She states that she is doing well on this
medication.  She states that she likes her new job.
Also, the patient states that she has been having irregular periods.  She wishes to see
a physician at Providence in regards to this.  She was referred to Dr. George Inge.
CE/rm

ADVANTAGE274

CLEILAND, CATHY                    10-27-98

S - The patient is in the office today for recheck. Her blood sugar has been elevated, even in the 500's. She states that she took some additional insulin and it got low, into the 60's. She states that she has been feeling better since that time.

The patient has a longer standing problem of palpitations. She has been seen in Birmingham and was diagnosed with mitral valve prolapse. She states that she has had problems off and on with palpitations, about once every two months or so, but the patient states that she has had more over the weekend.

The patient had previously been scheduled by me for a stress test, but she canceled it. She states that she has had no chest pain associated with the palpitations. She states that she does sometimes have some shortness of breath. There has been no temperature.

O - On examination chest - clear. Heart - regular without murmurs, gallops or rubs. I do not hear a murmur or mitral valve prolapse at this time. Extremities - no edema.

EKG - there is a good deal of artifact, even though numerous tracings were done. There were nonspecific ST-T wave changes noted. There were no significant ischemic changes noted. Intervals appear normal. Rate was approximately 80.

I - 1. PALPITATIONS.
    2. HYPERGLYCEMIA.

P - I explained to the patient that she will need to go back on a Regular insulin scale. She will recheck in the office as scheduled on Thursday; at that time, we will see what her blood sugar is doing. She was instructed to follow her blood sugar closely; if this gets over 400 or less than 70, she should seek immediate medical attention.

NOTE: The patient requested referral to a cardiologist; this was done with referral to Dr. Citrin Mobile. We will check a magnesium and potassium level.

Urine was done for ketones; this was negative.

CE/rm

                    CE

1-18-99 Prozac 20mg 1 po qd #30 c̄ II Rfs called into CVS Jackson Pharm 246-6634 per Dr. Edding orders
                                    J Johnson LPN

2-19-99 Humulin N 1 vial use as directed c̄ 10 refills CVS pharm in Jackson 246-6634 per Dr. eddins        L Knight LPN

4-21-99 Prozac 20mg 1 po qday #30, QRF called into CVS Jackson (334) 246-6634 per order Dr eddins — J Etheridge LPN

4-27-99 Humulin R 1 vials, SFP LUAD 11 cc Syringes #40 SFP called into CVS (334) 244-6634 per order J Etheridge

6-11-99 Prozac 20mg 1 po qday #30, QRF called into CVS (334) 246-6634 CVS in Jackson, per Direct Dr eddins — J Etheridge LPN

JUN 16 1999    Canceled                              ADVANTAGE275

CONTINUATION

Cathy Cleiland

7-16-98 C/o   Sore throat, sneezing, pain in both ears
WT 176
BP 126/74
T 90.3

---

CLEILAND, CATHY                    07-16-98
S - The patient is in the office today with complaints of a sore throat,
ear pain and congestion.
O - On examination, TM's - clear.  Pharynx - erythematous.  Neck - supple.
Chest - clear.
I - 1. PHARYNGITIS.
P - Amoxil 250 mg. tid. for ten days.  The patient will recheck in the
office if her symptoms have not cleared by the end of the course of
antibiotics.  She will recheck sooner for any worsening of her symptoms,
changes or any other problems.
CE/rm                               CE

---

8-17-98 Prozac 20mg Today #30 + Pt called into
CVS-Jackson 346-6105(?) for order breadow - PTM
10-21-98 Prozac 20mg #30 + 90l c̄ 2 RF's called
to CVS-Jackson per Dr. Eddins orders   2 wt right 6

---

10-27-98 C/o  palpitations, Bloodsugar elevated
WT 178
BP 130/70
T CP15
RBS- 235- NN

ADVANTAGE276

4-27-98 C/o ↑ BS
Wt 172
BP 140/92
T 99.1

CURRENT Rx
(1) Prozac 20mg q o d
(2) Insulin 15R/30N [AM]
10-12R/20-24N [PM]
(3) Macrodantin (Dr. Terry)

CLEILAND, CATHY 04-27-98

S The patient is in the office today with complaints of elevated blood sugar. She had to be admitted to the hospital in Jackson, Alabama secondary to this. She states that she is feeling better now. Blood sugar was over 600. She states that she is considering changing job and has been under a lot of stress recently.

The patient states that she also had some chest pain with some associated shortness of breath. PAST HISTORY is positive for mitral valve prolapse.

O - On examination, TM's - clear. Pharynx - clear. Neck - supple. Chest - clear. Heart - regular without murmurs, gallops or rubs. Extremities - no edema.

The patient states that her blood sugar is now ranging from 96 to 299. They are generally less than 200.

I asked the patient about any possible suicidal ideations; she denies any, but she states that she is under a good deal of stress, both at home and at work.

I - 1. CHEST PAIN.
2. DEPRESSION.
3. INSULIN DEPENDENT DIABETES MELLITUS.

EKG - normal sinus rhythm with nonspecific ST-T wave changes. Intervals appeared normal.

Chest x-ray - within normal limits. There were no infiltrates, cardiomegaly, etc.

P - Will give a refill of Prozac 20 mg. daily. I stressed that should she have any worsening of her symptoms, etc., she should seek immediate medical attention. The patient refuses to see a psychiatrist or psychologist, even though this was recommended to her. We will schedule a stress test. I explained that she may need further work-up depending on the results of the above. The patient will recheck in the office as scheduled after completing the above studies, within one week; she will recheck sooner for any worsening of her symptoms, changes or any other problems. I stressed that should she have any increased chest pain, shortness of breath, etc., she should seek immediate medical attention.

CE/rm

CONTINUATION

Cathy Guidara

3-23-96
3D

OT

3-18-98
3D

OT

3-18-98   Health Partner's Referral to Dr. William Jerry
          for (UTI)   X 2 visits   Exp. 6-17-98   # 980778506.   EBJ

ADVANTAGE278

TELEPHONE CONVERSATION:
The patient calls stating that she thinks that she has a urinary infection; there is a pressure feeling, some odor, minimal dysuria. She has recently had surgery and is unable to come over here. Because of her insurance, she came to a physician there in Jackson, Alabama

We will treat with Cectro 250 mg. tid. for seven days. I stressed to the patient that should she have any worsening of her symptoms, changes or any other problems, she should seek immediate medical attention. She needs prompt evaluation.

1-7-98
WT - 173
BP - 110/72
Temp - 98.6

c/o burning on urination - taking AZO - OTC
x ††† days

## Urinalysis

### IMC – DOCTORS CLINIC
1772 S. Alabama Ave. • Monroeville, AL 36460

Tech JL
Date 1-7-98
Time Coll. 4:30

NAME Cathy Cleland

| CHEMICAL | RESULT | NORMALS | MICROSCOPIC | RESULTS | NORMALS |
|---|---|---|---|---|---|
| COLOR | pale yellow | | RBC | 2-3 | 0 - 3 hpf |
| CHARACTER | hazey | | WBC | 2-3 | 0 - 3 hpf |
| SP. GRAVITY | 1005 | | BACTERIA | Rare | < 1 + |
| NITRITE | Ø | NEG | HYALINE CASTS | Ø | 0 - 1 hpf |
| pH | 7.0 | 5.0 - 8.0 | GRANULAR CAST | Ø | O |
| PROTEIN | Ø | NEG | RBC CAST | Ø | O |
| GLUCOSE | trace | NEG | EPITHELIAL CELLS | Rare | squamous |
| KETONE | Ø | NEG | CRYSTALS | Ø | Few Caox Amorphous |
| UROBILINOGEN | Ø | < 1 mg/dL | MUCUS THREADS | Ø | < 1 + |
| BILIRUBIN | Ø | NEG | PREGNANCY TEST | RESULT | OTHER |
| BLOOD | Ø | NEG | | | |

COMMERCIAL PRINTING • 564-2361 • PETERMAN

leuk 1+

CLELAND, Cathy                    01-07-98
S - The patient is in the office today with complaints of dysuria. She has been on Azo Gantrisin. There has been some urinary frequency.
O - On examination, abdomen - nontender; there is no cva tenderness. Urinalysis - 1+ leukocytes, but only 2-3 white and red cells.
A - URINARY TRACT INFECTION, POSSIBLY PARTIALLY TREATED
P - Will check a culture/sensitivity of the urine. Keflex 500 mg. bid. for seven days. I explained to the patient that she needs a GYN evaluation, she asked to see a gynecologist. I did recommend that she have this done promptly. Will check a hemoglobin A1C, chemistry 17 and electrolytes, for evaluation of her diabetic control
CT/rm

9-98   pt informed of last labwork - Glucose still
being elevated, pt instructed to make appt to follow
lab                                          [signature]

1-21-98  C/o review lab result
BP 108/70                    (P) (N)
P 170                       P5/25   Am
                       readable pm

CLELAND, CATH                01-21-98
S  -  The patient is in the office today for review of her laboratory
studies.  Hemoglobin A1C was slightly elevated at 6.9.  Fasting glucose was
236.  She states that this has been considerably lower at other times.
I  -  1.  DIABETES MELLITUS.
P  -  We did obtain a urine specimen, but the patient is on her menstrual
period at the current time.  We will need to recheck this after she completes
her cycle.  We will make her an appointment with an ophthalmologist for a
yearly examination in regards to any diabetic retinopathy.  I also explained
that we will need to repeat her fasting blood sugar in a couple of weeks.
The patient will recheck sooner for any problems.
CE/rm
                            [signature]

1-30-98   Had stopped antidepressants over past
(Phone)   few months - Restart
          Prozac 20 mg q day
          Talk to me before stopping -
          Denies SI/HI

          → To Jackson Pharmacy
             Revco
             (# 30, TRF)

                    [signature]

ADVANTAGE280

8-8-97.
BD
T
WT

8/14/97 — Restoril 15 mg i/hs prn sleep
(#12)
OTT

8-15-97 C/o Jack about Medication
WT 173
BD 10/4/70
T 98.4

CLEILAND, KATHY                                    08-15-97
S — The patient is in the office today for a check-up.  I had a long
discussion with her regarding some problems that she is having.  Her daughter
has entered a drug rehabilitation program.  Also, she and her husband are
having a great deal of difficulties.  The patient denies any suicidal or
homicidal ideations.
The patient does mention wanting to try a different anti-depressant, one that
a family member had been taking; she had tried this and it had helped
decrease her appetite, as she has been worried about her weight.  She had
been doing fairly well on Prozac until the recent problems.
Also, I discussed with the patient the possible need for evaluation by a
psychiatrist.  She was very receptive to this and states that she will check
with her insurance company to which one is on their list.  I explained that
we will be glad to schedule this for her.  The patient states that she will
try to let us know that either today or tomorrow.
I explained that I would like for her to continue on the Prozac for the
present time.  The patient will let us know if there is any worsening of her
symptoms or any other problems.  She will continue on the Restoril as needed
for sleep.
The patient will recheck in the office as needed for any problems.
CE/rm

CE

ADVANTAGE281

CLEILAND, KATHY                          08-29-97
TELEPHONE CONVERSATION
Discussion was healed with the patient.  We will call in some Luvox 50 mg.,
one at bedtime, #30 given with one refill, to Revco Pharmacy in Jackson.  She
was instructed to discontinue the Prozac.  The Luvox will be started on
Monday.  The patient will call the office for any problems.  CE/rm

Cathy Cleiland

CLEILAND, CATHY                          06-13-97

S - The patient is in the office today for follow-up. Her main complaint today is in her right foot, along the lateral aspect of the foot extending behind the lateral malleolus. Her neck and headache symptoms are much improved with the Skelaxin. The patient states that in general she is feeling better. She continues to have some occasional muscle pain in the extremities.
The patient states that she has also noticed a varicosity in the left lower extremity.
O - On examination, there is a varicosity of the left lower extremity, just below the knee. There is mild associated indenting; the tissue below this is actually somewhat indented. Reflexes are normal. There are no motor or sensory deficits. There is some tenderness along the lateral aspect of the right foot. Good pulses are felt. Reflexes are normal in the upper extremities. There is good grip strength noted. Strength is normal in the lower extremities as well. There is no significant tenderness in the neck.
I - MOTOR VEHICLE ACCIDENT WITH MULTIPLE MUSCULOSKELETAL PROBLEMS. MOST OF THESE ARE RELIEVED.
X-ray was done of the right foot; there were no fractures seen. I suspect that this represents some tendinitis.
P - Will go ahead and restart Naprosyn 375 mg. bid. with food; GI side affects were explained to the patient. She was instructed to apply heat to the affected area. She will recheck in the office as scheduled in two weeks. The patient will recheck sooner for any worsening of her symptoms or any other problems.
CE/rm

6/27/97    pt cancelled

7-14-97 c/o recheck
BP 130/90
T
wt 171

CLEILAND, CATHY                          07-14-97

S - The patient is in the office today for a check-up. She states that her foot is feeling well. She occasionally has headaches, but these are improved. She also complains of some neck pain at times. The patient also noticed that she has an indentation of the left side of the leg.
O - On examination, reflexes are normal. There is the previously noted indentation, laterally, on the lower leg, just above the calf. Pulses are good. Reflexes are normal. There is no tenderness noted in the neck.
I - MOTOR VEHICLE ACCIDENT WITH MULTIPLE MUSCULOSKELETAL PROBLEMS.
P - The patient will be referred to Dr. Wallace for further evaluation and/or treatment. She will recheck in my office as needed for any problems.
CE/rm

ADVANTAGE282

11-4-97 10:14AM
BP 138/83
T99
WT 166

Curred R̶x̶

① Insulin
② Naprosyn
③ Prozac
④ Fioricet

MILLS, M.D., KATHY                          09-04-97

S – The patient is in the office today with complaints of pain/headache, which is actually in the occipital region of the head. She states that the pain actually begins in the neck and radiates upward. She also complains of some pain between the shoulder blades.

O – On examination, there is tenderness in the superior portion of the trapezius and in the posterior cervical musculature. There is full range of motion of the neck. There is pain with flexion and extension as well as rotation. Reflexes are normal. Cranial nerves 2-12 are intact. Optic discs sharp. Deep tendon reflexes are 2+/4+ and equal. There appears to be spasm in the upper back and neck.

A – HEADACHES.
     NECK PAIN.
     ASSOCIATED SPASMS.

P – Will add Skelaxin one tid. as needed for muscle spasms. The patient was instructed not to take the Fioricet and Skelaxin together. She will continue on the Naprosyn as previously prescribed. She will recheck in the office as scheduled next week. The patient will recheck sooner for any worsening of her symptoms or any other problems.

NOTE: The patient was instructed not to drive, work or perform any hazardous activities after taking the Skelaxin.

CE/rm

D-13-97  C/O  FOLLOW-UP
BP 120/76
T98.7
WT 171
xray - # 97 -328

see   next page

CONTINUATION

NAME: Cathy Cliiland

ADDRESS:

| 5-2-97 | ℅ Was in a car wreck last |
| WT 164 | week. Wants M.D to look at L |
| BP 142/80 | leg |
| T | |

Cliiland, Cathy                    05-02-97                    - - - -
WORKMEN'S COMPENSATION
S  -  The patient is in the office today, stating that she was instructed in
an automobile accident, on the way to work.  She states that she has had pain
particularly in her left knee.  She has seen Dr. Guy Rutledge in Mobile since
that time.  She otherwise has some minor stiffness in her neck.  There is no
pain in the low back.  The patient states that she was wearing a seatbelt.
There was no loss of consciousness
O  -  On examination, there is only mild tenderness in the posterior cervical
musculature.  There is full range of motion noted.  Reflexes are normal.
There are no motor or sensory deficits noted.  Chest - clear.  Heart -
regular without murmurs, gallops or rubs.  There is some tenderness and
bruising of the left lower extremity, about the knee  Pulses were good.
Measurements of the calf and thigh were equal.
I  -  CONTUSIONS. TO KNEE
P  -  The patient will follow-up as instructed with Dr. Rutledge in Mobile.
She will recheck in my office as needed for any problems.
NOTE:  The patient was instructed to watch for swelling, increased pain,
numbness, weakness, etc.
CE/rm      CE                      5 - 9 -97

| 5-28-97 | Re Check post MVA |
| WT 167 | |
| BP 130/80 | |

(see next page for dictation)

Cathy Cleiland

5-28-97    (Cont.)

CLEILAND, CATHI                    05-28-97

S - The patient is in the office today for recheck, after being involved in a motor vehicle accident. She had seen the orthopaedist again and states that she does not wish to go back to see him.

The patient has three complaints today. One is of continued neck pain. She states that this has actually improved over the last couple of weeks, but she does continue to have some neck pain with some stiffness. She also complains of headaches in the occipital region.

The second complaint is pain about the left knee. The patient states that this is worse laterally. She states that this had improved somewhat, but as she began doing some increased walking, she noticed increased pain in that knee. There is no weakness or numbness.

The third complaint involves her right little toe. The patient states that she has had some pain, which sometimes extends more proximal on the foot, but this has completely cleared at the present time.

O - On examination, the patient continues to have some pain elicited with flexion and extension of the neck primarily. There is less pain with lateral motion, but there is some minimal residual pain elicited with the lateral rotation. Reflexes are normal in all four extremities. There are no motor deficits noted. Left knee - there is some tenderness laterally, just distal to the left knee. There are no joint effusions noted. Anterior and posterior drawer signs are negative. There is full range of motion of the knee. There is no tenderness of the little toe. Right foot was normal on examination. Good pulses are felt.

1 - NECK, LEFT KNEE AND RIGHT LITTLE TOE PAIN, AS DESCRIBED ABOVE.

P - We will give the patient a couple more weeks of observation. I explained that I do not want her to do any excessive walking, but she can undertake her regular activities. She was instructed to apply heat to the affected areas. She will continue on the Naprosyn as previously prescribed. The patient will recheck in the office as scheduled in a couple of weeks; she will recheck sooner for any worsening of her symptoms. I explained that if her symptoms are persistent beyond that time, she may require further evaluation and/or treatment. The patient voices understanding and is agreeable with this treatment plan.

CE/rm                    CE



ADVANTAGE285

CONTINUATION

FORM
NAME  1/27/97
ADDRESS                                                    DATE

↓ Rash on knuckles
F/U if not clear 2weeks
Prozac 20mg q day
to Big B            (# 30, 2RF)

CE

4/17/97    Revco (Jackson, AL)
           Humulin N        h. A.D.
                     R
           10RF
                        CE

ADVANTAGE286

CLEILAND, CATHY                    01-20-97

S  -  The patient is in the office today with complaints of pain in her hands; she states that this is across both knuckles.  She states that she had noticed some swelling at the time of taking antibiotics, but that had improved.  The patient states that she is not sure if there is a rash including this area, or whether it involves the knuckles themselves.  This is worse on the right.

O  -  On examination, the patient does have some erythema overlying the MCP joint on both hands.  There is some flaking of the skin and cracking.  The joints themselves do not seem to be enlarged at this time.  There are no other abnormalities noted at this time in the hands (the joints).

I  -  POSSIBLE RASH.

P  -  Lotrisone cream to the affected areas, twice daily.  The patient was instructed to let us know if her symptoms have not cleared in two weeks.  She will recheck sooner for any worsening of her symptoms or any other problems.  I explained that I would like for her recheck in the office in two weeks.  If her symptoms are persistent or if she develops more symptoms suggestive of joint problems, we may need to make a referral.

ADDENDUM:  The patient also complained of some problems in her marriage.  She states that she has been married for about six months now and there has been a great deal of stress.  She denies any suicidal or homicidal ideations.  The patient asked about going back on Prozac, which she had been taking previously.  We will see how this medication treats her knuckle symptoms of the next couple of days; I explained that I would prefer that she not start two different medications at the same time.  When she calls the office with a progress report, we can discuss beginning the Prozac, possibly next week.  The patient voices understanding and is agreeable.

CE/rm

ADVANTAGE287

mentioned lab work is noted. She will return after the above
of her symptoms or any other problems.
NOTE: The patient gets an annual eye check-up.
ADDENDUM: The patient states that she has bilateral foot pain. She states
that it has been present for six months. Good pulses are felt. There are no
motor or sensory deficits are noted. We will check lab work and will re-
evaluate this on recheck in the office. CE/rm  *CE*

11-11-96   Cipro 250 BID x 7 days
           (By B Jackson, AL)
           Warned Re sun R/me
           [Stop Bactrim]

**DIAGNOSIS — TENTATIVE**

**FINAL**

CLEILAND, KATHY            11-15-96
TELEPHONE CONVERSATION
The patient states that she has had some swelling in her joints as well as
some pain after taking Cipro. She states that she stopped this medication
last night and her symptoms are improved today. There has been no rash
noted, with the exception of a little bit of redness over the joints of her
hands. She states that she is having no more urinary symptoms.
The patient had taken the Cipro for approximately four days. Therefore, we
will discontinue that medication. She was instructed to bring in a urine
specimen next week. She will let us know if she has any recurrent symptoms
of dysuria, frequency or hesitancy. Otherwise, we will repeat a urinalysis
next week to see if this was sufficient to clear the infection. CE/rm

-8-97    cancelled
BP
T
wT

-20-97 c/o pain in hands
wT 163
BP 130/90
T

            dictation on next page

ADVANTAGE288

PHYSICAL EXAMINATION

NAME Cathy K Cleiland    36545   AGE 39 SEX F S M D W

ADDRESS HOI Jordan, Jackson, AL   PHONE 246-7419 DATE 11-8-96

INSURANCE BC-BS XAA4246 438H

SPONSOR Self     ADDRESS

OCCUPATION Medline    REF BY    ACCR

COMPLAINTS 11-8-96   C/o odor to urine, frequent urination
WT 164/2
BP 108/90
T 98.6

PREVIOUS ILLNESSES   NKA

**Urinalysis**

| Color | | Micro | |
|---|---|---|---|
| Sp. Gr. 1.0 | | REC | 0-1 |
| Ph | 8.5 | WBC | 10-15 |
| Prot | 0 | Casts | 0 |
| Gluc | 0 | Epith cells | few |
| Ket | 0 | Crystals | 0 |
| Bili | 0 | Bacteria | Mod |
| Blood | 0 | Mucus | 0 |
| Nit | 0 | Other | Leuk = 3+ |
| UROB | 0 | | |

HABITS   EATING   SLEEPING   BATHS   BOWELS

DRINK   MARITAL   TOBACCO   ALCOHOL

FAMILY HISTORY

CLEILAND, CATHY     11-08-96

S - This is the first visit in my office for this 39 year old white female. The patient is in the office today with complaints of an odor to her urine. She states that she has had some urinary frequency, urgency, hesitancy and dysuria, although everything but the odor has improved over the last couple of days. She denies any abdominal pain. The patient states that she does have some lower back pain. There has been no nausea, vomiting, diarrhea, etc. She states that this has been present for approximately two weeks. The patient states that sometimes she has some associated swelling with the urinary tract infections and believes that she has gained a few pounds at this time due to the above symptoms.

PAST MEDICAL HISTORY: There are no known allergies. The patient is currently taking Humulin insulin 25 units of N and 15 units of R in the morning; she states that she takes a variable amount of insulin in the evening. HISTORY is also positive for mitral valve prolapse; she states that she only had one episode with this; this was when it was first diagnosed. The patient denies any other major medical problems, besides the diabetes mellitus.

FAMILY HISTORY is significant for diabetes mellitus.

SOCIAL HISTORY - the patient neither drinks nor smokes. She is employed by MedLine.

O - On examination, the patient is a well nourished, well developed white female. She is in no apparent distress. TM's - clear. Pharynx - clear. Neck - supple without thyromegaly. Chest - clear. Heart - regular without murmurs, gallops or rubs. Abdomen - soft, nontender, nondistended. There is no cva tenderness. Neurological - grossly non-focal. Extremities - trace edema.

I - 1. URINARY TRACT INFECTION.
    2. PERIPHERAL EDEMA.
    3. DIABETES MELLITUS.
    4. MITRAL VALVE PROLAPSE.

ADVANTAGE289

P - Bactrim Double Strength bid. for seven days. Will check culture/sensitivity of the urine. I explained to the patient that she needs to have a fasting chemistry 27 level as well as hemoglobin AiC. Will refill

(Cont.) next page

'. Lemuel Gorden
Medical Director
    TIME: 12:22

WADE COUNTY HOSPITAL
MONROEVILLE, ALABAMA 36460

CLIA    Number:
        DID0671555

LABORATORY --- CUMULATIVE REPORT FOR DOCTORS CLINIC
                                                        HSLACUMV

ME.: CLEILAND CATHY ANN
CTU#: B35462
OK.: CONT.          - NO PENDING ORDERS
CATION: DOCTORS CLINIC

SEX.......: F
AGE.......: 46 Y
DOB.......:
PAT. PHONE: 2517659682

PHY..: BORDUGHS IV BERT
ADMIT: 10/22/03
MRN..: 769-3061

D/C'd

## ICROBIOLOGY          251-769-3061

| --ORDERED-- | --COLLECTED-- | --REC'D-- | --RESULTED-- | --VERIFIED--- |
|---|---|---|---|---|
| 10/22/03 1710 | 10/22/03 1416 | 10/22/03 1710 | 10/24/03 0951 | 10/24/03 0951 |
| HRA | MJ | HA | JDF | JDF |

URINE CULTURE

Sensitivities are not performed on mixed cultures of three or more organisms unless requested.

    Method Of Collection    UNSPECIFIED

    PRELIMINARY REPORT    100,000 CFU/ML E. COLI

                    after  24  hours

    FINAL REPORT        E. COLI

                    after  48  hours

                Department of Pathology—Microbiology Section

Specimen Source  Urine
Specimen Note:   CC

Exam Id. No:        37159

Collection Date 10/22/03
Receipt Date    10/22/03        Collection Time 14:16

Exam Status Preliminary

Organism # 1:   Escherichia coli (esccol)

10/31/03 pt. notified

| Antibiotics | esccol(1) | | Adult Dosage | Cost/24 Hours |
|---|---|---|---|---|
| Cefazolin | I | | | |
| Ampicillin | R | | | |
| Tobramycin | S | | | |
| Cefuroxime - Axetil | S | | | |
| Cefuroxime - Sodium | S | | | |
| Nitrofurantoin | S | | | |
| Levofloxacin | S | | | |
| Trimethoprin/Sulfa | R | | | |
| Ciprofloxacin | S | | | |
| Ticarcillin/CA | S | | | |
| Amoxicillin/CA | S | | | |
| Carbenicillin | R | | | |
| Ceftriaxone | S | | | |
| Cephalothin | I | | | |
| Minocycline | S | | | |
| Nalidixic Acid | S | | | |
| Norfloxacin | S | | | |

Macrobid 100 tab x 5 days

ADVANTAGE290

10/31/03 called & left message to call back

LEGEND: L-Low, H-High, C-Critical, A-Abnormal, *E*-Error

PRINT DATE: 10/24/03 0??
Dr. Lemuel Burden
Medical Director
TIME: 12:22

MONROE COUNTY HOSPITAL
MONROEVILLE, ALABAMA 36460
LABORATORY --- CUMULATIVE REPORT FOR DOCTORS CLINIC

PAGE 1
CLIA Number: 01D0671555
HSLPCUMC

NAME: CLEILAND CATHY ANN
ACCT#: B25-65
ROOM: CONT. - NO PENDING ORDERS
LOCATION: DOCTORS CLINIC

SEX........: F
AGE........: 46 Y
DOB........: 07/11/1957
PAT. PHONE: 2517659885

PHY..: BOROUGHS TO BERT
ADMIT: 10/22/03
MR#..: 169-3061

# MICROBIOLOGY

| HRG | MJ | AA | JDF | JDF |
|---|---|---|---|---|
| 10/22/03 1710 | 10/22/03 1416 | 10/22/03 1710 | 10/24/03 0951 | 10/24/03 0951 |
| --ORDERED-- | --COLLECTED-- | --REC'D-- | --RESULTED-- | --VERIFIED-- |

ADVANTAGE291

URINE CULTURE

Sensitivities are not performed on mixed cultures of three or more organisms unless requested.

Method Of Collection UNSPECIFIED

PRELIMINARY REPORT 100,000 CFU/ML E. COLI

after 24 hours

FINAL REPORT E. COLI

after 48 hours

Department of Pathology--Microbiology Section

Specimen Source Urine
Specimen Notes CC
Collection Date 10/22/03 Collection Time 14:16
Receipt Date 10/22/03

Exam Id. No: 2?159
Exam Status Preliminary

Organism # 1: Escherichia coli (ecoli)

| Antibiotics | ecoli(1) | Adult Dosage | Cost/24 Hours |
|---|---|---|---|
| Cefazolin | I | | |
| Ampicillin | S | | |
| Tobramycin | S | | |
| Cefuroxime - Axetil | S | | |
| Cefuroxime - Sodium | S | | |
| Nitrofurantoin | S | | |
| Levofloxacin | S | | |
| Trimethoprim/Sulfa | S | | |
| Ciprofloxacin | S | | |
| Ticarcillin/CA | S | | |
| Amoxicillin/CA | S | | |
| Carbenicillin | S | | |
| Ceftriaxone | S | | |
| Cephalothin | I | | |
| Minocycline | S | | |
| Nalidixic Acid | S | | |
| Norfloxacin | S | | |

PRINT: 10/24/03 12:22 CLEILAND CATHY ANN 064 Pages: : CONTINUED

LEGEND: L-Low, H-High, C-Critical, A-Abnormal, *E*-Error

INT DATE: 10/24/03 064
. Lemuel Gorden
edical Director
    TIME: 12:22

JABOE COUNTY HOSPITAL
MONROEVILLE, ALABAMA 36460

PAGE    2
CLIA    Number:
DID0671555
HSLACUMV

LABORATORY ---- CUMULATIVE REPORT FOR DOCTORS CLINIC

ME.: CLEILAND CATHY ANN
CT#: B35462
DM.: CONT.
CATION: DOCTORS CLINIC

- NO PENDING ORDERS

SEX.......: F
AGE.......: 46 Y
DOB.......:
PAT. PHONE: 2517659682

PHY..: BOROUGHS IV BERT
ADMIT: 10/22/03
MRN..: 769-3061

**ICROBIOLOGY**

"S" = SUSCEPTIBLE    "I" = INTERMEDIATE    "R" = RESISTANT

(C&S done) **Urinalysis**

Tech: _____
Date: 6-23-03
Time Coll. 1415

**IMC – DOCTORS CLINIC**
1772 S. Alabama Ave. • Monroeville, AL 36460

| NAME | Cleiland Cathy R | | MICROSCOPIC | RESULTS | NORMALS |
|---|---|---|---|---|---|
| CHEMICAL | RESULT | NORMALS | RBC | | 0 - 3 hpf |
| COLOR | Straw | | WBC | | 0 - 3 hpf |
| CHARACTER | Clear | | BACTERIA | | < 1 + |
| SP. GRAVITY | 1.005 | | HYALINE CASTS | | 0 - 1 hpf |
| NITRITE | | NEG | GRANULAR CAST | | O |
| pH | 5.0 | 5.0 - 8.0 | RBC CAST | | O |
| PROTEIN | | NEG | EPITHELIAL CELLS | | squamous |
| GLUCOSE | 1+ | NEG | CRYSTALS | | Few Caox Amorphous |
| KETONE | | NEG | MUCUS THREADS | | < 1 + |
| UROBILINOGEN | 0.2 | < 1 mg/dL | | RESULT | OTHER |
| BILIRUBIN | | NEG | | | |
| BLOOD | | NEG | PREGNANCY TEST | | |
| LEUK | none | | | | |

COMMERCIAL PRINTING • 864-2361 • PETERMAN

*ADVANTAGE292*

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E=Error

PRINT DATE: 10/24/03 064 MONROE COUNTY HOSPITAL PAGE 2

Dr. Lemuel Borden MONROEVILLE, ALABAMA 36460 CLIA Number:

Medical Director 01D0671555

TIME: 12:25 LABORATORY --- CUMULATIVE REPORT FOR DOCTORS CLINIC HELMCUMV

NAME.: CLEILAND CATHY ANN SEX.......: F PHY..: BOROUGHS IV BERT

ACCT#: B35465 AGE.......: 46 Y ADMIT: 10/22/03

ROOM.: CONT. - NO PENDING ORDERS DOB.......: 07/11/1957 MR#..: 769-3061

LOCATION: DOCTORS CLINIC PAT. PHONE: 2517659882

**MICROBIOLOGY**

"S" = SUSCEPTIBLE "I" - INTERMEDIATE "R" = RESISTANT

ADVANTAGE293

PRINT: 10/24/03 12:25 **CLEILAND CATHY ANN** 064 Page: 2 LAST

LEGEND: L-Low, H-High, C-Critical, A-Abnormal, *E*-Error

LABORATORY --- CUMULATIVE REPORT FOR DOCTORS CLINIC

SEX......: F
AGE......: 45
DOB......: ▓▓▓▓▓▓
PAT. PHONE: 2512467419

PHY...: JONES TIM MD
ADMIT: 09/26/02
MRN..: 246-7419

## CROBIOLOGY

| --COLLECTED-- | --REC'D-- | --RESULTED-- | --VERIFIED--- |
|---|---|---|---|
| 9/26/02 1100 | 9/26/02 1202 | 9/30/02 1241 | 9/30/02 1241 |

URINE CULTURE

Method Of Collection

PRELIMINARY REPORT      50,000 CFU/ML GRAM NEGATIVE ROD
                        ID/SENSITIVITY TO FOLLOW.
                        After  24  Hours

FINAL REPORT            E. COLI

                        After  48  Hours

**Urinalysis**

**IMC – DOCTORS CLINIC**

1772 S. Alabama Ave. • Monroeville, AL 36460

Tech: KW
Date: 9-26-02
Time Coll: 1040

NAME: Cathy Cleiland

| CHEMICAL | RESULT | NORMALS | MICROSCOPIC | RESULTS | NORMALS |
|---|---|---|---|---|---|
| COLOR | Straw | | RBC | 0 | 0 - 3 hpf |
| CHARACTER | hazy | | WBC | 30 - 40 | 0 - 3 hpf |
| SP. GRAVITY | 1.010 | | BACTERIA | 3+ | < 1 + |
| NITRITE | — | NEG | HYALINE CASTS | 0 | 0 - 1 hpf |
| pH | 10.0 | 5.0 - 8.0 | GRANULAR CAST | 0 | 0 |
| PROTEIN | — | NEG | RBC CAST | 0 | 0 |
| GLUCOSE | — | NEG | EPITHELIAL CELLS | few | squamous |
| KETONE | — | NEG | CRYSTALS | 0 | Few Caox Amorphous |
| UROBILINOGEN | nl | < 1 mg/dL | MUCUS THREADS | 0 | < 1 + |
| BILIRUBIN | | NEG | | | |
| BLOOD | — | NEG | PREGNANCY TEST | serum neg | RESULT    OTHER |
| LEUK | large | | | | |

COMMERCIAL PRINTING • 864-2601 • PETERMAN

ADVANTAGE294

**CLEILAND CATHY ANN**

MEDICAL DIRECTOR
    TIME: 15:56

LABORATORY ---- CUMULATIVE REPORT FOR DOCTORS CLINIC

CLIA  NUMBER:
01D0671565
HSLACOM

RE.: CLEILAND CATHY ANN
DX#: A78105
UNIT DON#,
PATTON: DOCTORS CLINIC

- NO PENDING ORDERS

SEX.......: F
AGE.......: 45 )
DOB......: ████
PAT. PHONE: 2512467415

PHY..: JONES TIM MD
ADMIT: 09-26-02
NR#..: 2467415

# ICROBIOLOGY

ADVANTAGE295

MONROE COUNTY HOSPITAL
MONROEVILLE, ALABAMA 36460

=============================================================
R A D I O L O G Y    R E P O R T
=============================================================
--------NAME--------    NUMBER    SEX AGE    ADMIT     DISC.    XRAY#         F/C    TYPE
CLELAND CATHY ANN        A73178    F   45   9/13/02   9/13/02  53665          P     O/P
    DATE OF BIRTH:                  M/R# 52657    PH#: 251-765-9882   RM
    LOCATION:                                 TRANSCRIBED: 9/17/02  7:48  RW
    =>MAMMO ORDER<=                           COMPLETE:09/13/02 13:30  AAF 88519
    Reason for Procedure:  ROUTINE
    MAMMOGRAPHY,SCREENING,BILAT    76092      COMPLETE:09/13/02 13:30  AAF 88533
    PHYSICIAN: EDDINS C

**Unsigned transcriptions represent a preliminary report and do not reflect
a medical or legal document.**
=============================================================
    A.  A negative x-ray report should not delay biopsy if a dominant or
        clinically suspicious mass is present.  Up to 10% of cancers are not
        identified by x-ray.
    B.  A negative report may reinforce clinical impression.
    C.  Adenosis and dense breasts may obscure an underlying mass.
    D.  False positive reports average 6-10%.

REASON FOR EXAM:     Screening.

RISK FACTORS:        Late child bearing, after age 30. Cyst aspiration in left
                     breast in 1992.  No hormones.

TISSUE DENSITY:      The breasts are of average density.

FINDINGS:            No discrete abnormality identified.

IMPRESSION:          NEGATIVE MAMMOGRAM, ACR CATEGORY I.

RECOMMENDATION:      ROUTINE YEARLY MAMMOGRAPHY UNLESS CLINICALLY INDICATED
                     SOONER.

The patient will receive written notification of results in lay terms.
-------------------------------------------------------------------------------


JOSEPH M. BAILEY, M.D.


DANIEL S. NOYES, D.O.

Transcribed:    09-17-02 / rw


ADVANTAGE296



54  pgs
*******AUTO** ALL FOR ADC 630          000406
000000406 10 AB    2.317
ATTN: DAN SCHULTE
ADVANTAGE 2000 CONSULTANTS
1 CORPORATE DR
SWANSEA IL  62226-2066

APR 0 9 2004

# ATTENTION
## Confidential information enclosed.
## To be viewed by authorized persons only.

# If you have questions regarding these records or any other information you have requested from Smart, please call the phone number on the attached invoice

The enclosed health information was reproduced by Smart Document Solutions, a health information outsourcing service.  Your health care facility contracts with Smart to process authorized copies of medical records.

The reproductions have been made from the medical facility 's original records.  The confidentiality of these records is protected by federal and state laws and regulations, including the Health Insurance Portability and Accountability Act (HIPAA).

If you requested items that are not maintained in the medical record, your request for those items was forwarded to the appropriate department and will be sent under separate cover.

Some medical records contain sensitive information that cannot be released without specific patient authorization.  If you need this information, please provide such authorization.  If the patient has questions about the need for specific authorization, he/she must contact the medical records department of the facility.

Since this facility has chosen to outsource its medical records reproduction function, Smart serves at the facility 's instruction. Future requests for medical records must continue to be directed to the facility.

ADVANTAGE297

# PLEASE NOTE:

SMART DOCUMENT SOLUTIONS, LLC
REMIT ADDRESS HAS CHANGED.

NEW REMIT (**PAYMENTS ONLY**)
ADDRESS IS ON THE ENCLOSED
INVOICE.

Please do not send any correspondence to
this address. (**PAYMENTS ONLY**)

---

Please direct all your **correspondence** to
the following address

**Smart Document Solutions LLC
PO BOX 1812
Alpharetta, GA 30023 – 1812**

THANK YOU FOR YOUR COOPERATION

ADVANTAGE298

TRANSMISSION VERIFICATION REPORT

```
                                      TIME : 07/13/2004 14:13
                                      NAME : ADVANTAGE 2000 CCMSP
                                      FAX  : 3148944891
                                      TEL  : 8005805299
```

```
DATE,TIME                07/13  14:09
FAX NO./NAME             812514415993
DURATION                 00:04:20
PAGE(S)                  15
RESULT                   OK
MODE                     STANDARD
                         ECM
```

# *ADVANTAGE 2000 CONSULTANTS, Inc.*

P.O. Box 24157                                    Fax: 314-894-4891
Belleville, IL 62223                              Phone: 800-580-5299

## FAX COVER

| To: Judge Ryan | FAX: 251-441-5993 |
| --- | --- |
| From: Trudy Wagner of Advantage 2000 Consultants | |
| RE: OTR Request | Re: Cathy A. Key |
| Date: 07/13/2004 | SS# ▓▓▓▓▓▓ |

## Attn. Master Docket Clerk,

Here is a copy of the OTR Brief that was sent on May 24, 2004.

Thank you,

*Trudy Wagner*
Claims Unit Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

ADVANTAGE299

# EXHIBIT

## "I"

# EXHIBIT

## "I"



**ADVANTAGE 2000
CONSULTANTS INC.**
*"Your Gateway to Social Security"*

*Visit Us Online at: www.advantage2k.com*

*4121 Union Rd. Ste. 216 St. Louis Mo 63129*
*Telephone: (800) 899-3433- Fax: (314) 845-6141*
*Email: advantage2000@advantage2k.com*

Wednesday, August 10, 2005

Ms. Cathy A Cleiland
P.O. Box 148
Clio, AL 36017

Dear Ms. Cleiland:

This letter is to confirm our conversation today regarding the coordination of your Social Security Disability benefits with your CIGNA Group Insurance Long Term Disability benefits.

Please review the attached CIGNA Group Insurance Overpayment Calculation Worksheet. This information indicates you received Long Term Disability benefits from CIGNA Group Insurance that did not offset for your Social Security Disability Insurance benefits for the period 11/10/2003 through 7/9/2005. Consequently, CIGNA Group Insurance overpaid you in the amount of $25,240.66.

According to the Reimbursement Agreement you originally signed, this amount is due back to CIGNA Group Insurance. Please remit a check made payable to Advantage 2000 Consultants, Inc. in the amount of $25,240.66 with the understanding that this money will be sent to CIGNA Group Insurance and applied toward your Long Term Disability benefits overpayment.

If you have any questions or concerns regarding this process, please contact me at 1-800-899-3433, ext 212. Thank you for your consideration.

Sincerely,

Mary E Boyd
Benefit Coordinator

Enclosures

Cleiland, Cathy Policy: FLK 20104 Policy Holder: Temple Inland DOB: 7/11/1957    Page 1 of 1

## Archacki, Kelli 212

| | |
|---|---|
| **From:** | Tammy Isaak [tammy.isaak@advantage2k.com] |
| **Sent:** | Tuesday, July 05, 2005 1:17 PM |
| **To:** | Archacki, Kelli 212 |
| **Cc:** | Brady, Chris 212; CGI Overpayment Recovery Unit |
| **Subject:** | Cleiland, Cathy Policy: FLK 20104 Policy Holder: Temple Inland DOB |

<<Cleiland, Cathy.rtf>> <<Cleiland, Cathy FACT Query.pdf>> <<OP Calc Sheet.xls>> <<Referral Overpayment Form.doc>>

Please complete the attached LTD Overpayment Calculation Sheet and return it to Advantage 2000 Benefit Coordination Team (RecoveryTeam@advantage2k.com) within 72 hours of receipt. In addition, the attached CGI Recovery Team Referral Guide is to be completed and forwarded to the CGI Recovery Team along with a copy of the completed calculation sheet. Once received, our Benefit Coordination Team will contact the claimant to coordinate the repayment of their LTD Overpayment.

**PLEASE NOTIFY ADVANTAGE 2000 IMMEDIATELY IF YOU HAVE REASON TO BELIEVE THE LTD CLAIM WILL CLOSE WITHIN THE NEXT TWO MONTHS**

Thank you for allowing us to be of service.

**Tammy Isaak**
Awards Processing Specialist
tammy.isaak@advantage2k.com
**Advantage 2000 Consultants, Inc.**
One Corporate Drive
Swansea, IL 62226

Toll Free: 1-800-580-5299

CONFIDENTIALITY NOTICE:

If you are not the intended recipient and have received this e-mail in error, then please notify the sender immediately. This e-mail transmission may contain confidential or sensitive information that is for use of the intended recipient only. Please delete this e-mail from your files if you are not the intended recipient. Thank you for your compliance.

7/11/2005

LINA/Cleiland 0800

# ADVANTAGE 2000 CONSULTANTS, Inc.

Telephone 1-800-899-3433
Fax 1-314-845-6141

Date:    7/5/2005

To:  Kelli Archacki
     CIGNA Group Insurance - Dallas TX FCO

From:  Tammy Isaak for Dan Schulte of ADVANTAGE 2000 Consultants Inc

## SOCIAL SECURITY DISABILITY ENTITLEMENT
## CONFIRMATION

RE:  **Cathy Cleiland**     SSN: ▮▮▮▮▮▮▮▮    FLK 20104
Phone: (334) 807-0396     Level of Decision = ALJ Hearing

---

**PLEASE NOTIFY ADVANTAGE 2000 IMMEDIATELY IF YOU HAVE REASON TO
BELIEVE THE LTD CLAIM WILL CLOSE WITHIN THE NEXT TWO MONTHS**

---

**Entitlement Data Based On:** 07/01/2005 - Fact Query
**AWARD PROCESSED DATE:** 06/24/2005

| | |
|---|---|
| Date of Disability Established by SS: | 05/14/2003 |
| Date of Entitlement to SS Disability: | 11/01/2003 |
| Retroactive Benefits paid: | $24,600.00 |
| This represents payment through: | 05/01/2005 |

**Diagnosis Code:** 7240 - Disorders of Back (discogenic and degenerative)
**Secondary Diagnosis Code:** 2500 - Diabetes Mellitus

**PRIMARY BENEFIT HISTORY:**

| Date | PIA | Benefit Paid | Basis |
|---|---|---|---|
| 11/2003-11/2003 | $1,217.70 | $1,217.00 | Original Award |
| 12/2003-12/2003 | $1,243.02 | $1,243.00 | Cost of Living Adjustment |
| 01/2004-11/2004 | $1,290.30 | $1,290.00 | Additional Earnings Increase |
| 12/2004-Cont'g | $1,325.10 | $1,325.00 | Cost of Living Adjustment |

**Amounts for Offset Consideration:** *[Your Jurisdiction per Plan Provisions]*
**Primary -**

| | | |
|---|---|---|
| 11/2003 – 12/2003 | @ | $1,217.00 |
| 01/2004 – Cont'g | @ | $1,217.00 + $47.00 Additional Earnings Increase |

**No Dependents are Noted!**

LINA/Cleiland 0801

FW: Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 2...    Page 1 of

## Archacki, Kelli 212

| | |
|---|---|
| **From:** | Trudy Wagner [trudy.wagner@advantage2k.com] |
| **Sent:** | Thursday, June 16, 2005 8:09 AM |
| **To:** | Archacki, Kelli 212 |
| **Subject:** | FW: Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 - DOB: |

Hello Kelli,

This is the information I sent to Yvonne. Are you the new Claim Manager for Ms. Cleiland?

Thanks,

Trudy

-----Original Message-----
**From:** Trudy Wagner
**Sent:** Tuesday, May 31, 2005 2:18 PM
**To:** Yvonne Smith (yvonne.smith@cigna.com)
**Subject:** Claimant: Cathy Cleiland - Administrative Law Judge Hearing - Policy ID #: FLK 20104 - DOB: 7/11/1957

05/31/2005 2:16:02 PM
DOB:
Policy ID #: FLK 20104
Claimant: Cathy Cleiland - Administrative Law Judge Hearing
Client: CIGNA Group Insurance - Dallas TX FCO / Yvonne Smith (800) 352-0611 - yvonne.smith@cigna.com

### Hello Yvonne,

Attached is the Notice of Decision – Fully Favorable OTR for Ms. Key. We will forward the payment information once received. Dan Schulte is the Case Manager handling this claim. If you have any questions, you may reach Mr. Schulte at (800)580-5299 ext. 123.

<<FF OTR Dec 5-26-05.pdf>>
Thank you,

## Trudy Wagner
Case Manager Assistant
Advantage 2000 Consultants
One Corporate Drive
Swansea, IL 62226
(800)580-5299 x144  (618)212-1144
Fax: (314)894-4891
trudy.wagner@advantage2k.com

6/16/2005

 **SOCIAL SECURITY ADMINISTRATION**

Refer To: ████████

Office of Hearings and Appeals
SSA/OHA Hearing Office
550 Government Street
Suite 200
Mobile, AL 36602-2010

Date: **MAY 2 6 2005**

Cathy A. Key
P.O. Box 148
Clio, AL 36017

### NOTICE OF DECISION -- FULLY FAVORABLE

I have made the enclosed decision in your case. Please read this notice and the decision carefully.

**This Decision is Fully Favorable To You**

Another office will process the decision and send you a letter about your benefits. Your local Social Security office or another may first ask you for more information. If you do not hear anything for 60 days, contact your local office.

**The Appeals Council May Review The Decision On Its Own**

The Appeals Council may decide to review my decision even though you do not ask it to do so. To do that, the Council must mail you a notice about its review within 60 days from the date shown above. Review at the Council's own motion could make the decision less favorable or unfavorable to you.

**If You Disagree With The Decision**

If you believe my decision is not fully favorable to you, or if you disagree with it for any reason, you may file an appeal with the Appeals Council.

**How to File an Appeal**

To file an appeal you or your representative must request that the Appeals Council review the decision. You must make the request in writing. You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office. You may also mail your request right to the **Appeals Council, Office of Hearings and Appeals, 5107 Leesburg Pike, Falls Church, VA 22041-3255**. Please put the Social Security number shown above on any appeal you file.

See Next Page

LINA/Cleiland 0806



Cathy A. Key ▓▓▓▓▓▓                                    Page 2 of 3

## Time to File an Appeal

To file an appeal, you must file your request for review **within 60 days** from the date you get this notice.

The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period. The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

## Time to Submit New Evidence

You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review.

## How an Appeal Works

Our regulations state the rules the Appeals Council applies to decide when and how to review a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J).

If you file an appeal, the Council will consider all of my decision, even the parts with which you agree. The Council may review your case for any reason. It **will** review your case if one of the reasons for review listed in our regulation exists. Section 404.970 of the regulation lists these reasons.

Requesting review places the entire record of your case before the Council. Review can make any part of my decision more or less favorable or unfavorable to you.

On review, the Council may itself consider the issues and decide your case. The Council may also send it back to an Administrative Law Judge for a new decision.

## The Appeals Council May Review The Decision On Its Own

The Appeals Council may decide to review my decision even though you do not ask it to do so. To do that, the Council must mail you a notice about its review within 60 days from the date shown above. Review at the Council's own motion could make the decision less favorable or unfavorable to you.

## If No Appeal and No Appeals Council Review

If you do not appeal and the Council does not review my decision on its own motion, you will not have a right to court review. My decision will be a final decision that can be changed only under special rules.

See Next Page

LINA/Cleiland 0807

Cathy A. Key                                     Page 3 of 3

**Your Right To Representation In An Appeal**

You may have a lawyer or other person help you in any appeal you file with the Appeals Council. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with an appeal.

If you get someone to help you with an appeal, you or that person should let the Appeals Council know. If you hire someone, we must approve the fee before he can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past-due insurance benefits to pay towards the fee.

**If You Have Any Questions**

If you have any questions, you may call, write or visit any Social Security office. If you visit an office, please bring this notice and decision with you. The telephone number of the local office that serves your area is (251)246-6018. Its address is Social Security, 4249 N College Ave, Jackson, AL 36545.

                                    Ricardo M Ryan
                                    Administrative Law Judge

cc: Dan Schulte
    One Corporate Drive
    Swansea, IL 62226

LINA/Cleiland 0808

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings and Appeals**

**DECISION**

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability and |
| | Disability Insurance Benefits |
| Cathy A. Key | |
| (Claimant) | |
| | |
| (Wage Earner) | (Social Security Number) |

## PROCEDURAL HISTORY

On October 10, 2003, the claimant protectively filed an application for a period of disability and Disability Insurance Benefits. This case is before the Administrative Law Judge on a request for a hearing filed by the claimant, who is dissatisfied with the previous determination at the state agency level which found that she was not disabled. Dan Shulte, a non-attorney, represents the claimant in this matter. Prior to the scheduling of a hearing in this matter, the undersigned arranged for a disability evaluation to further ascertain the claimant's capacity to perform work-related activities (Exhibit 28F). Based on same, the undersigned is convinced that a full hearing is not necessary in this matter. Instead, a "wholly favorable" decision may be issued in this matter with respect to all disability issues in dispute based on information already available for review (20 C.F.R. § 404.948(a)). The following discussion will highlight the evidentiary support contained in the record for reaching such a conclusion.

## ISSUES

The issues in this case are whether the claimant is under a disability as defined by the Social Security Act and if so, when the disability commenced, the duration of the disability, and whether the insured requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.

## HOLDING

After a thorough evaluation of the record, the Administrative Law Judge concludes that the claimant has been disabled since her alleged onset date of disability, i.e., May 14, 2003. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

LINA/Cleiland 0809



Cathy A. Key                                                                 Page 2 of 6

## LAWS AND REGULATIONS

Section 216(i) of the Social Security Act provides for the establishment of a period of disability, and Section 223 provides for the payment of disability insurance benefits where the requirements specified therein are met.

## EVALUATION OF THE EVIDENCE

The claimant was born on July 11, 1957, making her forty-seven (47) years of age. She has a high school education and four years of college education. In her application for benefits, the claimant alleged that she is disabled due to "multiple back surgeries" and "low back pain." The claimant expressed that these conditions limited her ability to work because she can't walk for more than thirty minutes and can only stay in one position for twenty minutes. In addition, the claimant stated that pain radiated down her left leg and the lower half of her body is very weak. The claimant expressed that she stopped working due to her conditions on May 14, 2003.

A claimant is considered disabled under the Social Security Act when she is unable to engage in any substantial gainful activity because of a physical or mental impairment, or combination thereof, which is expected to last for a continuous twelve month period or result in death. The Commissioner has established a five-step sequential evaluation process by which to evaluate the extent of a claimant's impairment(s) in determining whether the statutory definition of "disability" is met.

Briefly, the sequential evaluation process requires consideration of :(1) whether the claimant is engaging in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly affects her ability to work; (3) whether her impairment meets a listing; (4) whether the claimant can return to her past relevant work; and (5) whether, if the claimant cannot perform her past relevant work, she can perform other work (20 CFR section 404.1520).

The first inquiry in the disability evaluation process involves a determination as to whether the claimant has engaged in substantial gainful activity. The undersigned finds that the claimant has not engaged in work activity since her alleged disability onset date of May 14, 2003. Therefore, a determination in the present case cannot be based on work activity alone.

The evidence establishes that the claimant is suffering from a combination of impairments which is more than a slight abnormality and which has more than a minimal effect on her ability to work, irrespective of age, education and work experience. The undersigned finds at step two of the evaluation process that the claimant has the following impairments which are considered to be "severe" under Social Security Regulations: status post C4-5, C5-6, C6-7 anterior cervical fusions, status post L4-5 diskectomy and L4-5 internal fixation, lumbar radiculitis, insulin dependent diabetes, status post right carpel tunnel release and right shoulder bursitis.

LINA/Cleiland 0810



Cathy A. Key                                    Page 3 of 6

Although the claimant has impairments which are considered to be "severe," as set forth above, they are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments (Appendix 1 to Subpart P, 20 C.F. R. Part 404).

The medical evidence reflects that the claimant has a history of treatment for lumbar spinal instability with radiculopathy (Exhibit 20F)(Exhibit 22F). On November 17, 2003, Mark N. Hadley, M.D., a neurosurgeon, examined the claimant based on a referral from the claimant's treating physician, Dr. John Hackman (Exhibit 21F). Dr. Hadley noted that the claimant had previously had a "good bit of spinal surgery performed" to include three separate anterior cervical procedures, a lumbar spinal surgery in 2002 and a second spinal procedure on July 16, 2003. He noted that the claimant continued to experience intractable pain despite the previous surgeries and moved with precision so as to avoid injury. Dr. Hadley reviewed the claimant's MR studies and opined that she had developed lumbar spinal instability with recurrent nerve root compression. He opined that she should undergo an operative procedure to provide decompression, internal fixation and fusion. Dr. Hadley opined that this procedure would not totally eliminate the claimant's symptoms; rather she would have "an opportunity to benefit" from same. On December 18, 2003, Dr, Hadley performed a L4-5 laminectomy and diskectomy with L4-5 internal fixation and fusion and L4-5 posterior lumbar interbody fusion (Exhibit 22F). Two months post surgery; Dr. Hadley examined the claimant and noted that she continued to experience pain despite surgery and pain medications. He additionally noted that she continued to experience burning sensations and residual left side weakness. He noted his discussion with the claimant that her symptoms were not "positive signs for complete recovery." The record reflects that the claimant participated in pain management therapy at the Center for Pain of Montgomery (Exhibit 26F). On March 29, 2004, treatment records reflected that the claimant presented with complaints of back and leg pain judged to be an eight on a scale of one to ten. Treatment notes reflected that the claimant had been prescribed Robaxin, Lortab and Neurontin medications to alleviate her symptom of pain.

The undersigned finds that a determination in this case cannot be based on medical considerations alone. Therefore, it is necessary to proceed to steps four and five of the sequential evaluation. Steps four and five require a determination of whether the claimant has, during the time at issue, retained the residual functional capacity to perform her past relevant work, and if not, to perform other work existing in significant numbers in the national economy consistent with her age, education and past work experience. In order to make these determinations, it is necessary to assess the claimant's mental and physical residual functional capacity. Residual functional capacity is the most that a claimant can still do despite limitations caused by her impairments.

On April 12, 2005, Keith G. Vanderzyl, M.D., examined the claimant and completed a report to the record (Exhibit 28F). Dr. Vanderzyl noted that the claimant had in the past had numerous

LINA/Cleiland 0811

surgeries to include C5-6 disk fusion, a C6-7 anterior cervical fusion, a C4-5 cervical fusion, a diskectomy at L4-5, and a PLIF surgery. He noted that she had participated in pain management therapy. In addition, he noted that she continued to experience recurrent discomfort, to include, burning dysesthesias, posterior occipital headaches and symptoms of leg and back pain. Dr. Vandrzyl noted that her current medications included Methadone, Robaxin, Neurontin, Klonopin and Effexor. He diagnosed the claimant as follows: status post C4-5, C5-6, C6-7 and anterior cervical fusions with anterior curve leading to now significant degenerative changes at the atlantal axis joint with marked restriction of motion and constant pain and numbness in both arms from probably anterior cord syndrome and known spinal stenosis and status post L4-5 diskectomy times two followed by L4-5 PLIF operation with internal fixation. Dr. Vanderzyl indicated that the claimant's symptoms were not alleviated with "chronic medication." He opined that she was "totally disabled from both her lumbar and cervical problems which will not resolve and will probably worsen with time with significant posterior column deficits leading to a loss of walking stability and bowel and bladder incontinence." Dr. Vanderzyl completed a medical source opinion (physical) and opined that the claimant could stand, walk or sit for a total of thirty minutes at one time. He opined that the claimant could not lift any weight at all. He opined that the claimant could never climb, balance, stoop, kneel, crawl, drive automobile equipment or be exposed to extreme weather conditions.

The Administrative Law Judge finds the claimant's statements regarding her functional limitations and pain credible and consistent with the record when considered in its entirety. The claimant's credibility is bolstered by her excellent work history. Although the issue as to whether a claimant is disabled is one reserved to the Commissioner, the undersigned finds persuasive Vanderzyl's findings regarding the extent to which the claimant's physical impairments and symptoms significantly interfere with her daily activities and her performance of work activity. His opinion regarding the extent to which the claimant's physical impairments preclude her performance of work activity to any appreciable degree is well supported by the record as a whole.

In accordance with Social Security Ruling 96-6p, the Administrative Law Judge considered the administrative findings of fact made by the State agency medical physicians and other consultants. These opinions were weighed as statements from non-examining experts. The undersigned notes that medical records received after their review revealed a worsening of the claimant's condition (Exhibit 28F).

Based on the foregoing and evidence of record, the undersigned finds that the claimant does not retain the residual functional capacity to perform even the minimal exertional or non-exertional demands of any level of work on a regular and sustained basis. The undersigned finds that the combination of the claimant's physical impairments and symptoms precludes her sustained performance of work activity at any exertional level (SSR 83-14)(SSR 96-9).

Cathy A. Key                                     Page 5 of 6

With the above-stated residual functional capacity, the undersigned finds at step four of the disability evaluation process, that the claimant is incapable of performing her past relevant work as a human resource manager. Since the claimant cannot perform her past relevant work, the burden of proof shifts to the Commissioner to show, at step five of the disability evaluation process, that the claimant can perform other jobs which exist in significant numbers in the national economy given her impairments, residual functional capacity and vocational profile.

The claimant is a younger individual with a high school education and four years of college education. She has past relevant work as a human resource manager; however is no longer able to perform this work. The claimant has a residual functional capacity which has rendered her unable to perform even the minimal exertional and non-exertional demands of work on a regular and sustained basis. The Medical-Vocational Guidelines of the Regulations recognize that an individual's occupational base may become so eroded by exertional and non-exertional limitations that she becomes functionally unable to perform most of the jobs existing in the national economy at the sedentary level of exertion (20 CFR, Part 404, Subpart P, Appendix 2, Section 201.00(h)(3)). Therefore, because the claimant can perform significantly less than a full range of sedentary-type work, and giving great weight to the opinion of Dr. Vanderzyl; the Administrative Law Judge concludes, at step five of the disability evaluation process, that other jobs which the claimant is capable of performing do not exist in significant numbers in the national economy.

Accordingly, the Administrative Law Judge finds that the claimant has been disabled since her alleged disability onset date of May 14, 2003.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1. The claimant has not engaged in any substantial gainful activity since her alleged disability onset date of May 14, 2003.

2. The claimant's impairments which are considered to be "severe" under the Social Security Act are as follows: status post C4-5, C5-6, C6-7 anterior cervical fusions, status post L4-5 diskectomy and L4-5 internal fixation, lumbar radiculitis, insulin dependent diabetes, status post right carpal tunnel release and right shoulder bursitis.

3. The claimant's impairments do not, singly or in combination, meet or equal in severity the appropriate medical findings contained in 20 CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).

LINA/Cleiland 0813



Cathy A. Key                                                    Page 6 of 6

4.    The claimant's allegations of functional limitations and pain are considered credible.

5.    The claimant retains the residual functional capacity to perform no work on a regular and continuing basis.

6.    The claimant is unable to perform her past relevant work as a human resource manager.

7.    The claimant was forty-five(45) years old (a younger individual) on the date her disability began. The claimant is currently forty-seven (47) (a younger individual age 18-49). The claimant has a high school education and four years of college education.

8.    Based upon the claimant's residual functional capacity, and vocational factors, there are no jobs existing in significant numbers which she can perform. The combination and severity of the claimant's physical impairments, as well as symptom of pain, has reduced her functional capacity to a point where no work exists in significant numbers in the national economy which she can perform on a regular and sustained basis at acceptable levels of performance. (Social Security Rulings 83-14 and 96-9p).

9.    The claimant met the disability insured status requirements of the Social Security Act on the date her disability began, and through December of 2008.

10.   The claimant has been under a disability as defined by the Social Security Act and Regulations since her alleged disability onset date of May 14, 2003.

<div align="center">

**DECISION**

</div>

Based on the Title II application filed on October 10, 2003, the claimant is entitled to a period of disability commencing May 14, 2003 and to disability insurance benefits pursuant to Sections 216(i) and 223 of the Social Security Act, as amended. The claimant's disability has continued at least through the date of this decision.

Ricardo M Ryan
Administrative Law Judge
MAY 2 6 2005
Date

LINA/Cleiland 0814

# EXHIBIT

## "J"

December 7, 2005



**CIGNA Group Insurance**
Life · Accident · Disability

CATHY CLEILAND
P.O. BOX 148
CLIO, AL 36017

Routing 212
12225 Greenville Ave
Suite 1000
Dallas, TX 75243
Telephone 800.352.0611, Ext. 1294
Facsimile 860.731.3413
Kelli.Archacki@cigna.com

Re:  Name           :   Cathy Cleiland
     Policy #        :   FLK 20104 (LTD)
     Account Name    :   Temple Inland
     Underwriting by :   Life Insurance Company or North America

Dear Ms. Cleiland:

We are writing to you regarding your claim for benefits under the above captioned policy. We have reviewed your claim for Long Term Disability (LTD) benefits and are ready to render a decision.  Based on the information we have on file to date, we have determined that you do not meet the above policy's Definition of Disability.  Accordingly, no additional LTD benefits are payable under the FLK 20104 policy.

To ensure a mutual understanding of the LTD Policy language, we would like to review the following information with you:

**Definition of Disability**

"An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, the Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn 80% or more of his or her Indexed Covered Earnings."

**Disability Benefits**

"The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy.  A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician.  Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.



EXHIBIT
10

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

CLE00150

The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue."

We recently completed a review of your information. Specifically, this included:
- Disability Questionnaire received from you dated 6/28/05;
- Telephone call from the Center for Pain of Montgomery dated 8/23/05;
- Telephone call to you dated 8/23/05;
- Office visit notes from the Center for Pain of Montgomery dated 3/02/05 through 9/19/05;
- Telephone call from you regarding updated providers;
- Office visit note from Dr. Steven Harris dated 8/26/05; and
- Request for office visit notes from Dr. Brett Johnson.

A review of the medical information indicates that you were initially off work due to Lumbar Spine Surgery. We received the Disability Questionnaire that you completed dated 6/28/05. You listed as your treating providers the Center for Pain of Montgomery in Montgomery, Alabama.

We requested medical information from the Center for Pain of Montgomery. On 8/16/05 we received a telephone call from Kitty of their office. She stated that they are not disabling you and requested that we obtain the information that we have requested from your other treating physicians.

We telephoned you on 8/23/05 to find out who your treating physicians are and which physician is disabling you. You stated that you are only being seen by the Center for Pain of Montgomery and they are disabling you. We advised you of our conversation with Kitty from the Pain Center and told you that we would request the medical records from them. You stated that you had a primary care physician for six years but he is two hours away and you have not seen him in a year due to your moving.

We received the office visit notes from the Center for Pain of Montgomery. The Progress Note dated 03/02/05 states that you have lumbar degenerative disc disease, cervical degenerative disc disease, myofascial pain and diabetes. You have been on Methadone 5 mg up to five pills a day, Effexor, and Klonopin. You stated that you have been having some stomach problems. You have not had to go to the hospital for any IV fluids. You have been having some muscle spasms in your legs. You are not very active and your sugars have been running higher than usual. You have fallen down some steps and once the trunk of your car fell on your back when you were leaning over the trunk. You described your pain as an 8 that day. Upon examination you have no respiratory difficulties noted, no hemodynamic instability noted, no acute hot joints, and no acute localizing weakness. The note dated 6/21/05 states that you have Diabetes Mellitus, your medications are effective, and your current pain is rated as a 9. The plan was to refill the current medications. The note dated 8/17/05 states that you have Diabetes Mellitus, your medications are effective, and your current pain is rated as an 8. Your pain condition is stable and the plan was to refill the current medications. The note dated 9/19/05 states that you have Diabetes Mellitus, your

CLE00151

LINA/Cleiland 0259

medications are effective, and your current pain is rated as a 9. Your pain condition is stable and the plan was to refill the current medications.

We received a telephone call from you stating that you have been seen by a new primary care physician one time a month ago, Dr. Brett Johnson. You also saw an ENT one time a month ago, Dr. Steve Harris. You are being referred for a sleep study but have not set it up yet.

We received the office visit note from Dr. Steve Harris dated 8/26/05. In the office visit note you state that for about two months you have had some burning in the base of your throat. It is a little worse left than right, intermittent hoarseness, some pain deep in the left ear area. Your regular physician felt that you had a left ear infection and placed you on some Amoxil. You are being seen for evaluation of throat, ear, and intermittent hoarseness. Upon examination your voice quality sounds good but you state that it is an intermittent thing. There is considerable irritation at the cricopharyngeus area and in the back of the arytenoids area bilaterally though worse on the left. It is not really enough to cause an ulceration but looks like some significant laryngopharyngeal reflux irritation. It was recommended that they set up a GI medicine evaluation

We requested medical records from Dr. Brett Johnson's office on 10/20/05 and 10/27/05. We contacted Alicia at Dr. Brett Johnson's office on 11/02/05 and we were advised to refax it to a different fax number. It was refaxed on 11/02/05 and we received no information.

Summary

In reviewing your claim, Life Insurance Company of North America considered your claim file as a whole for purposes of determining your entitlement to benefits. The Agreement provides that Life Insurance Company of North America would administer benefits only if you were prevented by Disability as defined above.

Based on the documentation provided by the Pain Center of Montgomery and Dr. Harris, the limitations and restrictions are not supported as evidenced by no current complaints of any radiating pain, numbness or tingling, no current diagnostic testing, your medication usage has been stable for several months, and no current lab values to determine the status of your glucose. The information does not support that you are incapable of performing your occupation. As a result, you do not meet the definition of total disability from any occupation as of November 21, 2005. Therefore, no additional long term disability benefits are payable.

Appeal

If you disagree with our determination and intend to appeal this claim decision, you must submit a written appeal. This appeal should be received by us within 180 days of receipt of this letter and should be sent to the Life Insurance Company of North America representative signing this letter to the address noted on the letterhead.

CLE00152

# EXHIBIT

# "K"

Adam Nortick of 12/19/05. Need complete medical review.
Back surgery 5/14/03. Denied 11/21/05 due to lack of support. New info from pain management, Internist, & GI.
REFERRAL QUESTION - Does the medical support severity of any condition that would preclude Cx from performing in a sedentary capacity from 11/21/05 through present
PHYSICIANS STATEMENT OF PHYSICAL FUNCTIONAL CAPACITY see review located in chart.
CLAIMANTS STATEMENT OF PHYSICAL ACTIVITY see review located in chart.
LAST CLINICAL NOTE RELEVANT TO MAIN PHYSICAL DIAGNOSIS - see review located in chart.
BRIEF SUMMARY OF RELEVANT MEDICAL INFORMATION PRIOR TO LAST NOTE see review located in chart.
PERTINENT LAB, DIAGNOSTICS & REFERRALS see review located in chart.
PEER CONTACT ATTEMPTS - No provider contact made.
MATERIALS REVIEWED - CIGNA file records reviewed include but are not limited to those found on typed report. Typed report located in claimants chart.

**Investigation Result**

ASSESSMENT/CONCLUSION A careful review of the file was conducted. Claimant has chronic history of back pain and underwent several lumbar surgeries. Since that time she has been on chronic narcotic pain medications & high-dose neuroleptics drugs. She was paid through 11/21/05. Since that time her diabetes has been under poor control. She underwent esophageal dilatation in mid-November 2005. Her chronic pain appears to be stable & no changes in treatment have occurred. I do not believe, however, that the documents provide sufficient documentation to establish that severity of condition warrants L&Rs or that clinically measurable evidence exists to support deficits which require L&Rs given by the attending physician. In absence of such documentation, I do not believe the documentation supports deficits which require L&Rs which preclude performing sedentary activity during the period 11/21/05 through the present.
Scott C. Taylor, DO
CIGNA Medical Director
Date Completed 3/7/06

| Last Changed User | Scott Taylor | | Last Changed Date | 03/07/2006 04:00 PM |
|---|---|---|---|---|
| **Status:** | Completed | **Assigned To:** | Scott Taylor | **Created:** | 03/02/2006 11:57 AM |

LINA/Cleiland 0065

# EXHIBIT

## "L"

**Medha Bharadwaj**
Appeal Claim Manager

CIGNA Disability Management Solutions

March 10, 2006

**CIGNA** Group Insura
Life · Accident · Disability

CATHY CLEILAND
PO BOX 148
CLIO AL 36017

Routing 212
12225 Greenville Avenue
Suite 1000 LB 179
Dallas, TX 75243-9382
Telephone 800.352.0611 ext. 1249
Facsimile 860.731.3211
medha.bharadwaj@cigna.com

Re:     Claimant:          Cathy Cleiland
        Policy Keys:       FLK 20104
        Account Name:      Temple Inland
        Life Insurance Company of North America

Dear Ms. Cleiland:

We have completed our review of your appeal for Long Term Disability benefits, and must advise you that we are reaffirming our previous denial of benefits dated December 07, 2005. Please refer below for specific policy definitions and reviewed information. In addition, please review the following:

**Definition of Disability**

"An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, the Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn 80% or more of his or her Indexed Covered Earnings."

**Disability Benefits**

"The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician. Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue."

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

LINA/Cleiland 0677

March 10, 2006
Page 2

## Termination of Disability Benefits

"Disability Benefits will end on the earliest of the following dates.
1. The date an Employee earns more than 80% of his or her Indexed Covered Earnings
2. The date the Insurance Company determines an Employee is not Disabled
3. The end of the Maximum Benefit Period
4. The date an Employee dies
5. The date the Employee refuses to participate in rehabilitation efforts as required by the Insurance Company
6. The date the Employee is no longer receiving Appropriate Care

## Overview of Eligibility of Benefits

We based our decision on your claim for benefits upon Policy language and all documents contained in your claim file, viewed as a whole.

The following information was reviewed as part of your appeal:

- Medical records from various providers

I am aware that you have been off work since May 14, 2003 due to back pain, dysphagia, diabetes, and dyspepsia. As the previous decision on your claim was based on a medical judgment, your file was reviewed by our Medical Director. As part of his review, our Medical Director reviewed all the medical information contained in your claim file.

After review of the entirety of the medical information contained in your file, our Medical Director noted that you have a chronic history of back pain and have undergone several lumbar surgeries. Since then, you have been on chronic pain medications and neuroleptic drugs. Our Medical Director also noted that you have diabetes, which has been under poor control. In Mid-November 2005, you underwent a mid-esophageal dilatation. Our Medical Director said that your chronic pain appears to be stable and no changes in treatment have occurred. Our Medical Director stated that the documentation does not support deficits which require limitations and restrictions precluding you from performing any sedentary occupation from November 21, 2005 through present.

## Summary

Ms. Cleiland, in order to qualify for Long Term Disability Benefits, you must provide evidence of Total Disability from any occupation as outlined in your previous denial letter of December 07, 2005. However, as outlined above, the medical documentation does not support your inability to perform any sedentary occupation. Please note that your previous occupation as a Human Resources Manager is considered sedentary. The medical documentation does not support your inability to perform your or any sedentary occupation from November 21, 2005 forward.

As you have not submitted any additional information sufficient to change our previous determination regarding your eligibility for Long Term Disability benefits, we are reaffirming our previous denial decision of December 07, 2005 within the meaning and terms of your group Long Term Disability plan.

LINA/Cleiland 0678

March 10, 2006
Page 3

You may request a review of this decision by writing to the Life Insurance Company of North America representative signing this letter at the address noted on the letterhead. The written request for review must be sent within 180 days of the receipt of this letter. In addition to any written comments, your request for review must include new documentation you wish us to consider. Under normal circumstances, you will be notified of a decision on your appeal within 45 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the reason for delay within 30 days of receipt of your request, and every 30 days thereafter. A final decision will be made no later than 90 days.

Please note that you have a right to bring legal action regarding your claim under the ERISA section 502(a). You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local United States Department of Labor Office or your State Insurance Regulatory Agency.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein.

Please review your insurance booklet, certificate or coverage information available from your employer to determine if you are eligible for additional benefits. Upon written request, you may receive a copy of your claim file, free of charge.

Should you have any questions, please call me at 1.800.352.0611 ext. 1249 between the hours of 8:00am and 4:30pm Central Time.

Sincerely,

Medha Bharadwai

# EXHIBIT

# "M"

 

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

September 5, 2006

**VIA FEDERAL EXPRESS**
Medha Bharadwaj
Appeal Claim Manager
CIGNA Disability Management Solutions
CIGNA Group Insurance
Routing 212
12225 Greenville Avenue, Suite 1000 LB 179
Dallas, TX 75243-9382

Re:    Claimant:        **Cathy Cleiland**
       Policy Keys:   FLK 20104\FLI50710\OK810692\ABL670620
       Account Name:      **Temple Inland**

Dear Mr. Bharadwaj:

1.   This firm represents Ms. Cathy Cleiland with regard to her claim for benefits under the various Temple Inland Employee Welfare Benefit Plans and/or Pension Plans. No further contact should be made directly with Ms. Cleiland. Any and all contact regarding any and all benefits should be directed to this firm.

2.   Under separate cover you have been provided a HIPAA Complaint Authorization along with a request for production. This request is made pursuant to Ms. Cleiland's rights under ERISA. In order to perfect her appeal, it is necessary for your companies to comply with the requests for productions so that Ms. Cleiland may be fully informed as to the basis of your denial of benefits.

3.   All prior document production authorizations are hereby terminated. Your company will be provided documents pursuant to HIPAA compliant requests signed from this date forward by Ms. Cleiland upon receipt of a request from your company. Once again, all prior authorizations are hereby revoked pursuant to Ms. Cleiland's rights under HIPAA. Any authorizations signed prior to the date of this correspondence by your company will constitute violations of HIPAA.

4.   Attached hereto are documents bates numbered CLE00001 through CLE00134. Because Ms. Cleiland has not been provided a full copy of the records pertaining to her claim for benefits and the documents which you have obtained during the course of that review, it is impossible to determine what documents have not been included in your review. We look forward to receipt of your production so that we may properly assess the need for additional documentation.



6.   You are hereby provided notice that Ms. Cleiland disputes your company's claim that she is able to perform in a sedentary occupation.

7.   Please reconsider your termination in light of the attached medical records and hold off making a final determination on this appeal until such time as we have sufficient time to review your document production. Please forward that production to my office as soon as possible to avoid any further delay.

8.   This appeal and documentation is provided pursuant to your invitation in the March 10, 2006 correspondence wherein you state that Ms. Cleiland "may request a review of this decision by writing to the Life Insurance of North America representative signing this letter at the address noted on the letterhead." "In addition to any written comments, your request for review must include any documentation you wish us to consider." Under the circumstances, it is impossible to tell if there is additional "new" documentation provided in the attached bates numbered documents without a review of your document production which we look forward to receiving.

9.   In your review of this claim, please consider the operative word "or" contained in the definition of disability after 24 months of disability. I do not believe that there is an analysis of whether or not Ms. Cleiland could earn 80% or more of her pre-disability indexed earnings.

We look forward to receiving the documentation outlined in our document request letter. Once we receive that documentation, we will provide additional correspondence, arguments, position statements, documentation and further evidence of Ms. Cleiland's entitlement to benefits.

In the alternative, and in light of the numerous and well-documented physically disabling conditions suffered by Ms. Cleiland, we invite your company to immediately provide back benefits, reinstate benefits, provide a reasonable amount of attorney's fees based upon the Lodestar method along with interest on the past due benefits.

I look forward to receiving your production and response to the offer of settlement outlined above.

Sincerely,

**'DICTATED, BUT NOT READ
IN ORDER TO AVOID DELAY'**

Thomas O. Sinclair, Esquire

TOS/me
Enclosures
cc:     Cathy Cleiland
        Terry Key

# EXHIBIT

## "N"

# PART 1

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

September 5, 2006

**VIA FEDERAL EXPRESS**
Medha Bharadwaj
Appeal Claim Manager
CIGNA Disability Management Solutions
CIGNA Group Insurance
Routing 212
12225 Greenville Avenue, Suite 1000 LB 179
Dallas, TX  75243-9382

COPY

Re:    Claimant:    **Cathy Cleiland**
       Policy Keys:  FLK 20104\FLI50710\OK810692\ABL670620
       Account Name:  **Temple Inland**

Dear Mr. Bharadwaj:

1.    This firm represents Ms. Cathy Cleiland with regard to her claim for benefits under the
      various Temple Inland Employee Welfare Benefit Plans and/or Pension Plans. No
      further contact should be made directly with Ms. Cleiland. Any and all contact regarding
      any and all benefits should be directed to this firm.

2.    Under separate cover you have been provided a HIPAA Complaint Authorization along
      with a request for production. This request is made pursuant to Ms. Cleiland's rights
      under ERISA. In order to perfect her appeal, it is necessary for your companies to
      comply with the requests for productions so that Ms. Cleiland may be fully informed as
      to the basis of your denial of benefits.

3.    All prior document production authorizations are hereby terminated. Your company will
      be provided documents pursuant to HIPAA compliant requests signed from this date
      forward by Ms. Cleiland upon receipt of a request from your company. Once again, all
      prior authorizations are hereby revoked pursuant to Ms. Cleiland's rights under HIPAA.
      Any authorizations signed prior to the date of this correspondence by your company will
      constitute violations of HIPAA.

4.    Attached hereto are documents bates numbered CLE00001 through CLE00134. Because
      Ms. Cleiland has not been provided a full copy of the records pertaining to her claim for
      benefits and the documents which you have obtained during the course of that review, it
      is impossible to determine what documents have not been included in your review. We
      look forward to receipt of your production so that we may properly assess the need for
      additional documentation.

6.    You are hereby provided notice that Ms. Cleiland disputes your company's claim that she is able to perform in a sedentary occupation.

7.    Please reconsider your termination in light of the attached medical records and hold off making a final determination on this appeal until such time as we have sufficient time to review your document production. Please forward that production to my office as soon as possible to avoid any further delay.

8.    This appeal and documentation is provided pursuant to your invitation in the March 10, 2006 correspondence wherein you state that Ms. Cleiland "may request a review of this decision by writing to the Life Insurance of North America representative signing this letter at the address noted on the letterhead." "In addition to any written comments, your request for review must include any documentation you wish us to consider." Under the circumstances, it is impossible to tell if there is additional "new" documentation provided in the attached bates numbered documents without a review of your document production which we look forward to receiving.

9.    In your review of this claim, please consider the operative word "or" contained in the definition of disability after 24 months of disability. I do not believe that there is an analysis of whether or not Ms. Cleiland could earn 80% or more of her pre-disability indexed earnings.

We look forward to receiving the documentation outlined in our document request letter. Once we receive that documentation, we will provide additional correspondence, arguments, position statements, documentation and further evidence of Ms. Cleiland's entitlement to benefits.

In the alternative, and in light of the numerous and well-documented physically disabling conditions suffered by Ms. Cleiland, we invite your company to immediately provide back benefits, reinstate benefits, provide a reasonable amount of attorney's fees based upon the Lodestar method along with interest on the past due benefits.

I look forward to receiving your production and response to the offer of settlement outlined above.

Sincerely,

**'DICTATED, BUT NOT READ IN ORDER TO AVOID DELAY'**

Thomas O. Sinclair, Esquire

TOS/me
Enclosures
cc:    Cathy Cleiland
       Terry Key

CATHY CLEILAND
v.
LIFE INSURANCE COMPANY OF NORTH AMERICA & CIGNA GROUP INSURANCE

FILE # 4135

# DOCUMENTS PRODUCED

| NO. | DATE SUBMITTED | DOCUMENTS SUBMITTED TO | DOCUMENT BATES NUMBERS | DOCUMENTS SUBMITTED |
|---|---|---|---|---|
| 1. | 09/05/06 | CIGNA | CLE00001-CLE00134 | Documents Produced by CIGNA |
| 2. | 10/19/06 | CIGNA | CLE00135-CLE00137 | Medical Opinion of Steven D. Wise, M.D. |
| 3. | 11/03/06 | CIGNA | CLE00138-CLE00140 | Medical Opinion of Bret M. Johnson, M.D. |
| 4. | 11/27/06 | CIGNA | CLE00141 | CV of David P. Herrick, M.D. |
| 5. | 11/27/06 | CIGNA | CLE00142-CLE00149 | Updated medicals from Montgomery Pain Center |
| 6. | 11/27/06 | CIGNA | CLE00150-CLE00155 | 12/2/05 TD |
| 7. | 11/27/06 | CIGNA | CLE00156-CLE00157 | Claim File Letter |
| 8. | 11/27/06 | CIGNA | CLE00158-CLE00160 | CIGNA Doctor's Notes |
| 9. | 11/27/06 | CIGNA | CLE00161-CLE00195 | Sworn Statement of David P. Herrick, M.D. |
| 10. | 01/18/07 | CIGNA | CLE00196 – CLE0220 | Vocational Analysis Report of Mark Boatner, M.Ed., CRC |
| 11. | 05/03/07 | CIGNA | CLE00221–CLE00229 | Documents Produced by CIGNA |

May 8, 2007

 **The University of Alabama at Birmingham**
**The Medical Center/University of Alabama Hospitals**                    PAGE 1

## DISCHARGE SUMMARY

NAME: CLEILAND, CATHY                 MED.REC.NO.: 00698678    ROOM:

SERVICE: Mark N. Hadley, M.D./2823    ADMITTED: 12/16/03    DISCHARGED: 12/18/03

                                      DICTATED: 12/18/03    TRANSCRIBED: 12/18/03

ADMISSION DIAGNOSIS:    Lumbar instability.

DISCHARGE DIAGNOSIS:    Same.

PROCEDURE:              L4-5 laminectomy and diskectomy with
                        L4-5 internal fixation and fusion and
                        L4-5 posterior lumbar interbody fusion
                        by Dr. Hadley on 12/16.

HISTORY OF PRESENT ILLNESS: The patient is a 46-year-old white
female with a one and a half year history of low back pain and
left leg pain with numbness in the lateral left leg and plantar
surface of the left foot. She has a history of prior lumbar
surgery. Exam and imaging is consistent with L4-5 instability.
She presents now for elective decompression with L4-5 posterior
lumbar interbody fusion.

Please see history and physical for further details.

HOSPITAL COURSE: The patient underwent the aforementioned
procedure which she tolerated without difficulty. She was
followed on the floor postoperatively where she had an
uncomplicated hospital course and mobilized in a timely fashion
and she remained neurologically stable in comparison to her
preoperative exam. She had a slight foot drop on the left
preoperatively and this was felt to have improved actually
somewhat on postoperative day one with almost normal strength on
the left side with dorsiflexion. She was fitted with an LSO brace
and approved for discharge the morning of 12/18.

DISCHARGE CONDITION: Good.

DISPOSITION: Home.

DISCHARGE MEDICATIONS: Neurontin 300 mg t.i.d.; Robaxin, Lortab,
and Advil as needed for pain.

CLE00001

**UAB**  The University of Alabama at Birmingham                    PAGE 2
      The Medical Center/University of Alabama Hospitals

### DISCHARGE SUMMARY

NAME: CLEILAND, CATHY                    MED.REC.NO.: 00698678    ROOM:


Followup is on 12/29 for a wound check with Dr. Hadley.


Kevin N. Ammar, M.D./07734/TL032

                                        _____
                                        Mark N. Hadley, M.D.

CLE00002

Page 1



The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

## Operation Note

*NAME:* CLEILAND, CATHY   *MED. REC. NO.:* 000000698678   *ROOM:*

*SURG:* Mark N. Hadley, M.D.          *ASSIST:* Ajay K. Ananda, M.D.

*SURG#:* 2823

*SURG.SIGN:* Electronically Signed by Mark N. Hadley, M.D. on 12/19/2003

*DATE OPER.:* 12/16/2003  *ADMITTED:*  *DISCHARGED:*

*SERVICE:* Mark N. Hadley, M.D.  *DICTATED:* 12/16/03  *TRANSCRIBED:* 12/16/03

*DOCTOR/SERV. SIGN:* _____

PREOPERATIVE DIAGNOSIS:  Lumbar spinal instability, with L5
                         radiculopathy, left greater than right.

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURES PERFORMED:    1.  L4-L5 laminectomy for
decompression.
                         2.  L4-5 diskectomy, bilateral, with L4-5
                             posterior lumbar interbody fusion,
                             bilateral.
                         3.  Internal fixation L4-L5, bilateral.
                         4.  Autologous bone dorsolateral fusion
                             L4-L5, bilateral.

ANESTHESIA:  General with endotracheal intubation.

INDICATIONS:  This is a 46-year-old female who has had previous
L4-5 surgery.  She has developed collapse and instability at L4-5,
with marked L5 root compression and foot drop.  She has horrific
pain, both mechanical in nature and radicular in nature,
bilateral, again left more than right.  She is a candidate for
operative decompression at the L4-5 level, followed by L4-5
posterior lumbar interbody fusion and internal fixation and
dorsolateral fusion.  She understands the indications for as well

CLE00003



as the risks of the procedure.  She wishes to proceed.  Consent has been obtained.

OPERATIVE TECHNIQUE:  After smooth induction of anesthesia and intubation, the patient was carefully moved from the hospital bed to the operating table and placed in the prone position on the Wilson frame.  The patient's lumbosacral spine was shaved, prepped, and draped in the usual sterile fashion.  I used the previous skin incision but essentially extended the incision from the inferior portion of L3 down to the superior portion of S1.  There was a great deal of scar on this left side, particularly at L4-5.  I dissected down bilaterally, exposing the spinous process and lamina of L4 and the spinous process and lamina of L5.  There was marked facet mobility, in fact fractured facet at the L4-5 level on the left with collapse.  I dissected out laterally bilaterally and exposed the facet complex at L4-5 and then the transverse process of L5.  I worked up in a careful manner in a cephalad direction and exposed the transverse processes of L4 bilaterally, using great care to avoid any compromise or exposure of the L3-4 facet complex.  I irrigated the wound with antibiotic solution.  I then used a double-action rongeur to remove the spinous processes and lamina which remained at L4 and L5.  I had dissected around the L4-5 scar on the left side, of course, but was able to do so and then fully decompress the thecal sac from superior L4 through L5.  Working from the patient's left side toward the right, I undercut the medial facet complex and decompressed the lateral recess stenosis here.  I took the L4-5 facet down as well.  I went around to the patient's right, worked back toward the left, worked around and through scar, and decompressed the exiting L5 root which was markedly compromised, as well as the exiting L4 root.  There was tremendous scar here from this collapsed, fractured, and failed facet.  I then worked underneath the L5 root on the left, worked in a cephalad direction, and found recurrent disc herniation.  I was able to dissect through this using both blunt and sharp dissection techniques, avoiding injury to the L5 and the L4 root, and then retract the nerve root medially.  The markedly collapsed interspace here was identified.  Posterior lumbar interbody fusion instruments were then sequentially used, beginning with an 8 mm blade up to an 11 mm blade, decorticating the inferior left

**UAB** The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

endplate of L4 as well as the superior endplate of L5. Disc
material was removed with interspace rongeurs. I then dissected
on the patient's right side, careful to avoid any compromise of
the L4-5 root on the right. Again, posterior lumbar interbody
blades were used to remove disc material and decorticate the
endplates sequentially from 8 mm to 11. I then used a box cutter
to decorticate the endplates even better at the inferior L4 and
superior L5 bilaterally. I then placed a distraction device in
the interspace 12 mm. I used a 13 mm allograft posterior lumbar
interbody fusion substrate and tapped these as interposition
grafts, first on the patient's left and then the right. These
appeared to be in good position, and we had markedly increased,
although not quite to normal, the interspace height from her
preoperative collapsed circumstance. There was immediate firmness
and stability to this previously very unstable joint. I then
passed bone screws via the pedicles into the bodies with the use
of intraoperative fluoroscopy into L4 and L5 bilaterally. I
decorticated the exposed dorsolateral surfaces of L4 and L5. I
morselized all the patient's bone which I had removed during the
laminectomy and facetectomy completely of L4 and L5, admixed this
with bone morphogenic protein putty and paste, and then packed it
over the exposed dorsolateral surfaces of L4 and L5. Contoured
rods were then secured to the bone screws at L4 and L5 bilaterally
and locked into position, completing the procedure. I irrigated
the wound with antibiotic solution. There was no evidence of
nerve root compromise, thecal sac compression, or CSF leak.
Bleeding was well controlled. I placed a drain. We closed the
wound in multiple layers. The skin edges were approximated with a
running nylon suture.

I personally supervised the entirety of the procedure and
performed the essential elements outlined above.

Mark N. Hadley, M.D. / 07120 / TL030

CLEILAND, CATHY K.

JOHN E. HACKMAN, M.D., P.A.
1722 PINE ST., SUITE 1001
MONTGOMERY, AL 36106-1107

BIRTHDATE:
S.S.#:

**09-18-03**

Mrs. Cleiland comes in for followup.  She is having increasing problems.  She is now having a lot of pain down the right leg.  This has changed from when she was here last.  We reviewed her MRI scan and compared it with the one that was done on 08-11-03.  She now has disk protruding into the foramen at L4-5 on the right which was not there a month and a half ago. She also has some recurrent disk protrusion on the left which was not there a month and a half ago.  She says she can't live with the leg pain.  I offered her re-exploration at L4-5 bilateral.  She says she has been looking on the internet and she is interested in talking to somebody about instrumentation.  We are going to try to get her up to see Dr. Mark Hadley at UAB.

---

**11-11-03** - Lortab 5 #30, one refill, called to 334-774-5508.

---

**11-11-03** - Medical records mailed to Social Security.

---

**11-18-03**

Phone call: Mrs. Cleiland called up to tell us that Dr. Hadley in Birmingham is going to do a decompression with internal fixation and fusion, (possibly PLIF).  He is to do this on 12-09-03.

---

**12-09-03**

We received a nice note from Dr. Mark Hadley.  He plans instrumentation and stabilization on Cathy's back problem for lumbar spinal instability.  This is scheduled for 12-09-03.

---

**12-30-03**

We got a note from Dr. Mark Hadley that Mrs. Cleiland has had an L4-5 posterior lumbar interbody fusion.

---

**05-11-04** - Letter to Mrs. Cleiland.

---

**05-18-04** - Letter to Mrs. Cleiland.

---

CLEILAND, CATHY K.

**JOHN E. HACKMAN, M.D., P.A.**
**1722 PINE ST., SUITE 1001**
**MONTGOMERY, AL 36106-1107**

BIRTHDATE: 
S.S. #:

**07-14-03** - Hospital admission.

**07-16-03** - Re-exploration laminectomy, L4-5, left.

**07-17-03** - Discharged home.

**DIAGNOSIS**- Recurrent HNP, L4-5, left.

---

**07-18-03**

We had a deposition with Mr. Tom Galloway and Mr. Terry Key.  During the deposition they wanted impairment ratings.  I gave impairment ratings of 7% for her C5-6 disc, 2% for the C6-7 disc, 1% for the C4-5, 10% for the first low back operation and 2% for the second low back operation.

---

**07-22-03**

Cathy called up to talk about physical therapy.  I don't want her taking physical therapy until she is at least 12 weeks post op.

---

**08-21-03** - Refill on Darvocet N-100 called into Walmart 334-774-5508.

---

**08-04-03** - Refill on Darvocet N-100 and Medrol Dosepak called to pharmacy (251) 743-3784.

---

**08-28-03**

Mrs. Cleiland comes in for follow up.  On a weekend when I was out of town, she had to come up and see Dr. Pat Ryan.  He had an MRI scan done and I reviewed it.  It was done on 08-11-03.  It shows good decompression of the central canal and the nerve root canal.  There is marked narrowing of the interspace.

She saw Dr. Herrick yesterday and had an injection but she says it didn't help very much.

She is still having trouble with her left leg.

She has a diminished left knee reflex but no foot drop.  She has got negative straight leg raising.  Ankle reflexes are intact.

We had a discussion about activities.  I am going to see her back in six to eight weeks.

---

**09-09-03** - Darvocet N100 #30, one three times a day as needed with one refill called into Wal-Mart 251-666-6988.

---

**09-16-03** - Darvocet N100 #30, one four times a day as needed with one refill and Flexeril 10 mg., #100, one four times a day as needed with one refill called to Wal-Mart 251-666-6988.

---

CLE00007

**JOHN E. HACKMAN, M.D., P.A.**
**1722 PINE ST., SUITE 1001**
**MONTGOMERY, AL 36106-1107**

CLEILAND, CATHY K.

BIRTHDATE: ▓▓▓▓▓▓▓
S.S.#: ▓▓▓▓▓▓▓

04-23-03

Mrs. Cleiland comes in because she is having increasing problems in her left hip and leg with numbness in the left lateral thigh. She has already schedule surgery for May 21, 2003, **lumbar laminectomy at L4-5 on the left.** We went over her x-rays. We discussed alternatives. Risks and benefits of surgery were discussed. She is going to come in on May 21, 2003 for lumbar laminectomy at L4-5 on the left.

She said if anything might delay the surgery she would like to give it a try. So we are going to try some physical therapy and if the physical therapy does not help, then we will plan on surgery as scheduled.

05-12-03 - Letter to George K. Elbrecht, P.C., Attorney at Law - faxed and mailed 05-13-03.

05-13-03 - Lortab 5 #30, one three times a day as needed with one refill called into Wal-Mart 251-575-3383.     (FAX # 251-575-7063)

05-21-03 - Hospital admission.

05-21-03 - Lumbar laminectomy, L4-5, left.

05-22-03 - Discharged home.

DIAGNOSIS- Lumbar radiculitis, L4-5, left.

06-02-03

Patient called up because her Darvocet is not strong enough. We called in Ultram and Neurontin 300 mg four times a day.

06-10-03

Cathy called and said she needed something stronger for pain. We are going to call in Tylenol #3, #30, one every four hours as needed with two refills. Called in to Wal-Mart (334) 774-5508 or (334) 774-5651.

07-07-03 - Records mailed to Kathy Underwood, Legal Assistant to Terry G. Key, COCHRAN, CHERRY, GIVENS & SMITH, P.C.

07-10-03

Cathy comes in for follow up. She says she is still having a lot of trouble with her left leg. She says it hurts and it feels sort of swollen and heavy. She has got negative straight leg raising. Knee reflexes are intact. Ankle reflexes are both absent today. She does not have a foot drop.

I asked her about her medication. She says she is not taking Neurontin because it was too expensive. I told her the Neurontin might help. We are going to give her a Medrol Dosepak. We are going to get an MRI scan and see her back.

JOHN E. HACKMAN, M.D., P.A.
1722 PINE ST., SUITE 1001
MONTGOMERY, AL 36106-1107

CLEILAND, CATHY K.

BIRTHDATE:
S.S.#:

09-12-02 - continuation

reported trouble thinking and I have told her previously that that has nothing to do with her neck surgery.

09-19-02 - Medical records mailed to Attorneys Cochran, Cherry, et al.

09-19-02

Phone call: She says there is something much worse in her back and she wants to know when we can do surgery. I told her that we found some minimal changes at L4-5, but not anything that would require surgery so far. She wants me to check things further. We are going to do an MRI scan of her lumbar spine when she returns in October.

10-01-02

Mrs. Cleiland comes in for followup. Her MRI scan at the present time is much more impressive at L4-5 on the left side. There is a combination of disk bulge and osteophyte. This is worst than what things looked like in May. Her pain is in the left hip and leg. We talked about options. Surgery was discussed. She says that she would like to hold off on surgery at this point, but if things get worse, I will offer her a lumbar laminectomy at L4-5 on the left.

We are going to bring her back in three months for another neck x-ray.

10-29-02

Phone call: She called and talked to the girls in the office. She has been sore on the left side of her neck and Flexeril was not helping. We are going to call in some Neurontin.

She was not available when I called, but I listened to her answering machine and left a message. She has a nice clear voice on the answering machine, so it sounds like her hoarseness has probably cleared up.    Pharmacy #: 251-743-3784.

12-17-02

Mrs. Cleiland comes in for follow up. She still reports occasional cracking in her voice but she has got a good, clear voice today. She complains about numbness in her arms and legs. She has got a documented peripheral neuropathy which I think is caused by her diabetes.

She corrected information in one of my notes. On my note of 06-04-02 we have reported that her accident was on 05-25-02. In fact it was on 04-25-02, prior to her myelogram.

Her x-ray shows that she is developing a good, solid fusion. She takes one Flexeril at bedtime and I gave her plenty of refills. I will see her back as necessary.

02-20-03 - DNKA.

CLE00009

CLEILAND, CATHY K.

**JOHN E. HACKMAN, M.D., P.A.**
**1722 PINE ST., SUITE 1001**
**MONTGOMERY, AL 36106-1107**

BIRTHDATE:
S.S.#:

06-04-02 - continuation

I think the neck problem is due to C4-5.  I think the problem in the right hand with the numbness is due to a recurrent carpal tunnel.  I think the problem on the left side of the back is due to L4-5.  We discussed alternatives.  She would like to avoid surgery, so we are going to try some Bextra.  If things don't get better, she will be back to see me.

06-24-02 - Hospital admission.

06-24-02 - Anterior cervical discectomy and interbody fusion, C4-5, with a bone graft from the right iliac crest.

06-25-02 - Discharged home.

DIAGNOSIS- Cervical radiculitis, C4-5.

06-27-02 - Medrol Dosepak okayed to 251-743-3784.

07-09-02 - Flexeril #100, one refill, called to 251-743-3784.

08-01-02

Phone call:  She called up.  She has a little numbness under her chin and she gets hoarse if she talks for very long.  I told her this should all be temporary.

**08-06-02**

Mrs. Cleiland comes in for followup.  She is pretty much the same as we discussed the other day.  Her wound looks good.  Her x-ray looks good.  She is neurologically intact.  She is taking Flexeril with pretty good results.  We discussed activities.  I will see her back in 8 weeks.  When she returns I want to look at her MRI scan of the lumbar spine because she says her low back is still giving her trouble.

**08-13-02**

Phone call: She says that she doesn't think she is thinking as sharp as she was prior to surgery and she wanted to know if it was the anesthesia.  I told her it is much more likely to be related to medicine that she is taking such as the Flexeril.  I suggested she stop all medications for a week and see if these problems go away.

**09-05-02**

Phone call:  For about two weeks she has found that when she is trying to go to sleep at night she feels swelling her throat and she has had some hoarseness.  We are going to call in a Medrol Dosepak.

**09-12-02**

Phone call:  Cathy called up and talked to Kathy in my office and indicated she is still having trouble with hoarseness.  We cannot detect any hoarseness over the telephone, so I think it is probably just some tightness from the surgery.  I have talked to her about this before and told her that it will take 6-9 months before this goes away completely.  She also

CLE00010

CLEILAND, CATHY K.

**JOHN E. HACKMAN, M.D., P.A.**
**1722 PINE ST., SUITE 1001**
**MONTGOMERY, AL 36106-1107**

BIRTHDATE: ████████
S.S.#: ████████

04-15-02

Mrs. Cleiland comes in because of pain and numbness in the right arm and the right hand. This started suddenly about three weeks ago. She has neck pain, shoulder pain, numbness down the arm, right hand gets weak and clumsy. She has numbness in the thumb, index and long finger of the right hand, worst in the thumb.

She is neurologically intact on exam.

MRI scan of the cervical spine and x-ray of the neck showed good solid fusions at C5-6 and C6-7 and it shows no evidence of nerve root compression. All the nerve root canals appear to be wide open. Radiologist reported some various degrees of neural foraminal stenosis, but I don't see anything on the right side that would explain her complaints.

She does not have a Tinel's sign and she has had a previous carpal tunnel release in Mobile.

I am going to try her on Bextra and I am going to schedule a myelogram and some EMG studies.

04-29-02 - 23 observation for myelogram.

04-29-02 - Complete myelogram.

DIAGNOSIS- Recurrent carpal tunnel, right.
          C4-5 disk bulge.

05-03-02 - Medrol Dosepak okayed to 251-575-3393.

05-14-02

Mrs. Cleiland comes in for followup. On 04-25-02 she was hit at a four way stop. This was just a few days before she had her myelogram. We went over her myelogram. She has a bulge at C4-5. L4-5 had some minimal bulge. She is complaining alot about back and right leg pain. She is also complaining about headaches and neck pain.

We are going to get an **MRI** scan to look at her low back. There were some L4-5 changes last year and we are going to compare that with last year's MRI, so we need **both MRI's when she returns.** The neck problem is a bulge at C4-5 which is new. She also has diabetic neuropathy and a recurrent carpal tunnel on the right hand.

06-04-02

*-04/25* *Corrected 12/17/02 at request of patient*

Mrs. Cleiland comes in for followup. We went over all of her testing. Her pain in her neck started prior to her 05-25-02 accident, but her MRI scan did not show much. Her 04-29-02 myelogram showed a bulging disk at C4-5. She wanted to know if this meant that the accident caused it, and I told her that didn't necessarily follow. The reason we did the myelogram is that MRI scans consistently miss things in the neck. As far as her low back, she has persistent pain going down to the left hip. She says she hasn't had previous problems with her low back, so she wanted to know if that means that the accident caused this. I showed her a report from the Mobile Infirmary, 02-16-00, that showed some disk bulging and there is a notation on that report "could this be causing numbness in the left leg which I have had since the 1997 accident." MRI scan of the low back, dated 06-05-01, showed a posterior and central bulge of disk material at L4-5 level. I told her that she definitely has a history of previous low back problems, but I agreed with her that when I saw her on 04-15-02, prior to her myelogram, she was not complaining about her low back, and she is now complaining.

CLE00011

CLEILAND, CATHY K.

JOHN E. HACKMAN, M.D., P.A.
1722 PINE ST., SUITE 1001
MONTGOMERY, AL 36106-1107

BIRTHDATE:
S.S. #:

05-02-01 – Hospital admission.

05-02-01 – Anterior cervical discectomy and interbody fusion, C6-7, with a bone graft from the right iliac crest.

05-03-01 – Discharged home.

DIAGNOSIS– C6-7 disk herniation.

05-04-01 – Medrol Dosepak okayed to 566-8009.

05-15-01 – Second Medrol Dosepak okayed to 566-8009; also Parafon DSC #60, one refill, called to 334-247-2520.

06-05-01

Mrs. Cleiland comes in for followup. She is one month post-op anterior cervical fusion. She says her arm is better and the strength is better and the numbness is better. She still has some axial pain which I think is normal. Her x-ray looks good.

She had an MRI scan of the low back. This has some mild changes at L4-5, but I do not see any major abnormalities and I don't think she is going to need surgery.

We had a discussion about activities. I am going to see her back in 4-6 weeks. She is still out of work at this point.

06-07-01 – Lortab 5 #20, one refill, called to 334-247-2520.

08-09-01

Mrs. Cleiland comes in for followup. She was doing great until she took her car out to get serviced and she slipped on the handicapped ramp and fell down. She did it just about an hour ago. She is sore all over, but there is nothing that sounds like it is dangerous from a neurologic standpoint. X-ray of the neck looks good. She is back working. I am going to bring her back in in two weeks to get another neck x-ray to make sure that nothing happened with her fall today.

08-23-01 – DNKA.

JOHN E. HACKMAN, M.D., P.A.
1722 PINE ST., SUITE 1001
MONTGOMERY, AL 36106-1107

CLELLAND, CATHY K.

BIRTHDATE:
S.S.#:

04-19-01

**CHIEF COMPLAINT:** Neck, arm and shoulder pain.

**HISTORY:** This is a 43 year old white female. She was involved in a motor vehicle accident whe she was taking an employee to the doctor. She was at a stop sign, completely stopped, and got hit on the driver's side. She was treated by Dr. Faircloth for neck problems. MRI scan showed a large C5-6 disk herniation and smaller C6-7 protrusion. She had an anterior cervical fusion. C5-6 was fused. In general, she has done well, but she has never really been pain-free. She has continued with pain in the neck and pain in the shoulders. As time has gone on, it has become progressively worse. She now complains about neck pain, headaches, right scapular pain, pain down the right arm, and numbness in the right mid fingers.

**PAST MEDICAL HISTORY:** Positive for insulin-dependent diabetes.

**PRIOR SURGERY:** Two cesarean sections, tubal ligation, removal of a tubal ligation, removal of a right tube and ovary, C5-6 cervical fusion, carpal tunnel syndrome.

**CURRENT MEDICATIONS:** Humulin N 25 twice a day, Humulin Regular 15 twice a day, and Effexor. She has also been on Clonopin but she is currently not taking that.

**ALLERGIES:** None reported.

**FAMILY HISTORY:** Positive for diabetes.

**SOCIAL HISTORY:** She is a nonsmoker.

**PHYSICAL EXAM:** She has pain with neck extension and neck rotation. There is no definite neurologic abnormality except for the right triceps which seems a little bit weak.

**X-RAYS:** Her initial MRI scan after her accident showed a large central spur and disk at C5-6 with mass-effect on the right side of the cord. There is a small left-sided disk herniation at C6-7 without significant mass-effect. C5-6 was the level that had surgery.

Her current MRI, which was done about a month ago, shows a large central disk herniation at C5-6 with spinal cord compression and bilateral foraminal encroachment.
C6-7

**IMPRESSION:** I think her current problems are related to her C6-7 disk.

She reports some low back pain, but there is no film available to look at her low back. She was told that she had some bulging, but it was not enough to worry about.

**RECOMMENDATIONS:** Anterior cervical fusion at C6-7. Surgery, risks and benefits, were discussed. We will schedule surgery as soon as we get authorization.

cc: Virginia Benton at Reliance.



Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 10:46 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y     Sex= F     MRUN 28-51-42
Adm Dt= 09/18/2003 Loc= RAD SPEC    Acct#= 10576197    Phys= HACKMAN,JOHN E
-----------------------------------------------------------------------

Ord #= -                                    Sched D/T= 09/18/2003 1044
Ord Phys=                                   Collect D/T= 09/18/2003 1216
Resulted by= SYS,IS                         Result D/T= 09/18/2003 1312

MRI LUMBAR SPINE WITH AND WITH                          (1 of 1)
  RAD01:
       Clinical Data: back and leg pain  bc  linda

  REPORT:
       Procedure:  MRI L SPINE W & W/O CONTRAST  Date of Exam: 09/18/2003

       INDICATION: Low back and right leg pain with previous surgery most

       recently July 03.

       PROTOCOL:

       Parasagittal T1 and T2 weighted images with axial T1 and T2 weighted

       images.  Gadolinium was then injected followed by repeat parasagittal

       and axial T1 weighted images of the lumbar spine.

       FINDINGS:

       The disc space is considerably narrowed at L4-5 with degenerative end

       plate signal changes at that level.  The remaining lumbar vertebral

       bodies are normal but the disc space is also narrowed at L5- S1.


       At L4-5, there are operative changes upon the left lamina, foramen,

       facet and posterior margin of the disc with enhancing soft tissue in

       that location as well as encasing the left L5 nerve root proximally.

       The enhancing soft tissue fills the left neural foramen.  I suspect a

CLE00014

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 10:46 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y     Sex= F     MRUN 28-51-42
Adm Dt= 09/18/2003 Loc= RAD SPEC    Acct#= 10576197    Phys= HACKMAN,JOHN E
--------------------------------------------------------------------------------
MRI LUMBAR SPINE WITH AND WITH  09/18/2003 1:12 PM   (Continued)
    small residual disc fragment on the left at L4-5 adjacent to the

    exiting L5 nerve root proximally. It appears to be more closely

    approximating the root than on the previous examination of 8-11-03

    but there have been no other changes since the previous study.


    IMPRESSION:

    DEGENERATIVE CHANGES L5-S1, UNCHANGED.


    SEVERE DEGENERATIVE DISC DISEASE L4-5 AND OPERATIVE CHANGES UPON THE

    LEFT LAMINA, FORAMEN, FACET AND DISC AT THAT POINT WITH PROBABLE

    RETAINED DISC FRAGMENT TO THE LEFT OF MIDLINE AT L4-5 SURROUNDED BY

    ENHANCING SCAR.  THIS MAY ACTUALLY SLIGHTLY INDENT UPON THE LEFT L4

    NERVE ROOT PROXIMALLY AND THE LEFT L5 NERVE ROOT DOES APPEAR TO BE

    ENCASED BY SCAR.  THE RETAINED FRAGMENT IS SLIGHTLY MORE PROMINENT

    THAN ON 8-11-03.



    Faxed to Dr. Hackman's office.

    Dictated by: DONALD H. DAHLENE

    Verified by: DONALD H. DAHLENE

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 10:46 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K            Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 09/18/2003 Loc= RAD SPEC    Acct#= 10576197    Phys= HACKMAN,JOHN E
-------------------------------------------------------------------------
MRI LUMBAR SPINE WITH AND WITH  09/18/2003 1:12 PM    (Continued)


    Transcriptionist: JAJ

CLE00016

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

DISCHARGE SUMMARY

| | |
|---|---|
| PATIENT NAME:   CLEILAND, CATHY | MR#:   28-51-42 |
| ATTENDING:   RYAN, PATRICK | ACT#:  10567192 |
| ADMIT DATE:   8/10/2003 | RM#: |
| DISCHARGE DATE:   8/12/2003 | |

BS#:  0813-007

FINAL DIAGNOSES:
1.   Lumbar radiculitis.
2.   Status post lumbar laminectomy at L4 5 x two.

HISTORY:  Cathy Cleiland is a very pleasant 51-year-old female, admitted for intractable pain.  She is a patient of Dr. Hackman and has undergone lumbar laminectomy twice this year.  Most recently her surgery was done in July.  She states over the past few days her pain has become intractable in nature and the patient presented to the emergency room for evaluation and treatment.  She was admitted to the hospital on Sunday, August 10, 2003 for possible IV PCA and further workup.

HOSPITAL COURSE:  Cathy Cleiland was admitted to the hospital on August 10, 2003.  She was placed on IM pain medications and her pain resolved somewhat.  MRI scan of the lumbar spine with contrast demonstrated postoperative changes at L4-5, without evidence of disk herniation.  She appeared to be postoperative on the left at L4-5.  She was much improved on August 12, 2003, and was discharged from the hospital in stable condition.

Detailed discharge instructions, including wound care and activities were given to her prior to discharge, as well as a prescription for Tylox one every four hours as needed for pain and Flexeril 10 mg one b.i.d. p.r.n. spasm.  She was asked to follow up with Dr. Hackman in one week.  Dr. Hackman had been out of town for the week prior.

CONDITION ON DISCHARGE:  Stable.

ACTIVITIES:  Limited.

DIET:  Regular.

Michael D. Easterling, S.A.

PATRICK G. RYAN, M.D.

1AC0813
D:  8/13/2003 08:17
T:  8/13/2003 07:52
151804

000002

1

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY                    MR#:  28-51-42
ATTENDING:      PATRICK G. RYAN, M.D.              ACT#: 10567192
ADMIT DATE:     8/10/2003                          RM#:  6E-630

0811- 34/35
CHIEF COMPLAINT:  Intractable low back pain.

HISTORY:  Cathy Cleiland is a 46-year-old female, a patient of Dr.
Hackman.  She is admitted to the hospital at this time for
intractable low back pain and left sciatica.  She has undergone
lumbar laminectomy for disk herniation in May 2003, and was
readmitted for intractable low back pain in July.  She was found to
have recurrent disk herniation apparently at L4-5 and underwent
reexploration and diskectomy by Dr. Hackman.  She has done well since
that time, but over the past 3-4 days her pain has become increasing
in nature.  She found herself with intractable low back pain
yesterday with left sciatica.  She states her pain radiates into the
left hip, down her left thigh and into the left calf and foot.  She
has had numbness and tingling in her left lower extremity.  There is
no recent history of accident or injury.  She presented to the
emergency room yesterday for evaluation and treatment and was
admitted to the hospital for intractable low back pain.  She was to
be placed on pain medications and was admitted to the hospital.  The
patient was on 6-East.

PAST MEDICAL HISTORY

ALLERGIES:  No known allergies.

CURRENT MEDICATIONS: Insulin N 25 units and Humulin R 15 units
b.i.d., Darvocet for pain and Flexeril b.i.d.

PAST SURGICAL HISTORY:  She underwent lumbar laminectomy x 2,
anterior cervical fusion x 3, 2 by Dr. Hackman and 1 in Mobile.
Cesarean section, tubal ligation and carpal tunnel release.

SOCIAL HISTORY:  No use of cigarettes or alcohol noted.

FAMILY HISTORY:   Noncontributory.

REVIEW OF SYSTEMS: Positive for insulin-dependent type-2  diabetes.
No history of hypertension.  Denies cardiac disease or MI.  There is
no history of renal or hepatic disease.  Denies seizures, CVA or
bleeding abnormalities.  There is a positive history of mitral valve
prolapse.  There is no history of cancer or chronic lung disease.

PHYSICAL EXAMINATION
General:  This 46-year-old white female in no acute distress.  She is
well developed and well nourished.
Vital Signs:  Blood pressure 132/82, heart rate 96, respirations 18,
temperature 98.0.

000003

1

CLE00018

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY          MR#:  28-51-42
ATTENDING:      PATRICK G. RYAN, M.D.    ACT#: 10567192
ADMIT DATE:     8/10/2003                RM#:  6E-630

HEENT:  Normocephalic, atraumatic.  Extraocular movements  intact.
Pupils are equal, round, reactive to light and accommodation.
Neck:  Supple, nontender, no cervical lymphadenopathy.  There is no
jugular venous distention.
Heart:  Regular rate and rhythm, without murmur or gallop.
Lungs:  Clear to auscultation bilaterally without rales, rhonchi or
wheezing.
Abdomen:  Soft, nontender, nondistended, positive bowel sounds
present.
GU:  Deferred.
Extremities: Without clubbing or cyanosis.  No edema.  No atrophy.
Skin:  Turgor within normal limits.
Neurological:  Patient is alert and oriented x 3.  She answered
questions appropriately.  She is _____.  There is palpable
paralumbar spasm present.  Straight-leg raising on her left is
positive at 30 degrees.  Contralateral straight-leg raising is
positive at 70 degrees.  She is hyperesthetic to pinprick in the left
S1 and L5 distribution, especially below the knee.  Sensation is
intact on the right.  Reflexes are absent at the left ankle, 1-2+ on
the right and 1+ at the knee bilaterally.  Patrick's maneuver
negative.  Quadriceps strength and biceps strength is 5/5
bilaterally.

IMPRESSION:
1.  Lumbar radiculopathy, rule out recurrent disk herniation.
2.  Status post lumbar laminectomy x 2.
3.  Anterior cervical fusion x 3.
4.  Type 2 insulin-dependent diabetes mellitus.

PLAN:  The patient was admitted to the hospital at this time for pain
control.  She is admitted as well for MRI scan of the lumbar spine
and will have this done on 8/11/03, 6-East.

PATRICK G. RYAN, M.D.

2MQ0811
D:  8/11/2003 09:19
T:  8/11/2003 13:15
151560

JOHN E. HACKMAN, M.D.

000004

2

CLE00019

# JACKSON HOSPITAL & CLINIC, INC.

## 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

**Name: CLELLAND, CATHY K.**          DOB:          Age: 46 YEARS
**Physician: RYAN, PATRICK G**       Patient Location: 6301
MR#: 285142          X-RAY#: 463643          Account#: 10567192
Order ID: 1190671    Result ID: 1073900     Addendum Number: 0

---

Clinical Data: BACKK PAIN  TO LEFT LEG BACK SURGERY
**Procedure:  MRI L SPINE W & W/O CONTRAST    Date of Exam: 08/11/2003**

TECHNIQUE:
Pre and post contrast T1 axial and sagittal imaging was performed along with multi-echo T2 sagittal and fast spin echo T2 axial imaging was performed.

FINDINGS:
Comparison is made to a recent examination from 07/14/2003.  The previously described moderate sized disc extrusion in the left lateral recess of L4-5 has apparently been removed. There is a very small, 5mm area of low signal intensity that is surrounded by enhancing scar tissue that is adjacent to the posterolateral aspect of the intervertebral disc at L4-5 seen only on the post contrast axial images (image 10). This is adjacent to the superior end plate of L5 and is not seen on the parasagittal images. This does not abut or displace the exiting nerve roots. I cannot tell with certainty whether this represents a small piece of bone or a small residual disc fragment but may be clinically insignificant given its small size and no apparent abutment of the nerve roots. There is a fairly extensive amount of enhancing soft tissue in the left epidural space of L4-5. The enhancing soft tissue extends along the anterior aspect of the thecal sac as well as into the left neural foramen. There is no displacement or distortion of the thecal sac. The exiting left L5 nerve root is encased by the enhancing tissue. The patient has significant degenerative disc disease at this level with disc space loss and end plate sclerosis. The remaining intervertebral disc spaces show only some mild disc desiccation. No other areas of disc bulging or protrusion. The conus is normal.

IMPRESSION:
EXTENSIVE POST OPERATIVE CHANGES ON THE LEFT AT L4-5 WITH A LARGE AMOUNT OF ENHANCING EPIDURAL SCAR TISSUE AS DESCRIBED. THE MODERATE SIZED DISC EXTRUSION AT THIS LEVEL IS NO LONGER VISIBLE, HOWEVER THERE IS A SMALL NON-ENHANCING AREA OF LOW SIGNAL INTENSITY NEAR THE LEFT NEURAL FORAMEN AT L4-5. PROBABLY AND CLINICALLY INSIGNIFICANT GIVEN

JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1817
A Non Profit Organization

X-2 (2/99)

**000005**

**X-RAY REPORT**



ITS SMALL SIZE AND LACK OF ABUTMENT TO THE NERVE ROOTS BUT COULD REPRESENT A SMALL END PLATE FRAGMENT OR DISC FRAGMENT. THIS IS SEEN ONLY ON ONE VIEW.

SEVERE DEGENERATIVE DISC DISEASE AT L4-5.

Dictated by: KEN RICHARDSON
Verified by: KEN RICHARDSON

Transcriptionist: EE

Name:CLEILAND, CATHY K.          Order ID:1190671
Physician:RYAN, PATRICK G          Date:08/11/2003



JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non Profit Organization

X-2 (2/99)

000006          **X-RAY REPORT**



CLE00021

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

DISCHARGE SUMMARY

PATIENT NAME:   CLEILAND, CATHY                    MR#:   28-51-42
ATTENDING:      HACKMAN, JOHN                      ACT#: 1056 08 03
ADMIT DATE:     7/14/2003                          RM#:
DISCHARGE DATE: 7/17/2003

---

BS#:  0717-023

REASON FOR ADMISSION:  This 45-year-old white female diabetic had a
laminectomy on May 21, 2003 at L4-5 on the left and initially did
well.  She then developed a recurrence of pain down the left hip and
leg, which has gotten progressively worse.  She presented to our
emergency room in extreme pain.  She was admitted for pain control
and evaluation.

HOSPITAL COURSE:  The patient was admitted to the hospital and placed
on pain control.  The next day we did an MRI scan and this showed a
large extruded fragment at L4-5.  Surgery was recommended.  The
patient was taken to surgery on July 16, 2003 where she had re-
exploration of her laminectomy at L4-5 on the left.  She had
immediate improvement in her leg pain, did well, and was discharged
home the following day.  The wounds looked good and she was given
instructions.  She will be followed up in the office.

DISCHARGE DIAGNOSIS:
1.  Recurrent disk herniation at L4 5, left.

OPERATIVE PROCEDURE THIS ADMISSION:
1.  Re-exploration laminectomy at L4-5, left.


_____
                                 JOHN E. HACKMAN, M.D.

2AC0717
D:  7/17/2003 09:56
T:  7/17/2003 11:00
149107

000002

1

CLE00022

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLELLAND, CATHY          MR#:  28-51-42
ATTENDING:      HACKMAN, JOHN            ACT#: 10560803
ADMIT DATE:     7/14/2003                RM#:  630-1

CHIEF COMPLAINT: Left hip and leg pain.

HISTORY OF PRESENT ILLNESS: This is 45-year-old white female,
diabetic. She recently had a laminectomy on 5/21/03 at L4-5 on the
left. She initially did well. She has had a recurrence of pain in the
left hip and leg. We have talked to her a couple of times and I saw
her in the office this past week. She complained about increasing
weakness. I put her on medication but she has gotten progressively
worse and she presented to the emergency room and was admitted for
reevaluation and pain control.

PAST MEDICAL HISTORY: Positive for insulin-dependent diabetes. She is
noncompliant. She has been otherwise healthy.

PRIOR SURGERY: Includes two cesarean sections, tubal ligation,
reversal of the tubal ligation, removal of the right tube and ovary,
anterior cervical fusion, carpel tunnel surgery, lumbar laminectomy.


HOME MEDICATIONS:
1. Humulin insulin 70/30, 40 units twice a day.
2. Effexor.
3. Klonopin.
4. Pain pills.

ALLERGIES: None reported.

FAMILY HISTORY: Positive for diabetes.

SOCIAL HISTORY: Shows the patient is a nonsmoker.

PHYSICAL EXAM:
GENERAL: Shows a generally healthy appearing white female. She is
alert and oriented. Cranial nerves are intact.
NECK: She has a good range of motion of the neck.
CHEST: Clear.
HEART: Regular.
ABDOMEN: Soft.
EXTREMITIES: She has pain with straight leg raising on the left. Knee
reflexes are intact. The ankle are both absent. She has weakness of
toe extension on the left.


000003

1

CLE00023

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

```
PATIENT NAME:   CLEILAND, CATHY              MR#:   28-51-42
ATTENDING:      HACKMAN,JOHN                 ACT#:  1056O8O3
ADMIT DATE:     7/14/2003                    RM#:   630-1
```

ADMISSION IMPRESSION:
1. Recurrent lumbar radiculitis at L4-5 left.

JOHN R. HACKMAN, M.D.

```
4JB0715
D:  7/15/2003 908
T:  7/15/2003 12:01
148839
```

000004

2

CLE00024

# JACKSON HOSPITAL & CLINIC, INC.
### 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

**Name: CLELAND, CATHY K.**                    DOB:                    Age: 46 YEARS
**Physician: HACKMAN, JOHN E**               Patient Location: 6301
MR#: 285142               X-RAY#: 463643               Account#: 10560803
Order ID: 1182215               Result ID: 1066800               Addendum Number: 0

---

Clinical Data: BACK AND LEG PAIN
**Procedure:  MRI L SPINE W & W/O CONTRAST**          **Date of Exam: 07/14/2003**

Comparison is made October 02.

Surgical change is now seen on the left at L4-5 with enhancing scar in the left lateral recess and portion of the left neural foramen. There is a prominent focus of non-enhancing material that protrudes from the disc space posteriorly to the left. This is consistent with a recurrent disc extrusion. This fills the lateral recess and impinges on the left neural foramen. The remainder of the discs are intact. The L4-5 disc is more narrowed and desiccated with secondary spondylotic change along the end plates. Vertebral height and alignment is maintained. No intradural abnormalities are seen.

**IMPRESSION:**
RECURRENT OR RESIDUAL LARGE FOCAL EXTRUSION OF DISC MATERIAL TO THE LEFT AT L4-5.  UNDERLYING SURGICAL CHANGE AND ENHANCING SCAR IS ALSO PRESENT IN THIS AREA.

Dictated by: GARY W. SCOTT
Verified by: GARY W. SCOTT

Transcriptionist: TAC

JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non Profit Organization

X-2 (2/99)

000007

**X-RAY REPORT**



CLE00025

# JACKSON HOSPITAL & CLINIC, INC.

1725 PINE STREET
MONTGOMERY, ALABAMA 36106

**Name: CLEILAND, CATHY K.**                    DOB: ▓▓▓▓▓ Age: 46 YEARS
**Physician: HACKMAN, JOHN E**            Patient Location: 6301
MR#: 285142            X-RAY#: 463643            Account#: 10560803
Order ID: 1182214            Result ID: 1066801            Addendum Number: 0

---

Clinical Data: BACK AND LEG PAIN
**Procedure: L-SPINE COMPLETE**            **Date of Exam: 07/14/2003**

L4-5 and L5-S1 disc spaces are narrowed. There is a surgical defect seen in the left posterior
elements at L4-5. Mild facet hypertrophy and sclerosis is noted at the lower three disc levels.
Vertebral height and alignment is maintained. No fractures are seen.

**IMPRESSION:**
SURGICAL CHANGE ON THE LEFT AT L4-5.

NARROWING OF THE DISC AND SPONDYLOTIC CHANGES AT L4-5 AND L5-S1.

Dictated by: GARY W. SCOTT
Verified by: GARY W. SCOTT

Transcriptionist: TAC



**JACKSON HOSPITAL.**
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 38106-1117
A Non Profit Organization

X-2 (2/99)

000008

**X-RAY REPORT**

# JACKSON HOSPITAL & CLINIC, INC.

### 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

Name: CLEILAND, CATHY K.　　　　　　　DOB: ███████　Age: 46 YEARS
Physician: HACKMAN, JOHN E　　　　　　Patient Location: 6301
MR#: 285142　　　　　X-RAY#: 463643　　　　Account#: 10560803
Order ID: 1183115　　　Result ID: 1067796　　　Addendum Number: 0

---

Clinical Data: LL
**Procedure:  SPINE ONE LEVEL**　　　　　**Date of Exam: 07/18/2003**

Lateral view was obtained with metallic probe dorsal to the inferior aspect of L4.


Dictated by: PAUL A. TURNER
Verified by: PAUL A. TURNER

Transcriptionist: TAC



JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non Profit Organization

X-2 (2/99)

000009

**X-RAY REPORT**



CLE00027

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY              MR#:  28-51-42
ATTENDING:       HACKMAN,JOHN                 ACT#: 10560803
SURGEON:                                      RM#:  6E 630
                                             DATE: 7/16/2003

BS job # 0716-058

PREOPERATIVE DIAGNOSIS
Recurrent disc herniation at L4-5, left.

POSTOPERATIVE DIAGNOSIS
Recurrent disc herniation at L4-5, left.

PROCEDURE
Re-exploration laminectomy at L4-5, left.

SURGEON
Dr. John Hackman.

INDICATIONS
This 45-year-old white female had a laminectomy nearly two months ago
at L4-5 on the left and initially did well. She did start having some
recurrence of pain in her left hip and leg. That pain has become very
severe over the last week.  She presented to the emergency room and
was admitted for pain control. On evaluation, we found, on an MRI
scan, that she has large recurrent disc herniation at L4-5 on the
left with extruded fragments.

PROCEDURE
The patient was taken to the operating room where she underwent
general endotracheal anesthesia. She was turned to the prone position
on chest rolls. The operative site was shaved, prepped and draped in
sterile manner. Midline incision was made over L4-5, at old lumbar
scar. It was carried down to the lumbar fascia, left of the midline.
Paravertebral muscles were stripped off the spinous processes and
lamina, exposing the intralaminar space at L4-5 on the left.
Previous laminectomy site was enlarged. Scar tissue was removed. We
found several huge fragments of cartilage out under the dural sac and
the nerve root. These were all cleaned out. It appeared that she had
avulsed some of the cartilage end plate. We cleaned out all loose
fragments and made sure we had a good decompression. Bleeding was
controlled with Gelfoam and thrombin.  The wound was closed in
multiple layers of Vicryl suture.

ESTIMATED BLOOD LOSS
Blood loss during the procedure was 150 cc.

COMPLICATIONS
There were no obvious complications.

000024                                              1

CLE00028

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama 36106

REPORT OF OPERATION

PATIENT NAME:  CLEILAND, CATHY          MR#:  28-51-42
ATTENDING:     HACKMAN,JOHN             ACT#: 10560803
SURGEON:                                RM#:  6E 630
                                        DATE: 7/16/2003

Sterile dressings were applied and the patient was taken to the
recovery room in satisfactory condition.

                                  _____
                                  JOHN E. HACKMAN, M.D.

3AI0716
D:
T:  7/16/2003 22:27

000025

2

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

DISCHARGE SUMMARY

PATIENT NAME:  CLEILAND, CATHY                      MR#:   28-51-42
ATTENDING:                                          ACT#:  10547947
ADMIT DATE:       5/21/2003                         RM#:
DISCHARGE DATE:   5/22/2003

---

Bytescribe #0522-063

REASON FOR ADMISSION:  This 45-year-old, diabetic white female comes
in with persistent left hip and leg pain with numbness.  This has
gotten progressively worse for a year.  Magnetic resonance imaging
scan shows disc bulging at L4-5 on the left with osteophytes.  This
protrudes into the foramen.  She now comes in for surgery.

HOSPITAL COURSE:  The patient was admitted to the hospital and taken
to surgery where she had a lumbar laminectomy at L4-5 on the left.
She had immediate improvement, did well and was discharged home the
following day.  The wound looked good, and she was given
instructions.  She will be followed up in the office.

DISCHARGE DIAGNOSIS:  Lumbar radiculitis L4-5 on the left.

OPERATIVE PROCEDURE THIS ADMISSION: Lumbar laminectomy L4-5 on the
left.

JOHN E. HACKMAN, M.D.

8DW0522
D:  5/22/2003 08:17
T:  5/22/2003 10:56
143166

000002

1

CLE00030

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY                    MR#:   28-51-42
ATTENDING:                                         ACT#:  10547947
ADMIT DATE:     5/21/2003                          RM#:   6E-647

Bytescribe #0521-072

CHIEF COMPLAINT:  Left hip and leg pain with numbness.

HISTORY OF PRESENT ILLNESS:  This is a 45-year-old diabetic white
female.  She comes in with problems with left hip and leg pain with
numbness in the left lateral thigh.  She attributes this to a motor
vehicle accident which occurred on April 25, 2002.  She has
persistent pain in the left hip which has gotten progressively worse.
She does have a history of a prior accident and was treated at the
Mobile Infirmary in February of 2000.  They noticed some disc bulging
and had a report that she had numbness in the left leg ever since a
1997 accident.  She says things became worse after her April 25,
2002, accident.  She has had conservative treatment and has not
improved.  Magnetic resonance imaging scan shows some disc bulging at
L4-5 on the left with osteophyte.  This protrudes into the foramen.
She now comes in for lumbar laminectomy.  The surgery risks and
benefits have been discussed.

PAST MEDICAL HISTORY:  Positive for insulin-dependent diabetes
mellitus.  She is noncompliant.  When she went for her preoperative
visit she had a very high blood sugar, which was 497 and then
repeated at 541.  This morning she has taken insulin, and her blood
sugar is now down to 154.

PAST SURGICAL HISTORY:  Prior surgery includes two cesarean sections,
tubal ligation, reversal of a tubal ligation, removal of the right
tube and ovary, anterior cervical fusion and carpal tunnel surgery.

CURRENT MEDICATIONS:
1.  Humulin insulin.
2.  Effexor.
3.  Klonopin.

ALLERGIES:  None reported.

FAMILY HISTORY:  Positive for diabetes mellitus.

SOCIAL HISTORY:  She is a nonsmoker.

PHYSICAL EXAMINATION:
GENERAL APPEARANCE:  Examination shows a generally healthy-appearing
white female.  She is alert and oriented.  Cranial nerves are intact.
NECK:  She has a good range of motion of the neck.
CHEST:  Clear.
HEART:  Regular.
ABDOMEN:  Soft.

060003

1

CLE00031

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY                    MR#:   28-51-42
ATTENDING:                                          ACT#:  10547947
ADMIT DATE:     5/21/2003                           RM#:   6E-647

---

NEUROLOGICAL:  She has pain with straight leg raising on the left.
Knee reflexes and ankle reflexes are both unobtainable, probably
secondary to diabetes mellitus.  There is a little weakness with toe
extension on the left but no definite foot drop.

ADMITTING IMPRESSION:  Lumbar radiculitis, L4-5 left.


                                    JOHN E. HACKMAN, M.D.
7DW0521
D:  5/21/2003 09:23
T:  5/21/2003 11:13
143018


000004

2

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:   CLEILAND, CATHY                    MR#:  28-51-42
ATTENDING:      JOHN E. HACKMAN, M.D.              ACT#: 10547947
SURGEON:        JOHN E. HACKMAN, M.D.              RM#:  647-1
                                                   DATE: 5/21/2003

PREOPERATIVE DIAGNOSIS:  Lumbar radiculitis L4-5 left.

POSTOPERATIVE DIAGNOSIS:  Lumbar radiculitis L4-5 left.

NAME OF PROCEDURE:  Lumbar laminectomy L4-5 left.

ASSISTANT:

ANESTHESIA:  General endotracheal anesthesia.

INDICATIONS FOR PROCEDURE: This is a 45-year-old white female comes in with persistent back and left leg pain with numbness and weakness. She has had conservative treatment without improvement.  The MRI scan shows a protruding disk with associated osteophyte at L4-5 on the left.

DESCRIPTION OF PROCEDURE:  The patient was taken to the operating room where she underwent general endotracheal anesthesia.  She was turned in the prone position on chest rolls.  The operative sites were shaved, prepped, and draped in the sterile manner.  A midline incision was made over L4-5.  This was carried down to the lumbar fascia, which was opened to the left of the midline.  The paravertebral muscles were stripped off the spinous processes and lamina exposing the interlaminar space at L4-5 on the left.

A portion of the inferior lamina of L4 was removed.  The ligamentum flavum was removed.  The nerve roots were identified.  Underneath we found a soft protruding disk. There was some associated osteophyte going off the rim of the inferior part of L4 and extending out into the foramen along with protruding disk.

We opened the ligament.  We used pituitary rongeurs and curets and cleaned out fragmented disk material until all loose fragments were removed.  We then removed the associated osteophytes with curets.  We made sure we had a good decompression in the central canal and the nerve root canal.  Bleeding was controlled with Gelfoam and thrombin.

The wound was closed in multiple layers of Vicryl suture.  Blood loss during the procedure 350 cc.  There were no obvious complications. Sterile dressings were applied.

000022

1

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:   CLEILAND, CATHY            MR#:   28-51-42
ATTENDING:      JOHN E. HACKMAN, M.D.      ACT#:  10547947
SURGEON:        JOHN E. HACKMAN, M.D.      RM#:   647-1
                                          DATE:  5/21/2003

---

The patient was taken to the recovery room in satisfactory condition.


                              JOHN E. HACKMAN, M.D.

6HI0521
D:  5/21/2003 09:25
T:  5/21/2003 15:26
143022

000023

CLE00034

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:07 AM
Printed By: SML,HIM

```
Name= CLEILAND,CATHY K              Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 10/01/2002 Loc= RAD SPEC    Acct#= 10492239    Phys= HACKMAN,JOHN E
-------------------------------------------------------------------------
```

```
Ord #= -                                    Sched D/T= 10/01/2002 0844
Ord Phys=                                    Collect D/T= 10/01/2002 1032
Resulted by= SYS,IS                          Result D/T= 10/01/2002 1228
```

MRI LUMBAR SPINE WITHOUT CONTRAST                              (1 of 1)
  RAD01:
      Clinical Data: BACK PAIN    F&S    BRENDA        COMM

  REPORT:
      Procedure:  MRI LUMBAR SPINE   Date of Exam: 10/01/2002


      TECHNIQUE:

      T1 sagittal, multi-echo T2 sagittal, T1 axial, and fast spin echo T2

      axial imaging was performed.


      FINDINGS:

      Comparison is made to a previous study from May 24, 2002.  Overall, I

      see no significant interval change.  Again seen is some disc

      desiccation and mild disc bulging at L4-5.  There is some relative

      mild left neural foraminal stenosis due to disc bulge but this is

      stable in appearance from the prior study.  No focal disc protrusions

      are seen. No other disc bulges are identified.  There is no spinal

      canal stenosis.  The vertebral bodies maintain normal signal

      intensity on all sequences.  The conus is normal.

CLE00035

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:07 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 10/01/2002 Loc= RAD SPEC    Acct#= 10492239    Phys= HACKMAN,JOHN E
--------------------------------------------------------------------------
MRI LUMBAR SPINE WITHOUT CONTRAST10/01/200212:28 PM  (Continued)
    IMPRESSION:

    DISC DESICCATION AND MILD DISC BULGING AT L4-5.  NO FOCAL DISC

    PROTRUSIONS.


    Faxed to Dr. Hackman.

    Dictated by: KEN RICHARDSON

    Verified by: KEN RICHARDSON


    Transcriptionist: EE

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

DISCHARGE SUMMARY

PATIENT NAME:   CLEILAND, CATHY                    MR#:  28-51-42
ATTENDING:      HACKMAN,JOHN                       ACT#: 10466104
ADMIT DATE:     6/24/2002                          RM#:
DISCHARGE DATE: 6/25/2002

---

REASON FOR ADMISSION: This 44-year-old white female has had prior
cervical fusions at C5-6 and C6-7.  She was doing well until a recent
motor vehicle accident.  Ever since then, she has had pain in the
neck going into the shoulder.  She has had conservative treatment
without improvement.  Myelogram/CAT scan was abnormal at C4-5, and
she now comes in for surgery.

HOSPITAL COURSE:  The patient was admitted to the hospital and taken
to surgery where she had an anterior cervical diskectomy and
interbody fusion at C4-5 with a bone graft from the right iliac
crest.  She had immediate improvement, did well and was discharged
home the following day.  She will be followed up in the office.  The
wounds looked good, and she was given instructions.

DISCHARGE DIAGNOSIS: Cervical radiculitis, C4-5.

OPERATIVE PROCEDURE THIS ADMISSION:  Anterior cervical diskectomy and
interbody fusion at C4-5 with a bone graft from the right iliac
crest.

JOHN B. HACKMAN, M.D.

3DW0625
D:  6/25/2002
T:  6/25/2002
106116

000602

1

CLE00037

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY            MR#:   28-51-42
ATTENDING:      HACKMAN,JOHN               ACT#:  10466104
ADMIT DATE:     6/24/2002                  RM#:   630-1

CHIEF COMPLAINT: Neck and shoulder pain.

HISTORY: This is a 44-year-old white female. She had a prior cervical
fusion at C5-C6 in Mobile. A year ago she had an anterior cervical
fusion at C6-C7 here. She says she was doing well until this spring
when she started having trouble with her neck. She had pain and
numbness going to the right shoulder and right hand. She had an
accident on 05/25/2002, but she says the pain in the neck started
prior to the accident. She feels that things got worse after her
accident. She has been evaluated with myelogram CAT scan that was
abnormal at C4-C5. She now comes in for surgery. The risks and
benefits have been discussed.

The patient also has low back problems, which she attributes to her
motor vehicle accident. She has some protrusion at L4-L5 on the left.
She has also got numbness in her hand. She has had a prior carpal
tunnel performed in Mobile and her EMG studies show recurrent carpal
tunnel problems in the right hand.

PAST MEDICAL HISTORY: Positive for insulin-dependent diabetes.

PRIOR SURGERIES: Includes two cesarean sections, tubal ligation,
reversal of tubal ligation, removal of right tube and ovary, C5-C6
and C6-C7 cervical fusions, carpal tunnel surgery.

CURRENT MEDICATIONS: Humulin insulin, Effexor and Klonopin.

ALLERGIES: None reported.

FAMILY HISTORY: Positive for diabetes.

SOCIAL HISTORY: She is a nonsmoker.

PHYSICAL EXAMINATION: Examination shows a healthy-appearing, well-
developed, white female. She is alert and oriented. Cranial nerves
are intact. She has pain with neck extension and neck rotation. There
is no definite neurologic abnormality.

000603

1

CLE00038

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:　CLEILAND, CATHY　　　　　　　　MR#:　28-51-42
ATTENDING:　　HACKMAN,JOHN　　　　　　　　　ACT#: 10466104
ADMIT DATE:　　6/24/2002　　　　　　　　　　RM#:　630-1

She does have positive Tinel's sign in the right hand. Chest is
clear. Heart regular. Abdomen soft.

ADMITTING IMPRESSION: Cervical radiculitis C4-C5.

JOHN E. HACKMAN, M.D.

4EJ0624
D:  6/24/2002
T:  6/24/2002
106030

000004

CLE00039

# JACKSON HOSPITAL & CLINIC, INC.

1725 PINE STREET
MONTGOMERY, ALABAMA 36106

**Name: CLEILAND, CATHY K.**
**Physician: HACKMAN, JOHN E**
MR#: 285142                    X-RAY#: 463643
Order ID: 1056208              Result ID: 961967

DOB: ████████   Age: 44 YEARS
Patient Location: 6301
    Account#: 10466104
    Addendum Number: 0

---

Clinical Data: ACF
**Procedure:  C-SPINE ONE VIEW**          **Date of Exam: 06/24/2002**
Film for localization shows a marker anteriorly at the C4-5 level.   There has been previous
anterior fusion at C5-6 and C6-7.

**IMPRESSION:**
C4-5 LOCALIZATION.

Dictated by: STANLEY B. WINSLOW, M.D.
Verified by: STANLEY B. WINSLOW, M.D.

Transcriptionist: JAK

JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non Profit Organization

X-2 (2/99)

000607

**X-RAY REPORT**



X-2

CLE00040

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:   CLEILAND, CATHY                    MR#:  28-51-42
ATTENDING:      JOHN E. HACKMAN, M.D.              ACT#: 10466104
SURGEON:        JOHN E. HACKMAN, M.D.              RM#:
                                                   DATE:  6/24/2002

---

PREOPERATIVE DIAGNOSIS:  Cervical radiculitis C4-5.

POSTOPERATIVE DIAGNOSIS:  Cervical radiculitis C4-5.

OPERATION:  Anterior cervical diskectomy with inter body fusion C4-5 with bone grafts on the right iliac crest.

INDICATIONS:  This 44-year-old white female comes in with intractable neck and shoulder pain.  She has had conservative treatment without improvement.  Myelogram CAT scan is abnormal at C4-5.  She has had prior cervical fusions at C5-6 and C6-7 in the past.

PROCEDURE:  The patient was taken to the operating room where she underwent general endotracheal anesthesia.  She was positioned in the supine position with sandbags under the neck and under the right hip. The operative sites were shaved, prepped and draped in the usual sterile fashion.  A transverse incision was made in the anterior neck.  This was carried down through the superficial layers and the platysma.  The cervical fascia was opened along the anterior border of the sternocleidomastoid muscle.  Blunt dissection took us down to the cervical spine.  The C4-5 was identified and marked and we took an x-ray to confirm our level.  Meanwhile we went to the right iliac crest.  A transverse incision was made behind and below the anterior superior iliac spine.  This was carried down to the fascia lata which was opened along its fibers.  Muscle was stripped off the iliac crest and a 12 mm bone dowel was removed.  This wound was closed in multiple layers with Vicryl suture and we returned to the neck.  We had accurately identified C4-5.  We made an incision in the disk.  We used pituitary rongeurs and curets and cleaned out the entire disk space.  The posterolateral corners were decompressed with the 2 mm punch.  Bleeding was controlled with Gelfoam and thrombin.  We drilled down through the inner space with the 12 mm drill.  We controlled bleeding with Gelfoam and thrombin.  We distracted the interspaces and we inserted the bone graft.  We made sure there was no active bleeding.  The wound was irrigated.  The Homovac drain was brought out through a separate stab wound and the wound was closed in multiple layers with Vicryl suture.  The blood loss during the procedure was 100 cc.  There were no obvious complications.  Sterile

000020

CLE00041

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama 36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY                    MR#:   28-51-42
ATTENDING:       JOHN E. HACKMAN, M.D.              ACT#:  10466104
SURGEON:         JOHN E. HACKMAN, M.D.              RM#:
                                                    DATE:  6/24/2002

---

dressings were applied and the patient was taken to the recovery room
in satisfactory condition.

_____
JOHN E. HACKMAN, M.D.

2LV0624
D:  6/24/2002
T:  6/24/2002
106031

000021

CLE00042

## JACKSON HOSPITAL & CLINIC, INC.
### 1725 Pine Street, Montgomery, AL 36106
### (334) 293-8794   (334) 293-8395 (Fax)

## PATHOLOGY REPORT

**Patient Name:** CLELAND, CATHY K.
**Medical Record #:** 285142
**DOB/Age:** ▓▓▓▓▓▓▓▓ ge: 44)
**Gender:** F     **Race:** Caucasian
**Physician(s):** John E Hackman

**Account #:** 10466104\285142\1\9\1
**Location:** 6E
**Rm#:** 630-1
**Copy To:**

**Specimen #:** J02-4438
**Collected:** 6/24/02
**Received:** 6/24/02
**Reported:** 6/25/02

---

**Specimen(s) Received:** Disc material, cervical spine, C4-5

---

## FINAL DIAGNOSIS:
**Disc material, C4-5:**
      Degenerating fibrocartilage.

Electronic Signature
Timothy C. Barrowman, M.D

---

### Gross Description
Received is a 2.0 x 1.5 x 1.0 cm aggregate of irregular white and red tan tissue fragments. Representative fragments are submitted.

TCB

**Diagnostic Services By:**
**Alabama Pathology Associates, P.C.**
**Montgomery, AL 36106**

000022

CLELAND, CATHY K.                    J02-4438                    Page 1 of 1

CLE00043

Page 4

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

```
Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 04/29/2002 Loc= RAD SPEC    Acct#= 10452346    Phys= HACKMAN,JOHN E
-------------------------------------------------------------------------------

Ord #= -                                    Sched D/T= 04/29/2002 0859
Ord Phys=                                   Collect D/T= 04/29/2002 1405
Resulted by= SYS,IS                         Result D/T= 04/29/2002 1623

CT LUMBAR SPINE                                      (7 of 10)
   RAD01:
        Clinical Data: NECKPAIN

   REPORT:
        Procedure:  CT LUMBAR SPINE  Date of Exam: 04/29/2002
```

Axial images obtained from the L2-3 disc space into S1. Intrathecal contrast is present.

There is a mild diffuse protrusion of the disc at L2-3, 3-4 and moderate protrusion at L4-5 which appears to be eccentric to the left with posterior displacement of the left L5 nerve root. There appears to be previous laminectomy at L5 on the left. There is no evidence of disc protrusion at L5-S1.

IMPRESSION:

MILD DISC PROTRUSION AT L2-3 AND 3-4 AND MODERATE PROTRUSION AT L4-5 WITH LEFT L5 NERVE ROOT DISPLACEMENT. POST SURGICAL CHANGE L5-S1.

Dictated by: PAUL A. TURNER

CLE00044

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 04/29/2002 Loc= RAD SPEC    Acct#= 10452346    Phys= HACKMAN,JOHN E
------------------------------------------------------------------------
CT LUMBAR SPINE                04/29/2002 4:23 PM    (Continued)

    Verified by: PAUL A. TURNER


    Transcriptionist: EDA




Ord #= -                                Sched D/T= 04/29/2002 0859
Ord Phys=                               Collect D/T= 04/29/2002 1404
Resulted by= SYS,IS                     Result D/T= 04/29/2002 1623

CT CERVICAL SPINE                               (8 of 10)
 RAD01:
    Clinical Data: NECKPAIN

 REPORT:
    Procedure:  CT CERVICAL  Date of Exam: 04/29/2002


    Axial images obtained from C3 into T1.  Intrathecal contrast is

    present.  There is bony hypertrophic change of the intervertebral

    joints at C5-6 and C6-7 with no evidence of significant neural

    foraminal stenosis.  There is evidence of fusion at C5-7.  There is

    posterior bony spur arising from the inferior aspect of C6 slightly

    eccentric to the right.  This does impinge upon the thecal sac.

    There is mild posterior disc protrusion at C4-5.

CLE00045

Page 8

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

```
Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 04/29/2002 Loc= RAD SPEC    Acct#= 10452346    Phys= HACKMAN,JOHN E
```
------------------------------------------------------------------------
MYELOGRAM ENTIRE SPINE          04/29/2002 12:53 PM   (Continued)
    FINDINGS:

    LUMBAR:

    There is minimal ventral extradural impression at L4-5 and L5-S1.

    The nerve root sleeves are symmetrically filled with no truncation.

    THORACIC:

    Contrast flowed easily through the thoracic spine without

    obstruction. The conus is normal.

    CERVICAL:

    There has been anterior cervical fusion at C5-6 and C6-7.   There is

    a small ventral extradural defect at C4-5.  No nerve root sleeve

    truncation.


    IMPRESSION:

    PREVIOUS ANTERIOR CERVICAL FUSION AT C5-6 AND C6-7 WITH A SMALL

    VENTRAL DEFECT AT C4-5.


    MINIMAL VENTRAL IMPRESSION AT L4-5 AND L5-S1.


    Dictated by: KEN RICHARDSON

    Verified by: KEN RICHARDSON

CLE00046

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 04/29/2002 Loc= RAD SPEC    Acct#= 10452346    Phys= HACKMAN,JOHN E
------------------------------------------------------------------------
MYELOGRAM ENTIRE SPINE          04/29/2002 12:53 PM  (Continued)


Transcriptionist: JAJ

CLE00047

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

Name= CLELLAND,CATHY K            Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 04/10/2002 Loc= RAD SPEC    Acct#= 10447912    Phys= HACKMAN,JOHN E
---------------------------------------------------------------------------

Ord #= -                                    Sched D/T= 04/10/2002 1507
Ord Phys=                                  Collect D/T= 04/10/2002 1516
Resulted by= SYS,IS                         Result D/T= 04/10/2002 1841

CERVICAL SPINE SINGLE VIEW                              (1 of 2)
  RAD01:
      Clinical Data: neck arm & shoulder pain    MRI & XRAY LATERAL C SPINE
  REPORT:
      Brenda    wc #A751198 DOI 4-24-1997, ALICE EARLEY @ RELIANCE

      205-823-4042, 3440 PESTON RIDGE RD, SUITE 200 ALFARETTA, GA 30005

      Procedure:  C-SPINE ONE VIEW  Date of Exam: 04/10/2002


      There has been anterior cervical fusion at C5-6 and C6-7 with solid

      fusion. There is good anatomic alignment. No subluxation. The

      remaining disc spaces are well maintained.


      IMPRESSION:

      PREVIOUS ANTERIOR CERVICAL FUSION AT C5-6 AND C6-7 WITH NO FRACTURE

      OR SUBLUXATION.


      Dictated by: KEN RICHARDSON

      Verified by: KEN RICHARDSON


      Transcriptionist: EDA

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 04/10/2002 Loc= RAD SPEC    Acct#= 10447912    Phys= HACKMAN,JOHN E
-------------------------------------------------------------------------
CERVICAL SPINE SINGLE VIEW        04/10/2002 6:41 PM    (Continued)


Ord #= -                                    Sched D/T= 04/10/2002 1508
Ord Phys=                                   Collect D/T= 04/10/2002 1604
Resulted by- SYS,IS                         Result D/T- 04/10/2002 1841

MRI CERVICAL SPINE WITHOUT CONTRAST                        (2 of 2)
  RAD01:
     Clinical Data: neck arm & shoulder pain   MRI & XRAY LATERAL C SPINE

  REPORT:
     Brenda    wc #A751198 DOI 4-24-1997, ALICE EARLEY @ RELIANCE

     2C5-823-4042, 3440 PESTON RIDGE RD, SUITE 200 ALFARETTA, GA 30005

     Procedure:  MRI CERVICAL W/O CONTRAST  Date of Exam: 04/10/2002


  TECHNIQUE:

  T1 sagittal, multi-echo T2 sagittal, and axial gradient echo imaging

  was performed.


  FINDINGS:

  There has been previous anterior cervical fusion at C5-6 and at C6-7.

  There is some underlying spondylosis in the mid and lower cervical

  spine. There is mild right sided uncovertebral joint hypertrophy at

  C4-5 which creates mild right neural foraminal stenosis as compared

CLE00049

Page 3

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y     Sex= F     MRUN 28-51-42
Adm Dt= 04/10/2002 Loc= RAD SPEC    Acct#= 10447912    Phys= HACKMAN,JOHN E
-----------------------------------------------------------------------
MRI CERVICAL SPINE WITHOUT CONTRAST04/10/20026:41 PM (Continued)

to the left side. There is minimal disc bulging at this level but
this does not create any radiographically significant spinal canal
stenosis.


At C6-7 and to a lesser degree at C5-6, there is right sided
uncovertebral joint hypertrophy. This creates a moderate degree of
neural foraminal stenosis at C6-7 and mild stenosis at C5-6. The
underlying posterior end plate spurring does create some relative
mild spinal canal stenosis at these two levels but there continues to
be preservation of the subarachnoid space surrounding the cord and
there is no cord flattening. The remaining disc space levels are
unremarkable. No focal disc protrusions are seen.


IMPRESSION:

PREVIOUS ANTERIOR CERVICAL FUSION AT C5-6 AND C6-7. THERE IS RIGHT
SIDED UNCOVERTEERAL JOINT HYPERTROPHY AT C6-7 AND TO A LESSER DEGREE
AT C5-6 AND C4-5 CREATING VARIOUS DEGREES OF NEURAL FORAMINAL
STENOSIS.


NO FOCAL DISC PROTRUSIONS ARE IDENTIFIED.

CLE00050

# EXHIBIT

# "N"

# PART 2

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:13 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y     Sex= F     MRUN 28-51-42
Adm Dt= 04/10/2002 Loc= RAD SPEC     Acct#= 10447912     Phys= HACKMAN,JOHN E
------------------------------------------------------------------------
MRI CERVICAL SPINE WITHOUT CONTRAST04/10/20026:41 PM (Continued)


Dictated by: KEN RICHARDSON

Verified by: KEN RICHARDSON


Transcriptionist: EDA

CLE00051

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:14 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 06/05/2001 Loc= RAD SPEC   Acct#= 10372027    Phys= HACKMAN,JOHN E
-------------------------------------------------------------------------------

Ord #= -                                    Sched D/T= 06/05/2001 0947
Ord Phys=                                   Collect D/T= 06/05/2001 1043
Resulted by= SYS,IS                         Result D/T= 06/05/2001 1247

MRI LUMBAR SPINE WITHOUT CONTRAST                        (1 of 2)
  RAD01:
    Clinical Data: BACK PAIN and right leg pain  FAX AND SEND     LINDA

  REPORT:
    SIGNA

    Procedure:  MRI LUMBAR SPINE  Date of Exam: 06/05/2001

    HISTORY:    The patient is a 43 year old female who complains of pain

    and numbness in her left lower extremity.

    TECHNIQUE:    Sagittal T1 weighted, balanced, and T2 weighted

    images of the lumbar sacral spine have been obained.  In addition,

    angled axial T1 and T2 weighted images from the L3 vertebral body

    through the proximal sacrum have been obtained.

    FINDINGS:    At the L3-4 disc space level, the neural canal and

    intervertebral foramina are widely patent.  No significant posterior

    extension of disc material is identified.


    At the L4-5 disc space level, a posterior and left central bulge of

    disc material is present. This minimally encroaches into the anterior

    epidural space.  The intervertebral foramina and neural canal are

    widely patent.  There is desiccation noted of the disc material noted

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:14 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y      Sex= F    MRUN 28-51-42
Adm Dt= 06/05/2001 Loc= RAD SPEC    Acct#= 10372027    Phys= HACKMAN,JOHN E
------------------------------------------------------------------------------
MRI LUMBAR SPINE WITHOUT CONTRAST06/05/200112:47 PM  (Continued)
     at this level.


At the L5-S1 disc space level, no significant posterior extension of

disc material is present.  The neural canal and intervertebral

foramina are widely patent.

IMPRESSION:

POSTERIOR AND CENTRAL BULGE OF DISC MATERIAL AT THE L4-5 DISC SPACE

LEVEL.  THIS DOES NOT APPEAR TO SIGNIFICANTLY ENCROACH INTO THE

NEURAL CANAL OR INTERVERTEBRAL FORAMINA.


MINIMAL TO MILD DEGENERATIVE CHANGES OF THE FACET JOINTS ARE PRESENT

AT THE IMAGED LEVELS.


Faxed to Dr. Hackman's office.

Dictated by: ROBERT BALLARD

Verified by: ROBERT BALLARD

Transcriptionist: JAJ

CLE00053

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:14 AM
Printed By: SML,HIM

Name= CLELLAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 06/05/2001 Loc= RAD SPEC    Acct#= 10372027    Phys= HACKMAN,JOHN E
--------------------------------------------------------------------------------

Ord #= -                                    Sched D/T= 06/05/2001 0949
Ord Phys=                                    Collect D/T= 06/05/2001 1005
Resulted by= SYS,IS                         Result D/T= 06/05/2001 1247

CERVICAL SPINE AP AND LATERAL                            (2 of 2)
  RAD01:
      Clinical Data: ORDERED  LATERAL C-SPINE VIEWS   ****   FAX AND SEND

  REPORT:
      *** PT FOR MRI ALSO @ 10:50

      Procedure:  CERVICAL AP & LAT  Date of Exam: 06/05/2001


  Anterior cervical spine fusion changes with associated bone grafts

  are noted at the C5-7 vertebral levels.  Posterior vertebral spurring

  is noted at the C5-6 disc space level.


  The visualized posterior elements are intact.


  IMPRESSION:

  ANTERIOR CERVICAL SPINE FUSION CHANGES AT C5-7.


  Dictated by: ROBERT BALLARD

  Verified by: ROBERT BALLARD


  Transcriptionist: EE

CLE00054

Jackson Hospital & Clinic, Inc.
RESULTS BY SELECTION
RESULTS REPORTING
Thu Aug 3, 2006 11:14 AM
Printed By: SML,HIM

Name= CLEILAND,CATHY K          Age= 49Y    Sex= F    MRUN 28-51-42
Adm Dt= 06/05/2001 Loc= RAD SPEC    Acct#= 10372027    Phys= HACKMAN,JOHN E
--------------------------------------------------------------------------------
CERVICAL SPINE AP AND LATERAL    06/05/2001 12:47 PM    (Continued)

CLE00055

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

DISCHARGE SUMMARY

PATIENT NAME:   CLEILAND, CATHY                      MR#:   28-51-42
ATTENDING:      JOHN E. HACKMAN, M.D.                ACT#:  10361681
ADMIT DATE:     5/02/2001                            RM#:
DISCHARGE DATE: 5/03/2001

REASON FOR ADMISSION:  This is a 43-year-old white female who has had
a prior anterior cervical fusion at C5-6, but never really recovered.
Recent MRI scan shows C6-7 disc herniation.  She complains about
right-sided neck, arm and shoulder pain with numbness in the right
mid fingers and she has got triceps weakness.  She has failed
conservative treatment and she has got an abnormal MRI and now comes
in for surgery.

HOSPITAL COURSE:  The patient was admitted to the hospital and taken
to surgery where she had an anterior cervical diskectomy and
interbody fusion at C6-7 with a bone graft from the right iliac
crest.  She had immediate improvement, did well and was discharged
home the following day.  She will be followed up in the office.

DISCHARGE DIAGNOSIS
1.  C6-7 disc herniation.

OPERATIVE PROCEDURE THIS ADMISSION
1.  Anterior cervical diskectomy and interbody fusion C6-7 with a
bone graft from the right iliac crest.


                              JOHN E. HACKMAN, M.D.

5TA0503
D:  5/03/2001
T:  5/03/2001
289692

VIRGINIA BENTON - RELIANCE INSURANCE COMPANY

1

CLE00056

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY K                 MR#:  28-51-42
ATTENDING:      HACKMAN,JOHN E                    ACT#: 10361681
ADMIT DATE:     5/02/2001                         RM#:

CHIEF COMPLAINT:  Neck, arm and shoulder pain.

HISTORY:  This 43-year-old, white female had an injury in an
accident.  She was treated by Dr. Faircloth in Mobile.  MRI scan at
that time showed large C5-6 disc herniation and a smaller C6-7
protrusion.  She had an anterior cervical fusion at C5-6, but has
never really recovered.  C5-6 has healed up nicely.  Because of her
persistent complaints, she was referred up to my office by Virginia
Benton at Reliance Insurance Company.  I looked at her current
studies, which show a significant C6-7 disc herniation.  The patient
has complained about neck pain, headaches, right scapular pain, pain
down the right arm or numbness in the right mid fingers.  Because of
her persistent complaints and because of the positive MRI scan, it is
felt that she needs surgery at C6-7.  The risks and benefits were
discussed.

PAST MEDICAL HISTORY:  Positive for insulin dependent diabetes.

PRIOR SURGERY:  Two Cesarean sections, tubal ligation, reversal of
the tubal ligation, removal of the right tube and ovary, C5-6
cervical fusion, carpal tunnel surgery.

CURRENT MEDICATIONS:  Humulin insulin, Effexor, Klonopin.

ALLERGIES:  NONE REPORTED.

FAMILY HISTORY:  Positive for diabetes.

SOCIAL HISTORY:  She is a nonsmoker.

PHYSICAL EXAMINATION
Physical examination shows a healthy appearing, well-developed, white
female.  She is alert and oriented.  Cranial nerves are intact.

She has pain with neck extension and neck rotation.  She has got
weakness in the right triceps.

Chest is clear.

1

CLE00057

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama 36106

HISTORY AND PHYSICAL

PATIENT NAME:    CLELLAND, CATHY K              MR#:   28-51-42
ATTENDING:       HACKMAN,JOHN E                ACT#:  10361681
ADMIT DATE:      5/02/2001                     RM#:

---

Heart regular.

Abdomen soft.

ADMITTING IMPRESSION
1.  C6-7 disc herniation.

JOHN E. HACKMAN, M.D.

5TA0503
D:  5/03/2001
T:  5/03/2001
289690

2

CLE00058

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY K
ATTENDING:       HACKMAN,JOHN E
SURGEON:         JOHN E. HACKMAN, M.D.

MR#:   28-51-42
ACT#:  10361681
RM#:
DATE:  5/03/2001

PREOPERATIVE DIAGNOSIS:  C6-7 disk herniation.

POSTOPERATIVE DIAGNOSIS:  C6-7 disk herniation.

PROCEDURE:  Anterior cervical diskectomy and interbody fusion, C6-7, with a bone graft from the right iliac crest.

INDICATIONS:  This is a 43-year-old white female.  She comes in with intractable neck, arm and shoulder pain on the right side with numbness into her hand.  She has had a prior cervical fusion at C5-6 but has not completely recovered.  Current magnetic resonance imaging scan shows a C6-7 disk herniation.

DESCRIPTION OF PROCEDURE:  The patient was taken to the operating room where she underwent a general endotracheal anesthetic.  She was positioned in the supine position with sand bags under the neck and under the right hip.  The operative sites were shaved, prepped and draped in a sterile manner.  A transverse incision was made in the neck through an old scar.  This was carried down through the superficial layers and the platysma.  The cervical fascia was opened along the anterior border of the sternocleidomastoid muscle.  Blunt dissection took us down to the cervical spine.  C6-7 was identified and marked and we took an x-ray to confirm our level.  Meanwhile we went to the right iliac crest.  A transverse incision was made behind and below the anterior superior iliac spine.  This was carried down to the fascia lata which was opened along its fibers.  Muscle was stripped off the iliac crest and a 12-mm bone dowel was removed.  This wound was closed in multiple layers of Vicryl suture, and we returned to the neck.  We had accurately identified C6-7.  We made an incision in the disk.  We removed the entire disk and the cartilage end-plates.  We found the interior of the disk to be completely disrupted.  We decompressed the posterolateral corners.  We drilled down through the interspace with a 12 mm drill.  We controlled bleeding with Gelfoam and Thrombin.  We distracted the interspace and inserted a bone graft.  We made sure there was no active bleeding.  The wound was irrigated.  A Hemovac drain was brought out through a separate stab wound, and the wound was closed in multiple layers of Vicryl suture.  Blood loss during the procedure was 100 cc.  There

1

CLE00059

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY K                MR#:   28-51-42
ATTENDING:       HACKMAN,JOHN E                   ACT#:  10361681
SURGEON:         JOHN E. HACKMAN, M.D.            RM#:
                                                  DATE:   5/03/2001

---

were no obvious complications.  Sterile dressings were applied.  The
patient was taken to the recovery room in satisfactory condition.


3LR0504                           JOHN E. HACKMAN, M.D.
D:  5/03/2001
T:  5/04/2001
289691

2

CLE00060

Name _Cathy Cleveland_   ID _14795_   Date _7/19/06_   East   South

Pain Issues _LODD / CODD_

Comorbidities (DM) HBP CAD CVA Obesity CHF OSA COPD PVD GERD RA OA Osteoporosis
Thyroid Depression SLE Asthma _____

Soc HX no Δ _____ Family HX (no Δ) _____ injuries no_____ Health Stable _____

ROS /New Issues _____

Medical Care PCP Specialist Dentist ED Studies_____ Procedures_____

Medications _Methadone    Lodd    Neulgan_

Medications effective yes no +/- new meds_____ adverse rxn _____

Pain Location:                          Current Pain:



MSE alert depressed agitated sedated tearful _____
Ambulation self cane walker wheelchair scooter _____
Posture comfortable pacing fidgeting slouching antalgic Indian chief _____
Eyes PERRL EOMI conjunctiva wnl nystagmus _____
ENT rhinorrhea oropharynx TM HOH _____
Neck supple thyroidmegaly lymphadenopathy bruits _____
Chest Wall intact breasts symmetric _____
Lungs no respiratory embarrassment clear wheezing stridor rhonchi labored _____
Heart no hemodynamic instability RRR S1S2 murmur edema in legs _____
Abdomen soft non-tender non-surgical BS wnl organomegaly flank tenderness _____
Skin generalized rash irritation varicosities tattoes scars _____
MuSk vertebral tenderness c t l SI tenderness r l hot joints_____ amputation _____
Muscle tenderness_____ joint tenderness_____ ROM_____
Neuro CN 2 12 wnl no localizing weakness gait steady reflexes_____ Spurling
Straight leg Trunk lateral flexion Trunk rotation Romberg Froment Tinel Phalen
Radial tap position graphesthesia dysdiadokinesis break gastroc
Other_____

Patient Requests none new med_____ new dose_____ other_____

Diversion pill count contact pharmacy insurance check other provider UDS_____

Interactions review medication agreement review goals review studies education
handicap placard disability forms letter_____

Assessment pain issues stable new issues_____
Plan refill current meds drop_____ start_____ MRI_____ Procedure_____ Referral_____

Visit Length_____ Follow-up_____ Comments:_____

1 mo FU
8.16.06
@
10.15 am



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CRVby Cleiland_    Date: _4-19-06_

1. Are you: ❑ Better?    ☒ Worse?    ❑ Same?

2. Since your last visit, have you been to the Emergency Room?    ❑ YES    ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?    ❑ YES    ☒ NO
   (If Yes, please explain) _____

4. Since your last visit, have you had any X-rays?    ❑ YES    ☒ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☒ YES    ❑ NO
   (Please list all medications) _Dr. Nortick changed me from Robaxin to Flexeril_

6. Do you have any allergies? ☒ YES    ❑ NO
   (If Yes, Please list all your allergies) _Cipro - Leveaquinn_

7. What do you want to discuss today? (medicine) (pain) (refills) etc.)

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — 9 — 10
No Pain          Moderate Pain          Worst Pain



RIGHT    LEFT        LEFT    RIGHT
very bad

_I am in severe pain most of the time. Now both of my hands are basically numb most of the time - my memory is ? and I continue to fail_

CLE00062

# *The* Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _4-19-06_

1. Are you: ☐ Better?  ☒ Worse?  ☐ Same?

2. Since your last visit, have you been to the Emergency Room?  ☐ YES  ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?  ☐ YES  ☒ NO
   (If Yes, please explain) _____

4. Since your last visit, have you had any X-rays?  ☐ YES  ☒ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☒ YES  ☐ NO
   (Please list all medications) _Dr. Nortick changed me from Robaxin to Flexeril_

6. Do you have any allergies? ☒ YES  ☐ NO
   (If Yes, Please list all your allergies) _Cipro - Levequinn_

7. What do you want to discuss today? (medicine, pain, refills, etc.)

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0   1   2   3   4   5   6   7   8   9   10
No              Moderate              Worst
Pain              Pain              Pain





RIGHT  LEFT    LEFT  RIGHT

very bad

I am in severe pain
most of the time. Now both
of my hands are basically
numb most of the time - my memory is off and I continue to fall

CLE00063



**The Center for Pain** of M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_      Date: _10-13-06_

1. Are you: ☐ Better?  ☑ Worse?  ☐ Same?

2. Since your last visit, have you been to the Emergency Room? ☑ YES   ☐ NO
   (If Yes, please explain) _Cellulitis (Resistant + staph) on back_

3. Since your last visit, have you seen any other doctor(s) or had any surgery? ☑ YES   ☐ NO
   (If Yes, please explain) _Dr for staph - packing & repacking where cut_
   _was made to drain_

4. Since your last visit, have you had any X-rays? ☑ YES  ☐ NO
   (If Yes, what kind and where were they done) _under arm - breast area (caused from_
   _staph infection_

5. Since your last visit, have you had any medication changes? ☐ YES  ☑ NO
   (Please list all medications) _same as last visit_

6. Do you have any allergies? ☑ YES  ☐ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _3 falls since last visit - one causing a herniated disc_
   _One of the falls was last night. I have scrapes from it but_
   _it hasn't had time to bruise -_

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — 9 — 10

No Pain     Moderate Pain     Worst Pain

Mark all the places you feel pain.

RIGHT   LEFT     LEFT   RIGHT

_feels like sandpaper_

CLE00064



*The*
# Center for Pain
*of* MONTGOMERY, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _5-3-06_

1. Are you: ❑ Better?  ☒ Worse?  ❑ Same?

2. Since your last visit, have you been to the Emergency Room?  ❑ YES  ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?  ☒ YES  ❑ NO
   (If Yes, please explain) _endocrinologist & gynocologist_

4. Since your last visit, have you had any X-rays?  ☒ YES  ❑ NO
   (If Yes, what kind and where were they done) _CATSCAN_

5. Since your last visit, have you had any medication changes? ❑ YES  ☒ NO
   (Please list all medications) _Added HRT_

6. Do you have any allergies? ☒ YES  ❑ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _Pain, memory loss, can Baclofen take the place of robaxin_
   _burning tongue - could it be related to med's; headaches;_
   _severe leg cramps (not calf)_

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0 1 2 3 4 5 6 7 8 9 10
No        Moderate        Worst
Pain        Pain          Pain

CLE00065

RIGHT    LEFT    LEFT    RIGHT

# The
# Center for Pain
### of MONTGOMERY, P.C.

### DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

❑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _3-14-06_

1. Are you: ❑ Better?    ☒ Worse?    ❑ Same?

2. Since your last visit, have you been to the Emergency Room?    ❑ YES    ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?    ☒ YES    ❑ NO
   (If Yes, please explain) _Colonoscopy_

4. Since your last visit, have you had any X-rays?    ❑ YES    ☒ NO
   (If Yes, what kind and where were they done)_____

5. Since your last visit, have you had any medication changes? ❑ YES    ☒ NO
   (Please list all medications) _____

6. Do you have any allergies? ☒ YES    ❑ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0 No Pain   1   2   3   4   5 Moderate Pain   6   7   8   9   10 Worst Pain



hit nose when I fell

RIGHT    LEFT    LEFT    RIGHT

Another Round of bad falls on 3/12/06

CLE00066



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*
**David Herrick, M.D. ▼ Brad Katz, M.D.**
**Adam Nortick, M.D.**
**P.O. Box 241348**
**Montgomery, AL 36124**

432 St. Lukes Drive
Phone: 334-387-7246
Fax: 334-387-7250

2055 E. S. Blvd., Ste. 812
Phone: 334-288-7808
Fax: 334-288-8089

## PROGRESS NOTE

**NAME:**  CATHY CLEILAND
**DATE:**  02/06/06
**ACCT:**  14495
**DOB:**

Ms. Cleiland returns today for follow up. She has a mildly positive Spurling's on the left. She has had previous cervical epidural steroid injections, which have helped. Her pain is 8/10 in intensity. She is requesting a repeat injection. I have discussed the risks, benefits and rationale of this procedure with the patient. The risks are bleeding, infection, nerve damage, paralysis and other various complications up to and including death. She appears to understand, accept and wishes to proceed.

_____
DAVID P. HERRICK, M.D.
Signed without review.

DPH/slc
D: 02/06/06
T: 02/08/06

CLE00067

# *The* Center for Pain
## *of* M O N T G O M E R Y, P.C.

### DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_     Date: _2-14-06_

1. Are you: ❏ Better?   ☑ Worse?   ❏ Same?

2. Since your last visit, have you been to the Emergency Room?   ❏ YES   ☑ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ☑ YES   ❏ NO
   (If Yes, please explain) _ENT_

4. Since your last visit, have you had any X-rays?   ❏ YES   ☑ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ❏ YES   ☑ NO
   (Please list all medications) _____

6. Do you have any allergies? ☑ YES   ❏ NO
   (If Yes, Please list all your allergies) _Cipro_
   _____

7. _____
   What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0 No Pain   1   2   3   4   5 Moderate Pain   6   7   8   9   10 Worst Pain

CLE00068

The Center for Pain of Montgomery

Name _Cathy Cleveland_          East        South

ID _1445_    Date _1/17/2006_

Pain Problems: ddd c t l / radiculitis c t l / stenosis c t l / facet c t l / failed back c t l
Headache / PHN / Fibromyalgia / Restless leg / Periph neuropathy (DM) / Cancer / carpal tunnel
SI  r l / myofascial pain / DJD _____ / crps _____ / other _____

Comorbidities: (DM) CAD COPD HBP CVA PVD GERD RA OA OSA Ospo  Obesity Psych _____

SocHx: no∆ _____   FamHx: no∆ _____   ED: no pain other Studies: no _____ ROS: no∆ ____

Medicines: effective: y  p  n    adverse: no _____    requests ∆: no _____
Duragesic  Methadone  Avinza  Kadian  MSContin  Oxycontin  Ultram/cet  Darvocet  Talacen  Codiene
Panlor  Lortab  Lorcet  Norco  Xodol  Roxicet  Percocet  Percodan  Dilaudid  MSIR  OxyIR  Actiq
Adjuvants _____

Current Pain: _9_   New Pain Symptoms: no _____   Health: stable _____

Pain Location:



PE: MSE _alet_ _____ AMB _self_ ___ POST_____ HEENT_____ CV_____ RESP_____
GI_____ SKIN _w s_ _____ MUSK_____ NEURO _____ _____

Interactions: review studies  patient education  review goals  review medication contract

Assessment: Pain Condition: stable _____   New Issues: none _____

Plan: Refill current meds  DC_____  Start _____
Schedule: intervention _Schedule (ESI)_ study_____ referral_____

Visit Length: _____

F/U: _____      1mo FU
                           2·14·06
Comments:                    @
                          1015am

                                        CESI
                                        2·6·06
                                          @
                                        1030A

                                   _Nontrele_ _____ MD

December 19, 2005

Kelli Archacki
Cigna Insurance Company
Routing 2121225
Greenville Avenue, Suite #1000
Dallas, TX 75243

Re:    Cathy Cleiland
       Chart #14495

Dear Ms. Archacki,

This letter is on behalf of Ms. Cathy Cleiland in support of her claim for disability.

I understand that you recently sent Ms. Cleiland a letter discontinuing her benefits.  Part of your decision was based on some of the documentation from our office.

In reviewing the letter, it was mentioned that Ms. Cleiland had not been complaining of any problems with radiating type pain or numbness.  Ms. Cleiland has clearly indicated on her admission sheets and on the pain diagrams I put down that she has involvement in hands and feet.  Ms. Cleiland has persistently been on Neurontin for tingling and numbness.  It really is not a new complaint and has not required any additional documentation.

Ms. Cleiland's medications have been stable over the last few months.  However, this does not mean that she does not have ongoing problems, or that on any given day she may be more symptomatic than another.  It is fairly common for patients like Ms. Cleiland to have unpredictable exacerbations of their problem along with a steady course, otherwise.

Ms. Cleiland is still symptomatic, and I do believe that her symptoms are real.

Please feel free to contact me to further discuss the issue.

Respectfully yours,

Adam R. Nortick, MD

ARN:rts/qes/jdb

CLE00070

*norfick*

# The Center for Pain

*of* MONTGOMERY, P.C.

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

Ⓐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY Cleiland_    Date: _12-14-05_

1.  Are you: ❑ Better?    ☒ Worse?    ❑ Same?

2.  Since your last visit, have you been to the Emergency Room?    ❑ YES    ☒ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?    ☒ YES    ❑ NO
    (If Yes, please explain) _Dr. Bret Johnson (General MD)_

4.  Since your last visit, have you had any X-rays?    ☒ YES    ❑ NO
    (If Yes, what kind and where were they done) _Teeth_

5.  Since your last visit, have you had any medication changes? ❑ YES    ☒ NO
    (Please list all medications) _____

6.  Do you have any allergies? ☒ YES    ❑ NO
    (If Yes, Please list all your allergies) _CiPRO_

    _____

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _Pain ; Medication_

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0  1  2  3  4  5  6  7  8  9  10
No Pain          Moderate Pain          Worst Pain



Burning, feels like skin is being pulled back to...

feels like sand on feet not between

CARPAL Tunnel

CLE00071



### The
# Center for Pain
### of MONTGOMERY, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: *Cathy Cleiland*                    Date: *11-16-05*

1. Are you: ☐ Better?   ☒ Worse?   ☐ Same?

2. Since your last visit, have you been to the Emergency Room?   ☐ YES   ☒ NO

   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ☒ YES   ☐ NO

   *Neurologist*
   (If Yes, please explain) *Sleep Study ; light into stomach for exam*
   *gastroenterologist*

4. Since your last visit, have you had any X-rays?   ☐ YES   ☒ NO

   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☐ YES   ☒ NO

   (Please list all medications) _____

6. Do you have any allergies? ☒ YES   ☐ NO

   (If Yes, Please list all your allergies) *Cipro*

   _____

7. What do you want to discuss today? (medicine, pain, refills, etc.)

   *pain, possible medication change*

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0   1   2   3   4   5   6   7   8   9   10
No                  Moderate              Worst
Pain                  Pain                Pain





# *The* Center for Pain
## *of* M O N T G O M E R Y, *P.C.*

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

☑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❏ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_    Date: _10-18-05_

1.  Are you: ❏ Better?    ☑ Worse?    ❏ Same?

2.  Since your last visit, have you been to the Emergency Room?   ❏ YES   ☑ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?   ❏ YES   ☑ NO
    (If Yes, please explain) _____

4.  Since your last visit, have you had any X-rays?    ❏ YES   ☑ NO
    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ❏ YES   ❏ NO
    (Please list all medications) _Celebrex_

6.  Do you have any allergies? ☑ YES   ❏ NO
    (If Yes, Please list all your allergies) _Cipro_

    _____

7.  What do you want to discuss today? (medicine, pain, refills, etc.)

    _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

1   2   3   4   5   6   7   8   9   10
            Moderate            Worst
              Pain               Pain

RIGHT        LEFT        LEFT        RIGHT

CLE00073

# the
# CENTER for PAIN
## of Montgomery
### DAVID HERRICK, MD ■ BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _9-19-05_

1.  Are you: ☐ Better?  ☑ Worse?  ☐ Same?

2.  Since your last visit, have you been to the Emergency Room?  ☐ YES  ☑ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?  ☐ YES  ☐ NO
    (If Yes, please explain) _I had an appt at the sleep ctr this morning, but_
    _I waited from 11:15 – 1:10 and I had to leave to come here._

4.  Since your last visit, have you had any X-rays?  ☐ YES  ☑ NO
    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ☐ YES  ☑ NO
    (Please list all medications) _____

6.  Do you have any allergies? ☑ YES  ☐ NO
    (If Yes, Please list all your allergies) _CiPRO_

7.  What do you want to discuss today? (medicine, pain, refills, etc.)

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0 No Pain   1   2   3   4   5 Moderate Pain   6   7   8   9   10 Worst Pain

CLE00074



# *The* Center for Pain
## *of* MONTGOMERY, *P.C.*

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _8-17-05_

1.  Are you: ☐ Better?  ☑ Worse?  ☐ Same?

2.  Since your last visit, have you been to the Emergency Room?  ☐ YES  ☑ NO

    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?  ☐ YES  ☑ NO

    (If Yes, please explain) _____

4.  Since your last visit, have you had any X-rays?  ☐ YES  ☑ NO

    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ☐ YES  ☑ NO

    (Please list all medications) _Insulin, Neurontin, methadone, phenergin, protonix, Robaxin_

6.  Do you have any allergies? ☑ YES  ☐ NO   _Clonipin, Over the counter benadryl for sinus/allergys_

    (If Yes, Please list all your allergies) _Outdoor (Flowers) pet dander_

7.  What do you want to discuss today? (medicine, pain, refills, etc.)

    _I had a bad fall during the wee hrs of last Sat. morning_

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0 1 2 3 4 5 6 7 8 9 10
No Pain    Moderate Pain    Worst Pain



RIGHT  LEFT        LEFT  RIGHT

CLE00075



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

David Herrick, M.D. ▪ Brad Katz, M.D.

432 St. Lukes Drive

Montgomery, AL 36117

Phone (334) 387-7246    Fax (334) 387-7250

### PROGRESS NOTE

**NAME:** CATHY K. CLEILAND
**DATE:** 03/02/05
**ACCT:** 4495
**DOB:**

This is a 47-year-old, white female with lumbar degenerative disc disease, cervical degenerative disc disease, myofascial pain and diabetes. She has been on Methadone 5 mg up to five pills a day, Effexor, and Klonopin.

Ms. Cleiland states that she has been having some upset stomach problems. We called in Protonix. She says this has really been pre-helpful. Ms. Cleiland states that she has had a fair amount of nausea with Methadone, but on the whole it is livable with Phenergan. She really has not had to go to the hospital for any IV fluids. She has had worse problems with GI upset from other opioids and does not wish to try switching out.

Ms. Cleiland has been having some muscle spasms in the legs. She says she is not very active, and she thinks that her sugars have been running higher than they usually have. She states that she has fallen down some steps. She says she just miscalculated the last step. Once she said the trunk of the car fell on her back when she was leaning over into the trunk, just minor life traumas.

Ms. Cleiland describes her pain as an 8 today. Again, there are more areas marked off on the pain chart than not. There is pain in the right upper extremity, left leg and back. She states really no chest pain and no unusual dysuria. She states life is not in total turmoil as it has been in the past few visits.

**PHYSICAL EXAMINATION:** This is a 47-year-old, white female who is alert and cooperative. She is fairly pleasant today and less upbeat. She has no gross rashes. Skin is warm and dry. She has no respiratory difficulties noted, no obvious hemodynamic instability noted, no acute hot joints, and no acute localizing weakness.

**ASSESSMENT:** Cervical degenerative disc disease, cervical radiculitis, lumbar degenerative disc disease, lumbar radiculitis, and insulin dependent diabetes.

**PLAN:** We will refill Neurontin 800 mg 4x/day, Robaxin 750 mg 3x/day, Phenergan 25 ½ - 1 three times daily, Effexor 75 XR one at bedtime, Protonix 40 mg one daily, Klonopin 1 mg at bedtime, and we will switch her to Methadone 10 mg ½ - 1 p.o. three times a day rather than the 5s. We plan on seeing the patient back in one month's time. Today's office visit has been 20 minutes.

ADAM NORTICK, M.D.

AN/aww
D: 03/11/05
T: 03/15/05

CLE00076



### *The* Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: __Cathy Cleiland__          Date: __5-17-05__

1. Are you: ❑ Better?    ❑ Worse?    ☒ Same?

2. Since your last visit, have you been to the Emergency Room?  ❑ YES  ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?  ❑ YES  ☒ NO
   (If Yes, please explain) _____

4. Since your last visit, have you had any X-rays?  ☒ YES  ❑ NO
   (If Yes, what kind and where were they done) __mamogram__

5. Since your last visit, have you had any medication changes? ❑ YES  ☒ NO
   (Please list all medications) _____

6. Do you have any allergies? ☒ YES  ❑ NO
   (If Yes, Please list all your allergies) __Cipro__
   _____

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0  1  2  3  4  5  6  7  8  9  10
No                Moderate        Worst
Pain                Pain          Pain

CLE00077



*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

❏  2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❏  432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: ___CATHY  K. Cleiland___          Date: _3-2-05_

1.  Are you: ❏ Better?   ☒ Worse?   ❏ Same?

2.  Since your last visit, have you been to the Emergency Room?  ❏ YES  ☒ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?  ❏ YES  ☒ NO
    (If Yes, please explain) _____

4.  Since your last visit, have you had any X-rays?  ❏ YES  ☒ NO
    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ❏ YES  ❏ NO
    (Please list all medications) _The  protonix  that  Dr.  Nortick  prescribed_

6.  Do you have any allergies? ☒ YES  ❏ NO
    (If Yes, Please list all your allergies) _unknown  but  believe  dust + dander_

    _____

7.  What do you want to discuss today? (medicine) (pain) refills, etc.)
    _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW



0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — 9 — 10
0
No
Pain

Moderate
Pain

Worst
Pain

RIGHT        LEFT          LEFT        RIGHT

CLE00078

# *The* Center for Pain
## *of* MONTGOMERY, *P.C.*

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

❑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY Cleilard_     Date: _3-29-05_

1.  Are you: ❑ Better?   ☑ Worse?   ❑ Same?

2.  Since your last visit, have you been to the Emergency Room?  ☑ YES   ❑ NO
    (If Yes, please explain) _ER @ 5AM in Dothan- Diagnosed w/ the flu_

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?  ❑ YES  ☑ NO
    (If Yes, please explain) _____

4.  Since your last visit, have you had any X-rays?  ☑ YES  ❑ NO
    (If Yes, what kind and where were they done) _lungs  when  I  had  the flu_

5.  Since your last visit, have you had any medication changes? ❑ YES  ☑ NO
    (Please list all medications) _Just took Tamiflu along w/ my pain med's_

6.  Do you have any allergies? ☑ YES   ❑ NO
    (If Yes, Please list all your allergies) _Cipro_

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.



Mark all the places you feel pain.



CLE00079

*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID  HERRICK, MD  •  BRAD  KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

### PROGRESS NOTE

**NAME:**     CATHY CLEILAND
**DATE:**     12/01/04
**ACCT:**     14495
**DOB:**

Ms. Cleiland is a 47-year old white female who has been followed for lumbar degenerative disc disease and cervical degenerative disc disease. She also has myofascial pain and diabetes. Ms. Cleiland has been on Methadone 5 mg 1-5 pills a day, Effexor and Klonopin. Ms. Cleiland has not had any adverse reactions to her medicines.

Ms. Cleiland has been under a lot of stress in October. She states her daughter is a diabetic and has had problems with a staph infection and when _____. She said it was touch and go for a few days. Ms. Cleiland states that she spent 4 days in the ICU and she was at her side. She states she slept upright and in rather hard, uncomfortable chairs. She says at times she has been having some increasing pain in her neck going into both arms. She states that this was new and this really wasn't going on before. Ms. Cleiland has prior neck surgery. She said she has called up Dr. Hadley over at UAB but he states she would "have to have a real problem" before he would see her again. Ms. Cleiland is wanting to have an MRI and I think that is reasonable. We will go ahead and assist her in getting that scheduled.

Ms. Cleiland states that her back has been about the same. Ms. Cleiland states that she is not sleepy at night but she can be drowsy during the day. It is hard to say how much of this is has to do with the total upset that she has been through lately.

Ms. Cleiland has gone to the ophthalmologist and apparently has a 6th nerve palsy that is resolving without incident. Ms. Cleiland states that she has gained about 30 pounds. She states she never eats a lot of big meals but she kind of grazes and it can be at least 6 x a day. She is not having any unusual nausea, vomiting or gastroparesis type problems.

Ms. Cleiland does get some nausea, she uses Phenergan for. She has not had to go to the hospital getting IV fluids. Ms. Cleiland states that she was running short on her medicines and her daughter did admit to taking some of her Methadone. Ms. Cleiland states that was only Effexor XR but apparently plain Effexor was called in for her. We will remedy that.

Ms. Cleiland describes her pain today as a 9. It is across the shoulders and into the right arm and in the left leg. Ms. Cleiland really has no new significant health issues. She really is not having any chest pain, shortness of breath or rash.

On physical exam today she is a 47-year old white female. She is alert and cooperative. She has minimal respiratory difficulty. Her chest is clear. Chest wall is intact. Heart has a regular rate and rhythm, S1 and S2, without murmurs, gallops or thrills. She has no acute hot joints. She is ambulating without difficulty. She has no localizing weakness. She has a positive Spurling on the right side. She has no acute trophic skin changes. Cranial nerves II-XII are intact.

**ASSESSMENT:** Cervical degenerative disc disease, cervical radiculitis, lumbar degenerative disc disease, lumbar radiculitis and insulin dependent diabetes.

**PLAN:** We will continue her on her medicines of Methadone 5 mg up to 5 x a day, Effexor XR 75 mg at bedtime, Neurontin 800 mg at bedtime, Phenergan 25 mg #90 pills ½ to 1 up to 3 x a day and Clonazepam 1 mg at bedtime. We will also schedule her to get a cervical MRI for cervical radiculitis. Total office time today was 20-minutes. We will plan on seeing the patient back in 3-months time. If it comes back that there is something new on her cervical MRI, we will make appropriate arrangements.

ADAM NORTICK, M.D.

AN/slc
D: 12/02/04
T: 12/07/04

*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.   ■   BRAD KATZ, M.D.

❑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY CLELAND_          Date: _12-1-04_

1. Are you: ❑ Better?   ☒ Worse?   ❑ Same?

2. Since your last visit, have you been to the Emergency Room?   ❑ YES   ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ❑ YES   ☒ NO
   (If Yes, please explain) _I talked w/ Dr Hadley's nurse about severe pain in neck but she said he would have to know a problem had_

4. Since your last visit, have you had any X-rays?   ❑ YES   ☒ NO   _been identified before seeing me_
   (If Yes, what kind and where were they done)_____ _for that_

5. Since your last visit, have you had any medication changes? ☒ YES   ❑ NO
   (Please list all medications) _Y'all called in my effexor XR as regular effexor_

6. Do you have any allergies? ☒ YES   ❑ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0   1   2   3   4   5   6   7   8   9   10
No                  Moderate            Worst
Pain                  Pain                Pain

RIGHT          LEFT      LEFT          R

CLE00081

### *The* Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

❑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: __Cathy Cleiland__    Date: _9-21-04_

1.  Are you: ❑ Better?    ❑ Worse?    ☒ Same?

2.  Since your last visit, have you been to the Emergency Room?    ❑ YES    ☒ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?    ☒ YES    ❑ NO
    (If Yes, please explain) __Opthamologist for sixth cranial nerve palsy__

4.  Since your last visit, have you had any X-rays?    ❑ YES    ☒ NO
    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ❑ YES    ☒ NO
    (Please list all medications) _____

6.  Do you have any allergies? ☒ YES    ❑ NO
    (If Yes, Please list all your allergies) __Cipro__

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



CLE00082



# The Center for Pain
## of M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

❏ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❏ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_     Date: _8-24-04_

1. Are you: ❏ Better?   ☒ Worse?   ❏ Same?

2. Since your last visit, have you been to the Emergency Room?   ❏ YES   ☒ NO

   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ❏ YES   ❏ NO

   (If Yes, please explain) _Opthalmologist_

4. Since your last visit, have you had any X-rays?   ❏ YES   ☒ NO

   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes?   ❏ YES   ☒ NO

   (Please list all medications) _____

6. Do you have any allergies? ☒ YES   ❏ NO

   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _pain, side effects of med_

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

Mark all the places you feel pain.

0 means no pain.
10 means the worst pain you can imagine.

```
0    1    2    3    4    5    6    7    8    9    10
No                     Moderate                  Worst
Pain                     Pain                    Pain
```





pelvic area

RIGHT    LEFT    LEFT    RIGHT

CLE00083



*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

❏  2055 East South Blvd., Ste. 812
    Montgomery, AL 36116
    Telephone: 334-288-7808

❏  432 St. Lukes Drive
    Montgomery, AL 36117
    Telephone: 334-387-7246

Patient Name: __Cathy Cleiland__        Date: __7-21-2004__

1.  Are you: ❏ Better?    ❏ Worse?    ☒ Same?

2.  Since your last visit, have you been to the Emergency Room?    ❏ YES    ☒ NO
    (If Yes, please explain) _____
    _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?   ☒ YES ~~NO~~
    (If Yes, please explain)  ~~Dentist~~  Dr Mark Hadley @ UAB
    _____

4.  Since your last visit, have you had any X-rays?    ☒ YES    ❏ NO
    (If Yes, what kind and where were they done)  MRI @ UAB on 7-14-04
    _____

5.  Since your last visit, have you had any medication changes? ❏ YES   ☒ NO
    (If Yes, what)_____
    _____

6.  What do you want to discuss today? (medicine, pain, refills, etc.)
    Pain and medication
    _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | ⑨ | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| No Pain | | | | | Moderate Pain | | | | | Worst Pain |

CLE00084



# The
# Center for Pain
## of MONTGOMERY, P.C.

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

❑ 2055 East South Blvd., Ste. 812
   Montgomery, AL 36116
   Telephone: 334-288-7808

❑ 432 St. Lukes Drive
   Montgomery, AL 36117
   Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_    Date: _5-26-04_

1.   Are you: ❑ Better?    ☒ Worse?    ❑ Same?

2.   Since your last visit, have you been to the Emergency Room?  ☒ YES    ❑ NO

   (If Yes, please explain) _Monroeville, AL - Admitted to ICU/DKA After medicine_
   _made me nauseated/dehydrated_

3.   Since your last visit, have you seen any other doctor(s) or had any surgery?  ☒ YES    ❑ NO

   (If Yes, please explain) _Family Dr. saw me in hospital_

4.   Since your last visit, have you had any X-rays?    ❑ YES    ☒ NO

   (If Yes, what kind and where were they done)_____

5.   Since your last visit, have you had any medication changes? ☒ YES    ❑ NO

   (Please list all medications) _My family Dr prescribed me lortab when he dismissed_
   _me yesterday (5/25) until I could be seen here to..._

6.   Do you have any allergies? ❑ YES    ☒ NO

   (If Yes, Please list all your allergies) _CIPRO_

7.   What do you want to discuss today? (medicine, pain) refills, etc.)

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — ⑨ — 10
No                Moderate            Worst
Pain               Pain             Pain



RIGHT    LEFT    LEFT    RIGHT

CLE00085

### PROGRESS NOTE

**NAME:**    KATHY CLEILAND
**DATE:**    04/28/04

Ms. Cleiland returns today for follow up. Avinza 30 mg helps but is not enough. She continues to have neck and shoulder pain and the medication does make her slightly sluggish although she has become accustomed to it.

**PHYSICAL EXAM:**
**GENERAL:** She is alert and oriented x 3.
**HEENT:** Unremarkable.
**PULMONARY:** Clear.
**HEART:** Regular rate and rhythm.
**NEUROLOGICAL EXAM:** Non-focal. Cranial nerves appear to be intact.

**IMPRESSION:** Cervical degenerative disc disease.

**PLAN:** Continue titration of Avinza. Will increase to 60 mg po q a.m. She has been taken the medicine about mid-day and I have encouraged her to take it earlier in the morning and see if that has any added benefit. I have reviewed her medication agreement. I will see her back in 1-month for reassessment. I informed her she may see Dr. Nortick when she returns. This was a 20-minute face-to-face visit.

DAVID P. HERRICK, M.D.

AN/slc
D: 04/28/04
T: 05/03/04

CLE00086



*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

### DAVID HERRICK, MD • BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

## PROGRESS NOTE

**NAME:** CATHY CLEILAND
**DATE:** 05/26/04
**ACCT:** 14495
**DOB:**

Ms. Cleiland returns today for adjustment of medicines. Ms. Cleiland had been on Avinza. She had been on 30 mg and that dose was increased up to 60 mg. She was complaining with problems with nausea with 60 mg from the get go. She tried it for a few days, went off, and went back on. She eventually wound up having problems with nausea and vomiting. When she went to her local doctor she was probably in sort of DKA and was admitted to the hospital into the ICU. She did get some IV fluids. She was given a prescription for some Lortab when she left the hospital. Her other medicines include Neurontin 800 mg 4 x a day. She had a blood level checked about 3-weeks ago and was doing fine. She also takes Effexor 75 mg and Robaxin. At the present time Ms. Cleiland is most concerned about having a pain medicine, which will not cause any significant stomach upset rather than marked analgesia. She states in the past she has had some Demerol and never really suffered any adverse reactions from that. She states that Percocet had cost her some GI problems in the past and Lortab caused some slight quizziness but really it wasn't very effective for her pain.

On physical exam she is a 46-year old white female who is alert and cooperative. She has no obvious respiratory or hemodynamic compromise. The skin is warm and dry. She has a non-localizing neurologic exam.

**ASSESSMENT:** Cervical degenerative disc disease with nausea and vomiting secondary to Avinza.

**PLAN:** Through the next week we will have the patient use some Mepergan Fortes 1 po 4 x a day. We will then have her start on Methadone 10 mg twice a day for 3-weeks. We will have her come back in a month and see how she is doing in terms of nausea and pain effectiveness on the new medication regimen. We will keep all of her other medicines the same. Total office time today was 25-minutes.

ADAM NORTICK, M.D.

AN/slc
D: 05/26/04
T: 06/02/04

CLE00087

# *The* Center for Pain
## *of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

❏ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❏ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy K. Cleiland_          Date: _4-28-04_

1.  Are you: ❏ Better?   ❏ Worse?   ☑ Same?

2.  Since your last visit, have you been to the Emergency Room?   ❏ YES   ☑ NO

    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?   ☑ YES   ❏ NO

    (If Yes, please explain) _My General MD – just to have bloodwork_

4.  Since your last visit, have you had any X-rays?   ❏ YES   ☑ NO

    (If Yes, what kind and where were they done)_____

5.  Since your last visit, have you had any medication changes? ❏ YES   ☑ NO

    (Please list all medications) _____

6.  Do you have any allergies? ❏ YES   ☑ NO

    (If Yes, Please list all your allergies) _____

    _____

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _Continued pain and medicine_

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.







CLE00088

# the CENTER for PAIN

### of Montgomery

### DAVID HERRICK, MD ■ BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: **334-288-7808**

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: **334-387-7246**

Patient Name: _Cathy K. Cleiland_              Date: _3-29-04_

1. Are you: ☐ Better?      ☐ Worse?      ☑ Same?

2. Since your last visit, have you been to the Emergency Room? ☑ YES      ☐ NO

   (If Yes, please explain) _UAB_

3. Since your last visit, have you seen any other doctor(s) or had any surgery? ☑ YES    ☐ NO

   (If Yes, please explain) _Dr. Mark Hadley; UAB; 12/10/03_ _C-4, L5 lumbar laminectomy for decompression, L4-L5 diskectomy bilateral; with L4-L5 posterior lumbar fusion; spinal fixation L4-L5 bilateral; Bone + Dorsal fusion C4, C5 bilateral_

4. Since your last visit, have you had any X-rays?    ☐ YES    ☐ NO

   (If Yes, what kind and where were they done)_____

5. Since your last visit, have you had any medication changes? ☑ YES    ☐ NO

   (Please list all medications) _Insulin N 35 R 15 x 2; Effexor 75 mg; Neurontin 800 x 4; Lortab 25 x 6; Robaxin 750 mg x 3  Daily_

6. Do you have any allergies? ☐ YES    ☑ NO

   (If Yes, Please list all your allergies) _Not that I am aware of_

7. What do you want to discuss today? (medicine, (pain,) refills, etc.)

   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0  1  2  3  4  5  6  7  ⑧  9  10
No            Moderate            Worst
Pain           Pain                Pain



RIGHT      LEFT        LEFT      RIGHT



CLE00089

## *The* Center for Pain
*of* MONTGOMERY, *P.C.*

DAVID HERRICK, MD • BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: **334-288-7808**
Fax: **334-288-8089**

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: **334-387-7246**
Fax: **334-387-7250**

**NAME:** CATHY CLEILAND

**DOB:** 

**DATE:** 08/27/03

**SSN:**

**REFERRING PHYSICIAN:** Dr. Hackman.

**CHIEF COMPLAINT:** Back and left leg pain.

**HISTORY OF PRESENT ILLNESS:** The patient is a 46-year old female with back and left leg pain that has been present for approximately 16-months. It is an aching, burning, stabbing pain that is exacerbated by coughing, sneezing, sitting or standing. She has had two previous lumbar surgeries done by Dr. Hackman, the last being July 16th of this year. She continues to have a left lumbar pain that is an aching, burning, constant, unbearable pain that is exacerbated by sitting, standing and walking. She has had no previous spinal injections.

**PAST SURGICAL HISTORY:** Significant for lumbar surgery x 2, anterior cervical fusion x 3, C-section x 2, bilateral tubal ligation, right oophorectomy and carpal tunnel release.

**PAST MEDICAL HISTORY:** She is an insulin dependent diabetic.

**CURRENT MEDICATIONS:** Insulin, Darvocet, Flexeril and Neurontin.

**ALLERIES:** No known drug allergies.

**SOCIAL HISTORY:** Negative tobacco. Negative ETOH.

**FAMILY HISTORY:** Non-contributory.

**REVIEW OF SYSTEMS:** No fever, chills, nausea, vomiting, headaches, chest pain, shortness of breath, bowel/bladder dysfunction or rashes.

**PHYSICAL EXAM:**
**GENERAL:** She is a very pleasant, well-developed, well-nourished female. She is moderately distressed secondary to pain.
**HEENT:** Unremarkable.
**PULMONARY:** Clear.
**HEART:** Regular rate and rhythm.
**ABDOMEN:** Non-tender and non-distended.
**EXTREMITIES:** No clubbing, cyanosis, or edema.

CLE00090

**Name:**    Cathy Cleiland
**Date:**    08/27/03

Continued...2


**NEUROLOGICAL EXAM:** Significant for a positive straight leg raise on the left at about 45 degrees.

**IMPRESSION:** Lumbar degenerative disc disease and lumbar radiculitis.

**PLAN:** Lumbar selective nerve root block on the left at L4-5 and L5-S1. I have discussed the risks, benefits, and rationale of this procedure. The risks are bleeding, infection, nerve damage, paralysis and other various complications up to and including death. He appears to understand, accept and wishes to proceed.

DAVID P. HERRICK, M.D.
Signed without review.

DPH/slb
D: 08/27/03
T: 08/28/03

CLE00091

Patient Name: **Cleiland, Cathy Key**
Patient ID: **000214773**

Date of Birth:
Age: **48 years**
Gender: **Female**
Accession Number: **001000000159070**
Location: **SAMC**
Referring Physician: **Bret Johnson**

Study Date: **05-17-2006 16:54**
Procedure Types: **MRI LUMBAR WO/W**

*Preliminary*

# MR MRI LUMBAR WO/W

MRI MRI LUMBAR WO/W
Page 1 of 2

SOUTHEAST ALABAMA MEDICAL CENTER
PO Drawer 6987, Dothan, AL 36302
334-793-8111
RADIOLOGY SERVICES
MRI REPORT

Patient Name:  CLEILAND, CATHY
XRAY/MR#:  000214773
DOB:
Order #:  0012781674842104          Account #:  2781674
CDM:  3836052                       Age: 48                Room:MI-
                                    Accession #:    001000000159070   Pt Type: O

Attending Physician:
Ordering Physician:   Bret M. Johnson, M.D.
Referring Physician:  Bret M. Johnson, M.D.
Exam Requested: MRI LUMBAR WO/W
Exam Date:   05/17/2006

PROCEDURE:    MRI LUMBAR SPINE WO/W GADOLINIUM   5/17/06
HISTORY:      Low back pain radiating down left leg
COMPARISON:   None
TECHNIQUE:    T1, T2 and STIR sagittal, T1 and T2 axial sequences without
              Contrast, T1 axial and sagittal sequence following the
              administration of 17 cc's of intravenous Gadolinium.

FINDINGS:
Evidence of posterior spinal fusion at L4-5.  Spinal stabilization rods
and transpedicular screws are noted as well as an intervertebral disc

CLE00092

spacer at L4-5.

The vertebral bodies are in anatomic alignment with no evidence of compression deformity or significant subluxation. The marrow signal intensity is unremarkable. Conus medullaris terminates at inferior aspect of T12. No evidence of enlargement or abnormal signal.

L3-4: Mild diffuse disc bulging with moderate facet arthropathy and ligamentum flavum hypertrophy. There is resultant moderate central canal narrowing. No evidence of superimposed disc protrusion.

L4-5: Laminectomy defect noted at L4. There is no evidence of central canal narrowing. However, moderate narrowing of the neuroforamen noted on the left, secondary to a bulging disc. There is compression of the exiting L4 nerve root on the left.

L5-S1: Mild diffuse disc bulging with no evidence of disc protrusion, central canal or neuroforaminal narrowing.


Name: CLEILAND,CATHY                         MR #: 000214773
BRETT STORM, M.D.
{eop}


MRI
Page 2 of 2
                        SOUTHEAST ALABAMA MEDICAL CENTER
                        PO Drawer 6987,  Dothan, AL 36302
                              334-793-8111


IMPRESSION:
1.  EVIDENCE OF POSTERIOR SPINAL FUSION L4-5.  THERE IS NO EVIDENCE OF
    SUBLUXATION OR COMPRESSION DEFORMITY.
2.  MODERATE CENTRAL CANAL NARROWING AT L3-4.
3.  THERE IS EVIDENCE OF INTERVERTEBRAL DISC SPACER L4-5. HOWEVER, THERE
    APPEARS TO BE BULGING DISC EXTENDING INTO THE NEUROFORAMEN AT L4-5
    ON THE LEFT WITH COMPRESSION OF THE LEFT L4 NERVE ROOT.


_____

BRETT STORM, M.D.

DD:  5/18/2006 00:21      ko
DT:  5/18/2006 12:47      153245




Name: CLEILAND, CATHY                        MR: 000214773
BRETT STORM, M.D.
{eop}


**Brett Storm**
**05-18-2006 12:53**

CLE00093

**Montgomery Imaging Center**
2055 Normandie Drive, Suite 108
Montgomery, AL 36111-2743
Phone (334) 288-4624
Fax (334) 288-8478

| | | |
|---|---|---|
| John H. Payne, III, M.D. | Daniel S. Noyes, D.O. | Mary M. Karst, M.D. |
| David C. Montiel, M.D. | Mark H. LeQuire, M.D. | Paul Hutchinson, M.D. |
| Terry D. Williams, M.D. | Gordon Smith, M.D. | Oscar P. Orille, M.D. |
| Joseph M. Bailey, M.D. | Christopher Dorvault, M.D. | Eva Rubin, M.D. |
| David B. Neeland, M.D. | Phillip S. Piasecki, M.D. | Ronald D. Waters, M.D. |
| Thomas S. Moore, M.D. | David M. Downs, M.D. | John G. Kahler, M.D. |
| Jason H. Dorey, M.D. | Roland Ng, M.D. | |
| Byron C. Machen, M.D. | Gary Leung, M.D. | |

| | | | |
|---|---|---|---|
| Patient: **CLEILAND, CATHY K.** | DOB: | Age: | 048 |
| Exam: MRI CERVICAL SPINE WITHOUT CONTRAST  Procedure Date: 01/12/06 | | Film#: | 20046161 |
| Referring Physician: ADAM NORTICK, M.D. | | Acct#: | 000087431 |

**CERVICAL SPINE MRI:**

**HISTORY:** Neck pain and dizziness.

**TECHNIQUE:** Sagittal T1, fast spin echo T2, fat sat fast spin echo T2, axial gradient echo, and axial T1 weighted images.

**FINDINGS:** Comparison is made with a previous exam dated 12-08-04. The patient has had an anterior cervical fusion at C4/5/6/7. There is some mild posterior osteophyte formation at C7/T1, which is unchanged from the previous exam.

There is mild diffuse spinal stenosis through the upper portion of the fusion block, which appears unchanged from the previous exam. I do not see evidence of new disc herniation, spinal stenosis, fracture, or subluxation.

**OPINION:** No interval change in appearance since 12-08-04. Worse abnormality appears to be the mild circumferential spinal stenosis caused by the posterior osteophyte/ligamentous hypertrophy at C7/T1, seen best on the sagittal views.

Radiologist:    JOSEPH M. BAILEY, M.D.

Radiologist-Signature

Technologist:    Renee Reach, RT (R)(CT)(MR)
Transcribed by SUZANNEM on 01/12/2006 at 03:31 PM

# MONTGOMERY IMAGING CENTER

2055 Normandie Drive, Suite 108
Montgomery, Alabama 36111-2743

Phone (334) 288-4624    Fax (334) 288-8478

| | | | |
|---|---|---|---|
| John H. Payne, III, M.D. | Thomas S. Moore, M.D. | Mark H. LeQuire, M.D. | Mary M. Karst, M.D. |
| David C. Montiel, M.D. | Jason H. Dorey, M.D. | Christopher Dorvault, M.D. | Gary Leung, M.D. |
| Terry D. Williams, M.D. | Byron C. Machen, M.D. | Gordon Smith, M.D. | Oscar P. Orille, M.D. |
| Joseph M. Bailey, M.D. | Daniel S. Noyes, D.O. | Paul Hutchinson, M.D. | Eva Rubin, M.D. |
| David B. Neeland, M.D. | | | Philip S. Piasecki, M.D. |

```
Patient:    CLEILAND, CATHY K.
DOB:        ███████    AGE:047
Referring Physician:  ADAM NORTICK, M.D.
```

```
Account:    000087431 01              Film#: 20046161
Exam:       MRI CERVICAL SPINE WITH AND WITHOUT
Date:       12/08/04
Location:   MONTGOMERY IMAGING CENTER
```

MRI CERVICAL SPINE WITH AND WITHOUT CONTRAST:

The study is done without and after IV contrast. History of previous surgery in 97, 01, and 02. Patient has neck pain and pain in both arms and numbness in the right arm.

Multiplanar images obtained of the C-spine without and after IV contrast. The patient is post anterior fusion which I believe is at the C4-5, C5-6, and C6-7 levels. The cervical cord, cervicomedullary junction is unremarkable. There is normal signal from the intervertebral disc. On the images post injection of contrast, I do not see evidence for abnormal enhancement. On the axial images, I do not see evidence for disc herniation or neural foraminal impingement. There is some hypertrophy of the ligamentum flavum at C7-T1 that is causing some impingement on the thecal sac posteriorly at this level. This is obliterating the CSF space, but I don't believe causing significant impingement on the cord.

IMPRESSION:

THE PATIENT IS POST ANTERIOR FUSION, WHICH I BELIEVE IS AT THE C4-5, C5-6, AND C6-7 LEVELS. NO EVIDENCE OF DISC HERNIATION OR NEURAL FORAMINAL IMPINGEMENT. THERE IS HYPERTROPHY OF THE LIGAMENTUM FLAVUM AT THE C7-T1 LEVEL THAT IS CAUSING SOME POSTERIOR IMPRESSION ON THE SUBARACHNOID SPACE AT THIS LEVEL. NO IMPINGEMENT ON THE CORD NOTED.

Radiologist:    PAUL HUTCHINSON, M.D.

Technologist:    RENEE REACH RT MR

Transcribed by CAROLE on 12/08/2004 at  04:52

12/13/2004

# JACKSON HOSPITAL & CLINIC, INC.

1725 PINE STREET
MONTGOMERY, ALABAMA 36106

**Name: CLEILAND, CATHY K.**
**Physician: RYAN, PATRICK G**
MR#: 285142              X-RAY#: 463643
Order ID: 1190671        Result ID: 1073900

DOB: ███████████  Age: 46 YEARS
Patient Location: 6301
Account#: 10567192
Addendum Number: 0

Clinical Data: BACKK PAIN  TO LEFT LEG BACK SURGERY
**Procedure:  MRI L SPINE W & W/O CONTRAST    Date of Exam: 08/11/2003**

TECHNIQUE:
Pre and post contrast T1 axial and sagittal imaging was performed along with multi-echo T2 sagittal and fast spin echo T2 axial imaging was performed.

FINDINGS:
Comparison is made to a recent examination from 07/14/2003.  The previously described moderate  sized disc extrusion in the left lateral recess of L4-5 has apparently been removed. There is a very small, 5mm area of low signal intensity that is surrounded by enhancing scar tissue that is adjacent to the posterolateral aspect of the intervertebral disc at L4-5 seen only on the post contrast axial images (image 10).  This is adjacent to the superior end plate of L5 and is not seen on the parasagittal images.  This does not abut or displace the exiting nerve roots. I cannot tell with certainty whether this represents a small piece of bone or a small residual disc fragment but may be clinically insignificant given its small size and no apparent abutment of the nerve roots.  There is a fairly extensive amount of enhancing soft tissue in the left epidural space of L4-5.  The enhancing soft tissue extends along the anterior aspect of the thecal sac as well as into the left neural foramen.  There is no displacement or distortion of the thecal sac.  The exiting left L5 nerve root is encased by the enhancing tissue.  The patient has significant degenerative disc disease at this level with disc space loss and end plate sclerosis.  The remaining intervertebral disc spaces show only some mild disc desiccation.  No other areas of disc bulging or protrusion.  The conus is normal.

**IMPRESSION:**
EXTENSIVE POST OPERATIVE CHANGES ON THE LEFT AT L4-5 WITH A LARGE AMOUNT OF ENHANCING EPIDURAL SCAR TISSUE AS DESCRIBED. THE MODERATE SIZED DISC EXTRUSION AT THIS LEVEL IS NO LONGER VISIBLE, HOWEVER THERE IS A SMALL NON-ENHANCING AREA OF LOW SIGNAL INTENSITY NEAR THE LEFT NEURAL FORAMEN AT L4-5. PROBABLY AND CLINICALLY INSIGNIFICANT GIVEN

CLE00096

ITS SMALL SIZE AND LACK OF ABUTMENT TO THE NERVE ROOTS BUT COULD REPRESENT A SMALL END PLATE FRAGMENT OR DISC FRAGMENT. THIS IS SEEN ONLY ON ONE VIEW.

SEVERE DEGENERATIVE DISC DISEASE AT L4-5.

Dictated by: KEN RICHARDSON
Verified by: KEN RICHARDSON

Transcriptionist: EE

Name:CLEILAND, CATHY K.          Order ID:1190671
Physician:RYAN, PATRICK G          Date:08/11/2003

CLE00097

*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*
**David Herrick, M.D. ▼ Brad Katz, M.D.**
**Adam Nortick, M.D.**
**P.O. Box 241348**
**Montgomery, AL 36124**

432 St. Lukes Drive
Phone: 334-387-7246
Fax: 334-387-7250

2065 E. S. Blvd., Ste. 401
Phone: 334-288-7808
Fax: 334-288-8089

## PROCEDURE NOTE

**NAME:**    CATHY CLEILAND
**DATE:**    04/07/06
**ACCT:**    14495
**DOB:**

**PREOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**POSTOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**PROCEDURE PERFORMED:**   Cervical epidural steroid injection at C5-6 under fluoroscopy with injection of contrast.

**ANESTHESIA:** None.

**COMPLICATIONS:** None.

**PROCEDURE IS AS FOLLOWS:**   The patient was prepped and draped in the usual sterile fashion, prone on the OR table.  Using fluoroscopic guidance, C5-6 was identified.   A skin wheal was raised, and an 18 gauge Tuophy needle was advanced under loss-of-resistance technique in the epidural space.  Upon entering the epidural space, no paresthesias were elicited, no heme or CSF was aspirated.  5 cc of Omnipaque 240 was injected to confirm needle placement.  A total of 80 mg of Depo Medrol and 4 cc of normal saline were injected into the epidural space.  The patient tolerated the entire procedure with no acute complications and was discharged home in stable condition after observation for 30-minutes.

**ADDENDUM:** I have refilled her Methadone 10 mg 5 x a day, Lortab 10 mg TID and Baclofen 10 mg TID.

_____
DAVID P. HERRICK, M.D.
Signed without review.

DPH/slc
D: 04/07/06
T: 04/12/06

CLE00098



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*
David Herrick, M.D. ▼ Brad Katz, M.D.
Adam Nortick, M.D.
P.O. Box 241348
Montgomery, AL 36124

432 St. Lukes Drive
Phone: 334-387-7246
Fax: 334-387-7250

2055 E. S. Blvd., Ste. 812
Phone: 334-288-7808
Fax: 334-288-8089

**PROCEDURE NOTE**

**NAME:**      CATHY CLEILAND
**DATE:**      02/06/06
**ACCT:**      14495
**DOB:**       ▮▮▮▮▮▮▮

**PREOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**POSTOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**PROCEDURE PERFORMED:** Cervical epidural steroid injection at C5-6 under fluoroscopy with injection of contrast.

**ANESTHESIA:** Versed 4 mg IV.

**COMPLICATIONS:** None.

**PROCEDURE IS AS FOLLOWS:** The patient was prepped and draped in the usual sterile fashion, prone on the OR table. Using fluoroscopic guidance, C5-6 was identified. A skin wheal was raised, and an 18 gauge Tuophy needle was advanced under loss-of-resistance technique in the epidural space. Upon entering the epidural space, no paresthesias were elicited, no heme or CSF was aspirated. 5 cc of Omnipaque 240 was injected to confirm needle placement. A total of 80 mg of Depo Medrol and 4 cc of normal saline were injected into the epidural space. The patient tolerated the entire procedure with no acute complications and was discharged home in stable condition after observation for 30-minutes.

DAVID P. HERRICK, M.D.
Signed without review.

DPH/slc
D: 02/06/06
T: 02/08/06



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID  HERRICK, MD  •  BRAD  KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: **334-288-7808**
Fax: **334-288-8089**

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: **334-387-7246**
Fax: **334-387-7250**

### PROCEDURE NOTE

**NAME:**    CATHY CLEILAND
**DATE:**    08/27/03
**DOB:**

**PREOPERATIVE DIAGNOSIS:** Lumbar degenerative disc disease and lumbar radiculitis.

**POSTOPERATIVE DIAGNOSIS:** Lumbar degenerative disc disease and lumbar radiculitis.

**PROCEDURE PERFORMED:** Lumbar selective nerve root block on the left at L4-5 and L5-S1 under fluoroscopy with injection of contrast.

**ANESTHESIA:** None.

**COMPLICATIONS:** None.

**PROCEDURE IS AS FOLLOWS:** The patient was prepped and draped in the usual sterile fashion, prone on the OR table. Using fluoroscopic guidance, L4-5 and L5-S1 was identified on the left. A skin wheal was raised, and a 25 gauge 3 ½" needle was inserted until the tip of the needle rested in the 12 o'clock position at L4-5 and the second needle at L5-S1. Needle position was carefully confirmed AP and laterally. Divided equally into each needle was 2 cc of Omnipaque 240 to confirm needle placement. A total of 2 cc of 0.75% Marcaine plus 80 mg of Depo Medrol was divided between the two injections. The patient tolerated the entire procedure with no acute complications and was discharged home in stable condition after observation for 30 minutes.

DAVID P. HERRICK, M.D.
Signed without review

DPH/slb
D: 08/27/03
T: 08/28/03

CLE00100

# EXHIBIT

## "N"

# PART 3



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID  HERRICK, MD • BRAD  KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

## EPIDUROGRAM REPORT

**NAME:**    CATHY CLEILAND
**DATE:**    08/27/03
**DOB:**     ███████████

There are two fluoroscopic images showing contrast injected at L4-5. There is fairly ratty spread of contrast at L4-5 with very poor medial spread of contrast through the neural foramen into the epidural space. A large laminectomy defect is present with significant disc height loss at L4-5. The L5-S1 nerve root is very nicely illuminated with contrast spread medially into the epidural space.

**IMPRESSION:** Epidural fibrosis at L4-5 creating an abnormal epidurogram. No previous films are immediately available for comparison.

DAVID P. HERRICK, M.D.
Signed without review.

DPH/slb
D: 08/27/03
T: 08/28/03

CLE00101

 **SCHOOL OF MEDICINE**

Department of Surgery
Division of Neurosurgery


November 17, 2003


Dr. John Hackman
1722 Pine Street, Suite 1001
Montgomery, Alabama 36106


Re: CATHY CLEILAND
    UAB #: 000000698678


Dear John:

I saw your patient, Cathy Cleiland, in the Neurosurgery Clinic today. She is a pleasant woman of 46 years and has had a good bit of spinal surgery performed. She has had three separate anterior cervical procedures accomplished over time. She was in a motor vehicle accident in April 2002 and ultimately had lumbar spinal surgery, left-sided L4-5 discectomy, in May 2003. She says she did not have much improvement from this, or at least any lasting improvement. It has become increasingly troublesome to her. She ultimately sought re-evaluation and a second procedure in July 16, 2003 for recurrent disc. She unfortunately states that she is no better. She has developed important back pain, which is different than what she has experienced previously. The left lower extremity pain and dysfunction remains but she now has severe burning dysesthesia in the bottom of the foot, which radiates up to the knee. She also is developing right lower extremity complaints. You have discussed with her the options of additional therapy and she would like my thoughts regarding her circumstance.

Of importance with this woman is that she is a bit overweight for her frame. She is 171 pounds on a 5 foot 4 inch frame. She has juvenile diabetes and has been treated for same for 25 years. She is utilizing Neurontin, Darvocet, Lortab and Flexeril in treatment of her pain syndrome but is really not much better. She has not had much in the way of physical therapy of late. She tried this after her first operation.

She describes mechanical type pain, sharp, stabbing, lancinating pain with motion. She cannot always anticipate which motion is going to give her the trouble. Rolling over in bed, for example, sometimes causes a sharp, stabbing pain that then radiates down her left leg. At other times she can stand and walk and get around reasonably well with just an underlying, severe low backache but will have superimposed sharp, stabbing pains that literally take her breath away. Her pain tends to follow the L5 distribution and also S1 on this left side. She is developing some right-sided complaints as well. She walks with a

The University of Alabama at Birmingham
1030 Faculty Office Tower ● 510 20th Street South
Birmingham, Alabama 35294-3410
(205) 934-7170● FAX (205) 934-6507

4

CLE00102

limp and the more she walks, the more she limps. She walks in a flexed position too, very careful with the positioning of her spine and her step. She really tries to avoid any jarring. She cannot keep shoes on her feet more than two to three hours because of the burning dysesthesias, particularly on the left but the right as well.

As we examine her, she does have pain that appears mechanical. She has a real tough time with flexion, extension, laterally bending or rotation of the lumbar spine. This tends to cause focal back pain, sometimes sharp with lancination down the left leg. She appears to be weak in the extensor hallucis longis and anterior tibialis on that left side compared to the right. She indeed has burning dysesthesias in the L5 and S1 distribution on the left. She has reduced ankle response on the left.

I reviewed films on Cathy from prior to her original surgery to her most recent three sets of MR studies with two different sets of plain spine films. She has what appears to be collapse and degeneration despite attempted discectomy times two. I think she has developed failure of the facet complex on this left side and then subluxation and collapse, which is causing further canal compromise. There is a good bit of scar in around the previous operative site. I do not see specific disc material, which has re-herniated, but significant collapse with narrowing and angulation with a grade I spondylosis.

I think Cathy Cleiland has developed lumbar spinal instability with recurrent nerve root compression. I think some of her components, particularly the burning dysesthesias in the left lower extremity, are probably the result of nerve root injury from her pathology and its attempted treatment. I do think her mechanical instability and ongoing neuro compression can be improved with an operative procedure to provide decompression, internal fixation and fusion with the hope to restore her normal lumbar lordosis and interspace height. While I do not think she will have alleviation of her severe burning dysesthesias in her left lower extremity, she does have a very good opportunity to benefit from the above-mentioned procedure. Cathy would like to proceed. We have tentatively selected the date of December 9 as an operative date. We will complete the history, physical and preoperative counseling today. I will keep you posted on our progress. Thank you for asking me to provide an opinion on this pleasant woman.

Sincerely,

Mark N. Hadley, M.D.
Professor of Neurosurgery

MNH/hr

DSCjob#1117-507

CLE00103

Sincerely,

Mark N. Hadley, M.D.
Professor of Neurosurgery

MNH/npp

job#21-0714-425

CLE00104

| CLEILAND CATHY K | 698678 | 07/14/2004 | 07/14/2004 13:48:: |
|---|---|---|---|
| Patient Name | MR# | Observation Date | Last Edited Date |

**Result Type:**
MR Lumbar Spine wo+w contrast

**Reason For Exam:**
lumbar sacral spine - lumbar stenosis

**Results:**
**Evaluate operation on the lumbar spine:**
There is loss of normal lordosis of the lumbar spine. There is
evidence of marrow change in relation to the disc L4-5 with evidence of
operative intervention with metallic prosthesis using plates and
pedicular screws. There is minimal malalignment with a step deformity
between L4 and L5. Conus medullaris is normal ending at T12-L1.
Possibility of a transitional vertebra at the lumbosacral junction
cannot be excluded. For proper level determination, plain film
examination of the thoracic and lumbar spine is recommended. There is
evidence of laminectomy in the lower lumbar and lumbosacral region.
There is evidence of stenosis at L3-4 with a minimal disc bulge.

Paraspinal muscles appear normal.

After gadolinium injection, enhancement noted at the level of fusion at
L4-5. No evidence of abnormal enhancement in the paraspinal region.

**IMPRESSION:**
Post operative changes with abnormal enhancement in relation to the
disc plates at L4-5. Mild to moderate stenosis noted at L3-4. The
enhancement in relation to L4-5 could be due to degenerative changes
Type I, however inflammatory changes cannot be entirely excluded.

LPM

**Signature Line:**
Final Report
**Interpreted by:** Taher T. El Gammal
**Title:** MD
**Signed Date/Time:** 07/14/04 13 12

*End of document as received by CDA*

AUG-17-06  03:02pm   From-SURGERY MED RECORDS           2059704600           T-256   P.11/20   F-926

# THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 01/14/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

Cathy Cleiland is seen back in the Neurosurgery Clinic today.  She is four weeks out after re-operative lumbar spine surgery at L4-5 with posterior lumbar interbody fusion and internal fixation.  While she is standing better and has better function in her left lower extremity, she still has severe, burning dysesthetic pain in her legs, worse in the left leg than the right.  This is very similar to her preoperative circumstance.  She is using Neurontin 300 mg to 600 mg three times per day.  She is still using a fair bit of pain medication.  Her wound was giving her trouble but she has no tenderness or soreness there.

On examination, her wound looks good.  She has a scab on the bottom but it is not erythematous, not leaking.  The skin edges are simply healing.  There is no fullness or fluid here.  She can bend and move her spine and certainly her posture is much better than it was prior to surgery.  She cannot yet walk on her heels but can on her toes.  Independent testing reveals improved strength in the extensor hallucis longis and anterior tibialis on the left compared to preoperatively.

Imaging studies were not performed today.  We will obtain these in four weeks.  I am going to put her on an elevated dose of Neurontin 800 mg qid.  We will continue to offer supportive care.  We will get her involved in physical therapy as an outpatient.  I will see her back in four weeks.

MNH/hr/2823
D: 2004-01-14
T: 1/15/04 12:12 PM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

cc:

job#:0114-176

1
NeuroSurgCN-Hadley

CLE00106

# THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 02/11/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

Cathy Cleiland is seen back in the Neurosurgery Clinic today. She is two months out from L4-5 decompression, stabilization and fusion. She is doing okay. She is using Darvocet N-100 for pain, which is substantially a lower dose of narcotic than she has used in the past. She is using Neurontin 800 mg TID same as her preop. She is still having important and bitter burning dysesthesias in that left lower extremity. She has been plagued with that. She states she does not feel any better in that left leg after her operation than she did six months ago. Her only change she notes is that she is not having the same kind of back pain she has had previously.

On exam, I bring out residual weakness in the tibialis anterior and extensor hallucis longis on the left side. I bring out no other abnormalities. Radiographic studies today look pretty good. Internal fixation and fusion, PLIF construct looks fine as it has previously.

I have given my support and encouragement to Cathy. We are going to refill her Robaxin and her Darvocet medications today. She needs to give this more time. As we told her preoperatively, the burning dysesthesias and longstanding nature of her problems in her left lower extremity including weakness, sensory loss and the dysesthesias are not terribly positive signs for a complete recovery. Hopefully, she will continue to improve over time. We will assist her as we can and see her back in four months at her six-month followup.

MNH/hr/2823
D: 2004-02-11
T: 2/12/04 9:18 PM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

cc:

job#:0211-043



**Health System**
2000 6th Ave. South
Birmingham, AL
35249

Name: CLEILAND, CATHY K
MRN: 000000698678
DOB:              Age: 47 Years
Race: Unknown  KNEU//
Attending: Hadley, Mark N
Fin #: 406694196  Fin Class: Blue Cross
Admit Date:

## R A D I O L O G Y

| Accession Number: | Date of Service: | Ordering Physician | Exam: |
|---|---|---|---|
| MR-04-0011739 | 7/14/2004 | Hadley, Mark N | MR Lumbar Spine wo+w contrast |

Indications
lumbar sacral spine – lumbar stenosis

Results
Evaluate operation on the lumbar spine:
There is loss of normal lordosis of the lumbar spine.  There is
evidence of marrow change in relation to the disc L4-5 with evidence of
operative intervention with metallic prosthesis using plates and
pedicular screws.  There is minimal malalignment with a step deformity
between L4 and L5.  Conus medullaris is normal ending at T12-L1.
Possibility of a transitional vertebra at the lumbosacral junction
cannot be excluded.  For proper level determination, plain film
examination of the thoracic and lumbar spine is recommended.  There is
evidence of laminectomy in the lower lumbar and lumbosacral region.
There is evidence of stenosis at L3-4 with a minimal disc bulge.


Paraspinal muscles appear normal.


After gadolinium injection, enhancement noted at the level of fusion at
L4-5.  No evidence of abnormal enhancement in the paraspinal region.




PRESSION:
Post operative changes with abnormal enhancement in relation to the
disc plates at L4-5.  Mild to moderate stenosis noted at L3-4.  The
enhancement in relation to L4-5 could be due to degenerative changes
Type I, however inflammatory changes cannot be entirely excluded.


LPM
Final Report
Interpreted by: Taher T. El Gammal
Title: MD
Signed Date/Time: 07/14/04 13:12

UAB  60803 Form Rev 06/03                     Physician Copy                    Page: 1 of 1

CLE00108

)                                                )

PAGE 1

**L/AB**  The University of Alabama at Birmingham
         The Medical Center/University of Alabama Hospitals

## DISCHARGE SUMMARY

NAME: CLEILAND, CATHY

SERVICE: Mark N. Hadley, M.D./2823

MED.REC.NO.: 00698678    ROOM:

ADMITTED: 12/16/03    DISCHARGED: 12/18/03

DICTATED: 12/18/03    TRANSCRIBED: 12/18/03

ADMISSION DIAGNOSIS:    Lumbar instability.

DISCHARGE DIAGNOSIS:    Same.

PROCEDURE:    L4-5 laminectomy and diskectomy with
L4-5 internal fixation and fusion and
L4-5 posterior lumbar interbody fusion
by Dr. Hadley on 12/16.

HISTORY OF PRESENT ILLNESS:  The patient is a 46-year-old white
female with a one and a half year history of low back pain and
left leg pain with numbness in the lateral left leg and plantar
surface of the left foot.  She has a history of prior lumbar
surgery.  Exam and imaging is consistent with L4-5 instability.
She presents now for elective decompression with L4-5 posterior
lumbar interbody fusion.

Please see history and physical for further details.

HOSPITAL COURSE:  The patient underwent the aforementioned
procedure which she tolerated without difficulty.  She was
followed on the floor postoperatively where she had an
uncomplicated hospital course and mobilized in a timely fashion
and she remained neurologically stable in comparison to her
preoperative exam.  She had a slight foot drop on the left
preoperatively and this was felt to have improved actually
somewhat on postoperative day one with almost normal strength on
the left side with dorsiflexion.  She was fitted with an LSO brace
and approved for discharge the morning of 12/18.

DISCHARGE CONDITION:  Good.

DISPOSITION:  Home.

DISCHARGE MEDICATIONS:  Neurontin 300 mg t.i.d.; Robaxin, Lortab,
and Advil as needed for pain.

CLE00109

Aug-17-06  03:03pm   From-SURGERY MED RECORDS                    2058704600              T-256   P.16/20   F-326

**LUAB**    The University of Alabama at Birmingham                          PAGE 2
            The Medical Center/University of Alabama Hospitals

                              DISCHARGE SUMMARY

NAME: CLEILAND, CATHY                    MED.REC.NO.: 00698678    ROOM:


Followup is on 12/29 for a wound check with Dr. Hadley.


Kevin N. Ammar, M.D./07734/TL032

                                          Mark N. Hadley, M.D.

CLE00110

**LYAB**  The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

PAGE 1

<u>OPERATION NOTE</u>

NAME: CLEILAND, CATHY                MED.REC.NO.: 00698678    ROOM:

SURG: MARK N. HADLEY, M.D.           ASSIST: AJAY K. ANANDA, M.D.


SURG.SIGN.: _____

DATE OPER.: 12/16/03          ADMITTED: / /          DISCHARGED: / /

SERVICE: MARK N. HADLEY, M.D.   DICTATED: 12/16/03    TRANSCRIBED: 12/16/03

DOCTOR/SERV.SIGN.: _____


PREOPERATIVE DIAGNOSIS:    Lumbar spinal instability, with L5
                           radiculopathy, left greater than right.

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURES PERFORMED:      1.  L4-L5 laminectomy for decompression.
                           2.  L4-5 diskectomy, bilateral, with L4-5
                               posterior lumbar interbody fusion,
                               bilateral.
                           3.  Internal fixation L4-L5, bilateral.
                           4.  Autologous bone dorsolateral fusion
                               L4-L5, bilateral.

ANESTHESIA:  General with endotracheal intubation.

INDICATIONS:  This is a 46-year-old female who has had previous
L4-5 surgery.  She has developed collapse and instability at L4-5,
with marked L5 root compression and foot drop.  She has horrific
pain, both mechanical in nature and radicular in nature,
bilateral, again left more than right.  She is a candidate for
operative decompression at the L4-5 level, followed by L4-5
posterior lumbar interbody fusion and internal fixation and
dorsolateral fusion.  She understands the indications for as well
as the risks of the procedure.  She wishes to proceed.  Consent
has been obtained.

OPERATIVE TECHNIQUE:  After smooth induction of anesthesia and
intubation, the patient was carefully moved from the hospital bed
to the operating table and placed in the prone position on the
Wilson frame.  The patient's lumbosacral spine was shaved,
prepped, and draped in the usual sterile fashion.  I used the
previous skin incision but essentially extended the incision from
the inferior portion of L3 down to the superior portion of S1.
There was a great deal of scar on this left side, particularly at
L4-5.  I dissected down bilaterally, exposing the spinous process
and lamina of L4 and the spinous process and lamina of L5.  There

CLE00111



The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

PAGE 2

OPERATION NOTE

NAME: CLEILAND, CATHY          MED.REC.NO.: 00698678    ROOM:

was marked facet mobility, in fact fractured facet at the L4-5 level on the left with collapse. I dissected out laterally bilaterally and exposed the facet complex at L4-5 and then the transverse process of L5. I worked up in a careful manner in a cephalad direction and exposed the transverse processes of L4 bilaterally, using great care to avoid any compromise or exposure of the L3-4 facet complex. I irrigated the wound with antibiotic solution. I then used a double-action rongeur to remove the spinous processes and lamina which remained at L4 and L5. I had dissected around the L4-5 scar on the left side, of course, but was able to do so and then fully decompress the thecal sac from superior L4 through L5. Working from the patient's left side toward the right, I undercut the medial facet complex and decompressed the lateral recess stenosis here. I took the L4-5 facet down as well. I went around to the patient's right, worked back toward the left, worked around and through scar, and decompressed the exiting L5 root which was markedly compromised, as well as the exiting L4 root. There was tremendous scar here from this collapsed, fractured, and failed facet. I then worked underneath the L5 root on the left, worked in a cephalad direction, and found recurrent disc herniation. I was able to dissect through this using both blunt and sharp dissection techniques, avoiding injury to the L5 and the L4 root, and then retract the nerve root medially. The markedly collapsed interspace here was identified. Posterior lumbar interbody fusion instruments were then sequentially used, beginning with an 8 mm blade up to an 11 mm blade, decorticating the inferior left endplate of L4 as well as the superior endplate of L5. Disc material was removed with interspace rongeurs. I then dissected on the patient's right side, careful to avoid any compromise of the L4-5 root on the right. Again, posterior lumbar interbody blades were used to remove disc material and decorticate the endplates sequentially from 8 mm to 11. I then used a box cutter to decorticate the endplates even better at the inferior L4 and superior L5 bilaterally. I then placed a distraction device in the interspace 12 mm. I used a 13 mm allograft posterior lumbar interbody fusion substrate and tapped these as interposition grafts, first on the patient's left and then the right. These appeared to be in good position, and we had markedly increased, although not quite to normal, the interspace height from her preoperative collapsed circumstance. There was immediate firmness and stability to this previously very unstable joint. I then passed bone screws via the pedicles into the bodies with the use of intraoperative fluoroscopy into L4 and L5 bilaterally. I decorticated the exposed dorsolateral surfaces of L4 and L5. I morselized all the patient's bone which I had removed during the laminectomy and facetectomy completely of L4 and L5, admixed this

CLE00112

Aug-17-06  03:04pm    From-SURGERY MED RECORDS                    2059704600              T-256   P 19/20   F-326

 The University of Alabama at Birmingham                          PAGE 3
The Medical Center/University of Alabama Hospitals

OPERATION NOTE

NAME: CLEILAND, CATHY                    MED.REC.NO.: 00698678    ROOM:

with bone morphogenic protein putty and paste, and then packed it
over the exposed dorsolateral surfaces of L4 and L5.  Contoured
rods were then secured to the bone screws at L4 and L5 bilaterally
and locked into position, completing the procedure.  I irrigated
the wound with antibiotic solution.  There was no evidence of
nerve root compromise, thecal sac compression, or CSF leak.
Bleeding was well controlled.  I placed a drain.  We closed the
wound in multiple layers.  The skin edges were approximated with a
running nylon suture.

I personally supervised the entirety of the procedure and
performed the essential elements outlined above.


Mark N. Hadley, M.D./07120/TL030

CLE00113

## THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 06/09/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

**SUMMARY:**

Cathy Cleiland is seen back in the Neurosurgery Clinic today.  She underwent L4-L5 posterior lumbar interbody fusion with internal fixation and fusion on December 16, 2003.  She states that she has had improvement in back pain.  She no longer has the sharp, stabbing, mechanical complaints.  Unfortunately, she continues to have severe painful dysesthesias in her lower extremities, left more than right.  This is very similar to preop.  We cautioned her and were concerned that the burning dysesthesias in her legs prior to surgery may not be improved by surgery.  We certainly hoped that she would improve and, at least thus far, have not given up hope that improvement may occur.  On exam, she is stiff.  She does not bend and flex much, but can flex, extend, laterally bend, and rotate without evidence of instability.  Motor, sensory and reflex testing is quite good in the lower extremities.  She can walk on her toes and her heels.

Radiographic studies today demonstrate intact internal fixation hardware and good placement of fusion mass at the L4-L5 level.  There is no malalignment.  There is no pathology above or below.

We have done what we can for Cathy Cleiland.  We will continue to monitor progress on an intermittent or six-month type basis.  There is nothing additional at present for neurosurgery to provide other than supportive care.

MNH/npp/2823
D: 2004-06-09
T: 6/10/04 7:29 AM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

job#22-0609-301

CLE00114

SPRINGHILL MEMORIAL HOSPITAL

Radiological Consultation

NAME: CLEILAND, CATHY K
ADDRESS: 401 FORREST AVE          JACKSON

Age: 43Y     Sex: F     DOB:

Chk-in #    Order    Exam
173817      0001     4615     MR SPINE CERVICAL W/O CONTRAST
                              Ord Diag:

Comparison to previous examinations of 12/01/?? Routine sagittal and
axial images were obtained utilizing both T1 and T2 weighted scans.
Posterior fossa and cord intensity within normal limits. There is
redemontration of previous surgery C5-6 with what appears to be solid
bony fusion. There is, however, increased prominence of posterior
disc and spur at C6-7 which is causing severe central canal stenosis as
well as moderate to severe left neural foraminal stenosis. Residual
midline central canal diameter is approximately 10 - 11 mm.

C3-4, C4-5, and C7-T1 levels are unchanged.

IMPRESSION:

1.  INTERVAL WORSENING OF SEVERE CENTRAL CANAL NARROWING AT C6-7 DUE
TO BROAD BASED POSTERIOR MARGINAL OSTEOPHYTE AND ASSOCIATED DISC
HERNIATION SINCE PREVIOUS STUDIES.

2.  UNCHANGED POST SURGICAL APPEARANCE TO C5-6.

3.  C3-4, C4-5 AND C7-T1 LEVELS UNCHANGED SINCE PREVIOUS EXAMINATIONS.

                    /Read By/ Carl E BLOCK, M.D.
                    /Released By/ Carl E Block, M.D.

     AAH

     FINAL

CLE00115

**SPRINGHILL MEMORIAL HOSPITAL**
**EMERGENCY PHYSICIAN REPORT**

Patient Name: CLEILAND, CATHY K
Patient ID: 9220790      Admit Date/Time: 02/25/2001  15:11
DOB:                   Gender: F      Race: White

CHIEF COMPLAINT:  Pain in back and neck
Patient complains of chronic pain in neck and back for 4 years status post an MVA.  Patient is under the care of a chronic pain specialist, and has had cervical spine surgery for same thing.  Patient states that over the past year for symptoms and gotten worse, and that her intrathecal injections of antiinflammatories are becoming less and less effective.  Patient is three weeks s/p last injection, and as opposed to previous episodes, patient states that she didn't get any relief.  The patient also states that over the past few weeks, the tips of her fingers ( third and fourth) are numb.  Patient called Dr Snitzer, who instructed the patient to come to ED for evaluation.
There are no other complaints.
REVIEW OF SYSTEMS:
OTHER SYSTEMS:  All other systems that were reviewed were negative.
PMH: Medical History: diabetes
Prior Surgery: C-section, cervical fusion.
PATIENT'S ALLERGIES: The patient denies having any medication allergies.
PATIENT'S CURRENT MEDICATIONS: see list
SOCIAL HISTORY: The patient is a nonsmoker.
FAMILY HISTORY:  No Family History is pertinent to the present complaint.

PHYSICAL EXAM:  Vital Signs: Reviewed Nurse's notes.
PATIENT STATUS: is in no distress, alert and cooperative.
HEAD: Atraumatic, without temporal or scalp tenderness.
NECK: Supple, nontender, no lymphadenopathy.
CHEST: Nontender, symmetrical, no retractions.
LUNGS: Clear to auscultation and breath sounds equal, no wheezes, rales, or rhonchi.
HEART: Regular rate and rhythm, without murmurs, ectopy, gallops, or rubs.
ABDOMEN: Soft, nontender.
ARM:  Right arm.  Nontender.  Nonswollen.  Range of motion: full.  No deformity.
SKIN: Normal.  Neurovascular status: motor impaired mildly weaker on the right than left, but patient unable to give full effort with positive "breakaway weakness".  Sensation impaired per patient in tips of finger..  The distal pulses are normal.
REFLEXES: normal. with exception of decreased brachioradialis on the right compared to left.
GAIT: Normal.
BACK: No costovertebral, paravertebral, intervertebral, or vertebral tenderness or spasm.

TREATMENT:
CONSULT:  Dr Snitzer was consulted by phone and we have discussed the above..  He asked that the patient be given analgesia, and asked that the patient follow up in his office in the am.
Demerol, Phenergan, Toradol was given.

DIAGNOSIS: Back Pain, 724.5
Neck Pain, 723.1
Numbness, 782.0

DISPOSITION: Patient was discharged home accompanied by family.
 The patient's condition at discharge was stable.  See the Emergency Department face sheet for discharge instructions.

| E.D. Clinician: | Michael A. Mahoney, MD      EMERGENCY DEPARTMENT |
| Date: | Sun Feb 25, 2001      Page 1 of 2 |

SPRINGHILL MEMORIAL HOSPITAL         HOSPITAL #:  07581995

Radiological Consultation            DATE:      12/28/99

                                     LOCATION:    O/P

                         ORDERING PHYS:  MIDDLETON,TROY H

NAME:  CLEILAND,CATHY
ADDRESS:  401 FORREST AVE        JACKSON         AL   36545

Age: 42Y      Sex: F      DOB:  07/11/57      MR Number:  00173126

Chk-in #   Order    Exam
  86703    0001     1030     XR SPINE CERV SERIES
                            Ord Diag: NECK PAIN,FALL


There is fusion between C5 and C6 vertebral bodies.  The alignment is
normal.  There is no encroachment upon the foramina.  The other
vertebral bodies and interspaces are normal.


IMPRESSION:  FUSION AT THE C5-6 LEVEL.


                    /Read By/ Pavel M Lichtenstein, M.D.
                    /Released By/ Pavel M Lichtenstein, M.D.
FB


FINAL                      RADIOLOGY REPORT

CLE00117

SPRINGHILL MEMORIAL HOSPITAL

Radiological Consultation

HOSPITAL #: 07578095

DATE:      12/01/99

LOCATION:  O/P

ORDERING PHYS:  HINTON,JOHN L JR

NAME: CLEILAND,CATHY
ADDRESS:  401 FORREST AVE      JACKSON      AL   36545

Age: 42Y      Sex: F      DOB: ▓▓▓▓▓▓      MR Number:  00173126

Chk-in #    Order    Exam
  81810     0001     4615      MR SPINE LEVEL 2 CERVICAL
                              Ord Diag: NECK PAIN

There are no previous cervical spine MRIs available for comparison.
Routine sagittal and axial images were obtained utilizing both T1 and
T2 weighted technique.  Posterior fossa and spinal cord have normal
intensity.

IMPRESSION: 1) PREVIOUS ACD AND F AT C5-6 WITH MILD POSTERIOR BONY BAR
FORMATION WHICH IS CAUSING MINIMAL CENTRAL CANAL NARROWING.

2) AT C6-7, THERE IS A BROAD BASED POSTERIOR MARGINAL OSTEOPHYTE WHICH
IS CAUSING MODERATE TO SEVERE CENTRAL CANAL NARROWING, THIS IS BEST
VISUALIZED ON AXIAL VIEWS.

3) C3-4, C4-5, AND C7-T1 LEVELS UNREMARKABLE WITHOUT EVIDENCE OF DISC
HERNIATION AT ANY LEVEL.  ALL FINDINGS ARE SUPERIMPOSED UPON MILD TO
MODERATE DEGENERATIVE FACET DISEASE AT ALL LEVELS EXAMINED.


                    /Read By/ Carl E Blunck, M.D.
                    /Released By/ Carl E Blunck, M.D.
      LF


FINAL                        RADIOLOGY REPORT       Page :1

CLE00118



P.O. BOX 8246
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-8630

Cleiland, Cathy
TBA

PHYSICIAN:  William Faircloth, M.D.

MRN:
ACCOUNT NO:
ADM DATE: 01/15/99

## HISTORY & PHYSICAL

PRIMARY PHYSICIAN:       Brent Faircloth, M.D.

HISTORY OF PRESENT ILLNESS:
Ms. Cleiland is a 41 year old right handed white female who I performed anterior cervical discectomy fusion at Springhill Memorial Hospital in November of 1997. She did extremely well from that, but more recently has had progressive right hand and forearm pain. It has worsened, and is now to the point that it awakens her at night. She has pain with driving her car, and if she hyper-extends or flexes her wrist. She has developed numbness of her thumb, index finger. She feels though that her strength has remained unchanged. She underwent peripheral nerve conduction studies with Dr. Ed Snitzer who had identified a severe carpal tunnel syndrome on the right. She failed to improve with non-steroidal anti-inflammatory agents, as well as cock-up splints. She is being admitted for carpal tunnel release.

PAST MEDICAL HISTORY:
Significant for the anterior cervical discectomy. Medical history is significant for diabetes and she takes insulin 13 units of regular and 27 units of NPH twice a day.

ALLERGIES:          No known drug allergies.
OCCUPATION:         Human Resources Manager
SOCIAL HISTORY:     She is married.
HABITS:             Tobacco usage - none; Alcohol usage - occasional.
FAMILY HISTORY:     Father is age 76 and healthy; mother is 73 and healthy.
                    She has three brothers ages 36, 49, and 51; all are
                    healthy. She has one sister age 45 and healthy.

PHYSICAL EXAMINATION:
GENERAL:            Well developed, well nourished, middle aged, white female.
HEENT:              Normocephalic and atraumatic. Pupils equal, round, and
                    reactive to light and accommodation. Sclerae non-icteric.
                    Conjunctiva pink. Nares patent; Septum in midline.
                    Oropharynx without inflammation, irritation, injection.
NECK:               Supple without adenopathy or thyromegaly. She has no JVD
                    and no bruits.
LUNGS:              Symmetrical expansion of lungs; lungs clear.

Continued, page two....

CLE00119



P.O. BOX 8246
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-8630

Cleiland, Cathy                          PHYSICIAN:   William Faircloth, M.D.

PAGE 2...

HEART:       Regular rate and rhythm without gallops or murmurs.
ABDOMEN:     Soft. Non-tender. Non-distended.
NEUROLOGIC:  She is awake, alert and oriented x 3. Memory, intelligence,
             judgement and affect were all appropriate and within normal
             limits. Motor strength was 5/5 throughout.  Reflexes were
             2+/2.  She had decreased pinprick in her thumb, and index
             finger of her right hand, normal elsewhere.  She had a
             positive tinel sign at her wrist and had pain with maximal
             flexion and extension of her wrist on the right.

IMPRESSION:  Carpal tunnel syndrome, right

PLAN:
1.   Admit
2.   Right carpal tunnel release

DISCUSSION:
I had a long discussion with Ms. Cleiland.  I explained the anatomy and
pathology of her lesion at length, in plain English, and in great detail.
I explained to risks to include the possibility of infection, hemorrhage (
REPORT CUT OFF AT THIS POINT.......

Signature::
D: 01/14/99    T: 01/14/99    mmc          William Faircloth, M.D.

CLE00120



P.O. BOX 8246
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9630

CLEILAND, CATHY

PHYSICIAN:  William Faircloth, M.D.

MRN: OP
ACCOUNT NO:
ADM DATE:

## OPERATIVE SUMMARY

SURGERY DATE:  01/15/99

SURGEON:   William Faircloth, M.D.

This was a clean case performed in O.R. Room 9.

PREOPERATIVE DIAGNOSIS:  Right carpal tunnel syndrome

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURE:           Right median nerve decompression

ASSISTANT: Mr. David Redd, ORT
CIRCULATING NURSE:  Ms. Candy Cannibus
ANESTHESIA:  Monitored anesthesia care
ANESTHESIOLOGIST:  Dr. Hanlon
ANESTHETIST:  Mr. Lamar Brown, CRNA
COMPLICATIONS:  None.
ESTIMATED BLOOD LOSS:  Less than 20 ccs.

BRIEF HISTORY:  Ms. Cleiland is a 41 year old right handed white female who
presented with intractable right wrist pain.  EMGs revealed evidence of
carpal tunnel syndrome. In view of the fact that she failed to improve with
conservative management, she is admitted for surgery.

DESCRIPTION OF PROCEDURE:  The patient was brought to O.R. Room 9. The
right hand and arm were prepped with multiple applications of Betadine
scrub and Betadine. The patient was then sterilely draped in the routine
fashion. Planned skin incision was infiltrated with 1% Lidocaine, with
sodium bicarbonate. An incision was created in the midline, and carried
down to the first flexor crease, and extended down into the palm. The
palmaris ligament was identified, and the median nerve was identified just
posterior to this. I opened the carpal ligament along the nerve well down
into the palm. Meticulous hemostasis was achieved. The patient could move
her thumb and index finger well. She could oppose her thumb to her small
finger. She reported that she had improved sensation in her hand.

CONTINUED, PAGE TWO....

CLE00121



P.O. BOX 8248
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9890

CLEILAND, CATHY             PHYSICIAN:     William Faircloth, M.D.

PAGE 2...

The wound was closed in layers by approximating the subcutaneous tissue
with interrupted 4-0 Vicryl and the skin edges with running subcuticular 4-
0 PDS.

The patient was taken to the recovery room in satisfactory condition.

"I authorized my name to be electronically affixed by using
my unique dictation computer key."

Signature::
D: 01/15/99    T: 01/17/99    mm        William Faircloth, M.D.

Patient ID: 9132105.76
Patient Name: Cleiland, Cathy
40 year old well-appearing white female
MODE OF ARRIVAL: Patient arrived via private automobile.
Time seen by clinician:  1:10 pm
CHIEF COMPLAINT:  Left lower abdominal pain, left lower back pain
Patient complains of having urinary symptoms for approximately 2-3 weeks
prior to arrival.  There has been moderate dysuria, no hematuria, moderate
frequency, moderate urgency and a low grade fever.  There has been mild
left-sided flank pain.  There has been mild suprapubic abdominal pain.
There has been no nausea.  There has been no vomiting.  There has been no
vaginal discharge and no vaginal bleeding.
LMP: 3 weeks ago.  Patient has had frequent UTI's for 2 months now.

REVIEW OF SYSTEMS:
GENERAL:  some chills.
THROAT:  no sore throat.
RESPIRATORY:  no cough, no dyspnea.
CARDIAC:  no chest pain.
PMH:  The patient has a history of insulin dependent diabetes.  No
allergies.  Currently not on antibiotics
SOCIAL HISTORY:  Lives in Jackson, AL
PHYSICAL EXAM:  Vital Signs: Reviewed Nurse's notes.
PATIENT STATUS:    comfortable, alert and cooperative.
EYES: PERRL, EOMI, no discharge or injection.
EARS: TMs without perforation, injection, or bulging. External canals clear
without exudate.
THROAT: Pharynx without injection, exudate or tonsillar hypertrophy.
Airway patent.
NECK: Supple, nontender, no lymphadenopathy.
Without Kernig's or Brudzinski's signs.
LUNGS: Clear to auscultation and breath sounds equal, no wheezes, rales, or
rhonchi.
HEART: Regular rate and rhythm, without murmurs, ectopy, gallops, or rubs.
ABDOMEN:  Mild suprapubic, lower left lower tenderness.  Normal bowel
sounds.  No rebound.  No guarding.  Mild left-sided flank tenderness.  No
distension.  No tympany.  No mass is palpable.
EXTREMITIES: Symmetrical, full range of motion, equal tone and strength. No
cyanosis, edema, joint tenderness or effusion.  Pulses equal bilaterally.
DIFFERENTIAL DIAGNOSIS: UTI, pyelonephritis, kidney stone, pregnancy, among
others

GLUCOSE: Fingerstick, 69, normal.
Urine pregnancy negative.
URINALYSIS:  consistent with a urinary tract infection
URINE CULTURE: obtained.
CBC:  WBC 11.2 within high normal limits.  Otherwise normal.  CREATININE

ΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔΔ
E.D. Clinician:  John L. McCormick, M.D.  FACEP
Date:         Tue Mar 17, 1998              Page 1 of 2

CLE00123

Patient Name: Cleland, Cathy
Patient ID: 9117105.76

0.7 within normal limits.
INTERVENTION:
Tylenol 1 gram po was given
Gentamicin 80 mg IM was given.
Toradol 60 mg IM was given. After treatment the patient's symptoms were
moderately relieved.
REEXAMINATION: at 4:45 pm
The patient's condition is improved. Continues with mild back pain;
markedly improved. Patient ate a snack in ED. Patient has slight
palpitations; heart rate 100, regular.
DIAGNOSIS:
Urinary Tract Infection, 599.0
Fever, 780.6
Diabetes Mellitus, Type I (Insulin Dependent),  No Complications, 250.01

DISPOSITION: Patient was discharged home.
The following prescriptions were given to the patient: Macrodantin 100 mg
every 6 hours X 10 days
Pyridium 200 mg every 8 hours X 2 days
Motrin 800 mg every 8 hours w/meals.
   Return to the emergency department for high fever, worsening back pain,
abdominal pain, persistent vomiting, or if your condition otherwise seems
to worsen.  The patient was advised to follow-up with  Family Physician in
2-3 days  For continued symptoms .

               John L. McCormick, M.D., FACEP
               Tue Mar 1?, 1998, 04:43 PM

E.D. Clinician:  John L. McCormick, M.D., FACEP
Date:           Tue Mar 17, 1998

CLE00124

Patient ID: 9132105.76
Patient Name: Cleiland, Cathy

DIAGNOSIS:
Urinary Tract Infection, 599.0
Fever, 780.6
Diabetes Mellitus, Type I (Insulin Dependent),  No Complications, 250.01

DISPOSITION: Patient was discharged home.
The following prescriptions were given to the patient: Macrodantin 100 mg
every 6 hours X 10 days
Pyridium 200 mg every 8 hours X 2 days
Motrin 800 mg every 8 hours w/meals.
   Return to the emergency department for high fever, worsening back pain,
abdominal pain, persistent vomiting, or if your condition otherwise seems
to worsen.  The patient was advised to follow-up with  Family Physician in
2-3 days  For continued symptoms .


I have received the instructions above.  I understand that I have received
emergency treatment only, and that I may be released before all my medical
problems are known or treated.  I will arrange for follow-up care as
instructed above.

_____    _____    _____
/Patient/Responsible person         Date           Relationship to patient

_____
Signature of Witness

                    John L. McCormick, M.D., FACEP
                    Tue Mar 17, 1998, 04:43 PM






E.D. Clinician:  John L. McCormick, M.D., FACEP
Date:            Tue Mar 17, 1998

CLE00125

Name CLEILAND, CATHY K                    Address

Age DOB:                                  Sex        F

Part Examined CERVICAL SPINE-FLEX/EXT

ROENTGENOLOGICAL FINDINGS:

There is fusion of the C5 and C6 vertebral bodies.  No evidence of
significant arthritic disease. There is no evidence of subluxation.

IMPRESSION:   FUSION OF THE C5 AND C6 VERTEBRAL BODIES.  NO OTHER
ABNORMALITIES.

fb 01-23-98

01-23-98                                  LARRY GREER, M.D.

CLE00126



P.O. BOX 8246
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9030

PHYSICIAN:

CLEILAND, CATHY                                    FAIRCLOTH

### DISCHARGE SUMMARY

OF ADMISSION:   11/18/97
OF DISCHARGE:   11/19/97

PRIMARY PHYSICIAN:              William B. Faircloth, M.D.

REFERRING PHYSICIAN:            M. Andrew Wallace, M.D.

HISTORY OF PRESENT ILLNESS:    Please see previously dictated note for History and Physical Examination.

HOSPITAL COURSE:        The patient was admitted and was taken directly to the operating room where an anterior cervical fusion was performed at C5-6, with a right iliac crest graft. She tolerated the procedure well. She was awakened, extubated, and taken to the recovery room in satisfactory condition.  She was then placed in the intensive care unit where she remained overnight.  The AP and lateral cervical spine x-rays were obtained prior to discharge which revealed the arthrodesis to be in good position and there was good alignment. She had total resolution of her right arm pain.  She was discharged home today to return to see me in my office in three weeks.

ADMISSION DIAGNOSIS:           HERNIATED NUCLEUS PULPOSUS, C5-6, RIGHT.

PRIMARY PROCEDURE:             Anterior cervical fusion, C5-6, with right iliac crest graft.

DISCHARGE MEDICATIONS:    1.  Lortab 7.5 one q.4h. as needed for pain.
                          2.  NPH insulin 25 units each evening and 15 units of Regular each evening.

DISCHARGE INSTRUCTIONS:        The patient was asked to progressively increase her activity. She was to call my office immediately if she developed a temperature above 102 degrees, erythema, edema, or drainage from her wound. She was to call if she had any problems or questions.

cc: M. Andrew Wallace, M.D.


"I authorized my name to be electronically affixed by using my unique dictation computer key."

Dict: 11/18/97 Trans: 11/19/97 bri     WILLIAM B. FAIRCLOTH, M.D.

#SMH 16002

CLE00127



P.O. BOX 8248
MOBILE, ALABAMA 36608

37?? DAUPHIN STREET
(334) 343-9630

Cleiland, Cathy

PHYSICIAN:  William Faircloth, M.D.
(cc: extra copy to Dr. Faircloth)

MRN:  TBA
ACCOUNT NO:
DATES:  11/18/97

## HISTORY & PHYSICAL

REFERRING PHYSICIAN:        TONY WALLACE, M.D.

HISTORY OF PRESENT ILLNESS:

. Cleiland is a 40 year old, right handed, white female who was involved
. work related car accident in April of this year.  She was in her Honda
.. de wearing her seat belt, and was at a stop sign.  Apparently, another
... Accord traveling between 45 and 50 miles per hour swerved, missed
another car, and hit her left frontal area of her car.  She was turned to
90 degrees.  She denies loss of consciousness, but it "shook me".  She was
ambulatory at the scene, was taken to the emergency room.

Xrays of the cervical spine revealed "no break".  I have not seen these
films.  She was given pain medication and muscle relaxers, referred to Dr.
Charlie Eddins, who treated her with decreased activity, non-steroidal
anti-inflammatories, and she felt improved.  She was placed in physical
therapy, which would help her while she was there, but six or eight hours
later, the pain would recur.  She describes numbness in the medial aspect
of her right arm.  She complains of pain in her right shoulder blade which
feels like "raw meat".  She has had occipital headaches, and generalized
weakness in her right arm.  She is most uncomfortable with left lateral
rotation of her head which causes right neck pain.  She is most comfortable
sitting or reclining with her neck supported.

She underwent MRI of her cervical spine, which reveals a right sided disc
herniation at C5-6, causing neural impingement.

PAST MEDICAL HISTORY:
SURGERIES:      Significant for removal of right ovary and tube in 1987, and
                removal of the other fallopian tube in 1984.  She thinks
                that she had an appendectomy during one of those two
                procedures.  She has had two Cesarean sections.

ILLNESSES: MEDICATIONS: She has had diabetes for twenty years, takes
                insulin 15 units of regular each morning, 25 units of NPH
                each evening.  She takes Flexeril, but felt as though this
                did not help her.

Continued, page two....

#ST## 16002



P.O. BOX 8248
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9630

Cleiland, Cathy                    PHYSICIAN:    William Faircloth, M.D.

PAGE 2...

ALLERGIES:    Darvocet causes her to have nausea and vomiting.

SOCIAL HISTORY:    She is married and has two children.  She is a
                   Personnel manager with Medline.  She does not drink
                   and does not smoke.

FAMILY HISTORY:    Her mother is alive and well at age 70.  Her father
                   is 74, and his healthy.  She has three brothers, ages 36,
                   48, and 50, all of which are healthy.  She has one sister,
                   age 45, who is healthy.

PHYSICAL EXAMINATION:
GENERAL:       She is a well developed, well nourished, middle aged,
               female.
HEENT:         Normocephalic and atraumatic.  Pupils equal, round, regular
               and reactive to light and accommodation.  Sclera non-icteric.
               Conjunctiva pink.  Nares patent.  Nose - septum midline.
               Oropharynx - without inflammation, irritation, or injection.
NECK:          Supple without adenopathy, thyromegaly.  Flexion extension
               of the neck causes midline neck pain.  Left lateral rotation
               causes right neck pain.  Right lateral rotation with
               extension causes a radicular pain.
CHEST:         Symmetrical expansion.
LUNGS:         Clear.
HEART:         Regular rate and rhythm without murmurs, rubs or gallops.
EXTREMITIES:   Peripheral pulses are +2.
ABDOMEN:       Soft. Non-tender. Non-distended. Without hepatosplenomegaly
               or masses. Bowel sounds positive.
NEUROLOGIC:    She is awake, alert, and oriented x 3.  Memory,
               intelligence, judgement and affect are all appropriate and
               within normal limits.  Motor strength was 5/5 throughout.
               Reflexes were diminished throughout.  Sensation was
               diminished in the thumb and index finger right hand, normal
               elsewhere.

IMPRESSION:    Cervical disc herniation C5-6 on the right.

Continued, page three....

#SMH 10002



P.O. BOX 8248
MOBILE, ALABAMA 36608

3717 DAUPHIN STREET
(334) 344-9630

Cleiland, Cathy                    PHYSICIAN    William Faircloth, M.D.

PAGE 3...

PLAN:
    Admit
    Anterior cervical discectomy and fusion at C5-6 with iliac crest
    graft.

I explained the anatomy and pathology of the lesion at length, and
findings, in great detail.  I explained the risks being infection,
hemorrhage (so severe as to require transfusion, therefore the risk of aids
and hepatitis), right carotid injury (resulting in right hemispheric stroke
and left hemiplegia), vocal cord paralysis (permanent hoarse voice),
esophageal damage (requiring second operation to repair this), and spinal
cord damage (loss of use of her arms, legs, loss of bowel and/or bladder
function).  She appeared to understand these risks, and states she wishes
to proceed.  Therefore, I plan to proceed tomorrow.

        "I authorized my name to be electronically affixed by using
        my unique dictation computer key."

Signature::
D: 11/17/97    T: 11/17/97    mm        William Faircloth, M.D.



P.O. BOX 8246
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9639

CLEILAND, CATHY                    PHYSICIAN        William Faircloth, M.D.

MRN:  RM
ACCOUNT NO:
ADM DATE:

## OPERATIVE SUMMARY

SURGERY DATE:  11/18/97

SURGEON:    William Faircloth, M.D.

PREOPERATIVE DIAGNOSIS:    Herniated nucleus pulposus C5-6, right.

POSTOPERATIVE DIAGNOSIS:  Same.

PROCEDURE;       1.    Anterior cervical fusion C5-6.
                 2.    Anterior cervical diskectomy.
                 3.    Right iliac crest graft.

ASSISTANT;    Dr. R. L. White

INSTRUMENT NURSE;    Mr. David Redd
CIRCULATING NURSE;   Ms. Candy Cabiness, RN

ANESTHESIA;    General endotracheal.

ANESTHESIOLOGIST;    Dr. Buddendorf
ANESTHETIST;         Ms. Paula Green

COMPLICATIONS;       None.

ESTIMATED BLOOD LOSS; 300 cc.

BRIEF HISTORY;      Mrs. Cleiland is a 40 year old right handed white
female who was involved in a motor vehicle accident and has had intractable
neck and right arm pain.    She has failed to improve with conservative
measures.   MRI revealed a large cervical disc herniation at C5-6 on the
right.

PROCEDURE;      The patient was brought to OR #9.   After adequate level of
anesthesia was obtained, the patient was intubated.   She was given 2 grams
of Ancef IV and 12 mg of Decadron.   The right anterior neck and right
iliac crest were isolated with 10/10 drapes.   The area was prepped with
multiple applications of Betadine scrub and Betadine paint.   The patient
was sterilely draped in the routine fashion.

CC; DR. M. WALLACE

CONTINUED....

CLE00131



P.O. BOX 8248
MOBILE, ALABAMA 38908

DAUPHIN STREET
( 14) 344-9630

CLELLAND, CATHY                    PHYSICIAN    William Faircloth, M.D.

PAGE 2...

A transverse skin incision was created in the skin fold, sharp dissection
carried down through subcutaneous tissue to the platysma.  The platysma
was divided with Metzenbaum scissors.  I then created a plain medial to the
carotid, lateral to the trachea and posterior to the esophagus.  I
identified the C5-6 interspace.  I divided the anterior longitudinal
ligament in the midline and dissected in the subperiosteal plane and placed
the Casbar retractors posterior to the anterior colles muscle.  I placed
distraction pins at C5, C6 using fluoroscopic guidance, distracted the
interspace.  I opened the annulus with a monopolar cautery.  I resected
the degenerative disc material.  Using Midus-Rex drill, I performed a
diskectomy posteriorly to the posterior longitudinal ligament.  I opened
this ligament with various hooks as well as various Kerrison rongeurs.  I
removed a large extruded disc fragment on the right.  I could easily pass
a large blunt nerve hook along the course of the nerve root and it was well
decompressed.

I then directed my attention to the right iliac crest region.  I opened the
skin, and divided the fat down to the iliac crest.  I opened the fascia
over the iliac crest and after measuring the diskectomy, I obtained a right
iliac crest graft using an isolating saw and straight osteotome.  I waxed
the bone and placed Gelfoam in the cavity.  I then fashioned the bone graft
and introduced it in the interspace.  I returned to the iliac crest
incision and there was no bleeding.  After awaiting an appropriate period
of time, I irrigated the wound with copious amounts of Bacitracin solution
and approximated the fascia with a running #0 Vicryl in two layers, and
approximated the subcutaneous tissues with running 2-0 Vicryl and skin
edges with a running subcuticular 4-0 PDS.  I then returned to the cervical
incision and removed the two distraction pins and waxed the bone.  I
irrigated the wound with copious amounts of Bacitracin solution.  After
waiting for an appropriate period of time and removing the Casbar
retractors, I saw no bleeding and approximated the platysma with a running
4-0 Vicryl and the skin edges with a running subcuticular 4-0 PDS.  Benzoin
and 1/2 inch steri-strips were applied to both incisions.  Instrument,
sponge and needle counts were all reported to me as being correct.  The
patient was awakened, extubated and taken to the Recovery Room in
satisfactory condition.  She could move her arms and legs well.  She had
significant improvement in her right arm pain and right arm sensation.
    "I AUTHORIZED MY NAME TO BE ELECTRONICALLY AFFIXED BY USING
    MY UNIQUE DICTATION COMPUTER KEY."

Signature::
D: 11/18/97    T: 11/19/97    dd              William Faircloth, M.D.

#SMH 16002

CLE00132



P.O. BOX 8246
MOBILE, ALABAMA 36608

3619 DAUPHIN STREET
(334) 344-9630

CLEILAND, CATHY
1019

MRN:
ACCOUNT NO:
ADM DATE:

PHYSICIAN        Robert White, M.D.

## OPERATIVE SUMMARY

SURGERY DATE:  11/18/97

SURGEON:  Brent Faircloth, M.D.

ASSISTANT SURGEON:   Robert White, M.D.

PREOPERATIVE DIAGNOSIS:    RUPTURED CERVICAL DISC C5-6

PROCEDURE:  ANTERIOR CERVICAL MICRODISKECTOMY WITH AUTOLOGOUS BONE GRAFT

DESCRIPTION:  I was asked by Dr. Faircloth to assist him on the case of
Cathy Cleiland.  Cathy underwent anterior cervical microdiskectomy at C5-6
with removal of both osteophyte as well as extruded nucleus polyposis.

At patient's request, right iliac autologous bone graft was taken and
placed at the C5-6 interspace.  Surgery was uneventful and excellent
decompression was accomplished.

CC:  DR. ROBERT WHITE
     (ATTN) BONNIE

Signature::
D: 11/19/97    T: 11/19/97    1c

Robert White, M.D.

#SMH 16002

CLE00133

PATHOLOGY LABORATORY ASSOCIATES, P.A.
P.O. BOX 66229, MOBILE, AL 36660
TEL. 460-5288

M. EGGERS, M.D.
J. L. BROWN, M.D.

BRIAN C. HENZEL, M.D.
MICHEL H. SHAIN, M.D.
CAROL E. COOKE, M.D.

SURGICAL PATHOLOGY REPORT

| PATIENT DATA | DATE: | DOCTOR: | ROOM: ACCN. NO.: |
|---|---|---|---|
| XXX,CATHY K | 11/19/97 | FAIRCLOTH, WILL | 1001 M/5086-97 |
| 0173128 | | | |

TISSUES SUBMITTED:

C5 6 DISC.

SURGERY:  11/18/97

DIAGNOSIS:  Cervical herniation C5-6
 DIAGNOSIS:
ATION:  Anterior cervical discectomy C5-6

 DESCRIPTION: The specimen is received in formalin labeled "C5-6 disc"
 consists of multiple tough shaggy and irregularly shaped fragments of
 tissue measuring 1.2 x 1.0 x 0.4 cm.  This is totally submitted.
 (34; B1)

AL DIAGNOSIS:    (BASED ON GROSS AND MICROSCOPIC EXAMINATION):

 FROM THE C5-6 VERTEBRAL LEVEL:

 BENIGN FRAGMENTS OF FIBROCARTILAGE COMPATIBLE WITH
 HERNIATED DISC.

MHS:lkh

DATE REPORTED:  11/20/97
CLEILAND,CATHY K

MICHEL H. SHAIN, M.D.

CAMPBELL
WALLER &
POE, L.L.C.
2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

October 19, 2006



Ms. Medha Bharadwaj, FLMI, ACS
Appeal Claim Manager
CIGNA Group Insurance
D212
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243-9337

Re:    Cathy Cleiland

Dear Ms. Bharadwaj:

Attached hereto you will find a medical opinion form completed by Dr. Steven Wise who is treating Ms. Cleiland for her diabetes and peripheral neuropathy, bates numbered CLE00135 through CLE00137. Please be advised that this assessment form addresses those restrictions and limitations arising from only the type II diabetes and peripheral neuropathy. We are in the process of obtaining additional medical opinion forms from physicians treating the numerous other conditions suffered by Ms. Cleiland.

It is my expectation that once we have all of the documentation for the various conditions suffered by Ms. Cleiland, it will become obvious to even a layman that those restrictions and limitations arising from these various conditions when taken as a whole prevent Ms. Cleiland from performing any occupational duty.

On a separate note, we still await your production of documents. Until such time as we receive those documents, we are unable to complete our appeal in this matter. Please produce those forthwith.

Sincerely,

Thomas O. Sinclair, Esq.

TOS/me
Enclosures
cc:    Ms. Cathy Cleiland
       Terry Key, Esquire

## MEDICAL OPINION FORM

RE: Cathy Cleiland          SSN: ███████          DOB: ███████

Dear Dr. Wise:

Please provide your opinion to a reasonable degree of medical certainty, based on current treatment, of the above referenced patient's abilities and limitations.

1. Please state the diagnosis of the problem that causes your patient's limitations and restrictions, as well as the objective, clinical, or other specific findings that support your diagnosis and opinion: *Poorly controlled type 2 diabetes with peripheral neuropathy.*

   _____

   _____

   _____

   _____

2. In an 8 hour workday, 5 days a week, on a full time basis, the patient can be expected to be physically capable of the following activities:

   Sit: ___8___ hrs out of 8 hrs a day _____ hrs/min at one time

   Stand or walk: ___2___ hrs out of 8 hrs a day __10-15__ hrs/min at one time

3. Patient can lift/carry:

| | Never | Infrequently (very few times a day) | Occasionally (1/3 of workday) | Frequently (2/3 of workday) |
|---|---|---|---|---|
| 1-5 pounds | _____ | _____ | _____ | _____ |
| 1-10 pounds | _____ | _____ | _____ | _____ |
| 11-20 pounds | _____ | _____ | _____ | _____ |
| 21-25 pounds | _____ | _____ | _____ | _____ |
| 50 pounds or greater | _____ | _____ | _____ | _____ |

4. Does the patient require bedrest during a normal workday? Yes _____ No __✓__

   If yes, for approximately how many hours? _____

1

CLE00135

5. Does the patient have problems with stamina and endurance which would require him/her to rest more than the one 30-minute break and two 15-minute breaks normally allowed?

Yes _____    No _____  If yes, how much rest? _____ hours/minutes for
every _____ hrs/minutes of work

6. Do the patient's subjective complaints seem reasonable in view of your observations and diagnoses?  Yes ✓    No _____

7. Could the patient be reasonably expected to be reliable in attending an eight hour a day, 40 hour work week in view of the degree of pain, fatigue or other limitations he/she experiences?

Yes _____    No ✓

8. How severe is the pain reasonably suffered by the patient?

Extreme_____  Severe _____  Moderately Severe ✓  Moderate _____  Mild _____

9. Is it reasonable that the patient's pain, medical condition, or medication would cause lapses in concentration or memory on a regular basis to the extent that your patient could not attend to a task or be reliable in following work instructions?

Yes ✓    No _____

If yes, how often would his/her condition reasonably causes such lapses in concentration or memory?

_____ several hours 3 or more days a week

✓ daily for several hours a day

_____ other:_____

10. Are there environmental restrictions reasonably caused by the patient's condition (i.e. avoid heat, humidity, heights, dust etc.)?

_____

2

CLE00136

11. Does the patient have a reasonable medical need to be absent from a full time work schedule on a chronic basis? (**Chronic being,** more than 4 absences during any month's period attributable to any one medical condition or related conditions, including absences for required medical treatment including appointments, diagnostic testing, treatment etc.)

Yes ___✓___    No _____

Please estimate to the best of your ability and expertise how many absences could be reasonably medically expected in any month. ___5-6___

___10/13/06___
Date

___[signature]___
Doctor's Signature

___Steven D. Wise, MD___
Doctor's printed name

3



**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

November 3, 2006

COPY

Ms. Medha Bharadwaj, FLMI, ACS
Appeal Claim Manager
CIGNA Group Insurance
D212
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243-9337

Re:    Cathy Cleiland

Dear Ms. Bharadwaj:

Attached hereto you will find a medical opinion form bates numbered CLE00138 through CLE00140. Please be advised that this is from Dr. Bret Johnson who is one of Ms. Cleiland's attending physicians.

We are continuing to gather information concerning Ms. Cleiland's medical condition. Please advise on your efforts to obtain documentation concerning Ms. Cleiland's medical condition.

Sincerely,

Thomas O. Sinclair, Esquire

TOS/me
Enclosures
cc:    Ms. Cathy Cleiland
       Terry Key, Esquire

# MEDICAL OPINION FORM

RE: Cathy Cleiland          SSN: ███████          DOB: ███████

Dear Dr. Johnson:

Please provide your opinion to a reasonable degree of medical certainty, based on current treatment, of the above referenced patient's abilities and limitations.

1. Please state the diagnosis of the problem that causes your patient's limitations and restrictions, as well as the objective, clinical, or other specific findings that support your diagnosis and opinion: 

   1) Cervical spine HNP x 3 ⊤ C4-C7 interbody fusion

   2) Herniated disc (HNP) L4-5 w/ interbody fusion L5-S1

   Chronic neck / LBP 2° 1 & 2

2. In an 8 hour workday, 5 days a week, on a full time basis, the patient can be expected to be physically capable of the following activities:

   Sit: < 1 h.w 6 n time   hrs out of 8 hrs a day _____ hrs/min at one time

   Stand or walk: < 1 h.w 6 n t.m   hrs out of 8 hrs a day _____ hrs/min at one time

3. Patient can lift/carry:

| | Never | Infrequently (very few times a day) | Occasionally (1/3 of workday) | Frequently (2/3 of workday) |
|---|---|---|---|---|
| 1-5 pounds | | | | X |
| 1-10 pounds | | | X | |
| 11-20 pounds | | X | | |
| 21-25 pounds | X | | | |
| 50 pounds or greater | X | | | |

4. Does the patient require bedrest during a normal workday? Yes X   No _____

   If yes, for approximately how many hours? 6-7

1

CLE00138

5. Does the patient have problems with stamina and endurance which would require him/her to rest more than the one 30-minute break and two 15-minute breaks normally allowed?

   Yes  X    No _____ If yes, how much rest? ___4-0___ hours/minutes for
   every __1__ hrs/minutes of work

6. Do the patient's subjective complaints seem reasonable in view of your observations and diagnoses?   Yes  X    No _____

7. Could the patient be reasonably expected to be reliable in attending an eight hour a day, 40 hour work week in view of the degree of pain, fatigue or other limitations he/she experiences?

   Yes _____    No  X

8. How severe is the pain reasonably suffered by the patient? mild
   ( pain mild

   Extreme____  Severe ____  Moderately Severe  X   Moderate _____  Mild ____

9. Is it reasonable that the patient's pain, medical condition, or medication would cause lapses in concentration or memory on a regular basis to the extent that your patient could not attend to a task or be reliable in following work instructions?

   Yes  X    No _____

   If yes, how often would his/her condition reasonably causes such lapses in concentration or memory?

   _____ several hours 3 or more days a week
   __X__ daily for several hours a day
   _____ other:_____

10. Are there environmental restrictions reasonably caused by the patient's condition (i.e. avoid heat, humidity, heights, dust etc.)?

_____

2

CLE00139

11. Does the patient have a reasonable medical need to be absent from a full time work schedule on a chronic basis? (**Chronic being,** more than 4 absences during any month's period attributable to any one medical condition or related conditions, including absences for required medical treatment including appointments, diagnostic testing, treatment etc.)

Yes ___X___    No _____

Please estimate to the best of your ability and expertise how many absences could be reasonably medically expected in any month. _prob > 2-4/wk_

___10/27/.7___
Date

_____
Doctor's Signature

_Bret M. Johnson_
Doctor's printed name

3

**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

November 27, 2006

Ms. Medha Bharadwaj, FLMI, ACS
Appeal Claim Manager
CIGNA Group Insurance
D212
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243-9337



Re:    Cathy Cleiland

Dear Ms. Bharadwaj:

Attached hereto you will find the sworn statement taken under oath of Dr. Herrick, one of Ms. Cleiland's attending physicians. Attached to his statement under oath you will find additional medical records and assessment forms bates numbered CLE00141 through CLE00195.

We are still awaiting production of the information outlined in my prior correspondence so that we may properly assess the reasons for denying this lady's claim. We have yet to receive a response to our correspondence requesting the information and production and I am beginning to get a little worried that the company is refusing to produce the information the claimant needs in order to properly assess the basis for the denial of this claim. Please be advised that ERISA provides for certain statutory remedies for failure to produce the documents. The new Department of Labor Regulations enacted in January 2002 specified the broad scope of the nature of the documents that must be produced. Please provide those documents as soon as possible.

Sincerely,

Thomas O. Sinclair, Esquire

TOS/me
Enclosures

bcc:    Ms. Cathy Cleiland
        Terry Key, Esquire

# EXHIBIT

## "N"

# PART 4

**CATHY CLEILAND**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA & CIGNA GROUP INSURANCE**

**FILE # 4135**

| NO. | DATE SUBMITTED | DOCUMENTS SUBMITTED TO | DOCUMENT BATES NUMBERS | DOCUMENTS SUBMITTED |
|-----|----------------|------------------------|------------------------|---------------------|
| 1. | 09/05/06 | CIGNA | CLE00001-CLE00134 | |
| 2. | 10/19/06 | CIGNA | CLE00135-CLE00137 | |
| 3. | 11/03/06 | CIGNA | CLE00138-CLE00140 | Dr. Johnson |
| 4. | 11/27/06 | CIGNA | CLE00141 | Dr. Herrick CV |
| 5. | 11/27/06 | CIGNA | CLE00142-CLE00149 | Updated medicals from the Montgomery Pain Center |
| 6. | 11/27/06 | CIGNA | CLE00150-CLE00155 | 12/2/05 TD |
| 7. | 11/27/06 | CIGNA | CLE00156-CLE00157 | Claim File Letter |
| 8. | 11/27/06 | CIGNA | CLE00158-CLE00160 | CIGNA doctor's notes |
| 9. | 11/27/06 | CIGNA | CLE00161-CLE00195 | Sworn Statement of Dr. David P. Herrick |
| 10. | | | | |

November 27, 2006

## FREEDOM COURT REPORTING

Page 1

1

2

3

ORIGINAL

4    IN RE:   CATHY CLEILAND

5

6

7

8

9

10              * * * * * * * * * * * * *

11       SWORN STATEMENT OF DAVID P. HERRICK, M.D.,

12    taken before Jackie Parham, Certified

13    Shorthand Reporter and Commissioner for the

14    State of Alabama at Large, in the offices of

15    The Center for Pain Management, 2065 East

16    South Boulevard, Montgomery, Alabama, on

17    Monday, the 13th day of November, 2006,

18    commencing at approximately 7:15 a.m.

19              * * * * * * * * * * * * *

20

21

22

23

CLE00161

# FREEDOM COURT REPORTING

Page 2

1    APPEARING ON BEHALF OF CATHY CLElLAND BY PHONE:

2    THOMAS O. SINCLAIR, ESQUIRE

3    Campbell, Waller & Poer

4    Suite 450

5    2100-A SouthBridge Parkway

6    Birmingham, Alabama  35203

7

8            *  *  *  *  *  *  *  *  *  *  *  *  *

9                   INDEX OF EXHIBITS

10   Exhibit 1 (CV) ...................... 4

11   Exhibit 2 (Cigna letter, Center  ...... 5

12        for Pain Documents)

13   Exhibit 3 (Center for Pain  .......... 9

14        Documents)

15   Exhibit 4 (Discharge Summary from  ... 14

16        Dr. Faircloth)

17   Exhibit 5 (Discharge Summary from  ... 17

18        Dr. Hackman)

19   Exhibit 6 (Dr. Hackman's Notes) ...... 18

20   Exhibit 7 (Dr. Hackman's Notes) ...... 19

21   Exhibit 8 (Dr. Hackman's Notes) ...... 20

22   Exhibit 9 (Discharge Summary from  ... 21

23        Dr. Hadley)

# FREEDOM COURT REPORTING

Page 3

1    Exhibit 10 (Documents from Cigna) .... 23

2    Exhibit 11 (Cigna Documents) ........ 24

3    Exhibit 12 (Cigna Document) ......... 27

4    Exhibit 13 (Cigna Document) ......... 29

5    Exhibits 14 and 15 (Medical  ........ 30

6        Opinion Forms)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 4

1              DAVID P. HERRICK, M.D.,

2       The witness, after having first been duly

3  sworn to speak the truth, the whole truth, and

4  nothing but the truth, testified as follows:

5                    EXAMINATION

6  BY MR. SINCLAIR:

7  Q.    Good morning, Doctor.

8  A.    Good morning.

9  Q.    My name is Tom Sinclair, and I'm the

10        attorney for Ms. Cathy Cleiland.  I'm

11        going to ask you a few questions.  First

12        off, if we can, Doctor, let's take a look

13        at what's previously been marked as

14        Exhibit Number 1 to your sworn statement

15        here.

16                 (Exhibit 1 previously marked

17                  for purposes of identification)

18  Q.    That's Bates-numbered CLE141 at the

19        bottom.  Is that your current CV?

20  A.    Yes, it is.

21  Q.    I notice that you are Board-certified in

22        pain management.  Can you please tell me

23        what requirements there are for Board

## FREEDOM COURT REPORTING

Page 5

1      certification in pain management?

2  A.   Board certification in pain management by

3      the American Board of Anesthesiology

4      requires being Board-certified in

5      anesthesiology and then completing a

6      fellowship in pain management, passing a

7      test.  In my case, I've been through both

8      the original certification and the

9      recertification, because my -- I've been

10      at this more than ten years.

11  Q.   Well, we won't tell the folks how long

12      you've been at it.

13  A.   Okay.

14  Q.   You're right.  You have.  I also notice

15      you have the Board certification in

16      anesthesiology.  Are there any other,

17      besides those two certifications, that you

18      hold?

19  A.   No.

20           (Exhibit 2 previously marked

21               for purposes of identification)

22  Q.   Okay.  Let's march on then if we can to

23      Exhibit Number 2, which are a stack of

## FREEDOM COURT REPORTING

Page 6

1    documents that are Bates-numbered CLE70

2    through 126.  Do you have that document or

3    that exhibit in front of you?

4  A.    Exhibit Number 2 marked CLE00070; is that

5    it?

6  Q.    Yes.

7  A.    Yes.

8  Q.    Okay.  I will tell you that these are

9    documents we received from your office in

10    response to a Request for Production that

11    we've issued.  First off, if I can have

12    you -- can you tell me what Ms. Cleiland's

13    diagnosis is currently?  And I tell you

14    what, Doctor, I may be able to speed this

15    along a little bit if you'd like.

16  A.    Sure.

17  Q.    And maybe give you some of the history as

18    we go through the records here.

19  A.    Right.  I mean, I can answer that question

20    right now if you'd like me to, or however

21    you want to do this.

22  Q.    Please go ahead.

23  A.    Okay.  She has, among other things,

## FREEDOM COURT REPORTING

Page 7

1       cervical and lumbar degenerative disk

2       disease and both cervical and lumbar

3       Failed Surgery Syndrome.

4   Q.  All right.  Let's, first off, deal with

5       the first diagnosis if we can, the

6       cervical lumbar disk disease.  How do you

7       come by that diagnosis?  What factors do

8       you consider?

9   A.  It's multifactorial.  But it boils down to

10      the fact that she has had -- that she has

11      documented evidence of severe degenerative

12      disk disease in both the cervical and

13      lumbar spine from numerous MRIs.  It also

14      is documented by the fact she's had

15      multiple surgeries of both the cervical

16      lumbar spine, including fusions of both

17      the cervical and lumbar spine.

18  Q.  Okay.  And I believe we have some of those

19      records before us today, and we'll get to

20      those in a second.  But you also gave her

21      a diagnosis of failed surgery -- I'm

22      sorry.  I'm saying this wrong -- Failed

23      Surgical Syndrome?

## FREEDOM COURT REPORTING

```
1    A.    Yes.

2    Q.    What is that, please?

3    A.    Well, multiple surgeries, repeat surgeries

4          with continued pain and continued

5          symptomatic complaints.

6    Q.    Okay.  Let me ask you, Doctor, is your

7          office currently treating Ms. Cleiland?

8    A.    Yes.

9    Q.    Is her current treatment -- or please tell

10         us what her current treatment is.

11   A.    Her current treatment is predominantly

12         medical management, which means that she's

13         being managed using Schedule 2 opioids or

14         very strong narcotic pain medicine, to use

15         a lay term.  She also has had an

16         occasional injection of steroids into her

17         back for flareups, so to speak, of her

18         back pain.

19   Q.    Okay.  Well, let me ask you, because I am

20         a layman, or even worse, a lawyer.  Is

21         there a cure for what ails her?  Is there

22         some cure that the medical profession can

23         offer her to cure her failed back
```

# FREEDOM COURT REPORTING

Page 9

1    syndrome?

2    A.    No.

3    Q.    Okay.  So at this point it comes down to

4          just trying to make her life as

5          comfortable as possible?

6    A.    Yes.

7    Q.    Okay.  Has she refused any treatment from

8          your office?

9    A.    None that I'm aware of.

10   Q.    Okay.  Has she, to your knowledge, ever

11         complained of depression secondary to her

12         physical condition?

13   A.    I believe she has complained some of

14         depression.  However, I think depression

15         is certainly expected and secondary to her

16         -- and caused by her back pain.

17   Q.    Thank you, Doctor.

18                  (Exhibit 3 previously marked

19                   for purposes of identification)

20   Q.    Let's set aside Exhibit 2 then and go to

21         the next exhibit, which is Exhibit 3.  The

22         documents are Bates-numbered CLE142 to

23         149.  And I will tell you that these are

# FREEDOM COURT REPORTING

Page 10

1         updated medical records we had faxed from

2         your office in preparation for today.  If

3         you can, take just a moment to look at

4         those, and I'm going to ask you some

5         questions about her current treatment.

6         And let me know when you've had a moment

7         to look at those.

8 A.     Okay.

9 Q.     Okay.  Let me ask you, Doctor -- As a

10        layman, I'm not sure I understand

11        everything that she's been through.  But

12        is she going to require continuous

13        treatment?

14 A.     Yes.  I mean, she's got a very complex

15        history.  She's been seen by numerous

16        physicians, had numerous back surgeries.

17        She has problems that are not going to go

18        away.  They're going to have to be managed

19        over time using whatever we have at our

20        disposal.  In the case of pain,

21        predominantly pain medicines.  But her

22        problems are not going to go away, in my

23        opinion.

## FREEDOM COURT REPORTING

Page 11

1    Q.    Well, let me ask you, the insurance

2          company in this case has indicated that

3          her problems have stabilized.  Have her

4          problems been managed to the degree where

5          her issues are stable?  Is that a proper

6          way to put it?

7    A.    That's a curious way to put it.  I think

8          that she is managed as well as she can be

9          managed.  I think that she is as

10         functional as she can be functional.  And

11         I was thinking about some way to try to

12         describe this.  And I can use an analogy

13         if you would like.

14   Q.    Please.

15   A.    Okay.  To me, it's kind of like a

16         demolition derby.  You know, the cars they

17         use in demolition derby are not -- you

18         know, they're pretty much -- they're

19         damaged to begin with.  And she's, you

20         know, still driving around in the

21         demolition derby, but she's looking pretty

22         rough right now.  So she's stable, if you

23         want to put it that way, from the point of

## FREEDOM COURT REPORTING

Page 12

1    view that she is still moving.  She still

2    functions to some degree.  She certainly

3    does not function in a normal fashion, and

4    she doesn't function as well as somebody

5    else her age who didn't have all these

6    problems would be functioning.

7  Q.    And that's an excellent analogy, by the

8        way, Doctor.  Thank you.  I have a

9        question that really kind of relates to

10       that.  Would it be reasonable for this

11       particular patient to expect she'd be able

12       to work forty hours a week just as any

13       other individual who didn't have these

14       conditions?

15  A.    No.

16  Q.    Okay.  You mentioned earlier Schedule 2

17       opioids.  And I'm sorry.  Can you tell us

18       what her current meds are right now?

19  A.    Just a second.  Let me look that up.

20  Q.    Sure.  And I believe you'll find that in

21       Exhibit 3 on those most recent notes

22       hopefully.

23  A.    Right.  I'm going back to the carbon

## FREEDOM COURT REPORTING

1    copies we keep because it's the best

2    record that we have.  And I'm looking at

3    her original chart here.  She's taking a

4    medicine called Flexeril, which is a

5    muscle relaxant.  She is taking Cymbalta,

6    which is an anti-depressant.  Phenergan,

7    which is an anti-nausea medicine.

8    Protonix, which is a medicine for

9    gastroesophageal reflux disease.  And her

10    primary pain medicine is a medicine called

11    Methadone, which is a Schedule 2 opioid.

12    She's taking 50 milligrams per day in

13    divided doses.  In addition to Duragesic,

14    which is a patch form of the medicine

15    called Fentanyl.  And it is also a

16    Schedule 2 opioid.  She's taking 25

17    micrograms of that every 72 hours.

18  Q.    Doctor, are these medications reasonably

19    necessary to treat her condition?

20  A.    Yes.

21  Q.    In prescribing, for example, Methadone,

22    would you prescribe that for somebody who

23    had, say, for example, a bruise or a

# FREEDOM COURT REPORTING

Page 14

1       headache?

2   A.   No.  Methadone is used for chronic, severe

3        pain, in other words, pain that is really

4        bad that doesn't respond to simple

5        medications and pain that you don't expect

6        to go away.

7   Q.   Well, let me ask you, what is the combined

8        effect on the ability to concentrate of

9        all these different drugs?

10  A.   It varies from person to person.  You

11       know, it is quite possible you can take

12       these medicines and be of clear enough

13       mind to function.  The basic problem is,

14       you have pain that is such a distraction

15       that you're having to take these

16       medicines.  So you're up against severe

17       pain, plus taking medicines that are

18       potentially sedating, that potentially

19       dull your ability to respond or to face

20       stressful situations.

21                (Exhibit 4 previously marked

22                   for purposes of identification)

23  Q.   Okay.  Let's march off so we can get you

## FREEDOM COURT REPORTING

Page 15

1    back to treating patients.  Let's take a

2    look -- If you can set aside Exhibit 3 and

3    take a look at Exhibit 4.  We're going to

4    very briefly cover the basis for your

5    diagnosis for Failed Surgical Syndrome.

6    And I think I've got all the surgeries

7    actually gathered here before us finally.

8    So if we can take a look real quick and

9    make sure that these are the records

10   you're referring to.

11   A.   Okay.

12   Q.   Exhibit 4, which is Bates-numbered CLE127

13        to 133.

14   A.   Yes.

15   Q.   That is actually a Discharge Summary from

16        Dr. William Faircloth dated November 1997.

17        Do you see that?

18   A.   Yes.

19   Q.   He indicates that they performed an

20        anterior cervical fusion at C5-6, an

21        anterior cervical diskectomy and right

22        iliac crest graft.  Doctor, I've got to

23        tell you, I don't understand a single

## FREEDOM COURT REPORTING

1      thing that they -- what they're

2      describing.  Can you tell us in layman's

3      terms what that operation entails?

4  A.   Okay.  It involves removing the disk at

5      C5-6, which is in the neck.  And it

6      involves taking a piece of bone from the

7      hip and taking that bone, putting it where

8      the disk was, and then bolting the two

9      vertebrae together.

10  Q.   That sounds painful.  I mean, are we

11      looking at that bone being sufficient to

12      cause somebody -- potentially cause

13      somebody long-term pain?

14  A.   Well, people respond to that in different

15      ways.  I mean, certainly, you know, the

16      neck problem is the primary problem.  You

17      also sometimes run into problems with pain

18      coming from the site where you took the

19      bone for the graft, which would be the hip

20      in this case.  So it's not uncommon for

21      people to have residual pain after that

22      surgery.

23  Q.   Okay.  So, essentially, Ms. Cleiland has a

# FREEDOM COURT REPORTING

Page 17

1    piece of bone from her hip and a plate in

2    her neck at C5-6, right?

3  A.    Correct.

4              (Exhibit 5 previously marked

5              for purposes of identification)

6  Q.    Okay.  March on to Exhibit 5 if we can

7        then.  Exhibit 5 is Bates-numbered CLE56

8        to 60.  And it is a Discharge Summary

9        dated May 3rd, 2001 from Dr. John Hackman.

10       And in that Discharge Summary he indicates

11       that he performed an anterior cervical

12       diskectomy interbody fusion at C6-7 with a

13       bone graft from the right iliac crest.

14       Would you please tell us what that

15       entails?

16 A.    That procedure is similar to the procedure

17       we just described.  Again, the disk at

18       C6-7 is removed.  A bone graft was taken

19       from the right hip and placed at C6-7.

20       And then the disks were bolted together.

21       I'm sorry, not the disks.  The vertebrae

22       were bolted together.

23 Q.    Okay.  Would C6-7 be above or below C5-6?

# FREEDOM COURT REPORTING

1  A.    It would be below C5-6.

2  Q.    Okay.  So we're marching down

3        Ms. Cleiland's neck as we replace parts

4        here, is what it boils down to?

5  A.    Correct.

6  Q.    Let's take a look at -- The previous two

7        surgical procedures that we've described

8        here, would either one of those be

9        guaranteed one hundred percent recovery to

10       precondition levels?  I mean, are these

11       cures for back pain in Ms. Cleiland's

12       case?

13 A.    Sometimes they are, sometimes they're not.

14       Nothing is ever guaranteed.

15              (Exhibit 6 previously marked

16                 for purposes of identification)

17 Q.    Let's take a look at Exhibit 6 if we can.

18       It's Bates-numbered CLE37 to 42.  It's a

19       discharge date of June 25th, 2002 from

20       Dr. John Hackman.  And in it he describes

21       an interbody fusion at C4-5 with bone

22       grafts -- it appears to be another

23       cervical diskectomy just continuing on up

# FREEDOM COURT REPORTING

Page 19

1    her neck this time; is that right?

2  A.    That's correct.

3  Q.    Okay.  So we essentially have three

4        different portions of her spine that's

5        been replaced at this point?

6  A.    That's correct.

7                    (Exhibit 7 previously marked

8                    for purposes of identification)

9  Q.    Okay.  Let's take a look at Exhibit 7 if

10       we can.  It's Bates-numbered CLE30 to 34.

11       And I'm sorry.  Am I going too fast here?

12 A.    No.  You're good for me.

13 Q.    Exhibit 7 is a discharge date -- or

14       Discharge Summary of 5/22/2003.  Once

15       again, it appears to be Dr. John Hackman.

16       This is, I guess, the same laminectomy.

17       Is that a different procedure?  It

18       indicates lumbar laminectomy at L4-5.

19 A.    Right.  A laminectomy would be a procedure

20       in this case in the lumbar spine, in the

21       lower back, where usually a part of the

22       lamina or the bone of the vertebrae is

23       removed, and that would be to take some of

# FREEDOM COURT REPORTING

Page 20

1    the pressure off the nerve.  In this case

2    it was the L4-5 nerve on the left.

3  Q.   Okay.  So that's a completely different

4       procedure from the cervical diskectomy at

5       C4-5?

6  A.   Yes.

7  Q.   So, essentially, she had, within the span

8       of a couple of days it appears, two

9       different surgical procedures.  And now

10      we're talking about having four parts of

11      her spine that have been operated on as of

12      this date?

13 A.   That's correct.

14               (Exhibit 8 previously marked

15                  for purposes of identification)

16 Q.   Okay.  Let's march on then if we can to

17      Exhibit 8.  Exhibit 8 is marked CLE22 to

18      CLE24.  It appears to be a June 17th, 2003

19      Discharge Summary from Dr. John Hackman

20      once again.  And in this he describes a

21      reexploration laminectomy at L4-5.  Can

22      you please tell us what that entails?

23 A.   A reexploration means he's going back and

# FREEDOM COURT REPORTING

Page 21

1    looking at something that's already been

2    looked at.  In this case he's going back

3    to L4-5 to look for something else at that

4    level that may be still there or newly

5    there causing problems at the L4-5 level

6    on the left.

7  Q.    Okay.

8  A.    And, so, he went back and actually took a

9    little bit more bone, a little bit more

10   disk off the nerve at L4-5 on the left.

11              (Exhibit 9 previously marked

12                for purposes of identification)

13 Q.    Okay.  All right.  And I believe the last

14   we have as far as past surgical procedures

15   at this point would be Exhibit 9, which is

16   Bates-numbered CLE1 to CLE5.  That's a

17   Discharge Summary dated December 18th,

18   2003 from Dr. Hadley.  Do you see that?

19 A.    I do.

20 Q.    Okay.  Please tell us what that procedure

21   entailed, that surgical procedure, please.

22 A.    This procedure describes an additional

23   laminectomy and diskectomy.  In other

## FREEDOM COURT REPORTING

Page 22

1      words, they're taking a little bit more

2      bone, a little bit more disk out from

3      L4-5.  And they're also placing in fusion

4      hardware, which is hardware that actually

5      bolts the vertebrae together so that you

6      take some of the instability out of the

7      spine.

8   Q.  Okay.  Doctor, let me ask you, what's the

9      cumulative effect of all these surgical

10      procedures on a spine in Ms. Cleiland's

11      case?

12   A.  Well, the surgeries have been there, in my

13      opinion, because her back has been

14      degenerative and has been, for lack of a

15      better term, falling apart.  Any time you

16      operate on a spine, you take something

17      away from the spine.  You're taking away

18      some of the structure that holds the spine

19      together or supports the spine.  So each

20      procedure, certainly while in general it

21      encompasses the intent of taking

22      compression off the nerve or stabilizing

23      the spine, at the same time makes the

## FREEDOM COURT REPORTING

Page 23

1       spine more vulnerable.

2    Q.    Okay.  Let me ask you, wouldn't

3       Ms. Cleiland's complaints -- in light of

4       these procedures, would her current pain

5       complaints be reasonable?

6    A.    Absolutely.

7    Q.    Okay.  Are her current complaints of pain

8       reasonably related to these surgical

9       procedures or the -- I'm sorry.  Let me

10      say that again.  Are her current pain

11      complaints reasonably related to her

12      diagnosed conditions?

13   A.    Absolutely.

14                (Exhibit 10 previously marked

15                    for purposes of identification)

16   Q.    Okay.  All right.  Let's march on then to

17      Exhibit 10, Bates-numbered 150 to 155.

18      It's a December 7th, 2005 letter from the

19      insurance company in this case denying her

20      claim.  If you would, take a look at the

21      page Bates-numbered 151.  And I believe

22      I've highlighted a paragraph there on that

23      page wherein the insurance company states

## FREEDOM COURT REPORTING

Page 24

```
 1        on 8/16/05, "We received a telephone call

 2        from Kitty" at -- I believe they're

 3        referring to your office there, stating

 4        that your office is not disabling

 5        Ms. Cleiland.  Do you see that?

 6   A.   I do see that.

 7                   (Exhibit 11 previously marked

 8                    for purposes of identification)

 9   Q.   And let's flip on now if we can to Exhibit

10        11, which is Bates-numbered 156 and 157.

11        That's actually from the claim file

12        produced by the insurance company in this

13        case, a phone log note wherein it's an

14        indication that somebody at the insurance

15        company by the name of Kelly Archacki

16        talked to Kitty from your office, and

17        Kitty stated that your office was not

18        disabling Ms. Cleiland.  Do you see that

19        note?

20   A.   Tell me the page number again on that.

21   Q.   Exhibit 11.

22   A.   Okay.

23   Q.   156.
```

## FREEDOM COURT REPORTING

Page 25

1  A.     156.  Okay.

2  Q.     It's a very --

3  A.     Yes, I see it.  Yes.

4  Q.     First off, let me ask you, who is Kitty?

5  A.     Kitty is an LPN nurse here in my office.

6  Q.     Is Kitty somebody who provides diagnoses

7         of patients?

8  A.     Absolutely not.

9  Q.     Okay.  And I've seen this before, Doctor.

10        I'm not even suggesting Kitty said that.

11        But what they may have done is simply lied

12        and put a note in here.  But this is the

13        basis for their denial, claiming that your

14        office was not disabling her.  And

15        understand, I'm not asking whether or not

16        she's disabled under the terms of the

17        insurance policy.  Have you even looked at

18        her insurance policy in this case?

19  A.    No.

20  Q.    Well, then you wouldn't be qualified to

21        tell me whether or not she was disabled

22        under that policy, right?

23  A.    No.

# FREEDOM COURT REPORTING

Page 26

1   Q.   What I am asking you is, based upon her

2        diagnosis, what would you consider to be

3        reasonable restrictions and limitations

4        for this woman?  In other words, could

5        Ms. Cleiland, for example, lift fifty

6        pounds every day?

7   A.   No.

8   Q.   Could she be expected to work eight hours

9        in a day without any bedrest?

10  A.   No.

11  Q.   Could Ms. Cleiland stand for four or five

12       hours a day working?

13  A.   No.

14  Q.   Would it be reasonable for Ms. Cleiland to

15       require bedrest during the day?

16  A.   Yes.

17  Q.   Okay.  And we'll get to those -- the rest

18       of those restrictions and limitations.

19       But this is the basis for the insurance

20       company's denial.  Have you ever had an

21       insurance company call your nurse and ask

22       them whether or not a patient is disabled?

23  A.   No.  It's not in the nurse's job

# FREEDOM COURT REPORTING

Page 27

1   description to be doing that.  Now, I

2   don't think Kitty did in this case either.

3  Q.   I don't think she did either.  I think

4   this is a little fabrication.

5              (Exhibit 12 previously marked

6                 for purposes of identification)

7  Q.   Take a look at Exhibit 12 if we can.  This

8   is where they take Kitty's comments --

9   supposedly Kitty's comments and try to

10   twist them a little bit more.  If you'll

11   take a look at Exhibit 12, which is 158 --

12   Bates-numbered 158.  Down at the bottom,

13   I've blocked off some text down there.

14   These are notes from their internal

15   physician's review.  And you see there, it

16   says, "Based on medical data submitted,

17   restrictions and limitations are not

18   supported as evidenced by no current

19   complaints of any radiating pain, numbness

20   or tingling, no nerve testing, medication

21   usage stable, and no current lab values to

22   determine status of glucose.  AP's --

23   Attending physicians state they are not

## FREEDOM COURT REPORTING

Page 28

1   disabling her."

2        Doctor, do you agree with anything in

3   that statement?

4   A.   Well, there's no treating physician that

5        I've seen in any of this evidence here

6        that has not disabled her.  So I think

7        that is certainly a stretch of the

8        information that the doctor had before

9        him.

10  Q.   Well, let me ask you this:  Does

11       Ms. Cleiland have complaints of radiating

12       pain currently?

13  A.   Yes, she does.

14  Q.   Does she have numbness and tingling

15       currently?

16  A.   Yes, she does.

17  Q.   Did she have numbness and tingling back

18       when they first issued this denial letter

19       back at the end of last year in December?

20  A.   Yes, she did.

21  Q.   Okay.  They claim that her condition is --

22       Medication usage stable.  Doctor, what

23       does that mean as a quantitative measure

# FREEDOM COURT REPORTING

Page 29

1      of disability?

2   A.  It has no relationship to a quantitative

3      rating of disability.

4          (Exhibit 13 previously marked

5          for purposes of identification)

6   Q.  Okay.  Exhibit 13, if we can.  And I'm

7      almost done, and I'll let you get back to

8      being a doctor.  And thank you for your

9      time today.

10  A.  You're welcome.

11  Q.  Exhibit 13.  Pages 159 and 160 are the

12     internal notes of Dr. Scott Taylor, who's

13     the CIGNA Medical Director at the

14     insurance company.  On page 160, if you'll

15     look down there at the bottom of that

16     page, he indicates based upon his file

17     review that the documents don't establish

18     that she has a severe condition that

19     warrants limitations and restrictions.  Do

20     you agree with that diagnosis?

21  A.  You know, that's really kind of an absurd

22     statement.  No, I don't agree with that.

23  Q.  Dr. Taylor indicates that there is no

# FREEDOM COURT REPORTING

1      clinically measurable evidence to support

2      deficits which require restrictions and

3      limitations given by your office.  Do you

4      see that?

5    A.   Correct.

6    Q.   Do you agree with that statement?

7    A.   Absolutely not.

8            (Exhibits 14 and 15 previously

9             marked for purposes of

10           identification)

11   Q.   Then in that case, let's flip on over here

12      if we can to Exhibits 14 and 15.  Now,

13      these are from two other attending

14      physicians who treat Ms. Cleiland.  These

15      are Medical Opinion Forms.  They're not

16      asking whether or not somebody is disabled

17      under the insurance policy.  They're

18      asking what's the restrictions and

19      limitations this lady has to go by in

20      order to get through the day.  We have one

21      from her diabetes doctor who's treating

22      her for diabetes and another from

23      Dr. Johnson.  Are you familiar with

CLE00190

## FREEDOM COURT REPORTING

Page 31

1       Dr. Wise or Dr. Johnson?  I'm sorry.  It's

2       Bret Johnson.

3    A.  I don't know them personally.  I've seen

4       some of their patients before, I believe.

5       Yes.

6    Q.  If you would, let's go through this very

7       quickly and then we can wrap up.

8    A.  Okay.

9    Q.  You've already indicated that Ms. Cleiland

10      requires bedrest during the course of a

11      normal workday, correct?

12   A.  That's my opinion.  Yes.

13   Q.  Okay.  In your opinion, would Ms. Cleiland

14      have problems with stamina or endurance

15      which will require her to rest or take

16      more than thirty-minute breaks during the

17      day?

18   A.  Yes.

19   Q.  Do Ms. Cleiland's complaints of pain --

20      subjective complaints of pain seem

21      reasonable based upon your observations

22      and diagnoses?

23   A.  Yes.

# FREEDOM COURT REPORTING

Page 32

1   Q.   Would Ms. Cleiland, in your opinion, be

2        reliable in requiring -- or performing a

3        forty-hour workweek?

4   A.   No.

5   Q.   How severe would you categorize

6        Ms. Cleiland's complaints of pain?

7   A.   I would say they're severe.

8   Q.   Would Ms. Cleiland's medical condition

9        give rise to lapses in concentration or

10       memory that would cause her to be

11       unreliable in a forty-hour workweek

12       setting?

13  A.   Yes.

14  Q.   Okay.  And would you characterize

15       Ms. Cleiland's condition as chronic?

16  A.   Yes.

17  Q.   In other words, there's no cure for her

18       condition at this point?

19  A.   That's correct.  There is no cure.

20  Q.   Okay.  I believe that's it, Doctor.  Are

21       there any questions that I should have

22       asked that you would like to give me the

23       answer to at this point?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1    A.    No. I think you've covered the most

2          important things. Again, whatever

3          response they got from Kitty in this

4          office I think has been taken way out of

5          context. You know, she certainly did not

6          mean to imply that Ms. Cleiland is not

7          disabled. What she was implying was that

8          the disability responsibilities as far as

9          the ratings and whatnot were not -- had

10         never been asked for. And she would

11         assume that the surgeons were going to

12         place those restrictions on her. So --

13   Q.    And, Doctor, that's actually a trick

14         question. What I'm betting they did is,

15         they picked up the phone, called somebody

16         at your office and said, "Can you tell us

17         whether or not she's disabled under this

18         insurance policy?" And the answer is,

19         "No, we can't tell you?"

20   A.    Right.

21   Q.    So I appreciate your time, Doctor.

22   A.    Sure.

23   Q.    We can be off the Record at this point.

# FREEDOM COURT REPORTING

Page 34

1

2                    * * * * * * * * * * * *

3              FURTHER DEPONENT SAITH NOT

4                    * * * * * * * * * * * *

5                    REPORTER'S CERTIFICATE

6    STATE OF ALABAMA,

7    MONTGOMERY COUNTY,

8         I, Jackie Parham, Certified Shorthand

9    Reporter and Commissioner for the State of

10   Alabama at Large, do hereby certify that I

11   reported the sworn statement of DAVID P.

12   HERRICK, M.D., who was first duly sworn by me to

13   speak the truth, the whole truth, and nothing

14   but the truth, in the matter of CATHY CLEILAND,

15   on Monday, the 13th day of November, 2006.

16        The foregoing 33 computer-printed pages

17   contain a true and correct transcript of the

18   examination of said witness by counsel for the

19   parties set out herein.  The reading and signing

20   of same is hereby waived.

21        I further certify that I am neither of kin

22   nor of counsel to the parties to said cause, nor

23   in any manner interested in the results thereof.

## FREEDOM COURT REPORTING

Page 35

JACKIE PARHAM, Certified

Shorthand Reporter and

Commissioner for the State

of Alabama at Large

CLE00195

# David Phillip Herrick, M.D.

| | | |
|---|---|---|
| 2055 East South Blvd., Ste 812 | Montgomery, AL 36116 | (334)288-7808 |
| 432 St. Luke's Drive | Montgomery, AL 36117 | (334)387-7246 |

## Professional Experience

| | | |
|---|---|---|
| The Center for Pain of Montgomery, PC | Montgomery, AL | 06/1997 to Present |
| Central Alabama Pain Management | Montgomery, AL | 10/1995 to 06/1997 |
| U. S. Air Force Anesthesiologist | Maxwell AFB, AL | 08/1992 to 09/1995 |

## Education

| | | | |
|---|---|---|---|
| 1989 to 1992 | University of Tennessee | Memphis, TN | Anesthesiology |
| 1988 to 1989 | Baptist Medical Centers | Birmingham, AL | Internship |
| 1984 to 1988 | University of Alabama | Birmingham, AL | Medical Doctor |

*United States Air Force Health Professions Scholarship*

| | | | |
|---|---|---|---|
| 1980 to 1984 | Auburn University | Auburn, AL | B.S. Chemistry |

*Student Body President, 1983-1984*

## Board Certification

- American Board of Anesthesiology
- Additional Qualifications in Pain Management; American Board of Anesthesiology

## Professional Affiliations

- District 2 Censor; Medical Association of the State of Alabama
- Immediate Past President; Montgomery County Medical Society
- Physician Advisor; Alabama Quality Assurance Foundation
- Member; State of Alabama Prescription Drug Abuse Task Force
- Member; State of Alabama Medicaid Pharmacy and Therapeutics Committee

## Publications

Comparison of Intrathecal Methadone and Fentanyl in Women Undergoing Cesarean Delivery, D. P. Herrick, M. D. et. al. Presented to the American and European Society of Regional Anesthesia; Brussels, Belgium; June, 11, 1992.



EXHIBIT
1

December 19, 2005

Kelli Archacki
Cigna Insurance Company
Routing 2121225
Greenville Avenue, Suite #1000
Dallas, TX 75243

Re:     Cathy Cleiland
        Chart #14495

Dear Ms. Archacki,

This letter is on behalf of Ms. Cathy Cleiland in support of her claim for disability.

I understand that you recently sent Ms. Cleiland a letter discontinuing her benefits. Part of your decision was based on some of the documentation from our office.

In reviewing the letter, it was mentioned that Ms. Cleiland had not been complaining of any problems with radiating type pain or numbness. Ms. Cleiland has clearly indicated on her admission sheets and on the pain diagrams I put down that she has involvement in hands and feet. Ms. Cleiland has persistently been on Neurontin for tingling and numbness. It really is not a new complaint and has not required any additional documentation.

Ms. Cleiland's medications have been stable over the last few months. However, this does not mean that she does not have ongoing problems, or that on any given day she may be more symptomatic than another. It is fairly common for patients like Ms. Cleiland to have unpredictable exacerbations of their problem along with a steady course, otherwise.

Ms. Cleiland is still symptomatic, and I do believe that her symptoms are real.

Please feel free to contact me to further discuss the issue.

Respectfully yours,

Adam R. Nortick, MD

ARN:rts/qes/jdb

EXHIBIT
2

# The
# Center for Pain
### of MONTGOMERY, P.C.

**DAVID HERRICK, M.D.** ■ **BRAD KATZ, M.D.**

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY Cleiland_          Date: _12-14-05_

1. Are you: ☐ Better?   ☒ Worse?   ☐ Same?

2. Since your last visit, have you been to the Emergency Room?   ☐ YES   ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ☒ YES   ☐ NO
   (If Yes, please explain) _Dr. Bret Johnson (General. mp)_

4. Since your last visit, have you had any X-rays?   ☒ YES   ☐ NO
   (If Yes, what kind and where were they done) _teeth_

5. Since your last visit, have you had any medication changes? ☐ YES   ☒ NO
   (Please list all medications) _____

6. Do you have any allergies? ☒ YES   ☐ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _Pain, medication_

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
-10 means the worst pain you can imagine.

0 — No Pain   1   2   3   4   5 Moderate Pain   6   7   8   9   10 Worst Pain

Mark all the places you feel pain.

CLE00071

Burning feels like skin is being pulled back to...

feels like sand on feet and between...

CARPAL Tunnel

*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleland_    Date: _11-16-05_

1. Are you: ☐ Better?    ☒ Worse?    ☐ Same?

2. Since your last visit, have you been to the Emergency Room?    ☐ YES    ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?    ☒ YES    ☐ NO
   (If Yes, please explain) _Sleep Study ; light into stomach for exam_
   _Neurologist_    _gastro enterologist_

4. Since your last visit, have you had any X-rays?    ☐ YES    ☒ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☐ YES    ☒ NO
   (Please list all medications) _____

6. Do you have any allergies? ☒ YES    ☐ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _pain, possible medication change._

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — 9 — 10
No                     Moderate              Worst
Pain                     Pain                 Pain

Mark all the places you feel pain.



RIGHT        LEFT        RIGHT

extremely painful

CLE00072

# *The* Center for Pain
## *of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

☑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _10-18-05_

1. Are you: ☐ Better?   ☑ Worse?   ☐ Same?

2. Since your last visit, have you been to the Emergency Room?   ☐ YES   ☑ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ☐ YES   ☑ NO
   (If Yes, please explain) _____

4. Since your last visit, have you had any X-rays?   ☐ YES   ☑ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☐ YES   ☐ NO
   (Please list all medications) _Celebrex_

6. Do you have any allergies? ☑ YES   ☐ NO
   (If Yes, Please list all your allergies) _Cipro_

What do you want to discuss today? (medicine, pain, refills, etc.)
_____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



1  2  3  4  5  6  7  8  9  10
        Moderate              Worst
          Pain                 Pain





CLE00073

# CENTER for PAIN

## of Montgomery

### DAVID HERRICK, MD  ■ BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _9-19-05_

1. Are you: ☐ Better?  ☑ Worse?  ☐ Same?

2. Since your last visit, have you been to the Emergency Room?  ☐ YES  ☑ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?  ☐ YES  ☐ NO
   (If Yes, please explain) _I had an appt at the sleep ctr this morning but I waited from 11:15 - 1:10 and I had to leave to come here._

4. Since your last visit, have you had any X-rays?  ☐ YES  ☑ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☐ YES  ☑ NO
   (Please list all medications) _____

6. Do you have any allergies? ☑ YES  ☐ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____
   _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.



0
No
Pain

5
Moderate
Pain

10
Worst
Pain

Mark all the places you feel pain.



RIGHT        LEFT



LEFT        RIGHT

CLE00074

*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_   Date: _8-17-05_

1.   Are you: ☐ Better?   ☐ Worse?   ☐ Same?

2.   Since your last visit, have you been to the Emergency Room?   ☐ YES   ☑ NO
     (If Yes, please explain) _____

3.   Since your last visit, have you seen any other doctor(s) or had any surgery?   ☐ YES   ☑ NO
     (If Yes, please explain) _____

4.   Since your last visit, have you had any X-rays?   ☐ YES   ☑ NO
     (If Yes, what kind and where were they done) _____

5.   Since your last visit, have you had any medication changes? ☐ YES   ☑ NO
     (Please list all medications) _Insulin, Neurontin, methadone, phenergan, protonix, Robaxin_
     _Clonipin, over the counter benadryl for sinus/allergies_

6.   Do you have any allergies? ☑ YES   ☐ NO
     (If Yes, Please list all your allergies) _Outdoor (flowers) pet dander_

7.   What do you want to discuss today? (medicine, pain, refills, etc.)
     _I had a bad fall during the wee hrs of last Sat. morning_

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — 9 — 10

No Pain   Moderate Pain   Worst Pain

Mark all the places you feel pain.

RIGHT   LEFT      LEFT   RIGHT

CLE00075

# EXHIBIT

# "N"

# PART 5



*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*
David Herrick, M.D. ▪ Brad Katz, M.D.
432 St. Lukes Drive
Montgomery, AL 36117
Phone (334) 387-7246   Fax (334) 387-7250

PROGRESS NOTE

NAME:    CATHY K. CLEILAND
DATE:    03/02/05
ACCT:    4495
DOB:

This is a 47-year-old, white female with lumbar degenerative disc disease, cervical degenerative disc disease, myofascial pain and diabetes. She has been on Methadone 5 mg up to five pills a day, Effexor, and Klonopin.

Ms. Cleiland states that she has been having some upset stomach problems. We called in Protonix. She says this has really been pre-helpful. Ms. Cleiland states that she has had a fair amount of nausea with Methadone, but on the whole it is livable with Phenergan. She really has not had to go to the hospital for any IV fluids. She has had worse problems with GI upset from other opioids and does not wish to try switching out.

Ms. Cleiland has been having some muscle spasms in the legs. She says she is not very active, and she thinks that her sugars have been running higher than they usually have. She states that she has fallen down some steps. She says she just miscalculated the last step. Once she said the trunk of the car fell on her back when she was leaning over into the trunk, just minor life traumas.

Ms. Cleiland describes her pain as an 8 today. Again, there are more areas marked off on the pain chart than not. There is pain in the right upper extremity, left leg and back. She states really no chest pain and no unusual dysuria. She states life is not in total turmoil as it has been in the past few visits.

**PHYSICAL EXAMINATION:** This is a 47-year-old, white female who is alert and cooperative. She is fairly pleasant today and less upbeat. She has no gross rashes. Skin is warm and dry. She has no respiratory difficulties noted, no obvious hemodynamic instability noted, no acute hot joints, and no acute localizing weakness.

**ASSESSMENT:** Cervical degenerative disc disease, cervical radiculitis, lumbar degenerative disc disease, lumbar radiculitis, and insulin dependent diabetes.

**PLAN:** We will refill Neurontin 800 mg 4x/day, Robaxin 750 mg 3x/day, Phenergan 25 ½ - 1 three times daily, Effexor 75 XR one at bedtime, Protonix 40 mg one daily, Klonopin 1 mg at bedtime, and we will switch her to Methadone 10 mg ½ - 1 p.o. three times a day rather than the 5s. We plan on seeing the patient back in one month's time. Today's office visit has been 20 minutes.

AN/aww
D: 03/11/05
T: 03/15/05

ADAM NORTICK, M.D.

CLE00076

# *The* Center for Pain

*of* M O N T G O M E R Y, P.C.

· DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: __Cathy Cleiland__     Date: __5-17-05__

1.  Are you: ☐ Better?     ☐ Worse?     ☑ Same?

2.  Since your last visit, have you been to the Emergency Room?   ☐ YES   ☑ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?   ☐ YES   ☑ NO
    (If Yes, please explain) _____

4.  Since your last visit, have you had any X-rays?   ☑ YES   ☐ NO
    (If Yes, what kind and where were they done) __mamogram__

5.  Since your last visit, have you had any medication changes? ☐ YES   ☑ NO
    (Please list all medications) _____

6.  Do you have any allergies? ☑ YES   ☐ NO
    (If Yes, Please list all your allergies) __Cipeo__

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0   1   2   3   4   5   6   7   8   9   10
No                    Moderate            Worst
Pain                    Pain               Pain

RIGHT      LEFT        LEFT      RIGHT

CLE00077

*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY K. Cleveland_          Date: _3-2-05_

1.  Are you: ☐ Better?  ☒ Worse?  ☐ Same?

2.  Since your last visit, have you been to the Emergency Room?  ☐ YES  ☒ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?  ☐ YES  ☒ NO
    (If Yes, please explain) _____

4.  Since your last visit, have you had any X-rays?  ☐ YES  ☒ NO
    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ☐ YES  ☐ NO
    (Please list all medications) _The protonix that Dr. Nortick prescribed_

6.  Do you have any allergies? ☒ YES  ☐ NO
    (If Yes, Please list all your allergies) _unknown but believe dust + dander_

7.  What do you want to discuss today? (medicine) (pain) refills, etc.)
    _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0  1  2  3  4  5  6  7  8  9  10
No                Moderate        Worst
Pain               Pain            Pain




RIGHT    LEFT        LEFT    RIGHT

CLE00078

# The Center for Pain
## of M O N T G O M E R Y, P.C.

### DAVID HERRICK, M.D.   ■   BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❏ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY Cleland_     Date: _3-29-05_

1. Are you: ❏ Better?   ☑ Worse?   ❏ Same?

2. Since your last visit, have you been to the Emergency Room?   ☑ YES   ❏ NO
   (If Yes, please explain) _ER @ 5AM in Dothan- Diagnosed w/ the flu_

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ❏ YES   ❏ NO
   (If Yes, please explain) _____

4. Since your last visit, have you had any X-rays?   ☑ YES   ❏ NO
   (If Yes, what kind and where were they done) _lungs when I had the flu_

5. Since your last visit, have you had any medication changes?   ❏ YES   ❏ NO
   (Please list all medications) _Just took Tamiflu along w/ my pain med's_

6. Do you have any allergies?   ☑ YES   ❏ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



0   1   2   3   4   5   6   7   8   9   10
No                    Moderate              Worst
Pain                    Pain                 Pain



RIGHT   LEFT       LEFT   RIGHT

CLE00079

*The*
# Center for Pain
*of* MONTGOMERY, *P.C.*

DAVID HERRICK, MD • BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

PROGRESS NOTE

NAME:     CATHY CLEILAND
DATE:     12/01/04
ACCT:     14495
DOB:

Ms. Cleiland is a 47-year old white female who has been followed for lumbar degenerative disc disease and cervical degenerative disc disease. She also has myofascial pain and diabetes. Ms. Cleiland has been on Methadone 5 mg 1-5 pills a day, Effexor and Klonopin. Ms. Cleiland has not had any adverse reactions to her medicines.

Ms. Cleiland has been under a lot of stress in October. She states her daughter is a diabetic and has had problems with a staph infection and when _____. She said it was touch and go for a few days. Ms. Cleiland states that she spent 4 days in the ICU and she was at her side. She states she slept upright in rather hard, uncomfortable chairs. She says at times she has been having some increasing pain in her neck going into both arms. She states that this was new and this really wasn't going on before. Ms. Cleiland has prior neck surgery. She said she has called up Dr. Hadley over at UAB but he states she would "have to have a real problem" before he would see her again. Ms. Cleiland is wanting to have an MRI and I think that is reasonable. We will go ahead and assist her in getting that scheduled.

Ms. Cleiland states that her back has been about the same. Ms. Cleiland states that she is not sleepy at night but she can be drowsy during the day. It is hard to say how much of this is has to do with the total upset that she has been through lately.

Ms. Cleiland has gone to the ophthalmologist and apparently has a 6th nerve palsy that is resolving without incident. Ms. Cleiland states that she has gained about 30 pounds. She states she never eats a lot of big meals but she kind of grazes and it can he at least 6 x a day. She is not having any unusual nausea, vomiting or gastroparesis type problems.

Ms. Cleiland does get some nausea, uses Phenergan for. She has not had to go to the hospital getting IV fluids. Ms. Cleiland states that she was running short on her medicines and her daughter did admit to taking some of her Methadone. Ms. Cleiland states that was only Effexor XR but apparently plain Effexor was called in for her. We will remedy that.

Ms. Cleiland describes her pain today as a 9. It is across the shoulders and into the right arm and in the left leg.  Ms. Cleiland really has no new significant health issues. She really is not having any chest pain, shortness of breath or rash.

On physical exam today she is a 47-year old white female. She is alert and cooperative. She has minimal respiratory difficulty. Her chest is clear. Chest wall is intact. Heart has a regular rate and rhythm, S1 and S2, without murmurs, gallops or thrills. She has no acute hot joints. She is ambulating without difficulty. She has no localizing weakness. She has a positive Spurling on the right side. She has no acute trophic skin changes.  Cranial nerves II-XII are intact.

**ASSESSMENT:** Cervical degenerative disc disease, cervical radiculitis, lumbar degenerative disc disease, lumbar radiculitis and insulin dependent diabetes.

**PLAN:** We will continue her on her medicines of Methadone 5 mg up to 5 x a day, Effexor XR 75 mg at bedtime, Neurontin 800 mg at bedtime, Phenergan 25 mg #90 pills ½ to 1 up to 3 x a day and Clonazepam 1 mg at bedtime.  We will also schedule her to get a cervical MRI for cervical radiculitis. Total office time today was 20-minutes. We will plan on seeing the patient back in 3-months time.  If it comes back that there is something new on her cervical MRI, we will make appropriate arrangements.

ADAM NORTICK, MD

AN/slc
D: 12/02/04
T: 12/07/04

CLE00080

# *The* Center for Pain
## *of* M O N T G O M E R Y, *P.C.*

### DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

❑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CATHY CLELLAND_          Date: _12-1-04_

1. Are you: ❑ Better?   ☑ Worse?   ❑ Same?

2. Since your last visit, have you been to the Emergency Room?   ❑ YES   ☑ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ❑ YES   ☑ NO
   (If Yes, please explain) _I talked w/ Dr Hadley's nurse about severe pain in neck but she said he would have to know a problem had been identified before seeing me_

4. Since your last visit, have you had any X-rays?   ❑ YES   ☑ NO
   (If Yes, what kind and where were they done) _for that_

5. Since your last visit, have you had any medication changes? ☑ YES   ❑ NO
   (Please list all medications) _Gail called in my effexor XR as regular effexor_

6. Do you have any allergies? ☑ YES   ❑ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.



0 — No Pain   1   2   3   4   5 Moderate Pain   6   7   8   9   10 Worst Pain

Mark all the places you feel pain.




RIGHT   LEFT   LEFT   R

CLE00081

# *The* Center for Pain
#### *of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_    Date: _9-21-04_

1. Are you: ☐ Better?    ☐ Worse?    ☒ Same?

2. Since your last visit, have you been to the Emergency Room?    ☐ YES    ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?    ☒ YES    ☐ NO
   (If Yes, please explain) _Opthamologist for sixth cranial nerve palsy_

4. Since your last visit, have you had any X-rays?    ☐ YES    ☒ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☐ YES    ☒ NO
   (Please list all medications) _____

6. Do you have any allergies? ☒ YES    ☐ NO
   (If Yes, Please list all your allergies) _Cipro_

7. What do you want to discuss today? (medicine, pain, refills, etc.)
   _____

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.



0 No Pain — 1 — 2 — 3 — 4 — 5 Moderate Pain — 6 — 7 — (8) — 9 — 10 Worst Pain

Mark all the places you feel pain.




RIGHT    LEFT    LEFT    RIGHT

CLE00082

# The
# Center for Pain
## *of* M O N T G O M E R Y, *P.C.*

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

▢  2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

▢  432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_          Date: _8-24-04_

1.  Are you: ▢ Better?    ☑ Worse?    ▢ Same?

2.  Since your last visit, have you been to the Emergency Room?    ▢ YES    ☑ NO

    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?    ▢ YES    ▢ NO

    (If Yes, please explain) _Opthalmologist_

4.  Since your last visit, have you had any X-rays?    ▢ YES    ☑ NO

    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ▢ YES    ☑ NO

    (Please list all medications) _____

6.  Do you have any allergies? ☑ YES    ▢ NO

    (If Yes, Please list all your allergies) _Cipro_

7.  What do you want to discuss today? (medicine, pain, refills, etc.)

    _pain, side effects of med_

# PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0 — 1 — 2 — 3 — 4 — 5 — 6 — 7 — 8 — 9 — 10

0
No Pain

Moderate Pain

Worst Pain



RIGHT    LEFT    LEFT    RIGHT

pelvic area

CLE00083

*The*
# Center for Pain
## *of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D. ■ BRAD KATZ, M.D.

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: *Cathy Cleiland*                     Date: *7-21-2004*

1. Are you: ☐ Better?    ☐ Worse?    ☒ Same?

2. Since your last visit, have you been to the Emergency Room?    ☐ YES    ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?   ☒ YES ☐ NO
   (If Yes, please explain)   ~~Dentist~~ *Dr Mark Hadley @ UAB*

4. Since your last visit, have you had any X-rays?    ☒ YES   ☐ NO
   (If Yes, what kind and where were they done)   *MRI @ UAB on 7-14-04*

5. Since your last visit, have you had any medication changes? ☐ YES   ☒ NO
   (If Yes, what) _____

6. What do you want to discuss today? (medicine, pain, refills, etc.)
   *Pain and medication*

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
No Pain                 Moderate Pain                 Worst Pain

(marked between 8 and 9)

CLE00084

*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.  ■  BRAD KATZ, M.D.

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_    Date: _5-26-04_

1. Are you: ☐ Better?    ☒ Worse?    ☐ Same?

2. Since your last visit, have you been to the Emergency Room?    ☒ YES    ☐ NO
   (If Yes, please explain) _Monroeville, AL - Admitted to ICU/DKA after medicine_
   _made me nauseated/dehydrated_

3. Since your last visit, have you seen any other doctor(s) or had any surgery?    ☐ YES    ☐ NO
   (If Yes, please explain) _Family Dr. saw me in hospital_

4. Since your last visit, have you had any X-rays?    ☐ YES    ☐ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes?    ☐ YES    ☐ NO
   (Please list all medications) _My family Dr prescribed me lortab when he dismissed_
   _me yesterday (5/25) until I could be seen here today_

6. Do you have any allergies? ☐ YES    ☐ NO
   (If Yes, Please list all your allergies) _CIPRO_

7. What do you want to discuss today? (medicine, pain), refills, etc.)

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.

0  1  2  3  4  5  6  7  8  9  10
No Pain        Moderate Pain        Worst Pain

CLE00085

## PROGRESS NOTE

**NAME:**   KATHY CLEILAND
**DATE:**   04/28/04

Ms. Cleiland returns today for follow up. Avinza 30 mg helps but is not enough. She continues to have neck and shoulder pain and the medication does make her slightly sluggish although she has become accustomed to it.

**PHYSICAL EXAM:**
**GENERAL:**   She is alert and oriented x 3.
**HEENT:** Unremarkable.
**PULMONARY:** Clear.
**HEART:** Regular rate and rhythm.
**NEUROLOGICAL EXAM:** Non-focal. Cranial nerves appear to be intact.

**IMPRESSION:** Cervical degenerative disc disease.

**PLAN:** Continue titration of Avinza. Will increase to 60 mg po q a.m. She has been taken the medicine about mid-day and I have encouraged her to take it earlier in the morning and see if that has any added benefit. I have reviewed her medication agreement. I will see her back in 1-month for reassessment. I informed her she may see Dr. Nortick when she returns. This was a 20-minute face-to-face visit.

_____
DAVID P. HERRICK, M.D.

AN/slc
D: 04/28/04
T: 05/03/04

CLE00086

# The Center for Pain
## of MONTGOMERY, P.C.

DAVID HERRICK, MD • BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

## PROGRESS NOTE

NAME:    CATHY CLEILAND
DATE:    05/26/04
ACCT:    14495
DOB:

Ms. Cleiland returns today for adjustment of medicines. Ms. Cleiland had been on Avinza. She had been on 30 mg and that dose was increased up to 60 mg. She was complaining with problems with nausea with 60 mg from the get go. She tried it for a few days, went off, and went back on. She eventually wound up having problems with nausea and vomiting. When she went to her local doctor she was probably in sort of DKA and was admitted to the hospital into the ICU. She did get some IV fluids. She was given a prescription for some Lortab when she left the hospital. Her other medicines include Neurontin 800 mg 4 x a day. She had a blood level checked about 3-weeks ago and was doing fine. She also takes Effexor 75 mg and Robaxin. At the present time Ms. Cleiland is most concerned about having a pain medicine, which will not cause any significant stomach upset rather than marked analgesia. She states in the past she has had some Demerol and never really suffered any adverse reactions from that. She states that Percocet had cost her some GI problems in the past and Lortab caused some slight quizziness but really it wasn't very effective for her pain.

On physical exam she is a 46-year old white female who is alert and cooperative. She has no obvious respiratory or hemodynamic compromise. The skin is warm and dry. She has a non-localizing neurologic exam.

**ASSESSMENT:** Cervical degenerative disc disease with nausea and vomiting secondary to Avinza.

**PLAN:** Through the next week we will have the patient use some Mepergan Fortes 1 po 4 x a day. We will then have her start on Methadone 10 mg twice a day for 3-weeks. We will have her come back in a month and see how she is doing in terms of nausea and pain effectiveness on the new medication regimen. We will keep all of her other medicines the same. Total office time today was 25-minutes.

ADAM NORTICK, M.D.

AN/slc
D: 05/26/04
T: 06/02/04

CLE00087

*The*
# Center for Pain
*of* M O N T G O M E R Y, *P.C.*

DAVID HERRICK, M.D.   ■   BRAD KATZ, M.D.

❑  2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑  432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy K. Cleiland_          Date: _4·28·04_

1.  Are you: ❑ Better?      ❑ Worse?      ☑ Same?

2.  Since your last visit, have you been to the Emergency Room?  ❑ YES    ☑ NO
    (If Yes, please explain) _____

3.  Since your last visit, have you seen any other doctor(s) or had any surgery?  ☑ YES    ❑ NO
    (If Yes, please explain) _My general MD – just to have bloodwork_

4.  Since your last visit, have you had any X-rays?    ❑ YES   ☑ NO
    (If Yes, what kind and where were they done) _____

5.  Since your last visit, have you had any medication changes? ❑ YES   ☑ NO
    (Please list all medications) _____

6.  Do you have any allergies? ❑ YES   ☑ NO
    (If Yes, Please list all your allergies) _____

7.  What do you want to discuss today? (medicine, pain, refills, etc.)
    _Continued pain and medicine_

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.



0   1   2   3   4   5   6   7   8   9   10
No                  Moderate            Worst
Pain                  Pain              Pain

Mark all the places you feel pain.




RIGHT      LEFT      LEFT      RIGHT

CLE00088

# the CENTER for PAIN

of Montgomery

DAVID HERRICK, MD  ■  BRAD KATZ, MD

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7806

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy K. Cleiland_    Date: _3-29-04_

1. Are you: ☐ Better?    ☐ Worse?    ☑ Same?

2. Since your last visit, have you been to the Emergency Room? ☑ YES    ☐ NO
   (If Yes, please explain) _UAB_

3. Since your last visit, have you seen any other doctor(s) or had any surgery? ☑ YES    ☐ NO
   (If Yes, please explain) _Dr. Mark Hadley ; UAB ; 12/16/03_  C-4, C5 lumbar laminectomy de-
   compression, C4-C5 disc herniation
   bilateral with C4-C5 — herniated
   lumbar fusion, internal fixation
   C4-C5 bilateral. Bone w/ dorsolateral
   fusion C4, C5 bilateral

4. Since your last visit, have you had any X-rays?    ☐ YES    ☐ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☑ YES    ☐ NO
   (Please list all medications) _Insulin N 35 R 15 x 2; Effexor 75 mg; Neurontin 800 x 4; Lortab 2.5 x 6_
   _Robaxin 750 mg x 3_    Daily

6. Do you have any allergies? ☐ YES    ☑ NO
   (If Yes, Please list all your allergies) _Not that I am aware of_

7. What do you want to discuss today? (medicine, pain, refills, etc.)

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.



0 No Pain — 1 2 3 4 5 Moderate Pain 6 7 ⑧ 9 10 Worst Pain

Mark all the places you feel pain.





RIGHT    LEFT        LEFT    RIGHT

CLE00089

*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, MD • BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36 117
Telephone: 334-387-7246
Fax: 334-387-7250

**NAME:** CATHY CLEILAND
**DOB:**

**DATE:** 08/27/03
**SSN:**

**REFERRING PHYSICIAN:** Dr. Hackman.

**CHIEF COMPLAINT:** Back and left leg pain.

**HISTORY OF PRESENT ILLNESS:** The patient is a 46-year old female with back and left leg pain that has been present for approximately 16-months. It is an aching, burning, stabbing pain that is exacerbated by coughing, sneezing, sitting or standing. She has had two previous lumbar surgeries done by Dr. Hackman, the last being July 16th of this year. She continues to have a left lumbar pain that is an aching, burning, constant, unbearable pain that is exacerbated by sitting, standing and walking. She has had no previous spinal injections.

**PAST SURGICAL HISTORY:** Significant for lumbar surgery x 2, anterior cervical fusion x 3, C-section x 2, bilateral tubal ligation, right oophorectomy and carpal tunnel release.

**PAST MEDICAL HISTORY:** She is an insulin dependent diabetic.

**CURRENT MEDICATIONS:** Insulin, Darvocet, Flexeril and Neurontin.

**ALLERIES:** No known drug allergies.

**SOCIAL HISTORY:** Negative tobacco. Negative ETOH.

**FAMILY HISTORY:** Non-contributory.

**REVIEW OF SYSTEMS:** No fever, chills, nausea, vomiting, headaches, chest pain, shortness of breath, bowel/bladder dysfunction or rashes.

**PHYSICAL EXAM:**
**GENERAL:** She is a very pleasant, well-developed, well-nourished female. She is moderately distressed secondary to pain.
**HEENT:** Unremarkable.
**PULMONARY:** Clear.
**HEART:** Regular rate and rhythm.
**ABDOMEN:** Non-tender and non-distended.
**EXTREMITIES:** No clubbing, cyanosis, or edema.

CLE00090

Name:    Cathy Cleiland
Date:    08/27/03

Continued...2

NEUROLOGICAL EXAM:  Significant for a positive straight leg raise on the left at about 45 degrees.

IMPRESSION:  Lumbar degenerative disc disease and lumbar radiculitis.

PLAN:  Lumbar selective nerve root block on the left at L4-5 and L5-S1.  I have discussed the risks, benefits, and rationale of this procedure.  The risks are bleeding, infection, nerve damage, paralysis and other various complications up to and including death.  He appears to understand, accept and wishes to proceed.

DAVID P. HERRICK, M.D.
Signed without review.

DPH/slb
D:  08/27/03
T:  08/28/03

CLE00091

Patient Name: Cleiland, Cathy Key
Patient ID: 000214773

Date of Birth: ▓▓▓▓▓
Age: 48 years
Gender: Female
Accession Number: 001000000159070
Location: SAMC
Referring Physician: Bret Johnson

Study Date: 05-17-2006 16:54
Procedure Types: MRI LUMBAR WO/W

*Preliminary*

# MR MRI LUMBAR WO/W

MRI MRI LUMBAR WO/W
Page 1 of 2

SOUTHEAST ALABAMA MEDICAL CENTER
PO Drawer 6987,   Dothan, AL 36302
334-793-8111
RADIOLOGY SERVICES
MRI REPORT

Patient Name:   CLEILAND, CATHY
XRAY/MR#:   000214773
DOB: ▓▓▓▓▓▓▓
Order #: 00127816748422104                      Account #: 2781674
CDM: 3836052                                     Age: 48                     Room:MI-
                                                 Accession #:  001000000159070          Pt Type: O

Attending Physician:
Ordering Physician:  Bret M. Johnson, M.D.
Referring Physician:  Bret M. Johnson, M.D.
Exam Requested: MRI LUMBAR WO/W
Exam Date:   05/17/2006

PROCEDURE:   MRI LUMBAR SPINE WO/W GADOLINIUM  5/17/06
HISTORY:   Low back pain radiating down left leg
COMPARISON: None
TECHNIQUE:   T1, T2 and STIR sagittal, T1 and T2 axial sequences without
Contrast, T1 axial and sagittal sequence following the
administration of 17 cc's of intravenous Gadolinium.

FINDINGS:
Evidence of posterior spinal fusion at L4-5.   Spinal stabilization rods
and transpedicular screws are noted as well as an intervertebral disc

Page: 1 Printed: S. Skipper/05-23-2006 15:32 Study: Cathy Cleiland/05-17-2006 16:5

spacer at L4-5.

The vertebral bodies are in anatomic alignment with no evidence of compression deformity or significant subluxation. The marrow signal intensity is unremarkable. Conus medullaris terminates at inferior aspect of T12. No evidence of enlargement or abnormal signal.

L3-4:  Mild diffuse disc bulging with moderate facet arthropathy and ligamentum flavum hypertrophy. There is resultant moderate central canal narrowing. No evidence of superimposed disc protrusion.

L4-5:  Laminectomy defect noted at L4. There is no evidence of central canal narrowing. However, moderate narrowing of the neuroforamen noted on the left, secondary to a bulging disc. There is compression of the exiting L4 nerve root on the left.

L5-S1:  Mild diffuse disc bulging with no evidence of disc protrusion, central canal or neuroforaminal narrowing.


Name:  CLEILAND,CATHY
BRETT STORM, M.D.                              MR #: 000214773
{eop}


MRI
Page 2 of 2

                    SOUTHEAST ALABAMA MEDICAL CENTER
                    PO Drawer 6987,  Dothan, AL 36302
                            334-793-8111


IMPRESSION:
1.   EVIDENCE OF POSTERIOR SPINAL FUSION L4-5.  THERE IS NO EVIDENCE OF
     SUBLUXATION OR COMPRESSION DEFORMITY.
2.   MODERATE CENTRAL CANAL NARROWING AT L3-4.
3.   THERE IS EVIDENCE OF INTERVERTEBRAL DISC SPACER L4-5. HOWEVER, THERE
     APPEARS TO BE BULGING DISC EXTENDING INTO THE NEUROFORAMEN AT L4-5
     ON THE LEFT WITH COMPRESSION OF THE LEFT L4 NERVE ROOT.


_____
BRETT STORM, M.D.

DD:  5/18/2006 00:21        ko
DT:  5/18/2006 12:47        153245



Name:  CLEILAND, CATHY
BRETT STORM, M.D.                     MR:  000214773
{eop}


Brett Storm
05-18-2006 12:53

        Page: 2 Printed: S. Skipper/05-23-2006 15:32 Study: Cathy Cleiland/05-17-2006 16:54


                                                        CLE00093



Montgomery Imaging Center
2055 Normandie Drive, Suite 108
Montgomery, AL 36111-2743
Phone (334) 288-4624
Fax (334) 288-8478

David C. Montiel, M.D.
Terry D. Williams, M.D.
Joseph M. Bailey, M.D.
David B. Neeland, M.D.
Thomas S. Moore, M.D.
Jason H. Dorey, M.D.
Byron C. Machen, M.D.

Daniel Snow, M.D.
Mark H. LeQure, M.D.
Gordon Smith, M.D.
Christopher Dorvault, M.D.
Philip S. Piasecki, M.D.
David M. Downs, M.D.
Roland Ng, M.D.
Gary Leung, M.D.

Mary M. Kirst, M.D.
Paul Hutchinson, M.D.
Oscar F. Orille, M.D.
Eva Rubin, M.D.
Ronald D. Waters, M.D.
John G. Kahler, M.D.

| | | |
|---|---|---|
| Patient: CLEILAND, CATHY K. | DOB: | Age: 048 |
| Exam: MRI CERVICAL SPINE WITHOUT CONTRAST Procedure Date: 01/12/06 | | Film#: 20046161 |
| Referring Physician: ADAM NORTICK, M.D. | | Acct#: 000087431 |

## CERVICAL SPINE MRI:

**HISTORY:** Neck pain and dizziness.

**TECHNIQUE:** Sagittal T1, fast spin echo T2, fat sat fast spin echo T2, axial gradient echo, and axial T1 weighted images.

**FINDINGS:** Comparison is made with a previous exam dated 12-08-04. The patient has had an anterior cervical fusion at C4/5/6/7. There is some mild posterior osteophyte formation at C7/T1, which is unchanged from the previous exam.

There is mild diffuse spinal stenosis through the upper portion of the fusion block, which appears unchanged from the previous exam. I do not see evidence of new disc herniation, spinal stenosis, fracture, or subluxation.

**OPINION:** No interval change in appearance since 12-08-04. Worse abnormality appears to be the mild circumferential spinal stenosis caused by the posterior osteophyte/ligamentous hypertrophy at C7/T1, seen best on the sagittal views.

Radiologist:   JOSEPH M. BAILEY, M.D.

Radiologist-Signature

Technologist:   Renee Reach, RT (R)(CT)(MR)
Transcribed by SUZANNEM on 01/12/2006 at 03:31 PM

# MONTGOMERY IMAGING CENTER

2055 Normandie Drive, Suite 108
Montgomery, Alabama 36111-2743

Phone (334) 288-4624     Fax (334) 288-8478

John H. Payne, III, M.D.
David C. Montiel, M.D.
Terry D. Williams, M.D.
Joseph M. Bailey, M.D.
David B. Neeland, M.D.

Thomas S. Moore, M.D.
Jason H. Dorey, M.D.
Byron C. Machen, M.D.
Daniel S. Noyes, D.O.

Mark H. LeQuire, M.D.
Christopher Dorvault, M.D.
Gordon Smith, M.D.
Paul Hutchinson, M.D.

Mary M. Karst, M.D.
Gary Leung, M.D.
Oscar P. Orille, M.D.
Eva Rubin, M.D.
Philip S. Piasecki, M.D.

---

Patient:    CLELLAND, CATHY K.
            DOB ████████    AGE:047
Referring Physician:  ADAM NORTICK, M.D.

---

Account:    000087431 01
                                                    Film#  20046161
Exam:       MRI CERVICAL SPINE WITH AND WITHOUT
Date:       12/08/04
Location:   MONTGOMERY IMAGING CENTER

## MRI CERVICAL SPINE WITH AND WITHOUT CONTRAST:

The study is done without and after IV contrast. History of previous
surgery in 97, 01, and 02. Patient has neck pain and pain in both
arms and numbness in the right arm.

Multiplanar images obtained of the C-spine without and after IV
contrast. The patient is post anterior fusion which I believe is at
the C4-5, C5-6, and C6-7 levels. The cervical cord, cervicomedullary
junction is unremarkable. There is normal signal from the
intervertebral disc. On the images post injection of contrast, I do
not see evidence for abnormal enhancement. On the axial images, I do
not see evidence for disc herniation or neural foraminal impingement.
There is some hypertrophy of the ligamentum flavum at C7-T1 that is
causing some impingement on the thecal sac posteriorly at this level.
This is obliterating the CSF space, but I don't believe causing
significant impingement on the cord.

## IMPRESSION:

THE PATIENT IS POST ANTERIOR FUSION, WHICH I BELIEVE IS AT THE C4-5,
C5-6, AND C6-7 LEVELS. NO EVIDENCE OF DISC HERNIATION OR NEURAL
FORAMINAL IMPINGEMENT. THERE IS HYPERTROPHY OF THE LIGAMENTUM FLAVUM
AT THE C7-T1 LEVEL THAT IS CAUSING SOME POSTERIOR IMPRESSION ON THE
SUBARACHNOID SPACE AT THIS LEVEL. NO IMPINGEMENT ON THE CORD NOTED.

---

Radiologist:    PAUL HUTCHINSON, M.D.

Technologist:   RENEE REACH RT MR

---

Transcribed by CAROLE on 12/08/2004 at  04:52

12/13/2004

CLE00095

# JACKSON HOSPITAL & CLINIC, INC.
## 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

Name: CLEILAND, CATHY K.　　　　　DOB: ███████  Age: 46 YEARS
Physician: RYAN, PATRICK G　　　　 Patient Location: 6301
MR#: 285142　　　　X-RAY#: 463643　　Account#: 10567192
Order ID: 1190671　　Result ID: 1073900　 Addendum Number: 0

---

Clinical Data: BACKK PAIN  TO LEFT LEG BACK SURGERY
Procedure:  MRI L SPINE W & W/O CONTRAST    Date of Exam: 08/11/2003

TECHNIQUE:
Pre and post contrast T1 axial and sagittal imaging was performed along with multi-echo T2
sagittal and fast spin echo T2 axial imaging was performed.

FINDINGS:
Comparison is made to a recent examination from 07/14/2003.  The previously described
moderate  sized disc extrusion in the left lateral recess of L4-5 has apparently been removed.
There is a very small, 5mm area of low signal intensity that is surrounded by enhancing scar
tissue that is adjacent to the posterolateral aspect of the intervertebral disc at L4-5 seen only on
the post contrast axial images (image 10).  This is adjacent to the superior end plate of L5 and
is not seen on the parasagittal images.  This does not abut or displace the exiting nerve roots.
I cannot tell with certainty whether this represents a small piece of bone or a small residual disc
fragment but may be clinically insignificant given its small size and no apparent abutment of the
nerve roots.  There is a fairly extensive amount of enhancing soft tissue in the left epidural space
of L4-5.  The enhancing soft tissue extends along the anterior aspect of the thecal sac as well as
into the left neural foramen.  There is no displacement or distortion of the thecal sac.  The
exiting left L5 nerve root is encased by the enhancing tissue.  The patient has significant
degenerative disc disease at this level with disc space loss and end plate sclerosis.  The remaining
intervertebral disc spaces show only some mild disc desiccation.  No other areas of disc bulging
or protrusion.  The conus is normal.

**IMPRESSION:**
EXTENSIVE POST OPERATIVE CHANGES ON THE LEFT AT L4-5 WITH A LARGE
AMOUNT OF ENHANCING EPIDURAL SCAR TISSUE AS DESCRIBED. THE MODERATE
SIZED DISC EXTRUSION AT THIS LEVEL IS NO LONGER VISIBLE, HOWEVER THERE
IS A SMALL NON-ENHANCING AREA OF LOW SIGNAL INTENSITY NEAR THE LEFT
NEURAL FORAMEN AT L4-5. PROBABLY AND CLINICALLY INSIGNIFICANT GIVEN

CLE00096

ITS SMALL SIZE AND LACK OF ABUTMENT TO THE NERVE ROOTS BUT COULD REPRESENT A SMALL END PLATE FRAGMENT OR DISC FRAGMENT. THIS IS SEEN ONLY ON ONE VIEW.

SEVERE DEGENERATIVE DISC DISEASE AT L4-5.

Dictated by: KEN RICHARDSON
Verified by: KEN RICHARDSON

Transcriptionist: EE

Name:CLEILAND, CATHY K.
Physician:RYAN, PATRICK G

Order ID:1190671
Date:08/11/2003

CLE00097

The
# Center for Pain
of M O N T G O M E R Y, P.C.
David Herrick, M.D. ▼ Brad Katz, M.D.
Adam Nortick, M.D.
P.O. Box 241348
Montgomery, AL 36124

432 St. Lukes Drive
Phone: 334-387-7246
Fax: 334-387-7250

2065 E. S. Blvd., Ste. 401
Phone: 334-288-7808
Fax: 334-288-8089

### PROCEDURE NOTE

**NAME:** CATHY CLEILAND
**DATE:** 04/07/06
**ACCT:** 14495
**DOB:**

**PREOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**POSTOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**PROCEDURE PERFORMED:** Cervical epidural steroid injection at C5-6 under fluoroscopy with injection of contrast.

**ANESTHESIA:** None.

**COMPLICATIONS:** None.

**PROCEDURE IS AS FOLLOWS:** The patient was prepped and draped in the usual sterile fashion, prone on the OR table. Using fluoroscopic guidance, C5-6 was identified. A skin wheal was raised and an 18 gauge Tuophy needle was advanced under loss-of-resistance technique in the epidural space. Upon entering the epidural space, no paresthesias were elicited, no heme or CSF was aspirated. 5 cc of Omnipaque 240 was injected to confirm needle placement. A total of 80 mg of Depo Medrol and 4 cc of normal saline were injected into the epidural space. The patient tolerated the entire procedure with no acute complications and was discharged home in stable condition after observation for 30-minutes.

**ADDENDUM:** I have refilled her Methadone 10 mg 5 x a day, Lortab 10 mg TID and Baclofen 10 mg TID.

_____
DAVID P. HERRICK, M.D.
Signed without review.

DPH/slc
D: 04/07/06
T: 04/12/06

CLE00098

# The Center for Pain
## of MONTGOMERY, P.C.

David Herrick, M.D. ▼ Brad Katz, M.D.
Adam Nortick, M.D.
P.O. Box 241348
Montgomery, AL 36124

432 St. Lukes Drive
Phone: 334-387-7246
Fax:  334-387-7250

2055 E. S. Blvd., Ste. 812
Phone: 334-288-7808
Fax: 334-288-8089

## PROCEDURE NOTE

**NAME:**  CATHY CLEILAND
**DATE:**  02/06/06
**ACCT:**  14495
**DOB:**

**PREOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**POSTOPERATIVE DIAGNOSIS:** Cervical degenerative disc disease.

**PROCEDURE PERFORMED:**  Cervical epidural steroid injection at C5-6 under fluoroscopy with injection of contrast.

**ANESTHESIA:** Versed 4 mg IV.

**COMPLICATIONS:** None.

**PROCEDURE IS AS FOLLOWS:**  The patient was prepped and draped in the usual sterile fashion, prone on the OR table.  Using fluoroscopic guidance, C5-6 was identified.   A skin wheal was raised, and an 18 gauge Tuophy needle was advanced under loss-of-resistance technique in the epidural space. Upon entering the epidural space, no paresthesias were elicited, no heme or CSF was aspirated.  5 cc of Omnipaque 240 was injected to confirm needle placement.  A total of 80 mg of Depo Medrol and 4 cc of normal saline were injected into the epidural space.  The patient tolerated the entire procedure with no acute complications and was discharged home in stable condition after observation for 30-minutes.

DAVID P. HERRICK, M.D.
Signed without review.

DPH/slc
D: 02/06/06
T: 02/08/06

CLE00099

*The*
# Center for Pain
*of* M O N T G O M E R Y, P.C.

DAVID  HERRICK, MD • BRAD  KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-286-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

## PROCEDURE NOTE

NAME:  CATHY CLEILAND
DATE:  08/27/03
DOB:

**PREOPERATIVE DIAGNOSIS:**  Lumbar degenerative disc disease and lumbar radiculitis.

**POSTOPERATIVE DIAGNOSIS:**  Lumbar degenerative disc disease and lumbar radiculitis.

**PROCEDURE PERFORMED:**  Lumbar selective nerve root block on the left at L4-5 and L5-S1 under fluoroscopy with injection of contrast.

**ANESTHESIA:** None.

**COMPLICATIONS:** None.

**PROCEDURE IS AS FOLLOWS:**  The patient was prepped and draped in the usual sterile fashion, prone on the OR table. Using fluoroscopic guidance, L4-5 and L5-S1 was identified on the left. A skin wheal was raised, and a 25 gauge 3 ½" needle was inserted until the tip of the needle rested in the 12 o'clock position at L4-5 and the second needle at L5-S1.  Needle position was carefully confirmed AP and laterally. Divided equally into each needle was 2 cc of Omnipaque 240 to confirm needle placement. A total of 2 cc of 0.75% Marcaine plus 80 mg of Depo Medrol was divided between the two injections.  The patient tolerated the entire procedure with no acute complications and was discharged home in stable condition after observation for 30 minutes.

DAVID P. HERRICK, M.D.
Signed without review

DPH/slb
D: 08/27/03
T: 08/28/03

# The Center for Pain
## of MONTGOMERY, P.C.

### DAVID HERRICK, MD • BRAD KATZ, MD

2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808
Fax: 334-288-8089

432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246
Fax: 334-387-7250

## EPIDUROGRAM REPORT

**NAME:** CATHY CLEILAND
**DATE:** 08/27/03
**DOB:**

There are two fluoroscopic images showing contrast injected at L4-5. There is fairly ratty spread of contrast at L4-5 with very poor medial spread of contrast through the neural foramen into the epidural space. A large laminectomy defect is present with significant disc height loss at L4-5. The L5-S1 nerve root is very nicely illuminated with contrast spread medially into the epidural space.

**IMPRESSION:** Epidural fibrosis at L4-5 creating an abnormal epidurogram. No previous films are immediately available for comparison.

DAVID P. HERRICK, M.D.
Signed without review.

DPH/slb
D: 08/27/03
T: 08/28/03

CLE00101

 **SCHOOL OF MEDICINE**

Department of Surgery
Division of Neurosurgery

November 17, 2003

Dr. John Hackman
1722 Pine Street, Suite 1001
Montgomery, Alabama 36106

Re: CATHY CLEILAND
UAB #: 000000698678

Dear John:

I saw your patient, Cathy Cleiland, in the Neurosurgery Clinic today. She is a pleasant woman of 46 years and has had a good bit of spinal surgery performed. She has had three separate anterior cervical procedures accomplished over time. She was in a motor vehicle accident in April 2002 and ultimately had lumbar spinal surgery, left-sided L4-5 discectomy, in May 2003. She says she did not have much improvement from this, or at least any lasting improvement. It has become increasingly troublesome to her. She ultimately sought re-evaluation and a second procedure in July 16, 2003 for recurrent disc. She unfortunately states that she is no better. She has developed important back pain, which is different than what she has experienced previously. The left lower extremity pain and dysfunction remains but she now has severe burning dysesthesia in the bottom of the foot, which radiates up to the knee. She is also developing right lower extremity complaints. You have discussed with her the options of additional therapy and she would like my thoughts regarding her circumstance.

Of importance with this woman is that she is a bit overweight for her frame. She is 171 pounds on a 5 foot 4 inch frame. She has juvenile diabetes and has been treated for same for 25 years. She is utilizing Neurontin, Darvocet, Lortab and Flexeril in treatment of her pain syndrome but is really not much better. She has not had much in the way of physical therapy of late. She tried this after her first operation.

She describes mechanical type pain, sharp, stabbing, lancinating pain with motion. She cannot always anticipate which motion is going to give her the trouble. Rolling over in bed, for example, sometimes causes a sharp, stabbing pain that then radiates down her left leg. At other times she can stand and walk and get around reasonably well with just an underlying, severe low backache but will have superimposed sharp, stabbing pains that literally take her breath away. Her pain tends to follow the L5 distribution and also S1 on this left side. She is developing some right-sided complaints as well. She walks with a

The University of Alabama at Birmingham
1030 Faculty Office Tower ● 510 20th Street South
Birmingham, Alabama 35294-3410
(205) 934-7170● FAX (205) 934-6507

4

limp and the more she walks, the more she limps. She walks in a flexed position too, very careful with the positioning of her spine and her step. She really tries to avoid any jarring. She cannot keep shoes on her feet more than two to three hours because of the burning dysesthesias, particularly on the left but the right as well.

As we examine her, she does have pain that appears mechanical. She has a real tough time with flexion, extension, laterally bending or rotation of the lumbar spine. This tends to cause focal back pain, sometimes sharp with lancination down the left leg. She appears to be weak in the extensor hallucis longis and anterior tibialis on that left side compared to the right. She indeed has burning dysesthesias in the L5 and S1 distribution on the left. She has reduced ankle response on the left.

I reviewed films on Cathy from prior to her original surgery to her most recent three sets of MR studies with two different sets of plain spine films. She has what appears to be collapse and degeneration despite attempted discectomy times two. I think she has developed failure of the facet complex on this left side and then subluxation and collapse, which is causing further canal compromise. There is a good bit of scar in around the previous operative site. I do not see specific disc material, which has re-herniated, but significant collapse with narrowing and angulation with a grade I spondylosis.

I think Cathy Cleiland has developed lumbar spinal instability with recurrent nerve root compression. I think some of her components, particularly the burning dysesthesias in the left lower extremity, are probably the result of nerve root injury from her pathology and its attempted treatment. I do think her mechanical instability and ongoing neuro compression can be improved with an operative procedure to provide decompression, internal fixation and fusion with the hope to restore her normal lumbar lordosis and interspace height. While I do not think she will have alleviation of her severe burning dysesthesias in her left lower extremity, she does have a very good opportunity to benefit from the above-mentioned procedure. Cathy would like to proceed. We have tentatively selected the date of December 9 as an operative date. We will complete the history, physical and preoperative counseling today. I will keep you posted on our progress. Thank you for asking me to provide an opinion on this pleasant woman.

Sincerely,

Mark N. Hadley, M.D.
Professor of Neurosurgery

MNH/hr

DSCjob#1117-507

5

CLE00103

Sincerely,

Mark N. Hadley, M.D.
Professor of Neurosurgery

MNH/npp

job#21-0714-425

6

CLE00104

| CLELAND CATHY K | 698678 | 07/14/2004 | 07/14/2004 13:48: |
|---|---|---|---|
| Patient Name | Age | Observation Date | Last Edited Date |

**Result Type:**
MR Lumbar Spine wo+w contrast

**Reason For Exam:**
lumbar sacral spine - lumbar stenosis

**Results:**
**Evaluate operation on the lumbar spine:**
There is loss of normal lordosis of the lumbar spine. There is evidence of marrow change in relation to the disc L4-5 with evidence of operative intervention with metallic prosthesis using plates and pedicular screws. There is minimal malalignment with a step deformity between L4 and L5. Conus medullaris is normal ending at T12-L1. Possibility of a transitional vertebra at the lumbosacral junction cannot be excluded. For proper level determination, plain film examination of the thoracic and lumbar spine is recommended. There is evidence of laminectomy in the lower lumbar and lumbosacral region. There is evidence of stenosis at L3-4 with a minimal disc bulge.

Paraspinal muscles appear normal.

After gadolinium injection, enhancement noted at the level of fusion at L4-5. No evidence of abnormal enhancement in the paraspinal region.

**IMPRESSION:**
Post operative changes with abnormal enhancement in relation to the disc plates at L4-5. Mild to moderate stenosis noted at L3-4. The enhancement in relation to L4-5 could be due to degenerative changes Type I, however inflammatory changes cannot be entirely excluded.

LPM

**Signature Line:**
Final Report
**Interpreted by:** Taher T. El Gammal
**Title:** MD
**Signed Date/Time:** 07/14/04 13 12

*End of document as received by CDA*

https://horizon.hs.uab.edu/cgi-bin/cda/user/show_note.cgi?RS_::13742916:0:20040714134...   8/17/2006

https://horizon.hs.uab.edu/ipv/servlet/IPVViewDocument?isNS47=no&rid=3266275        8/17/2006
9

CLE00105

## THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 01/14/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

Cathy Cleiland is seen back in the Neurosurgery Clinic today. She is four weeks out after re-operative lumbar spine surgery at L4-5 with posterior lumbar interbody fusion and internal fixation. While she is standing better and has better function in her left lower extremity, she still has severe, burning dysesthetic pain in her legs, worse in the left leg than the right. This is very similar to her preoperative circumstance. She is using Neurontin 300 mg to 600 mg three times per day. She is still using a fair bit of pain medication. Her wound was giving her trouble but she has no tenderness or soreness there.

On examination, her wound looks good. She has a scab on the bottom but it is not erythematous, not leaking. The skin edges are simply healing. There is no fullness or fluid here. She can bend and move her spine and certainly her posture is much better than it was prior to surgery. She cannot yet walk on her heels but can on her toes. Independent testing reveals improved strength in the extensor hallucis longis and anterior tibialis on the left compared to preoperatively.

Imaging studies were not performed today. We will obtain these in four weeks. I am going to put her on an elevated dose of Neurontin 800 mg qid. We will continue to offer supportive care. We will get her involved in physical therapy as an outpatient. I will see her back in four weeks.

MNH/hr/2823
D: 2004-01-14
T: 1/15/04 12:12 PM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

cc:

job#:0114-176

1
NeuroSurgCN-Hadley

CLE00106

# THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 02/11/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

Cathy Cleiland is seen back in the Neurosurgery Clinic today. She is two months out from L4-5 decompression, stabilization and fusion. She is doing okay. She is using Darvocet N-100 for pain, which is substantially a lower dose of narcotic than she has used in the past. She is using Neurontin 800 mg TID same as her preop. She is still having important and bitter burning dysesthesias in that left lower extremity. She has been plagued with that. She states she does not feel any better in that left leg after her operation than she did six months ago. Her only change she notes is that she is not having the same kind of back pain she has had previously.

On exam, I bring out residual weakness in the tibialis anterior and extensor hallucis longis on the left side. I bring out no other abnormalities. Radiographic studies today look pretty good. Internal fixation and fusion, PLIF construct looks fine as it has previously.

I have given my support and encouragement to Cathy. We are going to refill her Robaxin and her Darvocet medications today. She needs to give this more time. As we told her preoperatively, the burning dysesthesias and longstanding nature of her problems in her left lower extremity including weakness, sensory loss and the dysesthesias are not terribly positive signs for a complete recovery. Hopefully, she will continue to improve over time. We will assist her as we can and see her back in four months at her six-month followup.

MNH/hr/2823
D: 2004-02-11
T: 2/12/04 9:18 PM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

cc:

job#: 0211-043

CLE00107



Health
System
2000 6<sup>th</sup> Ave. South
Birmingham, AL
35249

Name: CLEILAND, CATHY K
MRN: 000000698678
DOB ▮▮▮▮▮▮▮▮ Age: 47 Years
Race: Unknown KNEU//
Attending: Hadley, Mark N
Fin #: 406694196  Fin Class: Blue Cross
Admit Date:

## R A D I O L O G Y

| Accession Number: | Date of Service: | Ordering Physician | Exam: |
|---|---|---|---|
| MR-04-0011739 | 7/14/2004 | Hadley, Mark N | MR Lumbar Spine with contrast |

Indications
lumbar sacral spine - lumbar stenosis

Results
Evaluate operation on the lumbar spine:
There is loss of normal lordosis of the lumbar spine.  There is
evidence of marrow change in relation to the disc L4-5 with evidence of
operative intervention with metallic prosthesis using plates and
pedicular screws.  There is minimal malalignment with a step deformity
between L4 and L5.  Conus medullaris is normal ending at T12-L1.
Possibility of a transitional vertebra at the lumbosacral junction
cannot be excluded.  For proper level determination, plain film
examination of the thoracic and lumbar spine is recommended.  There is
evidence of laminectomy in the lower lumbar and lumbosacral region.
There is evidence of stenosis at L3-4 with a minimal disc bulge.


Paraspinal muscles appear normal.


After gadolinium injection, enhancement noted at the level of fusion at
L4-5.  No evidence of abnormal enhancement in the paraspinal region.



IMPRESSION:
Post operative changes with abnormal enhancement in relation to the
disc plates at L4-5.  Mild to moderate stenosis noted at L3-4.  The
enhancement in relation to L4-5 could be due to degenerative changes
Type I, however inflammatory changes cannot be entirely excluded.


LPM
Final Report
Interpreted by: Taher T. El Gammal
Title: MD
Signed Date/Time: 07/14/04 13:12



The University of Alabama at Birmingham                                    PAGE 1
The Medical Center/University of Alabama Hospitals

### DISCHARGE SUMMARY

NAME: CLEILAND, CATHY                    MED.REC.NO.: 00698878    ROOM:

SERVICE: Mark N. Hadley, M.D./2823      ADMITTED: 12/16/03      DISCHARGED: 12/18/03

                                         DICTATED: 12/18/03      TRANSCRIBED: 12/18/03

ADMISSION DIAGNOSIS:        Lumbar instability.

DISCHARGE DIAGNOSIS:        Same.

PROCEDURE:                  L4-5 laminectomy and diskectomy with
                            L4-5 internal fixation and fusion and
                            L4-5 posterior lumbar interbody fusion
                            by Dr. Hadley on 12/16.

HISTORY OF PRESENT ILLNESS:  The patient is a 46-year-old white
female with a one and a half year history of low back pain and
left leg pain with numbness in the lateral left leg and plantar
surface of the left foot.  She has a history of prior lumbar
surgery.  Exam and imaging is consistent with L4-5 instability.
She presents now for elective decompression with L4-5 posterior
lumbar interbody fusion.

Please see history and physical for further details.

HOSPITAL COURSE:  The patient underwent the aforementioned
procedure which she tolerated without difficulty.  She was
followed on the floor postoperatively where she had an
uncomplicated hospital course and mobilized in a timely fashion
and she remained neurologically stable in comparison to her
preoperative exam.  She had a slight foot drop on the left
preoperatively and this was felt to have improved actually
somewhat on postoperative day one with almost normal strength on
the left side with dorsiflexion.  She was fitted with an LSO brace
and approved for discharge the morning of 12/18.

DISCHARGE CONDITION:  Good.

DISPOSITION:  Home.

DISCHARGE MEDICATIONS:  Neurontin 300 mg t.i.d.; Robaxin, Lortab,
and Advil as needed for pain.

15

CLE00109

**UAB**   The University of Alabama at Birmingham                     PAGE 2
          The Medical Center/University of Alabama Hospitals

                         DISCHARGE SUMMARY

NAME: CLEILAND, CATHY              MED.REC.NO.: 00698678    ROOM:


Followup is on 12/29 for a wound check with Dr. Hadley.


Kevin N. Ammar, M.D./07734/TL032

                                        _____
                                        Mark N. Hadley, M.D.

16

CLE00110

**LAB**  The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals    PAGE 1

OPERATION NOTE

NAME: CLEILAND, CATHY          MED.REC.NO.: 00698078    ROOM:

SURG: MARK N. HADLEY, M.D.     ASSIST: AJAY K. ANANDA, M.D.

SURG.SIGN.: _____

DATE OPER.: 12/16/03

SERVICE: MARK N. HADLEY, M.D.  ADMITTED: / /        DISCHARGED: / /

DOCTOR/SERV.SIGN.: _____    DICTATED: 12/16/03   TRANSCRIBED: 12/16/03

PREOPERATIVE DIAGNOSIS: Lumbar spinal instability, with L5
radiculopathy, left greater than right.

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURES PERFORMED:
1. L4-L5 laminectomy for decompression.
2. L4-5 diskectomy, bilateral, with L4-5
posterior lumbar interbody fusion,
bilateral.
3. Internal fixation L4-L5, bilateral.
4. Autologous bone dorsolateral fusion
L4-L5, bilateral.

ANESTHESIA: General with endotracheal intubation.

INDICATIONS: This is a 46-year-old female who has had previous
L4-5 surgery. She has developed collapse and instability at L4-5,
with marked L5 root compression and foot drop. She has horrific
pain, both mechanical in nature and radicular in nature,
bilateral, again left more than right. She is a candidate for
operative decompression at the L4-5 level, followed by L4-5
posterior lumbar interbody fusion and internal fixation and
dorsolateral fusion. She understands the indications for as well
as the risks of the procedure. She wishes to proceed. Consent
has been obtained.

OPERATIVE TECHNIQUE: After smooth induction of anesthesia and
intubation, the patient was carefully moved from the hospital bed
to the operating table and placed in the prone position on the
Wilson frame. The patient's lumbosacral spine was shaved,
prepped, and draped in the usual sterile fashion. I used the
previous skin incision but essentially extended the incision from
the inferior portion of L3 down to the superior portion of S1.
There was a great deal of scar on this left side, particularly at
L4-5. I dissected down bilaterally, exposing the spinous process
and lamina of L4 and the spinous process and lamina of L5. There

17

CLE00111



**The University of Alabama at Birmingham**
**The Medical Center/University of Alabama Hospitals**                    PAGE 2

OPERATION NOTE

NAME: CLEILAND, CATHY            MED.REC.NO.: 00698678    ROOM:

was marked facet mobility, in fact fractured facet at the L4-5 level on the left with collapse. I dissected out laterally bilaterally and exposed the facet complex at L4-5 and then the transverse process of L5. I worked up in a careful manner in a cephalad direction and exposed the transverse processes of L4 bilaterally, using great care to avoid any compromise or exposure of the L3-4 facet complex. I irrigated the wound with antibiotic solution. I then used a double-action rongeur to remove the spinous processes and lamina which remained at L4 and L5. I had dissected around the L4-5 scar on the left side, of course, but was able to do so and then fully decompress the thecal sac from superior L4 through L5. Working from the patient's left side toward the right, I undercut the medial facet complex and decompressed the lateral recess stenosis here. I took the L4-5 facet down as well. I went around to the patient's right, worked back toward the left, worked around and through scar, and decompressed the exiting L5 root which was markedly compromised, as well as the exiting L4 root. There was tremendous scar here from this collapsed, fractured, and failed facet. I then worked underneath the L5 root on the left, worked in a cephalad direction, and found recurrent disc herniation. I was able to dissect through this using both blunt and sharp dissection techniques, avoiding injury to the L5 and the L4 root, and then retract the nerve root medially. The markedly collapsed interspace here was identified. Posterior lumbar interbody fusion instruments were then sequentially used, beginning with an 8 mm blade up to an 11 mm blade, decorticating the inferior left endplate of L4 as well as the superior endplate of L5. Disc material was removed with interspace rongeurs. I then dissected on the patient's right side, careful to avoid any compromise of the L4-5 root on the right. Again, posterior lumbar interbody blades were used to remove disc material and decorticate the endplates sequentially from 8 mm to 11. I then used a box cutter to decorticate the endplates even better at the inferior L4 and superior L5 bilaterally. I then placed a distraction device in the interspace 12 mm. I used a 13 mm allograft posterior lumbar interbody fusion substrate and tapped these as interposition grafts, first on the patient's left and then the right. These appeared to be in good position, and we had markedly increased, although not quite to normal, the interspace height from her – – preoperative collapsed circumstance. There was immediate firmness and stability to this previously very unstable joint. I then passed bone screws via the pedicles into the bodies with the use of intraoperative fluoroscopy into L4 and L5 bilaterally. I decorticated the exposed dorsolateral surfaces of L4 and L5. I morselized all the patient's bone which I had removed during the laminectomy and facetectomy completely of L4 and L5, admixed this

18

CLE00112



The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

PAGE 3

OPERATION NOTE

NAME: CLEILAND, CATHY                MED.REC.NO.: 00698678    ROOM:

with bone morphogenic protein putty and paste, and then packed it over the exposed dorsolateral surfaces of L4 and L5. Contoured rods were then secured to the bone screws at L4 and L5 bilaterally and locked into position, completing the procedure. I irrigated the wound with antibiotic solution. There was no evidence of nerve root compromise, thecal sac compression, or CSF leak. Bleeding was well controlled. I placed a drain. We closed the wound in multiple layers. The skin edges were approximated with a running nylon suture.

I personally supervised the entirety of the procedure and performed the essential elements outlined above.


Mark N. Hadley, M.D./07120/TL030

CLE00113

# THE KIRKLIN NEUROSURGERY CLINIC
## CLINIC NOTE

| CLEILAND, CATHY K | 000000698678 | 06/09/2004 |
|---|---|---|
| Patient Name | Record Number | Visit Date |

SUMMARY:

Cathy Cleiland is seen back in the Neurosurgery Clinic today. She underwent L4-L5 posterior lumbar interbody fusion with internal fixation and fusion on December 16, 2003. She states that she has had improvement in back pain. She no longer has the sharp, stabbing, mechanical complaints. Unfortunately, she continues to have severe painful dysesthesias in her lower extremities, left more than right. This is very similar to preop. We cautioned her and were concerned that the burning dysesthesias in her legs prior to surgery may not be improved by surgery. We certainly hoped that she would improve and, at least thus far, have not given up hope that improvement may occur. On exam, she is stiff. She does not bend and flex much, but can flex, extend, laterally bend, and rotate without evidence of instability. Motor, sensory and reflex testing is quite good in the lower extremities. She can walk on her toes and her heels.

Radiographic studies today demonstrate intact internal fixation hardware and good placement of fusion mass at the L4-L5 level. There is no malalignment. There is no pathology above or below.

We have done what we can for Cathy Cleiland. We will continue to monitor progress on an intermittent or six-month type basis. There is nothing additional at present for neurosurgery to provide other than supportive care.

MNH/mpp/2823
D: 2004-06-09
T: 6/10/04 7:29 AM
DOB: 07/11/1957

Mark N. Hadley, M.D.
Professor of Neurosurgery

job#22-0609-301

1
NeuroSurgCN-Hadley

20

CLE00114

SPRINGHILL MEMORIAL HOSPITAL

Radiological Consultation

NAME:  CLEILAND, CATHY K
ADDRESS:  401 FORREST AVE

Age: 43Y       Sex: F       DOB:

Chk-in #    Order      Exam
173817      0001       4615

JACKSON

MR SPINE CERVICAL W/O CONTRAST
Ord Diag: SRV MRLD AND ADV PAIN

Comparison to previous examinations of 12/01/96. Routine sagittal and
axial images were obtained utilizing both T1 and T2 weighted images.
Posterior fossa and cord intensity within normal limits. There is
redemontration of previous surgery C5-6 with vertebral body marrow
bony fusion.  There is, however, increased T2 signal within the
disc and spur at C6-7 which is causing severe central canal stenosis as
well as moderate to severe left neural foraminal stenosis. The residual
midline central canal diameter is approximately 10 - 11 mm.

C3-4, C4-5, and C7-T1 levels are unchanged.

IMPRESSION:

1.    INTERVAL WORSENING OF SEVERE CENTRAL CANAL NARROWING C6-7 SECONDARY
TO BROAD BASED POSTERIOR MARGINAL OSTEOPHYTE AND ASSOCIATED DISC
HERNIATION SINCE PREVIOUS STUDIES.

2.    UNCHANGED POST SURGICAL APPEARANCE TO C5-6.

3.    C3-4, C4-5 AND C7-T1 LEVELS UNCHANGED SINCE PREVIOUS examination.

/Read By/ Chris E Blundon, M.D.
/Released By/ Chris E Blundon, M.D.

AAH

FINAL

CLE00115

SPRINGHILL MEMORIAL HOSPITAL
EMERGENCY PHYSICIAN REPORT

Patient Name: CLEILAND, CATHY K
Patient ID: 9220790      Admit Date/Time: 02/25/2001 15:11
DOB: ██████      Gender: F      Race: White

CHIEF COMPLAINT: Pain in back and neck
Patient complains of chronic pain in neck and back for 4 years status post an MVA. Patient is under
the care of a chronic pain specialist, and has had cervical spine surgery for same thing. Patient
states that over the past year for symptoms and gotten worse, and that her intrathecal injections of
antiinflammatories are becoming less and less effective. Patient is three weeks s/p last injection, and
as opposed to previous episodes, patient states that she didn't get any relief. The patient also states
that over the past few weeks, the tips of her fingers ( third and fourth) are numb. Patient called Dr
Snitzer, who instructed the patient to come to ED for evaluation.
There are no other complaints.
REVIEW OF SYSTEMS:
OTHER SYSTEMS: All other systems that were reviewed were negative.
PMH: Medical History: diabetes
Prior Surgery: C-section, cervical fusion.
PATIENT'S ALLERGIES: The patient denies having any medication allergies.
PATIENT'S CURRENT MEDICATIONS: see list
SOCIAL HISTORY: The patient is a nonsmoker.
FAMILY HISTORY: No Family History is pertinent to the present complaint.

PHYSICAL EXAM: Vital Signs: Reviewed Nurse's notes.
PATIENT STATUS: is in no distress, alert and cooperative.
HEAD: Atraumatic, without temporal or scalp tenderness.
NECK: Supple, nontender, no lymphadenopathy.
CHEST: Nontender, symmetrical, no retractions.
LUNGS: Clear to auscultation and breath sounds equal, no wheezes, rales, or rhonchi.
HEART: Regular rate and rhythm, without murmurs, ectopy, gallops, or rubs.
ABDOMEN: Soft, nontender.
ARM: Right arm. Nontender. Nonswollen. Range of motion: full. No deformity.
SKIN: Normal. Neurovascular status: motor impaired mildly weaker on the right than left, but patient
unable to give full effort with positive "breakaway weakness". Sensation impaired per patient in tips of
finger.. The distal pulses are normal.
REFLEXES: normal, with exception of decreased brachioradialis on the right compared to left.
GAIT: Normal.
BACK: No costovertebral, paravertebral, intervertebral, or vertebral tenderness or spasm.

TREATMENT:
CONSULT: Dr Snitzer was consulted by phone and we have discussed the above.. He asked that
the patient be given analgesia, and asked that the patient follow up in his office in the am.
Demerol, Phenergan, Toradol was given.

DIAGNOSIS: Back Pain, 724.5
Neck Pain, 723.1
Numbness, 782.0

DISPOSITION: Patient was discharged home accompanied by family.
The patient's condition at discharge was stable. See the Emergency Department face sheet for
discharge instructions.

E.D. Clinician:
Date:                    Michael A. Mahoney, MD      EMERGENCY DEPARTMENT
                         Sun Feb 25, 2001      Page 1 of 2

CLE00116

SPRINGHILL MEMORIAL HOSPITAL

Radiological Consultation

HOSPITAL #: 0788195

DATE:     12/28/99

LOCATION:   O/P

ORDERING PHYS: MIDDLETON,TROY H

NAME:  CLEILAND,CATHY
ADDRESS:  401 FORREST AVE          JACKSON          AL  36545

Age: 42Y     Sex: F     DOB:                    MR Number:  00173126

Chk-in #   Order     Exam
  86703     0001     1030     XR SPINE CERV SERIES
                             Ord Diag: NECK PAIN,FALL

There is fusion between C5 and C6 vertebral bodies.  The alignment is
normal.  There is no encroachment upon the foramina.  The other
vertebral bodies and interspaces are normal.


IMPRESSION:  FUSION AT THE C5-6 LEVEL.



                    /Read By/ Pavel M Lichtenstein, M.D.
FB                  /Released By/ Pavel M Lichtenstein, M.D.

FINAL

CLE00117

SPRINGHILL MEMORIAL HOSPITAL

Radiological Consultation

HOSPITAL #: 07578095

DATE:    12/01/99

LOCATION:    O/P

NAME: CLEILAND,CATHY
ADDRESS:  401 FORREST AVE

ORDERING PHYS: HINTON,JOHN L JR

JACKSON                          AL    36545

Age: 42Y        Sex: F        DOB:

Chk-in #        Order        Exam
   81810        0001        4615

MR Number:  00173126

MR SPINE LEVEL 2 CERVICAL
Ord Diag: NECK PAIN

There are no previous cervical spine MRIs available for comparison.
Routine sagittal and axial images were obtained utilizing both T1 and
T2 weighted technique.  Posterior fossa and spinal cord have normal
intensity.

IMPRESSION: 1)  PREVIOUS ACD AND F AT C5-6 WITH MILD POSTERIOR BONY BAR
FORMATION WHICH IS CAUSING MINIMAL CENTRAL CANAL NARROWING.

2)  AT C6-7, THERE IS A BROAD BASED POSTERIOR MARGINAL OSTEOPHYTE WHICH
IS CAUSING MODERATE TO SEVERE CENTRAL CANAL NARROWING, THIS IS BEST
VISUALIZED ON AXIAL VIEWS.

3)  C3-4, C4-5, AND C7-T1 LEVELS UNREMARKABLE WITHOUT EVIDENCE OF DISC
HERNIATION AT ANY LEVEL.  ALL FINDINGS ARE SUPERIMPOSED UPON MILD TO
MODERATE DEGENERATIVE FACET DISEASE AT ALL LEVELS EXAMINED.

LF

/Read By/ Carl E Blunck, M.D.
/Released By/ Carl E Blunck, M.D.

FINAL

RADIOLOGY REPORT              Page :1

CLE00118

P.O. BOX 8248
MOBILE, ALABAMA 36606

3719 DAUPHIN STREET
(334) 344-8630

Cleiland, Cathy
TBA

MRN:
ACCOUNT NO:
ADM DATE: 01/15/99

PHYSICIAN:    William Faircloth, M.D.

## HISTORY & PHYSICAL

PRIMARY PHYSICIAN:    Brent Faircloth, M.D.

HISTORY OF PRESENT ILLNESS:
Ms. Cleiland is a 41 year old right handed white female who I performed anterior cervical discectomy fusion at Springhill Memorial Hospital in November of 1997. She did extremely well from that, but more recently has had progressive right hand and forearm pain. It has worsened, and is now to the point that it awakens her at night. She has pain with driving her car, and if she hyper-extends or flexes her wrist. She has developed numbness of her thumb, index finger. She feels though that her strength has remained unchanged. She underwent peripheral nerve conduction studies with Dr. Ed Snitzer who had identified a severe carpal tunnel syndrome on the right. She failed to improve with non-steroidal anti-inflammatory agents, as well as cock-up splints. She is being admitted for carpal tunnel release.

PAST MEDICAL HISTORY:
Significant for the anterior cervical discectomy. Medical history is significant for diabetes and she takes insulin 13 units of regular and 27 units of NPH twice a day.

ALLERGIES:                No known drug allergies.
OCCUPATION:               Human Resources Manager
SOCIAL HISTORY:           She is married.
HABITS:                   Tobacco usage - none; Alcohol usage - occasional.
FAMILY HISTORY:           Father is age 76 and healthy; mother is 73 and healthy.
                          She has three brothers ages 36, 49, and 51; all are
                          healthy. She has one sister age 45 and healthy.

PHYSICAL EXAMINATION:
GENERAL:                  Well developed, well nourished, middle aged, white female.
HEENT:                    Normocephalic and atraumatic. Pupils equal, round, and
                          reactive to light and accommodation. Sclerae non-icteric.
                          Conjunctiva pink. Nares patent. Septum in midline.
                          Oropharynx without inflammation, irritation, injection.
NECK:                     Supple without adenopathy or thyromegaly. She has no JVD
                          and no bruits.
LUNGS:                    Symmetrical expansion of lungs; lungs clear.

Continued, page two....

CLE00119

P.O. BOX 8246
MOBILE, ALABAMA 36608

3718 DAUPHIN STREET
(334) 344-9630

Cleiland, Cathy

PHYSICIAN:    William Faircloth, M.D.

PAGE 2...

HEART:          Regular rate and rhythm without gallops or murmurs.
ABDOMEN:        Soft. Non-tender. Non-distended.
NEUROLOGIC:     She is awake, alert and oriented x 3. Memory, intelligence,
judgement and affect were all appropriate and within normal
limits. Motor strength was 5/5 throughout.  Reflexes were
2+/2.  She had decreased pinprick in her thumb, and index
finger of her right hand, normal elsewhere.  She had a
positive tinel sign at her wrist and had pain with maximal
flexion and extension of her wrist on the right.

IMPRESSION:     Carpal tunnel syndrome, right

PLAN:
1.    Admit
2.    Right carpal tunnel release

DISCUSSION:
I had a long discussion with Ms. Cleiland.  I explained the anatomy and
pathology of her lesion at length, in plain English, and in great detail.
I explained to risks to include the possibility of infection, hemorrhage (
REPORT CUT OFF AT THIS POINT........

Signature::
D: 01/14/99      T: 01/14/99

CLE00120

P.O. BOX 8248
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9830

CLEILAND, CATHY

PHYSICIAN:   William Faircloth, M.D.

MRN:  OP
ACCOUNT NO:
ADM DATE:

OPERATIVE SUMMARY

SURGERY DATE:  01/15/99

SURGEON:     William Faircloth, M.D.

This was a clean case performed in O.R. Room 9.

PREOPERATIVE DIAGNOSIS:  Right carpal tunnel syndrome

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURE:                Right median nerve decompression

ASSISTANT: Mr. David Redd, ORT
CIRCULATING NURSE:  Ms. Candy Cannibus
ANESTHESIA:  Monitored anesthesia care
ANESTHESIOLOGIST: Dr. Hanlon
ANESTHETIST: Mr. Lamar Brown, CRNA
COMPLICATIONS:  None.
ESTIMATED BLOOD LOSS:  Less than 20 ccs.

BRIEF HISTORY: Ms. Cleiland is a 41 year old right handed white female who
presented with intractable right wrist pain.  EMGs revealed evidence of
carpal tunnel syndrome. In view of the fact that she failed to improve with
conservative management, she is admitted for surgery.

DESCRIPTION OF PROCEDURE:  The patient was brought to O.R. Room 9. The
right hand and arm were prepped with multiple applications of Betadine
scrub and Betadine. The patient was then sterilely draped in the routine
fashion. Planned skin incision was infiltrated with 1% Lidocaine, with
sodium bicarbonate. An incision was created in the midline, and carried
down to the first flexor crease, and extended down into the palm. The
palmaris ligament was identified, and the median nerve was identified just
posterior to this. I opened the carpal ligament along the nerve well down
into the palm. Meticulous hemostasis was achieved. The patient could move
her thumb and index finger well. She could oppose her thumb to her small
finger. She reported that she had improved sensation in her hand.

CONTINUED, PAGE TWO....

CLE00121

P.O. BOX 6446
MOBILE, ALABAMA 36608

3710 DAUPHIN STREET
(334) 344-8830

CLEILAND, CATHY                    PHYSICIAN:    William Faircloth, M.D.

PAGE 2...

The wound was closed in layers by approximating the subcutaneous tissue
with interrupted 4-0 Vicryl and the skin edges with running subcuticular 4-
0 PDS.

The patient was taken to the recovery room in satisfactory condition.

"I authorized my name to be electronically affixed by using
my unique dictation computer key."

Signature::
D: 01/15/99     T: 01/17/99     mma            William Faircloth, M.D.

CLE00122

Patient ID: 9132105.76
Patient Name: Cleiland, Cathy
40 year old well-appearing white female
MODE OF ARRIVAL: Patient arrived via private automobile.
Time seen by clinician: 1:10 pm
CHIEF COMPLAINT: Left lower abdominal pain, left lower back pain
Patient complains of having urinary symptoms for approximately 2-3 weeks
prior to arrival. There has been moderate dysuria, no hematuria, moderate
frequency, moderate urgency and a low grade fever. There has been mild
left-sided flank pain. There has been mild suprapubic abdominal pain.
There has been no nausea. There has been no vomiting. There has been no
vaginal discharge and no vaginal bleeding.
LMP: 3 weeks ago. Patient has had frequent UTI's for 2 months now.

REVIEW OF SYSTEMS:
GENERAL: some chills.
THROAT: no sore throat.
RESPIRATORY: no cough, no dyspnea.
CARDIAC: no chest pain.
PMH: The patient has a history of insulin dependent diabetes. No
allergies. Currently not on antibiotics
SOCIAL HISTORY: Lives in Jackson, AL
PHYSICAL EXAM: Vital Signs: Reviewed Nurse's notes.
PATIENT STATUS: comfortable, alert and cooperative.
EYES: PERRL, EOMI, no discharge or injection.
EARS: TMs without perforation, injection, or bulging. External canals clear
without exudate.
THROAT: Pharynx without injection, exudate or tonsillar hypertrophy.
Airway patent.
NECK: Supple, nontender, no lymphadenopathy.
Without Kernig's or Brudzinski's signs.
LUNGS: Clear to auscultation and breath sounds equal, no wheezes, rales, or
rhonchi.
HEART: Regular rate and rhythm, without murmurs, ectopy, gallops, or rubs.
ABDOMEN: Mild suprapubic, lower left lower tenderness. Normal bowel
sounds. No rebound. No guarding. Mild left-sided flank tenderness. No
distension. No tympany. No mass is palpable.
EXTREMITIES: Symmetrical, full range of motion, equal tone and strength. No
cyanosis, edema, joint tenderness or effusion. Pulses equal bilaterally.
DIFFERENTIAL DIAGNOSIS: UTI, pyelonephritis, kidney stone, pregnancy, among
others

GLUCOSE: Fingerstick, 69, normal.
Urine pregnancy negative.
URINALYSIS: consistent with a urinary tract infection
URINE CULTURE: obtained.
CBC: WBC 11.2 within high normal limits. Otherwise normal. CREATININE

ŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝŝ
E.D. Clinician: John L. McCormick, M.D. FACEP EMERGENCY PHYSICIAN REPORT
Date: Tue Mar 17, 1998 Page 1 of 1

Patient Name:  Cleveland, Cathy
Patient ID:  XXXX05.76

0.7 within normal limits.
INTERVENTION:
Tylenol 1 gram po was given
Gentamicin 80 mg IM was given.
Toradol 60 mg IM was given.  After treatment the patient's symptoms were
moderately relieved.
REEXAMINATION:  at 4:45 pm
The patient's condition is improved.  Continues with mild back pain;
markedly improved. Patient ate a snack in ED. Patient has slight
palpitations; heart rate 100, regular.
DIAGNOSIS:
Urinary Tract Infection, 599.0
Fever, 780.6
Diabetes Mellitus, Type I (Insulin Dependent),  No Complications, 250.01

DISPOSITION: Patient was discharged home.
The following prescriptions were given to the patient: Macrodantin 100 mg
every 6 hours X 10 days
Pyridium 200 mg every 8 hours X 2 days
Motrin 800 mg every 8 hours w/meals.
Return to the emergency department for high fever, worsening back pain,
abdominal pain, persistent vomiting, or if your condition otherwise seems
to worsen.  The patient was advised to follow-up with  Family Physician in
2-3 days  For continued symptoms .

John L. McCormick, M.D., FACEP
Tue Mar 17, 1998, 04:43 PM

E.D. CLINICIAN:  John L. McCORMICK
Date:                 Tue Mar 17, 1998

Patient ID: 9132105.76
Patient Name: Cleiland, Cathy

DIAGNOSIS:
Urinary Tract Infection, 599.0
Fever, 780.6
Diabetes Mellitus, Type I (Insulin Dependent), No Complications, 250.01

DISPOSITION: Patient was discharged home.
The following prescriptions were given to the patient: Macrodantin 100 mg
every 6 hours X 10 days
Pyridium 200 mg every 8 hours X 2 days
Motrin 800 mg every 8 hours w/meals.
    Return to the emergency department for high fever, worsening back pain,
abdominal pain, persistent vomiting, or if your condition otherwise seems
to worsen.  The patient was advised to follow-up with  Family Physician in
2-3 days  For continued symptoms .


I have received the instructions above.  I understand that I have received
emergency treatment only, and that I may be released before all my medical
problems are known or treated.  I will arrange for follow-up care as
instructed above.

X _Cathy J. Cleiland_____    _3/17/98_____   _Self_____
Patient/Responsible person      Date            Relationship to patient

_Dale McCormick_____                17:00
Signature of Witness

                          John L. McCormick, M.D., FACEP
                          Tue Mar 17, 1998, 04:43 PM


E.D. Clinician:  John L. McCormick, M.D., FACEP
Date:            Tue Mar 17, 1998

CLE00125

Name CLEILAND, CATHY K

Age DOB:                                     Address

Part Examined CERVICAL SPINE-FLEX/EXT           Sex    F

ROENTGENOLOGICAL FINDINGS:

There is fusion of the C5 and C6 vertebral bodies. No evidence of
significant arthritic disease. There is no evidence of subluxation.

IMPRESSION:    FUSION OF THE C5 AND C6 VERTEBRAL BODIES.  NO OTHER
ABNORMALITIES.

fb 01-23-98

01-23-98

LARRY GREER, M.D.

CLE00126



### *The* Center for Pain
*of* M O N T G O M E R Y, P.C.

David Herrick, M.D. ■ Brad Katz, M.D.
P.O. Box 241348
Montgomery, AL 36124
334-387-7246  ext. 108

## 334-387-0024  (Fax)

Date:  November 8, 2006

To:  Mrs. Ezell

From:  Michelle

Fax#:  205-803-0053                 Pages, including cover sheet :  9

---

## Updated records on Cathy Cleiland

### Michelle 334-387-7246 ext 108

#### Confidentiality Statement

The information contained in this facsimile is confidential and intended solely for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited under federal regulations (42 CPR part two).



EXHIBIT
3

1

Nov. 8. 2006 3:05PM                                        No. 2119   P. 2



Nortide

### The Center for Pain
### of MONTGOMERY, P.C.

DAVID HERRICK, M.D.    ■ BRAD KATZ, M.D.

☒ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _CAthy Cleiland_     Date: _10-24-06_

1. Are you: ☐ Better?  ☒ Worse?  ☐ Same?

2. Since your last visit, have you been to the Emergency Room?  ☐ YES  ☒ NO
   (If Yes, please explain) _____

3. Since your last visit, have you seen any other doctor(s) or had any surgery?  ☐ YES  ☒ NO
   (If Yes, please explain) _____

4. Since your last visit, have you had any X-rays?  ☐ YES  ☒ NO
   (If Yes, what kind and where were they done) _____

5. Since your last visit, have you had any medication changes? ☐ YES  ☒ NO
   (Please list all medications) _____

6. Do you have any allergies? ☒ YES  ☐ NO
   (If Yes, Please list all your allergies) _Cipro, Levaquin_

7. What do you want to discuss today? (medicine, pain) refills, etc.)
   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

Mark all the places you feel pain.



neck is very weak

feet burning really bad

right leg is hard to stay drawn up

0  1  2  3  4  5  6  7  8  9  10
No                Moderate              Worst
Pain                Pain                  Pain

RIGHT    LEFT      LEFT    RIGHT

2

CLE00143

Nov. 8. 2006  3:05PM                                    No. 2119   P. 3

Name _Cathy Cleveland_  ID _1449_  Date _10/24/06_  East (South)

Pain Issues: _arm / leg_

Comorbidities (DM) HBP  CAD CVA  Obesity CHF OSA COPD PVD GERD RA OA Osteoporosis
Thyroid  Depression  SLE  Asthma

Soc HX no δ _____  Family HX neg δ _____  Injuries _na_  Health (Stable)

ROS /New Issues _____

Medical Care  PCP  Specialist  Dentist  ER  Studies _____  Procedures _____

Medications _Hospice / Methadone_

Medications effective  yes  no +/-  new meds _____  adverse rxn _____

Pain Location:                      Current Pain: _10_



MSE (alert)  depressed  agitated  sedated  tearful ____
Ambulation (self) cane  walker  wheelchair  scooter ____
Posture  comfortable  pacing  fidgeting  slouching  antalgic  indian chief ____
Eyes  PERRL  EOMI  conjunctiva wnl  nystagmus ____
ENT  rhinorrhea  oropharynx  TM  HOH ____
Neck  supple  thyroidmegaly  lymphadenopathy  bruits ____
Chest Wall  intact  breasts symmetric ____
Lungs  no respiratory embarrassment  clear  wheezing  stridor  rhonchi  labored ____
Heart  no hemodynamic instability  RRR  S1S2  murmur  edema in legs ____
Abdomen  soft  non-tender  non-surgical  BS wnl  organomegaly  flank tenderness ____
Skin  generalized rash  irritation  varicosities  tattoos  scars ____
MuSk  vertebral tenderness  c t l  SI tenderness  r l  hot joints ____  amputation ____
Muscle tenderness ____  joint tenderness ____  ROM ____
Neuro  CN 2-12 wnl  no localizing weakness  gait steady  reflexes ____  Spurling ____
Straight leg  Trunk lateral flexion  Trunk rotation  Romberg  Froment  Tinel  Phalen ____
Radial tap  position  graphesthesia  dysdiadokinesis  break  gastroc ____
Other ____

Patient Requests  none  new med ____  new dose ____  other ____

Diversion  pill count  contact pharmacy  insurance check  other provider  UDS ____

Interactions  review medication agreement  review goals  review studies  education
handicap placard  disability forms  letter ____

Assessment  pain issues stable  new issues ____

Plan  refill current meds  drop ____  start ____  MRI _shoulder_ MRI ____  Procedure ____  Referral ____

Visit Length ____  Follow-up _1_  Comments ____

Natalie

3

CLE00144



**The Center for Pain**
*of* M O N T G O M E R Y, P.C.

DAVID HERRICK, M.D.    ■    BRAD KATZ, M.D.

☑ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

❑ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient Name: _Cathy Cleiland_                     Date: _____

1. Are you: ❑ Better?    ☑ Worse?    ❑ Same?

2. Since your last visit, have you been to the Emergency Room?  ☑ YES    ❑ NO

   (If Yes, please explain) _Troy 8-26-06. They said I had a small bowel obstruction and_
   _wanted to do surgery on Sunday. I left for 2nd opinion._

3. Since your last visit, have you seen any other doctor(s) or had any surgery?  ☑ YES    ❑ NO

   (If Yes, please explain) _My Primary Care Dr. after the ordeal in Troy. He stated that_
   _I did the right thing by seeking 2nd opinion._

4. Since your last visit, have you had any X-rays?   ☑ YES  ❑ NO

   (If Yes, what kind and where were they done) _CAT SCAN in Troy_

5. Since your last visit, have you had any medication changes? ❑ YES   ☑ NO

   (Please list all medications) _____

6. Do you have any allergies? ☑ YES   ❑ NO

   (If Yes, Please list all your allergies) _Cipro, Levaquin_

7. What do you want to discuss today? (medicine (pain) refills, etc.)

   _____

## PLEASE RATE YOUR PAIN AS IT IS RIGHT NOW

0 means no pain.
10 means the worst pain you can imagine.

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
No
Pain                Moderate                        Worst
                      Pain                            Pain

Mark all the places you feel pain.



my right side has been in severe pain over last month.

Outside of left side

RIGHT    LEFT    LEFT    RIGHT

4

CLE00145

Nov. 8. 2006 3:06PM                                No. 2119    P. 5

Name _____ ID _____ Date 9/26/____ East (South)

Pain Issues COPD / LBP

Comorbidities (DM) HBP CAD CVA Obesity CHF OSA COPD PVD GERD RA OA Osteoporosis
Thyroid Depression SLE Asthma _____

Soc HX no Δ _____ Family HX no Δ _____ Injuries no _____ Health Stable

ROS /New Issues _____

Medical Care PCP Specialist Dentist ED Studies _____ Procedures _____

Medications _____

Medications effective yes no +/- new meds _____ adverse rxn _____

Pain Location: _____                Current Pain: 0



MSE (alert) depressed agitated sedated tearful _____
Ambulation (self) cane walker wheelchair scooter _____
Posture (comfortable) pacing fidgeting slouching antalgic Indian chief
Eyes PERRL EOMI conjunctiva wnl nystagmus _____
ENT rhinorrhea oropharynx TM HOH _____
Neck supple thyromegaly lymphadenopathy bruits _____
Chest Wall intact breasts symmetric _____
Lungs (no respiratory embarrassment) clear wheezing stridor rhonchi labored _____
Heart (no hemodynamic instability) RRR S1S2 murmur edema in legs _____
Abdomen soft non-tender non-surgical BS wnl organomegaly flank tenderness
Skin generalized rash irritation varicosities tattoos scars _____
MuSK vertebral tenderness c t l SI tenderness r l hot joints _____ amputation _____
Muscle tenderness _____ joint tenderness _____ ROM _____
Neuro CN 2-12 wnl no focalizing weakness gait steady reflexes _____
Straight leg trunk lateral flexion trunk rotation Romberg Froment Tinel Phalen
Radial tap position graphesthesia dysdiadokinesis break gastroc
Other _____

Patient Requests none new med _____ new dose _____ other _____

Diversion pill count contact pharmacy insurance check other provider UDS _____

Interactions review medication agreement review goals review studies education
handicap placard disability forms letter _____

Assessment pain issues stable new issues _____

Plan refill current meds drop left start _____ MRI _____ Procedure _____ Referral _____

Visit Length 15      Follow-up 1      Comments: _____

5

**The Center for Pain**
*of* MONTGOMERY, P.C.

DAVID HERRICK, MD • BRAD KATZ, MD

☐ 2055 East South Blvd., Ste. 812
Montgomery, AL 36116
Telephone: 334-288-7808

☐ 432 St. Lukes Drive
Montgomery, AL 36117
Telephone: 334-387-7246

Patient _Cathy Cleveland_  Age _____  Date _9-18-06_

Superbill# _____  Allergies _____

Chief Complaint

History of Present Illness                                    MEDS

Location
Timing
Other
PSH
PMH
FH/SOC Hx
ROS   #          #2          #3

Exam

GEN  #          #2          #3
HEENT
PUL
CARDIAC
ABD
EXT
Spine
Neuro
Extremities/Spine
X-ray/Labs

Diagnosis:

Plan:

Physician Signature                    Staff Signature

6

CLE00147

Nov. 8. 2006 3:06PM                                      No. 2119   P. 7

**Montgomery Imaging Center**
2055 Normandie Drive, Suite 108
Montgomery, AL 36111-2743
Phone (334) 288-4624
Fax (334) 288-8478

John H. Payne, III, M.D.        Daniel S. Noyes, D.O.        Mary M. Karst, M.D.
David C. Montiel, M.D.          Mark H. LeQuire, M.D.        Paul Hutchinson, M.D.
Terry D. Williams, M.D.         Gordon Smith, M.D.           Oscar P. Orille, M.D.
Joseph M. Bailey, M.D.          Christopher Dorvault, M.D.   Eva Rubin, M.D.
David B. Neeland, M.D.          Philip S. Piasecki, M.D.     Ronald D. Waters, M.D.
Thomas S. Moore, M.D.           David M. Downs, M.D.         John G. Kahler, M.D.
Jason H. Dorey, M.D.            Roland Ng, M.D.
Byron C. Machen, M.D.           Gary Leung, M.D.

| | | | | |
|---|---|---|---|---|
| Patient: | CLEILAND, CATHY K | DOB: | Age: | 049 |
| Exam: | MRI UPPER EXT JOINT WITH CONTRAST | Procedure Date:  10/31/06 | Film#: | 20046161 |
| Referring Physician:   ADAM NORTICK, M.D. | | | Acct#: | 000087431 |

MRI RIGHT SHOULDER:

HISTORY OF RIGHT SHOULDER PAIN FOR 4 MONTHS.

Technical factors: Multiple imaging sequences were acquired in multiple planes through the structures of the right shoulder following the usual protocol after intraarticular injection of a gadolinium based contrast solution.

Findings:

There is some mild supraspinatus tendinosis present. There is also some small subacromial/subdeltoid bursitis. However, no full thickness tear can be seen and there is no indirect evidence of a tear such as extravasation of contrast in the subacromial/subdeltoid bursa.

Marrow appears normal. There is mild acromioclavicular joint osteoarthritis. Visualized soft tissue structures are otherwise normal.

IMPRESSION:

1. SUPRASPINATUS TENDINOSIS, AS WELL AS BURSITIS. NO EVIDENCE OF FULL THICKNESS TEAR.
2. MILD ACROMIOCLAVICULAR JOINT OSTEOARTHRITIS.
3. OTHERWISE NO FOCAL ABNORMALITIES ARE SEEN.

Radiologist:    RONALD D. WATERS, M.D.

Technologist:    Stephen Marsh RT R/Renee Reach RT (R) (CT) (MR)
Transcribed by BECKY on 10/31/2006 at 03:20 PM JOB 46065

Page 1 of 1

7

CLE00148

Nov. 8. 2006  3:07PM                                          No. 2119   P. 8

**Montgomery Imaging Center**
2055 Normandie Drive, Suite 108
Montgomery, AL 36111-2743
Phone (334) 288-4624
Fax (334) 288-8478

| | | |
|---|---|---|
| John H. Payne, III, M.D. | Daniel S. Noyes, D.O. | Mary M. Karst, M.D. |
| David C. Montiel, M.D. | Mark H. LeQuire, M.D. | Paul Hutchinson, M.D. |
| Terry D. Williams, M.D. | Gordon Smith, M.D. | Oscar P. Orille, M.D. |
| Joseph M. Bailey, M.D. | Christopher Dorvault, M.D. | Eva Rubin, M.D. |
| David B. Neeland, M.D. | Philip S. Piasecki, M.D. | Ronald D. Waters, M.D. |
| Thomas S. Moore, M.D. | David M. Downs, M.D. | John G. Kahler, M.D. |
| Jason H. Dorey, M.D. | Roland Ng, M.D. | |
| Byron C. Macben, M.D. | Gary Leung, M.D. | |

| Patient: | CLEILAND, CATHY K | DOB: | | Age: | 049 |
|---|---|---|---|---|---|
| Exam: | INJECT CONTRAST MATERIAL SHOULDER | Procedure Date: | 10/31/06 | Film#: | 20046161 |
| Referring Physician: | ADAM NORTICK, M.D. | | | Acct#: | 000087431 |

RIGHT SHOULDER INJECTION:

After informed consent the patient's shoulder was prepped and draped in the usual sterile fashion. 1% Lidocaine was used for anesthesia. The shoulder joint was punctured with a 22 gauge needle and 12 CC of contrast was instilled into the joint. The needle was removed and the patient sent to MR for further scanning. No complications.

IMPRESSION:

1. SUCCESSFUL INJECTION FOR RIGHT SHOULDER MRI.


Radiologist:       RONALD D. WATERS, M.D.


Technologist:      Shirley Pickett RT R
Transcribed by BECKY on 10/31/2006 at 03.25 PM

Page 1 of 1

CLE00149



P.O. BOX 8346
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9630

PHYSICIAN:

CLEILAND, CATHY

FAIRCLOTH

DISCHARGE SUMMARY

OF ADMISSION:  11/18/97
OF DISCHARGE:  11/19/97

MARY PHYSICIAN:

William B. Faircloth, M.D.

FERRING PHYSICIAN:

M. Andrew Wallace, M.D.

HISTORY OF PRESENT ILLNESS:    Please see previously dictated note for History and Physical Examination.

HOSPITAL COURSE:              The patient was admitted and was taken directly to the operating room where an anterior cervical fusion was performed at C5-6, with a right iliac crest graft. She tolerated the procedure well. She was awakened, extubated, and taken to the recovery room in satisfactory condition.  She was then placed in the intensive care unit where she remained overnight.  The AP and lateral cervical spine x-rays were obtained prior to discharge which revealed the arthrodesis to be in good position and there was good alignment. She had total resolution of her right arm pain.  She was discharged home today to return to see me in my office in three weeks.

ADMISSION DIAGNOSIS:
                         HERNIATED NUCLEUS PULPOSUS, C5-6, RIGHT.

PRIMARY PROCEDURE:
                         Anterior cervical fusion, C5-6, with right iliac crest graft.

DISCHARGE MEDICATIONS:    1.  Lortab 7.5 one q.4h. as needed for pain.
                          2.  NPH insulin 25 units each evening and 15 units of Regular each evening.

DISCHARGE INSTRUCTIONS:        The patient was asked to progressively increase her activity. She was to call my office immediately if she developed a temperature above 102 degrees, erythema, edema, or drainage from her wound. She was to call if she had any problems or questions.

cc: M. Andrew Wallace, M.D.

EXHIBIT
4

"I authorized my name to be electronically affixed by using my unique dictation computer key."

Dict: 11/18/97 Trans: 11/19/97 bri
                         WILLIAM B. FAIRCLOTH, M.D.

#SMH 16002

CLE00127

P.O. BOX 8248
MOBILE, ALABAMA 36608

J. DAUPHIN STREET
(334) 343-9630

Cleiland, Cathy

PHYSICIAN:    William Faircloth, M.D.
(cc: extra copy to Dr. Faircloth)

MRN: TBA
ACCOUNT NO:
DATE: 11/18/97

## HISTORY & PHYSICAL

REFERRING PHYSICIAN:            TONY WALLACE, M.D.

HISTORY OF PRESENT ILLNESS:
Cleiland is a 40 year old, right handed, white female who was involved in a work related car accident in April of this year.  She was in her Honda she was wearing her seat belt, and was at a stop sign.  Apparently, another Accord traveling between 45 and 50 miles per hour swerved, missed another car, and hit her left frontal area of her car.  She was turned to 90 degrees.  She denies loss of consciousness, but it "shook me".  She was ambulatory at the scene, was taken to the emergency room.

Xrays of the cervical spine revealed "no break".  I have not seen these films.  She was given pain medication and muscle relaxers, referred to Dr. Charlie Eddins, who treated her with decreased activity, non-steroidal anti-inflammatories, and she felt improved.  She was placed in physical therapy, which would help her while she was there, but six or eight hours later, the pain would recur.  She describes numbness in the medial aspect of her right arm.  She complains of pain in her right shoulder blade which feels like "raw meat".  She has had occipital headaches, and generalized weakness in her right arm.  She is most uncomfortable with left lateral rotation of her head which causes right neck pain.  She is most comfortable sitting or reclining with her neck supported.

She underwent MRI of her cervical spine, which reveals a right sided disc herniation at C5-6, causing neural impingement.

PAST MEDICAL HISTORY:
SURGERIES:    Significant for removal of right ovary and tube in 1987, and removal of the other fallopian tube in 1984.  She thinks that she had an appendectomy during one of those two procedures.  She has had two Cesarean sections.

ILLNESSES: MEDICATIONS: She has had diabetes for twenty years, takes insulin 15 units of regular each morning, 25 units of NPH each evening.  She takes Flexeril, but felt as though this did not help her.

Continued, page two....

P.O. BOX 8248
MOBILE, ALABAMA 36608

3719 DAUPHIN STREET
(334) 344-9630

Cleiland, Cathy

PHYSICIAN:     William Faircloth, M.D.

PAGE 2...

ALLERGIES:     Darvocet causes her to have nausea and vomiting.

SOCIAL HISTORY:     She is married and has two children.  She is a Personnel manager with Medline.  She does not drink and does not smoke.

FAMILY HISTORY:     Her mother is alive and well at age 70.  Her father is 74, and his healthy.  She has three brothers, ages 36, 48, and 50, all of which are healthy.  She has one sister, age 45, who is healthy.

PHYSICAL EXAMINATION:
GENERAL:     She is a well developed, well nourished, middle aged, female.

HEENT:     Normocephalic and atraumatic.  Pupils equal, round, regular and reactive to light and accommodation.  Sclera non-icteric.  Conjunctiva pink.  Nares patent.  Nose - septum midline.  Oropharynx - without inflammation, irritation, or injection.

NECK:     Supple without adenopathy, thyromegaly.  Flexion extension of the neck causes midline neck pain.  Left lateral rotation causes right neck pain.  Right lateral rotation with extension causes a radicular pain.

CHEST:     Symmetrical expansion.
LUNGS:     Clear.
HEART:     Regular rate and rhythm without murmurs, rubs or gallops.
EXTREMITIES:     Peripheral pulses are +2.
ABDOMEN:     Soft. Non-tender. Non-distended. Without hepatosplenomegaly or masses.  Bowel sounds positive.

NEUROLOGIC:     She is awake, alert, and oriented x 3.  Memory, intelligence, judgement and affect are all appropriate and within normal limits.  Motor strength was 5/5 throughout.  Reflexes were diminished throughout.  Sensation was diminished in the thumb and index finger right hand, normal elsewhere.

IMPRESSION:     Cervical disc herniation C5-6 on the right.

Continued, page three....

#SMH 16002

CLE00129

P.O. BOX 8246
MOBILE, ALABAMA 36308

377? DAUPHIN STREET
(3??) 344-9690

Clelland, Cathy

PHYSICIAN    William Faircloth, M.D.

PAGE 3...

???:
    Admit
    Anterior cervical discectomy and fusion at C5-6 with iliac crest
    graft.

I explained the anatomy and pathology of the lesion at length, and findings, in great detail. I explained the risks being infection, hemorrhage (so severe as to require transfusion, therefore the risk of aids and hepatitis), right carotid injury (resulting in right hemispheric stroke and left hemiplegia), vocal cord paralysis (permanent hoarse voice), esophageal damage (requiring second operation to repair this), and spinal cord damage (loss of use of her arms, legs, loss of bowel and/or bladder function). She appeared to understand these risks, and states she wishes to proceed. Therefore, I plan to proceed tomorrow.

"I authorized my name to be electronically affixed by using my unique dictation computer key."

Signature::
D: 11/17/97    T: 11/17/97    mm              William Faircloth, M.D.

ASMH 16002

CLE00130



P.O. BOX 8246
MOBILE, ALABAMA 36608

DAUPHIN STREET
(334) 344-9630

CLEILAND, CATHY                    PHYSICIAN    William Faircloth, M.D.

MRN;  RM
PRINT NO;
DATE;

OPERATIVE SUMMARY

SURGERY DATE:  11/18/97

SURGEON:    William Faircloth, M.D.

PREOPERATIVE DIAGNOSIS:  Herniated nucleus pulposus C5-6, right.

POSTOPERATIVE DIAGNOSIS:  Same.

PROCEDURE;    1.    Anterior cervical fusion C5-6.
              2.    Anterior cervical diskectomy.
              3.    Right iliac crest graft.

ASSISTANT;    Dr. R. L. White

INSTRUMENT NURSE;    Mr. David Redd
CIRCULATING NURSE;   Ms. Candy Cabiness, RN

ANESTHESIA;    General endotracheal.

ANESTHESIOLOGIST;    Dr. Buddendorf
ANESTHETIST;         Ms. Paula Green

COMPLICATIONS;    None.

ESTIMATED BLOOD LOSS; 300 cc.

BRIEF HISTORY;    Mrs. Cleiland is a 40 year old right handed white
female who was involved in a motor vehicle accident and has had intractable
neck and right arm pain.  She has failed to improve with conservative
measures.  MRI revealed a large cervical disc herniation at C5-6 on the
right.

PROCEDURE;    The patient was brought to OR #9.  After adequate level of
anesthesia was obtained, the patient was intubated.  She was given 2 grams
of Ancef IV and 12 mg of Decadron.    The right anterior neck and right
iliac crest were isolated with 10/10 drapes.    The area was prepped with
multiple applications of Betadine scrub and Betadine paint.  The patient
was sterilely draped in the routine fashion.

CC; DR. M. WALLACE

CONTINUED....

CLE00131

P.O. BOX 8248
MOBILE, ALABAMA 36608

359 DAUPHIN STREET
(334) 344-9030

CLEILAND, CATHY

PHYSICIAN   William Faircloth, M.D.

PAGE 2...

A transverse skin incision was created in the skin fold, sharp dissection carried down through subcutaneous tissue to the platysma. The platysma was divided with Metzenbaum scissors. I then created a plain medial to the carotid, lateral to the trachea and posterior to the esophagus. I identified the C5-6 interspace. I divided the anterior longitudinal ligament in the midline and dissected in the subperiosteal plane and placed the Casbar retractors posterior to the anterior colles muscle. I placed distraction pins at C5, C6 using fluoroscopic guidance, distracted the interspace. I opened the annulus with a monopolar cautery. I resected the degenerative disc material. Using Midus-Rex drill, I performed a diskectomy posteriorly to the posterior longitudinal ligament. I opened this ligament with various hooks as well as various Kerrison rongeurs. I removed a large extruded disc fragment on the right. I could easily pass a large blunt nerve hook along the course of the nerve root and it was well decompressed.

I then directed my attention to the right iliac crest region. I opened the skin, and divided the fat down to the iliac crest. I opened the fascia over the iliac crest and after measuring the diskectomy, I obtained a right iliac crest graft using an isolating saw and straight osteotome. I waxed the bone and placed Gelfoam in the cavity. I then fashioned the bone graft and introduced it in the interspace. I returned to the iliac crest incision and there was no bleeding. After awaiting an appropriate period of time, I irrigated the wound with copious amounts of Bacitracin solution and approximated the fascia with a running #0 Vicryl in two layers, and approximated the subcutaneous tissues with running 2-0 Vicryl and skin edges with a running subcuticular 4-0 PDS. I then returned to the cervical incision and removed the two distraction pins and waxed the bone. I irrigated the wound with copious amounts of Bacitracin solution. After waiting for an appropriate period of time and removing the Casbar retractors, I saw no bleeding and approximated the platysma with a running 4-0 Vicryl and the skin edges with a running subcuticular 4-0 PDS. Benzoin and 1/2 inch steri-strips were applied to both incisions. Instrument, sponge and needle counts were all reported to me as being correct. The patient was awakened, extubated and taken to the Recovery Room in satisfactory condition. She could move her arms and legs well. She had significant improvement in her right arm pain and right arm sensation.
    "I AUTHORIZED MY NAME TO BE ELECTRONICALLY AFFIXED BY USING
    MY UNIQUE DICTATION COMPUTER KEY."

Signature::
D: 11/18/97    T: 11/19/97    dd

William Faircloth, M.D.

#SMH 16000

P.O. BOX 8246
MOBILE, ALABAMA 36608

DAUPHIN STREET
(334) 344-9630

CLEILAND, CATHY
1019

PHYSICIAN

Robert White, M.D.

MRN:
ACCOUNT NO:
ADM DATE:

## OPERATIVE SUMMARY

SURGERY DATE: 11/18/97

SURGEON:  Brent Faircloth, M.D.

ASSISTANT SURGEON:   Robert White, M.D.

PREOPERATIVE DIAGNOSIS:   RUPTURED CERVICAL DISC C5-6

PROCEDURE:  ANTERIOR CERVICAL MICRODISKECTOMY WITH AUTOLOGOUS BONE GRAFT

DESCRIPTION:  I was asked by Dr. Faircloth to assist him on the case of Cathy Cleiland.  Cathy underwent anterior cervical microdiskectomy at C5-6 with removal of both osteophyte as well as extruded nucleus polyposis.

At patient's request, right iliac autologous bone graft was taken and placed at the C5-6 interspace.   Surgery was uneventful and excellent decompression was accomplished.

CC:  DR. ROBERT WHITE
     (ATTN) BONNIE

Signature::
D: 11/19/97      T: 11/19/97    1c

Robert White, M.D.

#SARH 16002

CLE00133

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama 36106

DISCHARGE SUMMARY

PATIENT NAME:  CLEILAND, CATHY
ATTENDING:    JOHN E. HACKMAN, M.D.
ADMIT DATE:   5/02/2001                          MR#:  28-51-42
DISCHARGE DATE: 5/03/2001                        ACT#: 10361681
                                                 RM#:

REASON FOR ADMISSION:  This is a 43-year-old white female who has had a prior anterior cervical fusion at C5-6, but never really recovered. Recent MRI scan shows C6-7 disc herniation.  She complains about right-sided neck, arm and shoulder pain with numbness in the right mid fingers and she has got triceps weakness.  She has failed conservative treatment and she has got an abnormal MRI and now comes in for surgery.

HOSPITAL COURSE:  The patient was admitted to the hospital and taken to surgery where she had an anterior cervical diskectomy and interbody fusion at C6-7 with a bone graft from the right iliac crest.  She had immediate improvement, did well and was discharged home the following day.  She will be followed up in the office.

DISCHARGE DIAGNOSIS
1.  C6-7 disc herniation.

OPERATIVE PROCEDURE THIS ADMISSION
1.  Anterior cervical diskectomy and interbody fusion C6-7 with a bone graft from the right iliac crest.


                                          JOHN E. HACKMAN, M.D.

STA0503
D:  5/03/2001
T:  5/03/2001
289692

VIRGINIA BENTON - RELIANCE INSURANCE COMPANY

EXHIBIT
5

1

CLE00056

# EXHIBIT

# "N"

# PART 6

BROWN & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama 36106

HISTORY AND PHYSICAL

PATIENT NAME: CLEILAND, CATHY K
ATTENDING: HACKMAN, JOHN E
ADMIT DATE: 5/02/2001

MR#: 28-51-42
ACT#: 1036181
RM#:

CHIEF COMPLAINT: Neck, arm and shoulder pain.

HISTORY: This 43-year-old, white female had an injury in an accident. She was treated by Dr. Faircloth in Mobile. MRI scan at that time showed large C5-6 disc herniation and a smaller C6-7 protrusion. She had an anterior cervical fusion at C5-6, but has never really recovered. C5-6 has healed up nicely. Because of her persistent complaints, she was referred up to my office by Virginia Benton at Reliance Insurance Company. I looked at her current studies, which show a significant C6-7 disc herniation. The patient has complained about neck pain, headaches, right scapular pain, pain down the right arm or numbness in the right mid fingers. Because of her persistent complaints and because of the positive MRI scan, it is felt that she needs surgery at C6-7. The risks and benefits were discussed.

PAST MEDICAL HISTORY: Positive for insulin dependent diabetes.

PRIOR SURGERY: Two Cesarean sections, tubal ligation, reversal of the tubal ligation, removal of the right tube and ovary, C5-6 cervical fusion, carpal tunnel surgery.

CURRENT MEDICATIONS: Humulin insulin, Effexor, Klonopin.

ALLERGIES: NONE REPORTED.

FAMILY HISTORY: Positive for diabetes.

SOCIAL HISTORY: She is a nonsmoker.

PHYSICAL EXAMINATION
Physical examination shows a healthy appearing, well-developed, white female. She is alert and oriented. Cranial nerves are intact. She has pain with neck extension and neck rotation. She has got weakness in the right triceps.

Chest is clear.

1

CLE00057

JACKSON HOSPITAL & CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY K
ATTENDING:      HACKMAN,JOHN E                    MR#:  20-51-42
ADMIT DATE:       5/02/2001                       ACT#: 1036168 1
                                                  RM#:

Heart regular.

Abdomen soft.

ADMITTING IMPRESSION
1.   C6-7 disc herniation.

                                    JOHN E. HACKMAN  M.D.

5TZ0503
D:  5/03/2001
T:  5/03/2001
289690

                                                              2

MONTGOMERY NEUROSURGICAL CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY K
ATTENDING:       HACKMAN, JOHN E
SURGEON:         JOHN E. HACKMAN, M.D.

MR#:   28-51-42
ACT#:  1036168 1
RM#:
DATE:  5/03/2001

PREOPERATIVE DIAGNOSIS:  C6-7 disk herniation.

POSTOPERATIVE DIAGNOSIS:  C6-7 disk herniation.

PROCEDURE:  Anterior cervical diskectomy and interbody fusion, C6-7, with a bone graft from the right iliac crest.

INDICATIONS:  This is a 43-year-old white female.  She comes in with intractable neck, arm and shoulder pain on the right side with numbness into her hand.  She has had a prior cervical fusion at C5-6 but has not completely recovered.  Current magnetic resonance imaging scan shows a C6-7 disk herniation.

DESCRIPTION OF PROCEDURE:  The patient was taken to the operating room where she underwent a general endotracheal anesthetic.  She was positioned in the supine position with sand bags under the neck and under the right hip.  The operative sites were shaved, prepped and draped in a sterile manner.  A transverse incision was made in the neck through an old scar.  This was carried down through the superficial layers and the platysma.  The cervical fascia was opened along the anterior border of the sternocleidomastoid muscle.  Blunt dissection took us down to the cervical spine.  C6-7 was identified and marked and we took an x-ray to confirm our level.  Meanwhile we went to the right iliac crest.  A transverse incision was made behind and below the anterior superior iliac spine.  This was carried down to the fascia lata which was opened along its fibers.  Muscle was stripped off the iliac crest and a 12-mm bone dowel was removed.  This wound was closed in multiple layers of Vicryl suture.  Muscle was returned to the neck.  We had accurately identified C6-7.  We made an incision in the disk.  We removed the entire disk and the cartilage end-plates.  We found the interior of the disk to be completely disrupted.  We decompressed the posterolateral corners.  We drilled down through the interspace with a 12 mm drill.  We controlled bleeding with Gelfoam and Thrombin.  We distracted the interspace and inserted a bone graft.  We made sure there was no active bleeding.  The wound was irrigated.  A Hemovac drain was brought out through a separate stab wound, and the wound was closed in multiple layers of Vicryl suture.  Blood loss during the procedure was 100 cc.  There

1

HACKMAN CLINIC, INC.
1235 Forest Avenue
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:   CLEILAND, CATHY K
ATTENDING:      HACKMAN,JOHN E
SURGEON:        JOHN E. HACKMAN, M.D.

MR#:   28-51-42
ACT#:  10361681
RM#:
DATE:  5/03/2001

were no obvious complications.  Sterile dressings were applied.  The
patient was taken to the recovery room in satisfactory condition.

3LR0504                                JOHN E. HACKMAN, M.D.
D:  5/03/2001
T:  5/04/2001
289691

2

CLE00060

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

DISCHARGE SUMMARY

PATIENT NAME:   CLEILAND, CATHY                    MRH:  28-51-42
ATTENDING:      HACKMAN, JOHN                      ACT#: 10466104
ADMIT DATE:     6/24/2002                          RM#:
DISCHARGE DATE: 6/25/2002

REASON FOR ADMISSION: This 44-year-old white female has had prior cervical fusions at C5-6 and C6-7.  She was doing well until a recent motor vehicle accident.  Ever since then, she has had pain in the neck going into the shoulder.  She has had conservative treatment without improvement.  Myelogram/CAT scan was abnormal at C4-5, and she now comes in for surgery.

HOSPITAL COURSE:  The patient was admitted to the hospital and taken to surgery where she had an anterior cervical diskectomy and interbody fusion at C4-5 with a bone graft from the right iliac crest.  She had immediate improvement, did well and was discharged home the following day.  She will be followed up in the office.  The wounds looked good, and she was given instructions.

DISCHARGE DIAGNOSIS: Cervical radiculitis, C4-5.

OPERATIVE PROCEDURE THIS ADMISSION:  Anterior cervical diskectomy and interbody fusion at C4-5 with a bone graft from the right iliac crest.

                                    JOHN E. HACKMAN, M.D.

3DW0625
D:  6/25/2002
T:  6/25/2002
106115



EXHIBIT
6

000602

1

CLE00037

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama 36106

HISTORY AND PHYSICAL

PATIENT NAME: CLEILAND, CATHY
ATTENDING: HACKMAN, JOHN
ADMIT DATE: 6/24/2002

MR#: 28-51-42
ACT#: 10466104
RM#: 630-1

CHIEF COMPLAINT: Neck and shoulder pain.

HISTORY: This is a 44-year-old white female. She had a prior cervical fusion at C5-C6 in Mobile. A year ago she had an anterior cervical fusion at C6-C7 here. She says she was doing well until this spring when she started having trouble with her neck. She had pain and numbness going to the right shoulder and right hand. She had an accident on 05/25/2002, but she says the pain in the neck started prior to the accident. She feels that things got worse after her accident. She has been evaluated with myelogram CAT scan that was abnormal at C4 C5. She now comes in for surgery. The risks and benefits have been discussed.

The patient also has low back problems, which she attributes to her motor vehicle accident. She has some protrusion at L4-L5 on the left. She has also got numbness in her hand. She has had a prior carpal tunnel performed in Mobile and her EMG studies show recurrent carpal tunnel problems in the right hand.

PAST MEDICAL HISTORY: Positive for insulin-dependent diabetes.

PRIOR SURGERIES: Includes two cesarean sections, tubal ligation, reversal of tubal ligation, removal of right tube and ovary, C5-C6 and C6-C7 cervical fusions, carpal tunnel surgery.

CURRENT MEDICATIONS: Humulin insulin, Effexor and Klonopin.

ALLERGIES: None reported.

FAMILY HISTORY: Positive for diabetes.

SOCIAL HISTORY: She is a nonsmoker.

PHYSICAL EXAMINATION: Examination shows a healthy-appearing, well-developed, white female. She is alert and oriented. Cranial nerves are intact. She has pain with neck extension and neck rotation. There is no definite neurologic abnormality.

000003

1

CLE00038

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama 36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY
ATTENDING:      HACKMAN, JOHN                    MR#:   28-51-42
ADMIT DATE:       6/24/2002                      ACT#:  10466104
                                                 RM#:   630-1

She does have positive Tinel's sign in the right hand. Chest is
clear. Heart regular. Abdomen soft.

ADMITTING IMPRESSION: Cervical radiculitis C4-C5.


                                    _____
4EJ0624                             JOHN E. HACKMAN, M.D.
D:  6/24/2002
T:  6/24/2002
106030

000004

CLE00039

# JACKSON HOSPITAL & CLINIC, INC.

### 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

Name: CLEILAND, CATHY K.
Physician: HACKMAN, JOHN E
MR#: 285142
Order ID: 1056208

X-RAY#: 463643
Result ID: 961967

DOB:
Patient Location: 6301
Account#: 10466104
Addendum Number: 0

Age: 44 YEARS

Clinical Data: ACF
Procedure: C-SPINE ONE VIEW          Date of Exam: 06/24/2002
Film for localization shows a marker anteriorly at the C4-5 level.   There has been previous anterior fusion at C5-6 and C6-7.

IMPRESSION:
C4-5 LOCALIZATION.

Dictated by: STANLEY B. WINSLOW, M.D.
Verified by: STANLEY B. WINSLOW, M.D.

Transcriptionist: JAK

JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non Profit Organization

(2/99)

000007

**X-RAY REPORT**



CLE00040

BROWN HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:   CLELAND, CATHY
ATTENDING:      JOHN E. HACKMAN, M.D.
SURGEON:        JOHN E. HACKMAN, M.D.

MR#:  28-51-42
ACT#: 10466104
RM#:
DATE:  6/24/2002

PREOPERATIVE DIAGNOSIS:  Cervical radiculitis C4-5.

POSTOPERATIVE DIAGNOSIS:  Cervical radiculitis C4-5.

OPERATION:  Anterior cervical diskectomy with inter body fusion C4-5 with bone grafts on the right iliac crest.

INDICATIONS:  This 44-year-old white female comes in with intractable neck and shoulder pain.  She has had conservative treatment without improvement.  Myelogram CAT scan is abnormal at C4-5.  She has had prior cervical fusions at C5-6 and C6-7 in the past.

PROCEDURE:  The patient was taken to the operating room where she underwent general endotracheal anesthesia.  She was positioned in the supine position with sandbags under the neck and under the right hip.  The operative sites were shaved, prepped and draped in the usual sterile fashion.  A transverse incision was made in the anterior neck.  This was carried down through the superficial layers and the platysma.  The cervical fascia was opened along the anterior border of the sternocleidomastoid muscle.  Blunt dissection took us down to the cervical spine.  The C4-5 was identified and marked and we took an x-ray to confirm our level.  Meanwhile we went to the right iliac crest.  A transverse incision was made behind and below the anterior superior iliac spine.  This was carried down to the fascia lata which was opened along its fibers.  Muscle was stripped off the iliac crest and a 12 mm bone dowel was removed.  This wound was closed in multiple layers with Vicryl suture and we returned to the neck.  We had accurately identified C4-5.  We made an incision in the disk.  We used pituitary rongeurs and curets and cleaned out the entire disk space.  The posterolateral corners were decompressed with the 2 mm punch.  Bleeding was controlled with Gelfoam and thrombin.  We drilled down through the inner space with the 12 mm drill.  We controlled bleeding with Gelfoam and thrombin.  We distracted the interspaces and we inserted the bone graft.  We made sure there was no active bleeding.  The wound was irrigated.  The Hemovac drain was brought out through a separate stab wound and the wound was closed in multiple layers with Vicryl suture.  The blood loss during the procedure was 100 cc.  There were no obvious complications.  Sterile

000020

1

CLE00041

J CSON HOSPITAL & CLINIC
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY
ATTENDING:       JOHN E. HACKMAN, M.D.          MR#:  28-51-42
SURGEON:         JOHN E. HACKMAN, M.D.          ACT#: 10466104
                                                RM#:
                                                DATE:  6/24/2002

dressings were applied and the patient was taken to the recovery room
in satisfactory condition.

2LV0624                          JOHN E. HACKMAN, M.D.
D:   6/24/2002
T:   6/24/2002
106031

000021

2

CLE00042

CLINIC, INC.
1725 Pine Street
Montgomery, Alabama 36106

DISCHARGE SUMMARY

PATIENT NAME:    CLEILAND, CATHY
ATTENDING:
ADMIT DATE:        5/21/2003                    MR#:   28-51-42
DISCHARGE DATE:  5/22/2003                    ACT#:  10547947
                                               RM#:

Bytescribe #0522-063

REASON FOR ADMISSION:  This 45-year-old, diabetic white female comes in with persistent left hip and leg pain with numbness.  This has gotten progressively worse for a year.  Magnetic resonance imaging scan shows disc bulging at L4-5 on the left with osteophytes.  This protrudes into the foramen.  She now comes in for surgery.

HOSPITAL COURSE:  The patient was admitted to the hospital and taken to surgery where she had a lumbar laminectomy at L4 5 on the left.  She had immediate improvement, did well and was discharged home the following day.  The wound looked good, and she was given instructions.  She will be followed up in the office.

DISCHARGE DIAGNOSIS:  Lumbar radiculitis L4-5 on the left.

OPERATIVE PROCEDURE THIS ADMISSION: Lumbar laminectomy L4-5 on the left.

8DW0522
D:  5/22/2003 08:17                    JOHN E. HACKMAN, M.D.
T:  5/22/2003 10:56
143166

EXHIBIT
1

000002

1

CLE00030

JACKSON HOSPITAL & CLINIC
1725 Pine Street
Montgomery, Alabama  36106

## HISTORY AND PHYSICAL

PATIENT NAME:  CLEILAND, CATHY
ATTENDING:
ADMIT DATE:       5/21/2003

MR#:   28-51-42
ACT#:  10547947
RM#:   6B-647

Bytescribe #0521-072

CHIEF COMPLAINT:  Left hip and leg pain with numbness.

HISTORY OF PRESENT ILLNESS:  This is a 45-year-old diabetic white female.  She comes in with problems with left hip and leg pain with numbness in the left lateral thigh.  She attributes this to a motor vehicle accident which occurred on April 25, 2002.  She has persistent pain in the left hip which has gotten progressively worse.  She does have a history of a prior accident and was treated at the Mobile Infirmary in February of 2000.  They noticed some disc bulging and had a report that she had numbness in the left leg ever since a 1997 accident.  She says things became worse after her April 25, 2002, accident.  She has had conservative treatment and has not improved.  Magnetic resonance imaging scan shows some disc bulging at L4-5 on the left with osteophyte.  This protrudes into the foramen.  She now comes in for lumbar laminectomy.  The surgery risks and benefits have been discussed.

PAST MEDICAL HISTORY:  Positive for insulin-dependent diabetes mellitus.  She is noncompliant.  When she went for her preoperative visit she had a very high blood sugar, which was 497 and then repeated at 541.  This morning she has taken insulin, and her blood sugar is now down to 154.

PAST SURGICAL HISTORY:  Prior surgery includes two cesarean sections, tubal ligation, reversal of a tubal ligation, removal of the right tube and ovary, anterior cervical fusion and carpal tunnel surgery.

CURRENT MEDICATIONS:
1.  Humulin insulin.
2.  Effexor.
3.  Klonopin.

ALLERGIES:  None reported.

FAMILY HISTORY:  Positive for diabetes mellitus.

SOCIAL HISTORY:  She is a nonsmoker.

PHYSICAL EXAMINATION:
GENERAL APPEARANCE:  Examination shows a generally healthy-appearing white female.  She is alert and oriented.  Cranial nerves are intact.
NECK:  She has a good range of motion of the neck.
CHEST:  Clear.
HEART:  Regular.
ABDOMEN: Soft.

000003

1

CLE00031

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:    CLEILAND, CATHY
ATTENDING:                                           MR#:   28-51-42
ADMIT DATE:      5/21/2003                           ACT#:  10547947
                                                     RM#.   6E-647

NEUROLOGICAL:  She has pain with straight leg raising on the left.
Knee reflexes and ankle reflexes are both unobtainable, probably
secondary to diabetes mellitus.  There is a little weakness with toe
extension on the left but no definite foot drop.

ADMITTING IMPRESSION:  Lumbar radiculitis, L4-5 left.

7DW0521                         JOHN E. HACKMAN, M.D.
D:   5/21/2003 09:23
T:   5/21/2003 11:13
143018

000004

2

CLE00032

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:    CLEILAND, CATHY
ATTENDING:       JOHN E. HACKMAN, M.D.
SURGEON:         JOHN E. HACKMAN, M.D.

MR#:   28-51-42
ACT#:  1054794-7
RM#:   647-1
DATE:  5/21/2003

PREOPERATIVE DIAGNOSIS:  Lumbar radiculitis L4-5 left.

POSTOPERATIVE DIAGNOSIS:  Lumbar radiculitis L4-5 left.

NAME OF PROCEDURE:  Lumbar laminectomy L4-5 left.

ASSISTANT:

ANESTHESIA:  General endotracheal anesthesia.

INDICATIONS FOR PROCEDURE: This is a 45-year-old white female comes in with persistent back and left leg pain with numbness and weakness. She has had conservative treatment without improvement.  The MRI scan shows a protruding disk with associated osteophyte at L4-5 on the left.

DESCRIPTION OF PROCEDURE:  The patient was taken to the operating room where she underwent general endotracheal anesthesia.  She was turned in the prone position on chest rolls.  The operative sites were shaved, prepped, and draped in the sterile manner.  A midline incision was made over L4-5.  This was carried down to the lumbar fascia, which was opened to the left of the midline.  The paravertebral muscles were stripped off the spinous processes and lamina exposing the interlaminar space at L4-5 on the left.

A portion of the inferior lamina of L4 was removed.  The ligamentum flavum was removed.  The nerve roots were identified.  Underneath we found a soft protruding disk. There was some associated osteophyte going off the rim of the inferior part of L4 and extending out into the foramen along with protruding disk.

We opened the ligament.  We used pituitary rongeurs and curets and cleaned out fragmented disk material until all loose fragments were removed.  We then removed the associated osteophytes with curets.  We made sure we had a good decompression in the central canal and the nerve root canal.  Bleeding was controlled with Gelfoam and thrombin.

The wound was closed in multiple layers of Vicryl suture.  Blood loss during the procedure 350 cc.  There were no obvious complications. Sterile dressings were applied.

000022

1

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

REPORT OF OPERATION

PATIENT NAME:   CLEILAND, CATHY
ATTENDING:      JOHN E. HACKMAN, M.D.            MR#:  28-51-42
SURGEON:        JOHN E. HACKMAN, M.D.            ACT#: 1054794 7
                                                RM#:  64/-1
                                                DATE: 5/21/2003

The patient was taken to the recovery room in satisfactory condition.

                                    JOHN E. HACKMAN, M.D.

6HI0521
D:  5/21/2003 09:25
T:  5/21/2003 15:26
143022

000023

2

CLE00034

J. KSON HOSPITAL & CLINIC IN.

Montgomery, Alabama  36106

DISCHARGE SUMMARY

PATIENT NAME:     CLEILAND, CATHY
ATTENDING:        HACKMAN, JOHN                         MR#:  28-51-4 2
ADMIT DATE:       7/14/2003                             ACT#: 1056080 3
DISCHARGE DATE:   7/17/2003                             RM#:

BS#:  0717-023

REASON FOR ADMISSION:  This 45-year-old white female diabetic had a
laminectomy on May 21, 2003 at L4-5 on the left and initially did
well.  She then developed a recurrence of pain down the left hip and
leg, which has gotten progressively worse.  She presented to our
emergency room in extreme pain.  She was admitted for pain control
and evaluation.

HOSPITAL COURSE:  The patient was admitted to the hospital and placed
on pain control.  The next day we did an MRI scan and this showed a
large extruded fragment at L4-5.  Surgery was recommended.  The
patient was taken to surgery on July 16, 2003 where she had re-
exploration of her laminectomy at L4-5 on the left.  She had
immediate improvement in her leg pain, did well, and was discharged
home the following day.  The wounds looked good and she was given
instructions.  She will be followed up in the office.

DISCHARGE DIAGNOSIS:
1.   Recurrent disk herniation at L4-5, left.

OPERATIVE PROCEDURE THIS ADMISSION:
1.   Re-exploration laminectomy at L4-5, left.

2AC0717                          JOHN E. HACKMAN, M.D.
D:  7/17/2003 09:56
T:  7/17/2003 11:00
149107

EXHIBIT
8
1

000002

J. KSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY
ATTENDING:      HACKMAN, JOHN                    MR#:  28-51-42
ADMIT DATE:     7/14/2003                        ACT#: 1056080 3
                                                 RM#:  630-1

CHIEF COMPLAINT: Left hip and leg pain.

HISTORY OF PRESENT ILLNESS: This is 45-year-old white female, diabetic. She recently had a laminectomy on 5/21/03 at L4-5 on the left. She initially did well. She has had a recurrence of pain in the left hip and leg. We have talked to her a couple of times and I saw her in the office this past week. She complained about increasing weakness. I put her on medication but she has gotten progressively worse and she presented to the emergency room and was admitted for reevaluation and pain control.

PAST MEDICAL HISTORY: Positive for insulin-dependent diabetes. She is noncompliant. She has been otherwise healthy.

PRIOR SURGERY: Includes two cesarean sections, tubal ligation, reversal of the tubal ligation, removal of the right tube and ovary, anterior cervical fusion, carpel tunnel surgery, lumbar laminectomy.

HOME MEDICATIONS:
1. Humulin insulin 70/30, 40 units twice a day.
2. Effexor.
3. Klonopin.
4. Pain pills.

ALLERGIES: None reported.

FAMILY HISTORY: Positive for diabetes.

SOCIAL HISTORY: Shows the patient is a nonsmoker.

PHYSICAL EXAM:
GENERAL: Shows a generally healthy appearing white female. She is alert and oriented. Cranial nerves are intact.
NECK: She has a good range of motion of the neck.
CHEST: Clear.
HEART: Regular.
ABDOMEN: Soft.
EXTREMITIES: She has pain with straight leg raising on the left. Knee reflexes are intact. The ankle are both absent. She has weakness of toe extension on the left.

000003

1

CLE00023

1725 Pine Street
Montgomery, Alabama  36106

HISTORY AND PHYSICAL

PATIENT NAME:   CLEILAND, CATHY                    MR#:   20-51-42
ATTENDING:      HACKMAN,JOHN                       ACT#:  1056080 3
ADMIT DATE:       7/14/2003                        RM#:   630-1

ADMISSION IMPRESSION:
1.  Recurrent lumbar radiculitis at L4-5 left.

4JB0715
D:   7/15/2003 908                 JOHN E. HACKMAN, M.D.
T:   7/15/2003 12:01
148839

000004

2

The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

## DISCHARGE SUMMARY

NAME: CLEILAND, CATHY

SERVICE: Mark N. Hadley, M.D./2823

MED.REC.NO.: 00698678    ROOM:

ADMITTED: 12/16/03    DISCHARGED: 12/18/03

DICTATED: 12/18/03    TRANSCRIBED: 12/18/03

ADMISSION DIAGNOSIS: Lumbar instability.

DISCHARGE DIAGNOSIS: Same.

PROCEDURE: L4-5 laminectomy and diskectomy with L4-5 internal fixation and fusion and L4-5 posterior lumbar interbody fusion by Dr. Hadley on 12/16.

HISTORY OF PRESENT ILLNESS: The patient is a 46-year-old white female with a one and a half year history of low back pain and left leg pain with numbness in the lateral left leg and plantar surface of the left foot. She has a history of prior lumbar surgery. Exam and imaging is consistent with L4-5 instability. She presents now for elective decompression with L4-5 posterior lumbar interbody fusion.

Please see history and physical for further details.

HOSPITAL COURSE: The patient underwent the aforementioned procedure which she tolerated without difficulty. She was followed on the floor postoperatively where she had an uncomplicated hospital course and mobilized in a timely fashion and she remained neurologically stable in comparison to her preoperative exam. She had a slight foot drop on the left preoperatively and this was felt to have improved actually somewhat on postoperative day one with almost normal strength on the left side with dorsiflexion. She was fitted with an LSO brace and approved for discharge the morning of 12/18.

DISCHARGE CONDITION: Good.

DISPOSITION: Home.

DISCHARGE MEDICATIONS: Neurontin 300 mg t.i.d.; Robaxin, Lortab, and Advil as needed for pain.

EXHIBIT
9

The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

DISCHARGE SUMMARY

NAME: CLELLAND, CATHY                    MED.REC.NO.: 00698678    ROOM:

Followup is on 12/29 for a wound check with Dr. Hadley.

Kevin N. Ammar, M.D./07734/TL032

_____
Mark N. Hadley, M.D.

CLE00002

**UAB** The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

## Operation Note

NAME: CLEILAND, CATHY    MED. REC. NO.: 000000698678    ROOM:

SURG: Mark N. Hadley, M.D.                ASSIST: Ajay K. Ananda, M.D.

SURG#: 2823

SURG.SIGN: Electronically Signed by Mark N. Hadley, M.D. on 12/19/2003

DATE OPER.: 12/16/2003  ADMITTED:  DISCHARGED:

SERVICE: Mark N. Hadley, M.D.  DICTATED: 12/16/03  TRANSCRIBED: 12/16/03

DOCTOR/SERV. SIGN: _____


PREOPERATIVE DIAGNOSIS:  Lumbar spinal instability, with L5
radiculopathy, left greater than right.

POSTOPERATIVE DIAGNOSIS: Same.

PROCEDURES PERFORMED:    1.  L4-L5 laminectomy for
decompression.
2.  L4-5 diskectomy, bilateral, with L4-5
posterior lumbar interbody fusion,
bilateral.
3.  Internal fixation L4-L5, bilateral.
4.  Autologous bone dorsolateral fusion
L4-L5, bilateral.

ANESTHESIA:  General with endotracheal intubation.

INDICATIONS:  This is a 46-year-old female who has had previous
L4-5 surgery.  She has developed collapse and instability at L4-5,
with marked L5 root compression and foot drop.  She has horrific
pain, both mechanical in nature and radicular in nature,
bilateral, again left more than right.  She is a candidate for
operative decompression at the L4-5 level, followed by L4-5
posterior lumbar interbody fusion and internal fixation and
dorsolateral fusion.  She understands the indications for as well

CLE00003



The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

as the risks of the procedure. She wishes to proceed. Consent has been obtained.

OPERATIVE TECHNIQUE: After smooth induction of anesthesia and intubation, the patient was carefully moved from the hospital bed to the operating table and placed in the prone position on the Wilson frame. The patient's lumbosacral spine was shaved, prepped, and draped in the usual sterile fashion. I used the previous skin incision but essentially extended the incision from the inferior portion of L3 down to the superior portion of S1. There was a great deal of scar on this left side, particularly at L4-5. I dissected down bilaterally, exposing the spinous process and lamina of L4 and the spinous process and lamina of L5. There was marked facet mobility, in fact fractured facet at the L4-5 level on the left with collapse. I dissected out laterally bilaterally and exposed the facet complex at L4-5 and then the transverse process of L5. I worked up in a careful manner in a cephalad direction and exposed the transverse processes of L4 bilaterally, using great care to avoid any compromise or exposure of the L3-4 facet complex. I irrigated the wound with antibiotic solution. I then used a double-action rongeur to remove the spinous processes and lamina which remained at L4 and L5. I had dissected around the L4-5 scar on the left side, of course, but was able to do so and then fully decompress the thecal sac from superior L4 through L5. Working from the patient's left side toward the right, I undercut the medial facet complex and decompressed the lateral recess stenosis here. I took the L4-5 facet down as well. I went around to the patient's right, worked back toward the left, worked around and through scar, and decompressed the exiting L5 root which was markedly compromised, as well as the exiting L4 root. There was tremendous scar here from this collapsed, fractured, and failed facet. I then worked underneath the L5 root on the left, worked in a cephalad direction, and found recurrent disc herniation. I was able to dissect through this using both blunt and sharp dissection techniques, avoiding injury to the L5 and the L4 root, and then retract the nerve root medially. The markedly collapsed interspace here was identified. Posterior lumbar interbody fusion instruments were then sequentially used, beginning with an 8 mm blade up to an 11 mm blade, decorticating the inferior left

CLE00004



The University of Alabama at Birmingham
The Medical Center/University of Alabama Hospitals

endplate of L4 as well as the superior endplate of L5. Disc material was removed with interspace rongeurs. I then dissected on the patient's right side, careful to avoid any compromise of the L4-5 root on the right. Again, posterior lumbar interbody blades were used to remove disc material and decorticate the endplates sequentially from 8 mm to 11. I then used a box cutter to decorticate the endplates even better at the inferior L4 and superior L5 bilaterally. I then placed a distraction device in the interspace 12 mm. I used a 13 mm allograft posterior lumbar interbody fusion substrate and tapped these as interposition grafts, first on the patient's left and then the right. These appeared to be in good position, and we had markedly increased, although not quite to normal, the interspace height from her preoperative collapsed circumstance. There was immediate firmness and stability to this previously very unstable joint. I then passed bone screws via the pedicles into the bodies with the use of intraoperative fluoroscopy into L4 and L5 bilaterally. I decorticated the exposed dorsolateral surfaces of L4 and L5. I morselized all the patient's bone which I had removed during the laminectomy and facetectomy completely of L4 and L5, admixed this with bone morphogenic protein putty and paste, and then packed it over the exposed dorsolateral surfaces of L4 and L5. Contoured rods were then secured to the bone screws at L4 and L5 bilaterally and locked into position, completing the procedure. I irrigated the wound with antibiotic solution. There was no evidence of nerve root compromise, thecal sac compression, or CSF leak. Bleeding was well controlled. I placed a drain. We closed the wound in multiple layers. The skin edges were approximated with a running nylon suture.

I personally supervised the entirety of the procedure and performed the essential elements outlined above.

Mark N. Hadley, M.D. / 07120 / TL030

CLE00005

**CIGNA Group Insurance**
Life · Accident · Disability

December 7, 2006

CATHY CLEILAND
P.O. BOX 148
CLIO, AL 36017

Routing 212
12225 Greenville Ave
Suite 1000
Dallas, TX 75243
Telephone 800.352.0611, Ext. 1294
Facsimile 860.731.3413
Kelli.Archacki@cigna.com

Re:     Name              :     Cathy Cleiland
        Policy #          :     FLK 20104 (LTD)
        Account Name      :     Temple Inland
        Underwriting by   :     Life Insurance Company or North America

Dear Ms. Cleiland:

We are writing to you regarding your claim for benefits under the above captioned policy. We have reviewed your claim for Long Term Disability (LTD) benefits and are ready to render a decision.   Based on the information we have on file to date, we have determined that you do not meet the above policy's Definition of Disability.  Accordingly, no additional LTD benefits are payable under the FLK 20104 policy.

To ensure a mutual understanding of the LTD Policy language, we would like to review the following information with you:

## Definition of Disability

"An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, the Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn 80% or more of his or her Indexed Covered Earnings."

## Disability Benefits

"The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy.  A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician.  Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.



EXHIBIT
10

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation.  Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue."

We recently completed a review of your information. Specifically, this included:
- Disability Questionnaire received from you dated 6/28/05;
- Telephone call from the Center for Pain of Montgomery dated 8/23/05;
- Telephone call to you dated 8/23/05;
- Office visit notes from the Center for Pain of Montgomery dated 3/02/05 through 9/19/05;
- Telephone call from you regarding updated providers;
- Office visit note from Dr. Steven Harris dated 8/26/05; and
- Request for office visit notes from Dr. Brett Johnson.

A review of the medical information indicates that you were initially off work due to Lumbar Spine Surgery. We received the Disability Questionnaire that you completed dated 6/28/05. You listed as your treating providers the Center for Pain of Montgomery in Montgomery, Alabama.

We requested medical information from the Center for Pain of Montgomery. On 8/16/05 we received a telephone call from Kitty of their office. She stated that they are not disabling you and requested that we obtain the information that we have requested from your other treating physicians.

We telephoned you on 8/23/05 to find out who your treating physicians are and which physician is disabling you. You stated that you are only being seen by the Center for Pain of Montgomery and they are disabling you. We advised you of our conversation with Kitty from the Pain Center and told you that we would request the medical records from them. You stated that you had a primary care physician for six years but he is two hours away and you have not seen him in a year due to your moving.

We received the office visit notes from the Center for Pain of Montgomery. The Progress Note dated 03/02/05 states that you have lumbar degenerative disc disease, cervical degenerative disc disease, myofascial pain and diabetes. You have been on Methadone 5 mg up to five pills a day. Effexor, and Klonopin. You stated that you have been having some stomach problems. You have not had to go to the hospital for any IV fluids. You have been having some muscle spasms in your legs. You are not very active and your sugars have been running higher than usual. You have fallen down some steps and once the trunk of your car fell on your back when you were leaning over the trunk. You described your pain as an 8 that day. Upon examination you have no respiratory difficulties noted, no hemodynamic instability noted, no acute hot joints, and no acute localizing weakness. The note dated 6/21/05 states that you have Diabetes Mellitus, your medications are effective, and your current pain is rated as a 9. The plan was to refill the current medications. The note dated 8/17/05 states that you have Diabetes Mellitus, your medications are effective, and your current pain is rated as an 8. Your pain condition is stable and the plan was to refill the current medications. The note dated 9/19/05 states that you have Diabetes Mellitus, your

CLE00151

medications are effective, and your current pain is rated as a 9. Your pain condition is stable and the plan was to refill the current medications.

We received a telephone call from you stating that you have been seen by a new primary care physician one time a month ago, Dr. Brett Johnson. You also saw an ENT one time a month ago, Dr. Steve Harris. You are being referred for a sleep study but have not set it up yet.

We received the office visit note from Dr. Steve Harris dated 8/26/05. In the office visit note you state that for about two months you have had some burning in the base of your throat. It is a little worse left than right, intermittent hoarseness, some pain deep in the left ear area. Your regular physician felt that you had a left ear infection and placed you on some Amoxil. You are being seen for evaluation of throat, ear, and intermittent hoarseness. Upon examination your voice quality sounds good but you state that it is an intermittent time. There is considerable irritation at the cricopharyngeus area and in the back of the arytenoids area bilaterally though worse on the left. It is not really enough to cause an ulceration but looks like some significant laryngopharyngeal reflux irritation. It was recommended that they set up a GI medicine evaluation

We requested medical records from Dr. Brett Johnson's office on 10/20/05 and 10/27/05. We contacted Alicia at Dr. Brett Johnson's office on 11/02/05 and we were advised to refax it to a different fax number. It was refaxed on 11/02/05 and we received no information.

Summary

In reviewing your claim, Life Insurance Company of North America considered your claim file as a whole for purposes of determining your entitlement to benefits. The Agreement provides that Life Insurance Company of North America would administer benefits only if you were prevented by Disability as defined above.

Based on the documentation provided by the Pain Center of Montgomery and Dr. Harris, the limitations and restrictions are not supported as evidenced by no current complaints of any radiating pain, numbness or tingling, no current diagnostic testing, your medication usage has been stable for several months, and no current lab values to determine the status of your glucose. The information does not support that you are incapable of performing your occupation. As a result, you do not meet the definition of total disability from any occupation as of November 21, 2005. Therefore, no additional long term disability benefits are payable.

Appeal

If you disagree with our determination and intend to appeal this claim decision, you must submit a written appeal. This appeal should be received by us within 180 days of receipt of this letter and should be sent to the Life Insurance Company of North America representative signing this letter to the address noted on the letterhead.

CLE00152

You have the right to submit written comments as well as any new documentation you wish us to consider. If you have additional information, it should also be sent for further review to the address noted on this letterhead, within 180 days of receipt of this letter.

We would be happy to consider any medical evidence which supports your total disability. Medical evidence includes, but is not limited to: physician's office notes, hospital records, consultation reports, test result reports, therapy notes, physical and/or mental limitations (i.e. Functional Capacities Testing), etc. These medical records should cover the period of disability through the present. You may also wish to have your physician(s) provide some or all following information:

- Height_____ Weight_____
- Diagnosis(es)
- Please send copies of any recent tests performed (in the last six months)
- Last several dates of treatment / current treatment plan / future treatment plan
- Is the patient compliant with the prescribed treatment plan? If no, please explain.
- Has or will your patient receive treatment from any other physician or provider for this condition? If so, please provide the name, specialty, address and phone number, if known.
- Current medications, dosage, and response.
- If surgery has been performed or will be performed, please indicate procedure, date and any complications.

Under normal circumstances, you will be notified of a decision on your appeal within 45 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the reason for delay within 30 days of receipt of your request, and every 30 days thereafter. A final decision will be made no later than 90 days.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein.

Please review your insurance booklet, certificate or coverage information available from your employer to determine if you are eligible for additional benefits.

Please contact our office at 800-352.0611 should you have any questions.

Sincerely,


Kelli Archacki
Claim Manager


CLE00153

You have the right to submit written comments as well as any new documentation you wish us to consider. If you have additional information, it should also be sent for further review to the address noted on this letterhead, within 180 days of receipt of this letter.

We would be happy to consider any medical evidence which supports your total disability. Medical evidence includes, but is not limited to: physician's office notes, hospital records, consultation reports, test result reports, therapy notes, physical and/or mental limitations (i.e. Functional Capacities Testing), etc. These medical records should cover the period of disability through the present. You may also wish to have your physician(s) provide some or all following information:

- Height_____ Weight_____
- Diagnosis(es)
- Please send copies of any recent tests performed (in the last six months)
- Last several dates of treatment / current treatment plan / future treatment plan
- Is the patient compliant with the prescribed treatment plan?
- Has or will your patient receive treatment from any other physician or provider for this condition? If so, please provide the name, specialty, address and phone number, if known.
- Current medications, dosage, and response.
- If surgery has been performed or will be performed, please indicate procedure, date and any complications.

Under normal circumstances, you will be notified of a decision on your appeal within 45 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the reason for delay within 30 days of receipt of your request, and every 30 days thereafter. A final decision will be made no later than 90 days.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein.

Please review your insurance booklet, certificate or coverage information available from your employer to determine if you are eligible for additional benefits.

Please contact our office at 800.352.0611 should you have any questions.

Sincerely,

Kelli Archacki
Claim Manager

CLE00154

CLE00155

| Name | | | SSN | | DOB | |
|---|---|---|---|---|---|---|
| Account Name | TEMPLE INLAND CORPORATE SERVIC | | Account # | FLK0020104 | Incurred Date | 05/14/2003 |
| Claim Manager | Kelli Archacki | | Incident # | 613165 | Claim Eff Dt-Status | 08/28/2006 - Closed |

| Title | F/U updated medical |
|---|---|

**Comment/Instruction**

Kitty from Dr. Harrick and Nordick's office called and stated that they have not disabled her, referring to other AP's.
334.288.7808

| Last Changed User | Kelli Archacki | | Last Changed Date | 08/23/2005 02:07 PM |
|---|---|---|---|---|

| Status: | Completed | Assigned To: | Kelli Archacki | Created: | 08/17/2005 05:03 PM |
|---|---|---|---|---|---|



EXHIBIT

11

Name CATHY CLELAND

Account Name TEMPLE INLAND CORPORATE SERVIC

SSN [redacted]  DOB [redacted]

Account # FLK0020104  Incurred Date 05/14/2003

Claim Manager Kelli Archacki

Incident # 613165

Claim Eff Dt-Status 08/28/2006 - Closed

## Contact Information

**Title** Request for medical

| | | | | | |
|---|---|---|---|---|---|
| ☐ First Phone Call | Result | | Date | User | |
| ☐ Second Phone Call | Result | | Date | User | |
| ☐ Generate Letter/Fax | | | Date | User | |
| ☐ Burden of Proof Letter Sent | | | Date | User | |
| ☑ Incoming Call | | | Date 08/23/2005 01:05 PM | User | Kelli Archacki |
| ☐ Mail Received | | | Date | User | |

Contact Comments:
received call 8/16/05

## Interview Documentation

Provider First Name CENTER FOR PAIN  Provider Last Name  Provider Specialty

Contact First Name KITTY  Contact Last Name  Contact Role

Primary ICD Code  Primary ICD Description

Comments

Kitty from Dr. Harrick and Nordick's office called and stated that they have not disabled her, referring to other AP's.
334.288.7808

Secondary ICD Code  Secondary ICD Description

Comments

ICD Code 3  ICD Code 3 Description

Comments

ICD Code 4  ICD Code 4 Description

Comments

ICD Code 5  ICD Code 5 Description

Comments

## Objective Findings

☐ Physical Exam Findings

☐ Test Results

☐ Provider Observations

Comments

## Treatment Information

| | | |
|---|---|---|
| Medication (1) | Dosage (1) | Frequency (1) |
| Medication (2) | Dosage (2) | Frequency (2) |
| Medication (3) | Dosage (3) | Frequency (3) |
| Medication (4) | Dosage (4) | Frequency (4) |
| Medication (5) | Dosage (5) | Frequency (5) |

Current Treatment Plan/Provider's Estimated RTW date

CLE00157

Strategy

3/2/05 lumbar, cervical, thoracic, cervical degenerative disc disease, myofascial pain, Diabetes, on Methadone 5 mg up to 5 pills/day, Effexor, Klonopin, nausea w/Methadone, muscle spasms legs, not very active, sugars running higher than usual, has fallen down some steps just miscalculated last step, trunk of car fell on back leaning over into trunk, just minor life traumas, more areas marked off in the pain chart than not, pain R upper extremity, L leg, back, life not in total turmoil past few visits, no acute hot joints, no acute localizing weakness, refill Neurontin 800 mg 1 x day, Robaxin 750 mg 3 x day, Phenergan 25 to 1 3 x day, Effexor 75 XR 1 qhs, Protonix 40 mg daily, Klonopin 1 mg qhs, switch to Methadone 10 mg to 1 3 x/day.

8/17/05 cervical degenerative disc disease, cervical stenosis, on Methadone & Neurontin, pain 8, f/u 1 month, fell home, remainder of report largely illegible.

9/17/05 cervical degenerative disc disease, cervical stenosis, on Methadone & Neurontin, pain 9, f/u 1 month, remainder of report largely illegible.

Rx Neurontin 800 mg 1 x day, Robaxin 750 mg 3 x day, Phenergan 25 to 1 3 x day, Effexor 75 XR 1 qhs, Protonix 40 mg daily, Klonopin 1 mg qhs, switch to Methadone 10 mg to 1 3 x/day

Treating once a month w/pain physician.

Functionality DQ drives 50 miles, uses walker times, uses computer once every 2 weeks, watches TV

PAA None noted.

RTW plans Indicates unknown if will RTW.

48 y/o w/hx multiple lumbar surgeries including fusion, cervical surgery, and Diabetes. Based on medical data submitted, R&Ls are not supported as evidenced by no current complaints of any radiating pain, numbness or tingling, no current EMG/NCV testing, medication usage stable for several months, and no current lab values to determine status of glucose. AP's state that they are not disabling her. The information does not support that she is unable to perform a sedentary position which is her previous occupation. Proceeding with closure of claim.

Last Changed User    Kelli Archacki    | Last Changed Date    11/21/2005 05:00 PM

Status:    Completed    Assigned To:    Kelli Archacki    Created:    11/21/2005 04:57 PM



CLE00158

https://dms-acclaim.group.cigna.com/acenza/custom/ClaimFilePrint.asp

10/23/2006

Cleiland, Cathy
Accident - 613165
Appeals Claims Manager - Medha Bharadwaj

**FILE REVIEW.**
DATE STAFFED - 3/2/06
CLAIM TYPE - LTD
CLAIM STATUS - Any Occupation
EMPLOYER - Temple Inland
OCCUPATION - Human Resource Manager
WORK DEMANDS - Sedentary
DIAGNOSIS - Back pain, dysphagia, diabetes, dyspepsia
INCUR DATE - 5/14/03
AGE - 48
CLAIM SYNOPSIS - OW since 05/14/03 due to lumbar spine surgery 5/21/03 & 7/16/03. Cx continues to claim disability due to back pain. Was seeing Pain management. Paid through 11/21/05. Then denied because L&Rs did not support preclusion from working any occupation. Previous occupation is sedentary. New information on appeal from 10/20/05 consult with gastroenterologist, notes from her primary care PCP, EGD with balloon dilation & biopsy from 11/15/05, & letter from Dr. Adam Nortick of 12/19/05. Need complete medical review. Back surgery 5/14/03. Denied 11/21/05 due to lack of support. New info from pain management, Internist, & GI.
REFERRAL QUESTION - Does the medical support severity of any condition that would preclude Cx from performing in a sedentary capacity from 11/21/05 through present?
PHYSICIAN'S STATEMENT OF PHYSICAL FUNCTIONAL CAPACITY - see review located in chart.
CLAIMANT'S STATEMENT OF PHYSICAL ACTIVITY - see review located in chart.
LAST CLINICAL NOTE RELEVANT TO MAIN PHYSICAL DIAGNOSIS - see review located in chart.
BRIEF SUMMARY OF RELEVANT MEDICAL INFORMATION PRIOR TO LAST NOTE - see review located in chart.
PERTINENT LAB, DIAGNOSTICS & REFERRALS - see review located in chart.
PEER CONTACT ATTEMPT(S) - No provider contact made.

**MATERIALS REVIEWED** - CIGNA file (records reviewed include but are not limited to those found on typed report). Typed report located in claimant's chart.
• Operative Report, Dr John Hackman (neurosurgery), 5/21/03 - Left L4-5 laminectomy.
• Progress Notes, Dr Hackman, 7/14/03 - initially did well then recurrence of hip & leg pain. Also weakness. Admitted to hospital through ER for re-evaluation & pain control. Positive SLR on left. Absent ankle reflex. Weakness toe extension. Dx: recurrent radiculitis L4-5 on left.
• Operative Report, Dr Hackman, 7/16/03 - Re-exploration laminectomy Left L4-5.
• MRI w & w/o contrast, 8/11/03 - large amount of enhancing epidural scar tissue. Small non-enhancing area of low signal intensity near left neural foramen L4-5. Could be disc fragment. Does not abut nerve roots. Could be disc fragment. Severe DDD L4-5.
• Progress Notes, Dr Hackman, 8/28/03 - MRI of 8/11/03 reviewed. Had injection by Dr Herrick yesterday. Trouble w/ left leg. Diminished left knee reflex but no foot drop. Negative SLR.
• MRI w & w/o contrast, 9/18/03 - Severe DDD L4-5. Probable retained disc fragment midline to left at L4-5. Enhancing scar tissue. Slight indentation of left L4 nerve root and left L5 root is encased by scar. Disc fragment more prominent since last MRI.
• Progress Notes, Dr Hackman, 9/18/03 - increasing problems. Radiation down right leg. Re-exploration offered due to changed MRI of today. Refer to Dr Hadley at UAB.
• Daily Activity Questionnaire, 11/12/03 - cannot sit or stand for any period. Spend most of time on back. Difficulty getting up & down to go to BR. Doing minimal activities.
• Letter, Dr Mark Hadley (Neurosurgery), 11/17/03 - has developed lumbar spinal instability w/ recurrent nerve root compression. Surgery needed.
• Operative Report, Dr Hadley, 12/16/03 - L4-5 laminectomy & diskectomy w/ L4-5 internal fixation & fusion.


EXHIBIT
13

- Progress Notes, Dr Hadley, 1/14/04 – cannot walk on toe/walk. No images done today. RTW presently. Does not do FCEs. LOV 2/11/04
- RTW Request Form, Dr Hadley, 2/24/04 – Neurontin & Lortabs. Cannot assess ability to

- Daily Activity Questionnaire, 6/28/04 – have excruciating back pain. Requires narcotics & pain management. Medications cause me to not think properly. Drives when she does not take pain meds. Lists no activities. Mom & dad help w/ ADLs. Do not go for walks.
- Progress Notes, Dr Adam Nortick (Pain Management), 3/2/05 – takes Methadone, Effexor, Klonopin. Reports spasms in legs. Not active. Reports falling down. Pain 8/10. Pain in R UEs, left leg, back. Exam unremarkable. DX: Cervical DDD w/ radiculitis, Lumbar DDD w/ radiculitis, IDDM. Continue Neurontin 3200 mg/day. Also Effexor & Klonopin. Increase Methadone. RTC one month.
- Daily Activity Questionnaire, 6/28/05 – have constant back pain. Requires narcotics & pain management regularly. Medications affect my memory. Drives when juggles pain meds. Lists no activities. Do not go for walks anymore due to pain.
- Progress Notes, Dr Steve Harris (ENT & allergy), 8/26/05 – has had lumbar & neck surgeries. Reports burning in base of throat. Exam shows significant laryngopharyngeal irritation. Has not responded to Protonix so need EGD evaluation.
- Consultation, Dr Robert Albares (Gastroenterologist), 10/20/05 – hoarseness & dyspepsia X6 months. Also dysphagia with solid foods. Physical exam remarkable. Mental status shows affect congruent. Memory intact. Change to Nexium. Needs EGD w/ possible dilatation.
- Lab report, 10/20/05 – glucose 394. Hgb A1C 11.8.
- Progress Notes, Dr Brett Johnson (Family Physician), 11/10/05 – IDDM uncontrolled. Increase Insulin. Refer to endocrine w/ Dr Wise.
- Operative Report, Dr Robert Albares (GI), 11/15/05 – EGD w/ balloon dilatation & biopsy.
- Progress Notes, Dr Johnson, 12/13/05 – recent dental surgery. Blood sugar log erratic. Some in 300s & 400s. Low as 50. Dx: Markedly uncontrolled diabetes. Increase insulin.
- Lab report, 12/13/05 – glucose 366. Hgb A1C 11.3. Alkaline Phosphatase 141.
- Letter, Dr Adam Nortick (Pain Management), 12/19/05 – Has been on stable medications over months. She has on-going problems. Some days are worse than others. She still has symptoms & requires medications.

**ASSESSMENT/CONCLUSION:** A careful review of the file was conducted. Claimant has chronic history of back pain and underwent several lumbar surgeries. Since that time she has been on chronic narcotic pain medications & high-dose neuroleptics drugs. She was paid through 11/21/05. Since that time her diabetes has been under poor control. She underwent esophageal dilatation in mid-November 2005. Her chronic pain appears to be stable & no changes in treatment have occurred. I do not believe, however, that the documents provide sufficient documentation to establish that severity of condition warrants L&Rs or that clinically measurable evidence exists to support deficits which require L&Rs given by the attending physician. In absence of such documentation, I do not believe the documentation supports deficits which require L&Rs which preclude performing sedentary activity during the period 11/21/05 through the present.

Scott C. Taylor, DO
CIGNA Medical Director
Date Completed: 3/7/06

## MEDICAL OPINION FORM

RE: Cathy Cleiland

SSN: ████████        DOB: ████████

Dear Dr. Wise:

Please provide your opinion to a reasonable degree of medical certainty, based on current treatment, of the above referenced patient's abilities and limitations.

1. Please state the diagnosis of the problem that causes your patient's limitations and restrictions, as well as the objective, clinical, or other specific findings that support your diagnosis and opinion: *Poorly controlled type 2*
*diabetes with peripheral neuropathy.*

2. In an 8 hour workday, 5 days a week, on a full time basis, the patient can be expected to be physically capable of the following activities:

Sit: _____8_____ hrs out of 8 hrs a day _____ hrs/min at one time

Stand or walk: _____2_____ hrs out of 8 hrs a day _10-15_ hrs/min at one time

3. Patient can lift/carry:

|  | Never | Infrequently (very few times a day) | Occasionally (1/3 of workday) | Frequently (2/3 of workday) |
|---|---|---|---|---|
| 1-5 pounds | ___ | ___ | ___ | ___ |
| 1-10 pounds | ___ | ___ | ___ | ___ |
| 11-20 pounds | ___ | ___ | ___ | ___ |
| 21-25 pounds | ___ | ___ | ___ | ___ |
| 50 pounds or greater | ___ | ___ | ___ | ___ |

4. Does the patient require bedrest during a normal workday? Yes _____ No ✓

If yes, for approximately how many hours? _____

EXHIBIT
14

5.  Does the patient have problems with stamina and endurance which would require him/her to rest more than the one 30-minute break and two 15-minute breaks normally allowed?

    Yes _____    No _____ If yes, how much rest? _____ hours/minutes for
                                             every _____ hrs/minutes of work

6.  Do the patient's subjective complaints seem reasonable in view of your observations and diagnoses?  Yes __✓__    No _____

7.  Could the patient be reasonably expected to be reliable in attending an eight hour a day, 40 hour work week in view of the degree of pain, fatigue or other limitations he/she experiences?

    Yes _____    No __✓__

8.  How severe is the pain reasonably suffered by the patient?

Extreme_____  Severe _____  Moderately Severe __✓__  Moderate _____  Mild _____

9.     Is it reasonable that the patient's pain, medical condition, or medication would cause lapses in concentration or memory on a regular basis to the extent that your patient could not attend to a task or be reliable in following work instructions?

    Yes __✓__    No _____

    If yes, how often would his/her condition reasonably causes such lapses in concentration or memory?

    _____ several hours 3 or more days a week

    __✓__ daily for several hours a day

    _____ other:_____

10.    Are there environmental restrictions reasonably caused by the patient's condition (i.e. avoid heat, humidity, heights, dust etc.)?

_____

2

CLE00136

11. Does the patient have a reasonable medical need to be absent from a full time work schedule on a chronic basis? (**Chronic being**, more than 4 absences during any month's period attributable to any one medical condition or related conditions, including absences for required medical treatment including appointments, diagnostic testing, treatment etc.)

Yes  ✓  No  _____

Please estimate to the best of your ability and expertise how many absences could be reasonably medically expected in any month. __5-6__

10/13/06
Date

_Steven D. Wise, MD._
Doctor's Signature

Steven D. Wise, MD.
Doctor's printed name

3

CLE00137

# MEDICAL OPINION FORM

RE: _Cathy Cleiland_        SSN: ████████        DOB: ████████

Dear Dr. Johnson:

    Please provide your opinion to a reasonable degree of medical certainty, based on current treatment, of the above referenced patient's abilities and limitations.

1. Please state the diagnosis of the problem that causes your patient's limitations and restrictions, as well as the objective, clinical, or other specific findings that support your diagnosis and opinion:

    1) Cervical spine HNP x 3 ⇒ C4-C7
    interbody fusion
    2) Herniated disc (HNP) L4-5 w/
    interbody fusion L5-L1
    Chronic neck / LBP 2° to H. 1 + 2

2. In an 8 hour workday, 5 days a week, on a full time basis, the patient can be expected to be physically capable of the following activities:

    Sit: _< 1 hr at a time_ hrs out of 8 hrs a day _____ hrs/min at one time

    Stand or walk: _< 1 hr at a time_ hrs out of 8 hrs a day _____ hrs/min at one time

3. Patient can lift/carry:

| | Never | Infrequently (very few times a day) | Occasionally (1/3 of workday) | Frequently (2/3 of workday) |
|---|---|---|---|---|
| 1-5 pounds | | | | X |
| 1-10 pounds | | | X | |
| 11-20 pounds | | X | | |
| 21-25 pounds | X | | | |
| 50 pounds or greater | X | | | |

4. Does the patient require bedrest during a normal workday? Yes _X_  No _____

    If yes, for approximately how many hours? _6-7_



EXHIBIT 15

1

5. Does the patient have problems with stamina and endurance which would require him/her to rest more than the one 30-minute break and two 15-minute breaks normally allowed?

Yes ___X___    No _____ If yes, how much rest? __40__ hours/minutes for every __1__ hrs/minutes of work

6. Do the patient's subjective complaints seem reasonable in view of your observations and diagnoses?    Yes __X__    No _____

7. Could the patient be reasonably expected to be reliable in attending an eight hour a day, 40 hour work week in view of the degree of pain, fatigue or other limitations he/she experiences?

Yes _____    No __X__

8. How severe is the pain reasonably suffered by the patient? med(

Extreme____ Severe ____ Moderately Severe __X__ Moderate _____ Mild ____

9. Is it reasonable that the patient's pain, medical condition, or medication would cause lapses in concentration or memory on a regular basis to the extent that your patient could not attend to a task or be reliable in following work instructions?

Yes __X__    No _____

If yes, how often would his/her condition reasonably causes such lapses in concentration or memory?

_____ several hours 3 or more days a week

__X__ daily for several hours a day

_____ other:_____

10. Are there environmental restrictions reasonably caused by the patient's condition (i.e. avoid heat, humidity, heights, dust etc.)?

_____

2

CLE00139

11. Does the patient have a reasonable medical need to be absent from a full time work schedule on a chronic basis? (**Chronic being,** more than 4 absences during any month's period attributable to any one medical condition or related conditions, including absences for required medical treatment including appointments, diagnostic testing, treatment etc.)

Yes _____✗_____    No _____

Please estimate to the best of your ability and expertise how many absences could be reasonably medically expected in any month. _prob > 2-4/wk_

_10/27/.1_
Date

_____
Doctor's Signature

_Bret M. Johnsin_
Doctor's printed name

3

CLE00140

CAMPBELL
WALLER &
POER, L.L.C.
2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

January 18, 2007

Ms. Medha Bharadwaj, FLMI, ACS
Appeal Claim Manager
CIGNA Group Insurance
D212
12225 Greenville Avenue, Suite 1000
Dallas, TX  75243-9337



        Re:    **Cathy Cleiland**

Dear Ms. Bharadwaj:

    Attached hereto you will find the vocational analysis report (Bates Nos. CLE00196 – CLE00220) regarding the above referenced claimant.  It is clear from the evidence that we have submitted to-date that Ms. Cleiland is entitled to benefits.  You have now been provided with detailed documentation regarding the various diagnoses that she has received from her physicians, the various restrictions and limitations arising from those diagnoses and now a detailed vocational analysis of those restrictions and limitations provided by her attending physicians.

    It is clear from the evidence submitted that Ms. Cleiland is entitled to benefits.

    Ms. Cleiland has now completed her submission of additional evidence and has provided your firm with more than enough evidence to support her claim for benefits.  You now have 45 days from the date of this correspondence to make the determination on her claim.  Failure to provide that determination within the 45-day period will result in triggering the deemed denial provisions under the Department of Labor Regulations.

                    Sincerely,

                    Thomas O. Sinclair, Esquire

TOS/me
Enclosures

## Mark Boatner, M.Ed., CRC

# Boatner Rehabilitation & Counseling Service, Inc.

♦♦♦

P.O. Box 3723 ♦ 305 Point North Place, Suite Two ♦ Dalton, Georgia 30721
Phone 706-226-7385 ♦ Fax 706-226-5979

### REPORT OF MEDICAL RECORDS REVIEW AND ASSESSMENT OF CAPACITY FOR SUSTAINED PERFORMANCE OF GAINFUL WORK ACTIVITY

To: Mr. Thomas O. Sinclair
Campbell, Waller & Poer, L.L.C
Attorneys at Law
2100-A Southbridge Parkway; Suite 450
Birmingham, AL 35209

Re: Ms. Cathy Cleiland
Post Office Box 148
Clio, AL 36017
SSN: ████████
Date of Birth: ████████, age 48 years, 6+ months
Date of Records Review and Report: January 13, 2007

REASON FOR REFERRAL
Attorney Thomas O. Sinclair represents Ms. Cathy Cleiland in her disability claim. Mr. Sinclair sent to me a volume of medical records that pertain to Ms. Cleiland and the treatment that she has had for her chronic neck and low back problems. He asked me to review those documents and determine the Residual Functional Capacity, RFC, indicated by those documents. RFC refers to the maximum sustainable capability that a person retains in spite of their medical problems. Mr. Sinclair wanted me to state my professional vocational rehabilitation opinion regarding Ms. Cleiland's ability or inability to perform all of the material duties of any underlying occupation (other than her own regular occupation) for which she might reasonably become qualified based upon education, training or experience. In addition, he wanted to know if she was unable to perform any occupation solely due to injury or illness, such that she was unable to earn more than 80% of her indexed or covered earnings.

The upshot of the medical records indicates that Ms. Cleiland has had three multilevel surgical procedures to her cervical spine and three surgical procedures to her lumbar spine. Administrative Law Judge Ricardo M. Ryan awarded Social Security Disability Income Benefits, SSDIB, to Ms. Cathy Key (Cleiland) on May 26, 2005 after a review of the entire medical record that included a consultative examination. She was 45 years of age at the time the ALJ determined that she was unable to perform any job in the US national economy that existed in significant numbers.

The medical records that Mr. Sinclair sent to me were from the following treating and consulting sources:
- Dr. William Faircloth, MD, treating surgeon
- Dr. John E. Hackman, MD, treating surgeon

CLE00196

- Dr. Mark N. Hadley, MD, treating neurosurgeon
- Dr. Adam R. Nortick, MD, treating pain management physician
- Dr. David P. Herrick, MD, treating pain management physician
- Dr. Scott C. Taylor, DO, insurance company records reviewer
- Dr. Steven D. Wise, M.D., letter to Mr. Sinclair & Medical Opinion Form dated 10-13-2006
- Dr. Bret M. Johnson, MD, Medical Opinion Form dated 10-27-2006
- Dr. David P. Herrick, MD, Sworn Statement dated November 13, 2006

In addition, Mr. Sinclair sent to me various documents that were as follows:
- CIGNA Group Insurance Policy number FLK 20104 (LTD) - denial of disability benefits
- Follow-Up Tasks records assigned to Kelli Archacki regarding Medical Requests, Provider Contacts, General Follow-Up, Claimant Contact, Outstanding Issues - various dates
- Notice of Decision, Fully Favorable by Social Security ALJ Ricardo M. Ryan, May 26, 2005
- Amendment to the Group Policy effective January 1, 1999 by Mr. John K. Leonard, President
- Mr. Medha Bharadwaj, appeal claim manager, denial of continuing coverage, letter dated March 10, 2006

REVIEW AND SUMMARY OF THE MEDICAL RECORDS REGARDING MS. CLEILAND
Ms. Cathy Cleiland has had a number of surgical procedures to her cervical and lumbar spine. The surgeries were performed by surgeons that found medical need for such invasive treatment based on a combination of the patient's subjective complains, findings of medical signs in the medical office and evidence on objective medical imaging studies.

Dr. William B. Faircloth, MD performed an anterior cervical fusion at C5-6 and used a right iliac crest graft on November 18, 1997. The medical diagnosis that indicated this treatment was necessary was a herniated nucleus pulposus at C5-6 on the right. The likely cause of that herniated cervical disc was a motor vehicle accident where another vehicle struck Ms. Cleiland's vehicle while she was stopped at a traffic signal. Dr. Faircloth reported her description of numbness in the medial aspect of her right arm as well as weakness in the right arm, pain in her right shoulder blade and occipital headaches. Left lateral rotation of her head caused right neck pain. She was most comfortable sitting or reclining with her neck supported. She had had a course of physical therapy that gave only short-lived relief for a few hours and the pain then returned. She reported intractable pain in her neck and right arm. A MRI showed the right-sided disc herniation at C5-6 that caused neural impingement. Dr. Faircloth also reported in his medical office note of November 18, 1997 that Ms. Cleiland had been diagnosed with diabetes mellitus at about age 20 and used 15 units of regular insulin each morning and 25 units of NPH each evening. At the time of her first neck surgery she was 40 years of age. She was married and had two children.

On January 15, 1999, Dr. William Faircloth, MD reported that he performed a right median nerve decompression to treat Ms. Cleiland's diagnosed right carpal tunnel syndrome. He noted that she had not improved following conservative care provided for her intractable right wrist pain.

On May 2, 2001 Dr. John E. Hackman, MD performed an anterior cervical discectomy and interbody fusion at C6-7 to treat the diagnosis of a disc herniation at that level. Dr. Hackman reported that she had indicated to him that she had never really recovered from her earlier

cervical surgery and her complaints were of pain in the right side of her neck and in her right shoulder and arm. She had failed conservative follow up treatment and had an abnormal MRI that showed the herniated disc at C6-7. Dr. Hackman indicated that he used donor bone graft from bone taken at the iliac crest site on the right. He also noted in his report that she had a history of a prior cervical surgery and a carpal tunnel surgery.

On June 24, 2002 Dr. John E. Hackman, MD reported performing an anterior cervical discectomy and interbody fusion at C4-5 with a bone graft from the right iliac crest. He reported that she had a history of two prior cervical surgeries and had been doing well until a recent motor vehicle accident. She had not improved with conservative treatment and a cervical myelogram and CAT scan was positive for an abnormal disc at C4-5. Dr. Hackman reported that Ms. Cleiland stated her right arm pain and neck pain had begun to increase prior to the motor vehicle accident that occurred on May 25, 2002. Her neck pain worsened after the accident and she had pain in her lower back as well. She attributed her low back pain to that same motor vehicle accident.

On May 21, 2003 Dr. John E. Hackman, MD performed a lumbar laminectomy on the left side at L4-5 for a diagnosis of lumbar radiculitis. Ms. Cleiland's complaints were of persistent left hip and leg pain with numbness that had worsened over the past year. She had a positive straight leg-raising test on the left leg. He was unable to obtain reflexes at her left knee and her left ankle. There was some toe weakness but no foot drop on the left. A magnetic resonance imaging scan showed disc bulging at L4-5 on the left with osteophytes. The disc protruded into the foramen. Dr. Hackman reported that she had immediate improvement of her symptoms noted on the day following surgery.

On July 14, 2003 Dr. John E. Hackman, MD admitted Ms. Cathy Cleiland into the hospital for pain management and diagnostic testing. On July 16, 2003 he performed a re-exploration at the L4-5 level on the left for the diagnosis of a recurrent disc herniation on the left there. The reason for the surgery was a return of her pain in the left hip and leg that had gotten progressively worse after an initial period of relief. A MRI scan showed a large extruded fragment at L4-5 on the left. Additionally there was a positive straight leg-raising test with the left leg.

On December 16, 2003 Dr. Mark N. Hadley, MD performed extensive surgery to Ms. Cleiland's lower back for the pre-operative diagnosis of lumbar instability with low back pain and left leg pain that included the plantar area of the left foot. The procedures that he performed were:
- L4-5 laminectomy and discectomy bilaterally with
- L4-5 internal fixation and fusion , bilaterally and
- L4-5 posterior lumbar dorsolateral interbody fusion, bilaterally with autologous bone

In his report of the operative technique that he used, he also described some of the anatomical abnormalities that he found. He stated that, "There was marked facet mobility, in fact, fractured facet at L4-5 level with collapse". Later, he noted that he, " worked around and through scar, and decompressed the exiting L5 nerve root, which was markedly compromised, as well as the exiting L4 root. There was tremendous scar here from the collapsed, fractured and failed facet… at L4 / L5 the markedly collapsed interspace here was identified. He noted that he had markedly increased, although not quite to normal, the interspace height from her preoperative collapsed circumstance."

Dr. Adam R. Nortick, MD, one of Ms. Cleiland's treating pain management physicians wrote a letter on December 19, 2005 to Ms. Kelli Archacki of Cigna Insurance. He stated his

CLE00198

professional reasons that supported Ms. Cleiland's application for LTⁱᴸ benefits and cited some of the "misquotes" of the insurance company. He stated that Ms. Cleiland had clearly indicated on her admission sheet and pain diagrams at the pain center that she had involvement with her hands and feet. The patient had been taking prescribed Neurontin for her tingling and numbness. He added that was not a new complaint and he did not feel that any additional documentation had been needed in that regard. He went on to state that, "Ms. Cleiland's medications have been stable over the last few months. However, this does not mean that she does not have ongoing problems, or that on any given day she may be more symptomatic than another. It is fairly common for patients like Ms. Cleiland to have unpredictable exacerbations of their problem along with a steady course, otherwise". He added that Ms. Cleiland was still symptomatic and that her symptoms are real. He offered to discuss the matter further if Ms. Archacki would only telephone him.

REVIEW AND SUMMARY OF THE MEDICAL OPINION FORM OF DR. WISE, MD
Dr. Steven Wise, MD is the endocrinologist who has treated Ms. Cathy Cleiland for her diabetes and peripheral neuropathy. He completed a Medical Opinion Form submitted to him by Mr. Sinclair regarding Ms. Cleiland's abilities for sustained full-time and part-time work as related to her diabetic condition. He listed in item number 1 the diagnosis of the medical problem that causes Ms. Cleiland's restrictions and limitations as, "Poorly controlled type 2 diabetes with peripheral neuropathy".

In item number 2 he noted that in an 8-hour workday, 5 days a week on a full-time basis Ms. Cleiland could be expected to be physically capable of the following activities:
- Sit - 8 hours out of 8-hours a day. He did not indicate the time per session that she could sit.
- Stand or walk - 2 hours out of 8-hours a day on the basis of 10 t 15 minutes at one time.

He did not list any comment in item number 3 regarding amount of weight and ratings of frequency that Ms. Cleiland could lift.

In item number 4 he indicated that Ms. Cleiland does not require bedrest during a normal workday.

Dr. Wise did not make any notation on item number 5 regarding the patient's need for rest periods during he normal workday.

In item number 6, Dr. Wise noted that Ms. Cleiland's subjective complaints seemed reasonable to him in view of his observations and diagnoses.

In item number 7, Dr. Wise indicated that Ms. Cleiland could not be reasonably expected to be reliable in attending an 8-hour a day, 40-hour workweek in view of the degree of pain, fatigue or other limitation that she experiences.
(Under this portion of the assessment alone, Ms. Cleiland would not have access to the labor market of full-time jobs since the 40-hour workweek is the cornerstone of regularly defined full-time work.)

In item number 8, regarding the pain that Ms. Cleiland reasonably suffers from, Dr. Wise rated her pain as "moderately severe" on a scale that ranges from "extreme, severe, moderately severe, moderate to mild".
(Pain that is credibly rated at the level of "moderately severe" or greater is taken as presumptive

that an individual could not sustain any job on a regular and reoccurring weekly schedule.)

In item number 9, Dr. Wise indicated that the patient's medication would cause lapses in her abilities of concentration or memory on a regular basis to the extent that she could not attend to a task or be reliable in following work instructions. In the follow-up to the question, Dr. Wise opined that Ms. Cleiland's condition / medication would reasonably cause such lapses in concentration or memory on a daily basis for several hours each day.
(Under this portion of the assessment alone, Ms. Cleiland would not have the capability to perform any job at any level of skill due to the erosion of her abilities of concentration and memory at the frequency noted.)

In item number 10 regarding any restrictions that applied to environmental characteristics or locations of jobs, Dr. Wise left the item blank.

In item number 11, Dr. Wise noted that Ms. Cleiland does have a reasonable medical need to be absent from a full-time work schedule on a chronic basis. Chronic is defined as more than 4 absences during any monthly periods that would be attributable to any one medical condition or related conditions including absences for keeping medical appointments, having medical treatments, having diagnostic testing and related matters. In the follow up portion to the item, Dr. Wise estimated to the best of his ability and expertise that Mrs. Cleiland would reasonably have from 5 to 6 absences in any monthly period.
(Under this portion of the assessment alone, Ms. Cleiland would not have access to any regularly defined job title existing in the US national economy. The absenteeism survey reported by the Bureau of Labor Statistics indicates that employers take a disapproving view of employee absence and tardiness. Typically employers tolerate only about 4 to 8-hours of absence per month. In my experience of interviewing employers over the years in conducting labor market surveys and job placement, this comports with my findings. Thus, Ms. Cleiland could not maintain employment even if she secured a job that was otherwise commensurate with her education and past relevant work experience.)

Dr. Steven D. Wise then signed and dated the Medical Opinion Form on October 16, 2006.

REVIEW AND SUMMARY OF THE MEDICAL OPINION FORM OF DR. BRET JOHNSON
Dr. Bret Johnson completed and signed this document on October 27, 2006. The instructions to the form asked him to provide his opinion to a reasonable degree of medical certainty based upon his current treatment of the patient, Ms. Cathy Cleiland.

In item number 1, he stated the medical diagnosis of the problem that causes the patient's limitations and restrictions as follows:
1. Cervical spine HNP X 3 with C4-5 interbody fusion
2. Herniated disc (HNP) L4-5; history of interbody fusion L5- S1
3. Chronic neck / LBP secondary to numbers 1 & 2 above.

In item number 2 regarding an 8-hour workday, 5 days a week on a full-time basis, he indicated that Ms. Cleiland could be expected to be physically capable of the following activities:
- Sit - < 1 hour at a time out of an 8-hour workday
- Stand or walk - < 1 hour at a time out of 8-hours a day
(On the basis of this portion of the assessment alone, Ms. Cleiland would not be capable of performing any type of job that required either full-time or part-time attendance. The typical

extent that Ms. Cleiland could not attend to a task or be reliable in following work instructions. He further indicated that these lapses in concentration or memory would occur on a daily basis for several hours a day.

(Under this portion of the assessment alone Ms. Cleiland would not be capable of sustaining any type of full-time or part-time employment since loss of cognitive ability for significant periods of time means the job is simply not being performed as the employer wants the job done.)

In item number 10, Dr. Johnson indicated that Ms. Cleiland should not work around heights as a result of her medical condition.

In item number 11, Dr. Johnson indicated that Ms. Cleiland does have a reasonable medical need to be absent from a full-time schedule on a chronic basis. Chronic is defined as more than 4 absences in any monthly period that is attributable to any one medical condition or related conditions including absences for required medical treatment, appointments, diagnostic testing and the like. He further estimated to the best of his ability and expertise that she would be absent in any month, "probably > 2 - 9 / week".

((Under this portion of the assessment alone, Ms. Cleiland would not have access to any regularly defined job title existing in the US national economy. The absenteeism survey reported by the Bureau of Labor Statistics indicates that employers take a disapproving view of employee absence and tardiness. Typically employers tolerate only about 4 to 8-hours of absence per month. In my experience of interviewing employers over the years in conducting labor market surveys and job placement, this comports with my findings. Thus, Ms. Cleiland could not maintain employment even if she secured a job that was otherwise commensurate with her education and past relevant work experience.)

Dr. Bret Johnson then dated and signed the document on October 27, 2006.

REVIEW AND SUMMARY OF THE SWORN STATEMENT OF DR. DAVID HERRICK
Attorney Thomas Sinclair took the sworn statement of Dr. David P. Herrick, MD after the physician agreed to speak the truth, the whole truth and nothing but the truth. The physician is Board-certified in Anesthesiology and Board-Certified as a pain management physician. He stated that he had been in practice of that specialty for more than 10 years.

On page 7, Dr. Herrick stated that Ms. Cleiland's medical diagnoses were cervical and lumbar degenerative disc disease and both cervical and lumbar failed surgery syndrome. The physician stated that there had been a number of MRI scans performed with regards to Ms. Cleiland's cervical spine and those documented evidence that she had severe degenerative disc disease in the cervical spine and later, in the lumbar spine. She had had multiple surgeries to each of those general areas of her spine and those included fusions of each area noted.

The physician stated that even after the multiple surgeries Ms. Cleiland continued to have symptomatic complaints. Dr. Herrick stated that he continued to treat Ms. Cleiland and he prescribed Schedule II narcotics for her. He also administered injections of steroids into her back from time to time for flare-ups of her pains there.

Mr. Sinclair asked Dr. Herrick on page 8 if there was any cure for Ms. Cleiland's problems and Dr. Herrick answered, "No." The physician indicated that his job was to keep Ms. Cleiland as comfortable as possible. He also indicated that the patient had been cooperative with all recommended medical treatment. He also indicated that from time to time she had complained of

CLE00202

some depression that he felt was certainly expected and caused by her back pain.

Dr. Herrick indicated that Ms. Cleiland was going to require continuous treatment for her ongoing problems. She had been seen by numerous physicians and she had had numerous back surgeries. Her problems were not going to go away. Mr. Sinclair told the physician that the insurance company had stated that Ms. Cleiland's problems had stabilized and that her problems had been managed to the point that her issues were stable. Mr. Sinclair asked Dr. Herrick if that was a proper way to put the point. Dr. Herrick responded that that was a curious way to put it and he stated that he thought, "that she is managed as well as she can be managed". He added that he thought that she was a functional as she could be functional and he had been trying to discover an analogy to her situation. He used the metaphor of a "demolition derby automobile". He said that at the time of such events the cars used were pretty well damaged to begin with but they could still be driven around. He said that Ms. Cleiland was "pretty rough" at this time but she was stable if that is how someone wanted to state that. He added that she was still moving and she did function to some degree but she did not function in a normal fashion. She did not function as well as someone else her age who had not had all the problems that she had.

On page 12, Mr. Sinclair asked Dr. Herrick if it would be reasonable for Ms. Cleiland to expect to be able to work 40-hours a week just as any other individual who did not have those problems. Dr. Herrick answered, "No".

Mr. Sinclair asked the physician to list the medications that he prescribed for Ms. Cleiland and he stated that they were:
- Flexeril, a muscle relaxant
- Cymbalta, an antidepressant
- Phenergan, an anti-nausea medicine
- Protonix, used for gastroesophageal reflux disease
- Methadone, her primary pain medication - 50 milligrams per day in divided doses
- Duragesic, a patch form of Fentanyl, a pain medication - 25 micrograms every 72 hours

Dr. Herrick answered the attorney's question if those medications were necessary in the affirmative. He stated that Methadone is used for chronic, severe pain that would be so bad that it did not respond to simple medications and for pain that the physician did not expect to go away.

Mr. Sinclair asked about the combined effect of the prescribed drugs on Ms. Cleiland's ability to concentrate. Dr. Herrick said that it varied from person to person but the basic problem is that such pain is a distraction. Pain at the level that requires such medications is severe. The medications are potentially sedating and also dull the ability to respond to or face stressful situations.

The attorney then reviewed the medical reports contained in Dr. Herrick's medical file from the surgeons that had operated on Ms. Cleiland's neck and lumbar spine. Beginning on page 15 the records indicated the following procedures, surgeons and dates:
- November 1997; anterior cervical fusion at C5-6 by Dr. William Faircloth
- May 3, 2001; anterior cervical fusion at C6-7 by Dr. John Hackman
- June 25, 2002; cervical discectomy and interbody fusion at C4-5 by Dr. John Hackman
- May 22, 2003; lumbar laminectomy at L4-5 by Dr. John Hackman
- June 17, 2003; re-exploration laminectomy at L4-5 by Dr. John Hackman
- December 18, 2003; laminectomy and discectomy with fusion at L4-5 by Dr. Hadley

CLE00203

Mr. Sinclair asked Dr. Herrick on page 22 what the cumulative effect of all those surgeries were in Ms. Cleiland's case. Dr. Herrick said that in his opinion, "her back had been degenerative and had been, for lack of a better term, falling apart...So each procedure, certainly while in general it encompasses the intent of taking compression off the nerve or stabilizing the spine, at the same time makes the spine more vulnerable."

The attorney asked Dr. Herrick if Ms. Cleiland's current complaints of pain would be reasonable and the physician answered, "Absolutely". In follow-up he asked the physician if her current complaints of pain were related to her diagnosed conditions and Dr. Herrick answered, "Absolutely".

On pages 23, 24 and 25 Mr. Sinclair asked about an insurance company note dated August 16, 2005 that referenced a phone call from Kitty at Dr. Herrick's office that indicated the physician "was not disabling" Ms. Cleiland. In follow up to that matter Mr. Sinclair quoted that a person named Kelly Archacki said that she talked to Kitty in Dr. Herrick's office and was told that that physician "was not disabling" Ms. Cleiland. Dr. Herrick said that Kitty is a LPN that works in his office and she is not someone who is authorized to assign diagnoses to patients. Mr. Sinclair pointed out that, "what they may have done is simply lied and put a note in here". However, that note formed the basis of the insurance company's denial of benefits, that is, by claiming that Dr. Herrick was "not disabling" Ms. Cleiland. Dr. Herrick responded to questioning that he had not read the disability policy that pertained to Ms. Cleiland. As such, the physician was not qualified to tell whether Ms. Cleiland was disabled under the policy.

Beginning on page 26 Mr. Sinclair asked Dr. Herrick if it would be reasonable to ask Ms. Cleiland to lift 50-pounds every day and the physician said, "No". Mr. Sinclair asked him if Ms. Cleiland could work for 8-hours without bedrest and Dr. Herrick said, "No". Mr. Sinclair asked Dr. Herrick if Ms. Cleiland could stand for 4 or 5 hours per day and Dr. Herrick answered, "No".

Mr. Sinclair asked at the bottom of page 26 if it would be reasonable for Ms. Cleiland to require bedrest during the day and Dr. Herrick answered, "Yes". The attorney then asked if Dr. Herrick had ever had an insurance company to call his nurse and ask them whether or not a patient is disabled and Dr. Herrick responded, "No. It's not in the nurse's job description to be doing that. Now, I don't think Kitty did in this case either". Mr. Sinclair commented that he thought that note from the insurance company was a "little fabrication".

The attorney read to Dr. Herrick on page 27 from the notes of an insurance company internal physician's review that stated that, "Based on medical data submitted, restrictions and limitations are not supported as evidenced by no current complaints of any radiating pain, numbness or tingling, no nerve testing, medication usage stable, and no current lab values to determine status of glucose. Attending physicians are not disabling her." Mr. Sinclair asked Dr. Herrick on page 28 if the physician agree with anything in that statement from the insurance company physician. Dr. Herrick said, "well, there's no treating physician that I've seen in any of this evidence here that has not disabled her. So I think that is certainly a stretch of the information that the doctor had before him". Mr. Sinclair asked Dr. Herrick if Ms. Cleiland had complaints of radiating pain currently and the physician answered, "Yes, she does". The attorney then asked if she had numbness and tingling currently and the physician answered, "Yes, she does". Mr. Sinclair asked if she had numbness and tingling back when the insurance company first issued the denial letter back at the end of last year and Dr. Herrick said, "Yes, she did". Dr. Herrick stated in response to the attorney's question of "medication usage stable" and what that meant as a "quantitative rating

of disability" that, "It had n relationship to a quantitative rating of di ility". Continuing on page 29, Mr. Sinclair asked Dr. Herrick about the internal insurance company notes of Dr. Scott Taylor, the CIGNA medical director, who indicated that based upon his file review the documents did not establish that Ms. Cleiland had a severe condition that warranted limitations and restrictions. Mr. Sinclair asked Dr. Herrick if he agreed with that diagnosis and Dr. Herrick stated, "You know, that's really kind of an absurd statement. No, I don't agree with that."

Mr. Sinclair asked in follow up about Dr. Herrick's opinion regarding Dr. Taylor's comment that there was no clinically measurable evidence to support deficits which would require restrictions and limitations as given by Dr. Herrick's office. Dr. Herrick stated that he absolutely did not agree with Dr. Taylor's statement.

The attorney then turned his attention to two Medical Opinion Forms that were completed by other of Ms. Cleiland's treating physicians. Mr. Sinclair pointed out that the purpose of he Medical Opinion Forms was not to discuss whether a person was disabled or not but rather to get an understanding of the restrictions and limitations that would apply to this patient. On page 31, Mr. Sinclair asked if Dr. Herrick's opinion remained that Ms. Cleiland did require bedrest during the course of a normal workday and the physician said that was his opinion. The attorney asked if Dr. Herrick thought that Ms. Cleiland would have problems with stamina or endurance that required her to take more than 30-mnute breaks during the workday and the physician answered, "yes". Mr. Sinclair asked if Ms. Cleiland's subjective complaints of pain seemed reasonable based upon the physician's observations and diagnoses and Dr. Herrick said, "Yes".

On page 32 Mr. Sinclair asked if Dr. Herrick thought it reasonable that Ms. Cleiland could be reliable in performing a 40-hour workweek and the physician answered, "No". Mr. Sinclair asked the physician how he would characterize Ms. Cleiland's complaints of pain and he said, "I would say they are severe". The attorney asked if the physician thought that the patient's medical condition would cause her to have lapses in concentration or memory that would cause her to be unreliable in a 40-hour workweek and the physician answered, "Yes". Mr. Sinclair then asked if Dr. Herrick would characterize Ms. Cleiland's condition as chronic and the physician answered, "Yes". Mr. Sinclair asked if there was a cure for Ms. Cleiland's condition at this point and Dr. Herrick said, "There is no cure".

The sworn statement closed by the physician making comment that whatever response the insurance company indicated they had gotten from Kitty, his office nurse, must have been taken way out of context. He said that Kitty would not have indicated in any way that Ms. Cleiland was not disabled. He thought that what had been implied was that the disability ratings and such had not been provided and his office had assumed that the surgeons would have given those ratings and placed restrictions upon Ms. Cleiland. Attorney Sinclair closed by indicating that there might have been a trick question in that someone from the insurance company might have asked the person who answered the telephone if that person could tell whether or not this person is disabled under this policy and the answer would have been, "No, we can't tell you". After closing comments the statement concluded.

DISCUSSION OF TERMS AND STANDARDS REGARDING OCCUPATIONS
The Dictionary of Occupational Titles (DOT) is the standard treatise on classification of jobs in the national economy of the United States. The DOT lists definitions for 12,741 job titles. Work is classified in several ways and by several criteria. Among the most useful systems are those regarding strength and skill level of work since all jobs require both behavior and cognitive

CLE00205

ability to some extent by the worker.

The United States Department of Labor (USDOL) embarked on a new venture several years ago to upgrade the database of the DOT and has named the effort the O*NET- short for the Occupational Information Network. This effort to revise and replace the venerable DOT remains under development and the USDOL has no plans to publish the 0*NET database in a book bound form. In fact, many, if not most of the job descriptions used in the 1,172 occupations listed in the O*NET are taken directly from the DOT. The last update of the DOT included definitions of 12,741 job titles. Many of the general job descriptions in the O*NET are composites of job descriptions as such are found in the DOT. There has not been a widespread effort to upgrade the database in terms of new on-site job analyses according to the standards published in the Revised Handbook for Analyzing Jobs. There is a version available to anyone who has Internet access through the Bureau of Labor Statistics web site at onetcenter.org. The O*NET documents that I employ are published by JIST Works, Inc. of Indianapolis, Indiana. The writers include the following paragraph on page xxxvi of their 1998 volume:
"You have probably heard of "caveat emptor", which is Latin for "let the buyer beware". We think, "caveat dictum", which loosely translated means, "beware of the data", is particularly appropriate as our advice for regarding the O*NET data as the basis for settling legal issues."

Thus, until there is another systematic method set forth by the USDOL, the DOT remains the accepted document used by Vocational Rehabilitation Counselors, state boards of worker compensation, and the Social Security Administration.

Strength factors are rated by the amount of weight or force that a worker has to exert in order to lift, handle and carry in the usual pursuit of the job. The weight factors consider measurable characteristics as the magnitude, frequency and duration of an activity. The strength ratings used in the DOT are as follows:
- Very Heavy- lift over 100 pounds occasionally, frequently and constantly
- Heavy- lift up to 100 pounds occasionally, 50 pounds frequently and 25 pounds constantly
- Medium –lift up to 50 pounds occasionally, 20 pounds frequently and constantly
- Light – lift up to 20 pounds occasionally, 10 pounds frequently and negligible amounts constantly
- Sedentary –lift up to 10 pounds occasionally, and / frequently

Furthermore, in the definition of Light Work that appears on page 1013 of the 4th Edition of the Dictionary of Occupational Titles, published by JIST Works, Inc. of Indianapolis, Indiana is the **NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the force exerted is negligible.**

Sedentary work is further defined as jobs that are performed while the worker is sitting. The DOT definition indicates the worker sits for 6 out of 8 hours and stands / walks for a total of 2 out of 8 hours. Light work is further defined as jobs that are performed while the worker is standing for 6 out of 8 hours with provisions for sitting / walking for 2 out of 8 hours. Generally speaking, all unskilled sedentary jobs require the worker sit except for comfort breaks and to get more material to work with. Likewise, the unskilled light jobs require that the worker stand for all of the time on the job except for sitting to get under a machine, sort material or other related chores. The remaining strength categories of Medium, Heavy and Very Heavy work require that the worker stand and walk for all of the time on the job except for occupations where the worker

CLE00206

uses foot / hand controls such as driving trucks, operating cranes, etc.

In the language of the DOT, the following definitions are used:
- Occasionally means up to one third of the time on the job (e.g. 2.5 of 8 hours)
- Frequently means from one third to two thirds of the time on the job
- Constantly means over two thirds of the time on the job

In addition, postural requirements of jobs are further specified in terms of physical demands / exertional requirements as listed below. Items 2 through 20 are also considered as non-exertional characteristics.

The DOT lists 20 physical demands and each is rated according to duration for each job. Each activity is identified as being required on an occasional, frequent or constant basis.

1. Strength – is discussed above.
2. Climbing –ladders stairs, scaffolding, ramps, poles, etc.
3. Balancing - to prevent fall from hazardous surfaces.
4. Stooping -(bending) the spine at the waist.
5. Kneeling –to come to rest on the knee or knees.
6. Crouching – bending legs and spine.
7. Crawling- by moving about on hands and knees.
8. Reaching- with hand(s) / arm(s) in any direction.
9. Handling – by seizing, holding, grasping or turning.
10. Fingering- by picking or pinching with finger(s).
11. Feeling- for size, shape, temperature, or texture.
12. Talking- to exchange ideas or information with others.
13. Hearing – the nature of sounds by the ear.
14. Tasting / Smelling- variations in flavors or odors.
15. Near Acuity- vision at 20 inches or less.
16. Far Acuity- vision at 20 feet or more.
17. Depth Perception- to judge distances.
18. Accommodation- quick near-point visual refocus.
19. Color Vision- to identify and distinguish colors.
20. Field of Vision- around the periphery of a fixed point.

The DOT also lists Environmental Conditions that are the surrounding in which a job is performed. An environmental condition is present when it is specific and job-related. The following is the list from the Dictionary of Occupational Titles:

1. WE - exposure to Weather - outside atmosphere
2. CO - extreme non-weather Cold temperatures
3. HO - extreme non-weather Hot temperatures
4. WT - exposure to Wetness and non-weather humidity
5. NO - Noise intensity level rated as Very Quiet, Quiet, Moderate, Loud, Very Loud
6. VI - Vibration of shaking objects or surfaces
7. AT - Atmospheric conditions (fumes, noxious odors, dust, gas, poor ventilation system, eye or skin)
8. MV - Moving mechanical parts hazard
9. EL - Electrical shock hazard
10. HI - High, exposed places hazard
11. RA - Radiation exposure hazard
12. EX - Explosion hazard

CLE00207

13. TX - Toxic / Caustic chemical hazard
14. OT - Other significant hazards

Skill levels are rated by the amount of time required for a person to learn the techniques, acquire the information and develop the facility for average performance in a specific job / worker situation. These time frames are described by the Specific Vocational Preparation (SVP) levels listed in the DOT and other volumes published by the US Department of Labor. These SVP levels are:

1.  Short demonstration only
2.  Up to 30 days
3.  30 days to 3 months
4.  3 to 6 months
5.  6 months to 1 year
6.  1 to 2 years (certificate / AA degree)
7.  2 to 4 years (AA /BA /BS degree)
8.  4 to 10 years (MS / Ph.D.)
9.  over 10 years

Skill refers to knowledge of a work activity, which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties. Skills are acquired through performance of an occupation which is above the unskilled level (requires more than 30-days to learn). A skill is a practical and familiar knowledge of the principles of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner. A skill gives a person a special advantage over unskilled workers in the labor market.

SVP may be obtained from vocational education, civilian, military and institutional work experience and from apprenticeships and in-plant and on-the-job-training. The SVP ratings are an "average" amount of time required since some workers might require more time to learn the specifics of a job than others and vice versa.

The SVP ratings are further interpreted into skill levels, such that:
- SVP 1 & 2 are unskilled
- SVP 3 & 4 are semiskilled
- SVP 5, 6 & 7 are skilled
- SVP 8 & 9 are highly skilled

The DOT lists eleven (11) vocationally relevant aptitudes. Each aptitude is rated on a 5-point scale. The vocational aptitudes are:
- G- general intelligence
- V – verbal
- N – numerical
- S –spatial
- P –form perception
- Q –clerical perception
- K- motor coordination
- F –finger coordination
- M –manual dexterity
- E – eye-hand-foot coordination

CLE00208

- C – color discrimination.

The aptitude rating scale is based on a high of 1 and a low of 5. The scale is defined as:
1. 90 to 99 percentile, Superior, GATB of over 125 (upper 10 % of the population)
2. 68 to 89 percentile, Above Average, GATB of 108 to 125 (upper third exclusive of the top 10%)
3. 34 to 65 percentile, Average, GATB of 92 to 107 (middle third of the population)
4. 1 to 33 percentile, Below Average, GATB of 56 to 91 (lower third of the population exclusive of the lowest 10%)
5. minimal ability / unable to perform (lowest 10% of the population)

GATB is the General Aptitude Test Battery and is the standard test instrument used by the US and state Departments of Labor. The APTICOM vocational testing system is used in private sector vocational rehabilitation to measure vocational aptitudes under the GATB system.

Each DOT job title is assigned a General Educational Development (GED) rating. GED depicts the formal and informal education which workers use to develop basic reasoning / direction following skills and language / math skills. GED embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature, which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, GED may be obtained from experience and self-study.

The GED scale is composed of three divisions: Reasoning Development, Mathematical Development and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematics developmental scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

There are 6 GED levels with 6 equal to high and 1 equal to low. Each GED level corresponds to a grade level of education. The chart summarizes the scale:

| GED | | REASONING | MATH | LANGUAGE |
|---|---|---|---|---|
| High – | 6 | Intellectual | Advanced Calculus | Graduate School |
| | 5 | Scientific | Statistics | College |
| Average– | 4 | High School | Algebra | High School |
| | 3 | 7th to 8th grade | 7th to 8th grade | 7th to 8th grade |
| Low– | 2 | 4th to 6th grade | 4th to 6th grade | 4th to 6th grade |

CLE00209

14

A matter of concern for vocational rehabilitation counselors, job placement counselors, Social Security Disability and the insurance industry is the matter of transferable skills. Transferable skills may be defined as using skills acquired in past work to apply to skilled or semiskilled activities of other jobs or other kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs. Job skills are not listed as such in any resource that I am aware of but there are lists of job titles arranged according to a number of different criteria. One may assume that jobs similarly arranged possess certain similar attributes or skills. Examples of these lists of jobs include:

- Census codes
- Data, People, Things - DPT
- Guide to Occupational Exploration – GOE
- Work Fields
- Materials, Products, Subject Matter and Services
- Industrial designation-Standard Occupational Classification (SOC) and Standard Industrial Code (SIC)
- Occupational Information Network- O*NET- a computer generated data base found at Internet address- online.onetcenter.org.

Transferable skills are best identified by persons with training and expertise in job analysis, vocational evaluation, job placement and job modification / accommodation. Transferability means applying work skills, which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs.

ASSESSMENT OF ACCESS TO THE LABOR MARKET

In order to calculate loss of access to the local and national labor market, it is necessary to estimate the pre-injury access to the labor market that a person possessed prior to injury, disease, accident that produced loss of function / loss of access to past work. I use a model based upon the frequency counts of occupations as listed in the Dictionary of Occupational Titles (DOT). As previously mentioned, this is not a perfect document yet no suitable replacement exists for it at the present time. Due to the limited numbers of jobs that skills transfer to, I use the database of unskilled job titles to calculate a pre-injury access to the labor market.

The DOT lists 12,741 job titles at all skill and strength levels. These matters are discussed in the Standards section of this report. Using the frequency counts of the DOT there are:

- 25 unskilled very heavy job titles
- 425 unskilled heavy job titles
- 967 unskilled medium job titles
- 1571 unskilled light job titles
- 137 unskilled sedentary job titles

These total 3125 job titles. By dividing 3125 by 12,741, a person with physical capacities up through the Heavy strength rated job titles had access to 24.53% of the jobs in the national or local economy. Even though not every job title listed in the DOT is available in every Metropolitan Statistical Area (geographical regions used by the United States Census Bureau-Division of the US Department of Labor), proportionally the numbers compare favorably. The proportions of job titles are:

- all sedentary job titles = 1,397 or 10.96 % of the labor market

CLE00210

- all light job titles = 6,31~ ɔr 49.59% of the labor market
- all medium job titles = 3,770 or 29.59 % of the labor market
- all heavy job titles = 1,164 or 9.14 % of the labor market
- all very heavy job titles = 92 or .72% of the labor market

In order for me to further define the percentages of the labor market, the following chart applies:
- 137 unskilled sedentary job titles is 9.8 % of all sedentary job titles
- 1571 unskilled light job titles is 24.86 % of all light job titles
- 967 unskilled medium job titles is 25.64 % of all medium job titles
- 425 unskilled heavy job titles is 36.51 % of all heavy job titles
- 25 unskilled very heavy job titles is 27.17% of all very heavy job titles

The assessment of a person's residual functional capacity, RFC is an additional consideration for the vocational evaluator, adjudicator or trier of fact. RFC refers to the maximum sustainable capability a person retains in spite of their medical problems. RFC has both an exertional and a non-exertional component. In fact, RFC may be defined as a multi-dimensional description of the work-related abilities, which an individual retains in spite of medical impairments (20-CFR, § 404.1545). RFC is an assessment based upon all of the relevant evidence. It may include descriptions (including those of the applicant) of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of the medical condition. The assessment of RFC is not necessarily a decision of whether or not a person is disabled but rather is used for determining the particular types of work that a person might be able to do in spite of their impairments. If a person is unable to perform their past relevant work due to medically determinable impairments then the evaluator considers if the RFC is compatible with other work that a person might be able to perform. Such other work might be simpler in cognitive demands and / or less strenuous from a physical demand frame of reference.

The task of the vocational evaluator / job placement counselor is to match the RFC with the requirements of work and identify job titles / jobs that exist that are compatible with the demonstrated or assessed RFC. Comparison is made with the RFC and the general standards of "regular duty" employment according to the standards set by the US Department of Labor as summarized in the relevant section of this report. If no match can be made between the demonstrated or assessed RFC and the world of work as jobs are ordinarily performed in the local or national economy, then a person is said to have a 100% vocational disability rating. Stated another way, the person has no access to the labor market as a result of their medically determinable impairment(s).

I use the following outline to define a rationale for the determination of vocational disability rating and assessment of access to the labor market:
1. History of the presenting problem
A. Injury, accident, cause – review of medical treatment records and diagnosis
B. History of medical treatment – conservative care, surgery, recuperation, pain management
C. MMI – Residual Functional Capacity – comparison with the world of work and consideration of the IW's age, education, work experience

2. RFC – the residual functional capacity is the most that a person can still do in spite of their limitations and restrictions - parameters
A. Exertional capabilities – magnitude, frequency and duration – how big, how often and how long might the person perform the following 7 strength demands

a. sitting
b. standing
c. walking
d. lifting
e. carrying
f. pushing
g. pulling

B. Non-Exertional capabilities – those abilities that do not depend on an individual's strength
a. postural – stooping, climbing, crawling, crouching, kneeling
b. manipulative – reaching, handling, fingering, feeling
c. visual – seeing – near and far acuity
d. communicative – hearing and speaking
e. environmental – tolerance of temperature extremes, dust, fumes, odors
f. mental – understanding, remembering and following instructions; responding appropriately to supervisors, co-workers and work situations; dealing with changes in the routine work setting

3. Effect of symptoms on exertional and / or non – exertional limitations and restrictions
a. Pain – might cause limitations of strength, reaching or any of the 7 strength demands
b. Pain / depression or psychiatric diagnosis – might also cause limitations of concentration, attention, capacity for persistence and pace regarding task completion
c. Pain / depression or psychiatric diagnosis – might reduce incidence / duration of sleep – lead to ease of fatigability, falling asleep during the normal waking period, failure to meet job attendance requirements, etc.
d. Pain / depression or psychiatric diagnosis – might lead to other symptoms such as isolation, social withdrawal, loss of interest in formerly pleasurable activities, weight gain or loss, pervasive loss of interest, insomnia, fatigue, diminished ability to think or concentrate, indecisiveness, feelings of worthlessness, inappropriate or excessive guilt, suicidal ideation with or without a specific plan.

Whenever any manifestation such as pain, fatigue, shortness of breath, weakness or nervousness, etc. is an anatomical, physiological or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical "sign" rather than a "symptom".

CONCLUSIONS

I reviewed all of the medical documents listed in the first section of this report as well as the other documents that I noted that Mr. Sinclair had sent to me. While reviewing the medical records I paid attention to those reports of objective medical findings as shown by MRI scans, x-rays and by medical signs elicited upon physical examination of treating and examining physicians. I paid particular attention to the medical records of treating surgeons, pain management physicians and the general medicine practitioner. I gave less weight to the opinion of non-examining physicians when such individuals only quoted the parts of other practitioner's medical records that would support conclusions of a RFC compatible with work. The insurance company physicians apparently did not consider the records in their entirety as evidenced by the functional capacities they indicated. The Administrative Law Judge of the Office of Hearings and Appeals, Division of the Social Security Administration wrote a decision that carefully and specifically enumerated the well-considered reasons that supported his conclusion that Ms. Cathy Cleiland did not possess the exertional and non-exertional capabilities for any job at any level of strength or skill. The examining orthopedist for the SSA carefully enunciated his reasons that

CLE00212

supported his assessment of functional capacity that was incompatible with any regularly defined job title or actual job that occurs in significant numbers in the national economy.

All jobs have requirements of both exertional and non-exertional characteristics. The exertional requirements correspond to the five strength demand categories listed in the Dictionary of Occupational Titles , DOT. The non-exertional characteristics refer to postures, positional capabilities, mental abilities and environmental surroundings required in the various workplaces where jobs occur. All full-time jobs require that employees meet attendance schedules of 40-hours per week based on 8-hours a day for 5-days per week or any equivalent schedule. Full-time work requires that employees spend 2080 hours per year in gainful effort on the jobs they hold.

The Medical Opinion Forms completed by treating physicians indicate that Ms. Cleiland does not possess the sustainable RFC for sedentary or light-strength rated job titles. Furthermore, the absenteeism rate that she would exhibit is incompatible with the usual and customary tolerances as published in "Absenteeism Tables" by the Bureau of Labor Statistics, division of the US Department of Labor. Typically, workers must devote 260 days per year to a full-time job schedule. Five days per week multiplied by 52-weeks per year equals 260 days. Employers typically have certain expectations of employees in terms of goals, productivity targets, quality control and the like. Absenteeism at the rate of one day per month is excessive and would most likely trigger an application for a Family Medical Leave application or termination from employment. Estimated absenteeism at the rate of two to nine days per month is clearly excessive and incompatible with a full-time work schedule.

Medically determinable impairments that demonstrate an inability of a person to sit, stand and walk on the "at will" basis of 8-hours per day and five days per week for 52 weeks per year provide support for a conclusion that that person is unable to be gainfully employed at any full-time job. Furthermore, when there is a reasonable basis for the allegations of pain, that pain must be regarded as having an adverse effect on a person's capacity for sustained gainful activity. A solid work history over many years demonstrates motivation for work. Ms. Cathy Cleiland also has some evidence of a depression that her pain management physician believes is caused by her chronic and severe back and neck pain.

Ultimately, the most reasonable vocational rehabilitation conclusion regarding Ms. Cleiland is that she is not a candidate for job placement or re-training because of the individual physical limitations and restrictions that apply to her. She is unable to remain in any gainfully employed capacity due to her chronic pains in her neck and upper extremities as well as by her back pain and the radiating pain in her lower extremities. She suffers cognitive deficits in that her attention is unreliable due to lapses in concentration and memory on a daily basis for several hours per day due to her pains and the strong narcotic medication that she uses as prescribed by her physicians. Ms. Cleiland's vocational disability rating is 100%. She does not have any access into the labor market at any job regardless of skill level or strength requirements. She would be unable to perform at any satisfactory level of expectation in even the most accommodated of jobs by the most benevolent of employers. She does not possess the sustainable functional capacity required for sedentary work or any other rating of work. As her physician, Dr. Herrick observed, there is no cure for Ms. Cleiland's problems and the best that medicine could hope to do is try to keep her as comfortable as possible. She is not capable of working at her past work or at any other work.

CLE00213

I have based my conclusions on a reasonable degree of vocational rehabilitation certainty. This report is most respectfully submitted by,

Mark Boatner, M.Ed., CRC, LPC

CLE00214

19

# Mark Boatner, M.Ed., CRC

# Boatner Rehabilitation & Counseling Service, Inc.
### ♦♦♦
P.O. Box 3723 ♦ 305 Point North Place, Suite Two ♦ Dalton, Georgia 30721
Phone 706-226-7385 ♦ Fax 706-226-5979

January 13, 2007
## LIST OF DEPOSITIONS AND COURT TESTIMONY IN THE PAST FOUR YEARS
### 2007
January 5, 2007 - Hearing testimony given in the civil matter of Mr. John E. Avitt versus Ms. Holly D. Avitt, case number 05-869; in the Chancery Court of Tennessee for the 11th Judicial Circuit at Chattanooga, Chancellor Frank Brown presiding. Mr. Hal North and Mrs. Valerie Richardson represented Mr. John Avitt and Ms. Leslie McWilliams represented Ms. Holly Avitt.

### 2006
November 13, 2006 - Discovery deposition given in the Tennessee worker compensation claim of Mr. Daniel Mendiola / Enrique Navarrete in the law office of attorney Bryan Hoss. Mr. Byron Lindberg represents the employer / insurer and Mr. Hoss represents the claimant. The case is set to be heard in the Chancery Court of Bradley County, Tennessee before Judge Jerri Bryant.

October 13, 2006 - Trial testimony given in the Chancery Court, Part 1, Knox County, Tennessee with Judge Weaver presiding; in the matter of the Tennessee worker compensation case of Mr. Javier Lopez versus Southland Building Company. Mr. Rodney H. Bennett represented Mr. Lopez and Ms. Debra Fulton represented the employer.

September 9, 2006 - Deposition given in the conference room of Mr. Christopher E. Sanspree of the law firm Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. representing Mrs. Barbara Ducoffe. Requested by Mr James S. Williams of the law firm Sirote & Permutt, P.C. representing UnumProvident Insurance and Protective Life Insurance, Co. This is Civil Action Number CV-04-1701 filed in the Circuit Court for the Judicial Circuit in and for Jefferson County, Alabama.

August 9, 2006 - Trial testimony in the Tennessee worker compensation claim of Mrs. Rebecca Harris versus Signal Centers, UCP before Chancellor Jeffrey Stuart in the Chancery Court of Rhea County in Dayton, Tennessee. Ms. Rebecca Hicks represented the claimant and Ms. Elaine M. Youngblood and Mr. Kent Thomas Jones represented the employer. The docket number was 9526.

July 21, 2006 - Trial Testimony in the Georgia worker compensation claim of Mrs. Sandra Evans versus Walmart Stores, Inc. before Administrative Law Judge David Whittenburg in the Municipal Courtroom in Rome, Georgia. Mr. Michael R. Eddings represented Mrs. Evans and Mr. John Stunda represented the employer. The case file number was 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.

June 12, 2006 - Evidentiary deposition in the Tennessee worker compensation claim of Mr. Grady Samuel Graden in the Circuit Court of Anderson County, Tennessee. Mr. Thomas L. Wyatt represents Mr. Graden and Ms. Kristi D. McKinney represents the employer, KHS&S Contractors. The case number is A4LA0450.

May 12, 2006 - Trial testimony in the Tennessee Worker Compensation claim of Mr. Michael Aldrich in Lewisburg, Tennessee in the Circuit Court of Marshall County, Judge Lee Russell presiding. Ms. Barbara G. Medley represented Mr. Aldrich. The employer, Saturn Corporation was represented by attorney, Mr. Cliff Wilson. Attorney Janis Mize represented the Tennessee Second Injury Fund. The docket number is 16103.

March 10, 2006 - Trial testimony in the Tennessee Worker Compensation claim of Mr. Earl Douglas Tryon in Lewisburg, Tennessee in the Circuit Court for Marshall County, Judge Lee Russell presiding. Ms. Barbara G. Medley represents Mr. Tryon and Mrs. Marcia McShane Watson represented the employer, Saturn Corporation. The docket number is 15843

March 7, 2006 - Discovery deposition given in the Tennessee Worker Compensation claim of Mr. Earl Douglas Tryon, by telephone. Deposition taken by Mrs. Marcia M. Watson representing the Saturn Corporation and attended by Ms. Barbara G. Medley, representing Mr. Tryon. The matter is set to be heard in the Circuit Court for Marshall County, Tennessee at Lewisburg before Chancellor Lee Russell. The docket number is 15843.

February 13, 2006 - Deposition given in the Georgia Worker Compensation claim of Mrs. Robin Sellars, state claim number 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 versus Piggly Wiggly Store number 116 and Management Services, Inc. the servicing agent. Mr. Tommy D. Goddard represents Mrs. Sellars and Mrs. Jennie Halenza Tavares represents the employer / insurer. The case is set for hearing before Honorable Dixon Belk, Administrative Law Judge.

<div align="center">2005</div>

November 14, 2005 - Discovery deposition given in the civil suit of plaintiffs, Nancy V. Kinsey and Tony Kinsey, individually as the natural parents of Samantha Kinsey versus Dr. Ismail Esener, MD, defendant. Deposition given in the conference room at the law offices of Mr. Jessie Vaughn of Coppedge, Leman & Vaughn in Calhoun, Georgia, who are representing the plaintiffs. Mr. John McCown of Minor, Bell & Neal represents the defendant in civil action file number 34278.

November 9, 2005 - Testimony in the civil suit of plaintiff, Mrs. Lisa Barker versus defendant, Kathy Marie Kennedy and R.G. & Associates given in the Circuit Court of Hamilton County, Tennessee at Chattanooga. Honorable Judge L. Marie Williams presiding in civil case number D1C1884. Mr. Bryan H. Hoss represented Mrs. Barker and Mr. Randolph Andy Veasey represented the defendants.

October 24, 2005 – Testimony in the civil suit of plaintiff, Mrs. Karen Lewis versus defendant, Juanita Smith given in the Circuit Court of Coffee County in Manchester, Tennessee. The Honorable Judge Jerry Smith presiding in civil case number 32, 375. Mr. Robert A. Croy represented Mrs. Lewis and Mr. Herbert J. Seivers, III represented Ms. Smith.

September 30, 2005 – Discovery deposition given in my office in the civil suit of plaintiff, Mrs. Karen Lewis versus defendant, Juanita Smith. Mr. Robert A. Croy represents Mrs. Lewis and Mr. Herbert J. Seivers, III represents the defendant. Case set for jury trial in the Circuit Court of Coffee County in Manchester, Tennessee, case number 32,375.

August 29, 2005 - Discovery deposition given in the Tennessee civil action of Mrs. Lisa Barker versus Mrs. Kathy Marie Kennedy at the law office of Mr. Bryan H. Hoss. Mr. Hoss represented

the plaintiff, Mrs. Barker and Mr. Randolph Andy Veasey represented Mrs. Kennedy. The case was set for the Circuit Court of Hamilton County at Chattanooga before honorable Judge L. Marie Williams, case number D1C1884.

July 29, 2005 – Evidentiary deposition in the Georgia worker compensation case of Mr. Bernard Vanderhorst versus Dekalb Medical Center taken at the law offices of Kissiah & Lay in Alpharetta, Georgia. Mr. Cornelius B. Scott represents Mr. Vanderhorst and Mr. James Jackson represents the employer. The case is Georgia WCB 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.

July 20, 2005 – Evidentiary deposition in the Georgia worker compensation case of Mrs. Kathryn Barrett taken at my office in Dalton, Georgia. Mr. Tommy D. Goddard represented Mrs. Barrett and Mr. Robert F. Hamilton represented the employer / insurer – Jackson- Hewitt Tax Service and Travelers Insurance Company. The Georgia WCB case number is 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.

June 3, 2005 – Trial testimony in the Tennessee worker compensation case of Mr. William Steve Holton versus Marshall County and the Tennessee Second Injury Fund, Division of the Tennessee Department of Labor in the Chancery Court of Marshall County at Lewisburg. Ms. Barbara G. Medley represented Mr. Holton and Mr. Andrew Saulters represented Marshall County; Ms. Janis Mize represented the Second Injury Fund. Judge Lee Russell presided. The case number was 16087.

April 25, 2005 – Trial testimony in the Tennessee worker compensation case of Ms. Sherry Parker versus Bradley County Government. Chancery Court Judge Jerri Bryant presided. Attorney Bert Bates represented the plaintiff, Ms. Parker. Attorney Tom Hasty represented the defendant, Bradley County. The case number was 03-220.

2004

September 27, 2004- Proof deposition in the Tennessee worker compensation case of Mrs. Patricia Hicks G. Lambert versus DuPont for the trial scheduled before Chancellor Jeffrey F. Stuart in the Chancery Court of Rhea County, Tennessee. Mr. J. Shannon Garrison represented Mrs. Lambert and Mr. Gerald Siciliano represented DuPont.

August 26, 2004- Trial testimony in the Tennessee Worker Compensation case of Mr. John Shelton versus Central Mutual Insurance Company in the Chancery Court of Bradley County, Tennessee before Chancellor Judge Jerri Bryant. Attorney Bert Bates for the claimant and attorney Lanny Goins for the defense. The case number was 00237.

August 12, 2004- Trial testimony in the Tennessee Worker Compensation case of Mr. Lucner Marc versus U.S. Express and Liberty Mutual Insurance Company in the Chancery Court of Hamilton County, Tennessee before Judge W. Frank Brown. Mr. Gary W. Starnes represented Mr. Marc and Mr. David Nagle represented the defendants. The case number was 02-0420.

July 23, 2004- Trial testimony in the Tennessee Worker Compensation case of Mr. Jolly Walls, Jr. versus Orion Building Corporation in the Chancery Court of Marshall County, Tennessee before Judge Lee Russell. Ms. Barbara G. Medley represented Mr. Walls and Mr. Robert R. Davies represented the defendants. The case number was 15707.

April 2, 2004-Trial testimony in the matter of the Tennessee worker compensation case of Jeannie Ruby Hefner versus McKee Foods in the Chancery Court of Hamilton County, Part II

CLE00217

before Chancellor Howell I. Peoples. Mr. Gary W. Starnes represented Mrs. Hefner and Mr. Bruce Bailey represented McKee Foods. The case number was 99-0056.

March 10, 2004-Discovery deposition taken at the law office of Spicer, Flynn & Rudstrom, PLLC in Chattanooga, Tennessee in the Tennessee worker compensation claim of Mr. Rickey Suttles versus Frontier House Restaurant and the Travelers Insurance Company. Mrs. Michelle Fowler represented defendant, Mr. Quinn Windham, represented the Tennessee Second Injury Fund, Mr. James Paris represented the claimant. The case will be set before the honorable Chancellor Jeffrey F. Stuart in the Chancery Court of Rhea County, Tennessee; Civil Action number 9629.

February 9,2004-Discovery deposition taken at the law office of Swift, Currie, McGhee & Hiers, LLP in Atlanta, Georgia in the worker compensation claim of Mr. Robert Jones, Jr. versus Masterack / Leggett & Platt. Georgia Worker Compensation claim number 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; date of injury: 05-04-2001. Mr. Cornelius B. Scott for the plaintiff and Mr. David W. Willis for the defense.

January 26,2004- Discovery deposition taken at the law office of Mr. David Blackburn in Dalton, Georgia in the personal injury matter of Johnny Dwayne Martin versus RWT, Inc., American Central Insurance Company and Michael L. Hudson d/b/a M & S Trucking. Attorneys for the defense were Ms. Stephanie Collins Patel and Mr. Jeff N. Mykkeltvedt. The case is filed in the Superior Court of Murray County, Georgia, civil action number 01-CI-939.

January 16, 2004- Discovery deposition taken at the law office of Mr. Jeffrey Rufolo of Summers & Wyatt in the Tennessee worker compensation case of Mr. Glenn Clifton versus Komatsu and the Tennessee Second Injury Fund. Mr. Wilson Von Kessler represented the employer and Ms. Janis Mize listened via telephone for the Second Injury Fund. The case is scheduled for trial in the Chancery Court of Sequatchie County in Dunlap, Tennessee before Chancellor Jeffrey F. Stuart. The docket number is 1932.

January 9,2004- Discovery and proof depositions taken at the law office of Mr. Walter W. Bussart in the Tennessee worker compensation claim of Mr. Danny Jett versus Irving Materials Company and Zurich American Insurance Company. Mr. Steven B. Morton represented Irving Materials. The case is scheduled in the Chancery court of Marshall County, Tennessee at Lewisburg and the case number is 12560.

January 5,2004 - Discovery deposition at the law office of Mr. Wilson Von Kessler of Spicer, Flynn & Rudstrom, in the Tennessee worker compensation case of Mr. Claude Vaughn. Mr. Howard Upchurh represented Mr. Vaughn and Mr. Von Kessler represented the Suburban Manufacturing Company. The matter is scheduled with the Circuit Court of Rhea County, Tennessee at Dayton before Judge Jeffrey F. Stewart. The docket number is 21475.

2003

December 3,2003-Testimony in the Chancery Court of Rhea County, Tennessee in Dayton in the worker compensation case of Mr. Freddie Lee Morgan versus the Roberts Concrete Company and the Tennessee Insurance Guarantee Associates. Mr. Gary W. Starnes appeared for Mr. Morgan and Mr. William Lockett appeared for the fund. Honorable Jeffrey F. Stuart presiding. Docket number 9516.

November 14, 2003-Testimony in the Chancery Court of Hamilton County, Tennessee in the

CLE00218

4

workers compensation case of Ms. Sheila Owens versus McKee Foods, Inc. Mr. Bruce Bailey and Mr. Chuck Lawson for the defendant and Mr. Gary W. Starnes for the plaintiff. Honorable Howell N. Peoples presiding. Docket number 01-0032; part II.

June 6,2003-Testimony given in the Chancery Court of Hamilton County, Tennessee in the Tennessee Worker Compensation case of Ms. Kimbra Dunning. Mr. Robert W. Sauser, Esq. Was attorney for the defendant, Lifecare Centers of America. Mr. Gary W. Starnes was the attorney for the plaintiff. The docket number was 01-0046. Honorable Howell N. Peoples presided in the matter.

May 1,2003-Deposition at the law office of Mr. Howard Upchurch in the worker compensation case of Mr. Chris Hankins. Mr. Scott Johnson of the Fleissner Firm took the deposition representing the La-Z-Boy Company. This is civil case 21458 in the Circuit Court of Rhea County, Tennessee before Honorable Chancellor Jeffrey F. Stuart.

February 28, 2003-Deposition at my Dalton, Georgia office in the matter of Mr. Ronald D. Steakley versus Jet Corporation & Powermatic, Tennessee Worker Compensation case. Attorney Howard Upchurch for the plaintiff and attorney Austin Pedigo for the defendant. In the Chancery Court of Van Buren County, Tennessee; civil action number 1170.

January 15,2003-Deposition at my Dalton, Georgia office in the matter of Ms. Linda Lindsey, Tennessee worker compensation case. Attorney Gary Starnes for the plaintiff and attorney Bartlett Quinn for McKee Foods, defendant. In the Chancery Court of Hamilton County, Tennessee; Case Number 00-0064, Part II, honorable Judge Howell N. Peoples presiding.

Since August 1996 I have provided impartial Vocational Expert testimony in Social Security Disability cases- both SSDIB and SSI- through the Office of Hearings and Appeals located at 5751 Uptain Road in Chattanooga, Tennessee. I usually participate in 45 to 65 cases per month depending upon the schedule of the various administrative law judges. I have provided this type of impartial vocational testimony every month since the agency determined that I met the SSA guidelines to be considered a vocational expert after my application in July 1996. I have testified in approximately 6000 Social Security hearings since that time and have a schedule of appearances at this time.

This list of depositions and court appearances to provide vocational testimony is accurate to the best of my knowledge and belief.

Most respectfully submitted,

Mark Boatner, M.Ed., CRC

# Mark Boatner, M.Ed., CRC
# Boatner Rehabilitation & Counseling Service, Inc.
### ◆◆◆
P.O. Box 3723 ◆ 305 Point North Place, Suite Two ◆ Dalton, Georgia 30721
Phone 706-226-7385 ◆ Fax 706-226-5979

## RESUME

### CREDENTIALS:

Certified Rehabilitation Counselor – CRC number 15489; valid through 03-30-2007

Licensed Professional Counselor  - LPC number 000937; valid through 09-30-2008

Certified Case Manager        - CCM number 05754; valid through 11-30-2008

### EXPERIENCE:

Employed from 1981 to the present as a Vocational Rehabilitation Counselor with the following responsibilities:

- Counsel handicapped and disabled persons to identify problems which require services needed to obtain maximal functional improvement; to make referrals / coordinate services
- Conduct appropriate vocational testing and evaluate persons regarding skills, transferable skills, loss of access to the labor market and identify range of suitable occupations that might lead to return to work
- Conduct labor market surveys and job placement activities leading to suitable job offer
- Discuss medical conditions and treatment needs of clients with appropriate medical and treating professionals
- Perform medical records and file reviews to learn Residual Functional Capacity and rate vocational disability, as appropriate
- Provide supportive counseling / teaching to injured persons regarding depression, anxiety, chronic pain and adjustment to medical impairment / limitations
- Provide impartial vocational expert testimony before Administrative Law Judges in the Social Security Office of Hearings and Appeals and before the triers of fact in Worker Compensation Courts

### EDUCATION:

Master of Education in Vocational Rehabilitation from the University of Georgia in 1981.

Bachelor of Arts in Psychology from Columbia College in Columbia, South Carolina in 1975.

### REFERENCES:

Furnished upon request

CLE00220

**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR

May 3, 2007

Ms. Karol Johnson
Senior Appeal Specialist
CIGNA Group Insurance
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243-9337

Re:                  **Cathy Cleiland**
Plan/Policy Holder:      **TEMPLE INLAND CORPORATE SERVICES**

Dear Ms. Johnson:

       I am in receipt of your April 24, 2007 correspondence. Attached hereto and bates numbered CLE00221 through CLE00229 is your letter dated April 24, 2007 and all of the documents attached to your letter. I understand that this production along with the previous documents you produced constitutes in their entirety all of the ERISA record in this matter as the record is defined by ERISA and the Department of Labor.

Sincerely,

Thomas O. Sinclair

TOS/me
Enclosures
cc:    Ms. Cathy Cleiland
       Terry G. Key, Esquire

*Karol Johnson*
*CIGNA Group Insurance*
12225 Greenville Avenue
Suite 1000
Dallas, TX 75243-9337

Phone: 800-352-0611 ext. 1249
Fax: 860-731-3211



**CIGNA Group Insurance**
Life · Accident · Disability

MR. THOMAS SINCLAIR, ATTORNEY AT LAW
2100-A SOUTHBRIDGE PARKWAY
SUITE 450
BIRMINGHAM, AL 35209

April 24, 2007

Name:                           CATHY CLEILAND
Incident Number:                613165
Plan/Policy Number:             FLK0020104
Plan/Policy Holder:             TEMPLE INLAND CORPORATE SERVICES
Underwriting Company:           Life Insurance Company of North America

DEAR MR. SINCLAIR,

Pursuant to your request enclosed is a copy of the information added to your client's claim file since the correspondence dated November 13, 2006.

Please contact our office at 800-352-0611 ext. 1249 should you have any questions.

Sincerely,

Karol Johnson
Senior Appeal Specialist

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

March 29, 2007

Ms. Noemi Landis
Appeals Claim Examiner
CIGNA Group Insurance
D212
12225 Greenville Avenue, Suite 1000
Dallas, TX  75243-9337

  **Re: Cathy Cleiland**

Dear Ms. Landis:

  I am in receipt of the final denial of Ms. Cleiland's claim.  I regret that the parties could not resolve this matter.

  It has been some time since your company's last production of documents.  If the company has any additional documents generated during this claim that have not been produced to the claimant, please produce those at this time.  You may exclude from your production documents bates numbered CLE00001 through CLE00220, a copy which has been provided to your office.

      Sincerely,

      Thomas O. Sinclair, Esquire

TOS/me

**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

March 16, 2007

Ms. Noemi Martinez-Landis
Appeal Claim Manager
CIGNA Group Insurance
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243-9337

Re:    Cathy Cleiland

Dear Ms. Martinez-Landis:

I am in receipt of your February 26, 2007 correspondence. I look forward to working with you on this matter.

As I understand it, you have now received the file, which was forwarded to you from within your company. Please be aware that our submission on January 18, 2007 completed Ms. Cleiland's submission and, as stated in that correspondence, the time clock began ticking when your firm received that correspondence. As I am sure you are aware, there are certain time periods for a decision to be made with regard to Ms. Cleiland's claim. Assuming that our January 18 correspondence took ten days to arrive at your firm, we will start the clock ticking on January 28, 2007. I will assume that you will want the full 90 days allowed under the rules and, as such, we look forward to your decision no later than April 30, 2007.

If we don't receive a decision by April 30, we will be left with little choice but to travel under the assumption that the Department of Labor deemed denial provisions have been triggered and we will proceed accordingly.

Sincerely,

Thomas O. Sinclair, Esquire

TOS/me
Enclosures
cc:    Ms. Cathy Cleiland
       Terry Key, Esquire

March 15, 2007



**CIGNA** Group Insurance
Life · Accident · Disability

THOMAS SINCLAIR
ATTORNEY AT LAW
2100 A SOUTHBRIDGE PARKWAY
SUITE 450
BIRMINGHAM, AL  35209

Routing  d212
12225 Greenville Ave
Suite 1000
Dallas, Texas 75243
Telephone 1-800-352-0611 ext 1249
Facsimile  860-731-3022

Re:    Claimant:          Cathy Cleiland
       Policy Keys:       FLK 20104
       Account Name:      Temple Inland
       Underwriting Co:   Life Insurance Company of North America

Dear Mr. Sinclair:

We have completed our review of client's appeal for Long Term Disability benefits, and we are reaffirming our previous denials of benefits

Temple Inland's Long Term Disability Policy has the following provisions:

Definition of Disability
"An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, the Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn 80% or more of his or her Indexed Covered Earnings."

Disability Benefits
"The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician. Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue."

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation.  Products and services are provided by operating subsidiaries and contracted companies and not by CIGNA Corporation.  Operating subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

Your client received Long Term Disability benefits under this policy from November 10, 2003 through November 21, 2005. Benefits were denied as the medical evidence on file no longer supported her inability to function at a sedentary capacity for the period of time in question.

All medical evidence on file, including the additional documentation you submitted for the appeal of Ms. Cleilan's claim was taken into consideration prior to rendering our determination.

The following is a brief summary of some of the medical records reviewed for the period of time in question:

- November 10, 2005 note, Dr. Johnson. Diabetes uncontrolled because glycosylated hemoglobin level was 11.8. Blood Pressure 150/78. Lungs, heart and abdomen exams normal. Blood sugar 314.
- December 13, 2005 note, handwritten, Dr. Johnson. Dental work done week ago today, extreme right side face pain with swelling. No exam recorded.
- January 12, 2006 Cervical spine MRI report. No interval change since December 8, 2004. Mild spinal stenosis.
- May 18, 2006 Lumbar spine MRI report. L4-5 posterior spinal fusion. Moderate L3-4 central canal narrowing. L4-5 disc spacer with bulging into L4-5 left neuroforamen with left L4 nerve root compression.
- October 13, 2006 medical opinion form, Dr. Wise. Restricted because of poorly controlled type 2 diabetes with peripheral neuropathy. No specific measured physical limitations are listed. Restrictions include sitting 8 hrs/d and standing of walking 2 hours per day, 10-15 minutes at a time. No lifting/carrying restrictions listed. He did not believe she could work 8 hours per day, 40 hours per week. He believed she was cognitively limited because of medication use, but did not provide any cognitive measurements to support this opinion.
- October 31, 2006 Right shoulder MRI report. Supraspinatus tendinosis without evidence of full thickness tear.

The available medical records on file do not provide documentation of significant measured physical limitations time-concurrent with the denial date to support continuation of work restrictions recommended by treating physicians. Examples of this could include measured range of motion limitations by inclinometry and/or lower extremity significant muscle strength deficits by manual muscle testing.

In reviewing Ms. Cleiland's claim, Life Insurance Company of North America considered her claim file as a whole for purposes of determining her entitlement to benefits. The Policy provides that Life Insurance Company of North America would pay benefits only she was prevented by disability to perform the duties of her sedentary occupation as a Human Resource Manager or any occupation. The documentation on file provided diagnoses, treatment plans, and medication regimes; however, pathology does not necessarily equate to presence of disability.

Based on our review of the records on file, the physical and psychological limitations and restrictions provided by her physicians are not supported as of November of 2005 and forward; therefore, we are reaffirming our previous denial decisions. Consequently, we will consider Mrs. Cleiland to have exhausted all administrative remedies with our office and no further appeals will be considered.

Please note that your client has a right to bring legal action regarding her claim under the ERISA section 502(a). The plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact Ms. Cleiland's local United States Department of Labor Office or her State Insurance Regulatory Agency.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein.

Please review your client's insurance booklet, certificate or coverage information available from her employer to determine if she is eligible for additional benefits.

Sincerely,


Noemi Landis

Cleiland, Cathy

Vol appeal 48 yof off work since 05/14/03 due to lumbar spine surgery. Cx continues to claim disability due to back pain. 10/20/05 consult with gastroenterologist, esophagogastroduodenoscopy with balloon dilation and biopsy from 11/15/05, and a letter from Dr. Adam Nortick dated December 19, 2005 indicating Letter from Dr. Nortick cx on Neurontin for tingling and numbness, meds stable, ongoing problems. May have unpredicted exacerbations as well as OV notes from 12/14/05-8/23/03

For vol appeal we received
    Medical opinion form from Dr. Wise 10/13/06 and Dr. Johnson 10/27/06 providing L & Rs of less than sed work.
    Lumbar MIR 5/17/06 bulging disc 4-5 extending on the left with compression of left L4 nerve root.
    Cervical epidural steroid injection 4/7/06, 2/6/06, 8/27/03,
    OV notes from the center for pain indicating tx 10/24/069/18/06, shoulder MRI confirmed successful injection 10/31/06
    Dr. Herrick sworn statement 11/13/06

Plan  Need to clarify if L & Rs are supported by medical evidence on file from 11/22/05 forward.
NLandis ACM

### 3/14/07:

Medical records reviewed include, but are not limited to
-   11/10/05 note, Dr. Johnson. Diabetes uncontrolled because glycosylated hemoglobin level was 11.8. BP 150/78. Lungs, heart and abdomen exams normal. Blood sugar 314.
-   12/13/05 note, handwritten, Dr. J. Dental work done week ago today, extreme right side face pain with swelling. No exam recorded.
-   1/12/06 Cervical spine MRI report. No interval change since 12/8/04. Mild spinal stenosis.
-   5/18/06 Lumbar spine MRI report. L4-5 posterior spinal fusion. Moderate L3-4 central canal narrowing. L4-5 disc spacer with bulging into L4-5 left neuroforamen with Left L4 nerve root compression.
-   10/13/06 medical opinion form, Dr. Wise. Restricted because of poorly controlled type 2 diabetes with peripheral neuropathy. No specific measured physical limitations are listed. Restrictions include sitting 8 hrs/d and standing of walking 2 hrs/d, 10-15 minutes at a time. No lifting/carrying restrictions listed. He did not believe she could work 8 hrs/day, 40 hrs/wk. He believed she was cognitively limited because of medication use, but did not provide any cognitive measurements to support this opinion.
-   10/31/06 Right shoulder MRI report. Supraspinatus tendinosis without evidence of full thickness tear.
See Investigation Results below for assessment.
John Mendez, M.D.

Re: Cleiland, Cathy
Page 2 of 2

ASSESSMENT, 3/14/2007 11:07 AM
Based on the additional provide medical records, the original assessment remains
unchanged because there is still no documentation of significant measured physical
limitations time-concurrent with the denial date to support continuation of work
restrictions recommended by treating physicians.  Examples of this could include
measured range of motion limitations by inclinometry and/or lower extremity
significant muscle strength deficits by manual muscle testing.
**John Mendez, M.D**

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute. Use and
distribution limited solely to authorized personnel. © Copyright 2007 CIGNA*

CLE00228

Medha Bharadwaj, FLMI, ACS
CIGNA Group Insurance
D212
12225 Greenville Avenue
Suite 1000
Dallas, TX 75243-9337

Phone: 800-352-0611 ext. 1249
Fax: 860-731-3211

**CIGNA Group Insurance**
Life · Accident · Disability

MR. THOMAS SINCLAIR, ATTORNEY AT LAW
2100-A SOUTHBRIDGE PARKWAY
SUITE 450
BIRMINGHAM, AL 35209

November 13, 2006

| | |
|---|---|
| Name: | CATHY CLEILAND |
| Incident Number: | 613165 |
| Plan/Policy Number: | FLK0020104 |
| Plan/Policy Holder: | TEMPLE INLAND CORPORATE SERVICES |
| Underwriting Company: | Life Insurance Company of North America |

DEAR MR. SINCLAIR,

In reference to your request for information dated October 27, 2006 concerning Ms. Cleiland's Long Term Disability claim, please note the following:

1. Copies of any other policies administered: As the Appeals team did not administer the Short Term Disability claim, please contact Temple Inland Corporate Services for this information. In reference to the Life Insurance Policy, please contact Temple Inland Corporate Services for this information.
2. Copies of information provided to SSA by Advantage 2000: Please note that we do not have this information.
3. Request for claims manual: Please be advised that the information requested is considered to be confidential and proprietary information and is not intended for duplication or distribution. Furthermore, nothing contained in this requested information was solely relied upon in the determination of the above referenced claim.

Please contact our office at 800-352-0611 ext. 1249 should you have any questions.

Sincerely,

Medha Bharadwaj, FLMI, ACS
Appeal Claim Manager

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

# EXHIBIT

## "O"

Noemi Landis
Appeals Claim Examiner

March 15, 2007

**CIGNA** Group Insuran
Life · Accident · Disability

THOMAS SINCLAIR
ATTORNEY AT LAW
2100 A SOUTHBRIDGE PARKWAY
SUITE 450
BIRMINGHAM, AL 35209

Routing d212
12225 Greenville Ave
Suite 1000
Dallas, Texas 75243
Telephone 1-800-352-0611 ext 1249
Facsimile 860-731-3022

Re:    Claimant:        Cathy Cleiland
       Policy Keys:     FLK 20104
       Account Name:    Temple Inland
       Underwriting Co: Life Insurance Company of North America

Dear Mr. Sinclair:

We have completed our review of client's appeal for Long Term Disability benefits, and we are reaffirming our previous denials of benefits

Temple Inland's Long Term Disability Policy has the following provisions:

Definition of Disability
"An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.

After Disability Benefits have been payable for 24 months, the Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn 80% or more of his or her Indexed Covered Earnings."

Disability Benefits
"The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician. Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue."

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are provided by operating subsidiaries and contracted companies and not by CIGNA Corporation. Operating subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

CLE00224

LINA/Cleiland 0233

March 15, 2007 
Page 2

Your client received Long Term Disability benefits under this policy from November 10, 2003 through November 21, 2005. Benefits were denied as the medical evidence on file no longer supported her inability to function at a sedentary capacity for the period of time in question.

All medical evidence on file, including the additional documentation you submitted for the appeal of Ms. Cleilan's claim was taken into consideration prior to rendering our determination.

The following is a brief summary of some of the medical records reviewed for the period of time in question:

- November 10, 2005 note, Dr. Johnson. Diabetes uncontrolled because glycosylated hemoglobin level was 11.8. Blood Pressure 150/78. Lungs, heart and abdomen exams normal. Blood sugar 314.
- December 13, 2005 note, handwritten, Dr. Johnson. Dental work done week ago today, extreme right side face pain with swelling. No exam recorded.
- January 12, 2006 Cervical spine MRI report. No interval change since December 8, 2004. Mild spinal stenosis.
- May 18, 2006 Lumbar spine MRI report. L4-5 posterior spinal fusion. Moderate L3-4 central canal narrowing. L4-5 disc spacer with bulging into L4-5 left neuroforamen with left L4 nerve root compression.
- October 13, 2006 medical opinion form, Dr. Wise. Restricted because of poorly controlled type 2 diabetes with peripheral neuropathy. No specific measured physical limitations are listed. Restrictions include sitting 8 hrs/d and standing or walking 2 hours per day, 10-15 minutes at a time. No lifting/carrying restrictions listed. He did not believe she could work 8 hours per day, 40 hours per week. He believed she was cognitively limited because of medication use, but did not provide any cognitive measurements to support this opinion.
- October 31, 2006 Right shoulder MRI report. Supraspinatus tendinosis without evidence of full thickness tear.

The available medical records on file do not provide documentation of significant measured physical limitations time-concurrent with the denial date to support continuation of work restrictions recommended by treating physicians. Examples of this could include measured range of motion limitations by inclinometry and/or lower extremity significant muscle strength deficits by manual muscle testing.

In reviewing Ms. Cleiland's claim, Life Insurance Company of North America considered her claim file as a whole for purposes of determining her entitlement to benefits. The Policy provides that Life Insurance Company of North America would pay benefits only she was prevented by disability to perform the duties of her sedentary occupation as a Human Resource Manager or any occupation. The documentation on file provided diagnoses, treatment plans, and medication regimes; however, pathology does not necessarily equate to presence of disability.



March 15, 2007
Page 3

Based on our review of the records on file, the physical and psychological limitations and restrictions provided by her physicians are not supported as of November of 2005 and forward; therefore, we are reaffirming our previous denial decisions. Consequently, we will consider Ms. Cleiland to have exhausted all administrative remedies with our office and no further appeals will be considered.

Please note that your client has a right to bring legal action regarding her claim under the ERISA section 502(a). The plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact Ms. Cleiland's local United States Department of Labor Office or her State Insurance Regulatory Agency.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein.

Please review your client's insurance booklet, certificate or coverage information available from her employer to determine if she is eligible for additional benefits.

Sincerely,


Noemi Landis

CLE00226

LINA/Cleiland 0235

# EXHIBIT

## "P"

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Temple-Inland, Inc.
Benefits Administration Committee
Plan Administrator
303 South Temple Drive
Post Office Drawer N
Diboll, TX 75941

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
9-11-06

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)
7004 2890 0002 8292 0960

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-154

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CIGNA Group Insurance
Routing 212
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243

CLEILAND

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X G. Davis  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
G. Davis   9-8-6

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)
7004 2890 0002 8292 0946

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-154

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Life Insurance Company of North America
1601 Chestnut Street
Philadelphia, PA 19192-2235

CLEILAND

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☒ Addressee

B. Received by ( Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
7004 2890 0002 8292 0953

Receipt    102595-02-M-154

**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

August 4, 2006

**VIA CERTIFIED MAIL**
Temple-Inland Forest Products Corporation
P. O. Drawer N
303 South Temple Drive
Diboll, TX  75941

     Re:   **Cathy Cleiland**

Dear Sir/Madam:

    This firm has been retained by Cathy Cleiland with regard to a claim for benefits under the terms of the employee welfare benefit plan(s) or pension plan(s) in which the above referenced individual was a participant and/or beneficiary. Please direct any and all correspondence, and all contact regarding this matter, to this firm.

    If it is your company's contention that the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 et. seq. applies in this matter, then please produce any and all "relevant" (as defined within 29 C.F.R. § 2560.503-1) documents to include the policy, summary plan description, or any other documents specified within 29 U.S.C. § 1001 et. seq,.and 29 C.F.R. § 2560.503-1. These documents should include any and all information upon which you based your decision regarding any claim for benefits, and all documents pertaining to or referencing the employee welfare benefit plan(s) and/or employee pension plans under the terms of which the above referenced individual is or was a beneficiary and/or participants.

    These documents are requested pursuant to the rights specified within 29 U.S.C. § 1132 (c). Your response should include any "relevant" ERISA documents, plan documents, claim file documents, any manuals, disability guidelines, or any other documents pertaining to the guidelines under which the claim was determined, and any brochures, handbooks, employee benefit guides, pension plan documents detailing any and all benefits provided to the above referenced individual.

                    Sincerely,

                    **'DICTATED, BUT NOT READ"**

                    Thomas O. Sinclair, Esq.

TOS/me
Enclosure
cc: Cathy Cleiland



**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Temple-Inland Forest Products Corporation
P. O. Drawer N
303 South Temple Drive
Diboll, TX  75941

*CLEILAND*

**COMPLETE T**

A. Signature
X

B. Received by

J. Gris

D. Is delivery a
If YES, ente

3. Service Typ
☐ Certified
☐ Register
☐ Insured

4. Restricted

2. Article Number
*(Transfer from service label)*    7001  2510  0001  297

PS Form **3811**, August 2001      Domestic Return Receipt

CAMPBELL
WALLER &
POER, L.L.C.

2100-A Southbridge Pway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

August 4, 2006

**VIA CERTIFIED MAIL**
Temple-Inland Benefits
Administrative Committee
1300 South Mopac Expressway
Austin, TX  78746

Re:    **Cathy Cleiland**

Dear Sir/Madam:

This firm has been retained by Cathy Cleiland with regard to a claim for benefits under the terms of the employee welfare benefit plan(s) or pension plan(s) in which the above referenced individual was a participant and/or beneficiary. Please direct any and all correspondence, and all contact regarding this matter, to this firm.

If it is your company's contention that the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 et. seq. applies in this matter, then please produce any and all "relevant" (as defined within 29 C.F.R. § 2560.503-1) documents to include the policy, summary plan description, or any other documents specified within 29 U.S.C. § 1001 et. seq,.and 29 C.F.R. § 2560.503-1. These documents should include any and all information upon which you based your decision regarding any claim for benefits, and all documents pertaining to or referencing the employee welfare benefit plan(s) and/or employee pension plans under the terms of which the above referenced individual is or was a beneficiary and/or participants.

These documents are requested pursuant to the rights specified within 29 U.S.C. § 1132 (c). Your response should include any "relevant" ERISA documents, plan documents, claim file documents, any manuals, disability guidelines, or any other documents pertaining to the guidelines under which the claim was determined, and any brochures, handbooks, employee benefit guides, pension plan documents detailing any and all benefits provided to the above referenced individual.

Sincerely,

**'DICTATED, BUT NOT READ"**

Thomas O. Sinclair, Esq.

TOS/me
Enclosure
cc:  Cathy Cleiland

## SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Temple-Inland Benefits
Administration Committee
1300 South Mopac Expressway
Austin, TX 78746

## COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail       ☐ Express Mail
   ☐ Registered           ☐ Return Receipt for Merchandise
   ☐ Insured Mail         ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

7004 0750 0002 7445 0610

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

CAMPBELL
WALLER &
POER, L.L.C.
2100-A Southbridge Pa...ay • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

September 5, 2006

**VIA CERTIFIED MAIL**
CIGNA Group Insurance
Routing 212
12225 Greenville Avenue, Suite 1000
Dallas, TX  75243

Life Insurance Company of North America
1601 Chestnut Street
Philadelphia, PA  19192-2235

Temple-Inland, Inc.
Benefits Administration Committee
Plan Administrator
303 South Temple Drive
Post Office Drawer N
Diboll, TX  75941

      Re:    **Cathy Cleiland**

Dear Sirs:

    This firm has been retained by Cathy Cleiland with regard to a claim for benefits under the terms of the employee welfare benefit plan(s) or pension plan(s) in which the above referenced individual was a participant and/or beneficiary. Please direct any and all correspondence, and all contact regarding this matter, to this firm.

    If it is your company's contention that the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 et. seq. applies in this matter, then please produce any and all "relevant" (as defined within 29 C.F.R. § 2560.503-1) documents to include the policy, summary plan description, or any other documents specified within 29 U.S.C. § 1001 et. seq.,and 29 C.F.R. § 2560.503-1. These documents should include any and all information upon which you based your decision regarding any claim for benefits, and all documents pertaining to or referencing the employee welfare benefit plan(s) and/or employee pension plans under the terms of which the above referenced individual is or was a beneficiary and/or participants.

    These documents are requested pursuant to the rights specified within 29 U.S.C. § 1132 (c). Your response should include any "relevant" ERISA documents, plan documents, claim file documents, any manuals, disability guidelines, or any other documents pertaining to the guidelines under which the claim

was determined, and any brochures, handbooks, employee benefit guides, pension plan documents detailing any and all benefits provided to the above referenced individual.

Sincerely,

**"DICTATED, BUT NOT READ
IN ORDER TO AVOID DELAY"**

Thomas O. Sinclair, Esq.

TOS/me
Enclosure
cc: Cathy Cleiland

# EXHIBIT

## "Q"

 

**CAMPBELL WALLER & POER, L.L.C.**

2100-A Southbridge Parkway • Suite 450
Birmingham • Alabama 35209
205 803-0051 • FX 205 803-0053

THOMAS O. SINCLAIR
tsinclair@cwp-law.com

September 5, 2006

<u>VIA CERTIFIED MAIL</u>
CIGNA Group Insurance
Routing 212
12225 Greenville Avenue, Suite 1000
Dallas, TX 75243

Life Insurance Company of North America
1601 Chestnut Street
Philadelphia, PA 19192-2235

Temple-Inland, Inc.
Benefits Administration Committee
Plan Administrator
303 South Temple Drive
Post Office Drawer N
Diboll, TX 75941

      Re:    **Cathy Cleiland**

Dear Sirs:

      This firm has been retained by Cathy Cleiland with regard to a claim for benefits under the terms of the *employee welfare benefit plan(s) or pension plan(s)* in which the above referenced individual was a participant and/or beneficiary. Please direct any and all correspondence, and all contact regarding this matter, to this firm.

      If it is your company's contention that the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 <u>et. seq.</u> applies in this matter, then please produce any and all "relevant" (as defined within 29 C.F.R. § 2560.503-1) documents to include the policy, summary plan description, or any other documents specified within 29 U.S.C. § 1001 <u>et. seq.</u> and 29 C.F.R. § 2560.503-1. These documents should include any and all information upon which you based your decision regarding any claim for benefits, and all documents pertaining to or referencing the employee welfare benefit plan(s) and/or employee pension plans under the terms of which the above referenced individual is or was a beneficiary and/or participants.

      These documents are requested pursuant to the rights specified within 29 U.S.C. § 1132 (c). Your response should include any "relevant" ERISA documents, plan documents, claim file documents, any manuals, disability guidelines, or any other documents pertaining to the guidelines under which the claim

was determined, and any brochures, handbooks, employee benefit guides, pension plan documen detailing any and all benefits provided to the above referenced individual.

Sincerely,

**"DICTATED, BUT NOT READ IN ORDER TO AVOID DELAY"**

Thomas O. Sinclair, Esq.

TOS/me
Enclosure
cc: Cathy Cleiland

# EXHIBIT

# "R"

**Temple-Inland**

Anissa Valdez
Retirement Plans Administrator
Benefits Administration Department

1300 S. MoPac Expressway
Austin, TX 78746
512.434.3945
512.434.5626
anissavaldez@templeinland.com

August 15, 2006

Personal & Confidential
Campbell, Waller, & Poer
Attn: Thomas O. Sinclair
2100 A Southbridge Parkway, Suite 450
Birmingham, AL 35209

Dear Mr. Sinclair:

We recently received your letter concerning Cathy Cleiland. Enclosed is Summary Plan Description for the Temple-Inland Salaried Retirement Plan.

If you have any questions, please contact the Benefits Administration Department, 1300 S. MoPac Expressway, Austin, TX 78746, 1(877) 437-3497.

Sincerely,

Anissa Valdez
Retirement Plans Administrator

# EXHIBIT

## "S"

**Temple-Inland**

September 12, 2006

Thomas O. Sinclair, Esq.
Campbell Waller & Poer, L.L.C.
2100-A Southbridge Parkway, Suite 450
Birmingham, AL 35209

Re: Cathy Cleiland

Dear Mr. Sinclair:

Per your request dated August 4, 2006, enclosed please find the following health and welfare plan documents:

1. Summary Plan Description for the Temple-Inland Disability Health and Welfare Plan as Amended and Restated Effective January 1, 2002.
2. Group Long Term Disability Insurance Certificate, Life Insurance Company of North America, Policy Number FLK-020104 inclusive of Amendments through February 14, 2005.
3. Summary Plan Description for the Temple-Inland Group Medical Plan Administered by Blue Cross and Blue Shield of Texas, Group #90189 PPO effective January 1, 2005.
4. Summary Plan Description for Temple-Inland Group Benefits Plan, Volume II-A dated January 1, 2000. This SPD is being provided for the Life Insurance Benefits.

If you have any other questions or need additional information, please let me know.

Sincerely,

*Sharon McClish*

Sharon McClish, CEBS
Lead Health and Welfare Administrator
512.434.3909

# EXHIBIT

## "T"

*Karol Johnson*
*CIGNA Group Insurance*
12225 Greenville Avenue
Suite 1000
Dallas, TX 75243-9337

Phone: 800-352-0611 ext. 1249
Fax: 860-731-3211

**CIGNA Group Insurance**
Life · Accident · Disability

MR. THOMAS SINCLAIR, ATTORNEY AT LAW
2100-A SOUTHBRIDGE PARKWAY
SUITE 450
BIRMINGHAM, AL 35209

October 23, 2006

Name:                          CATHY CLEILAND
Incident Number:               613165
Plan/Policy Number:            FLK0020104
Plan/Policy Holder:            TEMPLE INLAND CORPORATE SERVICES
Underwriting Company:          Life Insurance Company of North America

DEAR MR. SINCLAIR,

Please find enclosed a copy of the above referenced disability policy, claim file
and the Acclaim printout.

Please contact our office at 800-352-0611 ext. 1249 should you have any questions.

Sincerely,

Karol Johnson
Senior Appeal Specialist

"CIGNA" and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company.

# EXHIBIT

## "U"

2100-A Southbridge Parkway
Suite 450
Birmingham, Alabama 35209
Telephone: 205.803.0051
Facsimile: 205.803.0053

THOMAS O. SINCLAIR

July 11, 2007

John David Collins, Esquire
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203

Re:    *Cleiland, Cathy v. Life Insurance Co. of North America, et al.*
        **United States District Court of Alabama, Middle District**
        **Civil Action No: 2:07-cv-00486-MEF-SRW**

Dear Mr. Collins:

It was a pleasure speaking with you. I would like to confirm the substance of our conversation. As I indicated, our inclusion of the CIGNA entities comes out of an abundance of caution in dealing with the representations of parent corporations that are possibly involved in claims handling. I will be happy to drop the CIGNA entities from the complaint if: 1) the CIGNA entities are prepared to provide a statement in writing that they had no involvement in the claims process; 2) none of the CIGNA entities' employees played any role in the claims process; and 3) the CIGNA entities' absence from this suit will not be used as a basis for withholding any documents of information they have which might be responsive to our discovery requests. Simply telling me that they are not an insurance company or that they don't issue policies won't be sufficient.

I hope I explained my position clearly enough to allow you to determine the most efficient manner to deal with this issue.

Sincerely,

Thomas O. Sinclair

TOS/me
cc: Jenifer Champ Wallis, Esquire

Campbell, Gidiere, Lee, Sinclair & Williams, L.L.C.

# MAYNARD COOPER
## & GALE PC
### ATTORNEYS AT LAW

John David Collins
DIRECT 205.254.1104
DIRECT FAX 205.714.6404
EMAIL jcollins@maynardcooper.com

July 17, 2007

**VIA FACSIMILE**

Thomas O. Sinclair
CAMPBELL, GIDIERE, LEE,
 SINCLAIR & WILLIAMS, L.L.C.
2100-A Southbridge Parkway, Suite 450
Birmingham, Alabama 35209

Re: *Cathy Cleiland v. Life Insurance Co. of North America, et al.*
United States District Court of Alabama, Middle District
Civil Action No: 2:07-cv-00486-MEF-SRW

Dear Mr. Sinclair:

I am in receipt of and thank you for your July 11, 2007 letter, following up on our telephone conversation last week, wherein I requested that plaintiff voluntarily dismiss her claims against Cigna Corporation and Cigna Holdings, Inc. (the "Cigna entities"). You mentioned that the Cigna entities were named in this lawsuit, along with Life Insurance Company of North America, because of a concern that these parent or related companies may be involved in the claims handling process.

This letter will serve to confirm that neither the Cigna entities nor their employees had any role whatsoever in the adjudication, consideration or ultimate denial of your client's claim for disability benefits. The Cigna entities are holding companies. They are not in the business of insurance and do not offer, directly or indirectly, any insurance products or services to the public. Moreover, they are not licensed or registered to do business in Alabama, and have no agents, offices, employees or bank accounts in this state.

Finally, we will not rely upon the absence of the Cigna entities from this lawsuit as a basis to withhold documents that would otherwise be responsive to plaintiff's discovery requests. Of course, we specifically preserve and do not waive any and all remaining objections, including the objection that, under the applicable standard of review, discovery should be limited to the administrative record.

I hope this letter fully addresses your concerns. If so, the most efficient course of action would probably be for you to simply file a notice of voluntary dismissal as to the Cigna entities. Again, I appreciate your willingness to discuss this matter and consider my clients' position.

JUL 17 2007  9:34 AM FR MAYNARD COOPER 205 254 1154 TO 1198   P.03

Thomas O. Sinclair
July 17, 2007
Page 2

_____

If you have any questions about the above, please do not hesitate to contact me directly.

Very truly yours,

John David Collins

JDC/dm
cc:   William B. Wahlheim, Jr.

MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

01517799.1

** TOTAL PAGE.03 **

# EXHIBIT

## "V"

## Diary Entries

**Incident Id:** 578593343514414
**Completed Date:** 05/10/2001

UNILYNX DIARY ==> CREATED : 5/9/2001 GARRISON ARTHUR R, UPDATED : 7/3/2001 MERRILL BRIAN J, ASSIGNED : 5/9/2001 MERRILL BRIAN J, REGISTER TO SRO.*CLAIM WAS SUCCESSFULLY REGISTERED IN UNILYNX TO SRO. PLEASE VERIFY INFO.

**Incident Id:** 578593343514414
**Completed Date:** 05/10/2001

UNILYNX DIARY ==> CREATED : 5/10/2001 ANDREW CASSANDRA , UPDATED : 5/10/2001 ANDREW CASSANDRA , ASSIGNED : 5/10/2001 MERRILL BRIAN J, THE FOLLOWING REGISTRATION REQUEST FAILED DUE TO:E814-PLEASE KEY ICD9 AS 4 POSITIONS

**Incident Id:** 578593343514414
**Completed Date:** 05/10/2001

UNILYNX DIARY ==> CREATED : 5/8/2001 DAVIS ROBERT , UPDATED : 5/10/2001 ANDREW CASSANDRA , ASSIGNED : 5/8/2001 TARRYTOWN STD , READY FOR ASSIGNMENT

**Incident Id:** 578593343514414
**Completed Date:** 05/14/2001

UNILYNX DIARY ==> CREATED : 5/10/2001 ANDREW CASSANDRA , UPDATED : 5/14/2001 MERRILL BRIAN J, ASSIGNED : 5/10/2001 MERRILL BRIAN J, DISCUSS FILE W/LTD CASE MANAGER

**Incident Id:** 578593343514414
**Completed Date:** 05/29/2001

UNILYNX DIARY ==> CREATED : 5/24/2001 HILL CELESTE , UPDATED : 5/29/2001 MERRILL BRIAN J, ASSIGNED : 5/24/2001 MERRILL BRIAN J, CLAIM FORM AND SIGNED AUTH

**Incident Id:** 578593343514414
**Completed Date:** 06/06/2001

UNILYNX DIARY ==> CREATED : 5/29/2001 MERRILL BRIAN J, UPDATED : 6/6/2001 MERRILL BRIAN J, ASSIGNED : 5/30/2001 MERRILL BRIAN J, Flup to see if the claimant is rec WC from prior injury

**Incident Id:** 578593343514414
**Completed Date:** 06/06/2001

UNILYNX DIARY ==> CREATED : 5/15/2001 MERRILL BRIAN J, UPDATED : 6/6/2001 MERRILL BRIAN J, ASSIGNED : 6/15/2001 MERRILL BRIAN J, Flup for medical. Call AP for the EE Tx plan and comps

LINA/Cleiland 0225

## Notes Entries

**Incident Id:** 578593343514414
**Completed Date:** 05/08/2001 4:00:04 PM

UNILYNX NOTE ==> CREATED : 5/8/2001 DAVIS ROBERT , UPDATED : 5/8/2001 DAVIS ROBERT , I changed work address. RTW aprox 6 weeks.

---

**Incident Id:** 578593343514414
**Completed Date:** 05/08/2001 4:05:03 PM

UNILYNX NOTE ==> CREATED : 5/8/2001 DAVIS ROBERT , UPDATED : 5/8/2001 DAVIS ROBERT , EE is Salary. EE is the HR contact. No policy # on JQ.

---

**Incident Id:** 578593343514414
**Completed Date:** 05/11/2001 11:23:00 AM

UNILYNX NOTE ==> CREATED : 5/11/2001 LAMPLEY MARIA , UPDATED : 5/11/2001 LAMPLEY MARIA , MADE INITIAL CALL TO CX TO VERIFY INFO SUBMITTED IN CLAIM SUMMARY. CX WAS AVAILABLE & ALL INFO WAS VERIFIED. ER CONTACT IS SUPERVISOR J. PRIDGEN. EUGENE JONES WORKS @ A DIFFERENT PLANT.

---

**Incident Id:** 578593343514414
**Completed Date:** 05/15/2001 8:02:00 AM

UNILYNX NOTE ==> CREATED : 5/15/2001 MERRILL BRIAN J, UPDATED : 5/15/2001 MERRILL BRIAN J, CASE PLANAGE: 43SEX: Female DX: Herniated disc Surgery: Y (type and date not indicated) Hospitalized:Occupation: Human Resource ManagerDOH: 8/24/98 LDW: 4/30/01 Incur date: 5/1/01Benefits begin date: 5/1/01Bens paid from and Thru:RTW date:Elim: 0/0 Max date: 26 weeks Wkly earnings: Sal contin based on yearsWkly Benefit:Claim Synopsis: EE is a 43 yr old female Human Resource Manager for Temple Inland. EE LDW was 4/30/01. EE indicated the first day off work was 5/1/01. EE stated the AP Dx the EE with a herniated disc that is requiring Sx.Action:Call the AP for medical confirmation.

---

**Incident Id:** 578593343514414
**Completed Date:** 05/15/2001 12:55:05 PM

UNILYNX NOTE ==> CREATED : 5/15/2001 MERRILL BRIAN J, UPDATED : 5/15/2001 MERRILL BRIAN J, Called AP:John HackmanSpoke to BrendaEE had Sx on 5/2/01. Interior diskectomy and interbody fusoin C-6-7 with bone graft at the illiac crest.Fax attention:334-834-1936

---

**Incident Id:** 578593343514414
**Completed Date:** 05/15/2001 2:33:03 PM

UNILYNX NOTE ==> CREATED : 5/15/2001 MERRILL BRIAN J, UPDATED : 5/15/2001 MERRILL BRIAN J, Decision:EE is a 43 yr old female Human Resource Manager for Temple Inland. Dis for the EE will be 5/1/01. EE had Sx on 5/2/01. Sx for the claimant was a EE had Sx on 5/2/01. Interior diskectomy and interbody fusoin C-6-7 with bone graft at the illiac crest. Based on the Sx and comps, bens for the claimant will be approved thru 6/17/01.

---

**Incident Id:** 578593343514414
**Completed Date:** 05/29/2001 7:34:02 AM

UNILYNX NOTE ==> CREATED : 5/29/2001 MERRILL BRIAN J, UPDATED : 5/29/2001 MERRILL BRIAN J, Rec the Proof of Loss form:Rec the P of L and the form indicated the claimant Injury is WR but with a different ER. EE does indicate that she is not rec any other bens. Will flup with the ER to see if the ER is rec WC from the prior injury.Action:Call EE on 5/30/01 to see if the EE is collecting WC from prior injury

---

**Incident Id:** 578593343514414

LINA/Cleiland 0226