**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CATHY CLEILAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:07-CV-00486-MEF-SRW** |
| **LIFE INSURANCE COMPANY OF NORTH** | ) | |
| **AMERICA, TEMPLE-INLAND** | ) | |
| **DISABILITY HEALTH AND WELFARE** | ) | |
| **PLAN, and TEMPLE INLAND FOREST** | ) | |
| **PRODUCTS CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

William B. Wahlheim, Jr.
John David Collins
Grace Robinson Murphy

Attorneys for Defendants,
Life Insurance Company of North America,
Temple Inland Disability Health and
Welfare Plan and TIN, Inc.

**OF COUNSEL:**

MAYNARD, COOPER & GALE, P.C.
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2602
(205)254-1000

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................2

II.     STATEMENT OF UNDISPUTED FACTS ........................................................3
        A.      The Group Long-Term Disability Policy.................................................3
        B.      Plaintiff's Claim for Long-Term Disability Benefits...............................4
        C.      The Appeal Process.................................................................................7

III.    SUMMARY JUDGMENT STANDARD .........................................................16

IV.     STANDARD AND SCOPE OF REVIEW ......................................................17
        A.      LINA's Claim Determination Should Be Reviewed Under The "Modified"
                Arbitrary And Capricious Standard .......................................................17
        B.      This Court's Review Is Limited to the Administrative Record Before the Claims
                Administrator At the Time the Claims Decision Was Made .......................19

V.      ARGUMENT.................................................................................................20
        A.      Plaintiff's 502(a)(1)(B) Claim is Due to be Dismissed ............................20
                1.      LINA's Determination That Plaintiff Failed To Prove That She Continued
                        to be "Disabled" From Any Occupation Was Legally Correct......................20
                2.      LINA's Decision to Deny Plaintiff's LTD Benefits Was Not Arbitrary and
                        Capricious. ..........................................................................................26
        B.      Plaintiff's 502(c) Claim is Due to be Dismissed Against Both TIN and LINA. .........28
                1.      The Requested Documents Are Not Required to Be Produced. .....................28
                2.      Even if The Requested Documents Were Required to Be Produced,
                        Liability Cannot Attach to LINA. ...........................................................31
        C.      Plaintiff's Equitable Estoppel Claim Fails as a Matter of Law ...................32

VI.     CONCLUSION................................................................................................34

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Defendants Life Insurance Company of North America ("LINA"), Temple-Inland Disability Health and Welfare Plan ("Temple-Inland Plan") and TIN, Inc. ("TIN"), formerly known as Temple Inland Forest Products Corporation (collectively "Defendants"), by and through their counsel, hereby submit this Memorandum of Law in support of their contemporaneously filed Motion for Summary Judgment in the above-styled case.   For the reasons stated herein, Defendants are entitled to summary judgment as to Plaintiff's claim for long-term disability benefits under a group insurance policy governed by ERISA.

## I.      <u>INTRODUCTION</u>

Cathy Cleiland ("Plaintiff") asserts a claim for disability benefits under an ERISA governed Group Long Term Disability Plan (the "Plan") sponsored by her former employer, TIN, Inc.   LINA both insures the Plan and administers claims for the Plan.   The Policy makes clear that, in order to become eligible for continuing benefits after twenty-four months, the participant must demonstrate that she is "totally disabled" from performing the essential duties of <u>any</u> occupation.

Plaintiff claims that she is totally disabled from her former job and any other job due to prior back surgeries.   The facts and substantial undisputed evidence from the Administrative Record, however, show that LINA's decision to deny continuing benefits was correct and, at the very least, reasonable and not arbitrary and capricious.   In making its claims decision, LINA relied in part on medical opinions highlighting the lack of objective evidence and clinical findings from the relevant time period verifying Plaintiff's physical inability to perform full-time sedentary work.   In addition, Plaintiff cannot bring a penalty claim for the documents she identifies, and in any event, cannot maintain such a claim against LINA.   Lastly, Count III of

Plaintiff's Complaint does not allege a cognizable claim under ERISA for equitable estoppel. Accordingly, Defendants' motion for summary judgment is due to be granted as a matter of law.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     The Group Long-Term Disability Policy

1.     LINA issued a group long-term disability policy, FLK-020104 (the "Policy"), to Temple-Inland Forest Products Corporation, now TIN, Inc., to insure the long-term disability ("LTD") component of the employee welfare benefit plan established and maintained by TIN, Plaintiff's former employer.  (Aff. at ¶ 3 and Exh. 2 thereto, hereinafter referred to as "Policy").

2.     Under the Policy, it is the claimant's responsibility to provide on-going proof of disability or benefits will terminate.  Furthermore, LINA is vested with full discretionary authority to determine eligibility for benefits thereunder as evidenced by the following language: **"Satisfactory proof** of Disability benefits must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid" (Administrative Record at 499, Exh. 1 to Aff. at ¶ 2, hereinafter referred to as "AR at [bates stamp number]") (emphasis added).

3.     "Disability" or "Disabled" for purposes of Plaintiff's eligibility for disability benefits is defined in the Policy as follows:

> An Employee is Disabled if, solely because of Injury or Sickness, he or she is earning 80% or less of his or her Indexed Covered Earnings.
>
> Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation.
>
> After Disability Benefits have been payable for 24 months, an Employee is Disabled if, because of Injury or Sickness he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

(AR at 494).

**B.     Plaintiff's Claim for Long-Term Disability Benefits**

4.     Plaintiff Cathy Cleiland was employed by TIN as a Human Resources Manager, a sedentary occupation.  (AR at 164, 928-29, 1083).  Plaintiff initially applied for benefits in May 2001 while she recovered from back surgery.  (AR at 1077-78).  Two years later, in May 2003, Plaintiff again applied for disability benefits due to lower back surgery for a pinched nerve.  (AR at 1054-55).

5.     Plaintiff underwent a lumbar laminectomy and anterior cervical fusion on May 21, 2003.  (AR at 972-73).  At this time, her neurosurgeon, Dr. John Hackman, estimated that with rest Plaintiff could return to work by approximately August 13, 2003.  (AR at 1034-35).

6.     On July 16, 2003, Plaintiff underwent additional back surgery with Dr. Hackman due to a disc herniation at L4-5.  (AR at 962-63).  At this time, Dr. Hackman estimated Plaintiff could return to work on approximately October 8, 2003.  (AR at 1019).

7.     Plaintiff underwent a MRI of the lumbar spine on August 11, 2003.  This test revealed post operative changes and scar tissue at the L4-5 level.  The test also showed that the moderate disc extrusion was no longer visible.  (AR at 921-22).  A September 18, 2003 MRI of the lumbar spine revealed an unchanged degenerative condition at L5-S1 and severe degenerative disc disease at L4-5.  (AR at 1010).

8.     LINA awarded Plaintiff short-term disability benefits through the maximum payable period and then referred her claim for LTD evaluation.  (AR at 951).

9.     When requested to complete a physical abilities assessment, Dr. Hackman responded that he did not complete such forms, but informed LINA that Plaintiff was to undergo additional surgery on December 9, 2003.  (AR at 902).

10.     Plaintiff completed a disability questionnaire on November 12, 2003.  (AR at 895-97).  At this time, she indicated that she could drive, but that she was unable to stand or sit for long periods of time.  She also indicated that she had a college degree in business and had worked in human resources throughout her career.  She listed her medications as Darvocet, Flexeril, Neurontin, Insulin, Effexor and Macrodentin.  (AR at 897).

11.     Plaintiff was awarded LTD benefits by letter dated November 26, 2003.  (AR at 891-92).

12.     In December 2003, Plaintiff underwent additional back surgery with a new surgeon, Dr. Mark Hadley.  (AR at 858-60).  Her discharge summary reflected uncomplicated postoperative treatment and she was discharged in "good" condition.  (AR at 860-61).  During a post-operative visit, Dr. Hadley noted that her wound looked good, she was standing better and had better function in her left lower extremity.  (AR at 854).  He did note, however, that she still had leg pain and increased her dosage of Neurontin.

13.      In February 2004, Dr. Hadley indicated that he was not able to assess Plaintiff's ability to return to work and added that his office did not perform functional capacity evaluations.  (AR at 849-50).

14.     By June of 2004, Plaintiff had not seen her general practitioner, Dr. Eddins, in over a year and had begun seeing a pain specialist on a monthly basis, Dr. Herrick of the Pain Center of Montgomery.  (AR at 842).

15.     Plaintiff was awarded Social Security Disability benefits on May 26, 2005 with a retroactive disability date of May 14, 2003.  (AR at 817, 820).  The Administrative Law Judge relied on a disability evaluation performed by a Dr. Keith Vanderzyl.  (AR at 820-25).

LINA's Any Occupation Investigation

16.    In May 2005, Plaintiff was informed that her claim had been paid for almost 24 months, at which time the definition of disability would change, and she would be required to be disabled from performing any occupation.  LINA further informed Plaintiff that it would begin investigating her claim to see if she would remain eligible for continuing benefits.  (AR at 830).

17.    Plaintiff completed another disability questionnaire on June 28, 2005 in which she stated that she could drive up to 50 miles without stopping and it was unknown whether she would return to work.  She added that she was being treated with narcotic medication by the Pain Center.  (AR at 790-92).

18.    LINA undertook efforts to contact Plaintiff's treating physicians.  Kitty from Dr. Herrick's office returned LINA's call on August 23, 2005.  She stated that the Pain Center had "not disabled [Plaintiff]" and referred LINA to Plaintiff's other physicians.  (AR at 93, 782).

19.    After this call, LINA followed up with Plaintiff to obtain her other physicians' names and to see which physician was disabling her.  Plaintiff reported that she was not currently seeing any other doctors and that she had not seen her family doctor in a year. (AR at 780).

20.    Next, LINA faxed a request for records from January through September 2005 to the Pain Center on three separate occasions, but received no response.  (AR at 774-76).  LINA further requested Plaintiff's assistance in securing these records for its evaluation.  (AR at 773).

21.    Records submitted from the Pain Center reveal that Plaintiff had been referred to a sleep studies center.  (AR at 759).

22.    Registered Nurse Teresa Lynfoot with LINA reviewed Plaintiff's records, prescriptions and disability questionnaire on November 14, 2005 and opined that "[b]ased on medical data submitted, [restrictions and limitations] are not supported as evidenced by no current complaints of any radiating pain, numbness or tingling, no current EMG/NCV testing,

medication usage stable for several months, and no current lab values to determine status of glucose." (AR at 739-41, 745).

23.     LINA informed Plaintiff by letter dated December 7, 2005 that LINA was terminating her LTD benefits as she no longer met the definition of total disability as of November 21, 2005. (AR at 732-35). The letter quoted the relevant policy provisions and detailed LINA's investigation of Plaintiff's claim, including its conversation with Kitty at the Pain Center, LINA's review of her updated medical records from her new ENT physician, and LINA's unsuccessful attempt at collecting medical records including records from her new family physician. (*See also* AR at 719).

24.     Records from Plaintiff's new family physician, Dr. Bret Johnson, were submitted after Plaintiff's claim was initially denied. (AR at 723-29). These records reflect diabetes and a referral to a gastroenterologist, Dr. Robert Albares, who evaluated Plaintiff for hoarseness and changed her medication from Protonix to Nexium. (AR at 723, 726-29). Dr. Albares also performed an esophagoscopy in November 2005 which revealed distal esophageal changes. (AR at 716).

25.     A December 14, 2005 note from Dr. Richardson, a sleep disorders specialist, diagnosed Plaintiff with "central sleep apnea possibly related to her pain meds..." (AR at 587).

**C.  The Appeal Process**

26.     On December 21, 2005, Plaintiff wrote LINA to appeal its denial decision. (AR at 700-703). In her letter she informed LINA that she had been seen by a neurologist, Dr. Reuben Richardson, who planned on fitting her with breathing equipment to help her sleep. (AR at 701). Plaintiff's letter also described pain in her legs, toes, feet, knees and back and attached a list of twelve medications. (AR at 701-03).

27.     On January 5, 2006, Nurse Lynfoot, R.N., reviewed the supplemental records submitted by Plaintiff.  Nurse Lynfoot concluded that "[b]ased on medical data, submitted [restrictions and limitations] are not supported as evidenced by pain management provider not disabling claimant and no new medical to review that would prevent claimant from functioning." (AR at 699).

28.     Plaintiff also submitted a letter from Dr. Adam Nortick with the Pain Center of Montgomery on January 16, 2006 in support of her appeal.  (AR at 692-93).  Dr. Nortick indicated that Plaintiff was prescribed Neurontin for tingling and numbness.  He added that while her medications were stable, she was "still symptomatic" and that he believed her symptoms were real.  (AR at 693).

29.     Plaintiff submitted another letter dated January 19, 2006 in which she informed LINA that her memory was "extremely bad" and that she had been falling lately.  (AR at 689-90).

30.     LINA initiated its appeals review and requested an in-house medical director to review Plaintiff's claim.  Associate Medical Director Dr. Scott Taylor, D.O. reviewed all of Plaintiff's available medical records, lab results, and correspondence from both Plaintiff and her physician.  On March 7, 2006, Dr. Taylor stated that

> A careful review of the file was conducted.  Claimant has chronic history of back pain and underwent several lumbar surgeries. Since that time she has been on chronic narcotic pain medications and high-dose neuroleptics drugs.  She was paid through 11/21/05. Since that time her diabetes has been under poor control.  She underwent esophageal dilation in mid-November 2005.    Her chronic pain appears to be stable and no changes in treatment have occurred.  I do not believe, however, that the documents provide sufficient documentation to establish that severity of condition warrants [limitations and restrictions] or that clinically measurable evidence exists to support deficits which require [limitations and restrictions] given by the attending physician.  In absence of such

> documentation, I do not believe the documentation supports
> deficits which require [limitations and restrictions] which preclude
> performing sedentary activity during the period 11/21/05 through
> the present.

(AR at 680-81).

31.    By letter dated March 10, 2006, Plaintiff was informed that the decision to terminate her long-term disability benefits was upheld on appeal.  (AR at 677-79).  The letter addressed the material submitted in support of Plaintiff's appeal and recited Dr. Taylor's review concluding that "[a]s you have not submitted any additional information sufficient to change our previous determination regarding your eligibility for Long Term Disability Benefits, we are reaffirming our previous denial decision…"  (AR at 678).

32.    This letter further informed Plaintiff that, at this time, she could request an additional review of the denial decision, but that she also had the right to bring legal action.  (AR at 679).

Second Voluntary Appeal of Plaintiff's Claim for LTD Benefits

33.    Six months later, in September 2006, Plaintiff's retained counsel, Thomas Sinclair, wrote to LINA to request another review of the denial decision.  In connection with this appeal he submitted medical records and requested that the appeals period remain open while he reviewed the current claims file.  (AR at 528-29).

34.    The records received from counsel largely consisted of records previously submitted and considered by LINA, including records from Dr. Hadley and Dr. Hackman.  The majority of records not previously included in the claims file were from 2001 through 2003. (AR at 546-48).

35.    New records from Dr. Hadley's office reflect two visits with him after her December 2003 surgery.  (AR at 637, 644).  In February 2004, two months post-surgery, Dr.

Hadley evaluated Plaintiff and commented that she had significantly decreased her narcotic dosage. He also noted that her back pain had alleviated, but she was still experiencing left leg pain which would hopefully improve over time. (AR at 637). Dr. Hadley noted that radiographic studies taken at this time "look pretty good." (*Id.*)

36.     Another post-operative visit occurred on June 9, 2004. Dr. Hadley again noted Plaintiff's improvement in her back pain, but lingering left leg pain. (AR at 644). Dr. Hadley recorded his exam: "On exam, she is stiff. She does not bend and flex much, but can flex. extend, laterally bend, and rotate without evidence of instability. **Motor, sensory, and reflex testing is quite good in the lower extremities.** She can walk on her toes and her heels. **Radiographic studies today demonstrate intact internal fixation hardware and good placement of fusion mass at the L4-L5 level. There is no malalignment. There is no pathology above or below.** We have done what we can for Cathy Cleiland. We will continue to monitor progress on an intermittent or six-month type basis. There is nothing additional at present for neurosurgery to provide other than supportive care." (*Id.*) (emphasis added).

37.     A month later Plaintiff underwent a MRI of the lumbar spine. The July 14, 2004 test showed mild to moderate stenosis at L3-4, which the radiologist noted could be due to degenerative changes or inflammation. (AR at 638).

38.     Also included were more recent medical records (late 2005 – July 2006) with the Pain Center. (AR at 592-98). During these visits, Plaintiff complained of severe leg pain, memory loss and numb hands and reported a staph infection and frequent falls. Dr. Nortrick changed her medication from Robaxin to Flexeril. Dr. Herrick also performed a cervical epidural steroid injection in February and April 2006. (AR at 597, 628).

39.    Plaintiff underwent a cervical spine MRI in January 2006.  (AR at 624).  The radiologist noted "mild diffuse spinal stenosis through the upper portion of the fusion block, which appears unchanged from the previous exam.  I do not see evidence of new disc herniation, spinal stenosis, fracture or subluxation."  (*Id.*)

40.    A MRI of the lumbar spine was conducted in May 2006.  The MRI reflected Plaintiff's surgical fusions as well as moderate central canal narrowing at L3-4.  Also, the MRI demonstrated "moderate narrowing of the neuroformen on the left, secondary to a bulging disc" with compression of the left L4 nerve root.  (AR at 622-23).

41.    On October 19, 2006, Plaintiff's counsel submitted a pre-printed medical opinion form by Dr. Steven Wise.  (AR at 338-41).  Dr. Wise diagnosed Plaintiff with type II diabetes and peripheral neuropathy.  He indicated that during an 8 hour workday, Plaintiff could sit for 8 hours and stand or walk for 10-15 minutes at a time for a total of 2 hours a day.  (AR at 339).  He also indicated that Plaintiff did not require bed rest during a typical day.  He also added that, in his opinion, Plaintiff's pain was moderately severe, her subjective complaints were reasonable, her medication would reasonably cause lapses in concentration, and she would be absent from work 5-6 times in any month.  (AR at 340-41).

42.    By letter dated November 3, 2006, Plaintiff's counsel submitted a pre-printed medical opinion form completed by Plaintiff's family doctor, Dr. Bret Johnson.  (AR at 427-31).  It is unclear when he completed the form as the date is illegible.  On this form Dr. Johnson indicated that in his opinion Plaintiff could sit, stand and walk less than 1 hour at a time, and that she would require bed rest for 6-7 hours during a normal day.  He also suggested that she could frequently lift 1-5 pounds, occasionally lift up to 10 pounds and rarely lift up to 20 pounds.  (AR at 429).  He also checked boxes suggesting that Plaintiff's subjective complaints seemed

reasonable, Plaintiff's work attendance would not be reliable (she would be absent more than 2-4 times a week), her pain is moderately severe and that her pain, medical condition and medication would cause lapses in her concentration or memory on a regular basis.  (AR at 430-31).

43.     By letter dated November 27, 2006, Plaintiff's counsel submitted a deposition transcript from Dr. Herrick with the Pain Center along with his curriculum vitae.  (AR at 390-426, 455).

44.     During the deposition of Dr. Herrick taken by Plaintiff's counsel, Dr. Herrick stated Plaintiff's diagnoses as cervical and lumbar degenerative disc disease and both cervical and lumbar failed surgery syndrome.  (AR at 398).  Dr. Herrick described her current treatment as "medical management" with management of her medication and an occasional injection of steroids.  (AR at 399).

45.     Dr. Herrick continued describing Plaintiff as "stable from the point of view that she is still moving" adding "she still functions to some degree."  (AR at 402-03).  He listed her current medications and indicated that they were "reasonably necessary to treat her condition." (AR at 404).  He indicated that the effect of these medications and especially Methadone vary from person to person adding "it is quite possible you can take these medicines and be of clear enough mind to function," while adding that pain can be distracting.  (AR at 405).  Plaintiff's counsel reviewed each of Plaintiff's prior surgeries with Dr. Herrick, an anesthesiologist, who responded that in his opinion her complaints of pain could be reasonable.

46.     Dr. Herrick admitted that he had a nurse in his office named Kitty but denied that she would "provide diagnoses".  AR at 416.

47.     Dr. Herrick responded to Plaintiff's counsel's questions regarding her restrictions and limitations and agreed that she could not work eight hours a day without bedrest and could

not stand for four or five hours a day.  (AR at 417).  Dr. Herrick also disagreed with Dr. Taylor's opinion that the documents did not establish clinically measurable evidence of a severe condition to warrant restrictions and limitations.  (AR at 420-21).  Lastly, Dr. Herrick answered "yes" to a series of questions indicating that Plaintiff's condition was chronic and that her condition would lead her to be unreliable in a workplace setting.  (AR at 423).

48.    Lastly, Plaintiff's counsel retained a vocational consultant, Mark Boatner of Boatner Rehabilitation and Counseling Services, Inc. of Dalton, Georgia, to provide an opinion regarding Plaintiff's vocational abilities in support of her administrative appeal.  (AR at 366–89).  Boatner did not evaluate Plaintiff in person, but rather reviewed her records and Dr. Herrick's deposition and then gave an opinion regarding her residual functional capacity.

49.    Boatner concluded that, in his opinion, Plaintiff's records demonstrated that her expected rate of absenteeism was incompatible with a full-time work schedule.  He added that "she is not a candidate for job placement or re-training because of the individual physical limitations and restrictions that apply to her."  (AR at 383).  He indicated Plaintiff "suffers cognitive deficits" and assigned her a 100% vocational disability rating.  (*Id.*)

50.    LINA's Associate Medical Director, Dr. John Mendez, reviewed the additional records and materials submitted by Plaintiff's counsel on appeal with particular focus on records concerning Plaintiff's ability to perform any occupation at the time of denial (11/05) and after.  (AR 14, 16-17, 245-46).  Dr. Mendez concluded "[b]ased on the additional provided medical records, the original assessment remains unchanged because there is still no documentation of significant measured physical limitations time-concurrent with the denial date to support continuation of work restrictions recommended by treating physicians.  Examples of this could

include measured range of motion limitations by inclinometry and/or lower extremity significant muscle strength deficits by manual muscle testing."  (AR at 246).

51.    LINA upheld its denial decision by letter dated March 15, 2007.  (AR at 242-44). In this letter it communicated that "[t]he documentation on file provided diagnoses, treatment plans, and medication regimes; however, pathology does not necessarily equate to presence of disability.  Based on our review of the records on file, the physical and psychological limitations and restrictions provided by her physicians are not supported as of November of 2005 and forward."  (AR at 243-44).

<u>Plaintiff's Document Requests to LINA and TIN</u>

52.    Plaintiff's counsel requested certain documents from LINA and Temple-Inland, Inc. Benefits Administration Committee in a series of letters.  First, by letter dated August 4, 2006 addressed to Temple-Inland, Inc. Benefits Administration Committee Plan Administrator, Plaintiff's counsel requested "all 'relevant' documents (as defined within 29 C.F.R. § 2560.503-1)".  (TempleInland/Cleiland[1] at 10).  TIN received the letter on August 8, 2006.  (*Id.*)  TIN initially responded to this letter on August 15, 2006 and produced a summary plan description ("SPD") for the Temple-Inland Salaried Retirement Plan.  (TempleInland/Cleiland 1).  By letter dated September 12, 2006, TIN further responded to the document request enclosing SPDs for the Temple-Inland Disability Health and Welfare Plan, the Temple-Inland Group Medical Plan and the Temple-Inland Group Benefits Plan, which included the Life Insurance Plan, as well as the Certificate for Group LTD Policy FLK-020104.  (TempleInland/Cleiland 9, 11).

53.    By letter dated September 5, 2006, Plaintiff's counsel sent LINA a letter, with a copy to TIN, requesting "relevant" documents under 29 C.F.R. § 2560.503-1 which Plaintiff

---

[1] Documents produced in this litigation by TIN are bates-labeled TempleInland/Cleiland at [bates-stamp number].
*See* Affdvt of C. Cornelius at ¶ 3, Exh. 1.

enumerated as "plan documents, claim file documents, any manuals, disability guidelines, or any other documents pertaining to the guidelines under which the claim was determined, and any brochures, handbooks, employee benefit guides, pension plan documents detailing any and all benefits provided to the above referenced individuals." (TempleInland/Cleiland 2-3, AR at 522-23).

54.    By letter dated October 23, 2006, LINA sent Plaintiff a copy of the applicable LTD policy, and claims file including LINA's electronic claims diary. (AR at 346, 516-17).

55.    Plaintiff responded by letter dated October 27, 2006 acknowledging receipt of the above-mentioned documents and requesting copies of other policies, copies of information provided to the Social Security Administration from Advantage 2000 Consultants, Inc., and a copy of LINA's claims manual. (AR at 247-48).

56.    LINA responded by letter dated November 13, 2006. The letter responded to each specific request. First, with respect to policies other than the LTD policy, LINA responded "as the appeals team did not administer the Short Term Disability claim please contact Temple Inland Corporate Services for this information. In reference to the Life Insurance Policy, please contact Temple Inland Corporate Services for this information." (AR at 257). The letter continued stating that it did not possess copies of information provided to the Social Security Administration from Advantage 2000 Consultants, Inc. Lastly, LINA declined to produce its claims manual advising Plaintiff's counsel that "the information requested is considered to be confidential and proprietary information and is not intended for duplication or distribution. Furthermore, nothing contained in this requested information was solely relied upon in the determination of the above referenced claim." (*Id.*)

57.    Plaintiff's counsel then wrote two letters dated November 27, 2006.  The first letter contained Plaintiff's counsel's position that "[t]he new Department of Labor Regulations enacted in January 2002 specified the broad scope of the nature of the documents that must be produced."  (AR at 390).  The second letter of November 27, 2006, responded directly to LINA's most recent letter.  (AR at 456-57).

58.    Finally, by letter dated March 29, 2007, Plaintiff's counsel requested an updated copy of Plaintiff's claims file.  (AR at 240).  LINA copied and mailed a to-date copy of Plaintiff's claims file to counsel on April 24, 2007.  (AR at 238-39).

## III.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment when the pleadings and supporting materials demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate when Plaintiff fails to make a showing sufficient to establish the existence of an element essential to her case, and on which Plaintiff will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A plaintiff cannot defeat a properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings.  *See Anderson*, 477 U.S. at 248.  A mere "scintilla" of evidence supporting Plaintiff's position is not enough to survive summary judgment; Plaintiff must produce evidence so a jury could reasonably find for her.  *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242).

Summary judgment is especially appropriate in ERISA cases, such as this, where the Court "must determine whether the administrator (LINA) reached a reasonable and impartial decision in light of the evidence with which it was presented ... as contrasted with the typical summary judgment scenario, [and thus] it matters not that there may be conflicting evidence concerning the ultimate historical facts which underlie plaintiff's claim." *See Goodman v. S&A Restaurant Corp.*, 821 F.Supp. 1139, 1143 (S.D. Miss. 1993). As set forth herein, based upon the terms of the Policy, and the undisputed evidence that reveals the nature of Plaintiff's claims, summary judgment is due to be granted in favor of LINA.

## IV.    STANDARD AND SCOPE OF REVIEW

### A.    LINA's Claim Determination Should Be Reviewed Under The "Modified" Arbitrary And Capricious Standard.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that actions for termination of ERISA plan benefits should be judicially reviewed under the *de novo* standard "... unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115; *see Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1990) (The arbitrary and capricious standard of review is appropriate when the Plan gives the administrator some degree of discretion to construe eligibility for benefits and to interpret policy terms).

In the instant case, the Policy vests LINA with the discretionary authority to find facts and determine eligibility for benefits: **"[s]atisfactory proof** of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid." (AR at 499). In fact, substantially similar language concerning "satisfactory proof" has been held by district courts in the Eleventh Circuit to confer discretionary authority. *See, e.g., Serauskus v. Sun Life*

17

*Assurance Co. of Canada*, 205 F. Supp. 2d 1369 (N.D. Ga. 2001); *Sorrells v. Sun Life Assurance Co. of Canada*, 85 F. Supp. 2d 1221 (S.D. Ala. 2000); *Morency v. Rudnick & Wolfe Staff Group Long Term Disability Ins.*, 2001 WL 737531, *3 (M.D. Fla. Jan. 31, 2001). Indeed, the Eleventh Circuit more recently instructed that it was bound by prior precedent in holding that ERISA policy language requiring a claimant to provide "satisfactory proof" of disability to an insurance company constituted a sufficient grant of discretion to afford a deferential standard of review. *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1233-34 (11th Cir. 2006).

LINA both insures the Plan and administers claims for the Plan. The Eleventh Circuit has developed a "modified" arbitrary and capricious standard of review in an effort to account for the possible conflict of interest on the part of the plan fiduciary that both insures and decides claims under a plan. *See Brown v. Blue Cross and Blue Shield of Ala.*, 898 F.2d 1556, 1563 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991); *Torres v. Pittson Company*, 346 F.3d 1324, 1332 (11th Cir. 2003). Under the modified arbitrary and capricious standard, the first step is to determine – from the perspective of *de novo* – whether the fiduciary's factual findings were legally correct or legally wrong. If the Court determines that the findings advanced by the fiduciary are legally correct, there is no need for further consideration of a possible conflict of interest. *See HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 986 (11th Cir. 2001); *Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541 (11th Cir. 2000); *Adams v. Thiokol Corp.*, 231 F.3d 837, 843 (11th Cir. 2000); *Collins v. Amer. Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir. 1997).

For the sake of clarity and simplicity, the Eleventh Circuit has elaborated on *Brown* and its progeny by supplying a six-step test for use in judicially reviewing virtually all ERISA benefit denials:

(1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)    If there is no conflict, then end the inquiry and affirm the decision.

(6)    If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. Bellsouth*, 373 F.3d 1132, 1138 (11th Cir. 2004). Under the arbitrary and capricious standard, a "wrong" benefits determination is nevertheless entitled to deference so long as it was not "completely unreasonable." *Brown*, 898 F.2d at 1564.

As discussed in further detail *infra*, LINA's factual determination that Plaintiff did not furnish satisfactory proof of her continued disability was <u>absolutely</u> <u>correct</u> and, as such, the Court should end its inquiry at step one of the *Williams* test and affirm LINA's benefits decision. However, even if Plaintiff could somehow persuade the Court that LINA's decision was "wrong" from the perspective of *de novo* review, LINA is nevertheless entitled to summary judgment because the decision was entirely reasonable, supported by the substantial evidence of record, and neither arbitrary nor capricious.

**B.    This Court's Review Is Limited to the Administrative Record Before the Claims Administrator At the Time the Claims Decision Was Made.**

On deferential review of LINA's administrative decision, the Court must confine its analysis to the evidence that was before LINA during the administrative process. "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with the abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, **based upon the facts as known to the administrator** at the time the decision was made." *Jett v. Blue Cross and Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (emphasis added) (citations omitted). *See also Richards v. Hartford Life & Accident Ins. Co.*, 2005 WL 2888214 (11th Cir. Nov. 3, 2005); *Menard v. Hartford Life & Accident Ins. Co.*, 2007 U.S. App. LEXIS 29719, *2-3 (11th Cir. Dec. 21. 2007) (reversing and remanding case to district court where lower court considered evidence outside the administrative record at the time of the administrator's final denial decision in a case subject to a heightened arbitrary and capricious standard of review).

Accordingly, in conducting its review, this Court must limit itself to those facts before LINA at the time that its final benefits decision was made, *i.e.* – the plan documents and administrative record.

## V.  ARGUMENT

### A.  Plaintiff's 502(a)(1)(B) Claim is Due to be Dismissed.

#### 1.  LINA's Determination That Plaintiff Failed To Prove That She Continued to be "Disabled" From Any Occupation Was Legally Correct.

It is well settled law that a participant or beneficiary seeking benefits under the terms of an ERISA governed plan bears the burden of establishing that he or she is entitled to such benefits. 29 U.S.C. § 1132(a)(1)(B); *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); *see also Stiltz v. Metro. Life Ins. Co.*, 2007 U.S. App. LEXIS 12973, *12 (11th Cir. June 5, 2007); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (11th Cir. 1992);

*Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004); *Pace v. Liberty Life Assur. of Boston,* 2006 U.S. Dist. LEXIS 7702, *45 (S.D. Ala. Feb. 3, 2006) ("Under ERISA, plaintiff must prove he is entitled to benefits").   Based on the terms and conditions of the Temple-Inland Disability Health and Welfare Plan, Plaintiff here must demonstrate that she was "totally disabled" from performing <u>any</u> occupation after benefits were payable for twenty-four months.  As demonstrated below, Plaintiff simply cannot carry her burden.

      (a)      *Plaintiff Presented No Timely Objective Data, Testing or Medical Documentation to Support Her Physical Inability to Perform Any Alternative Occupation.*

The uncontroverted evidence demonstrates Plaintiff's last back and neck surgery occurred in December 2003.  (AR at 858-60).  It is further undisputed that Plaintiff's postoperative treatment was "uncomplicated" and she was discharged in "good" condition from this surgery. (AR at 860-61).  During visits with Dr. Hadley, her surgeon, two months and six months after the surgery, he noted decreased dosage in her medication and decreased back pain. (AR at 637, 644).  On the last visit of June 9, 2004, Dr. Hadley recorded that "**motor, sensory and reflex testing is quite good** in the lower extremities.  She can walk on her toes and her heels.   Radiographic studies today demonstrate intact internal fixation hardware and **good placement of fusion mass at the L4-5 level**.   There is **no malalignment**,   There is **no pathology** above or below."   (AR at 644) (emphasis added).   Although the doctor did note Plaintiff's complaints of continued leg pain, he noted Plaintiff would only need intermittent supportive care and that there was nothing "additional at present for neurosurgery to provide." (*Id.*)   Indeed, for the next two years, until Plaintiff's claim was denied in November 2005, Plaintiff obtained no additional surgical consults and underwent no physical therapy, but instead

began a prescription treatment plan of "medical management" with an anesthesiologist.  (AR at 399).[2]

   As argued above, both binding ERISA case law and the express Policy language put the burden on Plaintiff to prove, *i.e.* provide "satisfactory proof", that she continues to be disabled. Recent Eleventh Circuit case law makes clear that in such situations, "**it is implicit in the requirement of proof that the evidence be objective**."   *Watts v. Bellsouth Telecomm., Inc.*, 2007 U.S. App. LEXIS 3833, *3 (11th Cir. Feb. 22, 2007) (emphasis added).  In *Watts*, the Eleventh Circuit cited approvingly to district court opinions that lauded an implicit objective proof requirement as promoting the integrity of the claims process.  *See, i.d.*; *Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1205 (N.D. Ga. 2005) ("The requirement that a plaintiff submit objective evidence of the impact of a diagnosed disease, illness or other condition is logical and necessary … The objective-evidence requirement promotes integrity in the application of the law.  It assures claimants are treated fairly and with parity by providing that coverage decisions are not based on varying **subjective** expressions by claimants of a disease, illness or condition with which they have been diagnosed.  That is, it requires claimants to establish that the diagnosed disease, illness or condition results in an actual disability, not just a perceived one. The requirement of objective evidence also promotes integrity by assuring there is corroboration for a claimant's subjective complaints, thus deterring embellished allegations of the effect of the diagnosed malady as well as deterring fraud in the claims process.") (emphasis added); *Fick v. Metro. Life Ins. Co.*, 347 F. Supp. 2d 1271, 1286-87 (S.D. Fla. 2004) ("Case law supports the conclusion that it is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement.  Where a plan requires

---

[2] In addition, One of the doctors at the Pain Center, Dr. Nortick, admitted that as of January 2006, Plaintiff's medication had "been stable over the last few months."  (AR at 693).  In February 2006, Dr. Taylor also noted, after reviewing all of her submitted records, that no changes in treatment had occurred.  (AR at 681).

proof of continued disability, 'the very concept of proof connotes objectivity' … In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be 'meaningless because a plan administrator would have to accept all subjective claims of the participant without question.'  Furthermore, the fiduciary role of the plan administrator of scrutinizing claims, protecting the assets of a plan, and paying legitimate claims would be seriously compromised.") (citations omitted).

In good faith, LINA paid Plaintiff's claim for the first twenty-four months, representing the full duration of the own occupation period, and allowing her to recover from her prior back surgeries, the last of which occurred in December 2003.  (AR at 858-60).  LINA's claims decision cannot be disturbed when, after paying Plaintiff's claim for some two years, it determined that Plaintiff could perform at least sedentary work consistent with her past professional experience.

Thus, even accepting as true Plaintiff's complaints of pain and the imposition of some reasonable restrictions and limitations for someone who has undergone a cervical fusion (such as no heavy lifting), Plaintiff is simply not "disabled" within the meaning of the Policy.  In other words, Plaintiff has not met her burden as she presents no <u>objective</u> <u>medical</u> <u>evidence</u> corroborating her subjective symptoms.

(b)    *The Doctor's Opinions Relied on by Plaintiff are Contradictory and Do Not Speak to Her Functional Capacity.*

The evidence submitted by Plaintiff from her treating physicians also does not upset LINA's prior determination as the records and opinions contained therein are inherently contradictory.  In ERISA cases, administrators are not required to "accord special deference to the opinions of treating physicians.  Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physicians' opinion." *Black & Decker*

23

*Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *Sedjac v. Group Long-Term Disability Plan for Employees of Homeside Lending, Inc., et al.*, 348 F. Supp. 2d 1313, 1319 (M.D. Fla. 2004); *Pace v. Liberty Life Assurance of Boston*, 2006 U.S. Dist. LEXIS 7702 (S.D. Ala. Feb. 3, 2006); *Williams v. Greater Ga. Life Ins. Co.*, 2007 U.S. Dist. LEXIS 2429, *22-23 (M.D. Ala. Jan. 11, 2007). This is particularly true where the doctor's opinions merely recite Plaintiff's subjective complaints without providing any medical explanation or reference to clinical findings. *See Ethridge v. Metro. Life Ins. Co.*, 2005 US Dist. LEXIS 31259, *21-22 (M.D. Ga. Nov. 21, 2005) (affirming insurer's benefits termination decision where plaintiff presented no objective indication suggesting disability, but only her subjective complaints about back and leg pain and her doctor's conclusory and unsupported statements about her inability to work); *see also Fye v. Unisys Corp.*, 2007 U.S. Dist. LEXIS 17950, **23-25 (M.D. Fla. Mar. 14, 2007).

In particular, Dr. Wise's and Dr. Johnson's opinions of Plaintiff's functional capacity differ dramatically. First, Dr. Wise indicates that Plaintiff can sit <u>8</u> hours a day and can stand or walk for a total of <u>2</u> hours a day. He also stated that Plaintiff did <u>not</u> require bed-rest during a normal workday. (AR at 339-41). This is in stark contrast to Dr. Johnson who indicate that Plaintiff can only sit, stand or walk less than <u>1</u> hour at a time and requires <u>6-7</u> hours of bed-rest each day. (AR at 429). More importantly, neither of these doctors are orthopedists or physiologists. Although no records were submitted along with his preprinted form, it appears that Dr. Wise treats Plaintiff for diabetes, and Dr. Johnson is her family doctor.

The kind of evidence that would speak most directly to Plaintiff's ability to sit, stand and walk and need to lie down during a work day was never provided to LINA. Throughout this claim and despite the broad array of evidence collected by Plaintiff's counsel on appeal, no functional capacity evaluation was <u>ever</u> undertaken, even though Dr. Hadley, Plaintiff's last

neurosurgeon of record suggested this kind of testing should be performed to assess her ability to work. (AR at 849-50). In addition, Nurse Lynfoot indicated that no current EMG/NCV testing was on record during her claim review. (AR at 741). Dr. Mendez highlighted the absence of functional-type testing in his medical record review of March 14, 2007: "the original assessment remains unchanged because there is still no documentation of significant measured physical limitations time-concurrent with the denial date…**Examples of this could include measured range of motion limitations by inclinometry and/or lower extremity significant muscle strength deficits by manual muscle testing.**" (AR at 17) (emphasis added). The most similar type of requested testing was performed in June 2004 by Dr. Hadley who reported Plaintiff could "flex, extend, laterally bend and rotate without evidence of instability" and that her "motor, sensory and reflex testing is quite good." (AR at 644).

This lack of functional testing is also noticeably absent from the vocational opinion prepared by Plaintiff's retained consultant. The consultant issued Plaintiff a 100% disability rating <u>without</u> evaluating her in person, <u>without</u> results from a FCE and <u>without</u> verifying the effect of Plaintiff's pain medication on her ability to function. (AR at 383). He even indicated that she had "cognitive deficits" <u>without</u> the benefit of aptitude or intelligence testing. Further, while several of Plaintiff's physicians describe the potential effects that medication may have on her ability to concentrate, no evaluation or testing demonstrates Plaintiff's individual experience on her prescribed medications. Even Dr. Herrick conceded that the medication's effects can vary from person to person and that it is quite possible that someone can take these medications and be of "clear enough mind to function." (AR at 405).

As the record reflects no other corroborating medical evidence or findings, Plaintiff's doctors' opinions she is disabled must be derived from Plaintiff's own subjective reports about

her chronic pain. *See e.g., Pace v. Liberty Life Assur. of Boston*, 2006 U.S. Dist. LEXIS 7702, *54-55 (Feb. 3. 2006) (finding plaintiff did not meet burden to show entitlement to benefits in part where doctor's records primarily documented plaintiff's subjective complaints instead of providing significant objective findings); *Archible v. Metro. Life Ins. Co.*, 85 F. Supp. 2d 1203, 1220 (S.D. Ala. 2000) (acknowledging that disability cannot be established by relying on a physician's opinion when that opinion is based on the claimant's subjective complaints rather than objective findings.) "Disability" is a defined term in the Policy that is not established or satisfied by a mere diagnosis of failed back syndrome or complaints of discomfort or pain. *See Stiltz v. Metro. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 65394, *34 (N.D. Ga. Aug. 30, 2006) *aff'd by* 2007 U.S. App. LEXIS 12973 (11th Cir. June 5, 2007). The contradictory opinions from Plaintiff's treating physicians are thus insufficient to establish that Plaintiff was unable to perform the duties of <u>any</u> occupation.

While Dr. Herrick admitted that Plaintiff "still functions to some degree" and Plaintiff even admitted she was able to drive up to 50 miles at one time, it is clear that Plaintiff retains some degree of functional capacity. (AR at 402-03, 790). Without objective data shedding light on her physical capacity, Plaintiff has failed to carry her burden of demonstrating that she was continuously "disabled" from all occupations as of the fall of 2005. Therefore, LINA's decision to deny continued benefits was correct and, as such, should not be disturbed by this Court.

2.    <u>LINA's Decision to Deny Plaintiff's LTD Benefits Was Not Arbitrary and Capricious</u>.

Even assuming, for the purposes of argument, that LINA's decision is found to be legally incorrect, LINA would still be entitled to summary judgment so long as the decision was not arbitrary and capricious. *Brown*, 898 F.2d 1556 at 1570. A conflicted ERISA administrator can show its decision was not tainted with self-interest by "demonstrating that it chose to follow

what it reasonably perceived as equally or more objectively reliable data in denying a claimant benefits." *Wise v. Hartford Life and Accident Ins. Co.*, 403 F. Supp. 2d 1266 (N.D. Ga. 2005); *see also Muzyka v. Unum Life Ins. Co. of Am.*, 2006 U.S. App. LEXIS 23452, *17 (11th Cir. Sept. 13, 2006) (determining Plaintiff's contention insurer's investigation process was tainted by self-interest could be refuted by record); *Fye*, 2007 U.S. Dist. LEXIS 17950, *28.  As detailed above, LINA's determination that Plaintiff failed to demonstrate that she was totally disabled from any occupation is supported by the governing case law and the lack of objectively reliable medical evidence contained in the administrative record.  Plaintiff cannot meet her burden by relying solely on physicians' opinions that in turn were based solely on Plaintiff's subjective complaints.  *Pace*, 2006 U.S. Dist. LEXIS 7702, *54-55;  *see also Muzyka*, 2006 U.S. App. LEXIS 23452 at *13 (finding plaintiff's diagnoses not supported by record when questionnaires completed by physician contained only self-reported symptoms and limitations not supported or corroborated by other evidence in the record).  Despite the fact Plaintiff was given multiple opportunities to submit additional evidence in support of her claim, including LINA's acceptance of a second voluntary appeal, the insurer was provided with no relevant evidence addressing her functional capacity in the fall of 2005 to suggest disability under the Policy.  For all the reasons addressed above, it is beyond a doubt that LINA had at least a "reasonable basis" for determining that Plaintiff failed to provide adequate proof that she was "disabled" from any occupation as that term is defined in the Policy.

Moreover, Plaintiff has not, because she cannot, offered any evidence that LINA's decision was tainted by self-interest. *Brown,* 898 F.2d at 1564.  Here, LINA's decision was not only legally correct, but benefited all of the participants and beneficiaries of the Plan.  *Id*. at 1566-67.  Indeed, as the claims administrator of the Plan, LINA is charged not only with giving

fair consideration to the Plaintiff, but also with being fair and equitable to all Plan participants by guarding the Plan's assets from improper claims. *See Adams v. Thiokol Corp.*, 231 F.3d 837, 845-846 (11th Cir. 2000) ("One of the primary goals of an ERISA plan should be the protection of the employees' interests...However, an ERISA plan administrator is required to administer a plan 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of ERISA.'") (citations omitted).

The denial of Plaintiff's claim for benefits actually benefits the Plan as a whole as benefits will be maximized for participants who are disabled. Again, even if this Court would have reached a different conclusion, LINA's decision must be upheld it if falls somewhere on a continuum of reasonableness. Consequently, summary judgment should be entered in favor of LINA.

### B.    Plaintiff's 502(c) Claim is Due to be Dismissed Against Both TIN and LINA.

Count II of Plaintiff's Complaint asserts a penalty claim under 29 U.S.C. § 1132(c)(1) against LINA and TIN for failure to produce requested documents. Pursuant to this statute, "any <u>administrator</u> who fails or refuses to comply with a request for any information which such administrator is <u>required by this subchapter to furnish</u> to a participant or a beneficiary …may in the court's discretion be personally liable to such participant or beneficiary …" (emphasis added).

### 1.    The Requested Documents Are Not Required to Be Produced.

The undisputed evidence demonstrates that both LINA and TIN substantially complied with Plaintiff's document requests as required by ERISA and case law interpreting the statute. First, the record reflects at least four separate document productions on the part of LINA and TIN. (AR at 238-39, 346, 516-17; TempleInland/Cleiland at 1, 9, 11). There is no allegation in Plaintiff's Complaint that TIN failed to produce any requested documents. Indeed, the record

clearly demonstrates TIN's complete responses to each request. (TempleInland/Cleiland at 1, 9, 11). Therefore, as an initial matter, this Count should be summarily dismissed against TIN.

In addition, even when LINA was not in possession of or objected to certain requests made by Plaintiff's counsel, it timely responded to Plaintiff's written request. (AR at 257). The only documents to which Plaintiff can legitimately argue were not provided to her are: the claims manual and documents in the possession of a third party, Advantage 2000 Consultants, Inc. Section 1024 specifies which documents that a plan administrator must furnish to a participants upon request: "the latest summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Because § 1132(c) only permits penalties to be assessed for a failure to produce documents required by "this subchapter," Defendants' failure to produce the claims file and documents in the possession of third parties is not actionable. *See Sahlie v. Nolan*, 984 F. Supp. 1389, 1402 (M.D. Ala. 1997).

Plaintiff's only choice to salvage her penalty claim is to attempt to broaden the meaning of "other instruments under which the plan is operated" to encompass its requested documents. The "other instruments" provision of § 1024(b)(4) has been held to only apply to those formal legal documents which govern a plan. *See Faircloth v. Lundy Packaging Co.*, 91 F.3d 648, 652-54 (4th Cir. 1996); *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142-45 (2d Cir. 1997); *Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003); *Ames v. Am. Nat. Can Co.*, 170 F.3d 751, 758-59 (7th Cir. 1999); *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 861-62 (8th Cir. 1999); *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 59-60 (1st Cir. 1999). The *Faircloth* court examined the statutory construction of § 1024(b)(4) and concluded that "Congress used language limiting

§ 1024(b)(4) to 'instruments under which the plan is established or operated,'" so "the clear and unambiguous meaning of this statutory language encompasses only formal or legal documents under which a plan is set up or managed." *Id.* at 654. This interpretation was approved by the Eleventh Circuit in *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1274 n.8 (11th Cir. 2005). Under this Circuit's limited construction of the scope of § 1024(b)(4), the documents Plaintiff alleges were not produced are not "formal documents" under which the plan is established, but rather claims-related documents that <u>may</u> apply to her particular claim.

More recently, several district courts within the Eleventh Circuit have followed the traditional view that penalty provisions are required to be strictly construed. *Ferree v. Life Insurance Company of North America*, 2006 WL 2067033, **3, 8 (N.D. Ga. Jul. 17, 2006); *Disanto v. Wells Fargo & Co., et al.*, 2007 U.S. Dist. LEXIS 62781, *45-50 (M.D. Fla. Aug. 23, 2007) ("Section 1132(c) does not authorize penalties in connection with any and all types of information requested by the participant; rather, it refers specifically to a plan administrator's 'failure to or refusal to provide the documents identified in Section 1024'."); *Moody v. P. Michael Skaliy, M.D., et al.*, 2007 U.S. Dist. LEXIS 22307, *27-29 (N.D. Ga. Mar. 27, 2007) (rejecting plaintiff's broad interpretation of § 1024 which included documents not specifically enumerated in the subsection and concluding that a request for "any documents that affect a participant's rights or benefits under a plan" did not support a claim for statutory penalties under ERISA). In *Ferree*, the plaintiff similarly sought to impose ERISA statutory penalties for failure to produce "procedures and guidelines pertaining to the handling, evaluation and approval or denial of disability claims including CIGNA/LINA's claims manuals…" as well as "reports from Advantage 2000…" *Id.* at **3,8. First, the court in *Ferree* rejected the plaintiff's attempts to impose penalties for a failure to produce documents not set out in § 1024(b). Then, the court

rejected the plaintiff's claim, the same claim that Plaintiff alleges in her Complaint (¶¶ 96-98),that defendants are liable for failing to produce certain documents as required under Department of Labor regulation 29 C.F.R. §2560.503-1 (h)(2)(iii) on the basis that this regulation does not provide for strict liability for violation of the regulation and does not impose a per-diem fine. *Id.* at *16. Thus, the case law in this Circuit clearly establishes that LINA's failure to produce the few documents that Plaintiff requested and did not receive is not actionable under § 1132(c).

2.    <u>Even if The Requested Documents Were Required to Be Produced, Liability Cannot Attach to LINA</u>.

Even if this Court concludes that the failure to produce claims-related documents specific to Plaintiff's claim, beyond those previously produced, is actionable under § 1132(c)(1), the penalty provision is not applicable to LINA in this instance. The penalty provision, by its own express terms, is applicable only to administrators named by the plan or operation of law. Indeed, § 1024(b)(4) of ERISA provides that "the **administrator** shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract or other instruments under which the plan is established or operated." This section of ERISA makes <u>only</u> plan administrators responsible for providing certain documents and information upon request by plan participants and beneficiaries. *Adair v. Johnston, et al.*, 221 F.R.D. 573, 580 (M.D. Ala. 2004).

Similarly, § 1132(c)(1)(B) states that "any **administrator** who fails or refuses to comply with a request for any information which such **administrator** is required by this subchapter to furnish … may in the court's discretion be personally liable …" Thus, consistent with the clear language of § 1024(b), <u>only</u> plan administrators can be liable for failure to comply with these

31

production requirements. *Adair, id.*; *see also Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.7 (1985).

It is undisputed that TIN, Inc. is the Plan Administrator for the Temple Inland Long-Term Disability Plan. *See* Plaintiff's Complaint at ¶ 16. Therefore, LINA cannot be liable under Count II of Plaintiff's Complaint. For this additional reason, Defendants are due a judgment as a matter of law on Count II of Plaintiff's Complaint.

### C.    Plaintiff's Equitable Estoppel Claim Fails as a Matter of Law.

Contrary to Plaintiff's allegations in Count III of her Complaint, the federal common law of equitable estoppel is unavailable to Plaintiff because ERISA preempts that body of law in cases involving oral amendments or modifications of employee plans governed by ERISA. *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir. 1990); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 666 (11th Cir. 1990).

While this Circuit has created a very narrow common law doctrine under ERISA for an equitable estoppel claim in the context of an (a)(1)(B) claim, in order to present such a claim Plaintiffs must show that (1) the provisions of the LTD Plan are ambiguous and (2) representations were made to Plaintiff which constitute an oral interpretation of the ambiguity. *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994) (citing *Kane*, 893 F.2d at 1285-86).

In this case, Plaintiff has not identified any ambiguities in the relevant provisions of the Policy or Plan documents and the Court can consider the terms for itself. Indeed, all of the allegations under Count III of Plaintiff's Complaint concern Advantage 2000 Consultants, Inc., a third party who LINA retained to assist Plaintiff in obtaining Social Security Disability Benefits;

none concern ambiguities in the Plan or oral representations of Plan provisions.[3]  *See* Compl. at ¶¶ 101-107.  Therefore, Plaintiffs cannot make out a prima facie case for equitable estoppel and Defendants are due the entry of summary judgment on this claim for equitable relief.  *See Wright v. Aetna Life Ins. Co.*, 110 F.3d 762, 764 (11th Cir. 1997) ("Since the plan document was unambiguous, there was no need to consider outside communications to glean the parties' intent."); *Katz*, 197 F.3d at 1090-91 (11th Cir. 1999).

In addition, any attempt by Plaintiff to bind LINA's independent claims decision under the Policy by a disability determination made by the Social Security Administration is also contrary to prevailing case law authority that recognizes distinct differences between private coverage and the government program.  Courts have widely recognized that the criteria for determining eligibility for social security disability benefits are substantially different from the standard established by most insurance plans.  *See, e.g., Pari-Fasano v. ITT Hartford*, 230 F.3d 415 (1st Cir. 2000).  Accordingly, although LINA did consider the Social Security award along with all other evidence presented, evidence of an award of disability benefits by the Social Security Administration has no binding effect on a plan's decision to discontinue benefits.  *Id.*; *Whatley v. CNA Ins.*, 189 F.3d 1310 (11th Cir. 1999); *Paramore v. Delta Air Lines*, 129 F.3d 1446 (11th Cir. 1997); *Wilcox v. Std. Ins. Co.*, 340 F. Supp. 2d 1266, 1281 (N.D. Ala. 2004); *Nixon v. Life Ins. Co. of N. Am.*, 130 F. Supp. 2d  1279, 1293 (M.D. Ala. 2001).

Absent both (1) an ambiguous Plan provision and (2) oral representations interpreting that ambiguous interpretation, Plaintiffs' claims for equitable estoppel under ERISA fail as a

---

[3] Plaintiff also makes no allegations concerning written representations.  Any such allegations would be inconsequential, however, since under ERISA, informal documents, like a letter, that contradict or are inconsistent with the Plan or a Summary Plan Description "must be ignored."  *Alday v. Container Corp. of Am.*, 906 F.2d 660, 665-66 (11th Cir. 1990).

matter of law.  *See Conner v. Bayfront Health Sys.*, 2007 U.S. Dist. LEXIS 4346, *8 (M.D. Fla. Jan. 22, 2007).

## VI.    CONCLUSION

Based on evidence presented to this Court, LINA's decision to deny Plaintiff's claim for continuing long-term disability benefits was correct and, at the very least, reasonable, and not motivated by any self-interest.  It is also abundantly clear that Plaintiff's ERISA penalty claim and equitable estoppel claims must fail as a matter of law.  Accordingly, summary judgment should be entered in favor of Defendants.


Respectfully submitted this 8th day of February, 2008.


                                                  s/ Grace Robinson Murphy_____
                                                  William B. Wahlheim, Jr.
                                                  John David Collins
                                                  Grace Robinson Murphy
                                                  Attorneys for Defendants
                                                  Life Insurance Company of North America,
                                                  Temple Inland Disability Health and
                                                  Welfare Plan and TIN, Inc.


**OF COUNSEL**:
MAYNARD, COOPER AND GALE, P.C.
1901 6th Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
(205) 254-1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2008 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Thomas O. Sinclair
Jenifer Champ Wallis


s/ Grace Robinson Murphy._____
OF COUNSEL